1 BLECHER COLLINS PEPPERMAN & JOYE, P.C.
Maxwell M. Blecher (State Bar No. 26202)
2 mblecher@blechercollins.com
515 South Figueroa Street, Suite 1750
3 Los Angeles, California 90071-3334
Telephone: (213) 622-4222
4 Facsimile: (213) 622-1656

5 SAMINI SCHEINBERG PC
Bobby Samini (State Bar. No. 181796)
6 bsamini@saminilaw.com
949 South Coast Drive, Suite 420
7 Costa Mesa, California 92626
Tel: (949) 333.7203
8 Fax: (949) 724.0901

9 Attorneys for Plaintiffs
DONALD T. STERLING and
10 THE STERLING FAMILY TRUST



FILED
CLERK, U.S. DISTRICT COURT

MAY 3 0 2014

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

11              UNITED STATES DISTRICT COURT

12      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

13

14 DONALD T. STERLING, an              Case No. CV14-4192 FMO-SHx
individual, and THE STERLING
15 FAMILY TRUST,                       **COMPLAINT FOR DAMAGES:**

16          Plaintiffs,               1.   **VIOLATIONS FOR DENIAL
                                            OF CONSTITUTIONAL
17      vs.                                 RIGHTS;**

18 NATIONAL BASKETBALL             2.   **BREACH OF CONTRACT;**
ASSOCIATION, a New York
19 professional association; ADAM   3.   **ANTITRUST VIOLATIONS;**
SILVER, an individual; and DOES 1
20 through 10,                      4.   **CONVERSION; AND**

21          Defendants.            5.   **BREACH OF FIDUCIARY
                                            DUTY**
22
                                       **DEMAND FOR JURY TRIAL**
23

24

25

26

27

28

Blecher Collins
Pepperman & Joye

1    Plaintiffs Donald T. Sterling and The Sterling Family Trust (collectively
2  "Plaintiffs") complain against Defendants, and each of them, as follows:

3                                   **PARTIES**

4    1.    Plaintiff Donald T. Sterling ("Sterling") is, and at all times herein
5  mentioned was, a resident of Los Angeles County, State of California.

6    2.    Plaintiff The Sterling Family Trust is the sole shareholder of LAC
7  Basketball Club, Inc. ("Los Angeles Clippers"), a California corporation with its
8  principal place of business in Los Angeles, California.  Sterling is a co-trustee of the
9  Sterling Family Trust and co-owner of the Los Angeles Clippers with his estranged
10 wife, Rochelle ("Shelly") Sterling.

11   3.    Defendant National Basketball Association ("NBA") is, and at all times
12 herein mentioned was, a professional association of basketball teams with thirty
13 franchised members.  The principal place of business for the NBA is New York,
14 New York, but the NBA transacts business within the Central District of California.

15   4.    Defendant Adam Silver ("Silver") is, and at all times herein mentioned
16 was, the Commissioner of the NBA.  Silver is employed at the NBA offices in New
17 York, New York, but Silver transacts NBA business within the Central District of
18 California.

19   5.    Plaintiffs are ignorant of the true names and capacities of Defendants
20 sued herein as DOES 1 through 50, and therefore sues Defendants by such fictitious
21 names.  Plaintiffs will amend this complaint to allege their true names and capacities
22 when ascertained.  Plaintiffs are informed and believe, and, based on such
23 information and belief, allege each of the fictitiously named Defendants is
24 responsible in some manner for the injuries to Plaintiffs alleged herein.  Plaintiffs
25 further allege that their injuries were proximately caused by such Defendants, and
26 each of them.

27   6.    Plaintiffs allege that each of the Defendants was the agent, employee,
28 director, officer, member, partner, joint venturer, owner shareholder, principal,

Blecher Collins
Pepperman & Joye

-1-

1  successor, or predecessor in interest of the remaining Defendants.  In doing the
2  things alleged below, each Defendant was acting within the course and scope of his
3  agency, employment, directorship, capacity as an officer, member, partner, joint
4  venturer, owner, shareholder, principal, successor, or predecessor in interest of the
5  remaining Defendants.  Plaintiffs further allege that the acts and conduct attributed
6  to each Defendant were approved, ratified, authorized, and known to the remaining
7  Defendants, and each of them.

8  ## STATEMENT OF THE CASE

9      7.    Sterling is the longest-tenured owner in the NBA.  Sterling purchased
10  the Clippers in 1981 when they played their home games in San Diego, California.
11  Sterling moved the Clippers franchise to Los Angeles, California in 1984.  In 2005,
12  Sterling transferred the Los Angeles Clippers to the Sterling Family Trust.

13      8.    On or about April 25, 2014, the gossip website TMZ posted an
14  audiotape of a private conversation between Sterling and his lover, Ms. V. Stiviano
15  ("Stiviano").

16      9.    The conversation that TMZ leaked between Sterling and Stiviano took
17  place in Stiviano's living room.  Unbeknownst to Sterling at the time, Stiviano was
18  surreptitiously recording their conversation. California Penal Code section 632
19  criminalizes the act of recording an individual without their consent.  This right
20  flows from the California Constitution's right-to-privacy guarantee.  Sterling had a
21  reasonable expectation of privacy during the personal conversation in Stiviano's
22  living room, was not informed it was being recorded, and did not consent to Stiviano
23  recording the confidential conversation.

24      10.    The impetus for the conversation in question was Stiviano telling
25  Sterling that she was going to bring "four gorgeous black guys" to a Clippers game.
26  During the illegally recorded conversation, Sterling, in a jealous moment, asked
27  Stiviano, who is half African-American, not to bring "black people" to Clippers
28

*Blecher Collins*
*Pepperman & Joye*

1  games and to refrain from posting pictures of herself with "black people" on

2  Instagram.

3      11.    The release of the illicit audiotape by TMZ prompted a predictable

4  public backlash.  On or about April 29, 2014, after a less than three-day

5  "investigation" and in direct response to the illicit audiotape, Silver issued draconian

6  sanctions against Sterling.  Silver fined Sterling $2.5 million and imposed a lifetime

7  ban against Sterling's involvement with the operation or management of the

8  Clippers and even barred him from attending any NBA game. As Silver stated, this

9  was the most severe penalty that he could lawfully impose under the NBA

10  Constitution. Silver also announced that a vote would be conducted by the NBA

11  Board of Governors on June 3, 2014 to force Sterling to sell the Los Angeles

12  Clippers and stated that he urged the Board of Governors to take such an action.

13      12.    On May 19, 2014, Silver served a formal written charge on Sterling.

14  The charge is based entirely or almost entirely on the illegal Stiviano recording.

15  (Charge, Ex. 1 attached hereto, exhibits and additional evidence omitted).  The

16  charge contains six counts that allegedly provide a basis for the NBA Board of

17  Governors to terminate Plaintiffs' ownership in the Los Angeles Clippers.

18      13.    Incredibly, despite the clear and precise language of California Penal

19  Code section 632(d)—which states that "Except as proof in an action or prosecution

20  for violation of this section, *no evidence obtained a result of* . . . recording a

21  confidential communication in violation of this section shall be admissible in any

22  judicial, administrative, legislative, *or other proceeding*," (emphasis added)—in

23  their proceeding against Plaintiffs, Defendants rely almost entirely on an

24  inadmissible transcript of the illegally recorded conversation and other evidence

25  flowing directly from the conversation.

26      14.    On May 20, 2014, Commissioner Silver stated during a press

27  conference: "Mr. Sterling still owns the Los Angeles Clippers.  Mrs. Sterling, as I

28  understand it, through a trust owns 50 percent of the team as well.  It is their team to

Blecher Collins
Pepperman & Joye

1  sell, and so he [Mr. Sterling] knows what the league's point of view is, and so I'm

2  sure if he wanted to sell the team on some reasonable timetable, I'd prefer he sell it

3  than we go through this process."

4      15.    In an attempt to comply with Commissioner Silver's May 20, 2014

5  directive, on May 22, 2014, Mr. Sterling's lawyer Doug Walton wrote a letter to the

6  NBA stating: "As you know, I have been a long-time attorney for Donald T.

7  Sterling.  Mr. Sterling agrees to the sale of his interest in the Los Angeles Clippers.

8  This letter confirms that Donald T. Sterling authorizes Rochelle Sterling to negotiate

9  with the National Basketball Association regarding all issues in connection with a

10  sale of the Los Angeles Clippers team, owned by LAC Basketball Club, Inc."  (Ex.

11  2 attached hereto.)

12      16.    In a further attempt to comply with Commissioner Silver's May 20

13  directive, Rochelle Sterling retained Bank of America, and with her attorney Pierce

14  O'Donnell, has been proceeding forward with the sale process, meeting with various

15  prospective buyers and buyer groups, including Steve Ballmer, former Microsoft

16  CEO.

17      17.    On May 27, 2014, Sterling submitted his response to the charge.

18  (Answer to Charge, Ex. 3 attached hereto.)

19      18.    On May 27, 2014, Rochelle Sterling submitted her response to the

20  charge.

21      19.    On May 27, 2014, Mike Bass, Executive Vice President,

22  Communications issued the following statement on behalf of the NBA: "This

23  evening, the NBA received separate responses from lawyers representing Donald

24  and Shelly Sterling to the charge to terminate their ownership interests in the Los

25  Angeles Clippers.  These materials, together with the charge, will be distributed to

26  the NBA Board of Governors, who will meet on June 3, 2014 at 1 p.m. in New York

27  City to hear and vote upon this matter.  Should the Board vote to sustain the charge,

28  the Sterlings' interests in the Clippers will be terminated and the team will be sold."

Blecher Collins
Pepperman & Joye

-4-

20.    In accordance with Commissioner Silver's request to terminate Plaintiffs' ownership in the Los Angeles Clippers, the NBA Board of Governors will vote on June 3, 2014.

21.    Given multiple media reports, it is expected that the Board of Governors will unanimously approve Silver's request to terminate Plaintiffs' ownership in the Los Angeles Clippers despite the fact the basis for the charge is unconstitutional, in breach of contract, in restraint of trade, in breach of fiduciary duties, and is malicious and oppressive.

22.    The NBA has left Sterling no alternative but to file this Complaint and seek a temporary restraining order. Even though Rochelle Sterling has been accepting bids in order to sell the Los Angeles Clippers, the NBA refuses to postpone the June 3, 2014 termination hearing and vote, and in doing so, the NBA will irreparably harm Plaintiffs. On May 28, 2014, the NBA's General Counsel informed Sterling's counsel that the termination hearing was going forward.

23.    On May 29, 2014, it was announced that Shelly Sterling and the Sterling Family Trust reached an agreement with former Microsoft Chief Executive Officer Steven Ballmer regarding the purchase and sale of the Los Angeles Clippers for $2 billion.

24.    On May 30, 2014, Shelly Sterling informed Sterling that the June 3, 2014 was cancelled or was going to be cancelled. That same day, Plaintiffs' counsel emailed the NBA's General Counsel asking if the June 3, 2014 hearing regarding the termination of the Sterlings' ownership was cancelled. As of 1:30 p.m. Pacific Standard Time, Plaintiffs' counsel received no response, and at approximately 10:52 a.m. on May 30, the Los Angeles Times reported that the June 3, 2014 hearing was going to proceed as scheduled.

///
///
///

**Blecher Collins Pepperman & Joye**

## JURISDICTION AND VENUE

25.     The United States District Court for the Central District of California has federal question subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 15.  Venue is proper under 28 U.S.C. § 1391.

## FIRST CLAIM FOR RELIEF

### Violation of Plaintiff's Rights Under California Constitution

### (against all Defendants)

26.     Plaintiffs incorporate by reference paragraphs 1-25 with the same force and effect as though repeated in full herein.

27.     California Penal Code section 632(a) criminalizes the recording of a speaker's confidential communication without the consent of the person being recorded.  California Penal Code section 632(d) provides that "no evidence obtained as a result of . . . recording a confidential communication in violation of this section shall be admissible in any judicial, administrative, legislative or other proceeding."  The Ninth Circuit has construed this provision to embody "a state substantive interest in the privacy of California citizens from exposure of their confidential conversations to third parties."  Multiple cases have held that these rights derive directly from the guarantee of the right to privacy contained in the California Constitution.  *Feldman v. Allstate Insurance Co.*, 322 F. 3d 660, 667 (9th Cir. 2003); *Rattray v. City of National City*, 51 F. 3d 793, 797 (9th Cir. 1994).  In short, Penal Code section 632(d), which precludes the use of such a recording, is more than a rule of evidence—it rises to the level of guaranteeing a constitutional protection.

28.     The "Charge" filed by the NBA against Sterling is based "solely" on the illegal Stiviano recording and events flowing from the illegal recording's disclosure to the public.  The NBA General Counsel's letter to Maxwell M. Blecher dated May 19, 2014 admits as such.  (*See* Ex. 4 attached hereto ("The Charge is based solely on a recording that Mr. Sterling admits is authentic and events directly

1   related thereto.")).  All the claimed adverse effects to the NBA flow from the illegal

2   recording.  (*See* Charge, Ex. 1 ¶¶ 27-54).  Accordingly, this entire proceeding

3   violates substantive constitutional rights afforded Mr. Sterling by the California

4   Constitution and should be immediately terminated forthwith.

### SECOND CLAIM FOR RELIEF

#### Breach of Contract

#### (against all Defendants)

8       29.    Plaintiffs incorporate by reference paragraphs 1-28 with the same force

9   and effect as though repeated in full herein.

10       30.    The NBA Constitution and By-Laws are defined as "a contract among

11   the Members of the Association."  (*See* Constitution and By-Laws of the National

12   Basketball Association, dated May 29, 2012, Ex. 5 attached hereto.)

13       31.    On April 29, 2014, Defendant Silver: (a) levied a $2.5 million fine

14   against Sterling; (b) banned Sterling's participation as an owner "for life"; and (3)

15   initiated the process to force Plaintiffs to sell the Los Angeles Clippers.  Because

16   none are authorized under the NBA Constitution and By-Laws, each of these acts,

17   individually and cumulatively, offend the NBA Constitution and By-Laws.

18   Accordingly, Sterling requests that the Court to vacate each of the sanctions ordered

19   by Defendant Silver for the reasons set forth below:

20           a.    Plaintiff Sterling did not commit any act that violated the NBA

21   Constitution and By-Laws authorizing any fine or ban at all.  But even if his private,

22   illegally recorded speech is considered an act offending the NBA Constitution and

23   By-Laws, then the Commissioner (Defendant Silver) exceeded the scope of

24   permissible punishment.  Under the NBA Constitution, the maximum allowable fine

25   in these circumstances would be $1,000,000, not $2,500,000.  Further, when this

26   excessive fine is coupled with the "ban for life," the punishment is capricious,

27   arbitrary, unreasonable, and grossly discriminatory compared with similar "speech"

28   offenses.  For example, despite threats of boycotts from the LGBT community, the

*Blecher Collins Pepperman & Joye*

1  NBA ignored an owner who has made highly controversial comments about

2  individuals with HIV/AIDS and has donated a substantial amount of money to anti-

3  homosexual causes.  Similarly,  Kobe Bryant was fined $100,000 (but not

4  suspended) for calling a referee *during a televised game* a "fucking faggot."  The

5  NBA did not fine or suspend Shaquille O'Neal for mocking a disabled individual on

6  Instagram and for making multiple racist comments about Asian players on

7  television.  While there are several other similar examples, Sterling's punishment is

8  far and away the most severe ever imposed by an NBA Commissioner for *any*

9  conduct.

10          b.        Sterling violated no provision of Article 13 of the constitution,

11 which expressly sets forth the bases for termination of ownership.  Therefore, there

12 is no basis for invoking proceedings to terminate Sterling's ownership of the Los

13 Angeles Clippers.

14          c.        The NBA gave Sterling five business days to respond to the

15 extensive allegations of the charge and the approximately 1,000 pages of exhibits,

16 declarations, reports, and surveys submitted by the NBA in support of its "Charge."

17 The NBA flatly denied Sterling's request for an extension of time, and Silver stated

18 on television that no extension would be provided. The lack of any extension

19 precluded, among other things, interviewing the declarants and other witnesses,

20 gathering documents, and preparing counter expert surveys.  Furthermore, Sterling

21 was locked out of his office at the Staples Center, where he keeps all of his files

22 related to the team.  He was forced to rely on Defendants' evidence alone in

23 defending himself.  Accordingly, Sterling has been denied the protections which he

24 should have been afforded under the "fair procedure" doctrine applicable to such

25 matters.

26          32.    In levying the $2,500,000 fine against Sterling, in banning Sterling "for

27 life," and in implementing procedures to force a sale of the Los Angeles Clippers,

28

Blecher Collins
Pepperman & Joye

1    Defendants Silver and the NBA breached the NBA Constitution and By-Laws vis-à-

2    vis Plaintiff Sterling. Those acts should be enjoined by the Court.

### THIRD CLAIM FOR RELIEF

#### Violation of the Antitrust Laws Under Sherman Act § 1

#### (against all Defendants)

6        33.    Plaintiffs incorporate by reference paragraphs 1-32 with the same force

7    and effect as though repeated in full herein.

8        34.    The ownership interest in NBA teams is the relevant product market

9    that is threatened and affected here by the Silver/NBA concerted conduct to

10    terminate Plaintiffs' ownership of the Los Angeles Clippers. *Sullivan v. National*

11    *Football League*, 34 F.3d 1091 (1st Cir. 1994).

12        35.    The relevant geographic market is the United States, and alternatively,

13    Southern California.

14        36.    Competition exists for ownership of NBA franchises. The Los Angeles

15    market area is uniquely one of the most valuable of those franchises. In a free

16    market, unfettered by the NBA, Plaintiffs would be free to (a) retain or (b) sell the

17    franchise on terms acceptable to them.

18        37.    Silver and the competing NBA owners' collective decision to force a

19    sale of the Los Angeles Clippers not only deprives Plaintiffs of that choice

20    guaranteed under the antitrust laws but will also compromise the competitive

21    process for acquiring club ownership. Moreover, the "forced sale" process involves

22    the unfettered subjective discretion of Sterling's direct competitors who each stand

23    to gain financially from Sterling's exclusion from the market. Antitrust law does

24    not entrust such decision-making to the collective action of competitors. *Jane*

25    *Blalock v. Ladies Professional Golf Association*, 359 F. Supp. 1260 (N.D. Ga.

26    1973).

27        38.    The forced sale of the Los Angeles Clippers threatens not only to

28    produce a lower price than a non-forced sale, but more importantly, it injures

Blecher Collins
Pepperman & Joye

-9-

competition and creates antitrust injury by making the relevant market unresponsive to consumer preference and to the operation of the free market, *Sullivan*, 34 F.3d at 1101.

39.     Plaintiffs are informed and believe that the NBA's forced sale of the Los Angeles Clippers would create damages of at least $1 billion, which includes capital gains taxes, unnecessary and increased investment-banking fees, legal and transactional costs, and the loss of all future appreciation in the Los Angeles Clippers franchise value, before trebling.

### FOURTH CLAIM FOR RELIEF

### Conversion

### (against all Defendants)

40.     Plaintiffs incorporate by reference paragraphs 1-39 with the same force and effect as though repeated in full herein.

41.     Defendants' decision to force the sale of the Los Angeles Clippers and terminate Plaintiffs' ownership interest constitutes an actual and substantial interference with Plaintiffs' proprietary rights.

42.     Plaintiffs are informed and believe that Defendants' conduct is intentional, willful, malicious, and in conscious disregard of Plaintiffs' property rights.  Accordingly, Plaintiffs respectfully request that the Court award punitive damages against Defendants to punish their wrongful conduct and deter it from occurring again.

### FIFTH CLAIM FOR RELIEF

### Breach of Fiduciary Duties

### (against all Defendants)

43.     Plaintiffs incorporate by reference paragraphs 1-43 with the same force and effect as though repeated in full herein.

44.     Defendants Silver and the NBA, through its Board of Governors, are in a special relationship with Sterling, the Sterling Family Trust, or both, in that

Blecher Collins Pepperman & Joye

1  Defendants owe these Plaintiffs, as owners of the Los Angeles Clippers, fiduciary
2  duties, including duties of loyalty, cooperation, good faith and fair dealing, and the
3  exercise of due care.

4      45.    By bringing charges against Sterling that violate his constitutional
5  rights, by imposing unreasonably harsh and unprecedented penalties
6  disproportionate to the alleged offense and to the offenses of others, by conducting
7  an inadequate investigation, and by expressly denying Plaintiffs an adequate
8  opportunity to fully prepare to defend themselves, Defendants have breached their
9  fiduciary duties to Plaintiffs, and each of them.

10     46.    Because of the willful and malicious nature of the conduct described
11 above, Plaintiffs request that the Court award punitive damages against Defendants,
12 and each of them, to punish their wrongful conduct and deter it from occurring
13 again.

14                        **PRAYER FOR RELIEF**

15     WHEREFORE, Plaintiffs Donald T. Sterling and The Sterling Family Trust,
16 pray for the following relief against Defendants National Basketball Association and
17 Adam Silver:

18     1.    On Claim One, Plaintiffs' actual damages, which exceed $1 billion,
19 plus costs, reasonable attorney's fees, and injunctive relief, which includes
20 eliminating the lifetime ban, eliminating the $2.5 million fine, the reinstatement of
21 the longtime Chief Executive Officer of the Clippers, Andy Roeser, the removal of
22 the interim Chief Executive Officer, Richard Parsons, and the termination of the
23 NBA's proceedings to strip Donald Sterling and the Sterling Family Trust of their
24 ownership in the Los Angeles Clippers;

25     2.    On Claim Two, Plaintiffs' actual damages, which exceed $1 billion,
26 plus costs, reasonable attorney's fees, and injunctive relief, which includes
27 eliminating the lifetime ban, eliminating the $2.5 million fine, the reinstatement of
28 the longtime Chief Executive Officer of the Clippers, Andy Roeser, the removal of

Blecher Collins
Pepperman & Joye

1 | the interim Chief Executive Officer installed by the NBA, Richard Parsons, and the
2 | termination of the NBA's proceedings to strip Donald Sterling and the Sterling
3 | Family Trust of their ownership in the Los Angeles Clippers;

4 |      3.     On Count Three, treble Plaintiffs' actual damages, which exceed $1
5 | billion, plus costs, reasonable attorney's fees (15 U.S.C. § 15), and injunctive relief,
6 | which includes eliminating the lifetime ban, eliminating the $2.5 million fine, the
7 | reinstatement of the longtime Chief Executive Officer of the Clippers, Andy Roeser,
8 | the removal of the interim Chief Executive Officer installed by the NBA, Richard
9 | Parsons, and the termination of the NBA's proceedings to strip Donald Sterling and
10 | the Sterling Family Trust of their ownership in the Los Angeles Clippers;

11 |      4.     On Claim Four, Plaintiffs' actual damages, which exceed $1 billion,
12 | punitive or exemplary damages, costs, reasonable attorney's fees, and injunctive
13 | relief, which includes eliminating the lifetime ban, eliminating the $2.5 million fine,
14 | the reinstatement of the longtime Chief Executive Officer of the Clippers, Andy
15 | Roeser, the removal of the interim Chief Executive Officer installed by the NBA,
16 | Richard Parsons, and the termination of the NBA's proceedings to strip Donald
17 | Sterling and the Sterling Family Trust of their ownership in the Los Angeles
18 | Clippers;

19 |      5.     On Claim Five, Plaintiffs' actual damages, which exceed $1 billion,
20 | punitive or exemplary damages, costs, reasonable attorney's fees, and injunctive
21 | relief, which includes eliminating the lifetime ban, eliminating the $2.5 million fine,
22 | the reinstatement of the longtime Chief Executive Officer of the Clippers, Andy
23 | Roeser, the removal of the interim Chief Executive Officer installed by the NBA,
24 | Richard Parsons, and the termination of the NBA's proceedings to strip Donald
25 | Sterling and the Sterling Family Trust of their ownership in the Los Angeles
26 | Clippers;

27 |
28 |

Blecher Collins
Pepperman & Joye

-12-

1    Dated:  May 30, 2014              BLECHER COLLINS PEPPERMAN & JOYE, P.C.

2                                      SAMINI SCHEINBERG PC

3

4                                      By: _____

5                                              Maxwell M. Blecher
                                           Attorneys for Plaintiffs
6                                          DONALD T. STERLING and THE
                                           STERLING FAMILY TRUST

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## DEMAND FOR JURY TRIAL

2       Plaintiffs hereby demand a trial by jury of all issues triable by a jury.

3

4   Dated:  May 30, 2014         Respectfully submitted,

5                         BLECHER COLLINS PEPPERMAN & JOYE. P.C.

6                         SAMINI SCHEINBERG PC

7

8                         By:

9                                    Maxwell M. Blecher

10                        Attorneys for Plaintiffs
                      DONALD T. STERLING and THE
                      STERLING FAMILY TRUST

11  59587.5

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



# EXHIBIT 1

**BEFORE THE NATIONAL BASKETBALL
ASSOCIATION BOARD OF GOVERNORS**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of the Termination of
the National Basketball Association            :
Membership of                                              **CHARGE**

                                                                  :

       LAC Basketball Club, Inc.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## INTRODUCTION

    1.     At or about 1:00 A.M. Eastern time on April 26, 2014, an audio recording of

Donald T. Sterling, the controlling owner of the Los Angeles Clippers, was made public. As Mr.

Sterling himself now admits, he expressed on that recording deeply offensive, demeaning, and

discriminatory views toward African Americans, Latinos, and "minorities" in general, and

demanded that a female acquaintance not associate publicly with African Americans or

"minorities" or bring them to Clippers games. Mr. Sterling's views and demands—which are

antithetical to the most basic values, principles, and purposes of the NBA—have caused

devastating and incalculable harm to the NBA and its teams, and will continue to cause such

harm unless the Membership of LAC Basketball Club, Inc. ("LAC," "Team," or "Member") is

terminated.

    2.     As described in greater detail below, termination is warranted because LAC and

its controlling owner have:

        (a)     failed to fulfill contractual obligations to the Association under a 2005
                Agreement and Undertaking and the Association's 1989 Joint Venture
                Agreement in such a way as to affect the NBA and its Members adversely;

        (b)     engaged in conduct disloyal, injurious, and disruptive to the Association,
                in violation of contractual duties and the duty of loyalty owed to the
                Association;

15

(c)    willfully violated the Constitution by, among other things, destroying relevant evidence, providing false and misleading information in connection with the NBA's investigation, and by issuing a false and misleading public statement about this matter; and

(d)    failed to pay an indebtedness owed to the Association through a refusal to pay the $2.5 million fine that was imposed on April 29, 2014.

3.    Accordingly, pursuant to Article 14 of the NBA Constitution, Adam Silver, Commissioner of the NBA, hereby charges that LAC, by its own acts and omissions and by virtue of the acts and omissions of its owner Donald T. Sterling, for which LAC is responsible, has violated one or more provisions of Article 13 of the NBA Constitution and otherwise violated obligations owed to the NBA and its Members, and requests that the Board of Governors of the NBA vote to sustain these charges and terminate the Membership of LAC.

## OWNERSHIP OF THE LOS ANGELES CLIPPERS

4.    The Los Angeles Clippers basketball team is owned by LAC, which holds a membership ("Membership") in the National Basketball Association ("NBA" or "Association"). LAC is owned 100% by The Sterling Family Trust dated August 13, 1998, as amended and restated as of December 18, 2013 in a new trust agreement not yet approved by the NBA ("Sterling Family Trust"). The Sterling Family Trust's settlors and current beneficiaries are Donald T. and Rochelle "Shelly" Sterling, husband and wife. Under applicable law, each of them owns an equal, indivisible interest in the shares of LAC. Accordingly, the Sterling Family Trust, Donald T. Sterling, and Shelly Sterling are, and are hereinafter referred to as, "Owners" of LAC and the Clippers.

5.    Under California law, with exceptions not relevant here, all property acquired by a married person during the marriage is community property. Because LAC was acquired by the Sterlings during their marriage, it is community property under California law.

## EVENTS GIVING RISE TO THE CHARGE

6.      Late in the evening of Thursday, April 24, 2014, Clippers President Andy Roeser

informed Commissioner Silver that a recording was likely to be posted on the website TMZ.com.

Mr. Roeser said that the recording contained derogatory comments about African-Americans

made by Mr. Sterling.

7.      At or around 1:00 A.M. Eastern time on Saturday, April 26, 2014, TMZ.com

posted a nearly 10-minute audio recording of an in-person conversation between Mr. Sterling

and a woman identified as V. Stiviano ("TMZ Recording").  On Sunday, April 27, the website

Deadspin.com released a recording that included the conversation on the TMZ Recording and the

audio of nearly 5 additional minutes of conversation between Mr. Sterling and Ms. Stiviano

("Deadspin Recording") (TMZ and Deadspin Recordings collectively the "Recording").  A copy

of the transcript of the Recording is attached as Exhibit 1.

8.      On the Recording, Mr. Sterling expresses racially offensive views that are

contrary to the principles of diversity, inclusion, and respect that form the foundation of the NBA

and that are deeply hurtful to the multicultural and multiethnic NBA community, including NBA

owners, players, fans, coaches, team personnel, and business partners.

9.      For example, Mr. Sterling complains that Ms. Stiviano has taken photographs

with "black people" and "minorities" and had posted those photographs on social media:

| | |
|---|---|
| Sterling: | And why are you taking pictures with minorities . . . why? |
| Stiviano: | What's wrong with minorities?  What's wrong with black people? |
| Sterling: | Nothing.  Nothing. |
| Stiviano: | What's wrong with Hispanics? |
| Sterling: | It's like talking to an enemy.  There's nothing wrong with minorities.  They're fabulous.  Fabulous.  [Sarcasm.] Because you're an enemy to me. |

3

. . . .

| | |
|---|---|
| Stiviano: | Does it matter if they're white or blue or yellow? |
| Sterling: | I guess that you don't know that.  Maybe you're stupid.  Maybe you don't know what people think of you.  It does matter, yeah.  It matters. |

. . . .

I'm just saying, in your lousy fucking Instagrams, you don't have to have yourself with, walking with black people.

10.     Mr. Sterling demands Ms. Stiviano not bring "black people" to Clippers games:

Sterling:     You can sleep with them, you can bring them in, you can do whatever you want.  The little I ask you is not to promote it on that . . . and not bring them to my games.
. . . .

[D]on't come to my games.  Don't bring black people, and don't come.

11.     Mr. Sterling admonishes Ms. Stiviano for appearing publicly with "black people":

Sterling:     Why should you be walking publicly with black people?  Why?  Is there a benefit to you?
. . . .

Yeah, it bothers me a lot that you want to promo . . . broadcast that you're associating with black people.  Do you have to?

12.     Mr. Sterling criticizes Ms. Stiviano for posting photographs with former NBA

player Magic Johnson and demands that she not bring him to Clippers games:

Sterling:     I think it's nice that you admire him – I know him well, and he should be admired.  And I'm just saying that it's too bad you can't admire him privately, and during your entire fucking life your whole life – admire him, bring him here, feed him, fuck him, I don't care. . . .  But don't put him on an Instagram so the world has to see it so they have to call me.  And don't bring him into my games.  Okay?

13.     Mr. Sterling also denigrates NBA players:

4

| Stiviano: | Do you know you have a whole team that's black, that plays for you? |
|---|---|
| Sterling: | You just – do I know?  I support them and give them food, and clothes, and cars, and houses.  Who gives it to them? Does someone else give it to them? |

## THE NBA'S INVESTIGATION OF THE RECORDING

14.    Immediately after Mr. Sterling's sentiments and conduct were made known to the NBA, Commissioner Silver, pursuant to his authority under Article 24 of the Constitution and By-Laws of the NBA ("Constitution") (Ex. 2, Const. Art. 24), commenced an investigation regarding the Recording and its authenticity.  (Silver ¶ 9.)  The investigation was conducted by David Anders, a partner of the law firm Wachtell, Lipton, Rosen & Katz, who formerly served as an assistant United States Attorney for the Southern District of New York.  Mr. Anders has extensive experience conducting investigations.  (Anders ¶¶ 2-3.)

15.    From April 26, 2014 through April 29, 2014, Mr. Anders conducted the following interviews:  a telephone interview of Mr. Sterling; an in-person interview of Ms. Stiviano; an in-person interview of Clippers President Andy Roeser; a telephone interview of Mrs. Sterling; and a telephone interview of Lucy Vasquez (a sister of Ms. Stiviano who was with Mr. Sterling and Ms. Stiviano when the Recording was made).  A forensic audio expert retained by Mr. Anders also analyzed the Recording.  (Id. ¶¶ 5-6.)

16.    On Saturday, April 26, 2014 at 5:53 P.M. Eastern time, Mr. Anders received an email from Clippers President Andy Roeser containing a statement to be released to the media. The statement, on behalf of the Clippers, said "We do not know if [the TMZ Recording] is legitimate or it has been altered."  It also asserted that the statements on the TMZ Recording had been "attributed" to Mr. Sterling, but did not acknowledge that it was Mr. Sterling's voice on the tape.  (Id. ¶ 8.)

5

17.     During his telephone interview with Mr. Anders, Mr. Sterling denied that he had referred to "black people" during the conversation with Ms. Stiviano that was captured on the Recording.  Mr. Sterling stated his belief that aspects of the Recording had been doctored and words he did not say—and would never say—were inserted to appear as if he had made these statements.  (*Id.* ¶¶ 10, 12.)

18.     Toward the conclusion of Mr. Anders' telephone interview of Mr. Sterling, an in-person interview of Mr. Sterling was scheduled to take place at 5:00 P.M. Pacific time on April 28 in Los Angeles.  Prior to that scheduled interview, Mr. Sterling's counsel, Robert Platt, was advised that Mr. Sterling would be afforded every opportunity to be heard and that the NBA would consider any evidence or other materials Mr. Sterling wished to submit.  On April 28, Mr. Platt informed Mr. Anders that Mr. Sterling was cancelling the scheduled interview.  Neither Mr. Sterling nor his counsel presented any other evidence nor made any other submission to the NBA prior to the conclusion of its investigation into the Recording.  (*Id.* ¶¶ 13-14, 23-27, 31-33.)

19.     The NBA, through its General Counsel, informed Mr. Sterling (through Clippers President Andy Roeser) on April 28 that Commissioner Silver was willing to speak to him about the Recording prior to the conclusion of the investigation, if Mr. Sterling so desired.  Mr. Sterling declined to speak with Commissioner Silver.  (Silver ¶ 14.)

20.     Mr. Anders' investigation of the Recording confirmed conclusively—and it is now admitted by Mr. Sterling (*id.* ¶ 46)—that the male whose voice is heard on the Recording is Mr. Sterling, and that the Recording had not been altered.

21.     The findings of the investigation regarding the Recording and its authenticity were reported to Commissioner Silver.  On April 29, 2014, pursuant to his authority under Article 24 of the NBA Constitution, the Commissioner fined Mr. Sterling $2.5 million and

6

banned him for life from any further association with the Clippers organization or the NBA, a decision that was announced publicly that same day.  The Commissioner also announced that he would urge the Board of Governors to terminate Mr. Sterling's ownership of the Clippers.  (*Id.* ¶¶ 18-19.)

## THE NBA'S CONTINUED INVESTIGATION

22.     From May 5, 2014 through May 15, 2014, Mr. Anders and others at his firm continued their investigation, which included in-person and telephone interviews of twenty employees who held various positions with LAC.  (Anders ¶ 44.)

23.     The investigation revealed that Mr. Roeser received a copy of the Recording on April 9, 2014—more than two weeks before the Recording was made public—after an LAC staff member received an electronic copy of the Recording from Ms. Stiviano.  Upon receiving a copy of the Recording, Mr. Roeser promptly reported its receipt to Mr. Sterling.  (*Id.* ¶ 45(a).)

24.     Despite complete knowledge of the existence of the Recording and its contents, LAC did not inform the NBA for more than two weeks.  Indeed, the investigation further revealed that after LAC first received the Recording, and prior to its public release, Mr. Sterling called LAC's offices to speak to Mr. Roeser, and that following their conversation Mr. Roeser directed an LAC staff member to delete all electronic communications relating to the Recording, as well as all copies of the Recording itself.  (*Id.* ¶ 45(b).)

25.     The investigation further revealed that on April 26, 2014, despite Mr. Sterling's full awareness that the Recording was authentic and that he was the speaker, Mr. Roeser issued a public statement on behalf of the Los Angeles Clippers organization ("Clippers Statement") falsely questioning the legitimacy and authenticity of the Recording:  "We have heard the tape on TMZ.  We do not know if it is legitimate or it has been altered."  The Clippers Statement was a

7

product of a meeting held earlier that day among Mr. Roeser, Mr. Sterling, Mrs. Sterling, and others at the Sterlings' hotel room in San Francisco, as the Clippers were playing a playoff game against the Golden State Warriors in nearby Oakland. (*Id.* ¶¶ 8, 45(f).)

26.     On April 30, 2014, Mr. Sterling called Commissioner Silver and, during that conversation, conceded that he made the statements on the Recording. (Silver ¶ 46.)

## THE RECORDING SPARKS AN INTENSELY ADVERSE REACTION

27.     The reaction to the Recording by the public and throughout the NBA community was swift and severe. The words, actions, and views of Mr. Sterling had an immediate, devastating, and material adverse impact on the NBA and its member teams (including the Clippers), and will continue to have a devastating and material adverse impact on the NBA and its member teams so long as any of the current Owners retains any ownership interest in the team.

28.     The far-reaching impact of Mr. Sterling's words, actions, and views is summarized below, and is set forth in greater detail in the following documents: the Declaration of Adam Silver, Commissioner of the NBA; the Declaration of Mark Tatum, Deputy Commissioner and Chief Operating Officer of the NBA; the Declaration of Kevin Johnson, Mayor of Sacramento, California; the Declaration of Michael Bass, NBA Executive Vice President of Communications; the Declaration of Kathy Behrens, NBA Executive Vice President for Social Responsibility and Player Programs; the Declaration of Amy Brooks, NBA Executive Vice President of Team Marketing and Business Operations; the Declaration of Emilio Collins, NBA Executive Vice President of Global Marketing Partnerships; the Declaration of Salvatore LaRocca, NBA President of Global Operations and Merchandising; the Declaration of Dan Rossomondo, NBA Senior Vice President of Global Media; the Report of Richard E. Lapchick;

the Report of Sara Parikh Ph.D.; the Statement of Ron Klempner, Acting Executive Director of the National Basketball Players Association ("NBPA"); the Statement of Roger Mason, Jr., First Vice President of the NBPA; and the Statement of LeBron James of the Miami Heat. These documents are submitted in support of the Charge and are hereby incorporated as if fully set forth herein.

## The NBA's Commitment to Diversity and Inclusion

29.     Diversity, inclusion, and respect for others are core values of the NBA. These values are clearly enunciated in the NBA's Mission and Values Statement; are reflected in the hiring practices of the NBA and its teams and in the racially diverse nature of the NBA player population; and are practiced and spread worldwide through the NBA's extensive social responsibility programs such as NBA Cares and Basketball Without Borders. In order to conduct the sport of professional basketball according to the highest moral and ethical standards, these values must be shared and maintained by all members of the NBA community. (Silver ¶¶ 4-5; Behrens ¶¶ 4-6, 36-37; Lapchick Rep. ¶¶ 6-26.)

## LAC's Actions Are Condemned by NBA Owners

30.     Following the release of the Recording, NBA owners uniformly denounced the offensive and hurtful statements made by Mr. Sterling. (Silver ¶ 22.)

31.     Several owners expressed deep concern that the views expressed by Mr. Sterling had undermined years of effort by the NBA to establish and maintain its well-deserved and widely recognized reputation for promoting and upholding the principles of diversity, inclusion, and respect that form the very foundation of the League. Those owners believed the damage was especially severe because it was brought about by a fellow NBA owner. (*Id.*)

9

## LAC's Actions Harm the NBA's Relationship with its Fans

32.     The views expressed in the Recording have harmed and are continuing to harm the Clippers' and NBA's relationships with fans. (Silver ¶¶ 24, 33; Bass ¶¶ 10, 17, 19; Brooks ¶¶ 10-11; LaRocca ¶ 5.)

33.     A recent survey of more than 500 Clippers fans, conducted more than a week after Commissioner Silver's discipline was announced, confirmed that fan support for the Clippers would erode dramatically if Mr. Sterling did not sell the team. More than half of those polled responded that if Mr. Sterling remained the Clippers owner, they would be less likely to watch or listen to Clippers games, less likely to attend Clippers games, less likely to buy Clippers merchandise, and/or less likely to support the Clippers. The impact is even greater among avid Clippers fans—i.e., those who watch more than 11 Clippers games per year and/or attend more than 5 Clippers games: nearly two-thirds reported that they would be less likely to support the Clippers in one or more of the foregoing ways if Mr. Sterling remained the Owner. (Parikh Rep. ¶¶ 35-37.)

34.     Immediately after the Recording was released, season ticket holders began contacting the Clippers to communicate their outrage. A number of fans canceled their Clippers season ticket renewals for the 2014-15 NBA season and demanded that their deposits be refunded. These fans indicated they were cancelling their season tickets because of Mr. Sterling, and they would not consider returning as season ticket holders as long as he remains an owner. (Brooks ¶ 10.)

35.     If LAC continues to own the Clippers, it is likely that additional fans will cancel their season ticket packages and that fans who have yet to renew their season tickets will decline to do so. The Clippers similarly would struggle to attract new season ticket holders and purchasers of single-game tickets. And this loss of ticket sales will result in fewer fans attending

games and a corresponding decline in revenue from merchandise and food and beverage sales at home games. (*Id.* ¶ 11, 23-25.)

36.     The Clippers' loss of revenue from ticket sales and other sources would adversely affect the rest of the League in multiple respects.  For example, each team shares a portion of its gate receipts and other revenue with the other 29 teams through League gate assessments and the League's revenue sharing plan.  Lost revenue to the Clippers will result in less revenue sharing through these mechanisms. (*Id.* ¶ 12.)

37.     The damage caused to fans by Mr. Sterling's offensive and intolerant views extends far beyond just Clippers' fans.  Since the Recording was made public, thousands of NBA fans from all over the world have communicated directly with the League office or via social media that they are hurt and embarrassed by this incident and are questioning their continued support for the League and its teams.  Fans have urged the League to make clear that such views have no place in the NBA, and many have stated that the only way to do so is by terminating the Membership of LAC.  (Silver ¶¶ 24, 33; Bass ¶¶ 10, 17.)

## LAC's Actions Harm NBA Players

38.     NBA players have suffered, and continue to suffer, significant harm because of Mr. Sterling's words, actions, and views.  After the Recording was released, many players on the Clippers and other NBA teams voiced extreme outrage over the contents of the Recording and the sentiments expressed by Mr. Sterling.  Clippers and other NBA players have been put in an enormously difficult position, and many have felt pressure from family, friends, community organizations, and the media to speak out or take action.  Mr. Sterling's hurtful views have caused many of them to question the NBA's culture of diversity, inclusion, and respect for others and have created serious doubt as to whether the players should continue to play in a league

11

where such views are tolerated.  (Silver ¶¶ 23, 31; Behrens ¶¶ 28-35; LaRocca ¶ 5; Johnson ¶¶ 8-14; Klempner ¶ 9; James ¶ 7; Mason ¶ 6.)

39.     Clippers players have universally expressed reservations about continuing to play for the Clippers next season if any of the current Owners continue to have an ownership interest in the team.  The players have explained that they do not want to be viewed by fans as endorsing or supporting Mr. Sterling's racist views.  (Behrens ¶¶ 30-34; Johnson ¶¶ 8, 11.)

40.     Players from other NBA teams, as well as retired players, echoed the sentiments of current Clippers players.  They indicated that no player—including drafted players and free agents—would want to play for the Clippers if any of the current Owners remained.  (Silver ¶ 31; Behrens ¶¶ 29, 35; Johnson ¶¶ 8, 11, 15; Klempner ¶ 12; James ¶ 9; Mason ¶ 9.)

41.     In fact, players felt so strongly about taking a stand against the hurtful views expressed by Mr. Sterling that they considered boycotting playoff games, and several teams engaged in silent protests against Mr. Sterling (such as players for the Clippers, Heat, and Trail Blazers) in the games immediately following the release of the Recording.  (LaRocca ¶ 5; Johnson ¶ 9; Mason ¶¶ 4-6.)

### LAC's Actions Harm Clippers Personnel

42.     The hurtful views expressed by Mr. Sterling on the Recording deeply upset many team employees and caused them to question whether to continue to work for an organization owned by a person who holds such offensive views.  In addition, shortly after the Recording was released, several Clippers' employees received threats against themselves and their families regarding their continued employment by the team while Mr. Sterling remained an Owner .  Their mere association with the Clippers while Mr. Sterling remains an owner has injured, and will continue to injure, their own reputations.  (Behrens ¶¶ 43-44; Brooks ¶ 26.)

43.    Morale among Clippers employees is extremely low, and the longer LAC retains its ownership of the team, the more likely it is that employees will quit.  In particular, the Clippers could lose several long-tenured and indispensable employees who maintain close relationships with season ticket holders and sponsors.  It would be extremely difficult for the Clippers to hire qualified replacements under the team's current ownership.  (Brooks ¶¶ 26-27; Anders ¶ 46; Lapchick ¶ 24.)

### LAC's Actions Harm the NBA's and Clippers' Relationships with Sponsors and Licensees

44.    The words, actions, and views of Mr. Sterling also critically harmed the Clippers' and NBA's relationships with its current sponsors and licensees, and have greatly undermined the Clippers' ability to negotiate agreements with new sponsors.  (Silver ¶ 27; Tatum ¶¶ 9-14; Brooks ¶¶ 14-22; Collins ¶¶ 7-16, 21-27; LaRocca ¶¶ 5-6, 10; Rossomondo ¶¶ 6-16.)

45.    In the days after the Recording was released, NBA personnel spoke with senior executives from many NBA telecasters, as well as NBA marketing and other business partners, including adidas, American Express, Disney, ESPN, Turner Broadcasting, Samsung, State Farm, Sprint, Kia, Coca-Cola, Anheuser-Busch InBev, Gatorade, Diageo, Cisco, SAP, and BBVA. These business partners all communicated their condemnation of the views expressed by Mr. Sterling and their concern about the inevitable harm that their own businesses would suffer as a result of Mr. Sterling's continued association with the NBA and the Clippers.  They universally stated that if the NBA did not take swift and decisive action to penalize Mr. Sterling, they would need to reevaluate their relationships with the Clippers and the League.  (Tatum ¶¶ 9-14;  Brooks ¶¶ 15-18; Collins ¶¶ 7-16; LaRocca ¶¶ 5-6; Rossomondo ¶¶ 6-12.)

46.    Beginning on April 28, 2014, many of the NBA's marketing partners, including Kia, Sprint, Samsung, and State Farm, publicly announced that they were terminating or

13

suspending their relationships with the Clippers.  In addition, nearly all of the Clippers' local sponsors terminated or suspended their relationships with the team, including adidas, AquaHydrate, CarMax, Chumash Casino, Commerce Casino and Hotel, Diageo, LoanMart, Lumber Liquidators, Mandalay Bay Hotel, Mercedes, Red Bull, Southern California Ford, Virgin America, and Yokohama Tires.  Although these sponsors all expressed positive reactions to Mr. Sterling's lifetime ban, many have stated publicly and/or privately that they will not reactivate their sponsorships of the Clippers if current ownership remains in place.  (Silver ¶ 27; Tatum ¶ 15; Brooks ¶¶ 15-18, 20-22; Collins ¶¶ 8-16, 21-26; LaRocca ¶¶ 8-10.)

47.     Before Commissioner Silver announced the lifetime ban on Mr. Sterling on April 29, 2014, several sponsors, including Kia, LoanMart, Samsung, State Farm, Sprite, Sprint, Taco Bell, Gatorade, Sony Pictures, AutoTrader.com, and Cisco Systems, instructed NBA television partner Turner Broadcasting to remove their advertisements from its April 29 telecast of Game 5 of the first-round playoff series between the Clippers and the Golden State Warriors.  Had these sponsors followed through with these requests, they likely would have cost Turner approximately $5 million in lost revenue just for that one game.  (Collins ¶¶ 15-16; Rossomondo ¶ 12.)

48.     Within two hours of Commissioner Silver's announcement, all the sponsors who had requested that Turner remove their advertisements from the telecast of Game 5, with the exception of Kia, were once again running their television advertisements during the game. These sponsors returned to the game because of the swift and decisive nature of the penalty imposed on Mr. Sterling, and Commissioner Silver's assurance that he would do everything in his power to persuade the Board of Governors to terminate Mr. Sterling's ownership of the Clippers.  However, if LAC remains a Member, these sponsors likely will not continue their

14

association with the Clippers or the League.  (Tatum ¶ 15; Collins ¶¶ 19-26; Rossomondo ¶¶ 15-16.)

## LAC's Actions Harm the NBA's
## Relationship with Community and Government Leaders

49.     Mr. Sterling's words, actions, and views have also severely damaged the NBA's relationships with government and community leaders.

50.     On April 27, 2014, President Barack Obama was asked for his reaction to the Recording during a press conference in Malaysia.  He condemned the views expressed by Mr. Sterling as "incredibly offensive racist comments," and later, through a spokesman, praised the NBA and its response as "doing the right thing."  Other elected officials in California, including Los Angeles Mayor Eric Garcetti and Sacramento Mayor Kevin Johnson, had similar reactions.  (Silver ¶¶ 25-26; Behrens ¶¶ 11-16; Johnson ¶ 7.)

51.     Civic leaders and social welfare organizations also expressed their outrage, including the NAACP, the Thurgood Marshall College Fund, and the Congressional Black Congress.  Some of these leaders publicly called for protests and boycotts of the Clippers and/or the NBA, the threat of which remains if LAC's Membership is not terminated.  (Behrens ¶¶ 17-27, 37; Collins ¶¶ 8, 12.)

52.     Such protests, boycotts, and statements of condemnation unquestionably would cause devastating and irreparable harm to the NBA and its member teams.  (Behrens ¶ 37; Lapchick ¶¶ 21-23, 25.)

## These Harms are Magnified by Intense Media Scrutiny

53.     The Recording and the NBA's response to it have received unprecedented coverage across the country and around the world by the sports and general news media, as well as via social media.  Since the Recording was released on April 26, thousands of articles and

broadcast reports on this subject have appeared in the U.S. and international press. In addition, Mr. Sterling's words, actions, and views have been the most discussed topic in social media. Nearly 1.9 million tweets related to Mr. Sterling were posted within two hours of the NBA's April 29 press conference. Tweets related to Mr. Sterling during the press conference constituted 7% of the global Twitter conversation and 30% of the Twitter conversation in the United States. (Bass ¶¶ 7-9, 12-14, 17-18.)

54.     The media universally has condemned the views expressed by Mr. Sterling and questioned whether the Clippers and the NBA can operate successfully if the current Owners remain. (*Id.* ¶¶ 6-10, 20.) All the harm the Clippers and the NBA are facing will continue and will be exacerbated by the overwhelming media scrutiny, if LAC's Membership is not terminated.

### MR. STERLING'S BELATED AND INEFFECTUAL ATTEMPTS TO AMELIORATE THE HARMS HE CREATED

55.     Although fully aware of the devastating harm his words, actions, and views have caused the NBA and the Clippers, Mr. Sterling has failed to take meaningful steps of any kind to ameliorate that harm. Indeed, his most recent actions have exacerbated that harm.

56.     In an April 30, 2014 telephone call with Commissioner Silver, Mr. Sterling stated that he saw nothing wrong with the comments that he made. (Silver ¶ 46.)

57.     In an interview with CNN's Anderson Cooper that occurred on May 12, 2014, more than two weeks after the Recording was released, Mr. Sterling acknowledged making the statements on the Recording, purported to offer an apology, and said he was prepared to accept whatever sanctions his NBA partners might impose:

> (a)     "I made a terrible, terrible mistake. And I'm here with you today to apologize and to ask for forgiveness for all the people that I've hurt, and I've hurt so many people. So many innocent people." (Ex. 3.)

16

(b)   "I embarrassed the league; I humiliated them.  I don't know how – why – I did it.  I mean, it's so terrible."  (*Id.*)

(c)   "I don't want to fight with my partners.  You know, we all do what we have to do in life.  I love them and I respect them, and whatever their decision is with regard to the disposition of my terrible words, then I have to do it I think."  (*Id.*)

58.   Although Mr. Sterling said he now recognizes the harm he has caused the NBA, his statements to Mr. Cooper included yet additional offensive and discriminatory views that have inflicted further damage.  In particular, Mr. Sterling suggested that African Americans do not support their communities, and disparaged one of the NBA's all-time greatest and most admired players, Magic Johnson:

(a)   Mr. Sterling stated: "Jews, when they get successful, they will help their people, **and some of the African Americans – maybe I'll get in trouble again – they don't wanna help anybody**.  What has Magic Johnson really done for Children's Hospital, which kids are lying in the hallways.  They're sick; they need a bed.  What has he done for any hospital?  What has he done for any group?  I don't know."  (*Id.* (emphasis added).)

(b)   In a gratuitous and malicious attack on Magic Johnson, Sterling added:  "I don't know if I should say this – he acts so holy.  I mean, he made love to every girl in every city in America, and he had AIDS, and when he had those AIDS I went to my synagogue and I prayed for him. . . .  What has he done, can you tell me?  Big Magic Johnson, what has he done? . . . Did he help anybody in south L.A.?"  (*Id.*)

## MR. STERLING'S REFUSAL TO PAY THE NBA'S FINE

59.   On April 29, 2014, concurrent with Commissioner Silver's announcement of the imposition of discipline on Mr. Sterling, the NBA sent Mr. Sterling a letter formally notifying him of that discipline.  The letter stated that Commissioner Silver, under the authority provided by the NBA Constitution, had determined in the best interests of the NBA:  (i) to fine Mr. Sterling in the amount of $2.5 million, payable to the NBA no later than May 12, 2014; and (ii)

to permanently ban Mr. Sterling from any further involvement with the Los Angeles Clippers or the NBA. (Ex. 4.)

60.     On May 14, 2014, having failed to receive Mr. Sterling's payment of the $2.5 million due and owing to the League by May 12, the NBA provided Mr. Sterling a written Notice of Default, informing him that it had not received his $2.5 million payment, and that he was thus in default of his obligations to the NBA. (*Id.*)

61.     On May 15, 2014, the NBA received a response from Mr. Sterling's counsel, who rejected the NBA's demand for payment and contended that no punishment at all was warranted for Mr. Sterling's conduct. (*Id.*)

## RELEVANT PROVISIONS OF THE CONSTITUTION
## AND ITS BINDING EFFECT ON LAC AND ITS OWNERS

62.     As a condition of Membership in the NBA, each NBA Member agrees, among other things, that it (i) "shall be subject to the oversight and control of the Board of Governors of the Association," and (ii) "shall be governed by the Constitution and By-Laws, rules, regulations, resolutions, and agreements of the Association, as they may be modified or amended from time to time." (Ex. 2, Const. Art. 2.)

63.     Under the Constitution, "Member" is defined as "a person or Entity that has been granted a Membership in the Association." The Constitution further provides that "an action on behalf of a Member by any of its Owners, employees, officers, directors, managers, agents or representatives, or its Governor or Alternate Governors, shall be the action of a Member." (*Id.* Const. at p. 1 (Interpretation, sec. (a)(9)).) Accordingly, the actions of Mr. Sterling or any other Owner are attributable to LAC, and such actions may hereinafter be referred to as the actions of LAC.

18

32

64.    Article 13 of the Constitution sets forth certain grounds on which the Membership of a Member may be terminated.  Article 13 provides, in relevant part:

## ARTICLE 13
## TERMINATION OF OWNERSHIP OR MEMBERSHIP

The Membership of a Member or the interest of any Owner may be terminated by a vote of three fourths (3/4) of the Board of Governors if the Member or Owner shall do or suffer any of the following:

(a) Willfully violate any of the provisions of the Constitution and By-Laws, resolutions, or agreements of the Association.

. . . .

(c) Fail to pay any dues or other indebtedness owing to the Association within thirty (30) days after Written Notice from the Commissioner of default in such payment.

(d) Fail or refuse to fulfill its contractual obligations to the Association, its Members, Players, or any other third party in such a way as to affect the Association or its Members adversely.

Accordingly, under the Constitution, a Membership may be terminated due to the acts of an individual Owner.  (*Id.* Const., Art. 13; Const., Art. 14(g).)

65.    Article 14 of the Constitution sets forth the procedures for termination of an NBA Membership, providing in relevant part:

## ARTICLE 14
## PROCEDURE FOR TERMINATION

The Membership of a Member or the interest of any Owner shall be terminated on the occurrence of any of the events described in Article 13 by the following procedure:

(a) Any Member of the Association or the Commissioner may charge that a Member or Owner has violated one (1) or more of the provisions of Article 13.  Said charge shall be made in Writing and shall be filed with the Commissioner, who shall, no later than three (3) business days after the charges are filed, cause a copy thereof to be served by a Writing upon the Member or Owner against whom such charges have been made.

66.    Under Article 24(h) of the Constitution, the NBA Commissioner is granted the authority to "interpret . . . the provisions of the Constitution and By-Laws, rules, regulations,

resolutions, and agreements of the Association and any enforcement thereof, and any decision emanating therefrom shall be final, binding, conclusive, and unappealable."

67.     Under Article 24(e) of the Constitution, the NBA Commissioner "shall have the right to investigate all charges, accusations, or other matters that may adversely affect the Association or its Members."  In connection with any investigation conducted by the Commissioner, he "shall have the right to require testimony and the production of documents and other evidence from any Member, Owner, or Referee, any employee of any Member or Owner, and/or any employee of the Association, and any person or Entity not complying with the requirements of the Commissioner shall be subject to such penalty as the Commissioner may assess."  (*Id.* Const. Art. 24(m).)

68.     Article 35A of the Constitution sets forth certain obligations of NBA Members, Owners, and other team and League employees.  Most relevant to this Charge:

    (a)   Article 35A(c) of the Constitution prohibits any statement having "an effect prejudicial or detrimental to the best interests of basketball or of the Association or of a Member or its Team."

    (b)   Article 35A(d) of the Constitution prohibits "conduct prejudicial or detrimental to the Association."

69.     The Constitution is governed by the laws of the State of New York.

## LAC'S RELEVANT AGREEMENTS WITH, AND OBLIGATIONS TO, THE ASSOCIATION AND ITS MEMBERS

70.     In connection with their ownership of the Clippers and Membership in the NBA, LAC and its Owners have undertaken additional contractual obligations to the NBA, its Members, Players, and other third parties.  The failure to fulfill any of these obligations provides a basis for termination under Article 13(d) of the Constitution.  Most relevant to this Charge are obligations under: (i) a July 26, 2005 Agreement and Undertaking with the NBA made in favor

20

of the NBA and its Members (the "A&U") (Ex. 5); (ii) the Amended and Restated Joint Venture Agreement entered into by all of the NBA Members on January 1, 1989 (the "JVA") (Ex. 6); and (iii) a contractual obligation under New York law, which governs the Constitution, A&U, and the JVA, and which imposes on LAC a contractual duty of loyalty to support the Association in the attainment of its proper purposes.

### The Member's and Owners' Agreement and Undertaking with the NBA

71.     In 2005, as a condition of the Board of Governors' approval of Mr. Sterling's transfer of ownership of the Clippers to the Sterling Family Trust, Mr. and Mrs. Sterling each acknowledged in a signed writing that "they would be required to execute an agreement to abide by the Constitution, and By-Laws." (Ex. 7 ¶ 6D (Mr. Sterling's agreement); Ex. 8 ¶ 7D (Mrs. Sterling's agreement).)

72.     The agreement that the Sterlings were "required to execute" was the A&U, which was entered into by LAC, Mr. Sterling, Mrs. Sterling, and the Sterling Family Trust, who collectively constitute the "Owners" for purposes of the A&U. (Ex. 5.)

73.     In Paragraph 1(c) of the A&U, the Owners agreed to perform and discharge all obligations of the Team "however arising" to any of the NBA Teams and to the NBA and its affiliated entities. (*Id.* ¶ 1(c).)

74.     In Paragraph 2 of the A&U, each of the Owners jointly and severally agreed that they:

> **shall be bound by and conduct themselves in accordance with,** and shall cause their respective affiliates to be bound by and conduct themselves in accordance with, (a) **the Constitution and By-Laws of the NBA;** . . . (c) all present and future rules, regulations, memoranda, resolutions, and directives of each of the NBA Entities and the NBA Commissioner; (d) any agreements and arrangements to which the Team is (or after the date of this Agreement may become) subject. . . .

(*Id.* ¶ 2 (emphasis added).)

21

35

75.     Under that same Paragraph 2 of the A&U, each of the Owners agreed:

**not to take or support . . . any position or action** that may violate or be inconsistent with any NBA Rule or any right of any NBA Entity or NBA Team, or **which may have a material adverse impact on any of the NBA Entities or NBA Teams.**

(*Id.* (emphasis added).)

76.     Paragraph 8 of the A&U provides expressly that any breach of the A&U by any of the Owners, including Mr. Sterling, "shall constitute a failure to fulfill a contractual obligation within the meaning of Article 13(d)" of the Constitution, and shall entitle the NBA "to exercise all rights and remedies against the Team as if the Team had itself committed such breach." (*Id.* ¶ 8.) Paragraph 8 also makes clear that, in addition to the right to terminate LAC's Membership, the NBA and its teams shall retain "all other legal and equitable rights and remedies available." (*Id.*)

## The Member's NBA Joint Venture Agreement

77.     The next relevant contractual obligations are set forth in the JVA, which was signed by Mr. Sterling on behalf of LAC Basketball Club, Inc. (Ex. 6.) Pursuant to Article 2 of the JVA, LAC and all other Members of the NBA agree that they "shall use their best efforts to see to it that the sport of professional basketball is conducted according to the highest moral and ethical standards." (*Id.* Art. 2.)

78.     Mr. and Mrs. Sterling both confirmed their agreement to abide by the provisions of the JVA when they individually signed the A&U (Paragraph 2), which provides that the Owners shall be "bound by and conduct themselves in accordance with" the governing documents of the NBA (which includes the JVA), and any "agreements and arrangements" to which a team is subject. (Ex. 5 ¶ 2.)

22

## LAC's Contractual Obligations Under New York Law

79.      The law of New York governing membership associations such as the NBA imposes a contractual obligation on all members of the Association to loyally support the association in the attainment of its proper purposes. The breach of this contractual duty of loyalty is, in and of itself, sufficient grounds for termination of a membership in the NBA.

## THE HARMS CREATED BY LAC CAN BE AVERTED ONLY BY THE BOARD'S EXERCISE OF ITS AUTHORITY TO TERMINATE LAC'S MEMBERSHIP

80.      As the evidence submitted in support of the Charge makes clear, Mr. Sterling's continued ownership of the Clippers has had an incalculable material adverse impact on the NBA and its member teams, notwithstanding his lifetime ban from the Clippers and the NBA. The evidence also demonstrates that the NBA and its member teams will continue to suffer these harms if the Membership is not terminated.

81.      The Board of Governors has full authority to terminate LAC's Membership based on the acts of Mr. Sterling. Under the Constitution, the actions of an individual NBA Owner are attributable to and are deemed the actions of the Membership. (Ex. 2, Const. at p. 1 (Interpretation, sec. (a)(9)).) A similar principle is expressly incorporated into the A&U signed individually by Mr. and Mrs. Sterling, in which they agreed that any breach of the A&U by any of the Owners shall entitle the NBA "to exercise all rights and remedies against the Team as if the Team had itself committed such breach." (Ex. 5 ¶ 8.) Accordingly, if the Board, by a 3/4 vote, sustains the charges herein, "the Membership of the guilty Member or the Member in which the guilty Owner has an interest shall automatically be terminated." (Ex. 2, Const. Art. 14(g).)

82.      No other result is remotely tenable. If just Mr. Sterling's controlling ownership in the team were terminated, a potential new controlling owner would be forced to accept Mrs.

23

Sterling as a partner as a condition to buying into the Clippers. This would undoubtedly and dramatically reduce the value of the team.

83.    Further, the interests of Mr. and Mrs. Sterling are so inextricably intertwined that her continued ownership of LAC universally would be viewed as Mr. Sterling continuing to own LAC. Mr. and Mrs. Sterling have been married for nearly sixty years. Significant evidence exists in the public record and otherwise that Mr. and Mrs. Sterling are not in any sense "estranged," as Mrs. Sterling has recently claimed. For example, they attended nearly every Clippers home game this year together, sitting courtside next to each other. In February 2014, the Sterlings attended together the NBA's All-Star weekend in New Orleans. On March 7, 2014, Mrs. Sterling—as "a married woman and the wife of Donald T. Sterling"—sued Ms. Stiviano for conversion of property owned in common by Mr. and Mrs. Sterling. In April 2014, the Sterlings attended together the NBA Board of Governors meeting in New York City. On April 26, 2014, the day the Recording was released, Mrs. Sterling participated with Mr. Sterling and others in a meeting at which the preparation of the Clippers Statement falsely questioning the legitimacy and authenticity of the Recording was discussed. And on April 27, 2014, the day after the Recording was released, Mr. and Mrs. Sterling had dinner together in a Los Angeles restaurant, where in response to questions from the media as to whether Mr. Sterling is a racist, Mrs. Sterling immediately came to his defense, replying "of course not" and "it's not true." (Anders ¶ 47.)

84.    The inescapable conclusion of NBA owners, players, fans, community and government leaders, team personnel, business partners, and the media is that Mr. and Mrs. Sterling remain closely allied and that Mr. Sterling would continue to influence the operation of, and financially benefit from, LAC if Mrs. Sterling retained her ownership interest. And this

24

conclusion would persist regardless of whether now, after nearly sixty years of marriage and faced with this Charge and the penalties already imposed by the Commissioner, Mr. and Mrs. Sterling were to separate, commence divorce proceedings, or even divorce.  The harms described above that would exist if Mr. Sterling is not removed as the Clippers owner also would exist if Mr. Sterling is removed but Mrs. Sterling remains an Owner of LAC.  (Silver ¶¶ 43-45; Tatum ¶ 22; Bass ¶¶ 18-20; Behrens ¶¶ 14, 16, 28; Brooks ¶¶ 22, 25, 28; Johnson ¶ 15; Klempner ¶¶ 15-17; James ¶¶ 8-9; Mason ¶¶ 8-12.)

85.    Finally, termination of the Membership is also necessary here because it is the only way to terminate Mr. Sterling's ownership of LAC.  As set forth above, the Clippers basketball team is owned by LAC, which is owned 100% by the Sterling Family Trust, whose current beneficiaries are Donald and Shelly Sterling.  Mr. and Mrs. Sterling each have an equal interest in the Team, which they acquired during their marriage, and therefore each of their interests is community property under the laws of California.  Accordingly, Mr. Sterling's interest is indivisible from Mrs. Sterling's interest, and vice versa, and any ownership interest retained by Mrs. Sterling would also be retained by Mr. Sterling

## COUNT I
### Termination Pursuant to Article 13(d) of the Constitution

86.    The foregoing paragraphs are incorporated as if set forth herein.

87.    Paragraph 2 of the A&U prohibits Mr. Sterling from taking or supporting "any position or action . . . which may have a material adverse impact on any of the NBA Entities or NBA Teams."  LAC and the other Owners are jointly and severally liable for Mr. Sterling's obligations under Paragraph 2.

88.    As set forth herein, LAC, by virtue of the statements and acts of Mr. Sterling, has taken discriminatory actions and supported discriminatory positions that have had a material

adverse impact on the NBA and its Member teams.  LAC, through Mr. Sterling, has, among other things:  disparaged African Americans and "minorities"; denigrated the contribution of NBA players to the success and popularity of the NBA; directed a female acquaintance not to associate publicly with African Americans; admonished that acquaintance for posting pictures of herself with African Americans on social media; directed that acquaintance not to bring African Americans to Clippers games; criticized African Americans for not supporting their communities; and publicly disparaged NBA legend Magic Johnson.

89.     As set forth herein, LAC's actions and positions have had, and will continue to have, a material adverse impact on the NBA and its Teams (including the Clippers).  Among other things, LAC's actions and positions have significantly:  undermined and called into question the NBA's commitment to diversity and inclusion; damaged the NBA's relationship with its fans; harmed NBA players and Clippers team personnel; and impaired the NBA's relationship with marketing partners and licensees, and with government and community leaders.

90.     Accordingly, LAC has failed to fulfill its contractual obligations to the Association under the A&U in such a way as to affect the Association or its Members adversely, thus warranting termination of the Membership pursuant to Article 13(d) of the Constitution.

## COUNT II
### Termination Pursuant to Article 13(d) of the Constitution

91.     The foregoing paragraphs are incorporated as if set forth herein.

92.     Pursuant to Paragraph 2 of the JVA, LAC agreed to use "best efforts to see to it that the sport of professional basketball is conducted according to the highest moral and ethical standards."  Under Paragraph 2 of the A&U, LAC, Mr. Sterling and the other Owners have jointly and severally agreed to be bound by and conduct themselves in accordance with the JVA.

26

**40**

93.     As set forth herein, by virtue of the statements and acts of Mr. Sterling, LAC has failed to adhere to the basic principles of diversity, inclusion, and respect for others that are integral to the NBA's efforts to conduct the sport of professional basketball in accordance with the highest moral and ethical standards.

94.     As set forth herein, LAC's failure to fulfill its contractual obligations under Paragraph 2 of the JVA has affected, and will continue to affect, the Association or its Members adversely.  Among other things, LAC's actions and positions have significantly:  undermined and called into question the NBA's commitment to diversity and inclusion; damaged the NBA's relationship with its fans; harmed NBA players and Clippers team personnel; and impaired the NBA's relationship with sponsors and licensees, and with government and community leaders.

95.     Accordingly, LAC has failed to fulfill its contractual obligations to the Association under the JVA in such a way as to affect the Association or its Members adversely, thus warranting termination of the Membership pursuant to Article 13(d) of the Constitution.

## COUNT III
### Termination Pursuant to Article 13(d) of the Constitution

96.     The foregoing paragraphs are incorporated as if set forth herein.

97.     Under New York law, which governs the Constitution, A&U, and the JVA, LAC owes the NBA a contractual duty of loyalty to support the Association in the attainment of its proper purposes.

98.     Under Paragraph 1 of the A&U, LAC agrees to perform all obligations owed to the NBA and the NBA member teams, "however so arising."

99.     As set forth herein, by virtue of the statements and acts of Mr. Sterling, LAC has breached its duty of loyalty and failed to fulfill its obligations to the NBA and its member teams by engaging in conduct disloyal, injurious, and disruptive to the Association in the attainment of

27

41

its proper purposes. Among other things, LAC has: espoused views that are contrary to and wholly inconsistent with the NBA's commitment to diversity and inclusion, and that have alienated a wide segment of the NBA community, including its owners, players, coaches, team personnel, and sponsors; and engaged in conduct harmful to the other Members of the Association.

100.    Accordingly, LAC has failed to fulfill its contractual obligations to the Association under the A&U and at law in such a way as to affect the Association or its Members adversely, thus warranting termination of the Membership pursuant to Article 13(d) of the Constitution.

## COUNT IV
### Termination for Breach of Duty of Loyalty to the NBA

101.    The foregoing paragraphs are incorporated as if set forth herein.

102.    Under New York law, which governs the Constitution, A&U,  and the JVA, LAC owes the NBA a duty of loyalty to support the Association in the attainment of its proper purposes.

103.    As set forth herein, by virtue of the statements and acts of Mr. Sterling, LAC has breached its duty of loyalty and failed to fulfill its obligations to the NBA and member teams by engaging in conduct disloyal, injurious, and disruptive to the Association in the attainment of its proper purposes. Among other things, LAC has espoused views that are contrary to and wholly inconsistent with the NBA's commitment to diversity and inclusion, and that have alienated a wide segment of the NBA community, including its owners, players, coaches, team personnel and sponsors; and engaged in conduct harmful to the other Members of the Association.

104.    Accordingly, LAC has breached its duty of loyalty to support the Association in the attainment of its proper purposes, thus warranting termination of the Membership pursuant to New York law.

## COUNT V
## Termination Pursuant to Article 13(a) of the Constitution

105.    The foregoing paragraphs are hereby incorporated as though fully set forth herein.

106.    Article 24(m) of the Constitution requires Members and Owners to cooperate and provide evidence and testimony requested in connection with any investigation conducted by the NBA Commissioner.

107.    Article 35A(c) of the Constitution prohibits Members and Owners from making any statement that has "an effect prejudicial or detrimental to the best interests of basketball or of the Association or of a Member or its Team."

108.    Article 35A(d) of the Constitution prohibits Members and Owners from engaging in "conduct prejudicial or detrimental to the Association."

109.    As set forth herein, by virtue of the statements and acts of Mr. Sterling and others, LAC has willfully violated the provisions of the Constitution, resolutions or agreements of the Association by, among other things, destroying evidence relating to the Recording, providing false and misleading information to Mr. Anders in connection with the Commissioner's investigation of the Recording, and issuing a false and misleading public statement on April 26 regarding the authenticity of the TMZ Recording.

110.    Accordingly, LAC has willfully violated the foregoing provisions of the Constitution, thus warranting termination of the Membership pursuant to Article 13(a) of the Constitution.

**COUNT VI**
**Termination Pursuant to Article 13(c) of the Constitution**

111. The foregoing paragraphs are hereby incorporated as though fully set forth herein.

112. By letter dated April 29, 2014, Mr. Sterling was notified of Commissioner Silver's imposition of a $2.5 million fine against him, and that such amount was to be paid to the NBA no later than May 12, 2014.

113. Despite receiving a written Notice of Default on May 14, 2014, LAC, by virtue of the statements and acts of Mr. Sterling, has failed to pay an indebtedness to the Association, and through counsel has informed the NBA that it refuses to do so.

114. Accordingly, LAC has failed to pay an indebtedness to the Association, thus warranting termination of the Membership pursuant to Article 13(c) of the Constitution.

WHEREFORE, the undersigned requests that the Charge be sustained by the NBA Board of Governors, and that the Membership of LAC Basketball Club, Inc. in the National Basketball Association be terminated.

Adam Silver
Commissioner of
the National Basketball Association

May 18, 2014

30

44

**EXHIBIT 2**

# DOUGLAS L. WALTON
Attorney at Law

9441 Wilshire Boulevard, Penthouse
Beverly Hills, California 90212

Telephone (310) 278-8000
Fax (310) 278-8010

May 22, 2014

Mr. Adam Silver, Commissioner
Mr. Richard W. Buchanan, Esq., Vice-President and General Counsel
National Basketball Association
Olympic Tower
645 Fifth Avenue
New York, NY 10022

RE:   In re Termination of the National Basketball Association Membership of
      LAC Basketball Club, Inc.

Gentlemen:

As you know, I have been a long-time attorney for Donald T. Sterling.  Mr. Sterling
agrees to the sale of his interest in the Los Angeles Clippers.

This letter confirms that Donald T. Sterling authorizes Rochelle Sterling to negotiate with
the National Basketball Association regarding all issues in connection with a sale of the
Los Angeles Clippers team, owned by LAC Basketball Club, Inc.

Very truly yours,

Douglas L. Walton
DLW/gg

Read and Approved:

Donald T. Sterling

Cc:   Pierce O'Donnell, Esq.
      Maxwell Blecher, Esq.

**45**

# EXHIBIT 3

**BEFORE THE NATIONAL BASKETBALL
ASSOCIATION BOARD OF GOVERNORS**

In the Matter of the Termination of the National
Basketball Association Membership of

LAC Basketball Club, Inc.

## DONALD STERLING'S ANSWER TO CHARGE

## INTRODUCTION

On the basis of remarks made in a living room during a "lovers' quarrel," which were illegally recorded and then disclosed months later in retaliation for a lawsuit by Mr. Sterling's wife, the NBA seeks to forcibly strip Mr. Sterling and his wife of their ownership interest in the Los Angeles Clippers. The NBA's use of this illegal recording constitutes a clear and blatant violation of Mr. Sterling's California constitutional rights. The authors of the charge did not have the courage, decency, or honesty to acknowledge the circumstances surrounding Mr. Sterling's jealous rant or even that the source of their information was borne from the "fruit of the poisonous tree." So, in reality, Mr. Sterling is being banned for life, fined $2.5 million, and stripped of his ownership for a purely private conversation with his lover that he did not know was being recorded and that he never intended would see the light of day. We do not believe a court in the United States of America will enforce the draconian penalties imposed on Mr. Sterling in these circumstances, and indeed, we believe that preservation of Mr. Sterling's constitutional rights requires that these sham proceedings be terminated in Mr. Sterling's favor. This is particularly true when over its entire history the NBA has never fined anyone as much as $2.5 million, never suspended any owner for life, and never undertaken to confiscate an owner's team for *any* offense, much less an alleged offense originating in a conversation in a private setting that was illegally recorded.

## GENERAL DENIAL AND RESERVATION OF RIGHTS

Donald Sterling and LAC Basketball Club, Inc. deny generally and specifically every allegation in the charge and specifically deny that any lawful grounds exist to terminate the membership of LAC Basketball Club, Inc. in the NBA. Donald Sterling and LAC Basketball Club, Inc. reserve their right to supplement this response at any time before the hearing on this matter and do not waive any future factual or legal arguments that may be omitted in this

1

response. Furthermore, this answer shall not in any way be a waiver or deemed a waiver of any of Donald Sterling's or LAC Basketball Club, Inc.'s rights or remedies under state or federal law, including, without limitation, the right to have such matters adjudicated by a court of law.

### MR. STERLING SHOULD RETAIN OWNERSHIP OF THE LOS ANGELES CLIPPERS

**I.      Because the Conversation that V. Stiviano Illegally Recorded Invades Mr. Sterling's Rights Under the California Constitution and Cannot Be Used for *any* Purpose, These Proceedings Must be Terminated**

The California Penal Code *criminalizes* the act of recording another's confidential communication without their consent. Cal. Penal Code § 632(a). The Penal Code further provides that except for prosecuting an individual for committing the crime of illegally recording another, "*no* evidence obtained as a result of . . . recording a confidential communication in violation of this section shall be admissible in *any* judicial, administrative, legislative, *or other proceeding.*" Cal. Penal Code § 632(d) (emphasis added). The Commissioner's charge and the planned hearing is an "other proceeding."[1] While the NBA constitution states that "Strict rules of evidence shall not apply, and all relevant and material evidence submitted prior to and at the hearing may be received and considered" (Charge, Ex. 2, Art. 14(e)), the protection of section 632(d) is no mere rule of evidence or procedure. Rather, courts have held that section 632(d) "embodies a state *substantive interest* in the privacy of California citizens from exposure of their confidential conversations to third parties." *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 667 (9th Cir. 2003) (emphasis added). In fact, this right flows directly from the California Constitution's right-to-privacy guarantee. *Id.*; *Rattray v. City of National City*, 51 F.3d 793, 797 (9th Cir. 1994).

---

[1] Significantly, *all* of the harmful effects alleged by the NBA in paragraphs 27-54 relate *only* to the illegal recording.

Mr. Sterling expected—and had—a *constitutional right* not to have his private confidential communications recorded.  The California Supreme Court has unequivocally declared as much in the context of telephone calls: "California clearly has an interest in protecting the privacy of telephone conversations of California residents while they are in California. . . ."  *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 104 (2006).  Because Ms. Stiviano flagrantly encroached upon this right, this conversation is not usable in *any proceeding*, including this one, and the NBA's continued use of this illegally recorded conversation is nothing less than a direct and blatant invasion of Mr. Sterling's California constitutional guarantee of privacy.  Mr. Buchanan, the NBA's General Counsel, has admitted that "the charge is based *solely* on a recording. . . ."  (Ex. 1 attached hereto (emphasis added).)  Incredibly, the Commissioner never acknowledges in the charge that the conversation occurred in a private setting or that Mr. Sterling did not know he was being recorded in the charge.  (Charge, Ex. 3 ("Cooper: Let me ask you.  Let's start talking about the tape.  Did you know you were being recorded?  Sterling: No, of course not.  Of course not.  No."); Ex. 2, Declaration of Donald T. Sterling attached hereto, ¶¶ 4-5.)  This entire proceeding is therefore predicated on a constitutional violation and, on this basis alone, should be terminated.

Reportedly, Ms. Stiviano is under criminal investigation for possible extortion, and other issues connected with the illegal recording, a fact that the NBA did not bother to disclose and which did not deter reliance on her "testimony."

## II.   The Commissioner Has Not Established a Violation of the NBA Constitution

The Commissioner charges Mr. Sterling with various violations of Article 13.  But when the facts here are applied to the NBA constitution and the various provisions the Commissioner bootstraps to the NBA constitution, the cornerstone of the Commissioner's charge crumbles.  A jealous rant to a lover never intended to be published cannot offend the NBA rules.

3

**49**

### A.   Article 13(d) is not a "catch-all" provision

The first count in the Commissioner's charge is brought under Article 13(d) of the NBA constitution.  Article 13(d) provides that owners or members may be terminated if they: "Fail or refuse to fulfill its contractual obligations to the Association, its Members, Players, or any other third party in such a way as to affect the Association or its Members adversely."  (Charge, Ex. 2, Art. 13(d).)  A plain reading of this paragraph shows that it was intended to provide a termination remedy for owners that did not pay or otherwise fulfill contractual obligations to the NBA, the other members, players, or a third party.  For instance, if an owner did not contribute their portion of revenue sharing, failed to pay players' salaries, or breached a contract with a sponsor, termination might lie under Article 13(d).  There is no evidence and there are no allegations that Mr. Sterling or the Clippers have failed to fulfill any of these contractual obligations.

Article 13(d) was not meant to be the "catch-all" provision the Commissioner urges.  This reading is buttressed by the fact that such a catch-all provision *already exists* earlier in the very same article, Article 13(a), which states that any owner that "willfully violate[s] any of the provisions of the Constitution and By-Laws, resolutions, or agreements of the Association" may be terminated.  (Charge, Ex. 2, Art. 13(a).)  The Agreement and Undertaking (Charge, Ex. 5) and the Joint Venture Agreement (Charge, Ex. 6) are examples of the "agreements of the Association" referenced in Article 13(a).  But because Article 13(a) requires a "willful" component, which the Commissioner cannot prove and knows he cannot prove, he has attempted to create a second catch-all provision where there is none without the express willfulness requirement.  As such, Count I is fatally flawed from the very start.

4

### B.     Even if Article 13(d) applies here, Mr. Sterling did not violate paragraph 2 of the Agreement and Undertaking and as a result did not violate Article 13(d)

Even if the Commissioner were correct in his overly expansive reading of Article 13(d), he still does not establish that Mr. Sterling violated that article. In Count I, the Commissioner charges Mr. Sterling with violating paragraph two of an Agreement and Undertaking dated July 26, 2005, which states in pertinent part that Mr. Sterling agreed not to "take or support, and to cause their respective affiliates not to take or support, any position or action that may violate or be inconsistent with any NBA Rule or any right of any NBA Entity or NBA Team, or which may have a material adverse impact on any of the NBA Entities or NBA Teams." (Charge, Ex. 5, ¶ 2.) In particular, the Commissioner claims that the "material adverse impact" of Mr. Sterling's constitutionally protected private conversation "undermined and called into question the NBA's commitment to diversity and inclusion; damaged the NBA's relationship with its fans; harmed NBA players and Clippers team personnel; and impaired the NBA's relationship with marketing partners and licensees, and with government and community leaders." (Charge ¶ 89.) The charge does not establish that Mr. Sterling violated Article 13(d) of the NBA constitution.

### 1.     Mr. Sterling was illegally recorded during an inflamed lovers' quarrel in which he was clearly distraught; he did not take or support a position or action

The Commissioner's charge rests solely on comments made to Ms. V. Stiviano during an illegally recorded private conversation that occurred in her living room. As stated above, this conversation is not usable for *any* purpose and should not be considered as evidence against Mr. Sterling. But nevertheless, because the Commissioner has based the charge on the transcript of the illegal recording (Charge, Ex. 1), Mr. Sterling addresses it here.

Mr. Sterling did not "take or support" any "position or action" in the events giving rise to the charge, a prerequisite to violating paragraph two of the Agreement and Undertaking. Mr.

Sterling was engaged in a lovers' tiff stemming from his jealous reaction to Ms. Stiviano's statement that she was going to "bring four gorgeous black guys to the game." (Charge, Ex. 3, p. 1.) Mr. Sterling's ego was obviously bruised by this remark suggesting that she was cavorting with younger, "gorgeous" men. It's facially ludicrous that what Mr. Sterling said in these circumstances could produce the equivalent of a death penalty while Kobe Bryant called a referee a "fucking faggot" on national television sustaining only a modest $100,000 fine. Mr. Sterling did not deny that the words he uttered were "stupid, foolish, [and] uneducated." (*Id.*, p. 5.) But he also said—in a portion of the interview far less quoted in the media—that when "you get upset you say things." (*Id.*) It is beyond dispute to anyone who actually listened to the recording (and not just read the transcript) that Mr. Sterling was distraught—indeed, in tears— during the conversation. While this of course does not justify what Mr. Sterling said, it should be a mitigating factor because *everyone* has uttered words in the heat of an argument they later regretted; this is part of being human. Mr. Sterling has admitted that he was jealous, and Ms. Stiviano was aware of her position in relation to Mr. Sterling, telling him "And you're in love with me." (Charge, Ex. 1, p. 3.)

It is also apparent that Ms. Stiviano baited Mr. Sterling—in this distressed and vulnerable state—into saying many of these hurtful comments. (*Id.*, pp. 1, 2, 4.) Throughout the argument, Mr. Sterling tried to end the conversation, but Ms. Stiviano continued to try and elicit responses from him. Ms. Stiviano's persistent instigating continued when Mr. Sterling said that he was not a racist. When Ms. Stiviano first asked Mr. Sterling: "What's wrong with minorities? What's wrong with black people?," Mr. Sterling replied, "Nothing. Nothing." (Charge, Ex. 1, p. 1.) The following passage is particularly illustrative:

Ms. Stiviano: I don't understand how you can have so much hate towards minorities.

Mr. Sterling:   I don't have any hate, I love them.

Ms. Stiviano:   I cannot understand. . .

Mr. Sterling:   Why would you say I hate. . .

Ms. Stiviano:   How a person like you who's elevated, who's here still feels he's above the world and you can't even be seen with someone in which is considered of a different skin color?

Mr. Sterling:   They can be with me all day long and all night long.

Ms. Stiviano:   I can't believe that a man who's educated, a man who's a scholar, a man...

Mr. Sterling:   Well, believe it, and stop talking about it.  Let's finish our discussion with a period, okay?  You're not making any good points.  You can't believe this man—that's all I am.

Despite Mr. Sterling's repeated requests to end the conversation, Ms. Stiviano continued. It is evident that Ms. Stiviano intended to provoke a response from a flustered and vulnerable Mr. Sterling that she knew was "in love with her" and that she knew she was recording.  Perhaps this is no surprise.  When asked on an interview with Dr. Phil on May 20, 2014 if she enjoyed the limelight, Ms. Stiviano responded: "Absolutely!" and further stated, "Are you kidding me?  I get to experience first-hand what it is to be a celebrity in LA."  As she stated in her text message to a Clippers executive, she perceives this all as a game:  "LET THE GAMES BEGAN. . . ." (Anders Decl., Ex. C.)

In short, not even the Commissioner alleges that Mr. Sterling intended to harm the NBA with his comment.  Nor could he.  This was an argument between a jealous man and the woman he loved that should never have left the privacy of the living room.  And while Mr. Sterling said some terrible words in the passion of the argument—as he has already publicly admitted and for

7

which he has apologized—he has not taken a "position" or an "action" in the sense that it would be commonly understood in that paragraph of the Agreement and Undertaking.  If Mr. Sterling's lovers' tiff is a "position" or "action," the NBA ownership should be put on notice that any of their private comments and conversations—including their most intimate—will now be considered a "position" or "action" under the Agreement and Undertaking, and if some of those comments happen to leak, it may become grounds for their termination as owners.  Putting it most simply, stripping Mr. Sterling of his ownership because of a private lovers' quarrel that was not intended to harm the NBA in any way *or even become public* is an outrageous punishment.

### 2. Mr. Sterling's comments on Anderson Cooper's television interview do not violate the NBA constitution

Aside from the illegally recorded and private conversation with Ms. Stiviano, the Commissioner charges Mr. Sterling with "criticiz[ing] African Americans for not supporting their communities; and publicly disparag[ing] NBA legend Magic Johnson" on an interview with Anderson Cooper. (Charge ¶ 88.)  While Mr. Sterling's opinions may be unpopular and false, they remain opinions.  First, the contribution of groups of all races and ethnicities to their communities is an important social issue and is discussed often.  For example, when questioned last year about the image of "minorities in Hollywood," civil rights activist and music legend Harry Belafonte responded: "I think one of the great abuses of this modern time is that we should have had such high-profile artists, powerful celebrities.  But they have turned their back on social responsibility.  That goes for Jay-Z and Beyoncé, for example."  Although there is much literature casting doubt on this position, it remains an undeniable matter of social importance that merits discussion, and one side should not be silenced in that discussion because it may be unpopular.  Second, while Mr. Sterling's opinion of Magic Johnson may also be unpopular, is the NBA willing to set a standard that an individual can be punished for voicing a negative

opinion of a popular player? If so, such a standard will make short shrift of many players and

coaches. It will also needlessly suppress free speech. The Commissioner does not allege and

cannot allege that these facts could independently sustain the charge to terminate Mr. Sterling's

ownership interest.

> **3.     Because Mr. Sterling is locked out of his office at Staples Center, he cannot conduct his own investigation or research as to the materiality of the impact of the illegally recorded leaked tape**

Even if Mr. Sterling's fight with Ms. Stiviano constitutes a "position or action" (which it

does not), that position or action must violate an NBA rule or have a material adverse impact on

the NBA. (Charge, Ex. 5, ¶ 2.) The Commissioner charges Mr. Sterling's position or action as

having a material adverse impact on the NBA. (Charge ¶¶ 87-90.) In support, the Commissioner

provides declarations from several officers and employees of the NBA, in addition to a "report"

from Richard E. Lapchick[2] and a survey and expert report from Sara Parikh demonstrating the

materiality of the impact. Mr. Sterling cannot adequately respond to the NBA's allegations

because he is prohibited from entering his office at Staples Center or having any involvement

with the Los Angeles Clippers to retrieve relevant information that he could use in his defense.

Accordingly, among other things, he cannot verify how many season ticket holders have

demanded refunds, how many individuals purchased season tickets after the illegal recording

was released, how merchandise and concession sales were impacted after the illegal recording

was released, and if any new companies were interested in sponsoring the Clippers. Nor does

---

[2] Richard Lapchick is the endowed chair and director of the DeVos Sport Business Management Program. This program was founded by and is named for Richard DeVos and his wife, the owners of the Orlando Magic—a team that has already announced how it is going to vote in this matter. In view of this fact, it cannot be seriously contended that this "report" is neutral. Moreover, as discussed below, Mr. DeVos has made highly controversial comments against individuals with HIV/AIDS and generously supports anti-homosexual causes with impunity.

Mr. Sterling have the time to retain and conduct an effective survey analysis to counter the survey proffered by the Commissioner.

The "material adverse impact" the Commissioner claims is also highly questionable. Under paragraph 2, the league cannot force Mr. Sterling to sell because of *any* adverse harm to the NBA, the adverse harm must be *material*. The Commissioner has not made such a showing. The only demonstrable harm was that some sponsors temporarily withdrew their support (but for the most part, quickly reinstated it). As the Commissioner alleges, the sponsors "universally stated that if the NBA did not take swift and decisive action to penalize Mr. Sterling, they would need to reevaluate their relationship with the Clippers." (Charge ¶ 45.) The Commissioner, however, took such an action in the form of a lifetime ban and $2.5 million fine, and the overwhelming majority of sponsors reinstated their sponsorship as quickly as they withdrew it.

The players did not boycott any games when TMZ first leaked the illegal recording— when emotions were at their very highest—and it is *pure speculation* to say that the players will not play for the Clippers next season (or will not play at all) if the Sterlings are not removed entirely from the NBA. The Commissioner does not even allege this. The charge merely states that: "Clippers players have universally expressed reservations about continuing to play for the Clippers next season," that players "considered boycotting playoff games," and "several teams engaged in silent protests against Mr. Sterling." (Charge ¶¶ 39, 41.) But expressing reservations, considering boycotts, and engaging in silent protests hardly qualifies as a "material adverse impact" on the league. The same can be said of the "call[s] for protests and boycotts of the Clippers and/or the NBA" from "civic leaders and social welfare organizations." (*Id.* ¶ 51.) The Commissioner acknowledges the speculative nature of the harm when he alleges that "the *threat* [of protests or a boycott] remains if LAC's membership is not terminated." (*Id.* (emphasis

added).)  A threat is not a material adverse impact.  Finally, even the survey that Sara Parikh

conducted only shows that some fans would supposedly be "less *likely* to support the LA

Clippers if Donald Sterling remains the owner."  (Parikh Report ¶ 35 (emphasis added).)  This is

simply more speculation.

>    ### 4.   Mr. Sterling was instrumental in fostering the diverse body of players, coaches, general managers, employees, and fans on which the NBA prides itself

The Commissioner goes through great lengths to outline the NBA's commitment to

diversity and inclusion.  The achievements of the NBA on this front, which are well documented

in Exhibit A to the Declaration of Kathy Behrens, are commendable.  But the Commissioner

completely spurns and never acknowledges the role of Mr. Sterling in attaining these goals.  As

the longest-tenured owners in the NBA, the Sterlings have employed five African American

coaches, scores of African American players, an African American general manager who held

that job for 22 years, and staff who helped the NBA receive a laudable "A+" in racial hiring

practices.  Indeed, Mr. Sterling  recently terminated a Caucasian head coach and traded for an

African American head coach who is now among the most highly paid and respected in the

league.

Mr. Sterling was also active in the African American community.  Before the illegally

recorded comments were leaked, Mr. Sterling was set to receive his second lifetime achievement

award from the NAACP for plans to create a multimillion-dollar endowment at Los Angeles

Southwest College, which has a predominantly African American student body.  Mr. Sterling

similarly received an award from the NAACP in 2009 because of his "unique history of giving to

the children of L.A." and for being "very kind to the minority youth community," donating 2,000

to 3,000 tickets *a game* to youth groups.  The Commissioner intentionally ignores all of these

facts in the charge and fails to call them to the attention of the Board of Governors.  Over the

Sterlings' 30-year ownership, there has been only a single accusation of race discrimination involving the Clippers, and that was resolved in Mr. Sterling's favor.

**C.    Mr. Sterling did not violate paragraph 2 of the Joint Venture Agreement, and as a result did not violate Article 13(d)**

The second count in the Commissioner's charge is also brought under Article 13(d) of the NBA constitution. In this count, the Commissioner charges Mr. Sterling with violating Article II of the Amended and Restated Joint Venture Agreement, which is titled "Purpose of Venture." (Charge, Ex. 6, Art. II.) The "purpose of venture" as stated in Article II is "The Joint Venture shall consist of professional basketball teams, each of which shall be operated by a Joint Venturer. The Joint Venturers shall use their best efforts to see to it that the sport of professional basketball is conducted according to the highest moral and ethical standards." (*Id.*)

As discussed above in section II.A, Article 13(d) is not a catch-all provision, so any violation of another agreement should be brought under Article 13(a) of the NBA constitution, which requires a *willful* violation. All the same, Mr. Sterling still did not violate Article II of the Joint Venture Agreement. The article requires that Mr. Sterling use his "best efforts" to ensure that "the sport of professional basketball is conducted according to high moral and ethical standards." (Charge, Ex. 6, Art. II.) It is virtually inconceivable that Article II was intended to regulate a private lovers' quarrel. This is apparent from the article's language. Mr. Sterling was not "conducting" the "sport of professional basketball" when he was arguing with Ms. Stiviano in her living room. Under the Commissioner's interpretation of Article II, any immoral or unethical comment—even a private one—could become the basis for a forced termination.

And further, the Commissioner is hard-pressed to claim that when Mr. Sterling *actually* conducted the sport of professional basketball that he did not use his best efforts to "adhere to the basic principles of diversity, inclusion, and respect for others that are integral to the NBA's

12

efforts to conduct the sport of professional basketball in accordance with the highest moral and ethical standards." (Charge ¶ 93.) As discussed above in section II.B.4, Mr. Sterling has been instrumental in promoting a diverse and inclusive NBA.

In short, Article II *is not meant to oversee morals and ethics in the home*; it is meant to govern morals and ethics in conducting the sport of professional basketball. Because the Commissioner only charges Mr. Sterling with the former, he has not properly sustained his burden in showing that Mr. Sterling violated Article II of the Joint Venture Agreement.

**D.      Mr. Sterling did not violate or breach a contractual or common law duty of loyalty to the NBA**

The third and fourth counts of the Commissioner's charge involve alleged breaches of the fiduciary of duty of loyalty. (Charge ¶¶ 96-100, 101-104.) More specifically, the Commissioner has stated that Mr. Sterling has not supported the NBA "in the attainment of its proper purposes." (*Id.* ¶¶ 97, 102.) Mr. Sterling did not violate any fiduciary duty of loyalty to the NBA in Ms. Stiviano's living room, and counts three and four should accordingly be rejected.

The Commissioner misapprehends the scope of the fiduciary duty of loyalty that members of an association or joint venture owe one another. The fiduciary duty of loyalty includes:

- An obligation not to favor one's interests over those of the joint venture;

- An obligation not to unfairly manipulate or control corporate processes;

- An obligation not to retain control or to appropriate for oneself an opportunity that belongs to the joint venture.

In other words, a fiduciary duty of loyalty is meant to bar self-dealing and situations where a fiduciary's personal interest might conflict with the interest of those to whom that person owes the duty of loyalty.

13

The Commissioner has not charged Mr. Sterling with self-dealing or dealing in a manner where Mr. Sterling's decision-making might have been consciously or subconsciously influenced because of a conflict of interest. For example, a partner who directed business to his or her best friend instead of a more qualified candidate might violate a fiduciary duty of loyalty to the partnership. Likewise, an individual who took a lucrative business opportunity for his or herself when it was offered to a partnership might violate the duty of loyalty. In a nutshell, the duty of loyalty is about not putting your interests before those of the association. There are no allegations in Counts III or IV that Mr. Sterling was in fact "disloyal" to the interests of the NBA by putting his interests before those of the NBA and its members. Instead, the Commissioner vaguely alleges that "LAC has espoused views." (Charge ¶¶ 99, 103.) "Espousing views" is not a breach of the duty of loyalty. The other allegations in this paragraph, such as "LAC has . . . alienated a wide segment of the NBA community" (*id.* ¶¶ 99, 103), are consequences of the leak of the illegal recording and do not constitute a "breach."

But even under the Commissioner's amorphous and markedly expanded duty of loyalty to "support the Association in the attainment of its proper purposes," Mr. Sterling still did not breach a duty. He did nothing to undermine the NBA's attainment of its "proper purposes," a vague term that the Commissioner never defines. Presumably, the Commissioner is referring to the NBA's policy of diversity and inclusion. (Charge ¶ 29.) As has been discussed at length in this response, Mr. Sterling played a vital role *in helping* the NBA attain this purpose. An illegally recorded private conversation in a living room cannot possibly be considered a failure to support the Association in attaining its "proper purpose," especially when it flies in the face of Mr. Sterling's public conduct and the way he runs the Clippers. And without any allegation of

actual intent to breach the duty of loyalty, Counts III and IV become even weaker.  Mr. Sterling did not breach a contractual or common law duty of loyalty.

    **E.**    **Mr. Sterling did not violate Article 13(a) of the constitution because he did not willfully violate any provision of the constitution or other contract**

The fifth count charges Mr. Sterling with violating Article 13(a) of the NBA constitution. Article 13(a) provides that an owner may be terminated if they "*Willfully* violate any of the provisions of the Constitution and By-Laws, resolutions, or agreements of the association." (Charge, Ex. 2, Art. 13(a) (emphasis added).)  The Commissioner tethers three separate provisions of the Constitution to this alleged violation of Article 13(a).  None withstand even the slightest of scrutiny.

    **1.**    **Mr. Sterling did not willfully violate Article 24(m) because any alleged destruction of evidence occurred prior to the commencement of the Commissioner's investigation**

First, the Commissioner claims Mr. Sterling violated Article 24(m), which requires an owner to cooperate with the Commissioner to provide evidence and testimony requested in connection with any of the Commissioner's investigations.  (Charge, Ex. 2, Art. 24(m).) According to the Anders Declaration, the NBA became aware of the illegal recording on the evening of April 24, 2014.  (Anders Decl. ¶ 29.)  Mr. Anders is notably silent on when he was retained to begin the investigation, but it can be inferred from the Commissioner's declaration that the investigation began on April 26, 2014.  (Silver Decl. ¶¶ 6-9.)  According to Mr. Anders's Declaration, an unnamed employee told Mr. Anders that he or she was asked by Mr. Roeser sometime between April 9 and April 25 to delete the recording and text message history after Mr. Roeser got off the phone with Mr. Sterling (the implication being that Mr. Sterling told Mr. Roeser to delete the recording and text message history).  These facts—and the allegations that are missing—amply demonstrate that Mr. Sterling did not violate Article 24(m).

First, because the NBA did not start its investigation until April 26, Mr. Sterling had no obligation whatsoever to produce or even retain these documents because that obligation exists only "in connection with all actions, hearings, or investigations." (Charge, Ex. 2, Art. 24(m).) That fact disposes of this portion of the charge altogether. Second, the Commissioner does not allege that Mr. Sterling was ever *asked* to produce documents or other evidence; he does not allege that he sent a document-retention letter to Mr. Sterling; he does not even allege that he told Mr. Sterling he was starting an investigation. He identifies virtually no obligation Mr. Sterling had to contact the NBA. Finally, the NBA is relying on *triple* hearsay from an anonymous source that is predicated on assumption and a complete lack of personal knowledge.[3] This anonymous source did not hear Mr. Sterling instruct Mr. Roeser to delete the recording. On top of that, Mr. Sterling will not even have an opportunity to cross-examine the witness. In any event, because Mr. Sterling was under no obligation whatsoever to produce documents to the NBA before the Commissioner required him to do so, he could not and did not violate Article 24(m).

2.    **Mr. Sterling did not violate Article 35A(c) or Article 35A(d) because he did not willfully make any statement or engage in any conduct having a prejudicial or detrimental effect on the best interests of the NBA**

The second and third NBA constitutional provisions underlying Mr. Sterling's alleged violation of Article 13(a) are Article 35A(c) and Article 35A(d). Article 35A(c) prohibits any person from making a statement that has or is designed to have "an effect prejudicial or detrimental to the best interests of basketball or of the Association or of a Member or its Team, shall be liable to a fine not exceeding $1,000,000 to be imposed by the Commissioner." (Charge,

---

[3] As Shelly Sterling's response amply demonstrates, this is far from the only instance where the Commissioner relies upon hearsay, many times from declarants who lack personal knowledge of the conversations they are attesting to. The fact that the Sterlings will be unable to cross-examine these witnesses underscores the patent unfairness of this procedure.

Ex. 2, Art. 35A(c).) Article 35A(d) similarly prohibits an owner from engaging in "conduct prejudicial or detrimental to the Association." (Charge, Ex. 2, Art. 35A(d).) Mr. Sterling did not *willfully* violate either of these Articles.

The Commissioner does not specify any particular statement or acts that had any prejudicial effect on the NBA. He does not allege that Mr. Sterling's statements in the illegally recorded conversation or in his interview with Anderson Cooper violate these sections. Instead, the Commissioner alleges that Mr. Sterling "provid[ed] false and misleading information to Mr. Anders in connection with the Commissioner's investigation of the Recording" and "issu[ed] a false and misleading public statement on April 26 regarding the authenticity of the TMZ recording." (Charge ¶ 109.)

There are many problems with these allegations. First, and most importantly, the Commissioner does not allege or identify any prejudicial or detrimental effect of Mr. Sterling's or the Clippers' purported statements questioning the authenticity of the tape. This is a prerequisite to violating Articles 35A(c) and 35A(d) and Counts IV and V fall on this ground alone. In addition, the public was not privy to Mr. Sterling's statement to Mr. Anders so it is impossible to see how this statement could have prejudiced the NBA. Second, assuming that Mr. Sterling was aware that the illegal recording was authentic at the time he was asked, under the Commissioner's interpretation of the NBA constitution, an owner must automatically and publicly admit guilt when accused or risk facing termination of their team ownership. This interpretation was surely not contemplated by the NBA constitution and would infringe on basic principles against self-incrimination. Third, the illegally recorded conversation occurred on September 12, 2013. It is perfectly natural that a busy individual would forget the precise details of a conversation that occurred several months earlier and might question the authenticity of a

17

recording saying words that he was surprised to hear himself utter.  (Anders Decl. ¶ 10.)  For these reasons, Mr. Sterling did not *willfully* make any statement or engage in any conduct prejudicial or detrimental to the league.

**F.     Mr. Sterling did not violate Article 13(c) of the constitution because the Commissioner's fine is not 30 days overdue, and in any event, the fine was improperly issued**

The final count, Count VI, charges Mr. Sterling with a violation of Article 13(c) of the NBA Constitution.  Article 13(c) provides that an owner may not "fail to pay any dues . . . within thirty (30) days after Written Notice from the Commissioner of default in such payment." (Charge, Ex. 2, Art. 13(c).)  The Commissioner is incorrect that Mr. Sterling has violated Article 13(c).

**1.     The violation is not yet ripe**

At the outset, this violation is not ripe.  Mr. Sterling was notified that his fine was in default on May 14, 2014.  (Charge ¶ 113.)  As such, he has until at least June 13, 2014 to pay the fine.  Because this 30-day time period has not yet expired, there has been no violation of Article 13(c).

**2.     The maximum permissible fine in the circumstances was $1 million**

According to the NBA's general counsel, the Commissioner's fine against Mr. Sterling was levied under Article 24.  (Charge, Ex. 4.)  Article 24 allows the Commissioner to levy a fine of up to $2.5 million "*wherever there is a rule for which no penalty is specifically fixed.*" (Charge, Ex. 2, Art. 24(l) (emphasis added).)  But there is such a rule here, and that rule provides for only a maximum $1 million penalty.  Article 35A(c) punishes a person who "makes . . . any statement having, or designed to have, an effect prejudicial or detrimental to the bests interests of basketball."  According to the NBA's letter, "The penalties set forth in paragraphs 1 and 2 above are based on the recordings released on April 26 and 27." (Charge, Ex. 4.)  Because Article

35A(c) directly deals with the matter of speech having a prejudicial effect on the NBA, and because that is precisely what the Commissioner is charging, the NBA constitution fixes a specific penalty for the alleged conduct. As such, even if a violation occurred, the maximum amount Mr. Sterling could have been fined is $1 million. The Commissioner exceeded his authority in issuing a $2.5 million fine.

### III.   Expelling the Sterling Family Runs Afoul of General Principles Governing Private Associations Because It Would Result in an Unfair and Discriminatory Administration of the NBA's Rules

Under both New York and California law, while private associations are granted some deference in expelling members, they may not expel any members at will. There are certain rules governing how members may be lawfully expelled. If the Commissioner's request to terminate Mr. Sterling's ownership is granted in these circumstances, the NBA will violate those rules.

### A.   The punishment against Mr. Sterling is arbitrary and capricious and is grossly disproportionate to past punishments imposed by the NBA

As stated above, the magnitude of the NBA's punishment against Mr. Sterling is unparalleled. Judging in terms of the punishment already imposed, and the Commissioner's current request, Mr. Sterling's offense is far and away the worst offense that any player, coach, or owner has ever committed in the history of the NBA. In the past, the NBA has either punished offensive speech with a modest fine or ignored it. Consequently, even if Mr. Sterling violated the NBA constitution, the Commissioner's request to terminate Mr. Sterling as an owner, coupled with the punishment he already imposed, would result in unfairly disparate treatment, which would render the exclusion unlawful because of such an arbitrary punishment. On top of that punishment, forcing a sale rather than allowing the team to pass by succession to

19

65

the remaining spouse or heirs would trigger an avoidable capital gains tax estimated to be more than $300 million to $500 million.

For comparison, the below is a non-exhaustive list of *publicly available* examples of past *public* acts of conduct by NBA owners, coaches, and players. Some were punished; many were not.

<u>Speech-Related Conduct</u>

- A player was fined $100,000 but not suspended for referring to a referee as a "fucking faggot" on television.

- Jason Collins—the first openly homosexual player in the NBA—reported that he heard negative comments from another player during a game.[4] The NBA has not announced that it was investigating or taking any action concerning the matter.

- An owner donated $500,000 to the National Organization for Marriage, which advocates around the nation to legally ban marriage between homosexual couples. LGBT advocacy groups called for a boycott. The NBA took no action despite these threats of a boycott. On the topic of HIV/AIDS, the same owner had this to say in an interview 2010: "When HIV first came out President Reagan formed a commission, and I was honored to be on that commission. I listened to 300 witnesses tell us that it was everybody else's fault but their own. Nothing to do with their conduct, just that the government didn't fix this disease. At the end of that I put in the document, it was the conclusion document from the commission, that actions have consequences and you are responsible for yours. AIDS is a disease that people gain because of their actions. It wasn't like cancer. We all made the exceptions for how you got it, by accident, that was all solved a long time ago. . . . That's when they started hanging me in effigy because I wasn't sympathetic to all their requests for special treatment. Because at that time it was always someone else's fault. I said, you are responsible for your actions too, you know. Conduct yourself properly, which is a pretty solid Christian principle." The NBA similarly took no action.

- When talking to a newspaper reporter, a former NBA player referred to his legal counsel as "big-time Jew lawyers" and referred to the Jewish people as "some crafty people" because "they are hated all over the world." The same player also used an anti-homosexual epithet directed to a fan. Former NBA commissioner

---

[4] It is worth noting that Mr. Collins admirably stated the following in reaction to these comments: "We're all human. Everyone is entitled to their own opinions. You hope that if someone has a negative opinion, that they would keep it to themselves. But at the same time, I understand that in the NBA, we're a bunch of individuals and this is America and everyone's entitled to their opinion."

David Stern stated that the remarks against homosexuals were "inappropriate and insensitive" and merited a suspension but did not suspend the player or ban him from future NBA activities.

- In response to an Asian player's "tweet" asking to guess where he ate a meal, another player responded "Panda Express." The NBA took no action although it was reported in several media outlets.

- Referring to Yao Ming, a player stated (on a television show): "Tell Yao Ming, 'ching chong yang wah ah soh.'" And although the statement offended many in the Chinese community, the NBA neither fined nor suspended the player. Last month, that same player—now a former player—was accused of publicly mocking (on Instagram) a picture of a man with ectodermal dysplasia, a rare genetic disorder affecting one's appearance. Despite being a minority owner of the Sacramento Kings, the NBA has yet to take any action against this individual.

- After Mr. Sterling's illegally recorded private comments were leaked, a former player and current Knicks executive "tweeted": "Black people your Focusing on the wrong thing. We should be focusing on having our own, Own team own League! To For Self!!" The NBA ignored this call for a racially homogenous league.

## Past Owner Punishments

- An owner was suspended for nearly a year for signing a player to a secret contract, which violated the salary cap rules.

- An owner was fined $25,000 and suspended two games for being convicted of drunk driving.

- An owner was fined $100,000 for confronting referees on a court after the game and using inappropriate language toward them.

- Multiple owners were fined undisclosed sums (reported at between $100,000 and $500,000) for making public comments on Twitter about the collective bargaining process during the 2011 NBA lockout.

## Non-Speech-Related Player Punishments

- A player was suspended 72 games plus playoffs for punching a fan. That same player was suspended seven games for a domestic violence incident, among other past suspensions.

- A player was suspended for 82 games (reduced to 68 games by an arbitrator for being too severe) for choking his coach and threatening to kill him.

21

- A player was suspended for 11 games for kicking a cameraman in the groin such that the cameraman needed to be carried away on a stretcher. The same player was suspended six games and fined $20,000 for head-butting a referee.

- A player was suspended for seven games for pleading guilty to a reckless driving charge that resulted in the death of a passenger.

No owner, coach, or player has ever been fined close to $2.5 million, banned for life, and forced to sell their property for *any* offense, let alone an alleged *private speech-related* offense. The NBA claims a commitment to diversity and inclusion, but it appears to have ignored many public statements undermining those principles in the past. In fact, the only permanent bans of record—other than the ban the Commissioner currently requests—involve gambling violations and repeated violations of the NBA's substance-abuse policy. And further, as far as Mr. Sterling is aware, no one in the NBA has ever been punished for speaking in a private constitutionally protected setting. In view of these facts, the Commissioner's request to compel Mr. Sterling to sell the Los Angeles Clippers is internally inconsistent with prior punishments, is discriminatory, and is arbitrary and capricious.

## B.     The procedures of the NBA constitution are unfair—both facially and as applied in this setting

The NBA constitution provides a meager five business days for Mr. Sterling to review the immense charge and "additional evidence in support of charge," perform factual and legal research, and draft a response. This time is woefully inadequate for individuals with a billion-dollar enterprise on the line to investigate and sufficiently respond to a charge as severe as divesting a member of ownership of a team. On the other hand, the Commissioner and members have as much time as they need to research, prepare, and file a charge. On top of that, the NBA constitution provides no internal avenue for review or appeal and in fact prohibits "any and all recourse to any court of law to review any such decision." (Charge, Ex. 2, Art. 13(j).) These procedures are strikingly improper with so much at stake.

22

**68**

But the rule is far worse as applied here. The Commissioner and his office—who have been following media reports closely (Declaration of Michael Bass and accompanying exhibits)—almost certainly knew that Mr. Sterling was in the process of retaining counsel to represent him. Once Mr. Sterling retained counsel, he was unable to provide his attorneys with the pertinent documents, which were located in his office at Staples Center. When Mr. Sterling's counsel requested that Mr. Sterling be granted access to his office, the NBA refused the request. As such, Mr. Sterling's counsel *still* have not had access to Mr. Sterling's files and are forced to rely exclusively on the Commissioner's evidence.

Even further, the NBA refused Mr. Sterling's request for an extension of time to respond. This position was cemented in the Commissioner's press conference of May 20, 2014, where he stated: "In terms of additional time, the answer has been no." The Commissioner indicated an unwillingness to deviate from the procedures enumerated in the constitution. The NBA, with its own vast resources and at least one of the nation's largest law firms behind it, took 23 days from the time TMZ leaked the illegal recording to file its charge. The charge is 30 pages long, contains 15 statements and declarations, an expert report, survey evidence, and what appears to be approximately 1,000 pages of exhibits. Despite the extent and magnitude of the charges, the NBA refused to provide Mr. Sterling with more than five business days to respond. These are impermissible tactics. The basic charges aside, how can Mr. Sterling possibly retain experts and respond to the NBA's extensive survey and forensic evidence in five business days, including a holiday weekend? How can he obtain declarations from anyone in the Clippers organization when he is barred from the premises? The procedures insisted upon by the Commissioner under these circumstances—especially with so much at stake for Mr. Sterling—offend the most rudimentary maxims of fairness.

**C.      Mr. Sterling's hearing will be neither fair nor impartial, and many owners have already announced their agreement with the Commissioner**

The result of the Commissioner's request in the charge is preordained, and Mr. Sterling will receive neither a fair nor impartial hearing.  For instance, in a news conference on May 20, 2014, the Commissioner stated: "We know we're doing the right thing, and I know I have the owners behind me."  Another news outlet reported that a league source told Yahoo Sports: "Adam has the votes—all of them, I believe."  Many owners have already said as much themselves, *even before the charge and Mr. Sterling's response was filed.*  A few examples include:

- Chicago Bulls: "We completely support Commissioner Silver's decision today regarding Clippers owner Donald Sterling, and praise him for his prompt investigation and action.  The Commissioner was correct to ban Mr. Sterling from all official NBA business, to levy the stiffest allowable fine, **and we will support his recommendation to press for Mr. Sterling to relinquish his ownership of the Los Angeles Clippers franchise.**  We believe Commissioner Silver's decision reflects the best interests of the NBA and public civility."

- Cleveland Cavaliers: "It is shocking that anyone could hold the kind of offensive and feeble minded views that are being attributed allegedly to the Clippers owner, Donald Sterling.  **The diverse staff members of the Cleveland Cavaliers franchise are unified in encouraging Commissioner Silver and the NBA to respond with swift and appropriate action** consistent with a strong zero tolerance approach to this type of reprehensible behavior."

- Detroit Pistons: "I am proud of Adam Silver for providing the leadership and strength necessary in this situation.  **He has my full support.**"

- Golden State Warriors: "We applaud the firm punishment handed out today by NBA Commissioner Adam Silver and appreciate the swiftness with which the NBA conducted its investigation.  **Similarly we anticipate that the NBA Board of Governors will act promptly to put this chapter behind us.**"

- Houston Rockets: "This kind of behavior can't be allowed in the NBA by owners, players or anybody.  **This guy has no place in the family of the NBA.**  Whatever it takes, we have to make sure this kind of event never happens again."

- Miami Heat: "Great job Adam.  The @NBA is in good hands.  **You have my full support.**"

- New Orleans Pelicans: "In light of the serious matter facing our league, a matter that transcends sports, the New Orleans Pelicans fully support the decisions made today by NBA Commissioner Adam Silver **and will fully support his recommendations moving forward.**"

- Orlando Magic: "**We are whole-heartedly behind Adam's recommendation and plan to vote accordingly.**"

- Phoenix Suns: "I applaud the actions taken today by Commissioner Silver in response to the disturbing comments made by Donald Sterling. Commissioner Silver's decision upholds the principles of diversity, tolerance and respect for all people that the NBA and Phoenix Suns represent. **The Commissioner has my full support.**"

- Sacramento Kings: "Great leadership today from @NBA Adam Silver. **Very clear message** about who we are as a league & **where we're going**. #NBA3.0 #secondthemotion."

The import of these statements is that the owners have already admitted that they are going to follow the Commissioner, who has now effectively assumed the role of prosecutor, jury, and executioner. These proceedings will be a spectacle meant to mollify the popular opinion, not a fair and impartial hearing: the outcome of these proceedings became a foregone conclusion weeks ago.

## IV. Forcing the Sterling Family to Sell the Los Angeles Clippers Would Result in an Egregious Forfeiture Because the Sterling Family Would Have to Pay an Enormous but Avoidable Capital Gains Tax

If the Sterlings are forced to sell their interest in the Los Angeles Clippers, they will face vast and avoidable financial consequences. Upon a forced sale of the team, the Sterlings would be subject to a capital gains tax of approximately 33 percent. This would result in the Sterling family owing several hundred million dollars in taxes they would otherwise not owe if the team passed through the probate process. In other words, if the Los Angeles Clippers passed to the Sterlings' heirs and they subsequently sold the team, they would pay immensely reduced capital gains taxes—by several orders of magnitude. Accordingly, a forced sale of the team would result in an egregious forfeiture to the Sterling family.

## CONCLUSION

For all the foregoing reasons, Donald Sterling and LAC Basketball Club, Inc. request that the Charge be denied and that the Membership of Donald Sterling and LAC Basketball Club, Inc. not be terminated.

Dated:  May 27, 2014

_____
Donald T. Sterling

**EXHIBIT 1**



# National Basketball Association

Richard W. Buchanan
Executive Vice President &
General Counsel

May 19, 2014

**By Overnight Mail and Email**

Maxwell M. Blecher, Esq.
Blecher, Collins, Pepperman & Joye
515 South Figueroa Street
Suite 1750
Los Angeles, CA 90071
mblecher@blechercollins.com

Dear Mr. Blecher:

I have your email requesting a 3-month delay of the time period set forth in the NBA Constitution for a response to the Charge that was initiated today.

The language of Paragraph 14 of the Constitution setting forth the procedure for termination of an NBA Membership is mandatory regarding the time allotted for a response: "The Member or Owner so charged, shall, within five (5) days after receipt of the charges, file with the Commissioner its written answer thereto." That is the rule to which all NBA Owners, including Mr. Sterling, have agreed.

There are good reasons for that rule. Time is of the essence when a charge is made to terminate an NBA Membership, and particularly so in this case, given the overwhelming and unprecedented harm to the NBA that has occurred and is continuing to occur by reason of Mr. Sterling's ownership of the team. Accordingly, the rule set forth in the Constitution must be adhered to.

Adherence to this rule is not in any way unfair to Mr. Sterling. The factual and legal issues here are not at all complex. The Charge is based solely on a recording that Mr. Sterling admits is authentic and events directly related thereto. The NBA's authority to act is clearly set forth in the NBA Constitution. Mr. Sterling has known about the existence of the recording since April 9, and he and his counsel already have been afforded multiple opportunities to be heard: (i) at an in-person interview, (ii) through the submission of any materials or other evidence to the NBA, and (iii) in a direct conversation with the Commissioner. He declined them all. Moreover, he is now being given a full eight (8) days (because of three (3) intervening non-business days) to respond to the Charge.

Maxwell M. Blecher, Esq.
May 19, 2014
Page 2

     Given this pattern of non-cooperation and failure to avail himself of multiple prior opportunities to be heard, and the more than adequate time to respond provided for by the Constitution, Mr. Sterling's request for an additional 3-month delay is entirely unjustified and cannot be granted. His answer to the Charge is due on May 27.

     Please contact me if you have any questions.

     Sincerely,

     Richard W. Buchanan

**76**

**EXHIBIT 2**

BEFORE THE NATIONAL BASKETBALL
ASSOCIATION BOARD OF GOVERNORS

In the Matter of the Termination of the National
Basketball Association Membership of

        LAC Basketball Club, Inc.

DECLARATION OF
DONALD STERLING

Donald Sterling, under penalty of perjury, declares as follows:

    1.    1. I am over the age of 18 and have personal knowledge of the factual matters set forth in this Declaration and, if called to testify, could and would competently and truthfully testify thereto.

    2.    I make this declaration in opposition of the Charge initiated by the Adam Silver, Commissioner of the National Basketball Association, dated May 18, 2014.

    3.    On several occasions, I was with Ms. Stiviano in the living room of her home. Specifically, on or about September 12, 2013, I was with Ms. Stiviano in the living room of her home. At that time I had a private conversation with her.

    4.    At no time did Ms. Stiviano disclose to me that she was recording our private conversation.

    5.    At no time did I give my consent to Ms. Stiviano to record our private conversation.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

    Executed on May 2 2, 2014 at Los Angeles, California.

_____
DONALD STERLING

59560.1

78

# EXHIBIT 4



# National Basketball Association

Richard W. Buchanan
Executive Vice President &
General Counsel

May 19, 2014

**By Overnight Mail and Email**

Maxwell M. Blecher, Esq.
Blecher, Collins, Pepperman & Joye
515 South Figueroa Street
Suite 1750
Los Angeles, CA 90071
mblecher@blechercollins.com

Dear Mr. Blecher:

I have your email requesting a 3-month delay of the time period set forth in the NBA Constitution for a response to the Charge that was initiated today.

The language of Paragraph 14 of the Constitution setting forth the procedure for termination of an NBA Membership is mandatory regarding the time allotted for a response: "The Member or Owner so charged, shall, within five (5) days after receipt of the charges, file with the Commissioner its written answer thereto." That is the rule to which all NBA Owners, including Mr. Sterling, have agreed.

There are good reasons for that rule. Time is of the essence when a charge is made to terminate an NBA Membership, and particularly so in this case, given the overwhelming and unprecedented harm to the NBA that has occurred and is continuing to occur by reason of Mr. Sterling's ownership of the team. Accordingly, the rule set forth in the Constitution must be adhered to.

Adherence to this rule is not in any way unfair to Mr. Sterling. The factual and legal issues here are not at all complex. The Charge is based solely on a recording that Mr. Sterling admits is authentic and events directly related thereto. The NBA's authority to act is clearly set forth in the NBA Constitution. Mr. Sterling has known about the existence of the recording since April 9, and he and his counsel already have been afforded multiple opportunities to be heard: (i) at an in-person interview, (ii) through the submission of any materials or other evidence to the NBA, and (iii) in a direct conversation with the Commissioner. He declined them all. Moreover, he is now being given a full eight (8) days (because of three (3) intervening non-business days) to respond to the Charge.

Olympic Tower • 645 Fifth Avenue • New York NY 10022 • Main: (212) 407-8000 • Direct: (212) 407-8013 • Fax: (212) 888-7931 • Email: rbuchanan@nba.com
RECYCLED PAPER

Maxwell M. Blecher, Esq.
May 19, 2014
Page 2

      Given this pattern of non-cooperation and failure to avail himself of multiple prior opportunities to be heard, and the more than adequate time to respond provided for by the Constitution, Mr. Sterling's request for an additional 3-month delay is entirely unjustified and cannot be granted. His answer to the Charge is due on May 27.

      Please contact me if you have any questions.

      Sincerely,

      Richard W. Buchanan

# EXHIBIT 5



# CONSTITUTION

## and

# BY-LAWS

## of

# THE NATIONAL BASKETBALL ASSOCIATION

May 29, 2012

# TABLE OF CONTENTS

Page

Interpretation                                          1

## CONSTITUTION

1.   Name of Association                               5
2.   Principles of Organization                       5
3.   Conflicts of Interest                            5
4.   Application for Membership                        7
5.   Transfer of Membership                           8
6.   Limitations on Indebtedness                     13
7.   Relocation                                       14
8.   Arenas                                           19
9.   Certain Playing Site Relocations                22
10.  Territory                                        23
11.  Resignation of a Member                          24
12.  Bankruptcy of a Member                           24
13.  Termination of Ownership or Membership           26
14.  Procedure for Termination                        27
14A. Consequences of Termination                      29
15.  Alternatives to Termination                      30
16.  Dissolution                                      31
17.  Amendments                                       31
18.  Board of Governors                               32
19.  Meetings of the Board of Governors               33

ii

|     |     | Page |
|-----|-----|------|
| 20. | Notice of Meetings | 34 |
| 21. | Quorum | 34 |
| 22. | Vote Required at Meetings | 34 |
| 23. | Alternatives to In-Person Meetings | 35 |
| 24. | Authority and Duties of the Commissioner | 36 |
| 25. | Deputy Commissioner | 39 |
| 26. | Vice Presidents | 40 |
| 27. | Secretary | 40 |
| 28. | Treasurer | 40 |
| 29. | Salaries of Officers | 41 |
| 30. | Indemnification of Commissioner and Employees of the Association | 41 |
| 31. | Capital Contributions | 42 |
| 32. | Additional Capital Contributions | 43 |
| 33. | Playoff Payments | 43 |
| 34. | Members, Their Powers and Responsibilities | 44 |
| 35. | Misconduct | 44 |
| 35A. | Misconduct of Persons other than Players | 46 |
| 36. | Penalties for Failure of Team Appearance | 51 |
| 37. | Bonuses | 52 |
| 38. | Protest | 52 |
| 39. | Rule Changes | 53 |
| 40. | Effective Time | 53 |
| 41. | Official Statements | 54 |
| 42. | Fiscal Year | 54 |
| 43. | No Third Party Beneficiaries | 55 |
| 44. | Affiliates and Subsidiaries | 55 |

iii

|  |  | Page |
|---|---|---|
| 45. | Conflict Waiver | 56 |
| 46. | Litigation Costs | 56 |

# BY-LAWS

## SECTION 1 – CHAMPIONSHIP

| 1.01. | Conferences | 59 |
|---|---|---|
| 1.02. | Standings | 59 |

## SECTION 2 – ELIGIBILITY OF PLAYERS

| 2.01. | Good Character | 59 |
|---|---|---|
| 2.02. | Eligibility | 60 |
| 2.03. | Formal Contract | 60 |
| 2.04. | Consequences of Ineligibility | 60 |

## SECTION 3 – CONTRACTUAL MATTERS

| 3.01. | Title to Player Contracts | 61 |
|---|---|---|
| 3.02. | Filed Documents | 61 |
| 3.03. | Violations | 61 |

## SECTION 4 – INTRA-ASSOCIATION ASSIGNMENT OF CONTRACTUAL RIGHTS

| 4.01. | Trading Dates/Compliance | 61 |
|---|---|---|

iv

| | | Page |
|---|---|---|
| 4.02. | Trade Procedures | 62 |
| 4.03. | Full Disclosure | 63 |
| 4.04. | Allocation of Obligations | 64 |
| 4.05. | Additional Trade Rules | 64 |

## SECTION 5 – INTRA-ASSOCIATION WAIVER OF CONTRACTUAL RIGHTS

| 5.01. | Waiver Right | 65 |
|---|---|---|
| 5.02. | Waiver Price | 65 |
| 5.03. | Waiver Procedure | 65 |
| 5.04. | Waiver Period | 66 |
| 5.05. | Waiver Preferences | 66 |
| 5.06. | Players Acquired Through Waivers | 66 |
| 5.07. | Additional Waiver Rules | 67 |

## SECTION 6 – PLAYER LISTS AND ROSTERS

| 6.01. | Player Lists | 67 |
|---|---|---|
| 6.02. | Active List | 67 |
| 6.03. | Inactive List | 68 |
| 6.04. | Playoff Eligibility | 69 |
| 6.05. | Suspended List | 69 |
| 6.06. | Minimum Number of Players | 70 |
| 6.07. | Hardship | 70 |
| 6.08. | Voluntarily Retired List | 71 |
| 6.09. | Armed Services List and Returning Servicemen | 71 |

v

| | | Page |
|---|---|---|
| 6.10. | Effect of Waiver on Player Lists | 73 |
| 6.11. | Transfer Between Player Lists | 73 |

## SECTION 7 – NBA DRAFT

| | | |
|---|---|---|
| 7.01. | Draft Date | 73 |
| 7.02. | Draft Preferences and Choosing Players | 73 |
| 7.03. | First Round Draft Choice | 76 |
| 7.04. | Contact with Prospective Draftees | 76 |
| 7.05. | Additional Rules Concerning Draft | 76 |

## SECTION 8 – MISCELLANEOUS PROVISIONS

| | | |
|---|---|---|
| 8.01. | Exhibition Games | 76 |
| 8.02. | Regular Season Game | 77 |
| 8.03. | Television and Gate Receipts | 77 |
| 8.04. | Protection for Referees | 77 |

## SECTION 9 – TELEVISION CONTRACT TERMS

| | | |
|---|---|---|
| 9.01. | Mandatory Television Contract Terms | 78 |

## SECTION 10 – RADIO CONTRACT TERMS

| | | |
|---|---|---|
| 10.01. | Mandatory Radio Contract Terms | 79 |

# CONSTITUTION AND BY-LAWS

# OF THE

# NATIONAL BASKETBALL ASSOCIATION

# INTERPRETATION

(a)     For purposes of this Constitution and By-Laws of the National Basketball Association, the following capitalized terms shall have the following meanings:

(1)   "Active List" shall mean the list of Players who have signed player contracts with a Member and are otherwise eligible to participate in a Regular Season Game in accordance with Section 6.02 of the By-Laws.

(2)   "Armed Services List" shall mean the list of those Players who have entered the Armed Services and are serving on active duty.

(3)   "Association" shall mean the National Basketball Association.

(4)   "Entity" shall mean any corporation, partnership, limited liability company, trust, unincorporated association, sole proprietorship, or other organization.

(5)   "Exhibition Game" shall mean any game in which an NBA team participates other than a Regular Season Game or a Playoff Game.

(6)   "Governor" or "Alternate Governor" shall mean a person who has been appointed by a Member as a member or alternate member of the Board of Governors of the Association in accordance with Article 18.  For purposes of this Constitution and By-Laws, any action that may be taken by a Governor may be taken in his or her absence by an Alternate Governor appointed by the same Member, and such action shall have the same force and effect as an action taken by the Governor.

2

(7)   "Inactive List" shall mean the list of Players who have signed player contracts with a Member but are otherwise ineligible to participate in a Regular Season Game or a Playoff Game, in accordance with Section 6.03 of the By-Laws.

(8)   "Member" shall mean a person or Entity that has been granted a Membership in the Association. For purposes of this Constitution and By-Laws, an action on behalf of a Member by any of its Owners, employees, officers, directors, managers, agents or representatives, or its Governor or Alternate Governors, shall be the action of a Member.

(9)   "Membership" shall mean the rights, privileges, and benefits granted to a Member by the Association, including, without limitation, the right to organize and operate a professional basketball team to play in the league operated by the Association.

(10)   "NBA Draft" or "Draft" shall mean the process by which Members select certain incoming NBA players.

(11)   "NBA Draft List" shall mean the list of those Players who have been selected in accordance with the NBA Draft.

(12)   "Owner" shall mean a Member and each individual or Entity (including both the trustees and beneficiaries of any trust) that, directly or indirectly (including through one or more intermediate Entities), owns of record or beneficially an interest in, or has effective control over, a Member or its Membership.

(13)   "Player" shall mean either a person carried on any Player List of a Team or, where the context permits, a person eligible to be carried on any such Player List.

(14) "Player List" shall mean any of the following lists referred to herein:   Active List, Inactive List, Suspended List, NBA Draft List, Voluntarily Retired List, and Armed Services List.

(15) "Playoff Game" shall mean any game included in the Association's schedule of playoff games during a Season.

(16) "Playoff Roster" shall mean the list of fifteen (15) Players from each Member who have been designated as eligible to compete in Playoff Games in accordance with the By-Laws.

(17) "Prospective Owner" shall mean any person or Entity that directly or indirectly owns, seeks to own, or has been identified to the Association as a prospective owner of, an interest in an applicant for Membership under Article 4 or a proposed transferee under Article 5.

(18) "Referee" shall mean a person employed as a game official by the Association.

(19) "Regular Season" shall mean the period beginning on the day of the first Regular Season Game of the Association's schedule and ending at the end of the day on which the last Regular Season Game is played.

(20) "Regular Season Game" shall mean any game included in the Association's schedule of regular season games during a Season, and shall not include Playoff Games or Exhibition Games.

(21) "Season" shall mean the period beginning the day of the first Regular Season Game of the Association's schedule and ending at the end of the day on which the last Playoff Game is played.

4

   (22) "Suspended List" shall mean the list of those Players who, for proper cause, have been suspended by the Association or by the Member having the right to so suspend, and have therefore been removed from the Active or Inactive Lists of their Teams.

   (23) "Team" shall mean the professional basketball team organized and operated by a Member to play in the league operated by the Association.

   (24) "Voluntarily Retired List" shall mean the list of those Players who have formally retired as players in the Association.

   (25) "Writing" or "Written Notice" shall mean any written communication delivered personally or sent by certified mail (return receipt requested), facsimile, internationally recognized overnight courier service, or electronic mail system utilized by the Association.

  (b) All references to "Articles" or "Sections" shall be references to the Articles and Sections of the Constitution and By-Laws, as they may be amended, modified, supplemented, or restated from time to time.

  (c) Terms for which meanings are defined in this Constitution and By-Laws shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine or feminine form. The term "including," whenever used in any provision of this Constitution and By-Laws, shall mean including without limiting the generality of any description preceding or succeeding such term. Each reference to a person or Entity shall include a reference to the successors and assigns of that person or Entity.

# CONSTITUTION

# ARTICLE 1

## NAME OF ASSOCIATION

The name of this Association shall be the National Basketball Association.

# ARTICLE 2

## PRINCIPLES OF ORGANIZATION

This Constitution and By-Laws constitutes a contract among the Members of the Association. This Association is organized to operate a league consisting of professional basketball teams, each of which shall be operated by a Member of the Association. The Association and each of its Members shall be subject to the oversight and control of the Board of Governors of the Association as set forth herein and shall be governed by the Constitution and By-Laws, rules, regulations, resolutions, and agreements of the Association, as they may be modified or amended from time to time. The Association shall not be operated for profit.

# ARTICLE 3

## CONFLICTS OF INTEREST

(a)    No Owner, or director, officer, manager, coach, employee, agent or representative of an Owner, shall (i) hold a position with, or directly or indirectly exercise control or any management authority over any other Member or Membership, or (ii) hold any direct or indirect financial interest in any other Member or Membership, unless, in the case of this clause (ii), (x) the facts in connection with such financial interest are disclosed in detail in an application provided to the Commissioner by the applicable Owner and, in addition to any approvals that may be required under Article 5, such interest is

6

expressly approved for purposes of this Article 3 in accordance with the approval procedures set forth in Article 5(f) and 5(h)(i) and (ii), or (y) such interest represents less than one percent (1%) of any outstanding class of securities that are publicly traded on any generally recognized stock exchange or over-the-counter market.

(b)    No Owner shall, directly or indirectly, lend money to or become a surety or guarantor for any Member other than a Member in which it owns an interest, any Player of any Member other than a Member in which it owns an interest, any Referee, the Commissioner or any other employee of the Association, except that Owners that engage in commercial lending as a principal business activity may enter into such lending, surety, or guarantee arrangements with such other Members or persons if (i) such arrangements are disclosed in detail to the Board of Governors and approved by three-fourths (3/4) vote of all Governors, or (ii) such Owners do not have effective control of a Member, the lending, surety, or guarantee arrangements are between the Owner and a Player, Referee, or employee of the Association, and such arrangements are on terms customarily offered to similarly situated individuals not affiliated with the Association.

(c)    Neither the Commissioner nor any Referee nor any other employee of the Association shall, directly or indirectly, hold stock or have a financial interest in any Owner or lend money to or become a surety or guarantor for any Owner.

(d)    No Owner, or director, officer, manager, coach, employee, agent or representative of an Owner, shall hold any direct or indirect financial interest in, any position with, or directly or indirectly exercise any management authority over, any other professional basketball association or league or any member or team thereof, unless the facts in connection with such financial interest, position, or management authority are disclosed in detail to the Board of Governors and approved by a three-fourths (3/4) vote of all Governors; provided, however, that the foregoing prohibition shall not preclude any such financial interest that represents less than one percent (1%) of any outstanding class of securities that are publicly traded on any generally

recognized stock exchange or over-the-counter market.  This Article 3(d) does not apply to financial interests in, any executive position with, or any management authority over, a professional basketball team in the NBA Development League.

## ARTICLE 4

## APPLICATION FOR MEMBERSHIP

(a)    Each applicant for Membership shall make a written application to the Commissioner specifying the city that the applicant wishes to represent in the Association.   Upon receipt of such application, the Commissioner shall have the right to require from the applicant and each Prospective Owner, and the applicant and each Prospective Owner shall furnish to the Commissioner, such information as the Commissioner shall request about the application, the applicant and each Prospective Owner, any persons or Entities with which the applicant or any Prospective Owner is associated or affiliated, and such other matters, whether or not confidential, as the Commissioner shall deem relevant in his sole discretion.   The applicant and each Prospective Owner shall also execute, deliver, and perform and shall cause such other parties (including their respective controlled subsidiaries and affiliates) as the Commissioner shall direct to execute, deliver, and perform such documents in such forms as the Commissioner shall prescribe.

(b)    The Association shall have no obligation to consider any application that is submitted under this Article or to solicit applications from more than one applicant for any potential new Membership.

(c)    All applications shall contain a binding agreement of the applicant and each Prospective Owner providing that if the application is approved by the Association, the applicant and each Prospective Owner shall be bound by the Constitution and By-Laws,

8

rules, regulations, resolutions, and agreements of the Association, and any modifications or amendments thereof.

(d)     Upon receipt of any application for Membership in the Association that the Association wishes to consider, the Commissioner shall conduct such investigation thereof as the Commissioner deems appropriate.  Following the completion of such investigation, the Commissioner shall submit the application to the Members for approval, together with such information as the Commissioner deems pertinent.  Each Prospective Owner must be approved by the affirmative vote of not less than three-fourths (3/4) of all Governors at a meeting duly called for such purpose.

(e)     Each application for Membership shall be accompanied by a certified check in the amount of $1,000,000 (the "Application Fee").  If the application for admission is accepted, the Application Fee shall be used to pay the fees, costs, and expenses (including attorneys' fees) incurred by the Association in considering the application and all related matters, and any remaining balance shall be applied as a credit against the Membership fee to be paid by the applicant.  If the application for admission is denied, the Application Fee shall be used to pay the fees, costs, and expenses (including attorneys' fees) incurred by the Association in considering the application and all related matters, and any remaining balance shall be repaid to the applicant.  There shall be no obligation to pay interest on any Application Fee submitted to and held by the Association.

## ARTICLE 5

## TRANSFER OF MEMBERSHIP

No Membership, nor any direct, indirect, contingent, or convertible interest therein (regardless of the size of the interest), may be sold, pledged, hypothecated, assigned, or otherwise transferred or encumbered (each a "transfer") in whole or in part, directly or

indirectly, except in accordance with and subject to the following provisions of this Article 5:

      (a)    An application requesting approval of a transfer must be made in writing to the Commissioner by the applicable Member (on behalf of the transferring Owner) promptly after an agreement with respect to such transfer has been reached.  The Commissioner may waive this requirement and accept an application directly from a Prospective Owner that has a security interest previously approved by the Association in the interest proposed to be transferred or when, in the Commissioner's sole judgment, the best interests of the Association would be served.

      (b)    Upon receipt of such application, the Commissioner shall have the right to require from the transferring Owner, and the transferring Owner shall furnish or cause the proposed transferee to furnish to the Commissioner, such information as the Commissioner shall request about the transfer, the proposed transferee and each Prospective Owner, any persons or Entities with which the transferee or any Prospective Owner is associated or affiliated, and such other matters, whether or not confidential, as the Commissioner shall deem relevant in his sole discretion. The transferring Owner and its proposed transferee and each of its Prospective Owners shall also execute, deliver, and perform, and shall cause such other parties (including their respective controlled subsidiaries and affiliates) as the Commissioner shall direct to execute, deliver, and perform, such documents in such forms as the Commissioner shall prescribe.  It shall be the obligation of the transferring Owner to ensure that the Commissioner timely receives all information that the Commissioner may request under this Article 5.

      (c)    Any agreement to transfer an interest in a Member or Membership, and any application requesting approval of such transfer, shall include a binding agreement of the proposed transferee and each of its Prospective Owners stating that if the transfer is approved by the Association, the proposed transferee and each of its Prospective Owners (and each of their respective controlled subsidiaries and affiliates) shall be bound by the Constitution and By-Laws, rules,

10

regulations, resolutions, and agreements of the Association, and any modifications or amendments thereof.

(d)   An application requesting approval of a transfer of an interest in a Member or Membership equal to or larger than ten percent (10%), or such smaller interest as may result in a change of control over such Member or Membership, shall be accompanied by a certified check from the transferring Owner to the order of the Association in the sum of $50,000 to defray all expenses (including, but not limited to, attorneys' fees) incurred by the Association in investigating, reviewing, and processing the application.   Following the disposition of any application, the Association shall repay to the applicant the sum of $50,000, less all expenses incurred in connection with the application. If these expenses exceed $50,000, the additional expenses shall be assessed against the Member and promptly paid to the Association.

(e)   With respect to an application requesting approval of a transfer of an interest in a Member or Membership of less than ten percent (10%) (other than a transfer that would result in a change of control over such Member or Membership), all expenses incurred by the Association in investigating, reviewing, and processing the application (including, but not limited to, attorneys' fees) shall be assessed against the Member and promptly paid to the Association.

(f)   Upon receipt of an application requesting approval of a transfer, the Commissioner shall conduct such investigation as the Commissioner deems appropriate.   Upon the completion of the investigation, the Commissioner shall submit the proposed transfer to the Members for approval, together with all information in respect thereto that the Commissioner deems pertinent.   A transfer shall only become effective if approved by the affirmative vote of not less than three-fourths (3/4) of all Governors at a meeting duly called for such purpose.

(g)   The Commissioner shall appoint a committee to assist him in matters relating to proposed transfers of Membership interests (for purposes of this Article 5, the "Committee").

(h)    Notwithstanding the provisions of Article 5(f):

(i)    If a proposed transfer involves (x) a larger than five percent (5%) but smaller than ten percent (10%) interest in a Member or Membership (including an interest subject to Article 5(h)(iii)), or (y) the transfer of a Membership or an interest in a Member or Membership to a different Entity owned by substantially the same Owners in substantially the same proportions (provided that the aggregate direct and indirect changes in ownership, if any, do not equal or exceed ten percent (10%)), the Committee shall have the power, in its sole discretion, to approve such proposed transfer without submitting it to the Members for approval under Article 5(f) above, unless (A) the transfer would result in any person or Entity (or group of persons or Entities acting in concert) that has not been approved by the Members directly or indirectly owning an interest of ten percent (10%) or larger in a Member or Membership, or (B) the effect of such proposed transfer is or may be to change the ownership of effective control of such Member or Membership.

(ii)    If a proposed transfer involves (x) a five percent (5%) or smaller interest in a Member or Membership, or (y) the transfer of a Membership or an interest in a Member or Membership to a different Entity owned by substantially the same Owners in substantially the same proportions (provided that the aggregate direct and indirect changes in ownership, if any, do not exceed five percent (5%)), the Commissioner shall have the power, in his sole discretion, to approve such proposed transfer without submitting it to the Members for approval under Article 5(f) above, unless (A) the transfer would result in any person or Entity (or group of persons or Entities acting in concert) that has not been approved by the Committee or the Members directly or indirectly owning an interest of larger than five percent (5%) but smaller than ten percent

12

(10%) in a Member or Membership, (B) the transfer would result in any person or Entity (or group of persons or Entities acting in concert) that has not been approved by the Members directly or indirectly owning an interest of ten percent (10%) or larger in a Member or Membership, or (C) the effect of such proposed transfer is or may be to change the ownership of effective control of such Member or Membership.

(iii) This Article 5 shall not be applicable to a proposed transfer of any interest in a Member or other Owner in which the number of individuals and Entities directly or indirectly owning interests prior to such proposed transaction exceeds five hundred (500), unless (w) the interest proposed to be transferred represents a direct or indirect interest of five percent (5%) or larger in a Member or Membership, (x) the transfer would result in any person or Entity (or group of persons or Entities acting in concert) that has not been approved by the Committee or the Members directly or indirectly owning an interest of at least five percent (5%) but less than ten percent (10%) in a Member or Membership, (y) the transfer would result in any person or Entity (or group of persons or Entities acting in concert) that has not been approved by the Members directly or indirectly owning an interest of ten percent (10%) or larger in a Member or Membership, or (z) the effect of such proposed transaction is or may be to change the ownership of effective control of such Member or Membership.

(iv) If a proposed transfer is in the form of a pledge, lien or hypothecation of a Membership or an interest in a Member or Membership in connection with such Member's incurrence of indebtedness under a credit facility generally available to the Members of the Association that has been approved by the Board of Governors, the Commissioner shall have the power, in his sole discretion, to approve such

proposed transfer without submitting it to the Members for approval under Article 5(f) above, upon and subject to such conditions as the Commissioner shall determine.

(i)     Any addition, replacement, or substitution of a trustee or a beneficiary of a trust that is an Owner shall be deemed a transfer of the entire interest owned by that trust, unless the Commissioner shall determine that the interest to be transferred is only a portion of the interest owned by the trust (in which case the interest deemed to be transferred for purposes of this Article 5 shall be such portion).

(j)     Absent a compelling reason to the contrary as determined by the Board of Governors, it shall be the policy of the Association not to approve a proposed transfer of an interest in a Member or Membership to (i) any governmental or quasi-governmental authority, agency, or instrumentality, or (ii) any person or Entity not satisfying any minimum ownership criteria that may be established from time to time by the Commissioner, the Committee, or the Board of Governors.

(k)     Any violation of the provisions of this Article 5 shall constitute a violation of Article 13(b).

## ARTICLE 6

## LIMITATIONS ON INDEBTEDNESS

The Board of Governors (and such committees of the Board as it or the Commissioner may appoint) shall have the right to establish limits on the indebtedness and other obligations that any Member or Owner may incur.

14

# ARTICLE 7

# RELOCATION

A Member may transfer its Team, city of operation, or playing site of any or all of its home games to a different location within or outside its existing Territory, as defined in Article 10, only in accordance with and subject to the provisions of this Article 7 and, where applicable, the provisions of Articles 8 and/or 9.

(a)   Application to relocate must be made in writing by the Member to the Commissioner.  The application shall identify the proposed new location and the arena in which the Member proposes to play its home games, and shall be accompanied by an Application Fee (in the form of a certified check to the order of the Association) in the sum of $50,000, if the proposed new location is within the Member's Territory, or $250,000, if the proposed new location is outside of the Member's Territory, to defray the costs of the investigation of the application.   Following the disposition of any application, the Association shall repay to the applicant the amount of the Application Fee, less all expenses reasonably incurred in connection with the investigation of the application (including attorneys' fees).   If these expenses exceed the Application Fee, the additional expenses shall be assessed against the Member and promptly repaid to the Association.

(b)   No application to relocate may be made after the first day of March preceding the Season in which the proposed relocation is to take effect.  Within ten (10) days of the receipt of an application to relocate, the Commissioner shall refer the application to a committee for investigation (the "Relocation Committee").   The Relocation Committee shall be appointed by the Commissioner and shall consist of no fewer than five (5) Governors or Alternate Governors.  Within one hundred twenty (120) days from the Commissioner's receipt of the application, the Committee shall report to the Board of Governors with respect to the results of its investigation and its recommendation of whether   the   application   should   be   granted   or   denied.     The

recommendation of the Relocation Committee shall be based solely and exclusively upon the following factors:

(i)    The support of the Member's Team in the existing location by fans, telecasters, broadcasters, and sponsors.   In evaluating this factor, the Relocation Committee shall consider the Member's past performance in the management and operation of its Team in the existing location.

(ii)   The ability of the Member's existing location to support a Team in the Association.   In evaluating this factor, the Relocation Committee shall consider the following criteria with respect to the Member's existing location: existing and projected population, income levels, and age distribution; existing and projected markets for radio, broadcast television, cable television, and other forms of audio-visual transmission of Association games; existing and projected business environment; the size, quality, and location of the Member's existing arena and any other arena in the existing location, and the terms, if any, on which that other arena would be available to the Member; and the presence, history, and popularity in the existing location of other professional sports teams and other forms of entertainment.

(iii)  The ability of the proposed new location to support a Team in the Association or, if the proposed new location is within the existing Territory of a Member, the ability of the proposed new location to support another Team.  In evaluating this factor, the Relocation Committee shall consider the following criteria with respect to the proposed new location:  projected support of the Member's team by fans, telecasters, and sponsors; existing and projected population, income levels and age distribution; existing and projected markets for radio, broadcast television, cable television, and other forms of audio-visual

transmission of Association games; existing and projected business environment; the size, quality and location of the arena in which the Member proposes to play its home games; and the presence, history and popularity in the proposed new location of other professional sports teams and other forms of entertainment.

(iv)    The Member's ability to operate an Association team successfully in the proposed new location.   In evaluating this factor, the Relocation Committee shall consider the applicant's present and projected financial condition and its financial resources.

(v)    The   Member's   past   performance   in   the management and operation of its Team in the Association.

(vi)    The effect of the proposed relocation on the Association's ability to market and promote Association basketball on a nationwide basis in a diverse group of geographic markets.

(vii)   The effect of the proposed relocation on the Association's   existing   or   prospective   commercial relationships with telecasters, broadcasters, sponsors, and others.

(viii) The extent to which the proposed new location presents particular disadvantages for the operation of the Association, such as by creating significant traveling or scheduling   difficulties   or   because   of   adverse   laws   or regulations.

(ix)    The interest of other Members, in addition to the applicant, in transferring their Teams to the proposed new location, or the interest of other persons or Entities in obtaining a new Membership to operate an NBA team in the proposed new location.  In any such event:

(A)   Except as otherwise provided herein, all applicants shall follow the procedures set forth in Article 4 or this Article 7, as the case may be.  All additional applications to establish an NBA team in the proposed new location for the Season to which the initial application relates shall be made within forty-five (45) days of the Commissioner's receipt of the initial application referred to in subparagraph (a), and the one hundred twenty (120) day period provided for in subparagraph (b) of this Article 7 shall be extended by no longer than forty-five (45) days after the Commissioner's receipt of the initial application.

(B)   The   Relocation   Committee   shall investigate each of the applications and shall recommend which of the applications, if any, should be granted.  In reaching its recommendation, the Relocation Committee shall consider all factors listed in subparagraphs (b)(i-viii) of this Article 7 and shall also consider:

(i)   which applicant is likely to operate most successfully in the proposed new location, or otherwise best serve the interests of the Association; and

(ii)   in the case of a proposed expansion team to be operated by a new Member, whether the interests of the Association would best be served by expanding the number of Members in the Association.

(c)   The Relocation Committee is empowered to require from the applicant, and the applicant shall furnish, such information as the Relocation Committee deems appropriate for the conduct of its investigation.  The Relocation Committee may engage consultants or

18

other experts to assist it in the investigation of the application and may also request such additional information from the Commissioner as the Committee may deem appropriate for the conduct of its investigation. All information supplied to the Relocation Committee pursuant to this subparagraph (c) (other than confidential communications of counsel) shall be made available to the applicant, and the applicant shall be afforded an opportunity to appear before the Committee to present whatever additional information or arguments the applicant desires. Any other member of the Board of Governors or his representative, or any other party from which the Relocation Committee wishes to hear, may also appear before the Relocation Committee to present whatever information or arguments such Governor or party desires.

(d)    The report and recommendation of the Relocation Committee shall be delivered to each member of the Board of Governors. The Commissioner shall call a meeting of the Board of Governors to consider the Relocation Committee's report and recommendation, which meeting shall be held no sooner than seven (7) days and no later than thirty (30) days after delivery of the Committee's report and recommendation. The applicant shall be afforded an opportunity to appear before the Board of Governors to present whatever information or arguments the applicant desires. The question whether to approve the proposed relocation shall be decided by a majority vote of all of the Members, and no vote by proxy shall be permitted. The vote of each Governor on the proposed relocation shall be based solely and exclusively upon the factors listed in subparagraphs (b)(i–ix) of this Article.

(e)    The Board of Governors shall have the right to attach reasonable and appropriate conditions to its approval of a proposed relocation, including, but not limited to, that the Member indemnify and release the Association from any and all claims arising out of the proposed relocation and that the Member pay a reasonable fee in connection with the relocation of its Team. In establishing the amount of such a fee, the Board of Governors may consider, among other factors, the value to the Association of the business opportunity represented by the relocation, and any increase in the value of the

Member that results from the relocation.  Any fee so charged may be distributed among the other Members of the Association in such proportion as the Board of Governors shall determine.

## ARTICLE 8

### ARENAS

      (a)    The Commissioner shall have the power from time to time (i) to establish minimum standards for the design, construction, and operation of NBA-quality arenas in areas related to the production and marketing of NBA basketball games and events; (ii) to establish minimum standards for the conditions under which NBA basketball games and events are conducted, and to regulate the in-arena presentation of those games and events; (iii) to establish procedures for ensuring compliance with this Article 8; and (iv) to enforce such standards and procedures, including through the imposition of appropriate penalties.  It shall be the responsibility of the Member, and not the responsibility of the Association, to ensure that the Member's arena complies with all applicable statutes, regulations, and ordinances. Nothing contained in Articles 8(b)-(d) below shall be construed as limiting the applicability of this Article 8(a) to all Members.

      (b)    In addition to complying with Article 7 and the other provisions of this Article 8, any Member seeking to transfer the playing site of any or all of its home games to a different location (other than a proposed transfer under Article 9) shall be subject to and shall comply with the following provisions:

          (i)    If a Member seeks to relocate to an arena that will be newly constructed or substantially renovated for use by the Member's team:

               (A)    the Member shall obtain a written determination from the Commissioner (or the Commissioner's designee) at least thirty (30) days

20

prior to the commencement of the arena's construction or renovation that all designs, plans, and specifications for the newly-constructed or renovated arena required to be submitted pursuant to Article 8(a) above have been submitted and comply substantially with the minimum arena standards of the Association; and

(B) the Member shall obtain a written determination from the Commissioner (or the Commissioner's designee) prior to holding any practice, exhibition, or game involving NBA players at the newly-constructed or renovated arena that the construction or renovation of the arena has been completed in substantial compliance with the minimum arena standards of the Association.

(ii) If a Member seeks to relocate to an already-existing arena that will not be substantially renovated for its use, the Board of Governors shall have no obligation to consider the Member's Article 7 application at the meeting called for that purpose unless the Member shall obtain a written determination from the Commissioner (or the Commissioner's designee) at least thirty (30) days prior to such meeting either stating (x) that the arena substantially complies with the minimum arena standards of the Association (as determined by the Commissioner or the Commissioner's designee), or (y) that specified modifications are necessary in order for the arena to comply substantially with such standards, that the Team has agreed in a Writing to make such modifications, and that the Team has supplied to the Commissioner (or the Commissioner's designee) design plans sufficient to evidence its intent to make such modifications. If specified modifications are required, the Member shall not hold or attempt to hold any practice, exhibition, or game involving NBA players at the arena unless it has received a written

21

determination from the Commissioner (or the Commissioner's designee) that the modifications have been completed and that the arena substantially complies with the minimum arena standards of the Association.

(iii) No Member's application to relocate will receive final approval under Article 7 unless the Member has received the written determination(s) of the Commissioner (or the Commissioner's designee) required under either clause (i) or clause (ii) above.

(iv) For purposes of this Article 8, "substantial compliance" with the NBA's minimum arena standards shall be solely determined by the Commissioner (or the Commissioner's designee).

(v) Any Member that fails to comply with any of the provisions of this subparagraph (b) shall be subject to a fine of up to $5,000,000 to be imposed by the Commissioner.

(c) In addition to any other arena compliance obligations it may have under Article 8(a), a Member who receives approval to relocate under Article 7 shall ensure that its arena continues to comply with the NBA's minimum arena standards in effect at the time the Member received the written determination(s) required by paragraph (b) above.

(d) For any violation of Article 8(a) or 8(c) above, the Commissioner shall have the right to impose a fine against the Member of up to $250,000 per game (Exhibition, Regular Season, or Playoff) for each game that the Member's team plays in the arena during the period when it is in violation of such provisions.

22

# ARTICLE 9

## CERTAIN PLAYING SITE RELOCATIONS

Articles 7, 8(b), and 8(c) shall not apply to a request by a Member, in accordance with this Article 9, to transfer the home playing site of one or more of its Regular Season or Playoff Games to a different facility under the following circumstances:

(a)     the usual home playing site is unavailable on a date scheduled for a Playoff Game;

(b)     an unanticipated event or emergency renders the usual home playing site temporarily unavailable or unsuitable and the Member wishes to play its home games during such period at another facility; or

(c)     the Member seeks to schedule up to four (4) of its Regular Season home games at another playing site within its Territory.

In order for a Member to transfer the home playing site of any of its Regular Season or Playoff Games under the circumstances set forth in Article 9(a), 9(b), or 9(c) above, the Member must make an application in writing to the Commissioner, who is empowered to grant or deny such application, either unconditionally or upon specific conditions, as in his judgment shall be in the best interests of the Association (based on such factors as the Commissioner deems appropriate, including the extent to which the arena to which the Member seeks to relocate complies with the NBA's minimum arena standards). An application pursuant to Article 9(a) or 9(b) shall be made promptly upon the occurrence of the event rendering the home playing site unavailable or unsuitable, and an application pursuant to Article 9(c) must be made on or before the first day of May preceding the Season in which the Member proposes to play up to four (4) of its home games at the additional playing site. An application pursuant to this Article 9 shall specify the reasons for the proposed transfer and

shall be accompanied by such further information and documentation as the Commissioner may deem appropriate.

# ARTICLE 10

## TERRITORY

(a)    Subject to any rules, regulations, resolutions, or agreements of the Association, or any agreement between the affected Members that has been approved by the Association, the Territory of a Member shall be the territory incorporated within an area of seventy-five (75) air miles of the corporate limits of the city of operation, except that when the line circumscribing the Territory of a Member intersects with the line circumscribing the Territory of another Member, the respective Territories shall be evenly divided by a line between the two (2) points of intersection.

(b)    Except in accordance with any rules, regulations, resolutions, or agreements of the Association, (i) a Team operated by a Member shall have no right to play in the Territory of another Member without the consent of the resident Member; and (ii) subject to Article 10(c), no Team shall conduct any of its operations outside of its Territory.

(c)    In addition to the territorial rights set forth in Article 10(a) above, a Member shall have priority within the corporate limits of any city in which its Team has played not less than three (3) home Regular Season Games during the preceding Season, provided that it has requested and receives the prior approval of the Association to play in such location.   Such priority shall continue so long as such Member's Team continues to play not less than three (3) home Regular Season Games in such city in each succeeding consecutive Season; provided, however, that the Commissioner, in his discretion, may, by Written Notice to each of the Members of the Association, excuse the failure of the Team of any Member to play such minimum number of games in such city in any one (1) Season, in which event such

Member's priority in such city shall continue notwithstanding its Team's failure to play such minimum number of games in such city during such Season. "Priority," as used in this paragraph (c), means a preference granted to schedule and play home Regular Season Games and home pre-season Exhibition Games within the corporate limits of such city.

# ARTICLE 11

## RESIGNATION OF A MEMBER

A Member may resign from the Association at the end of any Season provided Written Notice of such resignation shall have been given to the Commissioner and other Members of the Association at least three (3) calendar days prior to the commencement of the NBA Draft immediately following such Season. However, such resignation shall be effective only if, within thirty (30) days of such notice, the resigning Member shall have (a) made full payment of all dues or other debts owing to the Association, its Members, and any third-party creditors designated by the Association; and (b) assigned to the Commissioner the contracts of its Players, its arena lease (if assignable) and its Membership, in each case free and clear of all liens, claims, and encumbrances. The Commissioner shall have the power to deal with and dispose of such contracts, lease, and Membership as if said Member had suffered an event described in Article 14A hereof. Upon the effective date of such resignation, the resigning Member shall hold no further interest in its Player Contracts, lease, or Membership.

# ARTICLE 12

## BANKRUPTCY OF A MEMBER

For purposes of this Article 12, a Member shall be deemed to be involved in a bankruptcy proceeding if it makes an assignment for the benefit of creditors, a receiver is appointed for all or substantially

all of its assets, it voluntarily files a petition for relief under Title 11 of the United States Code or any foreign or state law providing for relief of debtors, or any such petition is filed against it and not discharged within thirty (30) days. The Members of the Association each acknowledge that substantial hardship may result to the creditors of a Member involved in a bankruptcy proceeding, to the other Members of the Association, and to the public if the operations of such Member's Team are not continued under the direction of a qualified person having no relationship to such Member. Therefore, if any Member is involved in a bankruptcy proceeding, the Association shall have the option, exercisable by a vote of three-fourths (3/4) of the Board of Governors (the Member involved in the bankruptcy proceedings not being considered a Member of the Board of Governors for purposes of this Article), to cause such Member and its assets and properties to be placed under the management and control of the Commissioner. Upon exercise of such option, the Commissioner shall be deemed authorized to take the following actions: to appear on behalf of the Association in any court in which a bankruptcy proceeding is pending; to cause the Member's Team to continue to play its Exhibition, Regular Season, and Playoff Games; to collect all revenues from every source payable to the Member and apply such revenues, to the extent available, to the payment of such Member's operating expenses; and to take such further action as he shall deem advisable to accomplish the purpose of the option, all subject to the supervision and control of the court having jurisdiction over the bankruptcy proceeding. The management and control by the Commissioner shall continue until the first to occur of termination of the bankruptcy proceeding, transfer of such Member's Membership in the Association in accordance with and subject to Article 5, termination of such Member's Membership in the Association, or a determination by a majority of the Board of Governors (the Member involved in the bankruptcy proceeding not being considered a Member of the Board of Governors for purposes of this Article) that continuation of such management and control is no longer advisable. The existence or exercise of the option shall not impose upon the Association or any of its Members any requirement to provide funds to a Member involved in a bankruptcy proceeding or any liability for another Member's debts or obligations.

# ARTICLE 13

## TERMINATION OF OWNERSHIP OR MEMBERSHIP

The Membership of a Member or the interest of any Owner may be terminated by a vote of three fourths (3/4) of the Board of Governors if the Member or Owner shall do or suffer any of the following:

(a)   Willfully violate any of the provisions of the Constitution and By-Laws, resolutions, or agreements of the Association.

(b)   Transfer or attempt to transfer a Membership or an interest in a Member without complying with the provisions of Article 5.

(c)   Fail to pay any dues or other indebtedness owing to the Association within thirty (30) days after Written Notice from the Commissioner of default in such payment.

(d)   Fail or refuse to fulfill its contractual obligations to the Association, its Members, Players, or any other third party in such a way as to affect the Association or its Members adversely.

(e)   Wager or countenance wagering by its officers or employees on any game in which a Team operated by a Member of the Association participates.

(f)   Willfully permit open betting, pool selling, or any other form of gambling upon any premises owned, leased, or otherwise controlled by the Member or an Owner, except, subject to Article 8(a), for gambling activities that are lawful in the applicable jurisdiction and do not involve in any way, directly or indirectly, gambling with respect to any aspect of the Association's games, events, property, players, or other personnel.

(g)     Offer, agree, conspire, or attempt to lose or control the score of any game participated in by a Team operated by a Member of the Association, or fail to suspend immediately any officer or any Player or other employee of the Member who shall be found guilty, in a court of law or in any hearing sanctioned by this Constitution and By-Laws, of offering, agreeing, conspiring, or attempting to lose or control the score of any such game or of being interested in any pool or wager on any game in which a Team operated by a Member of the Association participates.

(h)     Disband its Team during the Season, dissolve its business, or cease its operation.

(i)     Willfully fail to present its Team at the time and place it is scheduled to play in an Exhibition, Regular Season, or Playoff Game.

(j)     Willfully misrepresent any material fact contained in its application for Membership in the Association.

# ARTICLE 14

## PROCEDURE FOR TERMINATION

The Membership of a Member or the interest of any Owner shall be terminated on the occurrence of any of the events described in Article 13 by the following procedure:

(a)     Any Member of the Association or the Commissioner may charge that a Member or Owner has violated one (1) or more of the provisions of Article 13.  Said charge shall be made in Writing and shall be filed with the Commissioner, who shall, no later than three (3) business days after the charges are filed, cause a copy thereof to be served by a Writing upon the Member or Owner against whom such charges have been made.

28

(b)    The Member or Owner so charged shall, within five (5) days after receipt of the charges, file with the Commissioner its written answer thereto.   The Commissioner shall thereupon transmit said charges and answer to each of the Governors of the Association and shall call a special meeting of the Governors to hear the charges, to be held on a date not more than ten (10) days after the filing of a Member's or Owner's answer, due notice to be given.

(c)    Willful failure by a Member or Owner so charged to answer the charges during such five (5) day period or to appear at the hearing shall be deemed an admission by said Member or Owner of the total validity of the charges as presented.

(d)    At such hearing, the Chairman of the Board of Governors shall be the presiding officer, except that if the Chairman of the Board of Governors represents either the complaining Member or the Member charged, then the Commissioner shall designate an alternate Chairman for purposes of the hearing.

(e)    At the hearing, the Member or Owner so charged shall have the right to be represented by counsel.   Strict rules of evidence shall not apply, and all relevant and material evidence submitted prior to and at the hearing may be received and considered.

(f)    After duly considering all the evidence, the Board of Governors shall vote upon the proposition that the charges have been sustained in whole or in part.   The affirmative vote of three-fourths (3/4) of all the Governors shall be required to sustain the charges.

(g)    If, by a three-fourths (3/4) vote, the Board of Governors votes to sustain the charges, the Membership of the guilty Member or the Member in which the guilty Owner has an interest shall automatically be terminated, unless, following a motion duly made and seconded, two-thirds (2/3) of all the Governors vote instead to terminate the ownership interest of the guilty Owner or to invoke the provisions of Article 15.

(h)     Notwithstanding Article 14(g) above, in the case of a violation of Article 13 by an Owner who has an interest of ten percent (10%) or less in, and does not have effective control over, a Member, the Membership of such Member may not be terminated solely because of such Owner's violation.  In such case, if the charges are sustained against such Owner by a three-fourths (3/4) vote of the Board of Governors, the ownership interest of that Owner shall be automatically terminated unless, following a motion duly made and seconded, two-thirds (2/3) of all the Governors vote to invoke the provisions of Article 15.

(i)     If any Membership or interest of an Owner shall be terminated pursuant to this Article 14, the provisions of Article 14A shall apply.

(j)     The decisions of the Association made in accordance with the foregoing procedure shall be final, binding, and conclusive, and each Member and Owner waives any and all recourse to any court of law to review any such decision.

## ARTICLE 14A

## CONSEQUENCES OF TERMINATION

(a)     When the Membership of a Member is terminated, such Member and its assets, properties and operations shall be placed under the management and control of the Commissioner, who shall have the following powers:  to cause the Member's Team to continue to play its Exhibition, Regular Season, and Playoff Games; to collect all revenues from every source payable to the Member and apply such revenues, to the extent available, to the payment of such Member's debts and obligations; and, as directed by a majority of the Board of Governors (the Member whose Membership was terminated not being considered a Member of the Board of Governors for the purposes of this Article), either to transfer such Member's Membership (including its Player Contracts and other assets) in accordance with and subject to

30

Article 5 or to liquidate the Player Contracts and other assets of the Member in an orderly manner in the best interests of the Member and its creditors, and the Association, in each case at such prices and on such terms as the Commissioner shall deem reasonable and appropriate.

(b)    When the interest of any Owner is terminated, that interest shall, unless the Commissioner has approved an alternative arrangement, be placed under the management and control of the Commissioner, who shall have the power to exercise all of the rights otherwise exercisable by the Owner of that interest, including, but not limited to, any management or voting rights and the right to transfer all or any portion of that interest in accordance with and subject to Article 5 at such prices and on such terms as the Commissioner shall deem reasonable and appropriate.

(c)    All proceeds from any transfer of a Member's Membership or the liquidation of its Player Contracts and other assets, or of an Owner's interest in a Member, shall be applied first to discharge the liabilities and obligations to all creditors of the Member (or Owner), including the Association and its Members but excluding any Owner of the Member, second to discharge the liabilities and obligations to any Owner of the Member, and any balance shall be remitted to the Member (or Owner).  The existence or implementation of this Article 14A shall not impose upon the Association or any of its Members any requirement to provide funds to any Member (or Owner) or any liability for any debts or obligations of any Member (or Owner).

# ARTICLE 15

## ALTERNATIVES TO TERMINATION

If a charge that a Member or Owner has committed any of the offenses described in Article 13 is sustained, two-thirds (2/3) of all the Governors may waive the remedy of termination, and instead direct the Member or Owner to pay a stated fine in a stipulated manner and by a stipulated date, which fine may be required to be paid, in whole or in

part, to any other Member or Members as compensation to such Member or Members for damages sustained by it or them by reason of such act or acts of omission or commission by such offending Member or Owner. Such fine shall be payable within five (5) days after its imposition. Moreover, the Board of Governors may, in its discretion, either in addition to, or in lieu of, such fine, direct the forfeiture of the offending Member's Draft rights.

## ARTICLE 16

## DISSOLUTION

The Association may be dissolved at any time by a three fourths (3/4) vote of all the members of the Board of Governors at a meeting duly called for this purpose. Upon dissolution, the assets of the Association shall be distributed in accordance with the laws of the State of New York.

## ARTICLE 17

## AMENDMENTS

(a)    Except as otherwise provided for in this Constitution and By-Laws, the Constitution and By-Laws of the Association may be amended by the votes of three-fourths (3/4) of all the Governors at any meeting of the Board of Governors, provided that the nature of the proposed amendment is set forth in the Written Notice of the meeting.

(b)    The Constitution and By-Laws may also be amended at any other meeting of the Board of Governors, without prior notice of the amendment, provided there is complete attendance of all the Governors and there is unanimous consent to the adoption of the amendment at the meeting.

32

(c)    Any amendment to this Constitution and By-Laws and any proposal to amend this Constitution and By-Laws which fails of passage shall not be submitted again to the Board of Governors for reconsideration for one (1) year after the passage of such amendment or submission of such proposal to amend, without the consent of two-thirds (2/3) of all the Governors.

## ARTICLE 18

## BOARD OF GOVERNORS

(a)    The Members of the Association shall have the general supervision of the affairs of the Association, which general supervision shall be carried out through a Board of Governors.  At the annual meeting, the Board of Governors shall elect a Chairman whose duties shall be:

(i)    to be an ex-officio member of all Committees;

(ii)    to act as liaison between the Commissioner's Office and the Board of Governors; and

(iii)    to preside at Board of Governors meetings in the absence of the Commissioner.

(b)    Each Member shall be represented on the Board of Governors by a Governor who may be replaced at will by such Member (and who shall be an individual who is an Owner, or a director, officer, or authorized employee of such Member), and who shall be vested with the full power and authority to represent such Member and to bind such Member by his or her vote.   Each Member shall submit to the Commissioner in a Writing the name of such Governor and the names of up to three Alternate Governors, who may be replaced at will by such Member (and who shall be persons qualified to serve as Governors).  No Player shall be permitted to serve as a Governor or Alternate Governor or to vote at any meeting of the Board of

Governors.   The authority of such Governor and each Alternate Governor shall become effective only after the name of such Governor or Alternate Governor shall be filed with the Commissioner of the Association.

(c)   The Board shall have the right to appoint committees and to authorize and direct the Commissioner to appoint committees to assist the Commissioner in the performance of his duties.

(d)   A Governor or Alternate Governor may be removed with substantial cause by a vote of three-fourths (3/4) of all Governors at a meeting called for such purpose.  If a Governor is so removed, the Member must appoint a new Governor within ten (10) days.  The Board may fine a Governor or Alternate Governor up to the amount of $1,000,000 for willful violations of the Constitution and By-Laws.

(e)   All actions duly taken by the Board of Governors shall be final, binding and conclusive, as an award in arbitration, and enforceable in a court of competent jurisdiction in accordance with the laws of the State of New York.

# ARTICLE 19

# MEETINGS OF THE BOARD OF GOVERNORS

The following meetings of the Board of Governors shall be held in each year:

(a)   An annual meeting of the Board of Governors shall be held, at about the same time each year, on a date and at a place to be fixed by the Commissioner.

(b)   Special meetings may be called by the Commissioner at any time and shall be called by the Commissioner whenever a request is made for such meeting by six (6) or more Members by a Writing.

34

# ARTICLE 20

## NOTICE OF MEETINGS

Prior Written Notice of all meetings of the Board of Governors shall be given to each Governor. Each such notice shall set forth so far as is reasonably possible the purpose for which the meeting is called and shall be given sufficiently in advance of the meeting so that in the normal course the Writing will be received no later than ninety-six (96) hours prior to the meeting. Notice of the meeting may be waived by any Member and shall be deemed waived by a Member's attendance at a meeting unless the Member shall object to the absence of timely notice at the outset of the meeting.

# ARTICLE 21

## QUORUM

Governors representing a majority of the Members shall constitute a quorum for the transaction of any business unless otherwise provided herein. No quorum, once present, shall be broken by the departure of any Governors.

# ARTICLE 22

## VOTE REQUIRED AT MEETINGS

(a)     Subject to the other provisions of this Constitution and By-Laws requiring a greater number of votes, questions arising at meetings of the Board of Governors shall be decided by a majority vote of those present and voting. In the absence of a Member's Governor or Alternate Governor, a Member shall be entitled to vote by proxy so long as (a) the proxy is given only to another Governor or Alternate Governor, (b) its validity is limited to the one (1) meeting for which it is granted, (c) the Commissioner is informed of the proxy so granted

prior to the commencement of the meeting, and (d) an announcement of the proxy is made prior to the transaction of any business at the meeting; provided, however, that no vote by proxy shall be counted in favor of an application for Membership pursuant to Article 4, or of termination of a Membership pursuant to Article 13, or of dissolution of the Association pursuant to Article 16.

(b)   On all votes of the Board of Governors, the roll shall be called and votes cast in alphabetical rotation according to the name of the home city of each Member, beginning with the name of the Member whose Governor voted second in the last roll call vote taken at any meeting of the Board of Governors.  Any vote cast, including an abstention or any waiver of the right of any Member to vote, once recorded, may not be withdrawn or altered on that roll call.

# ARTICLE 23

## ALTERNATIVES TO IN-PERSON MEETINGS

(a)   Any action or resolution which may be taken or adopted at a meeting of the Board of Governors may be taken or adopted by a Writing setting forth the action so taken or the resolution so adopted manually signed or consented to in a Writing by three-fourths (3/4) of the members of the Board of Governors; provided, however, that any action to approve an application for Membership in the Association pursuant to Article 4, or requiring termination of a Membership pursuant to Article 13, or to dissolve the Association pursuant to Article 16, may not be taken or adopted except at a meeting of the Board of Governors or by a Writing consented to by all the members of the Board of Governors.

(b)   In lieu of calling a special meeting of the Board of Governors under Article 19(b), the Commissioner may call a meeting in which members of the Board of Governors participate by teleconferencing or any other means of communication that enables all persons participating in the meeting to hear each other.  All provisions

36

of this Constitution and By-Laws applicable to special meetings (including, but not limited to, provisions relating to quorums and voting) shall apply to such meetings, except that the Written Notice of such meetings shall be given to the Governors so that in the normal course it will be received no later than 48 hours prior to the meeting. Notice of meeting may be waived by any Member and shall be deemed waived by a Member's participation in the meeting unless the Member shall object to the absence of timely notice at the outset of the meeting. Members of the Board of Governors shall not be permitted to participate by such alternative means of communication in meetings called under Article 19.

## ARTICLE 24

## AUTHORITY AND DUTIES OF THE COMMISSIONER

(a)     A Commissioner shall be elected by the affirmative vote of three-fourths (3/4) of all the Governors.  The Commissioner shall serve as the Chief Executive Officer of the League and shall be charged with protecting the integrity of the game of professional basketball and preserving public confidence in the League.   The Commissioner's term of office may be terminated by a vote of three-fourths (3/4) of the Governors at a meeting duly called for such purpose.

(b)     The Commissioner shall have no financial interest, direct or indirect, in any professional sport.

(c)     The Commissioner shall have the responsibility for the general supervision and direction of all business and affairs of the League and shall have all such other powers as may be necessary or appropriate to fulfill this responsibility.

(d)     The Commissioner shall have exclusive, full, complete, and final jurisdiction of any dispute involving two (2) or more Members of the Association.

(e)     The Commissioner shall have the right to investigate all charges, accusations, or other matters that may adversely affect the Association or its Members.

(f)     The Commissioner shall have all rights and powers accorded to him by any collective bargaining agreement.

(g)     The Commissioner, on behalf of the Association, may incur any expense which, in his discretion, is necessary to conduct and transact the business of the Association, including but not limited to, the leasing of office space, the hiring of employees, and the engaging of other assistance or services; provided, however, that the Commissioner shall not have the authority to incur any expense inconsistent with expenses incurred for similar assistance or services during the past five (5) years, without prior approval of the Board of Governors.

(h)     The Commissioner shall preside at all meetings of the Board of Governors and shall discharge all duties imposed upon him by the Constitution and By-Laws, and by the Board of Governors.  The Commissioner shall interpret and from time to time establish policy and procedure in respect to the provisions of the Constitution and By-Laws, rules, regulations, resolutions, and agreements of the Association and any enforcement thereof, and any decision emanating therefrom shall be final, binding, conclusive, and unappealable.

(i)     (i)     The Commissioner shall have the power to suspend a Player, Coach, Member, Owner, or other person subject to the Commissioner's jurisdiction for a definite or indefinite period and to impose such fines and other penalties as are authorized by Article 35, 35A or any other Article or Section relating thereto of this Constitution and By-Laws.   The Commissioner shall have the power to declare null and void any Player transaction made by and between Members of the Association or by and between Members of the Association and any organization outside of the Association.

38

(ii) The Commissioner shall represent Members in disputes with operators of teams in other leagues or associations as to rules of ownership of contracts or rights to services of Players.

(j) The Commissioner shall be empowered to withhold all revenues due to any Member in the event that said Member has, in the Commissioner's determination, failed to discharge its financial obligations to the Association or any Member thereof.

(k) The Commissioner shall have the right to set the date and time of all games, including Playoff Games, consistent with:

(i) the obligations of the Association under its media contracts;

(ii) the availability of arenas; and

(iii) what in the Commissioner's judgment are the best interests of all Teams involved.

(l) The Commissioner shall, wherever there is a rule for which no penalty is specifically fixed for violation thereof, have the authority to fix such penalty as in the Commissioner's judgment shall be in the best interests of the Association. Where a situation arises which is not covered in the Constitution and By-Laws, the Commissioner shall have the authority to make such decision, including the imposition of a penalty, as in his judgment shall be in the best interests of the Association. The penalty that may be assessed under the preceding two sentences may include, without limitation, a fine, suspension, and/or the forfeiture or assignment of draft choices. No monetary penalty fixed under this provision shall exceed $2,500,000.

(m) Following an opportunity for the affected party to submit evidence and be heard, all actions duly taken by the Commissioner pursuant to this Article 24 or pursuant to any other

Article or Section of the Constitution and By-Laws, which are not specifically referable to the Board of Governors, shall be final, binding and conclusive, as an award in arbitration, and enforceable in a court of competent jurisdiction in accordance with the laws of the State of New York.  In connection with all actions, hearings, or investigations taken or conducted by the Commissioner pursuant to this Article 24, (i) strict rules of evidence shall not apply, and all relevant and material evidence submitted may be received and considered, and (ii) the Commissioner shall have the right to require testimony and the production of documents and other evidence from any Member, Owner, or Referee, any employee of any Member or Owner, and/or any employee of the Association, and any person or Entity not complying with the requirements of the Commissioner shall be subject to such penalty as the Commissioner may assess.

## ARTICLE 25

## DEPUTY COMMISSIONER

A Deputy Commissioner may be elected at any time by the affirmative vote of three-fourths (3/4) of all the Governors and, if elected, shall perform such duties as are delegated to him by the Commissioner or the Board of Governors.  On the death, resignation, incapacity or absence of the Commissioner, the Deputy Commissioner shall assume the duties, rights, and powers of the Commissioner and shall continue as such until the return of the Commissioner or a new Commissioner is elected by the Board of Governors.

40

# ARTICLE 26

## VICE PRESIDENTS

The Commissioner may appoint such Vice President or Vice Presidents as the Commissioner may decide, and each such Vice President shall perform such duties as are assigned to him or her by the Commissioner or the Board of Governors.

# ARTICLE 27

## SECRETARY

A Secretary may be elected by the affirmative vote of three-fourths (3/4) of all the Governors and, if elected, shall have the care and custody of the official records and papers of the Association; shall keep accurate minutes of all meetings of the Board of Governors; shall issue all official notices and attend to all necessary correspondence; and shall prepare and furnish such reports as may be called for by the Commissioner or Board of Governors. In default of election of a Secretary, or while the office is vacant, the Commissioner shall have the power to appoint a Secretary from among the Governors who, when so appointed, shall have the power to certify to the correctness of the minutes of any meeting of the Board of Governors.

# ARTICLE 28

## TREASURER

A Treasurer may be elected by the affirmative vote of three-fourths (3/4) of all the Governors and, if elected, shall be the custodian of all Association funds, receive all dues, fines and assessments and make such payments as shall be ordered by the Commissioner or the Board of Governors, and shall be bonded by companies, and in an amount, satisfactory to the Board of Governors.

The Treasurer shall annually render a report of all his receipts and disbursements to the Board of Governors. At the expiration of the Treasurer's term of office, the Treasurer shall account for the delivery to the Board of Governors of all monies, books, papers, and property received by the Treasurer by virtue of that office. In default of election of a Treasurer, or while the Treasurer's office is vacant, the Commissioner shall act as Treasurer.

**ARTICLE 29**

**SALARIES OF OFFICERS**

The officers shall receive such salaries as the Board of Governors shall annually determine and shall be reimbursed for all proper expenses actually incurred by them in the service of the Association. The Association may exact from them such surety bond for the faithful performance of their duties as the Board of Governors may deem proper.

**ARTICLE 30**

**INDEMNIFICATION OF COMMISSIONER AND EMPLOYEES OF THE ASSOCIATION**

The Commissioner and the employees of the Association will be indemnified by the Association against expenses actually and necessarily incurred by them in connection with the defense of any action, suit or proceeding to which they are made a party, and against any judgments which may be rendered against them therein, by reason of their being or having been Commissioner or an employee of this Association, except in relation to matters as to which a court of competent jurisdiction, in a proceeding to which they are a party, shall have adjudged that such indemnification is contrary to law or against public policy. Such right of indemnification shall not be deemed exclusive of any other rights to which the Commissioner and/or

42

Association employees may be entitled under the Constitution and By-Laws, any agreement with the Association, any vote by the Board of Governors, or otherwise.

## ARTICLE 31

## CAPITAL CONTRIBUTIONS

(a)    Each Member shall contribute to the capital of the Association a fixed annual capital contribution of $6,000.

(b)    In addition to the capital contribution required under Paragraph (a) above, each Member shall be required from time to time to contribute to the capital of the Association an amount equal to six percent (6%) of the gross gate receipts derived from all Regular Season Games played in each Season, or $30,000 per Season, whichever is greater.  Each Member shall immediately after each such game send to the Commissioner a report, on forms furnished by the Association, of all the information required as to such game, and shall also send a check for payment of the required sum.  Payment of such sums shall be due within five (5) days after each game.  The books with respect to such payments shall be open to all Members of the Association.

(c)    As used herein "gross gate receipts" shall mean the actual receipts derived by any Members from the sale of tickets (including any receipts attributable under Association rules to luxury suites, seat licenses, and club or other premium seats), less refunds and returns, and exclusive of excise, sales, and admissions taxes based on the sale of such tickets.

# ARTICLE 32

## ADDITIONAL CAPITAL CONTRIBUTIONS

In addition to the contributions provided for in the preceding Article, the Board of Governors may, at any meeting of which notice has been given as to the subject matter to be acted on, fix by a vote of the majority of all the Governors an additional amount which can be either a percentage of the gross gate receipts derived from all Regular Season Games played in each Season, or a fixed sum that each Member shall contribute in order to defray the expenses and liabilities of the Association.

# ARTICLE 33

## PLAYOFF PAYMENTS

(a)    Each Member engaging in the Playoffs shall, after each home Playoff Game, send a true report covering the sale of tickets for such game and shall also send a check payable to the Association, as agent for the Members, for forty-five percent (45%) of its gross gate receipts (as defined in Article 31(c)).

(b)    The monies so received by the Association as agent shall be applied:

(i)    To the payment of the Player Playoff Pool.

(ii)    To the payment of traveling and maintenance costs of the contesting Playoff Teams.

(iii)    To the payment of a sum, to the Head Coach of each Member participating in the Playoffs, equal to the aggregate amount received from the Player Playoff Pool by the Players on the Head Coach's Team, divided by the

44

maximum number of Players permitted to be listed on the Member's Active List during the Regular Season.

(iv)   To the payment of the fees and traveling and maintenance costs of the Referees appointed for the games.

(v)   The balance, if any, shall be distributed equally to the Members.

(c)   In the event that the monies so received by the Association are insufficient to pay the items referred to in Paragraph (b) hereof, the deficit shall be supplied equally by the Members.

## ARTICLE 34

## MEMBERS, THEIR POWERS AND RESPONSIBILITIES

In circumstances where a rule is not provided by the Constitution and By-Laws, rules, regulations, resolutions, or agreements of the Association, each Member shall conduct its operations in accordance with its own business judgment.

## ARTICLE 35

## MISCONDUCT

The provisions of this Article 35 shall govern all Players in the Association.

(a)   Each Member shall provide and require in every contract with any of its Players that they shall be bound and governed by the provisions of this Article.  Each Member, at the direction of the Board of Governors or the Commissioner, as the case may be, shall take such action as the Board or the Commissioner may direct in order to effectuate the purposes of this Article.

(b)   The Commissioner shall direct the dismissal and perpetual disqualification from any further association with the Association or any of its Members, of any Player found by the Commissioner after a hearing to have been guilty of offering, agreeing, conspiring, aiding or attempting to cause any game of basketball to result otherwise than on its merits.

(c)   If in the opinion of the Commissioner any act or conduct of a Player at or during an Exhibition, Regular Season, or Playoff Game has been prejudicial to or against the best interests of the Association or the game of basketball, the Commissioner shall impose upon such Player a fine not exceeding $50,000, or may order for a time the suspension of any such Player from any connection or duties with Exhibition, Regular Season, or Playoff Games, or he may order both such fine and suspension.

(d)   The Commissioner shall have the power to suspend for a definite or indefinite period, or to impose a fine not exceeding $50,000, or inflict both such suspension and fine upon any Player who, in his opinion, (i) shall have made or caused to be made any statement having, or that was designed to have, an effect prejudicial or detrimental to the best interests of basketball or of the Association or of a Member, or (ii) shall have been guilty of conduct that does not conform to standards of morality or fair play, that does not comply at all times with all federal, state, and local laws, or that is prejudicial or detrimental to the Association.

(e)   Any Player who, directly or indirectly, entices, induces, persuades or attempts to entice, induce, or persuade any Player, Coach, Trainer, General Manager or any other person who is under contract to any other Member of the Association to enter into negotiations for or relating to his services or negotiates or contracts for such services shall, on being charged with such tampering, be given an opportunity to answer such charges after due notice and the Commissioner shall have the power to decide whether or not the charges have been sustained; in the event his decision is that the

46

charges have been sustained, then the Commissioner shall have the power to suspend such Player for a definite or indefinite period, or to impose a fine not exceeding $50,000, or inflict both such suspension and fine upon any such Player.

(f)     Any Player who, directly or indirectly, wagers money or anything of value on the outcome of any game played by a Team in the league operated by the Association shall, on being charged with such wagering, be given an opportunity to answer such charges after due notice, and the decision of the Commissioner shall be final, binding and conclusive and unappealable.  The penalty for such offense shall be within the absolute and sole discretion of the Commissioner and may include a fine, suspension, expulsion and/or perpetual disqualification from further association with the Association or any of its Members.

(g)     Except for a penalty imposed under Paragraph (f) of this Article 35: (i) any challenge by a Team to the decisions and acts of the Commissioner pursuant to Article 35 shall be appealable to the Board of Governors, who shall determine such appeals in accordance with such rules and regulations as may be adopted by the Board in its absolute and sole discretion, and (ii) any challenge by a Player to the decisions or acts of the Commissioner pursuant to Article 35 shall be governed by the provisions of Article XXXI of the NBA/NBPA Collective Bargaining Agreement then in effect.

## ARTICLE 35A

## MISCONDUCT OF PERSONS OTHER THAN PLAYERS

The provisions of this Article 35A shall apply only to Members and Owners; to Officers, Managers, Coaches, and other employees, agents or representatives of a Member or Owner; and to all Referees and other employees of the Association; except that the term "employees" as used in this Article 35A shall mean employees other than Players.  The word "persons" as used herein shall include all such Members, Owners, Officers, Managers, Coaches, Referees, employees,

agents or representatives of Members, Owners, or the Association, other than Players.

(a)     Each Member must provide and require in every contract with any of its Owners, Officers, Managers, Coaches or other employees that they shall be bound and governed by the Constitution and By-Laws, rules, regulations, resolutions and agreements of the Association, as they may be modified or amended from time to time. Each Member, at the direction of the Board of Governors or the Commissioner, as the case may be, shall take such action as the Board or Commissioner may direct in order to effectuate the purposes of this Article.

(b)     The Commissioner shall direct the dismissal and perpetual disqualification from any further association with the Association or any of its Members, of any person found by the Commissioner after a hearing to have been guilty of offering, agreeing, conspiring, aiding, or attempting to cause any game of basketball to result otherwise than on its merits.

(c)     Any person who gives, makes, issues, authorizes or endorses any statement having, or designed to have, an effect prejudicial or detrimental to the best interests of basketball or of the Association or of a Member or its Team, shall be liable to a fine not exceeding $1,000,000 to be imposed by the Commissioner.  The Member whose Owner, Officer, Manager, Coach or other employee has been so fined shall pay the amount of the fine should such person fail to do so within ten (10) days of its imposition.

(d)     The Commissioner shall have the power to suspend for a definite or indefinite period, or to impose a fine not exceeding $1,000,000, or inflict both such suspension and fine upon any person who, in his opinion, shall have been guilty of conduct prejudicial or detrimental to the Association.

(e)     No person may, directly or indirectly, (i) entice, induce, persuade or attempt to entice, induce or persuade any Coach,

48

Trainer, General Manager or any other person who is under contract to any other Member of the Association to enter into negotiations for or relating to his services or negotiate or contract for such services or (ii) otherwise interfere with any such employer-employee relationship of any other Member of the Association. The Commissioner, either in his discretion or at the request of any Member who alleges that its employee has been tampered with, shall conduct an investigation into whether a person has violated the anti-tampering rule set forth in the prior sentence. In the event that, following such investigation and a hearing at which the person (and the Member employing the person allegedly tampered with) has an opportunity to be heard after due notice, the Commissioner determines that the anti-tampering rule has been violated, he shall have the power, in his sole discretion, to impose a penalty for such offense, which penalty may include (without limitation) the suspension of such person for a definite or indefinite period; the prohibition of the Member employing or otherwise affiliated with the offending person from hiring the person being tampered with for a definite or indefinite period; the forfeiture of Draft picks held by the Member employing or otherwise affiliated with the offending person or the transfer of such Draft picks to the Member aggrieved by the tampering; and/or the imposition of a fine upon the offending person and/or the Member employing or otherwise affiliated with such offending person in an amount not to exceed $5,000,000. In the event that the Commissioner imposes a fine, he may direct that some or all of the fine be paid directly to the Member aggrieved by the tampering.

(f)     No person may, directly or indirectly, (i) entice, induce, persuade, or attempt to entice, induce or persuade, any Player who is under contract to, or whose exclusive negotiating rights are held by, any other Member of the Association to enter into negotiations for or relating to his services or negotiate or contract for such services or (ii) otherwise interfere with any such employer-employee relationship (or prospective employer-employee relationship in the case of a Player subject to exclusive negotiating rights) of any other Member of the Association. The Commissioner, either in his discretion or at the request of a Member who alleges that its Player has been tampered with, shall conduct an investigation into whether a person has violated

49

the anti-tampering rule set forth in the prior sentence. In the event that, following such investigation and a hearing at which the person (and the Member employing the person allegedly tampered with) has an opportunity to be heard after due notice, the Commissioner determines that the anti-tampering rule has been violated, he shall have the power, in his sole discretion, to impose a penalty for such offense, which penalty may include (without limitation) the suspension of such person for a definite or indefinite period; the prohibition of the Member employing or otherwise affiliated with the offending person from hiring the Player tampered with for a definite or indefinite period; the forfeiture of Draft picks held by the Member employing or otherwise affiliated with the offending person or the transfer of such Draft picks to the aggrieved Member; and/or the imposition of a fine upon the offending person and/or the Member employing or otherwise affiliated with such offending person in an amount not to exceed $5,000,000. In the event that the Commissioner imposes a fine, he may direct that some or all of the fine be paid directly to the Member aggrieved by the tampering.

(g)   No person may:

(i)   directly or indirectly wager money or anything of value on the outcome of any game played by a Team in the league operated by the Association;

(ii)   directly or indirectly disclose confidential or non-public Association or Team information (which includes but is not limited to confidential or non-public information concerning the medical, personal, or other condition of any Player, Coach, or Referee; any Player transaction; any disciplinary action taken or to be taken by the Association or a Team; and Referee schedules, assignments, statistics, and ratings) to any individual or entity, under circumstances where the person knows or should know that such individual or entity intends to use such information in connection with wagering money or

50

anything of value on the outcome of any game played by a Team in the league operated by the Association;

(iii) directly or indirectly induce or attempt to induce any individual or entity to wager money or anything of value on the outcome of any game played by a Team in the league operated by the Association; or

(iv) engage in any other conduct related to wagering money or anything of value on the outcome of any game played by a Team in the league operated by the Association that the Commissioner deems prejudicial or detrimental to the Association.

Any person who is charged with such conduct shall be given an opportunity to answer such charges after due notice, and the decision of the Commissioner shall be final, binding, conclusive, and unappealable. The penalty for such offense shall be within the absolute and sole discretion of the Commissioner and may include a fine, suspension, expulsion and/or perpetual disqualification from further association with the Association or any of its Members.

(h) Any person who has been convicted of (including a plea of guilty, no contest, or nolo contendere to) a crime involving the use, possession, or distribution of heroin, cocaine or any other substance for which a Player could be dismissed or disqualified from further association with the Association or any of its Members under the terms of the collective bargaining agreement then in effect, shall be subject to dismissal and disqualification from further association with the Association or any of its Members. Notwithstanding the foregoing, after a period of at least two years from the time of such person's dismissal and disqualification, such person may apply for reinstatement. However, such person shall have no right to reinstatement under any circumstance and the reinstatement shall be granted only with the prior approval of the Board of Governors, which

may be conditioned upon such terms as the Board may determine in its sole discretion.

(i)     All persons shall comply with such anti-drug programs as may be instituted by the Board of Governors from time to time.   Such programs may include drug testing and penalties for violators.  Penalties may include fines, suspensions, or dismissal and disqualification from further association with the Association or any of its Members.   Any person dismissed and disqualified from further association with the Association or any of its Members pursuant to an anti-drug program instituted by the Board of Governors may apply for reinstatement after a period of at least two years from the time of such dismissal and disqualification.   However, such person shall have no right to reinstatement under any circumstance and the reinstatement shall be granted only with the prior approval of the Board of Governors, which may be conditioned upon such terms as the Board may determine in its sole discretion.

## ARTICLE 36

## PENALTIES FOR FAILURE OF TEAM APPEARANCE

A Member whose Team for any reason fails to appear for or complete any scheduled game, whether Exhibition, Regular Season or Playoff, including overtime, except for causes beyond its reasonable control, (i) shall pay, in the discretion of the Commissioner, a sum in an amount not to exceed $2,500,000 for each of such games to the Member operating the opposing Team and, (ii) in the discretion of the Commissioner, shall be liable to a fine not exceeding $5,000,000, to a forfeit of the game, or both.

52

# ARTICLE 37

## BONUSES

No Team or Player bonus may be offered or paid to a Team or Player for winning a particular game or series of games or for attaining a certain position in the standing of the league operated by the Association as of a certain date.  This prohibition shall not include bonus payments to individual Players made at the close of a Regular Season based on the performance of the individual Player during the entire Season or qualification by the Team for a Playoff position, or selection of a Player for one of the All-Star Teams.

# ARTICLE 38

## PROTEST

(a)    In order for a Member to protest against or appeal from the result of a game, notice thereof must be given to the Commissioner within forty-eight (48) hours after the conclusion of said game, by a Writing, stating therein the grounds for such protest.  No protest may be filed in connection with any game played during the Regular Season after midnight of the day of the last game of the Regular Season.  A protest in connection with a Playoff Game must be filed not later than midnight of the day of the game protested.  A game may be protested only by a Governor, Alternate Governor, General Manager, or Head Coach.  The right of protest shall inure not only to the allegedly aggrieved contestants, but to any other Member who can show an interest in the grounds of protest and the results that might be attained if the protest were allowed.  No protest shall be valid unless the Written Notice to the Commissioner thereof is accompanied by a check in the sum of $10,000 (the "Protest Fee") payable to the order of the Association.  If the Member filing the protest prevails, the Protest Fee is to be refunded.  If the Member does not prevail, the Protest Fee is to be forfeited and retained in the Association treasury.

(b)   Upon receipt of a protest, the Commissioner shall at once notify the Member operating the opposing Team in the game protested and require both of said Members within five (5) days to file with him such evidence as he may desire bearing upon the issue. The Commissioner shall decide the question raised within five (5) days after receipt of such evidence.

## ARTICLE 39

## RULE CHANGES

Playing rule changes may only be made by two-thirds (2/3) vote of all the Governors at a meeting called for this purpose.

## ARTICLE 40

## EFFECTIVE TIME

(a)   In computing any period of time under this Constitution and By-Laws, (i) a letter shall be deemed to have been mailed on the date shown on the postmark appearing on the envelope, and (ii) any other Writing shall be deemed to have been sent on the date appearing thereon, provided that such date can be verified by receipt or other independent means.

(b)   In computing any period of days prescribed or allowed by the Constitution and By-Laws, the day of the act, event, or default from which the designated period of time begins to run shall not be included.   When the period of time is less than ten (10) days, Saturdays, Sundays and legal holidays shall be excluded from the computation.   When the period of time is ten (10) days or greater, Saturdays, Sundays and legal holidays shall be included in the computation, except that if the last day of the designated period falls on a Saturday, Sunday or legal holiday, then the last day of such designated period shall instead be deemed to fall on the following

54

business day.  As used herein, "legal holiday" means New Year's Day, Birthday of Martin Luther King, Jr., President's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day.

(c)    Except as provided otherwise herein, wherever an hour is referred to in this Constitution and By-Laws in connection with a basketball game, or the happening of any other event, such time shall be the local time then current in the city in which the game was, or is to be played, or where the event was, or is to have, occurred.

## ARTICLE 41

## OFFICIAL STATEMENTS

No person, other than the Commissioner, shall have the right to issue any information concerning business transacted at meetings of the Board of Governors or reveal or make public any official business of the Association.  Any person violating such rule shall be subject to, in the discretion of the Commissioner, a fine of not more than $250,000.  The foregoing shall not be construed to limit the power of the Commissioner as set forth in Article 35A(c) of the Constitution.

## ARTICLE 42

## FISCAL YEAR

The fiscal year of the Association shall commence on October 1 and terminate on September 30.

# ARTICLE 43

## NO THIRD PARTY BENEFICIARIES

The Constitution and By-Laws, rules, regulations, resolutions, and agreements of the Association, and any amendments or modifications thereof, are solely for the benefit of the Association and its Members and Owners, and shall not benefit or create any right or cause of action in or on behalf of any other person or Entity, and may not be relied upon or enforced by any other person or Entity.

# ARTICLE 44

## AFFILIATES AND SUBSIDIARIES

Each Owner shall cause each of its affiliates and subsidiaries over which it has or can exercise effective control to comply with the Constitution and By-Laws, rules, regulations, resolutions, and agreements of the Association, and any amendments and modifications thereof. If any such affiliates or subsidiaries of an Owner violates the foregoing sentence, such Owner and, in the case of violations committed on behalf of, as agent for, or for the benefit of, a Member (including, but not limited to, actual or proposed compensation arrangements with Players that violate NBA rules), the applicable Member shall be subject to the same penalties as if that Owner (or Member) had itself committed that violation.

56

# ARTICLE 45

## CONFLICT WAIVER

Each Member and Owner acknowledges that from time to time they and the Association will jointly retain one or more law firms or experts to represent and advise them ("League Advisors"). Each Member and Owner agrees and consents to the representation of the Association and the other Members and Owners by League Advisors in connection with any and all controversies and disputes, including any litigation or other adversarial proceeding adverse to such Member or Owner. In any such adverse representation, the current or prior representation of such Member or Owner by that League Advisor, and the information that was conveyed to that League Advisor in the course of such representation, shall not be asserted as, and shall not constitute, a basis to disqualify that League Advisor from the adverse representation.

# ARTICLE 46

## LITIGATION COSTS

(a)   In any action in which a claim or counterclaim is brought by one or more Members or their Owners (each a "Claiming Party") against any of (i) the Association, (ii) a majority of the Members (or the Owners of a majority of the Members), (iii) any Entity directly or indirectly owned or controlled by a majority of the Members (or a majority of the direct or indirect owners of such Entity), or (iv) the Commissioner or any other executive or employee of the Association (clauses (i) – (iv) collectively, the "Association Parties"), the following shall apply:

(i)   unless the Claiming Parties shall fully prevail on the merits of each and every claim or counterclaim brought against the Association Parties, the Claiming Parties shall jointly and severally indemnify and hold

harmless the Association Parties against all costs, fees and expenses of every kind and description that the Association Parties may incur in connection with the action (including, but not limited to, all reasonable attorneys' fees incurred in such action between the Claiming Party and the Association Parties) (collectively, "Litigation Costs");

(ii)   even if a Claiming Party prevails on the merits of each and every claim or counterclaim brought against the Association Parties, it shall remain liable for its share of all Litigation Costs incurred by the Association Parties in connection with the action (the Claiming Party's share to be determined by dividing the Litigation Costs by the number of members of the Association); and

(iii)   each Member and Owner hereby waives any right it may have to recover its Litigation Costs from the Association Parties, and agrees not to seek or accept reimbursement of such Litigation Costs, in connection with any action in which such Member or Owner is a Claiming Party.

(b)   In any action in which a claim is brought by the Association Parties against one or more Members or their Owners (each a "Defending Party"), the following shall apply:

(i)   if the Association Parties shall prevail on the merits of any claim brought against the Defending Parties, the Defending Parties shall jointly and severally indemnify and hold harmless the Association Parties against all Litigation Costs that the Association Parties may incur in connection with such claim; and

(ii)   even if the Association Parties do not prevail on each and every claim brought against the Defending Parties, each Defending Party shall remain liable for its share of all Litigation Costs incurred by the Association

58

Parties in connection with the action (the Defending Party's share to be determined by dividing the Litigation Costs by the number of Members of the Association).

# BY-LAWS

# SECTION 1

## CHAMPIONSHIP

1.01. *Conferences.*  The league operated by the Association shall be divided into two (2) conferences, the Eastern and the Western Conferences.  Each Conference shall contain three (3) divisions of five (5) or more Teams.  The Atlantic, Central and Southeast Divisions shall comprise the Eastern Conference and the Southwest, Northwest and Pacific Divisions shall comprise the Western Conference.  There shall be established three (3) championships:  the Championship of the Eastern Conference, the Championship of the Western Conference, and the Championship of the Association.  The aforementioned may be changed prior to the commencement of any Season by a two-thirds (2/3) vote of the Board of Governors.

1.02. *Standings.*  If the operations of a Member are suspended during a Season, the games won and lost by its Team during that Season prior to the suspension shall not count in the records of the other Teams.

# SECTION 2

## ELIGIBILITY OF PLAYERS

2.01. *Good Character.*  All Players shall be of good moral character and possess qualities which will make them proper members of their respective Teams.  The Commissioner shall have the right to disqualify a Player if the Commissioner finds that the Player does not possess the requisite qualities of character and morality.  Such disqualification may be made by the Commissioner only after a hearing before the Commissioner, at which hearing the Player shall be afforded the right to call witnesses, to submit written evidence, and to be represented by counsel.  The decision of the Commissioner shall be appealable to the Board of Governors who, upon receipt of said appeal, shall require all interested parties within ten (10) days to file with the

60

Board of Governors such evidence as they may desire bearing upon the issue. The Board of Governors shall decide the appeal within ten (10) days after receipt of such evidence.

2.02. *Eligibility.* No person shall be eligible as a Player unless he complies with the eligibility rules set forth in this Constitution and By-Laws and/or the NBA/NBPA Collective Bargaining Agreement then in effect. A Player who is not eligible under those rules may not be signed by a Member to any agreement, nor may his future services in any way be negotiated for, contracted for, or otherwise reserved. Any negotiations or agreements with any such person shall be null and void and shall confer no rights whatsoever. No Member violating the provisions of this Section shall be permitted to acquire the rights to the services of such person at any time thereafter.

2.03. *Formal Contract.* A person who has not entered into a Player Contract that is valid and binding for the then-current Season in accordance with this Constitution and By-Laws and the NBA/NBPA Collective Bargaining Agreement then in effect shall not be eligible to participate as a Player in any Exhibition, Regular Season, or Playoff Game.

2.04. *Consequences of Ineligibility.* Any Team that utilizes the services of any person not eligible (in accordance with the NBA/NBPA Collective Bargaining Agreement then in effect, this Constitution and By-Laws, or otherwise) to participate as a Player in any Exhibition, Regular Season, or Playoff Game shall, regardless of the actual final score of the game, be deemed, for all purposes, to have lost such game, and the opposing Team shall be deemed, for all purposes, to have won such game. A person's services are "utilized" for purposes of this Section if he dresses in a Team uniform for a game.

61

# SECTION 3

# CONTRACTUAL MATTERS

3.01. *Title to Player Contracts.* Each Member must have absolute title to the contract and rights and services of each of its Players. The use of loaned Players is prohibited.

3.02. *Filed Documents.* The Commissioner shall file at the Association Office all Player Contracts, documents relating to intra-Association assignments of contractual rights, and other similar documents governing the rights of Members and Players. Information contained in any such filed document may, in the discretion of the Commissioner, be made available to any Member.

3.03. *Violations.* Any Member entering into a contract with a Player or a prospective Player in violation of the NBA/NBPA Collective Bargaining Agreement then in effect and/or this Constitution and By-Laws shall be liable to such penalties as set forth in the NBA/NBPA Collective Bargaining Agreement then in effect, and/or in the discretion of the Commissioner, to such penalties as in the Commissioner's judgment shall be in the best interests of the Association.

# SECTION 4

# INTRA-ASSOCIATION ASSIGNMENT OF CONTRACTUAL RIGHTS

4.01. *Trading Dates/Compliance.*

(a)   From the start of the Season and until 3 p.m. (eastern time) on the seventeenth Thursday of the Season, Members may, by trade or sale, assign to other Members the contracts of Players, draft rights to particular Players, or draft choices in accordance with these By-Laws (an "Assignment Transaction").  No Assignment Transactions

62

are permitted after 3 p.m. (eastern time) on the seventeenth Thursday of any Season and until the day following the last Regular Season Game. On the day following the last Regular Season Game, Teams may again engage in Assignment Transactions; provided, however, that (i) no Member whose team is participating in the Playoffs may assign the contract of a Player on its Playoff Roster until the team is eliminated from the Playoffs, and (ii) no Assignment Transactions may take place during the Moratorium Period (as such term is defined in the collective bargaining agreement then in effect).

(b)   An Assignment Transaction must comply with all rules relating to such transactions as set forth in the NBA/NBPA Collective Bargaining Agreement then in effect.

4.02. *Trade Procedures.*

(a)   In order to conduct any Assignment Transaction, the parties thereto shall state their agreement on the terms and conditions of the transaction during a conference call with the Association Office (the "Trade Call"). Such terms and conditions shall include, without limitation, all details with respect to amounts of money, terms of payment, and draft choices, if any. An Assignment Transaction shall not be deemed to be completed until all conditions thereof agreed upon during the Trade Call have been satisfied and the parties thereto have received written notice from the Association Office confirming that all such conditions to the Assignment Transaction have been satisfied. Any term or condition of an Assignment Transaction not disclosed to the Association Office on the Trade Call shall not be enforceable. If it is subsequently discovered by the Association Office that an Assignment Transaction included a term or condition not disclosed on the Trade Call, then the Commissioner shall have the right to impose a fine on each of the parties to the Assignment Transaction in an amount not to exceed $5,000,000.

(b)   All terms and conditions of an Assignment Transaction shall be set forth in detail in a Trade Memorandum to be

prepared by the Association Office following the Trade Call. In the event of any subsequent dispute concerning the terms and conditions of the transaction, the Trade Memorandum shall govern.

(c)   The Commissioner shall be empowered to establish such additional procedures as are necessary and appropriate to foster the orderly conduct of Assignment Transactions.

(d)   No Assignment Transaction shall be valid and enforceable unless conducted pursuant to the procedures set forth in this Section 4.

4.03.  *Full Disclosure.*

(a)   A Member shall disclose during a Trade Call all relevant information in its possession, custody, or control concerning the health of a Player whose contract or negotiating rights the Member is assigning.  For purposes of the foregoing sentence, "relevant information" shall include any information concerning current or prior injuries, illnesses, or other health conditions that could affect the Player's ability to play skilled basketball at any point during the Player's career.  No Member shall misrepresent or fail to disclose any such relevant information.

(b)   No Member shall make any other material misrepresentation or fail to disclose any other material information during the Trade Call.

(c)   If any Member is found, after a hearing before the Commissioner, to have violated subsections (a) or (b) above, the Member shall be subject to penalty.  Such penalty shall be within the absolute and sole discretion of the Commissioner and may include a fine (not to exceed $1,000,000), suspension of the offending employee, rescission of the Assignment Transaction, and/or forfeiture or transfer of the offending Member's draft choices.

64

### 4.04. *Allocation of Obligations.*

(a)    In the event that the contract of a Player is assigned by one Member to another during the Regular Season, the salary of the Player so assigned shall be apportioned on a per diem basis utilizing the entire number of days in the Regular Season, without regard to Playoff Games or Exhibition Games.  The assignor shall be responsible for the portion of the salary through the day of the assignment and the assignee shall be responsible for the salary of the Player after said date.  In cases where the Player actually dresses in a uniform for a game for the assignee team on the date of the Assignment Transaction, then the assignee shall be responsible for the salary on that date.

(b)    The assignee shall assume all of the obligations of the assignor that are contained in the Player's contract and disclosed to the assignee on the Trade Call to the same extent as if the contract had originally been between the assignee and the Player.

(c)    The foregoing provisions relating to the allocation of obligations may be modified by the agreement of the parties.

(d)    Any financial or contractual obligation not disclosed to the assignee on the Trade Call shall remain the responsibility of the assignor.

### 4.05. *Additional Trade Rules.*

(a)    A Member who has assigned its rights to the services of a Player may not retain any rights to such Player, conditional or otherwise, following consummation of the Assignment Transaction.

(b)    A Member who has assigned its rights to the services of a Player may not reacquire such rights prior to the end of the Season in which the assignment occurred, or, if the assignment occurred between Seasons, prior to the end of the next succeeding Season; provided, however, that the foregoing prohibition shall not apply in the

event that the assignee shall have first offered the services of such Player to all other Members through the waiver procedure.

(c)   No Player Contract may be assigned during a game for which the Player is dressed to play.

(d)   The Association Office will not conduct a Trade Call unless and until each party thereto has room on its Active List or Inactive List (or will have room after the Trade Call is completed) for the Player(s) whose contract(s) it is receiving in the transaction.

## SECTION 5

## INTRA-ASSOCIATION WAIVER
## OF CONTRACTUAL RIGHTS

5.01. *Waiver Right.*  Except for sales and trading between Members in accordance with these By-Laws, no Member shall sell or otherwise assign the contract with, or right to negotiate with, a Player without complying with the waiver procedure prescribed by this Constitution and By-Laws.

5.02. *Waiver Price.*  The waiver price shall be $1,000 per Player.

5.03. *Waiver Procedure.*  A Member desiring to secure waivers on a Player shall notify the Commissioner or the Commissioner's designee, who shall, on behalf of such Member, immediately notify all other Members of the waiver request.  Such Player shall be assumed to have been waived unless a Member shall notify the Commissioner or the Commissioner's designee in accordance with Section 5.04 of a claim to the rights to such Player. Once a Member has notified the Commissioner or the Commissioner's designee of its desire to secure waivers on a Player, such notice may not be withdrawn.  A Player remains the financial responsibility of the

66

Member placing him on waivers until the waiver period set by the Commissioner or the Commissioner's designee has expired.

5.04. *Waiver Period.*    If the Commissioner or the Commissioner's designee distributes notice of request for waiver, any Members wishing to claim rights to the Player shall do so by giving notice by telephone and in a Writing of such claim to the Commissioner or the Commissioner's designee within forty-eight (48) hours after the time of such notice.  A Team may not withdraw a claim to the rights to a Player on waivers.  Notwithstanding Article 40 of the NBA Constitution, Saturdays, Sundays and legal holidays shall be included when computing the above-referenced waiver period.

5.05. *Waiver Preferences.*

(a)    In the event that more than one (1) Member shall have claimed the rights to a Player placed on waivers, the claiming Member with the lowest team standing at the time the waiver was requested shall be entitled to acquire the rights to such Player.  If the request for waiver shall occur after the last day of the Season and before 11:59 p.m. eastern time on the following November 30, the standings at the close of the previous Season shall govern.

(b)    If the winning percentage of two (2) or more claiming Teams are the same, then the tie shall be determined, if possible, on the basis of the Regular Season Games between the two (2) or more Teams during the current Season or, if the waiver request shall occur after the last day of the Season and before 11:59 p.m. eastern time on the following November 30, during the preceding Season.  If still tied, a toss of a coin shall determine priority.

5.06. *Players Acquired Through Waivers.*  A Member who has acquired the rights and title to the contract of a Player through the waiver procedure may not sell or trade such rights for a period of thirty (30) days after the acquisition thereof; provided, however, that if the rights to such Player were acquired between Seasons, the 30-day period

described herein shall begin on the first day of the next succeeding Season.

5.07. *Additional Waiver Rules.*  The Commissioner or the Board of Governors may from time to time adopt additional rules (supplementary to those set forth in this Section 5) with respect to the operation of the waiver procedure.  Such rules shall not be inconsistent with the provisions of this Section 5 and shall apply to but shall not be limited to the mechanics of notice, inadvertent omission of notification to a Member, and rules of construction as to time.

# SECTION 6

# PLAYER LISTS AND ROSTERS

6.01. *Player Lists.*  The Player Lists shall be the Active List, Inactive List, Suspended List, NBA Draft List, Voluntarily Retired List, and Armed Services List.  Except as expressly set forth in this Constitution and By-Laws, there shall be no limit on the maximum number of Players that a Member may carry on any Player List; provided, however that such maximum number of Players, and the duration of time that a Player may be carried on any such List, shall be established from time to time by the Board of Governors.  The names of Players on the aforementioned Lists shall be maintained in the Association Office and shall be disseminated from time to time to all the Members.

6.02. *Active List.*

(a)     Only Players whose names appear on the Active List shall be permitted to dress for and be eligible to participate in an Exhibition, Regular Season, or Playoff Game.

(b)     Each Member shall carry twelve (12) or thirteen (13) Players on its Active List, except that any Member may from to time to time as appropriate, but for no more than two (2) consecutive weeks at

a time during the Regular Season, have eleven (11) Players on its Active List.  Notwithstanding the foregoing, during the period from the day following the last day of the Regular Season until the day before the first day of the following Season, the maximum number of Players that a Member may carry on its Active List (and, if applicable pursuant to Section 6.03(c) and (d) below, Inactive List) shall be twenty (20).

6.03. *Inactive List.*

(a)    During the Regular Season, each Member: (i) may carry a maximum of two (2) Players and as few as zero (0) Players on its Inactive List if the Member has thirteen (13) Players on its Active List in accordance with Section 6.02(b) above; and (ii) may carry a maximum of three (3) Players and a minimum of (1) Player on its Inactive List if the Member has eleven (11) or twelve (12) Players on its Active List in accordance with Section 6.02(b) above, except that any Member with eleven (11) or twelve (12) Players on its Active List may from time to time as appropriate, but for no more than two (2) consecutive weeks at a time during the Regular Season, have zero (0) Players on its Inactive List.

(b)    For Members that do not qualify for the playoffs, the Inactive List shall exist only during the Regular Season; all Players on the Inactive List of any such Member shall be transferred to the Active List on the day following the last day of the Regular Season.

(c)    During the playoffs, each Member that is participating in the playoffs may carry a maximum of three (3) Players on its Inactive List if the Member has twelve (12) Players on its Active List in accordance with Section 6.02(b) above, or a maximum of two (2) Players on its Inactive List if the Member has thirteen (13) Players on its Active List in accordance with Section 6.02(b) above.

(d)    For Members that qualify for the playoffs, the Inactive List shall exist only for so long as the Member continues to participate in Playoff Games; any Player listed on the Inactive List of

such a Member shall be transferred to the Active List on the day following such Member's last Playoff Game.

### 6.04. *Playoff Eligibility.*

(a)   Each Member must submit a Playoff Roster consisting of Players from its Active, Inactive, and Suspended Lists by 3 p.m. (eastern time) on the day following the last day of the Regular Season.  Any Player signed by a Member to a Player Contract prior to the start of the Member's last Regular Season Game is eligible to participate in Playoff Games, except that a Player with respect to whom a request for waiver has been made after midnight on March 1 is not eligible to participate in Playoff Games during the then-current Season unless the Player has been acquired by a Member whose Active List is reduced to eight (8) Players due to injury or illness.

(b)   Only Players whose names appear on a Member's Active List and Playoff Roster shall be permitted to dress for and be eligible to participate in a Playoff Game.

### 6.05. *Suspended List.*

(a)   Any Player on a Team's Active List or Inactive List may be suspended by the Member employing him or by the Commissioner for failure to discharge his contractual obligations, or for failure to comply with training schedules or other disciplinary rules or procedures.  In the event that any Member shall suspend a Player, it shall give prior Written Notice of such suspension to the Commissioner.  A notice of suspension shall include the name and address of the Player to be suspended, the cause and duration of the suspension (including whether the suspension is indefinite), and such other information as the Member invoking the suspension may deem relevant.

(b)   Any Player who is suspended by the Commissioner must be placed on his Team's Active List during the term of the suspension, except if the suspension is for more than five (5) games, in

70

which case, following the fifth game of the suspension, the Member may transfer the Player from the Active List to the Suspended List and substitute a Player in his stead.

(c)   Any Player who is suspended by his Team may be placed on his Team's Active List or Inactive List during the term of the suspension.  If a Player has been suspended by his Team for more than three (3) games, the Member may, following the third game of the suspension, transfer the Player from the Active List or Inactive List to the Suspended List and substitute a Player in his stead.

6.06. *Minimum Number of Players*.   Throughout the Season, no Team shall appear for any Exhibition or Regular Season Game unless at least eight (8) Players are dressed for and eligible and able to participate in such Game.  During the Playoffs, no Team shall appear for any Playoff Game unless at least nine (9) Players are dressed and eligible and able to participate in such Playoff Game.

6.07. *Hardship*.   In the event that the application of the provisions of these By-Laws pertaining to Player Lists and replacement of Players shall, in any particular case, cause extreme hardship, such provisions, upon application by the Member claiming hardship, may be waived or modified, and special rules may be invoked for the Member claiming such hardship; provided, however, that such provisions may only be waived or modified by the affirmative vote of a majority of the entire Board of Governors (the Governor representing the Member claiming hardship not voting).  Notwithstanding the foregoing, in the event that a Member has three (3) Players on its Active List and/or Inactive List who are unable to perform playing services due to injury or illness and such Member has an additional Player who becomes unable to perform playing services due to injury or illness, it may substitute a Player in his stead after the following has occurred:

(a)   each of the three (3) injured or ill Players and the additional injured or ill Player has missed a minimum of three (3) consecutive games due to injury or illness; and

(b)    the Commissioner's Office has determined, through an independent physician, if necessary, that at the time the replacement Player is signed, each of the three (3) injured or ill Players on the Member's Active and/or Inactive List, and the additional injured or ill Player, will continue to be unable to perform playing services due to injury or illness.

The Commissioner, in his sole discretion, may permit a Member to replace additional injured or ill Players on that Member's Active List or Inactive List.

6.08. *Voluntarily Retired List.*   A Player who has not completed the playing services called for under his Player Contract may be transferred to the Voluntarily Retired List only after the Commissioner is notified in a Writing by both the Player and the Team with which he is under contract.  No Player whose name appears on any Member's Voluntarily Retired List shall, without the unanimous consent of the Board of Governors, be permitted to engage in any Exhibition, Regular Season, or Playoff Game within a period of one (1) year from the date that his name shall have been first placed on such List.   If such Player desires to become an active Player in the Association, and the Member for which he last played does not desire to acquire his services, the right to acquire such services shall be determined in accordance with the waiver procedure.

6.09. *Armed Services List and Returning Servicemen.*

(a)    Members shall continue to have rights to the services of a Player who has been inducted into the Armed Services by placing the name of the Player on its Armed Services List.  The name of such Player, unless removed from such List in accordance with the provisions hereof, shall remain on such List during his active duty and for thirty (30) days thereafter.  As used herein "active duty" shall not include performance of periodic reserve obligations of any such Player.

(b)    Notwithstanding the foregoing, a Player in the Armed Services may be retained or placed on a Member's Active List or

72

Inactive List and may play in Exhibition, Regular Season and, if otherwise eligible, Playoff Games, if his retention on such Active List or Inactive List will not result in exceeding the maximum provided in Sections 6.02 and 6.03 of these By-Laws. A Player may be placed on a Member's Armed Services List at any time after such Player has been inducted into the Armed Services; provided, however, that a Player may be placed on such Armed Services List from the Member's Active List or Inactive List only once during the same period of active service in the Armed Services if such Player has played in any Exhibition, Regular Season, or Playoff Games during the period of active service.

(c)    A Player who was under contract with a Member at the time of his induction into the Armed Services and who, upon his release, requests re-employment prior to February 15, must be tendered a contract on the same terms and conditions as the contract in existence at the time he was so inducted. Such Player must be "tried out" and, notwithstanding the provision of Sections 6.02 and 6.03 of these By-Laws governing the maximum number of Players that may be carried on an Active List or Inactive List, may participate in Exhibition, Regular Season, and Playoff Games. If such a returning Player requests re-employment on or after February 15, he must similarly be tendered a contract and "tried out" and, notwithstanding the provisions in said Sections 6.02 and 6.03 of these By-Laws, may participate in Exhibition and Regular Season Games but may not participate in Playoff Games.

(d)    The provisions of this Section 6.09 shall also apply to returning servicemen not previously under contract with a Member; provided, however, that no more than two (2) such Players may be "tried out" by a Member at any one time.

(e)    A Player who has played in any Regular Season Game or Playoff Game while in the Armed Services and who, upon his release from the Armed Services, is entitled to employment or reemployment pursuant to the provisions of subsections (c) and (d) hereof must, notwithstanding the provisions of those subsections, be included in determining the maximum number of Players on the

Member's Active List and Inactive List provided for in Sections 6.02 and 6.03 of these By-Laws.

6.10. *Effect of Waiver on Player Lists.* A Player with respect to whom a request for waiver has been made will be removed, immediately upon receipt of such request by the Commissioner or the Commissioner's designee, from the Member's Player Lists.

6.11. *Transfer Between Player Lists.* Members are required to provide written notice to the Association Office immediately upon transferring any Player from one Player List to another. No such transfers shall be permitted within the sixty-minute period prior to the publicly announced start time of a Exhibition, Regular Season or Playoff Game; provided, however, that the Commissioner (or his designee) shall be entitled to grant exceptions to the foregoing rule upon a showing of extreme hardship.

## SECTION 7

## NBA DRAFT

7.01. *Draft Date.* The annual Draft of prospective NBA basketball players shall be held on a date to be fixed by the Commissioner.

7.02. *Draft Preferences and Choosing Players.* Draft choices shall be made as follows:

(a) For the first round of the NBA Draft, each Team shall make one selection to be determined as follows:

(i) There shall be a drawing among the fourteen (14) Teams that do not participate in the Playoffs in the preceding Season (the "Lottery Teams") to determine the first three (3) selections. Such drawing shall be made on the basis of 1,000 total chances, with each participating

74

Team assigned the following number of chances out of 1,000 (Team 1 having had the worst record during the Regular Season and Team 14 having had the best record among the Lottery Teams during the Regular Season):

| | |
|---|---|
| Team 1: | 250 |
| Team 2: | 199 |
| Team 3: | 156 |
| Team 4: | 119 |
| Team 5: | 88 |
| Team 6: | 63 |
| Team 7: | 43 |
| Team 8: | 28 |
| Team 9: | 17 |
| Team 10: | 11 |
| Team 11: | 8 |
| Team 12: | 7 |
| Team 13: | 6 |
| Team 14: | 5 |

The Commissioner shall determine the appropriate procedure for breaking ties;

(ii)   The remaining Teams that did not qualify to participate in the Playoffs in the preceding Season shall then select, in inverse order of their consolidated standings at the end of the preceding Season; and

(iii)   The Teams that participate in the Playoffs shall then select, in inverse order of their consolidated standings at the end of the preceding Season. The foregoing shall afford each Team one selection.

(b)   In the second round of the NBA Draft, draft choices shall be made in inverse order of the consolidated standings of all Teams at the close of the preceding Season, one selection at a time.

(c)   In the first round of the NBA Draft, if any Teams are tied on a percentage basis, then priority in selection as between such Teams is to be established on the basis of a drawing among the Teams involved, except that if the tied Teams are Lottery Teams, priority in selection may be determined by the Lottery. As between the Teams participating in any such drawing, the winner shall have the right to the earliest selection in the first round of the Draft, followed by the other tied Teams participating in the drawing, in accordance with the results of the drawing. In the second round of the Draft, if only two Teams are tied, the tied Teams shall reverse the order in which they selected in the first round; if more than two Teams are tied, then, as among the tied teams, each tied Team shall select one position earlier than it selected in the first round, except that the tied Team that selected earliest in the first round shall, among the tied Teams, select latest in the second round.

(d)   A Member that has drafted a Player in the NBA Draft shall have such rights to negotiate with and sign such Player consistent with the rules and regulations that may be adopted from time to time by the Board of Governors and/or with provisions of any collective bargaining agreement(s) entered into by the Association.

7.03. *First Round Draft Choice.* No Member may sell its rights to select a player in the first round of any NBA Draft for cash or its equivalent, or trade or exchange its right to select a player in the first round of any NBA Draft if the result of such trade or exchange may be to leave the Member without first-round picks in any two (2) consecutive future NBA Drafts.

7.04. *Contact with Prospective Draftees.*

(a)   Prior to the annual NBA Draft, Members may have preliminary discussions with players eligible for the Draft, but may not discuss the matter of compensation.

(b)   Members may not, directly or indirectly, have or engage in, or attempt to have or engage in, any discussions, communications, or contacts whatsoever with any player who has remaining intercollegiate basketball eligibility or is otherwise ineligible to be selected in an upcoming Draft; provided, however, that the foregoing shall not apply to discussions, communications, or contacts between a Member and any player who was previously eligible to be selected in an NBA Draft.

7.05. *Additional Rules Concerning Draft.* The Board of Governors shall, from time to time, be free to adopt such additional rules and regulations regarding the annual Draft as it shall determine. Such rules and regulations shall not be inconsistent with the Constitution and By-Laws.

# SECTION 8

# MISCELLANEOUS PROVISIONS

8.01. *Exhibition Games.* No Member may participate in an Exhibition, charity, or all-star Game during the Season without the approval of a majority of the Board of Governors.

8.02. *Regular Season Game.* No Member shall be required, without its consent, to participate as the visiting Team in any Regular Season Game to be played in any city in which the home Team does not have exclusive rights as provided in this Constitution and By-Laws.

8.03. *Television and Gate Receipts.*

(a)  The revenues derived from network, national, and international television contracts shall be shared equally among the Members of this Association.  Each Member may pledge, grant a lien on, or otherwise hypothecate all of its share of the revenue derived from such television contracts, subject to its first having obtained all required approvals under the Constitution and By-Laws (including Article 5 of the Constitution) and to the execution and delivery of such documentation as may be satisfactory to the Commissioner, including documentation that assures to the satisfaction of the Commissioner the payment of such Member's obligations to the Association, the other Members of the Association and their respective affiliates out of such Member's share of the revenue derived from such television contracts.

(b)  The visiting Team shall not be entitled to any portion of the gate receipts derived from any Regular Season Game.

8.04. *Protection for Referees.*

(a)  Each Member shall provide at its arena two separate dressing rooms for the exclusive use of the Referees, and shall take all steps necessary to insure that no person, without the permission of the Referees, gains access to such dressing room.

(b)  No person affiliated with any Member shall enter such dressing room except with the permission of the Referees.

(c)  Each Member shall provide at its arena adequate police protection for the Referees.

78

(d)   A Member failing to comply with the provisions of Subsections (a) or (c) and any person affiliated with any Member failing to comply with the provision of Subsection (b) shall be liable to a fine not exceeding $10,000 to be imposed by the Commissioner.  The foregoing shall not be construed to limit the power of the Commissioner as set forth in Articles 8 and/or 24(l) of the Constitution.

(e)   All Referees shall report any breach of this Section to the Commissioner.

## SECTION 9

## TELEVISION CONTRACT TERMS

9.01. *Mandatory Television Contract Terms.*  All contracts entered into by any Member of the Association for the telecasting of any of its games by any means whatsoever shall contain provisions in the form required by the Association:

(a)   Reserving to the Association the copyright in all games telecast; and

(b)   Rendering such contracts subject to (i) the Constitution and By-Laws and all other rules, regulations, and resolutions of the Association as they presently exist and as they may from time to time be amended or modified; (ii) the terms of any existing or future contracts entered into by the Association for the telecasting of basketball games; and (iii) the approval of the Commissioner of the Association, with whom all contracts must be filed within ten (10) days of their execution, and who may disapprove such contracts, thereby rendering them null and void, only on the ground that they fail to comply with the requirements of this Section 9.

# SECTION 10

# RADIO CONTRACT TERMS

10.01. *Mandatory Radio Contract Terms.*   All contracts entered into by any Member of the Association for the broadcasting of any of its games by radio shall contain provisions in the form required by the Association:

(a)   Reserving to the Association the copyright in all games broadcast; and

(b)   Rendering such contracts subject to (i) the Constitution and By-Laws and all other rules, regulations, and resolutions of the Association as they presently exist and as they may from time to time be amended or modified; (ii) the terms of any existing or future contracts entered into by the Association for the broadcasting of basketball games; and (iii) the approval of the Commissioner of the Association, with whom all contracts must be filed within ten (10) days of their execution, and who may disapprove such contracts, thereby rendering them null and void, only on the ground that they fail to comply with the requirements of this Section 10.

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Central District of California

<table>
<tr><td>

DONALD T. STERLING, an individual, and THE<br>STERLING FAMILY TRUST

_____<br>
*Plaintiff(s)*

v.

NATIONAL BASKETBALL ASSOCIATION, a New<br>York professional association; ADAM SILVER, an<br>individual; and DOES 1-50, inclusive

_____<br>
*Defendant(s)*

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

Civil Action No.

CV14-4192 FMO-SHx

</td></tr>
</table>

### SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    BLECHER COLLINS PEPPERMAN & JOYE, P.C.
Maxwell M. Blecher
515 S. Figueroa Street, Suite 1750
Los Angeles, CA  90071

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date:    MAY  3 0 2014        _____
*Signature of Clerk or Deputy Clerk*

1184

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

DONALD T. STERLING, an individual, and THE STERLING FAMILY TRUST

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

NATIONAL BASKETBALL ASSOCIATION, a New York professional association; ADAM SILVER, an individual; and DOES 1 through 50

**(b)** County of Residence of First Listed Plaintiff   Los Angeles
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

**(c)** Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

See Attachment

Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No       ☒ **MONEY DEMANDED IN COMPLAINT:** $ 1 billion

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 U.S.C. § 1.  Conspiracy in restraint of trade.

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☒ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accommodations | ☐ 740 Railway Labor Act | |
| | ☐ 220 Foreclosure | | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:**      Case Number:      CV14-4192

CV-71 (11/13)                    CIVIL COVER SHEET                    Page 1 of 3

UNITED S...ES DISTRICT COURT, CENTRAL DISTRICT O... ...IFORNIA
CIVIL COVER SHEET

**VIII.  VENUE**: Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A:  Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes  ☒ No<br><br>If "no," go to Question B.  If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| Question B:  Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | A PLAINTIFF?<br><br>Then check the box below for the county in which the majority of DEFENDANTS reside. | A DEFENDANT?<br><br>Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| ☐ Yes  ☒ No<br><br>If "no," go to Question C.  If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Los Angeles | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? (Make only one selection per row) | A.<br>Los Angeles County | B.<br>Ventura, Santa Barbara, or San Luis Obispo Counties | C.<br>Orange County | D.<br>Riverside or San Bernardino Counties | E.<br>Outside the Central District of California | F.<br>Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of defendants reside: | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| Indicate the location in which a majority of claims arose: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |

**C.1. Is either of the following true?  If so, check the one that applies:**

☐ 2 or more answers in Column C

☐ only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right.  ➡

**C.2. Is either of the following true?  If so, check the one that applies:**

☐ 2 or more answers in Column D

☐ only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below.  ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above:  ➡ | Western |

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court** and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s):

**IX(b). RELATED CASES:** Have any cases been previously filed **in this court** that are related to the present case?   ☒ NO   ☐ YES

If yes, list case number(s):

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY
(OR SELF-REPRESENTED LITIGANT):**   DATE: 5/30/14

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

*Sterling, et al. v. National Basketball Association, et al.*

Attachment to Civil Cover Sheet

I(c)    Plaintiffs' Attorneys

BLECHER COLLINS PEPPERMAN & JOYE, P.C.
Maxwell M. Blecher (State Bar No. 26202)
mblecher@blechercollins.com
515 South Figueroa Street, Suite 1750
Los Angeles, California 90071-3334
Telephone: (213) 622-4222
Facsimile: (213) 622-1656

SAMINI SCHEINBERG PC
Bobby Samini (State Bar. No. 181796)
bsamini@saminilaw.com
949 South Coast Drive, Suite 420
Costa Mesa, California 92626
Tel: (949) 333.7203
Fax: (949) 724.0901

59620.1