# Exhibit A

1  PIERCE O'DONNELL (SBN 81298)
   PODonnell@GreenbergGlusker.com
2  MARC M. STERN (SBN 126409)
   MStern@GreenbergGlusker.com
3  GREENBERG GLUSKER FIELDS CLAMAN &
   MACHTINGER LLP
4  1900 Avenue of the Stars, 21st Floor
   Los Angeles, California  90067-4590
5  Telephone:  310.553.3610
   Fax:  310.553.0687
6
   Attorneys for Trustee
7  ROCHELLE H. STERLING

**ORIGINAL**
**FILED**
Superior Court of California
County of Los Angeles

**JUN 1 1 2014**

Sherri R. Carter, Executive Officer/Clerk
By _____, Deputy
    Andre Watts

**DATE OF HEARING:**
7-7-14
**Time:** 8:30 **Dept.:** 5

8               SUPERIOR COURT OF THE STATE OF CALIFORNIA
9                        COUNTY OF LOS ANGELES
10
11  In the Matter of                    Case No. **BP152858**
12                                      **EX PARTE PETITION (1) FOR**
13  THE STERLING FAMILY                 **CONFIRMATION OF TRUSTEE'S ACTS**
    TRUST.                              **AND INSTRUCTING TRUSTEE AND**
14                                      **(2) FOR ORDER DIRECTING TRUSTEE**
                                        **UNDER PROBATE CODE §1310(b) TO**
15                                      **PREVENT INJURY OR LOSS TO TRUST**
16                                      [Probate Code §§1310(b); 17200(b)(5) & (6)]
17                                      [Declaration of Rochelle Sterling and Richard
                                        Buchanan and [Proposed] Order Filed
18                                      Concurrently]
19                                      Date:
                                        Time:
20                                      Dept.:
21      Petitioner Rochelle H. Sterling ("Petitioner"), sole Trustee of the Sterling Family Trust
22  (the "Trust"), hereby presents her Ex Parte Petition (1) For Confirmation of Trustee's Acts and
23  Instructing Trustee and (2) For Order Directing Trustee Under Probate Code §1310(b) to Prevent
24  Injury or Loss to Trust (the "Petition") as follows:
25      1.    **Overview:**  This Petition is brought pursuant to Probate Code §17200(b)(5) & (6)
26  concerning the internal affairs of the Trust and requests that the Court confirm Petitioner's act, as
27  sole Trustee of the Trust, of selling certain assets of the Trust, namely, the Los Angeles Clippers
28

81294-00002/2190870.5

PETITION FOR CONFIRMATION OF TRUSTEE'S ACTS AND INSTRUCTING TRUSTEE

1  NBA Franchise (the "Clippers"),[1] at a record price of $2 Billion.  This confirmation is required to

2  satisfy the "Conditions to Closing" under the Binding Term Sheet, dated May 29, 2014 (the

3  "BTS"), which memorializes the terms of sale of the Clippers to a new limited liability company

4  wholly-owned by former Microsoft Corp. CEO Steve Ballmer ("Buyer").  A true and correct

5  copy of the BTS is attached hereto as Exhibit 1.[2]  A fully executed copy of the BTS was provided

6  to Donald T. Sterling ("Donald") through his counsel on or about June 4, 2014.  Because there

7  will be a significant loss to the Trust and its beneficiaries if the Clippers are not promptly sold

8  upon the terms and conditions of the BTS,[3] Petitioner also requests an Order under Probate Code

9  §1310(b) directing her, as Trustee of the Trust, to consummate the sale of the Clippers as

10  provided in the BTS notwithstanding any appeal that may be taken of the substantive Order

11  confirming Petitioner's act and instructing her with respect to the sale.

12          The BTS contemplates a closing on July 15, 2014.  Notwithstanding the BTS, the NBA

13  has set its own deadline of September 15, 2014, for the closing of the sale and has advised

14  Petitioner that if the sale is not consummated by that date, the NBA will undertake proceedings to

15  seize and sell the team.  See Declaration of Richard W. Buchanan ("Buchanan Decl."), at ¶¶ 13,

16  14 and 20.)  Thus, the sale of this $2 Billion asset hinges on granting the requested relief.  It is

17  imperative that the Court act as soon as possible.  Time is of the essence.

18          2.      **Trust**:  The Trust was established on August 12, 1998, by Donald and Petitioner,

19  husband and wife, as Settlors and Trustees.  Donald and Petitioner are the sole vested current

20  beneficiaries of the Trust.  The Trust was subsequently restated by Donald and Petitioner on

21  December 18, 2013.  (Declaration of Rochelle Sterling ("Pet. Decl."), at ¶¶ 1, 2.)  True and

---

[1]  The Clippers are owned by LAC Basketball Club, Inc. ("LAC"), a California corporation whose stock is owned 100% by the Trust.

[2]  The As a result of Donald's lifetime ban from the NBA, as discussed more thoroughly below, the Lifetime Rights under the BTS (pages 9 and 10) exist only during Petitioner's lifetime.  Because the Lifetime Rights are nevertheless community property and properly belong to the Trust, Petitioner assigned the Lifetime Rights to the Trust.  A true and correct copy of the Assignment is attached hereto as Exhibit 2.

[3]  The BTS provides for up to 10% of the Clippers to be retained by LAC and contributed to a charitable foundation, to be sold at a later date.  However, Petitioner will not exercise the option to have any interest in the Clippers contributed to the foundation without either written consent by Donald, or a person who has authority to act on his behalf, or a Court Order.  (Pet. Decl. at ¶10.)

PETITION FOR CONFIRMATION OF TRUSTEE'S ACTS AND INSTRUCTING TRUSTEE

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

correct copies of various relevant pages and provisions of the Trust, as restated on December 18, 2013,[4] are attached hereto as the following Exhibits:

| Page or Provision | Exhibit Number |
| --- | --- |
| Page 1 | 3 |
| Paragraphs 2.5. through 2.7. | 4 |
| Article 7 | 5 |
| Article 8 | 6 |
| Paragraph 10.24 | 7 |
| Signature/Notary pages | 8 |

3.    **Venue and Jurisdiction**:  Both Settlors reside in Los Angeles County, California, and the principal place of administration of the Trust is Los Angeles County, California.  The Court, therefore, has jurisdiction to hear this Petition and to grant the relief requested herein pursuant to Probate Code §§17200(b)(5) & (6), and proper venue lies in this Court.

4.    **Based on Donald's Incapacity, Petitioner Acted Within Her Authority As Sole Trustee of the Trust**:  Pursuant to the applicable provisions of the Trust instrument discussed below, Donald ceased serving as a Co-Trustee of the Trust as of May 29, 2014, upon Petitioner's receipt of written certifications of his incapacity by two licensed physicians whose practice regularly includes determinations of capacity.  As a result, Petitioner currently serves as sole Trustee of the Trust.

a.    Provisions of Trust:  The Trust contains the following provisions relevant to Petitioner's status as the sole Trustee of the Trust:

i.    Paragraph 7.2.a. provides that "[i]f either Settlor ceases to serve, the other shall serve as Trustee."  (Ex. 5, ¶7.2.a.)

ii.    Paragraph 7.3. provides that "[a]n individual serving as a Co-Trustee of any trust may designate one or more persons to serve serially (but not together) as his

---

[4]  All references to the Trust in this Petition are to the Trust as restated on December 18, 2013.

81294-00002/2190870.5

3

PETITION FOR CONFIRMATION OF TRUSTEE'S ACTS AND INSTRUCTING TRUSTEE

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

or her successors and/or as successors to any such designees." Under Paragraph 7.3.a., a designation "shall be in writing, signed by the individual Trustee making the designation and delivered to any other then serving Co-Trustees of the trust." (Ex. 5, ¶7.3.)

        iii.      Paragraph 7.5.c. states: "Any individual who is deemed incapacitated, as defined in Paragraph 10.24., shall cease to serve as a Trustee of all trusts administered under this document. Each individual who agrees to serve as a Trustee of any trust administered under this document (A) shall cooperate in any examination reasonably appropriate to carry out the provisions of this Paragraph 7.5.c., (B) waives the doctor-patient and/or psychiatrist-patient privilege with respect to the results of such examination, and (C) shall allow a Co-Trustee or the Current Beneficiaries of the trust to review the individual's individually identifiable health information or other medical records, waiving any privacy rights governed by the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. §1320d (HIPAA), and the regulations thereunder, including 45 C.F.R. §§160-164, to the extent required to implement this Paragraph 7.5.c. An individual's obligation to comply with the provisions of this Paragraph 7.5.c. is specifically enforceable." (Ex. 5, ¶7.5.c.)

        iv.      Paragraph 10.24. defines "incapacity," and derivations thereof, and provides that "[a]n individual shall be deemed to be incapacitated if . . . two licensed physicians who, as a regular part of their practice are called upon to determine the capacity of others, and neither of whom is related by blood or marriage to any Trustee or beneficiary, examine the individual and certify in writing that the individual is incapacitated." (Ex. 7.)

        b.      <u>Determination of Donald's Incapacity</u>:

        i.      Paragraph 7.5.c. of the Trust, quoted above, includes language waiving an individual Trustee's privilege and privacy rights for purposes of determining whether the individual is incapacitated and ceases to serve as a Trustee. When the Trust was executed on December 18, 2013, Donald and Petitioner both signed the "Acceptance by Trustee," which expressly acknowledged that waiver. (Ex. 8.[5])

---

[5] The Acceptance By Trustee states, "The undersigned hereby accept the office of Trustee and agree to serve in accordance with the terms and conditions of service as set forth in this document, specifically including those terms

81294-00002/2190870.5

                                  4

PETITION FOR CONFIRMATION OF TRUSTEE'S ACTS AND INSTRUCTING TRUSTEE

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1         ii.       Donald, who is 80 years old, was examined by Dr. Meril S. Platzer

2  on May 19, 2014, and by Dr. James Edward Spar on May 22, 2014.  Prior to these examinations,

3  at Dr. Platzer's request, Donald voluntarily underwent a CT scan and a PET scan of his brain at

4  Cedars Sinai Medical Center.

5         iii.      Both Dr. Platzer and Dr. Spar are licensed physicians who, as a

6  regular part of their practice, are called upon to determine the capacity of others, and both

7  Dr. Platzer and Dr. Spar are board-certified by the American Board of Psychiatry and Neurology.

8  Neither Dr. Platzer nor Dr. Spar is related by blood or marriage to Donald or Petitioner, the sole

9  vested current beneficiaries of the Trust under Probate Code §15800.

10        1.      Dr. Platzer is a neurologist who regularly sees patients

11  suffering from Alzheimer's Disease and other forms of dementia.  A true and correct copy of

12  Dr. Platzer's Curriculum Vitae is attached hereto as Exhibit 9.

13        2.      Dr. Spar specializes in geriatric psychiatry and has

14  frequently been appointed by courts to determine capacity.  Petitioner requests that this Court take

15  judicial notice of *Conservatorship of Ramirez* (2001) 90 Cal.App.4th 390, Los Angeles Superior

16  Court case number NP008126, in which Dr. Spar was appointed by this Court to examine the

17  proposed conservatee and file a report with the Court.  A true and correct copy of Dr. Spar's

18  Curriculum Vitae is attached hereto as Exhibit 10.

19        iv.      Following their examinations of Donald, both Dr. Platzer and

20  Dr. Spar certified in writing that Donald was incapable of carrying out the duties as a Trustee of

21  the Trust.  True and correct copies of their written certifications of Donald's incapacity are

22  attached hereto as Exhibits 11 and 12, respectively.

23        1.      Dr. Spar's letter/certification dated May 27, 2014,

24  concludes: "Because of his cognitive impairment, Mr. Sterling is at risk of making potentially

25  serious errors of judgment, impulse control, and recall in the management of his finances and his

26  trust.  Accordingly, in my opinion he is substantially unable to manage his finances and resist

27

28  and conditions of service imposed pursuant to Paragraph 7.5.c."

81294-00002/2190870.5                5

PETITION FOR CONFIRMATION OF TRUSTEE'S ACTS AND INSTRUCTING TRUSTEE

1    fraud and undue influence, and is no longer competent to act as trustee of his trust."

2         2.     Dr. Platzer's certification dated May 29, 2014, concludes:

3    "It is my opinion that Mr. Donald T. Sterling is unable to reasonably carry out the duties as

4    Trustee of The Sterling Family Trust as a result of, among other factors, an impairment of his

5    level of attention, information processing, short term memory impairment and ability to modulate

6    mood, emotional lability, and is at risk of making potentially serious errors of judgment."

7         v.     Dr. Stephen L. Read is also board-certified by the American Board

8    of Psychiatry and Neurology and specializes in geriatric psychiatry and has frequently been

9    appointed by courts to determine capacity. Petitioner requests that this Court take judicial notice

10    of *In Re Estate of Wizel* (2013; unpublished), Los Angeles Superior Court case number

11    BP101210, in which Dr. Read testified about a Co-Trustee's competence to serve. A true and

12    correct copy of Dr. Read's Curriculum Vitae is attached hereto as Exhibit 13. Dr. Read has

13    confirmed the methodology and conclusions of Drs. Platzer and Spar. A true and correct copy of

14    Dr. Read's written conclusions is attached hereto as Exhibit 14.

15         c.     No Designation of Alternate Successor Trustee:

16         i.     While both Donald and Petitioner served as Co-Trustees of the

17    Trust, each of them had the power, under Paragraph 7.3. of the Trust, to designate a successor to

18    serve in his or her place as a Co-Trustee of the Trust should he or she cease to serve. Absent such

19    a designation, the Trust names Petitioner to serve as sole Trustee if Donald ceases to serve. (Ex.

20    5, ¶7.3.)

21         ii.     Any such designation was, under Paragraph 7.3.a. of the Trust,

22    required to have been "in writing, signed by the individual Trustee making the designation and

23    delivered to any other then serving Co-Trustees of the trust." (Id.) At no time from December

24    18, 2013, when the Trust was restated, through May 29, 2014, when Donald ceased serving as a

25    Co-Trustee of the Trust, did Petitioner, as a Co-Trustee of the Trust, ever receive a document by

26    which Donald designated a successor to himself. (Pet. Decl. at ¶3.)

27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590



d.   Effect of Determination of Donald's Incapacity:

i.   Pursuant to Paragraph 7.5.c. of the Trust, Donald ceased serving as a Trustee of the Trust on May 29, 2014, when the second of the two licensed physicians' written certifications of his incapacity was issued and received by Petitioner.  (Ex. 5, ¶7.5.c.)

ii.   Paragraph 7.2.a. of the Trust names Petitioner as the sole Trustee of the Trust if Donald ceases to serve without having made any contrary designation of successor Trustees under Paragraph 7.3. of the Trust that alters the succession of Trustees.  (Ex 5, ¶7.2.a.)

iii.   Petitioner has served as the sole Trustee of the Trust since Donald ceased serving as a Co-Trustee on May 29, 2014.  Petitioner, through her counsel, promptly delivered notice of Donald's removal as a Trustee of the Trust to Donald, through his counsel, on May 29, 2014.  A true and correct copy of the notice is attached hereto as Exhibit 15.

5.   **Urgent Need for Order Confirming Act and Need for Probate Code §1310(b) Order:**  There is an urgent need for Orders from this Court both confirming Petitioner's acts in connection with the sale of the Clippers upon the terms and conditions set forth in the BTS (the "Sale Order") and directing Petitioner, as Trustee of the Trust, to consummate the sale under the BTS pursuant to Probate Code §1310(b), even if there is an appeal of the Sale Order.  This urgency arises because, for reasons set forth below, there is a strong likelihood that the National Basketball Association (the "NBA") will seize and sell the Clippers, a significant and valuable asset of the Trust, if the sale under the BTS cannot be closed on or before September 15, 2014.  A Condition to Closing the sale is that:

> "either (i) Donald [] irrevocably consents, in writing, to the sale of the Purchased Assets in a document in form and substance reasonably satisfactory to Buyer, and which consent includes the cessation/termination of any and all lawsuits that are then-pending against Buyer or with respect to the transactions contemplated hereby, or (ii) a court of competent jurisdiction over the Trust issues a final and non-appealable order confirming [Petitioner's] authority to unilaterally bind the Trust and sell the Purchased Assets hereunder." (Ex. 1, at p. 8)

Thus, without Donald's consent to the sale of the Clippers under the BTS, it is necessary to obtain an Order confirming Petitioner's authority to unilaterally bind the Trust and sell the Clippers as set forth in the BTS.  Although the July 15, 2014, Closing Date for the sale under the BTS can be

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

81294-00002/2190870.5

7

PETITION FOR CONFIRMATION OF TRUSTEE'S ACTS AND INSTRUCTING TRUSTEE

1    extended (Ex. 1, at pp. 6-7), the NBA has imposed a non-extendable closing date of September

2    15, 2014, for the sale. (Buchanan Decl., at ¶¶ 13,14 and 20.)

3            a.    Background:  On March 7, 2014, Petitioner filed suit in Los Angeles

4    Superior Court, Case No. BC538659, to recover certain transfers that Donald had made from their

5    community property which Petitioner believes were for less than full and adequate consideration

6    and were without her consent.  In apparent retaliation by the defendant in the suit, audio

7    recordings of Donald expressing racially offensive remarks (the "Recording") became public.

8    (Buchanan Decl., at ¶4.)  Reaction to the Recording by the public and throughout the NBA

9    community was swift and severe, generating significant attention. (Buchanan Decl., at ¶5.)  The

10   NBA condemned Donald's remarks as contrary to its principles of diversity, inclusion and respect

11   and deeply hurtful to the multicultural and multiethnic NBA community, including NBA owners,

12   players, fans, coaches, team personnel and business partners.  (Buchanan Decl., at ¶ 4.)

13           On April 29, 2014, NBA Commissioner Adam Silver fined Donald $2.5 Million

14   and banned him for life from any further association with the Clippers or the NBA.  The

15   Commissioner further stated that he would urge the NBA Board of Governors to terminate the

16   current ownership of the Clippers and sell the team to a new owner. (Buchanan Decl., at ¶6.)  By

17   May 9, 2014, the NBA had taken control of the day-to-day operations of the Clippers by

18   installing former Citigroup Chairman and former Chairman and CEO of Time Warner Dick

19   Parsons as the interim Chief Executive Officer.  Mr. Parsons reports to the Commissioner.

20   (Buchanan Decl., at ¶7.)  The next day Donald participated in a televised interview with CNN's

21   Anderson Cooper in which he admitted making the racially offensive statements in the Recording

22   and acknowledged the harm he had caused.  However, he also made additional offensive and dis-

23   criminatory statements about African-Americans during the interview. (Buchanan Decl., at ¶8.)

24           On May 19, 2014, the Commissioner initiated a written charge ("Charge") in

25   accordance with the procedures set forth in the NBA Constitution asserting that LAC's

26   membership in the NBA should be terminated. (Buchanan Decl., at ¶9.)  A hearing before the

27   NBA Board of Governors (excluding Donald) was scheduled for June 3, 2014, to hear evidence

28   and vote on the Charge. Under the NBA Constitution, if the Charge was sustained by a vote of

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

81294-00002/2190870.5

8

1    three-fourths of the NBA Board of Governors, LAC's membership in the NBA would

2    automatically be terminated. (Buchanan Decl., at ¶10.) Upon termination, the NBA would seize

3    the team, remove the Sterling family as owners, and sell the Clippers through a public auction

4    conducted by the NBA. (Buchanan Decl., at ¶20.)

5            b.    Petitioner's Actions on Behalf of the Trust:  Around the middle of May,

6    2014, Petitioner came to understand from the NBA that it would be impossible for Donald and

7    her to retain any interest in the Clippers. (Pet. Decl., at ¶5.) Thus, Petitioner took immediate

8    action to ensure preservation of the value of the Clippers for the Trust's beneficiaries. To that

9    end, she obtained Donald's consent to give her authority to sell the team so that she (rather than

10   the NBA) could control the inevitable sale. (Pet. Decl., at ¶6.) Accordingly, on May 22, 2014,

11   Donald sent the NBA a signed letter agreeing to the sale of his interest in the Clippers and

12   authorizing Petitioner to negotiate with the NBA regarding all issues in connection with a sale of

13   the Clippers. (Pet. Decl., at ¶6; Buchanan Decl., at ¶11.) A true and correct copy of Donald's

14   May 22, 2014, authorization letter is attached hereto as Exhibit 16.

15           Next, Petitioner retained counsel and experienced investment bankers to assist her

16   in the marketing and sale of the Clippers. Between May 23 and May 29, Petitioner and her

17   advisors were in contact with at least twelve parties in connection with the sale of the Clippers,

18   four of whom submitted formal bids. The formal bids submitted to Petitioner ranged in value

19   from $1.2 Billion to $2 Billion – the latter of which was submitted by Buyer and accepted by

20   Petitioner, as Trustee of the Trust. Petitioner ultimately signed the BTS, accepting Buyer's $2

21   Billion offer, the highest offer Petitioner received for the team. (Pet. Decl., at ¶7.)

22           Petitioner firmly believed, and still believes, that if the NBA had terminated

23   LAC's membership – as the NBA was virtually certain to do at the June 3 hearing – and seized

24   and sold the Clippers at public auction, there would have been no way to ensure that the sales

25   price of this significant and valuable asset of the Trust was maximized for the benefit of the

26   Trust's beneficiaries. Thus, time was of the essence in locating an appropriate purchaser for the

27   Clippers and entering into a binding contract to sell the Clippers in advance of the June 3 hearing.

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

81294-00002/2190870.5

9

PETITION FOR CONFIRMATION OF TRUSTEE'S ACTS AND INSTRUCTING TRUSTEE

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1      c.     <u>Petitioner Obtained the Highest Possible Value for the Clippers</u>:  Petitioner

2  is informed and believes that the $2 Billion purchase price for the Clippers under the BTS –

3  which includes not only the NBA franchise, but also assets which are of a nature customarily

4  associated with an NBA franchise, including all cash, intellectual property and goodwill related to

5  the assets owned by LAC, but excluding assets (and liabilities or obligations) which either are not

6  related to the franchise or are not customarily associated with an NBA franchise (collectively, the

7  "Purchased Assets") – represents the full and fair market value of the Clippers and clearly

8  demonstrates the adequacy of her efforts to market and sell the Clippers, notwithstanding the

9  exceptionally short period of time.  (Pet. Decl., at ¶8.)  In fact, the fast track sale – prompted by

10  the looming June 3 hearing to terminate LAC's NBA membership – likely heightened the interest

11  for the Clippers and contributed to the record sale price.  Less than one month ago, on May 15,

12  2014, the NBA approved the sale of another team, the Milwaukee Bucks, for $550 Million – less

13  than one-third of the price obtained for the Clippers under the BTS.  According to *Forbes*

14  *Magazine*, the Bucks were worth $405 Million at the time of sale.  The same *Forbes* article

15  valued the Clippers at $575 Million.  A true and correct copy of a summary of the *Forbes* analysis

16  is attached hereto as Exhibit 17.

17      d.     <u>Based on the BTS, the NBA Provisionally Withdrew the Charge Against</u>

18  <u>LAC and Donald</u>:  After the NBA received a copy of the signed BTS, the NBA immediately

19  withdrew the Charge and cancelled the June 3 hearing based on the assurances of Petitioner, as

20  Trustee of the Trust, and Buyer that they would "proceed promptly to a closing of the

21  transaction."  (Buchanan Decl., at ¶14.)  A true and correct copy of the NBA's May 30, 2014,

22  letter is attached hereto as Exhibit 18.  It is anticipated that a vote by the NBA owners to approve

23  Buyer's proposed ownership of the Clippers – which is required to consummate the sale of the

24  team by September 15, 2014 – will be conducted at the next regularly-scheduled NBA Board of

25  Governors meeting on July 15, 2014.  (Buchanan Decl., at ¶14.)

26      e.     <u>There Remains an Imminent Risk of NBA Seizure and Sale of the Clippers</u>

27  <u>if the Sale Under the BTS is not Consummated</u>:  Although Petitioner staved off an immediate

28  seizure and forced sale of the Clippers by the NBA, the threat remains.  Although the NBA

81294-00002/2190870.5                   10

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    withdrew the Charge, it did so without prejudice and expressly reserved all of its rights,

2    "including the right to renew the Charge or file a new or amended charge at a later date."

3    (Buchanan Decl., at ¶¶14, 20 and Ex. 18.)  Moreover, the NBA entered a settlement agreement

4    with Petitioner, LAC, and the Trust (the "Settlement Agreement") under which Petitioner only

5    has until September 15, 2014, to complete the sale to Buyer.  If the sale is not consummated by

6    that date, the NBA has the right to reinstate the Charge and reschedule the termination hearing.

7    (Buchanan Decl. at ¶¶14, 20.)

8            It is the NBA's position that every day that Mr. Sterling remains an owner of the

9    Clippers causes additional damage not only to the Trust, but to the team and the NBA.  The NBA

10   believes that the sale of the team to new ownership is the only way to put an end to this harm and

11   permit the Clippers and the NBA to disassociate themselves from Donald's "abhorrent views"

12   and actions, and that immediate consummation of the BTS would best accomplish this result.

13   Petitioner's actions in entering into the BTS must be confirmed in order for the sale to close and

14   be approved by the NBA Board of Governors at its next meeting.  (Buchanan Decl., at ¶15.)

15           Given the NBA's position that Donald's continued ownership of the Clippers is

16   causing substantial harm to the Clippers and the NBA's relationship with its fans, existing and

17   potential business partners and licensees, current and former NBA players and other Clippers

18   employees (Buchanan Decl., at ¶¶16-19), it is virtually certain that if the sale to Buyer does not

19   close, the NBA will reinstitute the Charge, conduct a hearing, terminate ownership and seize and

20   sell the team at public auction.  In fact, the NBA has confirmed that if Donald delays the sale to

21   Buyer, it will most likely do just that.  (Buchanan Decl., at ¶20.)  That result is not in the best

22   interests of the Trust or its beneficiaries.

23           f.      A Sale Under the Terms of the BTS is in the Best Interest of the Trust:

24   Petitioner's actions culminated in the execution of the BTS which allowed Petitioner to control

25   the sale of the Clippers; had Petitioner not executed the BTS, it is highly likely that the NBA

26   would have seized the Clippers and taken control of the sale which likely would have resulted in a

27   substantially lower sale price.  By virtue of Petitioner's efforts, an unprecedented sale price of

28   $2 Billion was obtained, and the NBA dismissed the Charge against LAC and Donald.  The sale

81294-00002/2190870.5                                        11

PETITION FOR CONFIRMATION OF TRUSTEE'S ACTS AND INSTRUCTING TRUSTEE

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    of the Clippers for $2 Billion is for the benefit of, and is in the best interests of, the Trust and its

2    beneficiaries, Donald and Petitioner. The $2 Billion sale price that Petitioner negotiated

3    represents the highest price ever paid for a sports franchise in North America[6] and is more than

4    three times greater than the $550 Million for which the Milwaukee Bucks NBA franchise recently

5    sold, a sale that was just confirmed on May 15, 2014. Even after the income tax on the sale

6    proceeds is paid, the sale of the Clippers on the terms set forth in the BTS should result in *net*

7    sales proceeds being received by the Trust for the benefit of its beneficiaries that are in excess of

8    twice the *gross* proceeds from the sale of the Milwaukee Bucks.

9        Moreover, if the NBA had seized the Clippers, or seizes the Clippers in the future,

10    and controls the sale process, there will likely be additional costs to the Trust. The NBA contends

11    that under the NBA Constitution, and as a result of the Settlement Agreement, LAC and the Trust

12    would be responsible for all of the NBA's costs in connection with a termination and subsequent

13    sale of the Clippers, which could include the costs of hiring a bank, other experts, and counsel.

14    LAC and the Trust could also potentially be responsible for millions of dollars of damages.

15    (Buchanan Decl., at ¶20.)

16        g.    <u>Petitioner Requires a Court Order Affirming Her Actions on Behalf of the</u>

17    <u>Trust</u>: The BTS requires as a Condition of Closing either Donald's consent or a final and non-

18    appealable Order confirming Petitioner's authority to unilaterally bind the Trust. Because Donald

19    has, to date, refused to consent to the sale of the Clippers, a final and non-appealable order

20    confirming Petitioner's authority to unilaterally bind the Trust and sell the Clippers is required to

21    close the sale. Petitioner therefore requests that this Court confirm that Petitioner had authority to

22    (i) unilaterally bind the Trust under the BTS, as the owner of LAC which owns the Clippers, and

23    (ii) sell the Purchased Assets.

24        h.    <u>Order under Probate Code §1310(b) is Necessary and Appropriate Given</u>

25    <u>the Tight Time Constraint the NBA Has Placed on the Sale</u>: As discussed above, time is of the

26    essence with respect to closing the sale of the Clippers. If the sale is not closed by September 15,

27

28    [6] Although the sale price for the Los Angeles Dodgers was slightly higher, that sale included substantial real estate holdings in addition to the baseball franchise.

PETITION FOR CONFIRMATION OF TRUSTEE'S ACTS AND INSTRUCTING TRUSTEE

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    2014, it is highly likely that the NBA will reinstate the Charge against LAC (and Donald) and set

2    a hearing at which the LAC's membership will be terminated. That action will be followed by a

3    seizure and sale of the team at public auction, eviscerating all of Petitioner's efforts to maximize

4    the sale proceeds in the best interests of the Trust's beneficiaries. (Buchanan Decl., at ¶20.)

5          It will likely take two to three months to negotiate and draft the numerous

6    documents necessary for the closing of the sale under the BTS. Petitioner needs to have her

7    authority to consummate the sale under the BTS as soon as possible so that her counsel and

8    counsel for Buyer can begin this complex process.

9          Although, at times, Donald has consented to a sale, he has repeatedly changed his

10   mind. On May 22, Donald represented to NBA Commissioner Adam Silver that he agreed to a

11   sale of his interest in the Clippers and specifically authorized Petitioner to negotiate a sale. A

12   week later, he refused to consent to the sale despite the staggering sale price. Then on June 5,

13   Donald announced through his attorney Max Blecher that he consented to the sale. A true and

14   correct copy of a June 5, 2014, AP newswire report is attached hereto as Exhibit 19. By June 9,

15   Donald had again made a complete about-face. A true and correct copy of a June 10, 2014, AP

16   newswire report is attached hereto as Exhibit 20.

17         Under the BTS, if Donald does not consent to the sale, Petitioner must obtain a final non-

18   appealable court order confirming her authority to unilaterally bind the Trust under the BTS. Left

19   to its normal course, the process will take much longer than either Buyer or the NBA is willing to

20   wait. The BTS contemplates a closing by July 15, 2014, and the NBA Board of Governors plans

21   to meet that day to vote on whether to approve the sale to Buyer. Although the BTS contains

22   provisions permitting an extension of that date, the Settlement Agreement provides that the sale

23   must close by September 15, 2014. (Buchanan Decl., at ¶20.)

24         It would be impossible for this mater to be heard by the trial court on regular notice, and

25   possibly the appellate courts, in time to meet the NBA's deadline. If heard on regular notice,

26   Petitioner would not have a ruling by this Court until after the July 15, 2014, vote. A subsequent

27   appeal to the Court of Appeal and/or petition for review filed with the California Supreme Court

28

Exhibit A
Page 16

1    could not possibly be completed prior to the NBA's September 15, 2014, deadline.[7] The entire

2    appellate process could consume one to two years.

3        Thus, Petitioner requests that this Court direct Petitioner under Probate Code §1310(b) to

4    consummate the sale of the Clippers as provided in the BTS notwithstanding any appeal that may

5    be taken of the substantive Order confirming Petitioner's actions in order to prevent loss and

6    injury to Donald and Petitioner as a result of not consummating the private sale of the Clippers to

7    Buyer.

8        6.    **Donald's Purported Revocation of the Trust on June 9, 2014, Does Not Effect**

9    **the BTS**:  On June 9, 2014, Petitioner received from Donald a two-page letter by which Donald

10   purported to revoke the Trust (the "June Revocation"), a true and correct copy of which is

11   attached as Exhibit 21.  Petitioner does not believe that Donald had capacity on June 9, 2014, to

12   execute the June Revocation.

13       If, however, Donald did have capacity to execute the June Revocation, then the

14   June Revocation revoked the Trust, but, under both the terms of the Trust and California law, the

15   BTS remains a binding Trust contract and Petitioner, as Trustee of the Trust, does not need to

16   immediately distribute the Trust assets to Donald and herself, individually, as the Trust's

17   beneficiaries, but can instead retain the requisite assets to consummate the contractually required

18   sale of the Clippers under the BTS.  Moreover, immediate distribution would be imprudent given

19   the issues surrounding Donald's capacity and the inevitable deadlock between Donald (who

20   opposes the Clippers' sale) and Petitioner (who supports the Clippers' sale), making it impossible

21   to perform under the BTS, a binding contract entered into prior to the purported revocation.

22       Paragraph 2.5.a. of the Trust provides that either Settlor may revoke the Community

23   Trust, and, upon revocation, the assets of "the Community Trust shall promptly be distributed to

24   the Settlors as their community property."  Paragraph 2.6.a. of the Trust contains a similar

25   provision relating to any Separate Trust.  In both cases, however, the Trust expressly provides

26   that "the Trustee may retain sufficient assets to secure payment of liabilities lawfully incurred by

27

28   _____

[7] Donald could conceivably even file a petition for writ of certiorari with the United States Supreme Court, further
delaying the finality of any prior decision.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

81294-00002/2190870.5                        14

PETITION FOR CONFIRMATION OF TRUSTEE'S ACTS AND INSTRUCTING TRUSTEE

1  the Trustee in the administration of the [applicable] Trust." Furthermore, Paragraph 6.6. of the

2  Trust provides that although "[a]ll interests under [the Trust] shall vest upon the occurrence of the

3  event specified herein, . . . [, the] Trustee may delay distribution or division of any trust for a

4  reasonable period of administration."

5       Consistent with the Trust, Probate Code §15407(a)(5) provides that "[a] trust terminates

6  when any of the following occurs: . . . (5) The trust is revoked"; however, under Probate Code

7  §15407(b), "[o]n termination of the trust, the trustee continues to have the powers reasonably

8  necessary under the circumstances to wind up the affairs of the trust." The commentary to

9  §15407 states, "[a]s to the trustee's powers upon termination see Restatement, Third, of Trusts

10  Section 89."[8]  Restatement, Third, of Trusts Section 89 provides that "[t]he powers of a trustee do

11  not end on the trust's termination date but may be exercised as appropriate to the performance of

12  the trustee's duties in winding up administration." The comments to Section 89 provide

13  additional guidance.  Comment b states that "[a]lthough the termination date for a trust has

14  arrived, the trustee does not thereby necessarily cease to be trustee but normally continues to

15  serve until the trust is finally wound up.  The period for winding up the trust refers to the period

16  after the termination date and before trust administration ends by complete distribution of the

17  trust estate. . . . If . . . the trust terms or circumstances require the sale of property that is not

18  readily saleable . . ., the period for winding up the trust may properly be longer than it would be

19  in the absence of these or other complicating circumstances." Comment d states that "[a]lthough

20  the trust termination date has arrived, the trustee can properly exercise such powers as are

21  reasonable and appropriate for the preservation of trust property until the process of winding up is

22  completed . . . [including] keep[ing] trust property productive. . . . Accordingly, suitable new

23  investments or commitments (e.g. renewal of leases on trust-owned apartments) may be

24  appropriate to avoid wasting the potential of trust assets to produce income."

25       Thus, if this Court confirms that Petitioner validly executed the BTS on behalf of the

26  Trust, the Trust and California law provide that Petitioner, as Trustee, has the power to retain

27

28  [8] *See also, Botsford v. Haskins & Sells* (1978) 81 Cal.App.3rd 780, 784.

81294-00002/2190870.5

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

15

PETITION FOR CONFIRMATION OF TRUSTEE'S ACTS AND INSTRUCTING TRUSTEE

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1  LAC and the other Purchased Assets held by the Trust for the relatively short period necessary to

2  consummate the sale of the Clippers under the BTS, even after the June Revocation. Confirming

3  that, notwithstanding the June Revocation, the Trustee retains the authority to consummate the

4  sale under the BTS will protect the Trust from damages claims by Buyer for failure to close the

5  sale and allows the highly beneficial sale to be consummated.

6      7.    **For the Benefit of the Trust, the Sale Should be Confirmed**:  Even assuming

7  *arguendo* that Donald continues to serve as a Co-Trustee of the Trust and does not agree to the

8  sale, the Court should nevertheless confirm the sale because it is in the best interests of the

9  Trust's beneficiaries as set forth in greater detail in Paragraph 5 above. This is not a situation

10  where the Trustee's two choices are to hold an asset or to sell an asset. The NBA has made its

11  position clear: the two options are to (i) consummate the pending private sale that Petitioner seeks

12  to have confirmed by the Court or (ii) have LAC's NBA membership terminated and the Clippers

13  sold through a public auction controlled by the NBA. Because Petitioner believes the pending

14  private sale is extremely favorable to Donald and Petitioner, as beneficiaries of the Trust, and also

15  allows the Trustee control over the sale process, Petitioner believes that this Court should approve

16  the sale even if the Court were to determine that Donald remains a Co-Trustee of the Trust or that

17  the Trust is revoked. Petitioner is cognizant that a third option is to challenge the NBA's right

18  under the NBA Constitution to seize and sell the Clippers,[9] but this third option will not only be

19  costly and protracted, with little likelihood of success, causing the opportunity to sell the Clippers

20  for $2 Billion to be lost, but also expose the Trust to substantial damages from Buyer and the

21  NBA.

22      8.    **Notice**: The names and addresses of each person entitled to notice of this Petition,

23  all of whom are adults, are as follows:

24  **NAME**                                          **AGE/RELATIONSHIP**

25  Donald T. Sterling                                Adult Beneficiary
    c/o Maxwell M. Blecher, Esq.
26  Blecher Collins Pepperman & Joye
    515 South Figueroa Street
27  Suite 1750

---

[9] Donald has filed a federal action against the NBA and its Commissioner Adam Silver alleging violation of
28  constitutional rights (free speech), breach of contract; antitrust; conversion; and breach of fiduciary duty.

1    As set forth in the accompanying Declaration of Marc M. Stern, notice of this Ex Parte Petition

2    was given to Donald, through his attorneys, telephonically and by email on June 10, 2014, at

3    approximately 9:40 a.m.

4    WHEREFORE, Petitioner prays for an Order of this Court:

5        1.    Confirming that Petitioner had authority to unilaterally bind the Trust, as the

6    owner of LAC which owns the Clippers, by executing the BTS and agreeing to sell the Purchased

7    Assets pursuant thereto;

8        2.    Authorizing and instructing Petitioner to sell the Clippers to a limited liability

9    company wholly-owned by Steve Ballmer upon the terms and conditions set forth in the BTS, and

10   to take all actions necessary or appropriate to complete the sale, including but not limited to the

11   execution of any and all documents necessary to complete the sale and the transfer of the Clippers

12   contemplated thereby;

13       3.    Directing Petitioner under Probate Code §1310(b), as Trustee of the Trust,

14   to consummate the sale of the Clippers as provided in the BTS notwithstanding any appeal that

15   may be taken of the Order confirming Petitioner's act and instructing her with respect to the sale;

16   and

17       4.    For such further relief as the Court deems appropriate.

18   DATED: June _10_, 2014                         RESPECTFULLY SUBMITTED

19

20

21                                                  _ROCHELLE H. STERLING, Trustee_

22

23                                                  GREENBERG GLUSKER FIELDS CLAMAN
                                                    & MACHTINGER LLP
24

25                                                  By: _____

26                                                  PIERCE O'DONNELL (SBN 81298)
                                                    Attorneys for Trustee Rochelle H. Sterling
27

28

81294-00002/2190870.4                              ·17·

PETITION FOR CONFIRMATION OF TRUSTEE'S ACTS AND INSTRUCTING TRUSTEE

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

## VERIFICATION

1

2     I have read the foregoing Ex Parte Petition (1) For Confirmation of Trustee's Acts and Instructing Trustee and (2) For Order Directing Trustee Under Probate Code §1310(b) to Prevent

3 Injury or Loss to Trust and know its contents.

4   ☒    I am a party to this action. The matters stated in it are true of my own knowledge except as to those matters which are stated on information and belief, and as to

5     those matters I believe them to be true.

6   ☐    I am an officer of _____, a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason.

7     I have read the foregoing document(s). I am informed and believe and on that ground allege that the matters stated in it are true.

8

9   ☐    I am one of the attorneys of record for _____, a party to this action. Such party is absent from the county in which I have my office, and I make this

10     verification for and on behalf of that party for that reason. I have read the foregoing document(s). I am informed and believe and on that ground allege that the matters stated in it are true.

11

12     Executed at Los Angeles, California on June _10_, 2014.

13     I declare under penalty of perjury under the laws of the State of California that the

14 foregoing is true and correct.

15

16                      _Rochelle Sterling_

                     ROCHELLE H. STERLING

17

18

19

20

21

22

23

24

25

26

27

28

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

81294-00002/2190870.4           18

PETITION FOR CONFIRMATION OF TRUSTEE'S ACTS AND INSTRUCTING TRUSTEE

# Exhibit A-3

06/11/2014

**EXHIBIT 3**

## THE STERLING FAMILY TRUST
### (2013 RESTATEMENT)

## ARTICLE 1
### INTRODUCTION

**1.1      Restatement Of Trust**

On August 13, 1998,   **DONALD T. STERLING** and **ROCHELLE H. STERLING**, who are referred to herein individually as the "Husband" or the "Wife," respectively, or as a "Settlor," and collectively as the "Settlors" or as the "Trustee," depending upon the context, executed that certain Declaration of Trust referred to as **THE STERLING FAMILY TRUST**. Pursuant to the Settlors' retained powers, the Settlors hereby restate **THE STERLING FAMILY TRUST** in its entirety. This restatement shall neither create a new trust nor require the transfer or re-registration of assets now held by the Trustee of **THE STERLING FAMILY TRUST**.

**1.2      Family Of Settlors**

The Settlors are married to each other and have two (2) adult living children of their marriage, namely, **JOANNA STERLING MILLER** and **CHRIS STERLING**. The Settlors have one (1) deceased child, namely **SCOTT STERLING**. The Settlors have no other children, living or deceased. References herein to the Settlors' children shall include only the foregoing named children.

**1.3      Disinheritance Clause**

The Settlors have intentionally omitted to provide for any individual not mentioned in this document who, if either Settlor had died intestate, would be entitled to share in his or her estate as an heir at law or otherwise.

**1.4      Names Of Trusts**

The trust restated by this document shall continue to be referred to as **THE STERLING FAMILY TRUST**. From time to time, various trusts may be established under this document, and, as a matter of convenience, each such trust may be designated by any name set forth in this document or by any other name that the Trustee considers appropriate.

**1.5      Character Of Property**

The Community Trust shall remain the community property of the Settlors, and a Settlor's Separate Trust shall remain the separate property of the transferring Settlor. To

- 1 -

81294-00002/1915393.5

Exhibit 3 - Page 35

# Exhibit A-4

06/11/2014

**EXHIBIT 4**

2.5      Settlors' Powers To Revoke, Withdraw, Appoint And Amend Community Trust

2.5.a      Revocation

Either Settlor may revoke the Community Trust, and, following the revocation, all of the income and principal of the Community Trust shall promptly be distributed to the Settlors as their community property, unless the Settlors, acting together, contemporaneously direct that all or any portion of the assets of the Community Trust be distributed to any one or more other persons. If the Community Trust is revoked, the Trustee may retain sufficient assets to secure payment of liabilities lawfully incurred by the Trustee in the administration of the Community Trust, including Trustee's fees that have been earned, unless the Trustee is indemnified to the Trustee's satisfaction against loss or expense.

2.5.b      Withdrawal

Either Settlor may withdraw all or any portion of the income and/or principal of the Community Trust, and, following the withdrawal, the withdrawn portion of the Community Trust shall promptly be distributed to the Settlors as their community property, unless the Settlors, acting together, contemporaneously direct that all or any portion of the withdrawn assets be distributed to any one or more other persons. If all or a major portion of the Community Trust is withdrawn, the Trustee may retain sufficient assets to secure payment of liabilities lawfully incurred by the Trustee in the administration of the Community Trust, including Trustee's fees that have been earned, unless the Trustee is indemnified to the Trustee's satisfaction against loss or expense.

2.5.c      Joint Appointment

Both Settlors, acting together, may appoint all or any portion of the Community Trust in favor of any one or more persons, including themselves and their estates.

2.5.d      Joint Amendment

Both Settlors, acting together, may amend the Community Trust, in whole or in part.

2.5.e      Unilateral General Testamentary Power Of Appointment

Either Settlor may unilaterally appoint all or any portion of his or her fifty percent (50%) share of the Community Trust in favor of any one or more persons, including such Settlor's estate; provided, however, that such appointment shall only be effective at the Settlor's death if he or she is the Deceased Settlor.

- 4 -

81294-00002/1915393.5

Exhibit 4 - Page 36

Exhibit A-4
Page 25

2.6 **Settlor's Powers To Revoke, Withdraw, Appoint And Amend His Or Her Separate Trust**

2.6.a **Revocation**

A Settlor may revoke his or her Separate Trust, and, following the revocation, all of the income and principal of the Settlor's Separate Trust shall promptly be distributed to such Settlor as his or her separate property, unless the Settlor contemporaneously directs that all or any portion of the assets of his or her Separate Trust be distributed to any one or more other persons. If the Settlor's Separate Trust is revoked, the Trustee may retain sufficient assets to secure payment of liabilities lawfully incurred by the Trustee in the administration of the Separate Trust, including Trustee's fees that have been earned, unless the Trustee is indemnified to the Trustee's satisfaction against loss or expense.

2.6.b **Withdrawal**

A Settlor may withdraw all or any portion of the income and/or principal of his or her Separate Trust, and, following the withdrawal, the withdrawn portion of the Settlor's Separate Trust shall promptly be distributed to such Settlor as his or her separate property, unless the Settlor contemporaneously directs that all or any portion of the withdrawn assets be distributed to any one or more other persons. If all or a major portion of a Settlor's Separate Trust is withdrawn, the Trustee may retain sufficient assets to secure payment of liabilities lawfully incurred by the Trustee in the administration of the Separate Trust, including Trustee's fees that have been earned, unless the Trustee is indemnified to the Trustee's satisfaction against loss or expense.

2.6.c **Appointment**

A Settlor may appoint all or any portion of his or her Separate Trust in favor of any one or more persons, including himself or herself or his or her estate.

2.6.d **Amendment**

A Settlor may amend his or her Separate Trust, in whole or in part.

2.7 **Exercise Of Settlors' Powers**

The Settlors' powers under this Article 2 shall be exercised as follows:

2.7.a **No Writing Required**

A direction with respect to, or a withdrawal from, a trust under this Article 2 by a Settlor who is then serving as sole Trustee of that trust need not be in writing.

- 5 -

81294-00002/1915393.5

Exhibit 4 - Page 37

Exhibit A-4
Page 26

### 2.7.b   Writing Required

A direction with respect to, or a withdrawal from, a trust under this Article 2 by a Settlor who is not then serving as sole Trustee of that trust shall be made by a writing signed by that Settlor. A revocation or an amendment shall be made by a writing signed by the Settlor or Settlors, as the case may be. Any writing required by this Paragraph 2.7.b. shall clearly identify the trust as to which the power being exercised relates and shall be delivered to all then serving Trustees of the trust.

## ARTICLE 3
## ADMINISTRATION OF TRUSTS
## UPON DEATH OF DECEASED SETTLOR

### 3.1   Administrative Trust

Upon the death of the Deceased Settlor, all trust property, including all trusts established pursuant to Paragraph 1.5., and any additions thereto by reason of the Deceased Settlor's death, shall be referred to as the "Administrative Trust." The Trustee shall (i) pay all taxes and expenses relating to the Administrative Trust, (ii) distribute the portion of the Deceased Settlor's interest in the Administrative Trust that the Deceased Settlor has effectively appointed pursuant to Paragraphs 2.5. and 2.6., and (ii) distribute the residue of the Administrative Trust as provided in Paragraph 3.2. The Trustee of the Administrative Trust may distribute to any Current Beneficiary of any trust under Paragraph 3.2. such amounts of income and/or principal as are consistent with the terms of such trust, and any such distributions shall be in lieu of and thus charged against the income and/or principal remaining to be distributed to such trust.

### 3.2   Division Of Residue Of Administrative Trust Into Separate Trusts

The Trustee shall distribute the residue of the Administrative Trust to new trusts, referred to as the "Survivor's Trust," the "Credit Trust" and the "Marital Trust," as provided in this Paragraph 3.2.

### 3.2.a   Gift To The Survivor's Trust

The Trustee shall distribute to the Survivor's Trust (i) all Tangible Personal Property, (ii) the remainder of the Surviving Settlor's Separate Trust held as part of the residue of the Administrative Trust and (iii) that amount of the remainder of the Community Trust as shall equal the Surviving Settlor's interest therein. The Survivor's Trust shall be administered as provided in Paragraph 4.1.

81294-00002/1915393.5

- 6 -

Exhibit 4 - Page 38

# Exhibit A-5

forth in this document; (ii) the provisions of the applicable Code section or Regulatory Authority shall override and supersede any provisions of the trust preventing the trust from qualifying for treatment under the Code section; (iii) the Independent Trustee of the trust shall amend the trust to expressly include any required provisions and to restrict or eliminate any inconsistent provisions, either by a writing which is delivered to the Trustee and to all Current Beneficiaries of the trust or by petitioning the court having jurisdiction over the trust to have the provisions of the trust reformed; (iv) the trust shall be administered in accordance with the Code section and applicable Regulatory Authority; and (v) the Trustee shall not take any action or have any power which would impair the ability of the trust to qualify for treatment under the Code section. The Independent Trustee of the trust is further authorized to enter into any and all agreements with the Internal Revenue Service or any other governmental body or official or to execute, from time to time, any agreements, declarations of policy or disclaimers that may be required in order for the trust to qualify under the particular Code section.

 6.18 **No Revocation Or Amendment Except As Specifically Provided**

  Except as expressly provided to the contrary in this document, including the provisions of Article 2 relating to the Community Trust and each Settlor's Separate Trust and Paragraph 4.1. relating to the Survivor's Trust, no trust administered under this document may be revoked or amended.

## ARTICLE 7
## PROVISIONS REGARDING TRUSTEES

 7.1 **General Provisions Concerning Fiduciaries**

  Except to the extent expressly provided otherwise, references to the "Trustee" of any trust are to the person then serving as sole Trustee of such trust or to the persons then serving as Co-Trustees of such trust. The provisions of this Article 7 shall apply to all fiduciaries serving under this document, including Trustees and Special Trustees.

 7.2 **Appointment Of Trustees**

  7.2.a **In General**

  The Settlors, DONALD T. STERLING and ROCHELLE H. STERLING, shall serve as Trustee. If either Settlor ceases to serve, the other shall serve as Trustee. If both Settlors cease to serve, JOANNA STERLING MILLER, DARREN SCHIELD, DOUGLAS L. WALTON and RICHARD ANDREW ROESER shall serve as Trustee. If any one of JOANNA STERLING MILLER, DARREN SCHIELD, DOUGLAS L. WALTON or RICHARD ANDREW ROESER fails to qualify or ceases to serve, the others

Exhibit 5 - Page 39

shall serve as Trustees. If two or more of **JOANNA STERLING MILLER, DARREN SCHIELD, DOUGLAS L. WALTON** and **RICHARD ANDREW ROESER** fail to qualify or cease to serve, **BANK OF AMERICA, N.A.** through its **MERRILL LYNCH TRUST COMPANY** division ("**MERRILL LYNCH**") shall serve with the one or ones remaining. If all of **JOANNA STERLING MILLER, DARREN SCHIELD, DOUGLAS L. WALTON** and **RICHARD ANDREW ROESER** fail to qualify or cease to serve, **MERRILL LYNCH** shall serve alone as Trustee. The persons named in Paragraph 7.2.a. or their successors designated under Paragraph 7.3. are referred to in this Article 7 collectively as the "**Primary Trustee.**" *Except as otherwise provided in this Article 7, the Primary Trustee shall serve as Trustee of all trusts administered under this document.*

7.2.b        **Trustees Of Trusts For Issue**

(i)        Trust for **JOANNA STERLING MILLER. JOANNA STERLING MILLER** shall serve as sole Trustee of the trust administered for her benefit under Paragraph 5.5. If **JOANNA STERLING MILLER** fails to qualify as Trustee or ceases to serve and has not designated a successor Trustee as provided in Paragraph 7.3., the Primary Trustee shall serve as Trustee of **JOANNA STERLING MILLER**'s trust.

(ii)        Trust for **CHRIS STERLING. CHRIS STERLING, DARREN SCHIELD, DOUGLAS L. WALTON** and **RICHARD ANDREW ROESER** shall serve as Trustee of the trust administered for **CHRIS STERLING**'s benefit under Paragraph 5.5. If **CHRIS STERLING** fails to qualify or ceases to serve, the others shall serve as Trustee. If any one or more of **DARREN SCHIELD, DOUGLAS L. WALTON** or **RICHARD ANDREW ROESER** fails to qualify or ceases to serve, **MERRILL LYNCH** shall serve as a Trustee with such of **CHRIS STERLING, DARREN SCHIELD, DOUGLAS L. WALTON** and **RICHARD ANDREW ROESER** who is then serving. If all of **CHRIS STERLING, DARREN SCHIELD, DOUGLAS L. WALTON** and **RICHARD ANDREW ROESER** fail to qualify or cease to serve, **MERRILL LYNCH** shall serve alone as Trustee.

(iii)        Trust for Descendant. **Trusts For Descendants.** The Primary Trustee shall serve as Trustee of the Descendant's trust administered under Paragraph 5.6. Upon attaining age twenty-five (25), the Descendant shall serve as a Co-Trustee of the Descendant's trust with the Primary Trustee. From and after attaining age thirty-five (35), the Descendant shall serve as the sole Trustee of the Descendant's trust. If the Descendant fails to qualify as a Co-Trustee or as sole Trustee or ceases to serve and has not designated a

81294-00002/1915393.5

- 39 -

Exhibit 5 - Page 40

Exhibit A-5
Page 30

successor Trustee as provided in Paragraph 7.3., the Primary Trustee shall serve as Trustee of the Descendant's trust.

### 7.2.c      Vacancy In Office Of Trustee

If at any time there is a vacancy in the office of Trustee of any trust administered under this document, including if a Trustee resigns, is removed or declines to serve as provided in Paragraph 7.5., and there is no Replacement Trustee who is able and willing to serve as a Trustee of the trust, the Majority Beneficiaries of the trust shall designate a successor Trustee for the trust in the manner provided in Paragraph 7.3.a., as if the Majority Beneficiaries were the only then serving Trustees of the trust; provided, however, that if the vacancy occurs as a result of a removal pursuant to Paragraph 7.5.d., other than pursuant to clause (A) of subparagraph (ii) thereof, or pursuant to Paragraph 7.5.f., the Majority Beneficiaries shall designate a bank or trust company authorized to conduct trust business in the jurisdiction the laws of which govern such trust under Paragraph 12.3. and having trust assets under management in excess of One Billion Dollars ($1,000,000,000) as successor Trustee for the trust, in the manner provided in Paragraph 7.3., as if the Majority Beneficiaries were the only then serving Trustees of the trust.

### 7.2.d      If No Trustee Is An Independent Trustee

If at any time (i) the Trustee of a trust is requested to exercise a power vested in the Independent Trustee pursuant to Paragraph 6.4. or otherwise determines that it is appropriate for an Independent Trustee to consider exercising a power vested in the Independent Trustee with respect to the trust and (ii) no Trustee then serving with respect to the trust is an Independent Person, the Replacement Trustee of the trust who is an Independent Person shall serve for the sole purpose of exercising or not exercising the powers vested in the Independent Trustee. If no Replacement Trustee of the trust is an Independent Person, the then serving Trustee of the trust shall designate an Independent Person to serve, in the manner provided in Paragraph 7.3., for the sole purpose of exercising or not exercising such powers.

### 7.2.e      If No Trustee Is A Neutral Person

If at any time (i) the Trustee of a trust is requested to exercise a power vested in the Neutral Person serving as Trustee pursuant to Paragraph 6.5. or otherwise determines that it is appropriate for a Neutral Person to consider exercising a power vested in the Neutral Person serving as Trustee with respect to the trust and (ii) no Trustee then serving with respect to the trust is a Neutral Person, the Replacement Trustee of the trust who is a Neutral Person shall serve as a Trustee for the sole purpose of exercising or not exercising the powers vested in the Neutral Person serving as Trustee. If no Replacement Trustee of the trust is a

- 40 -

Exhibit 5 - Page 41

Neutral Person, the then serving Trustee of the trust shall designate a Neutral Person to serve, in the manner provided in Paragraph 7.3., for the sole purpose of exercising or not exercising such powers.

### 7.3    Designation Of Co-Trustees And Successor Trustees

An individual serving as the sole Trustee of any trust may designate one or more persons to serve as his or her successors, to serve with him or her as a Co-Trustee and/or to serve as successors to any such designees. An individual serving as a Co-Trustee of any trust may designate one or more persons to serve serially (but not together) as his or her successors and/or as successors to any such designees. In addition, if all then serving Co-Trustees of any trust are individuals, they may designate one or more persons to serve with them as a Co-Trustee, as the successor for any one or more of them, and/or as successors to such designated Co-Trustees. A designation may name persons either in lieu of or in addition to those persons named in Paragraph 7.2. A designation may be revoked or amended by a subsequent designation. If a conflict occurs between the terms of two or more designations, whether such designations were by the same or different Trustees, the terms of the most recent designation shall prevail.

### 7.3.a    Exercise Of Designation

A designation under this Paragraph 7.3. shall be in writing, signed by the individual Trustee making the designation and delivered to any other then serving Co-Trustees of the trust.

### 7.3.b    Other Terms Of Designation

A designation may (i) waive bond, (ii) specify the compensation for so serving, (iii) be for a fixed or an unlimited duration, (iv) be for all or a portion of the designating Trustee's powers or (v) otherwise set forth terms and conditions of service by the designee.

### 7.3.c    Effect Of Removal Of Designating Trustee

If a Trustee is removed for cause pursuant to Paragraph 7.5.d., other than pursuant to clause (A) of subparagraph (ii) thereof, all designations by the removed Trustee under this Paragraph 7.3. shall be void, and any Co-Trustee appointed by the removed Trustee shall cease to serve, unless such Co-Trustee would have been a Replacement Trustee by reason of being named in this document or designated by a predecessor to the removed Trustee.

- 41 -

81294-00002/1915393.5

Exhibit 5 - Page 42

7.4     **Qualification Of Successor Trustees**

7.4.a     **Consent To Serve**

No person shall qualify to serve as a Trustee of any trust unless the person has consented to serve in writing, which consent shall specifically accept any terms and conditions of service, including those imposed pursuant to Paragraph 7.5.c. or by a designation under Paragraph 7.3. All fees and costs incurred by the person in determining whether or not to consent to serve shall be paid from the trust as an expense of administration.

7.4.b     **Conflicts Of Interest**

No person shall be disqualified from serving as a Trustee of any trust by reason of (i) owning an interest in real or personal property in which the trust holds an interest, (ii) owning an interest in a corporation, partnership, limited liability company or other business venture in which the trust holds or has at any time held an equitable, beneficial or management interest or (iii) being an officer, director or employee of any corporation, partnership, limited liability company or other business venture in which the trust holds or has at any time held an equitable, beneficial or management interest.

7.5     **Declination, Resignation And Removal Of Trustees**

7.5.a     **Declination**

A Replacement Trustee of any trust may decline to serve upon written notice to the then serving Trustee or, if there is none, to all then Current Beneficiaries of the trust.

7.5.b     **Resignation**

A Trustee of any trust may resign upon written notice to all other Co-Trustees or, if there are none, to the resigning Trustee's successor or, if none, to all then Current Beneficiaries of the trust.

7.5.c     **Removal Of Individual Due To Incapacity**

Any individual who is deemed incapacitated, as defined in Paragraph 10.24., shall cease to serve as a Trustee of all trusts administered under this document. Each individual who agrees to serve as a Trustee of any trust administered under this document (A) shall cooperate in any examination reasonably appropriate to carry out the provisions of this Paragraph 7.5.c., (B) waives the doctor-patient and/or psychiatrist-patient privilege with respect to the results of such examination, and (C) shall allow a Co-Trustee or the Current Beneficiaries of the trust to review the individual's individually identifiable health information or other

- 42 -

Exhibit 5 - Page 43

Exhibit A-5
Page 33

medical records, waiving any privacy rights governed by the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. §1320d (HIPAA), and the regulations thereunder, including 45 C.F.R. §§160-164, to the extent required to implement this Paragraph 7.5.c. An individual's obligation to comply with the provisions of this Paragraph 7.5.c. is specifically enforceable.

7.5.d    Removal Of Trustee For Cause

(i)    Majority Beneficiaries May Remove Trustee For Cause. The Majority Beneficiaries of any trust may remove any Trustee thereof for reasonable cause by delivering written notice of the removal which specifies the reasonable cause for the removal to all persons then serving as Trustee, to the Replacement Trustee and to all other Current Beneficiaries of the trust.

(ii)    Causes For Removal. As used in this Paragraph 7.5.d., the term "reasonable cause" includes (A) the incapacity of the Trustee as provided in Paragraph 7.5.c., (B) the willful or negligent mismanagement of the trust assets by the Trustee, (C) the abuse or abandonment of, or inattention to, the trust by the Trustee, (D) a federal or state charge against the Trustee involving the commission of a felony or serious misdemeanor, (E) an act of stealing, dishonesty, fraud, embezzlement, moral turpitude or moral degeneration by the Trustee, (F) Substance Abuse by the Trustee, (G) the Trustee's poor physical, mental or emotional health which causes the Trustee to be unable to devote sufficient time to administer the trust, (H) the Trustee's failure to comply with a written agreement regarding compensation or any other legally enforceable written agreement affecting the trust's operation, (I) a demand for unreasonable compensation, (J) the failure of a corporate Trustee to appoint a senior officer with at least five (5) years of experience in administering trusts to handle the account, (K) unreasonably high turnover of account officers assigned to the trust (unless requested by the Majority Beneficiaries), (L) unreasonably poor investment performance, (M) the removal of all Current Beneficiaries from the State in which the corporate Trustee is licensed to conduct business as a corporate Trustee, (N) the relocation of the Trustee away from the location where the trust operates so as to interfere with the administration of the trust, (O) unreasonable lack of communication between the Trustee and the Current Beneficiaries, (P) unreasonably inaccurate or unclear transaction statements or statements of account, (Q) unreasonable conflicts between the Trustee and the Current Beneficiaries caused by the Trustee, (R) merger, acquisition or a deteriorating financial condition of a corporate Trustee, or (S) any other reason for which a court of competent jurisdiction would remove a Trustee.

Exhibit 5 - Page 44

**7.5.e    Liability Of Former Trustee**

If a Trustee resigns or is removed as provided in this Paragraph 7.5., or ceases to serve, including by virtue of the termination of any trust, the Trustee shall not be relieved of liability until the Trustee's accounting has been settled pursuant to Paragraph 8.3. and the Trustee's successor, if any, has commenced serving.

**7.5.f    Removal Of Trustee Without Cause**

(i)    **Removal Of Trustee Without Cause.** The (A) Majority Beneficiaries of any trust acting together with (B) the majority of the persons then serving as Trustee of such trust may remove any Trustee of such trust without cause by delivering written notice of the removal to all persons then serving as Trustee, to the Replacement Trustee and to all Current Beneficiaries of the trust.

(ii)    **Removal Of Corporate Trustee Without Cause.** The Majority Beneficiaries of any trust may remove the corporate Trustee of such trust without cause by delivering written notice of the removal to all persons then serving as Trustee, to the Replacement Trustee and to all Current Beneficiaries of the trust.

**7.6    Provisions Relating To Multiple Trustees**

**7.6.a    In General**

When two Co-Trustees are serving, they shall act unanimously. When more than two Co-Trustees are serving, they shall act by majority vote; no dissenting Co-Trustee shall be liable to any person for any action taken or not taken pursuant to the decision of the majority.

**7.6.b    When Settlors Are Serving As Co-Trustees**

The provisions of this Paragraph 7.6.b. shall apply only while both Settlors are serving as the only Trustees of any trust.

(i)    **Financial And Administrative Matters Other Than Real Property.** Except as provided in subparagraph (ii) below, either Trustee alone, and without the approval of the other, may, with respect to transactions involving assets not in excess of One Hundred Thousand Dollars, adjusted as provided in Paragraph 6.12., (A) sign checks or other withdrawal instruments drawn on the trust's bank, stock, bond, brokerage or other accounts, including orders and instructions, (B) execute any other instruments of conveyance of property of the trust, excluding real property, (C) form, alone or with others, and invest property of the

81294-00002/1915393.5

Exhibit 5 - Page 45

Exhibit A-5
Page 35

trust in, any new business entity, including a corporation, partnership or limited liability company and (D) take any action authorized by the following provisions of this Paragraph 7.6.b. In addition, a Trustee may act with respect to any other matter that has been delegated to such Trustee by the other pursuant to Paragraph 7.6.c.

(ii)   **Real Property Matters.**   Both Trustees shall act together with respect to the execution of any instrument by which an interest in real property in the Community Trust is leased for a longer period than one year or is sold, conveyed or encumbered unless one Trustee has delegated powers affecting the real property to the other Trustee pursuant to Paragraph 7.6.c.

(iii)   **Partnership Matters.**   If the trust is a general or limited partner of any partnership, either Trustee alone may, with respect to transactions involving assets not in excess of One Hundred Thousand Dollars, adjusted as provided in Paragraph 6.12., execute any documents on behalf of the trust with respect to the partnership, including governance, loan, encumbrance and/or conveyance documents.

(iv)   **Limited Liability Company Matters.**   If the trust is a manager or member of any limited liability company, either Trustee alone may, with respect to transactions involving assets not in excess of One Hundred Thousand Dollars, adjusted as provided in Paragraph 6.12., execute any documents on behalf of the trust with respect to the limited liability company, including governance, loan, encumbrance and/or conveyance documents.

(v)   **Corporate Matters.**   If the trust is a shareholder of any corporation, either Trustee alone may, with respect to transactions involving assets not in excess of One Hundred Thousand Dollars, adjusted as provided in Paragraph 6.12., execute any documents on behalf of the trust with respect to the corporation, including governance, loan, encumbrance and/or conveyance documents.

(vi)   **Ongoing Business Matters.**   A Trustee who, acting alone, operates or manages a business that is a part of the Community Trust may, acting alone, sell, exchange, encumber or dispose of that business after complying with the requirements of California Family Code §1100(d).

(vii)   **Reliance By Third Parties.**   Subject to subparagraph (ii) above, any third party may accept orders and other instructions from either Trustee, and either

- 45 -

81294-00002/1915393.5

Exhibit 5 - Page 46

Exhibit A-5
Page 36

Trustee may alone execute any documents on behalf of the trust which the third party may require.

7.6.c    Delegation By Trustees Permitted.

(i)    **Exercise Of Delegation Power.** Any Co-Trustee may at any time delegate to any one or more other Co-Trustees all or any of the delegating Trustee's powers. The delegation shall (A) be in writing, (B) be delivered to all other Co-Trustees and (C) specify the powers delegated. Any delegation may be revoked or modified in the same manner. Notwithstanding the foregoing, powers vested exclusively in the Independent Trustee may only be delegated by an Independent Trustee to another Independent Trustee and powers vested exclusively in the Neutral Person serving as Trustee may only be delegated by a Neutral Person serving as Trustee to another Neutral Person serving as Trustee.

(ii)    **Reliance On Delegation By Third Parties.** Any third party, including any insurer, transfer agent, securities broker, bank, trust company, credit union, title insurer or other financial institution, may rely upon any delegation pursuant to this Paragraph 7.6.c. and shall incur no liability for any action taken in reliance on the delegation in the absence of actual knowledge of its revocation or modification.

(iii)    **Duty To Monitor By Delegating Trustee.** Any delegation pursuant to this Paragraph 7.6.c. shall not relieve the delegating Co-Trustee of the duty to monitor the actions of the Co-Trustees to whom powers have been delegated.

7.7    **Bond Waived**

No bond shall be required of any person serving as a Trustee of any trust unless requested, in writing, by the Majority Beneficiaries of the trust.

7.8    **Compensation For Services**

7.8.a    For Individuals

Any individual serving as a Trustee of any trust shall be entitled to (i) receive reasonable compensation for services rendered to the trust as a Trustee, even if receiving compensation as a partner, officer, director, manager, member or employee of any corporation, partnership, limited liability company or other business venture, an interest in which is held by the trust and (ii) be reimbursed for any reasonable expenses of the trust that the individual has paid. Notwithstanding the foregoing, a Settlor shall not receive compensation as Trustee with respect to any trust revocable by such Settlor. Any individual may waive the right

81294-00002/1915393.5

- 46 -

Exhibit 5 - Page 47

Exhibit A-5
Page 37

to compensation for services to be rendered to any trust. A waiver may be limited in duration or to specific services. The Trustee is authorized to retain himself or herself or any firm with which he or she is associated to render legal or other professional services. Fees may be paid for such services without respect to such relationship and without respect to any agreement which the Trustee may have with his or her firm concerning the division of fees and commissions after complying with the requirements of California Probate Code §15687, if applicable.

### 7.8.b    For Corporate Trustees

Any corporate Trustee shall receive compensation for its services in the amount and at the time specified in its Schedule of Fees and Charges established from time to time (and in effect when the services were rendered) by the corporate Trustee for the administration of trusts of a character similar to the trust as to which the corporate trustee is serving, including minimum fees, and additional compensation for special investments, closely-held business interests and certain other services. The Settlors intend this Paragraph be a provision for specific rates or amounts of commissions within the meaning of any applicable statute requiring such a provision. The Settlors recognize that such compensation may exceed the compensation for services in effect from time to time under applicable law. If a corporate Trustee engages an affiliate to assist with the administration of any trust pursuant to Paragraph 8.1.a., the compensation paid by the trust to the affiliate shall not affect the corporate Trustee's compensation.

### 7.9    Liability Of Trustee

#### 7.9.a    In General

Unless expressly provided otherwise in this document, the Trustee shall be liable for any action taken or omission made that fails to comply with the Trustee's standard of care determined under California law. Notwithstanding the foregoing, with respect to (i) the determination of whether to implement an express recommendation set forth in this document or (ii) a distribution made or withheld without actual notice of the event upon which the right to the distribution depends, the Trustee shall only be liable for an action taken or omission made in bad faith or with gross negligence.

#### 7.9.b    With Respect To Investments

Pursuant to the California Uniform Prudent Investor Act, the Trustee's investment performance shall be evaluated in light of the Trustee's overall investment performance and not in light of any isolated investment. Notwithstanding the foregoing, the

81294-00002/1915393.5

Exhibit 5 - Page 48

Exhibit A-5
Page 38

Trustee shall have no liability for retaining any property transferred to any trust by either or both Settlors, as provided in Paragraph 8.1.c., without diversification.

### 7.9.c    With Respect To Acts Of Predecessor

A successor Trustee shall not be liable for an action taken or omission made by a predecessor Trustee *unless the successor (i) has actual knowledge of facts which might reasonably be expected to put the successor on notice of such action or omission and (ii) fails to investigate and/or take appropriate remedial action*. All fees and costs incurred in connection with a determination of a predecessor Trustee's liability shall be paid by and charged against the trust as to which the predecessor Trustee served, subject to any right of reimbursement or contribution from the predecessor Trustee.

### 7.9.d    With Respect To Acts Of Designees, Delegates Or Professionals

A Trustee who has (i) designated Co-Trustees, (ii) delegated powers to a Co-Trustee or (iii) employed professionals or agents to assist with the administration of any trust pursuant to Paragraph 8.1.a, shall not be liable for the actions or omissions of such designees, delegates, professionals or agents, nor shall the Trustee be obligated to continually supervise or monitor any of them, unless the Trustee either (i) has designated, delegated or employed such designees, delegates, professionals or agents in bad faith or with gross negligence or (ii) has actual knowledge of facts which might reasonably be expected to put the Trustee on notice of improper actions or omissions by such designees, delegates, professionals or agents and thereafter fails to investigate and/or take appropriate remedial action.

### 7.9.e    With Respect To Independent Person Or Neutral Person Serving As Trustee

Neither an Independent Trustee serving solely for the purpose of exercising one or more of the powers vested in the Independent Trustee nor a Neutral Person serving as Trustee solely for the purpose of exercising one or more of the powers vested in the Neutral Person shall have any responsibility for the administration of any other assets of the trust.

### 7.9.f    Burden Of Proof

In all cases, a person claiming that the Trustee has failed to comply with the Trustee's standard of care under this Paragraph 7.9, shall have the burden of proving such claim.

Exhibit 5 - Page 49

Exhibit A-5
Page 39

# Exhibit A-6

**EXHIBIT 6**

# ARTICLE 8
## MANAGEMENT OF TRUST ASSETS

8.1      Powers Of Trustee

Subject to any limitations elsewhere in this document, the Trustee is granted all powers appropriate to carry out the terms of each trust administered under this document, including the following:

8.1.a      To Employ Professional And Other Assistants

(i)      To employ, compensate and grant discretionary authority to agents, managers, attorneys, accountants, brokers, investment counselors and others, even if they are associated or affiliated with a Trustee. Any third party, including any insurer, transfer agent, securities broker, bank, trust company, credit union, title insurer or other financial institution, may rely upon any grant of authority pursuant to this Paragraph 8.1.a. and shall incur no liability for any action taken in reliance on such grant of authority in the absence of actual knowledge of its revocation or modification.

(ii)      To pay out of income or principal or both the reasonable charges and fees of such agents, managers, attorneys, accountants, brokers, investment counselors and others, as it shall in its sole discretion determine, including the power to select brokers and dealers affiliated with any Trustee for the sale or purchase of any securities or other investment property in the trust. This authorization shall include an affiliated broker acting in a principal or agency capacity for equity and fixed income securities, routing orders for over-the-counter (OTC) stocks to a market maker affiliated with any Trustee, routing listed stocks to specialists affiliated with any Trustee, or routing after-hours orders to a proprietary trading operation in which any Trustee or an affiliate owns an equity interest. In such case the Trustee or an affiliate may receive both monetary and non-monetary "payment for order flow," including an inter-company transfer of funds in connection with orders routed to an affiliated market maker; monetary compensation (including fee sharing) from, and participation in the profits of, certain affiliated and independent exchange specialists who execute orders; other compensation as part of reciprocal order routing arrangements with various exchange specialists and dealer firms; and rebates and credits against fees paid by various exchanges to member firms. To the extent permitted by applicable law, the Trustee's compensation shall not be reduced by any additional compensation received by the Trustee, its parent, or any affiliate thereof, or any agent, principal, advisor, counsel, broker, dealer, market maker or specialist (including exchange

81294-00002/1915393.5

Exhibit 6 - Page 50

Exhibit A-6
Page 41



specialist) affiliated with the Trustee, its parent or any affiliate thereof, for providing any of the services authorized in this Paragraph.

  8.1.b  **To Pay Expenses**

    To pay all expenses and taxes incurred in the administration of the trust, including such insurance as the Trustee deems advisable to protect the trust from damage or loss and to protect the Trustee from liability.

  8.1.c  **To Receive And Retain Property**

    To receive and retain any property, without regard to whether the receipt or retention of the property violates sound diversification principles or the property is underproductive.

  8.1.d  **To Hold Property**

    To hold title to any property of the trust in the name of the Trustee or in the name of a nominee (without revealing nominee status if the nominee has the power to revoke the trust).

  8.1.e  **To Operate A Business**

    To form, hold and operate legal entities, including corporations, partnerships (limited and general) and limited liability companies; to operate a business, directly or through one or more legal entities; to terminate any business or withdraw from or dissolve any legal entity; to exercise all voting and management rights attendant to holding an interest in a business or legal entity, including the right to vote securities, give proxies and pay assessments; to participate in voting trusts, pooling arrangements, foreclosures, reorganizations, consolidations, mergers, liquidations and dissolutions; to deposit securities with and transfer title to any protective or other committee; and to exercise or sell stock subscription or conversion rights.

  8.1.f  **To Manage And Control Property**

    To manage, control, lease for terms within or beyond the duration of any trust, grant options with respect to, partition, divide, improve, insure and repair any kind of property, real or personal; to create restrictions, easements and servitudes.

  8.1.g  **To Purchase And Sell**

    (i)  To purchase, exchange or sell for cash or upon terms at public or private sale any kind of property, real or personal, including trust funds administered

- 50 -

81294-00002/1915393.5

Exhibit 6 - Page 51

by the Trustee, stocks, bonds, futures contracts and other securities, puts, calls, straddles and other options of every kind, annuities, general and limited partnership interests, interests in limited liability companies and interests in other businesses and legal entities, whether or not an interest in any such property is already included in the trust. Any such purchase, exchange or sale may be made with any person, including any beneficiary, any fiduciary under this document or any estate or trust, including an estate or trust having as a beneficiary or fiduciary any beneficiary or fiduciary under this document; provided, however, that any property sold to any such beneficiary, fiduciary, estate or trust is sold for adequate consideration. The Trustee may maintain brokerage accounts, including margin and commodity accounts, and, in connection therewith, may borrow, pledge securities, make short sales and sell on margin or otherwise. If any security is purchased for a premium or at a discount, such premium or discount shall be amortized.

(ii)    In addition to the provisions of subparagraph (i) above, to invest in or retain any securities or other property, real or personal (within or without the United States), including: any security as defined by the Securities Act of 1933 or other applicable law, any contract of sale of a commodity for future delivery within the meaning of the Commodity Exchange Act, shares or interests in any private investment fund, private equity or venture capital fund, hedge fund, common trust fund, joint venture, general or limited partnership, limited liability company, statutory or common law business trust, statutory trust, real estate investment trust or an open-end (including any mutual fund) or closed-end management type investment company or unit investment trust, whether registered under the Investment Company Act of 1940 or unregistered, any money market instrument, bank deposit account (including savings, time, certificate of deposit and transaction accounts), precious metal, foreign exchange, structured product, insurance contract, options, options on futures and variable forward contracts, swaps, caps, collars and other derivative instruments of a financial nature, notwithstanding the fact that the trustee, investment manager or custodian, its respective parent or any affiliate, is an issuer of such investment or provides services (whether as manager, underwriter, distributor, custodian, advisor, agent, servicer, Trustee or otherwise) with respect to any such investment and further, notwithstanding that the Trustee, investment manager, custodian or its respective parent or any affiliate may receive compensation with respect to any such investment (in addition to Trustee's commissions), so long as the total compensation received is reasonable. To the extent permitted by applicable law, this provision is intended to override any contrary provision of law prohibiting such additional fees or otherwise requiring either a reduction in Trustee's commissions or an election between such additional fees and such commissions. Any

Exhibit 6 - Page 52

Exhibit A-6
Page 43

diversification requirement that would otherwise apply, including one imposed by a Prudent Investor Act or similar applicable law, is negated.

8.1.h        To Borrow And Encumber

To borrow and to encumber trust property by mortgage, deed of trust, pledge, guarantee, indemnity or otherwise for the debts of the trust, the debts of any entity an interest in which is owned by the trust or the joint debts of the trust, any entity an interest in which is owned by the trust and any co-owner of the property in which the trust or an entity an interest in which is owned by the trust has an interest; and, in connection therewith, to execute any mortgages, deeds of trust, pledges, guarantees, indemnities or other loan or security documents attendant thereto. Any mortgage, deed of trust, pledge, guarantee, indemnity or other encumbrance may be for a period within or beyond the duration of the trust.

8.1.i        To Secure The Debt Of A Beneficiary

With respect to any revocable trust, including the Community Trust and each Settlor's Separate Trust under Article 2 and the Survivor's Trust under Paragraph 4.1., the Trustee shall, at the direction of the individual entitled to revoke the trust, encumber all or any of the assets thereof by mortgage, deed of trust, pledge, guarantee, indemnity or otherwise to secure any indebtedness of the individual. With respect to any irrevocable trust, the Trustee shall encumber all or any of the assets thereof by mortgage, deed of trust, pledge, guarantee, indemnity or otherwise to secure any indebtedness of any Current Beneficiary of the trust, even though such mortgage, deed of trust, pledge, guarantee, indemnity or other security is not for the benefit of the trust but is for the exclusive benefit of the Current Beneficiary, if directed to do so by the Independent Trustee.

8.1.j        To Lend

To lend money or property of any trust to any beneficiary of the trust upon such terms as the Independent Trustee considers appropriate, and to lend money or property of any trust to any person other than a beneficiary of the trust upon such terms as the Trustee considers appropriate.

8.1.k        To Deposit And Withdraw Funds

To deposit funds in and withdraw funds from accounts of any kind, with any insurer, securities broker, bank, trust company, credit union or other financial institution, including a Trustee.

Exhibit 6 - Page 53

**8.1.l    To Distribute Assets**

To allocate or distribute trust assets, in cash or in kind or partly in each, including undivided interests, pro rata or non-pro rata, and for this purpose to sell trust assets. In making any allocation or distribution, the Trustee shall consider the income tax bases of such assets. Unless otherwise required by the Code and Regulatory Authority, the Trustee shall value an asset distributed in kind at its value on the date of distribution. Whenever the distribution of property constitutes the residual transfer of property after the satisfaction of a pecuniary amount, the pecuniary amount shall bear interest at the statutory rate of interest set forth in California Probate Code §12001, beginning from the date specified in California Probate Code §12003 and continuing until the date of distribution.

**8.1.m    To Commence, Defend And Compromise Actions**

To litigate, arbitrate, mediate and compromise claims and actions; and to commence, maintain or defend any claims or actions brought on behalf of or against the trust or any potential claims or actions on behalf of or against the trust.

**8.1.n    To Release Powers**

To release or restrict, by means of a written document, any power granted the Trustee. Unless otherwise specified by all of the Trustees then serving, any power released or restricted shall continue to exist and shall pass to and be held by all other Trustees.

**8.1.o    To Deal With Insurance**

To acquire insurance of any kind, including property, casualty or liability insurance, errors and omissions insurance and insurance on the life, health or income of any beneficiary, Trustee or other individual in whom the trust or any beneficiary of the trust has an insurable interest, by purchase, bequest, gift, exchange or in any other manner; to retain an insurance policy as a part of the trust; and to exercise all options, benefits, rights and privileges of an owner thereof, including the right to borrow against, to pledge and to cancel or otherwise terminate or dispose of the policy, to surrender the policy for its cash value, to name and change beneficiaries, to select and change settlement options and to receive any benefits thereunder. The Trustee may maintain, defend, compromise, arbitrate or settle any suit or claim with respect to such insurance. The Trustee shall not be liable for any acts or omissions of an insured in connection with any policy of insurance on the insured's life, health or income. Insurers shall have no obligation to inquire into the terms of this document or to see to the application of the proceeds of any policy, and may rely without liability on a receipt, release or other instrument executed by the Trustee.

- 53 -

81294-00002/1915393.5

Exhibit 6 - Page 54

Exhibit A-6
Page 45

8.2    **Segregation Of Separate Trusts**

The Trustee shall keep an account for each separate trust and may physically segregate the assets of the separate trusts administered under this document.

8.3    **Accounting**

Although the Trustee shall be under no obligation to render an annual accounting to any beneficiary of any trust administered under this document, (i) with respect to any revocable trust, any individual having the power to revoke the trust (but no other person or entity) shall be entitled to receive information concerning, or compel an accounting for, that trust and (ii) with respect to any irrevocable trust, any beneficiary thereof may obtain information concerning, or compel an accounting for, that trust as provided by California Probate Code §16060 et seq. The Trustee's account may, at the Trustee's option, either be settled pursuant to the provisions of the California Probate Code or by providing the account to all Current Beneficiaries of the trust. No guardian ad litem shall be required for any minor or unascertained Current Beneficiary of the trust. Unless written objections are received by the Trustee within the time period specified in California Probate Code §16461, the account and all transactions set forth therein shall be deemed settled and approved.

8.4    **Other Property May Be Added**

Additional property may be added to any trust with the approval of its Trustee.

8.5    **Trust As Owner Of S Stock**

Other than a charitable remainder trust under Code §664(d), the Settlors intend that each trust administered under this document be permitted to own stock in an S Corporation pursuant to Code §1361(c)(2)(A), including as a Qualified Subchapter S Trust or as an Electing Small Business Trust. If the trust does not by its terms qualify to own stock in an S Corporation pursuant to Code §1361(c)(2)(A), the Trustee shall have the power to determine whether the trust should be a Qualified Subchapter S Trust or an Electing Small Business Trust and to take appropriate action under Paragraph 6.17.

8.6    **Environmental Hazards And Compliance With Environmental Laws**

8.6.a    **Authorization To Inspect Property Prior To Accepting Property Or Consenting To Serve As Trustee**

(i)    Prior to accepting assets as part of any trust, the Trustee thereof may take or cause to be taken the actions set forth in subparagraphs (A) and (B) below at the expense of the trust. Similarly, prior to consenting to serve as a Trustee of any trust, any

81294-00002/1915393.5

- 54 -

Exhibit 6 - Page 55

Replacement Trustee may take or cause to be taken the actions set forth in subparagraphs (A) and (B) below at the expense of the trust.

        (A)   To enter and inspect any existing or proposed asset of the trust (or of any corporation, partnership, limited liability company or other business venture in which the trust holds an interest) for the purpose of determining the existence, location, nature and magnitude of any past or present release or threatened release of any Hazardous Substance; and

        (B)   To review records of the currently serving Trustee or of a Settlor (or of any corporation, partnership, limited liability company or other business venture in which the trust or a Settlor holds an interest) for the purpose of determining compliance with any federal, state or local Environmental Laws including those records relating to permits, licenses, notices, reporting requirements and governmental monitoring of any Hazardous Substance.

        (ii)   The right of the Trustee or Replacement Trustee to enter and inspect assets and records of a corporation, partnership, limited liability company or other business venture under subparagraph (i) above shall be treated as equivalent to the right under state law of a shareholder, partner or member to inspect assets and records under similar circumstances.

        (iii)   Acts performed under this Paragraph 8.6.a. shall constitute neither acceptance of the asset in question by the Trustee nor consent to serve as a Trustee by a Replacement Trustee.

        (iv)   If, upon any review of the trust's existing or proposed assets under this Paragraph 8.6.a., the Trustee discovers or has reason to believe that an asset of the trust is or may be contaminated with a Hazardous Substance or is otherwise not in compliance with any Environmental Law, the Trustee may refuse to accept the transfer of any asset proposed to be transferred to the Trustee. Similarly, the Replacement Trustee may decline to serve as Trustee solely with respect to such asset while consenting to serve with respect to all other assets of the trust. If there is no person willing to serve as a Trustee with respect to any asset in, or proposed to be transferred to, the trust, the court having jurisdiction over the trust shall appoint a receiver or Special Trustee to hold and manage the rejected asset, pending its final disposition.

81294-00002/1915393.5

- 55 -

Exhibit 6 - Page 56

Exhibit A-6
Page 47

8.6.b    **Trustee's Powers Relating To Environmental Laws.**

The Settlors intend that the Trustee have the widest possible discretion in identifying and responding to problems associated with the potential or actual environmental liability of the trust or the Trustee, in order to protect the interests of the trust, the Trustee and the beneficiaries of the trust. The Trustee may, on behalf of the trust, take any action considered appropriate to prevent, abate, avoid or otherwise remedy any actual or threatened violation of any Environmental Law or any condition that may give rise to liability under any Environmental Law relating to any asset which is or has been held as part of the trust, including performing investigations and audits and taking any actions required by any Environmental Law. If the trust holds one or more assets, either directly or through any corporation, partnership, limited liability company or other business venture, the nature, condition or operation of which is likely to give rise to liability under, or is an actual or threatened violation of, any Environmental Law, the Independent Trustee may take one or more of the following actions:

(i)    Modify the trust by granting the Trustee such additional powers as are required to protect the trust and its beneficiaries from liability or damage relating to the actual or threatened violation of any Environmental Law;

(ii)    Divide the trust as provided in Paragraph 6.8.;

(iii)    Designate a Special Trustee as provided in Paragraph 7.3. to administer any such assets or business interests which fail to comply with or may give rise to liability under any Environmental Law;

(iv)    Abandon such assets or business interests; or

(v)    With court approval, terminate the trust or partially or totally distribute its assets to its beneficiaries.

8.6.c    **Indemnification Of Trustee For Environmental Expenses**

The Trustee shall be entitled to be indemnified from the trust for any Environmental Expenses, including Environmental Expenses relating to: (i) any real property or business enterprise which is or has at any time been held or operated by the trust; and (ii) any real property or business enterprise which is or has at any time been held or operated by a corporation, partnership, limited liability company or other business venture in which the trust holds or has at any time held an equitable, beneficial or management interest. Notwithstanding anything in this Paragraph 8.6.c. to the contrary, the foregoing right of indemnification shall not

81294-08002/1915393.5

- 56 -

Exhibit 6 - Page 57

Exhibit A-6
Page 48

apply to any Environmental Expenses which are a result of the Trustee's actions or omissions in bad faith, with gross negligence or with willful misconduct.

**8.6.d    Indemnification Of Trustee For Environmental Expenses In Excess Of Trust Value**

If the assets of the trust are insufficient, or there is insufficient liquidity in the trust to satisfy the obligation of indemnification for Environmental Expenses under Paragraph 8.6.c., the Trustee shall notify the beneficiaries of the trust, in writing. Each of the trust beneficiaries shall, within thirty (30) days following the delivery of the notice, indemnify the Trustee for such Environmental Expenses. Any indemnification under this Paragraph 8.6.d. shall be in a form acceptable to the Trustee.

**8.6.e    Exoneration Of Trustee For Actions Or Omissions Relating To Any Environmental Law**

The Trustee shall not be liable to any beneficiary or to any third party for any action or omission relating to any Environmental Law or for the payment of any Environmental Expenses unless resulting from bad faith, gross negligence or willful misconduct.

**8.7    Administration Of Creative Property**

The Trustee may take the following actions with respect to any Creative Property included in any trust:

**8.7.a    Exploit Creative Property**

To exploit any Creative Property, including any Creative Property which is unfinished or unpublished at the time of the death of the Settlor who created or holds the rights to the Creative Property; and to arrange for the writing, publication, promotion, copyrighting and licensing of Creative Property, or of a biography of a Settlor.

**8.7.b    Proceeds From Creative Property**

To provide for the processing, management, investigation and collection from any source of any sums due to the trust from Creative Property, or rights therein, specifically including (i) residuals due to the trust, (ii) the share or percentage of net profits from musical compositions, plays, films, television programs, online programs, games or other Creative Property, and (iii) royalties, residuals, licensing fees and other proceeds under contract for the publication, performance or other exploitation of Creative Property; and to employ and reasonably compensate one or more auditors to track and audit the sums due to the trust from Creative Property, or rights therein.

81294-00002/1915393.5

- 57 -

Exhibit 6 - Page 58



8.7.c    **Copyright**

With respect to copyrights on Creative Property held as a part of the trust; to protect the trust's ownership interest in such copyrights; to maintain exclusivity and unified control over such copyrights and to avoid the fractionalization of any such copyrights that could impair the value of, or income generated by, such copyrights; to register, secure, extend and renew any such copyrights; to take any and all legal action to prevent or redress the infringement of any such copyrights; and to grant licenses and other contractual rights for the publication, performance or other exploitation of Creative Property.

## ARTICLE 9
## PAYMENT OF ESTATE AND GENERATION-SKIPPING TRANSFER TAXES

9.1    **Deceased Settlor's Estate Taxes**

Unless specifically provided to the contrary in another provision of this document, all Estate Taxes occasioned by the death of the Deceased Settlor (the "Decedent's Taxes") shall be paid by, charged against and recovered from the persons (including trusts) receiving taxable benefits from property includible in the Deceased Settlor's Gross Estate in accordance with the principles of California Probate Code §20110 and related sections, after giving effect to Code §2207A. Notwithstanding the foregoing:

9.1.a    **Attributable To Specific Gifts**

The specific gift of the Deceased Settlor's Tangible Personal Property under Paragraph 3.2.a. shall not bear any of the Decedent's Taxes. All Decedent's Taxes attributable to such gift shall be charged against and paid from the property passing to the Credit Trust under Paragraph 3.2.b.

9.1.b    **Attributable To Partial QTIP Election**

If the Deceased Settlor's Executor does not make a QTIP Election for the entire Marital Trust, each person (including a trust) receiving taxable benefits from the Deceased Settlor's Gross Estate shall be responsible for paying only that portion of the Decedent's Taxes which such person would have been responsible for paying if the Deceased Settlor's Executor had made a QTIP Election for the entire Marital Trust, and any remaining Decedent's Taxes shall be paid from the Non-QTIP Marital Trust.

9.1.c    **Attributable To Divided Trust**

If any trust to which a portion of the Decedent's Taxes are apportioned has been divided into an Exempt Trust and a Non-Exempt Trust, all Decedent's Taxes attributable to such trust shall be paid out of and charged against the Non-Exempt Trust

- 58 -

81294-00002/1915393.5

Exhibit 6 - Page 59

# Exhibit A-7

remediation, removal, transportation, use or existence of a waste, substance or material hazardous, toxic, radioactive or dangerous to the public health, safety or the environment.

10.24    **Incapacity**

"Incapacity" and derivations thereof mean incapable of managing an individual's affairs under the criteria set forth in California Probate Code §810 et seq. An individual shall be deemed to be incapacitated if any of the following conditions exist: (a) the individual's regular attending physician (provided such physician is not related by blood or marriage to any Trustee or beneficiary) examines the individual and certifies in writing that the individual is incapacitated, (b) two licensed physicians who, as a regular part of their practice are called upon to determine the capacity of others, and neither of whom is related by blood or marriage to any Trustee or beneficiary, examine the individual and certify in writing that the individual is incapacitated or (c) an order of the court having jurisdiction over the trust as to which the individual is serving as a Trustee or as to which the individual is a beneficiary, as the case may be, finds that the individual is incapacitated. The expenses of any examination or court proceeding to determine if an individual is incapacitated shall be paid (i) if the individual is a *Settlor, from all trusts established under this document revocable by him or her, and (ii) if the* individual is a Current Beneficiary other than a Settlor, from all trusts established under this document with respect to which he or she is a Current Beneficiary and (iii) if the individual is a Trustee but not a Current Beneficiary under this document, from all trusts administered under this document as to which the individual is serving as a Trustee, in each case in proportion to the relative values of the trusts from which payment is to be made.

10.25    **Including**

"Including" means "including, but not limited to."

10.26    **Independent Person**

"Independent Person" means a person who is neither (i) a beneficiary of the trust, (ii) a person who has transferred or joined in the transfer of property to the trust, nor (iii) a Related or Subordinate Party to any person described in the preceding clauses (i) or (ii).

10.27    **Independent Trustee**

"Independent Trustee" means all Independent Persons serving as Trustee.

10.28    **Issue**

"Issue" of any individual means the individual's lineal descendants of all generations (i.e., the individual's children, grandchildren, great-grandchildren and so on).

- 65 -

81294-00002/1915393.5

*Exhibit 7 - Page 70*

Exhibit A-7
Page 52

# Exhibit A-8

BLUEBIRD OFFICE SUPPLIES   (888) 477-0700   www.bluebirdbiz.com

EXHIBIT 8

### 12.8 Counterparts

This document may be executed in one or more counterparts, each of which shall be deemed an original part and all of which, when taken together, shall constitute a single instrument.

Executed on  12-18-13

DONALD T. STERLING, SETTLOR      ROCHELLE H. STERLING, SETTLOR

### ACCEPTANCE BY TRUSTEE

The undersigned hereby accept the office of Trustee and agree to serve in accordance with the terms and conditions of service as set forth in this document, specifically including those terms and conditions of service imposed pursuant to Paragraph 7.5.c.

Executed on 12-18-13

DONALD T. STERLING, TRUSTEE      ROCHELLE H. STERLING, TRUSTEE

81294-00002/1915393.5

Exhibit 8 - Page 71

Exhibit A-8
Page 54

STATE OF CALIFORNIA                      )
                                        )
COUNTY OF Los Angeles                    )

On December 18, 2013 , before me, ___A - Shing___ , Notary Public,
                                    (here insert name and title of officer)
personally appeared **DONALD T. STERLING**, who proved to me on the basis of satisfactory
evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies),
and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

I certify UNDER PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____              (Seal)

> A. SHING
> Commission # 1946346
> Notary Public - California
> Los Angeles County
> My Comm. Expires Jul 31, 2015

STATE OF CALIFORNIA                      )
                                        )
COUNTY OF Los Angeles                    )

On December 18, 2013 , before me, ___A - Shing___ , Notary Public,
                                    (here insert name and title of officer)
personally appeared **ROCHELLE H. STERLING**, who proved to me on the basis of
satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or
the entity upon behalf of which the person(s) acted, executed the instrument.

I certify UNDER PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____              (Seal)

> A. SHING
> Commission # 1946346
> Notary Public - California
> Los Angeles County
> My Comm. Expires Jul 31, 2015

- 73 -

81294-00002/1915393.5

Exhibit 8 - Page 72

Exhibit A-8
Page 55

# Exhibit B

ORIGINAL

1   PIERCE O'DONNELL (SBN 81298)
    PODonnell@GreenbergGlusker.com
2   BERTRAM FIELDS (SBN 024199)
    BFields@GreenbergGlusker.com
3   MARC M. STERN (SBN 126409)
    MStern@GreenbergGlusker.com
4   GREENBERG GLUSKER FIELDS
      CLAMAN & MACHTINGER LLP
5   1900 Avenue of the Stars, 21st Floor
    Los Angeles, California  90067-4590
6   Telephone:  310.553.3610
    Fax:  310.553.0687
7
    Attorneys for Trustee
8   ROCHELLE H. STERLING
9
    LOEB & LOEB LLP
10  ADAM F. STREISAND (SBN 155662)
    AStreisand@loeb.com
11  10100 Santa Monica, Boulevard, Suite 2200
    Los Angeles, California 90067
12  Telephone:  310.282.2000
    Fax:  310.282.2200
13
    Attorneys for Interested Party
14  Steven A. Ballmer

FILED
Superior Court of California
County of Los Angeles

AUG /2 2014

Sherri R. Carter, Executive Officer/Clerk
By _____, Deputy
     Salvador Jimenez

15          SUPERIOR COURT OF THE STATE OF CALIFORNIA

16                    COUNTY OF LOS ANGELES

17

18  In the Matter of the                Case No.  BP 152858

19                                      [Assigned to Hon. Michael Levanas
    THE STERLING FAMILY TRUST.           Department 5]
20
                                        [PROPOSED] ORDER GRANTING *EX
21                                      PARTE* PETITION (1) FOR
                                        CONFIRMATION OF TRUSTEE'S
22                                      ACTS AND INSTRUCTING TRUSTEE
                                        AND (2) FOR ORDER DIRECTING
23                                      TRUSTEE UNDER PROBATE CODE
                                        §1310(b) TO PREVENT INJURY OR
24                                      LOSS TO TRUST

25
                                        Trial Date:  July 7, 2014
26                                      Time:        8:30 a.m.
                                        Dept.:       5
27
                                        Petition Filed:  June 11, 2014
28

LA2378968.1
223368-10001

            [PROPOSED] ORDER GRANTING *EX PARTE* PETITION

                                                            Exhibit B
                                                            Page 56

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    The *Ex Parte* Petition (1) for Confirmation of Trustee's Acts and Instructing Trustee

2    and (2) for Order Directing Trustee Under Probate Code §1310(b) to Prevent Injury or

3    Loss to Trust (the "Petition") of Rochelle H. Sterling ("Rochelle") came on for an

4    evidentiary hearing on July 7, 8, 9, 10, 21, 22 and 23, 2014 in Department 5, before the

5    Honorable Michael I. Levanas, Judge presiding.  Rochelle was represented by Pierce

6    O'Donnell and Bertram Fields of Greenberg Glusker Fields Claman & Machtinger LLP.

7    Respondent Donald Sterling ("Donald") was represented by Gary Ruttenberg of Bloom &

8    Ruttenberg, Bobby Samini of Samini Scheinberg, PC, Maxwell Blecher of Blecher Collins

9    Pepperman & Joye, P.C., and Alexander Ginzburg of Ginzburg & Brohnsteyn LLP.

10   Interested Party Steven A. Ballmer ("Ballmer") was represented by Adam F. Streisand of

11   Loeb & Loeb LLP.

12   Upon consideration of the Petition and other pleadings filed in this matter, including

13   all exhibits thereto, and the oral testimony and other evidence presented at the July 7, 8, 9,

14   10, 18, 21, 22 and 23, 2014 hearing, and the arguments of counsel, including at hearing on

15   July 28, 2014, and rulings thereon, and good cause appearing therefor,

16   The Court makes the findings and reaches the conclusions regarding contentions of

17   fact and law as set forth in its final statement of decision.

18   **IT IS THEREFORE ADJUDGED, ORDERED and DECREED:**

19   1.    The Court hereby confirms that Rochelle had authority to bind unilaterally

20   the Sterling Family Trust, as amended and restated on December 18, 2013 (the "Trust"), as

21   the sole owner of LAC Basketball Club, Inc. ("LAC"), by executing the Binding Term

22   Sheet, dated May 29, 2014 (the "BTS"), and agreeing to sell the "Purchased Assets", as

23   that term is defined in the BTS, and enter into the transactions contemplated by the BTS.

24   2.    The Court hereby authorizes and instructs Rochelle to sell the Purchased

25   Assets to a limited liability company wholly owned by Ballmer upon the terms and

26   conditions set forth in the BTS, and to take all actions necessary or appropriate to complete

27   the sale, including without limitation, the execution of any and all documents necessary to

28   complete the sale and the transfer of the Purchased Assets as contemplated by the BTS.

LA2378968.1
223368-10001

2

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

3.       The Court hereby orders and directs Rochelle, as sole Trustee of the Trust,

pursuant to the Court's authority under Probate Code §1310(b), to consummate the sale of

the Purchased Assets and to take all actions necessary or appropriate to complete the

transactions as set forth in the BTS, including without limitation, executing any and all

documents necessary or appropriate for those purposes, notwithstanding any appeal that

may be taken of this Order or any part thereof to prevent injury or loss to the Trust.


Dated:    8 -12-14

The Honorable Michael I. Levanas
Judge of the Superior Court

LA2378968.1
223368-10001

3

[PROPOSED] ORDER GRANTING *EX PARTE* PETITION

# Exhibit C

ORIGINAL

1  BERTRAM FIELDS (SBN 024199)
   BFields@GreenbergGlusker.com
2  PIERCE O'DONNELL (SBN 81298)
   PODonnell@GreenbergGlusker.com
3  MARC M. STERN (SBN 126409)
   MStern@GreenbergGlusker.com
4  AARON J. MOSS (SBN 190625)
   AMoss@GreenbergGlusker.com
5  CAROLINE S. HEINDEL (SBN 190967)
   CHeindel@GreenbergGlusker.com
6  GREENBERG GLUSKER FIELDS CLAMAN &
   MACHTINGER LLP
7  1900 Avenue of the Stars, 21st Floor
   Los Angeles, California  90067-4590
8  Telephone:  310.553.3610
   Fax:  310.553.0687
9
   Attorneys for Trustee
10 ROCHELLE H. STERLING
11 LOEB & LOEB LLP
   ADAM F. STREISAND (SBN 155662)
12 AStreisand@loeb.com
   10100 Santa Monica Boulevard, Suite 2200
13 Los Angeles, California 90067
   Telephone:  310.282.2000
14 Fax:  310.282-2200
15 Attorneys for Interested Party
   Steven A. Ballmer
16

FILED
Superior Court of California
County of Los Angeles

AUG 07 2014

Sherri R. Carter, Executive Officer/Clerk
By _____, Deputy
Salvador Jimenez

FILED
Superior Court of California
County of Los Angeles

AUG 12 2014

Sherri R. Carter, Executive Officer/Clerk
By _____, Deputy
Salvador Jimenez

17              SUPERIOR COURT OF THE STATE OF CALIFORNIA

18                          COUNTY OF LOS ANGELES

19

20 In the Matter of                    | **Case No.  BP 152858**

21                                     | *Assigned to Hon. Michael Levanas, Dept. 5*

22 THE STERLING FAMILY
   TRUST.                               | ~~[PROPOSED]~~ **STATEMENT OF DECISION**

23

24                                      | Trial Date:  July 7, 2014
                                         | Petition filed:  June 11, 2014
25

26

27

28

81294-00002/2221208.4

~~[PROPOSED]~~ STATEMENT OF DECISION

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

Exhibit C
Page 59

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1   An evidentiary hearing on Rochelle H. Sterling's Petition (1) For Confirmation of

2   Trustee's Acts and Instructing Trustee and (2) For Order Directing Trustee Under Probate Code

3   § 1310(b) commenced on July 7, 2014 and was held July 7-10, July 21-23, and July 28, 2014, the

4   Honorable Michael I. Levanas Judge presiding.  Petitioner ("Rochelle") was represented by

5   Pierce O'Donnell and Bertram Fields of Greenberg Glusker Fields Claman & Machtinger LLP;

6   Donald T. Sterling ("Donald") was represented by Maxwell Blecher of Blecher & Collins, Gary

7   Ruttenberg and Stefanie Cutler of Bloom & Ruttenberg, Bobby Samini of Samini Scheinberg, and

8   Alexander Ginzburg and Yasha Bronshteyn of Ginzburg & Bronshteyn, and Steven Ballmer was

9   represented by Adam Streisand of Loeb & Loeb LLP.

10   Both oral and documentary evidence were received on the issues raised in Rochelle's

11   Petition.  The matter was briefed, argued, and submitted for decision.  In making the findings

12   below, the Court has considered all the evidence, the testimony, the demeanor and credibility of

13   the witnesses, the written and oral argument of counsel, the pleadings, papers, and other

14   documents filed with the Court.  Pursuant to Code of Civil Procedure § 632 and California Rules

15   of Court 3.1590 and 3.1591, this Statement of Decision is intended to explain the legal and factual

16   basis as to each of three controverted issues at the hearing.

17   First, the Court hereby finds, concludes, adopts and specifically incorporates by reference

18   herein each of the contentions set forth at pages 1-39:15 and pages 42-48:8 of the Joint Post-Trial

19   Brief of Petitioner and Interested Party filed 7/24/2014.

20   In addition, the Court hereby finds and concludes as follows:

21   **DONALD WAS PROPERLY REMOVED AS TRUSTEE.**

22   On December 13, 2013, Donald and Rochelle each signed the Sterling Family Trust

23   Agreement (the "Trust") which was received in evidence as Exhibit 29.  The Trust established

24   that both Donald and Rochelle would be acting as Co-Trustees.

25   The law and specifically Probate Code § 810(a) states that every person is presumed to

26   have capacity, and there has been no evidence presented that Donald lacked capacity when he

27   signed the Trust in December, 2013.

28   Paragraph 7.5.c. of the Trust deals with the removal of an individual for incapacity.

81294-00002/2221208.4                                   1

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1  Paragraph 10.24. ("Incapacity") sets out three ways a Trustee can be determined incapacitated

2  and removed:

3          A. certification by the individual's regular treating physician;

4          B. two reports from licensed physicians who regularly practice in areas

5  involving capacity or;

6          C. a court order that the individual is incapacitated.

7       The Court does not find any credible or compelling evidence of a "secret" Plan B. The

8  alleged secret plan B is nothing more than Paragraph 10.24.(b) of the Trust signed by Donald and

9  Rochelle in December, 2013. It clearly is not a secret option and it was not a secret to Donald.

10       The Court finds credible and compelling Rochelle's testimony that over a period of about

11  two to three years, she noticed that Donald's behavior was changing; he was becoming forgetful,

12  slurring words and getting agitated for no reason. The Court believes that, during that time and at

13  all times up until May 29, 2014, Rochelle was legitimately concerned about Donald's well-being.

14       Rochelle's concerns were significantly increased when she saw the Anderson Cooper

15  interviews on or about May 12, 2014. Thereafter, friends called her and urged her to get Donald

16  examined, and the Court finds that Rochelle's motivations in setting up the testing and the

17  evaluations both by Dr. Platzer and Dr. Spar were motivated solely by her concerns for his well-

18  being.

19       The Court notes and that, despite Rochelle and Donald being separated, Rochelle was

20  extensively involved in Donald's care, including setting up medical appointments, getting

21  medications and coordinating his caregivers at his home.

22       The Court finds that Rochelle acted appropriately in seeking out Dr. Platzer and Dr. Spar,

23  both recognized and respected experts in the field of capacity, based on her concerns for Donald.

24       The Court also finds that Rochelle appropriately sought out recommendations, including

25  through her attorney, for someone to give a second opinion on the first diagnosis by Dr. Platzer, a

26  serious diagnosis of Alzheimer's.

27       The Court finds the weight of the credible evidence and compelling evidence is that

28  Rochelle set these appointments based solely on her concern for Donald and not as a secret plan

81294-00002/2221208.4           2

Exhibit C
Page 61

1   to remove him as a Trustee of the Trust.  In this regard, Dr. Platzer testified she did not know of

2   the plan to remove Donald as a Trustee.  Dr. Spar testified he was advised but did not tell

3   Rochelle, and the compelling evidence is that she first was advised by her attorneys about those

4   sections of the Trust when Donald abruptly changed his mind and refused to sign the Binding

5   Term Sheet on May 29, 2014.

6        The Court finds that up until that time, Rochelle had a good faith reasonable belief and

7   had been authorized by Donald to sell the Clippers and, specifically. That Donald approved the

8   deal she negotiated with Mr. Ballmer.  Since Rochelle reasonably expected that Donald would

9   sign the BTS, there was no need for her to focus on a different plan.

10       Donald willingly participated in the evaluations by both Dr. Spar and Dr. Platzer.  He

11  testified that he agreed to be examined by them.  There is no credible or compelling evidence that

12  Donald was distracted or under stress during the evaluations by Dr. Platzer or Dr. Spar as

13  suggested by Dr. Cummings.  Dr. Cummings, called by Donald, had no facts that supported his

14  opinion outside of the fact that he was advised the Sterlings were separated.  Contrary to Dr.

15  Cummings' testimony, Dr. Platzer and Dr. Spar described Donald as comfortable and cooperative

16  and testified that he had asked Rochelle to remain at each of these examinations.

17       No credible evidence was presented that Dr. Platzer continued her evaluation of Donald at

18  the Polo Lounge or that Dr. Platzer was intoxicated.  Dr. Platzer and Rochelle Sterling were

19  credible, and the Court finds that Donald's testimony that Dr. Platzer said "Can we finish the

20  evaluation at the Polo Lounge after drinks?" to be not credible.

21       It is not surprising to the Court or unusual that Rochelle would want to talk to Dr. Platzer

22  after the evaluation about her diagnosis of Alzheimer's.  Anyone hearing that would want to ask

23  the expert what it means and what it will look like going forward, especially if they were involved

24  to the extent Rochelle is involved in Donald's life.  Finally, the Court does not read anything

25  sinister into Rochelle's conduct when Donald and Bobby Samini arrived at the Polo Lounge later

26  after the examination terminated.

27       The Court notes that in general, Rochelle's testimony was far and away more credible

28  than Donald's.  Donald's answers were often evasive and in one instance inconsistent with his

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

81294-00002/2221208.4                    3

1   previous sworn testimony in Robyn Cohen v . Donald Sterling, LASC Case No. BC 429389 (Ex.

2   31.) Thus, Donald testified at one point that he ran all of his companies each and every day.  Yet,

3   in his prior sworn testimony (Exhibit 31), he stated that he was "totally retired."  And in

4   Exhibit 17, his interview with Anderson Cooper, Donald stated that he was "not interested in

5   business any more at all." (Ex. 17 p. 25.)

6          In addition, there were wild fluctuations in the value or damage estimates that Donald had

7   no explanation for.  For example, Donald agreed to the Ballmer deal for $2 Billion in late May,

8   2014, yet when he testified in July, he valued the team at $2.5 Billion to $5 Billion.  Donald filed

9   his federal lawsuit against the NBA citing damages of $1 Billion, yet a short time later in

10  testimony he testified his damages were $9 Billion.

11         In reaction, in part, to Donald's Anderson Cooper interview on May 18, 2014, the NBA

12  reported that they would vote to take the Clippers from Donald at the June 3, 2014 meeting.

13         The Court finds credible that this report caused Donald great concern and he was insistent

14  that the team be sold before that meeting telling Rochelle:  "We need to sell the team before this

15  occurs."

16         Rochelle testified that Donald told her that he knew they would vote him out.  Rochelle

17  testified that she was chosen and authorized to sell the team on May 22, 2014.  The letter signed

18  by Donald confirms that she was given full authority to negotiate the sale of the team with the

19  NBA. (Ex. 14.)

20         Rochelle testified that she was present when Donald signed the May 22, 2014 letter and

21  she testified that she absolutely had authority to sell the team and instructed to arrange the biding

22  and the sale before the June 3, 2014 NBA meeting.

23         Rochelle was credible when she testified that Donald told her that he wanted her to be

24  happy and to get ownership or perks if she could.  The Court finds Rochelle's testimony credible

25  that Donald told her, quote:  "Honey, I want you to get whatever you can get to make you happy."

26         Thereafter, Rochelle retained valuation experts, undertook a search for buyers and

27  conducted the auction, which produced bids of $1.2 Billion, $1.6 Billion and $2 Billion.

28         Rochelle testified that she spoke with Donald daily during the bidding process and at all

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

[PROPOSED] STATEMENT OF DECISION

Exhibit C
Page 63

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1   times he continued to encourage the sale.  She testified she discussed the $2 Billion offer from

2   Mr. Ballmer, and Donald was happy saying, "You really made a good deal."

3        There is no credible evidence that Donald removed his consent to the sale until May 29,

4   2014.  Up to that date, as the Court has found, Rochelle had every good reason to believe he had

5   authorized the sale of the team and Donald was happy with the $2 Billion offer and that he would

6   sign.

7        On May 28, 2014, Rochelle called Donald to coordinate his signature.  He said he didn't

8   feel well.  The next day she called again and he became hostile and refused to sign.

9        On May 29, 2014, after Donald unexpectedly refused to sign the BTS, in consultation with

10  her lawyer, Donald was deemed no longer a Trustee per Paragraphs 7.5.c. and 10.24.(d) of the

11  Trust, and Rochelle signed the BTS to sell the Clippers to Mr. Ballmer.

12       The Court finds that the contract Rochelle entered into with Ballmer did not provide

13  Rochelle with any unfair advantage.  It is clear that a percentage of the sale price would only go

14  into a charitable foundation if Donald agreed to the BTS, and that the perks in the BTS were

15  assigned to the Trust.

16       The Court finds that Donald's change of heart was not because the $2 Billion offer was

17  not in the best interest of the Trust.  The Court finds no credible evidence to support Donald's

18  contention that he was defrauded, subjected to undue influence or breach of fiduciary duty, or that

19  Rochelle had unclean hands in obtaining the doctors' examinations or in any other respect.  The

20  Court does not find any direct or compelling evidence of fraud, breach of fiduciary duty, undue

21  influence or unclean hands on the part of Rochelle.  Accordingly, the Court finds that there was

22  no such fraud, breach of fiduciary duty, undue influence or unclean hands.

23       In addition, the tortious conduct of which Rochelle is accused requires proof that she had

24  the duty to tell Donald that the purpose of the doctors' examinations was to determine his capacity

25  to remain a Trustee.  Even assuming that, at the time of the examinations, Rochelle believed that

26  this was the purpose of the examinations, she had no duty to inform Donald.

27       Dr. Spar testified that knowing that his position as a Trustee was at stake would have

28  increased Donald's anxiety and probably negatively affected his performance.  (RT 7/8/14 at

37:4-16.)  Dr. Cummings also agreed that Donald should not be given that stressful information. (RT 7/23/14 at 26:4-10.)  The rule urged by Donald – requiring that every trustee to be examined under provisions similar to Paragraphs 7.5.c. and 10.24. of the Trust must be told that the purpose of the examination is to determine capacity to remain as a Trustee – is wholly unsupported by the evidence.  Based on this record, it is clear that Rochelle had no duty to tell that to Donald and violated no duty in not telling him.  Nor, as Donald's expert Dr. Cummings admitted, did the doctors have ethical or legal obligation to inform Donald of the potential legal results of the examinations.  (RT 7/23/14 at 25:19-27; 26:4-9.)

Moreover, since Donald had the legal duty to participate in those examinations, Rochelle could only have induced Donald to do something he was legally obligated to do.  As a matter of law, inducing compliance with a pre-existing legal obligation does not give rise to a fraud claim and therefore cannot be the basis for striking the doctors' certifications.  Reliance and materiality are essential elements of a fraud claim, and, thus, of a claim for undue influence, unclean hands or breach of fiduciary duty based on misrepresentation or a fiduciary's failure to disclose. Accordingly, the misrepresentation or failure to disclose must be a cause "that altered [the plaintiff's] legal relations."  *Wilhelm v. Pray, Price, Williams & Russell* (1986) 186 Cal.App.3d 1324, 1381-82 (emphasis added).  *See Schauer v. Mandarin Gems of Cal, Inc.* (2005) 125 Cal.App.4th 949, 960 (discussing same).  Thus, where a party already has the legal obligation to perform an act, a misrepresentation or failure to disclose that leads him to perform that act cannot be the basis for recovery.  *See, e.g., Leegin Creative Leather Products, Inc. v. Diaz* (2005) 131 Cal.App.4th 1517, 1524-25 (where plaintiff had legal duty to file a claim, he cannot recover for misrepresentation causing him to file that claim).

Here, Donald had the legal duty under the Trust to cooperate in the doctors' examinations. Paragraph 7.5.c. on page 42-43 of the Trust not only required Donald to "cooperate in any examination reasonably appropriate to carry out the provisions of this Paragraph 7.5.c.," but also expressly provided that "[a]n individual's obligation to comply with the provisions of this Paragraph 7.5.c. is specifically enforceable."  (Ex. 29, ¶7.5.c. at pp. 53-54.)  Donald expressly agreed to "serve in accordance with the terms and conditions of service as set forth in this [Trust]

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1   document, specifically including those terms and conditions of service imposed pursuant to

2   Paragraph 7.5.c."  (Ex. 29 at p. 83.)

3        Misleading Donald into complying with his admitted legal obligations, if it had occurred,

4   could not provide the basis for striking the doctors' certifications.

5        Even if Rochelle had believed that the purpose of the doctors' examinations was to

6   determine Donald's capacity to remain a Trustee and had the duty to tell him that, not doing so

7   had no legally cognizable effect.  Donald has admitted that he would have cooperated in the

8   examinations even if he knew that was their purpose, but that he would have chosen a more

9   convenient place and eaten a better breakfast, so that he might have done better on the tests.  (RT

10  7/10/14 at 74:25-75:20; 77:16-78:21 (quoting from Donald's pleading).)  A statement in a

11  pleading or a concession in a brief or argument is a judicial admission, and Donald is bound by

12  his judicial admission.  It is "not merely evidence of a fact, it is a conclusive concession of the

13  truth of the matter and has the effect of removing it from the issues."  1 Witkin, Cal. Evidence

14  (5th Ed.) §§98, 101, pp. 922, 926.  *See, e.g., Smith v. Walter E. Heller & Co.* (1978)

15  82 Cal.App.3d 259, 269.

16       The examinations were conducted at Donald's home, not an inconvenient location.  And,

17  Dr. Platzer and Dr. Spar each testified that nothing Donald could have eaten would have

18  improved his performance on the tests.  (RT 7/7/14 at 52:26-53:1; RT 7/8/14 at 44:28-45:5.)

19  They also testified that you cannot prepare for such examinations.  And Dr. Spar testified that

20  Donald's knowledge that his status as a Trustee was at stake would have increased his anxiety

21  and would probably have led to poorer, rather than better performance.  (RT 7/8/14 at 37:4-16.)

22       Because Donald has admitted that he would have allowed himself to be examined even if

23  told that this could lead to his disqualification, the failure to tell him had no material effect and

24  cannot serve as a basis for striking the doctors' certifications.  *See, e.g., Wilkins v. National*

25  *Broadcasting Co.* (1999) 71 Cal.App.4th 1066, 1081 (no reliance and no fraud where, if told the

26  truth, plaintiff's conduct would not have been materially different).

27       Moreover, even if the doctors' examinations had been obtained by Rochelle's violation of

28  a duty to disclose, their certifications would nevertheless be admissible evidence.  In general, the

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

81294-00002/2221208.4

7

Exhibit C
Page 66

1   "exclusionary rule" barring illegally obtained evidence applies only in criminal cases, not in

2   conservatorship proceedings or other civil proceedings like this probate action. *E.g.,*

3   *Conservatorship of Susan T.*, 8 Cal.4th, 1005, 1011-20 (1994) (refusing to apply exclusionary

4   rule in conservatorship matter); *United States v. Janis* (1976) 428 U.S. 422, 454 (exclusionary

5   rule for evidence obtained in violation of constitutional rights does not apply to civil cases).

6          Based on that evidence relating to the issue of whether Donald Sterling was properly

7   deemed no longer a Co-Trustee pursuant to the terms of the Trust, it has been shown, and the

8   Court finds, that Donald was properly removed as a Trustee and Rochelle was acting properly as

9   a sole Trustee when she entered into the Binding Term Sheet, BTS, on May 29, 2014.

10         The Court finds that Paragraph 7.5.c. of the Trust incudes a broad medical privilege

11  waiver regarding the issues of capacity of a Trustee, including HIPAA waivers.  The Court notes

12  that without these waivers, a number of the provisions of Paragraph 10.24. of the Trust would be

13  meaningless.  Even if the waivers of medical privacy in the Trust instrument had not been valid,

14  the reports and certifications of Drs. Spar and Platzer would not be stricken or disregarded.  Many

15  cases reject application of the "exclusionary rule" to civil proceedings such as this case.  For

16  example, in *Conservatorship of Susan T.*, 8 Cal.4th, 1005, 1011-20 (1994), after reviewing the

17  many cases declining to apply the exclusionary rule in non-criminal proceedings (*id.* at 1017,

18  fn. 19), the Supreme Court held the exclusionary rule inapplicable to conservatorship

19  proceedings.  But the waivers here were valid.  Civil Code § 56.28 expressly provides that the

20  Confidentiality of Medical Information Act ("CMIA"), does not affect disclosures made pursuant

21  to Section 1158 of the Evidence Code ("Section 1158").  Section 1158 provides, in pertinent part,

22  that  "[w]henever, prior to the filing of any action . . . an attorney at law or his or her

23  representative presents a written authorization therefor signed by an adult patient. . . or a copy

24  thereof, a physician . . . shall make all of the patient's records under his, hers or its custody or

25  control available for inspection and copying by the attorney at law or his, or her, representative,

26  promptly upon the presentation of the written authorization."  Paragraph 7.5.c. of the Trust allows

27  a Co-Trustee "to review the individuals' individually identifiable health information or other

28  medical records . . . to the extent required to implement this Paragraph 7.5.c."  Donald signed an

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    "Acceptance by Trustee" specifically acknowledging "those terms and conditions of service

2    imposed pursuant to Paragraph 7.5c." This constitutes a written authorization by Donald within

3    Section 1158. Upon receiving Mr. O'Donnell's request for Donald's medical records based on

4    Donald's signed authorization in the Trust, Drs. Platzer and Spar were not only permitted but

5    required by law to provide Mr. O'Donnell with Donald's medical records.

6        Moreover, the disclosures pursuant to paragraph 7.5(c) of the Trust instrument are

7    disclosures "authorized by law" and for this reason also, are exempt from the CMIA non-

8    disclosure provisions. Civil Code § 56.10(b)(9). What is "authorized" or "required" by "law," as

9    those phrases are used in Section 56.10, are to be given a broad interpretation. *Shaddox v.*

10   *Bertani*, 110 Cal.App.4th 1406 (2003). A disclosure to comply with a binding trust instrument

11   signed by the party asserting a privacy right is one "authorized by law."

12       *Shaddox v. Bertani*, 110 Cal.App.4th 1406 (2003), also holds that communications within

13   the litigation privilege of Civil Code §47(b) are not barred by CMIA. Here, the doctors'

14   certifications are being used in court proceedings and were issued in anticipation of such

15   proceedings and would be privileged under Civil Code § 47(b)(2).

16

17       **THE COURT HAS JURISDICTION TO DECIDE ROCHELLE'S SECTION 17200**

18       **PETITION AFTER DONALD'S REVOCATION.**

19       There is no case law directly on point to answer the question of whether a Trustee retains

20   the power to proceed with a Section 17200 Petition which asks a court to confirm that a condition

21   in a contract has been met when the contract was validly entered into prior to the Settlor revoking

22   the Trust. Therefore, the Court must look to the language of the Probate Code. In that regard, the

23   Court is compelled by Section 15407(b) which states: "On termination of the Trust, the Trustee

24   continues to have the power reasonably necessary under the circumstances to wind up the affairs

25   of the Trust."

26       Based on Section 15407(b), the Court believes it does retain jurisdiction to handle this

27   Section 17200 Petition. The language of Section 15407(b) does not limit the statute's application

28   only to irrevocable trusts, as is argued by Donald. Therefore, the Court interprets the statute to

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

81294-00002/2221208.4                                    9

Exhibit C
Page 68

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1   apply to both irrevocable and revocable trusts.  Moreover, Section 15407(b) provides a court

2   significant leeway to determine when an action is reasonably necessary for a Trustee to wind up

3   the affairs of a Trust.  In the Court's opinion, this Section 17200 Petition is reasonably necessary

4   under the circumstances, as it seeks interpretation of a condition in a contract entered into by the

5   Trustee before revocation by the Settlor.

6          The Petition here presents significant questions regarding appropriate distribution of

7   assets, traditional acts of a Trustee in post-revocation actions.  In this case, Rochelle essentially is

8   faced with two options:  (1) confirm the sale to Mr. Ballmer and distribute the cash to Rochelle

9   and Donald; or (2) distribute the shares in kind to Donald and Rochelle.  The latter option will

10  threaten major loss to the Trust as the NBA could seize and terminate the team as an NBA

11  franchise pursuant its contract with the Trust and its internal rules.

12          As to the argument that Rochelle did not have authority to transfer the shares of the

13  corporation, the BTS clearly states that Rochelle was the Chairman of the Board of LAC

14  Basketball Club, Inc. ("LAC Basketball") on May 29, 2014, the day she entered into the BTS and

15  before a transfer to Richard Parsons on May 30, 2014.  Thus, Rochelle clearly had authority to

16  enter into the BTS and transfer the shares of LAC Basketball, which were in the Trust at that

17  time.  Donald concedes that at the time the BTS was executed prior to his revocation, 100% of the

18  stock in LAC Basketball was owned by the Trust.  (Donald's Closing Brief at p. 1 n. 1).

19  Therefore, it is undisputed that as of the date Rochelle entered into the BTS, the Trust owned

20  100% of LAC Basketball which, in turn, owns the Clippers.

21          Accordingly, the Court does have authority to rule on Rochelle's Section 17200 Petition.

22  The Court also believes it is appropriate for Rochelle to bring this matter to the Court and to

23  retain the powers of Trustee in winding up the affairs of the Trust.  As the Court does have

24  jurisdiction, the Court may and hereby does find that Rochelle may proceed with and close the

25  transaction set forth in the BTS.

26

27

28

[PROPOSED] STATEMENT OF DECISION

Exhibit C
Page 69

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

## AN ORDER PURSUANT TO PROBATE CODE §1310(b) IS WARRANTED TO PREVENT INJURY OR LOSS TO TRUST PROPERTY.

Although an appeal ordinarily stays the operation and effect of a judgment or order, Probate Code §1310(b) provides an exception to that general rule.  Probate Code §1310(b) empowers this Court to direct a Trustee to take actions as if no appeal were pending for the purpose of preventing injury or loss to a person or property in an estate or trust.

Donald argues in his closing brief that Probate Code §1310(b) may be applied only in a limited class of cases where there is a showing that a stay of appeal has a direct effect on "life or death decisions."  (Donald's Closing Br. At 62:12-13.)  The Court concludes that this is not the law.

In *In re Conservatorship of McElroy*, 104 Cal.App.4[th] 536 (2002), cited by both sides, the trial court was affirmed on appeal after applying Probate Code §1310(b) to avoid a potential pecuniary loss of a conservatee's estate.  The court of appeal found that the trial court did not abuse its discretion in determining that immediate action was necessary to avoid tax liability that the estate would necessarily incur upon the death of the conservatee before the action was taken. The Court of Appeal in *McElroy* found no abuse of discretion where the application of Probate Code §1310(b) served only to prevent financial harm to the estate of the conservatee and not to the conservatee himself.  In fact, it was the death of the conservatee that would have triggered the substantial tax liability to the estate.  Accordingly, Section 1310(b) cannot be said to apply only in cases of "life and death decisions."

In addition, the Court does not find that Section 1310(b) is either unclear or ambiguous, as argued by Donald.

In deciding this issue, the Court first addresses the evidence that has been produced regarding valuation and damages.

The Court finds that Richard Parsons, the interim CEO of the Clippers, and Anwar Zakkour, the valuation expert for Bank of America/Merrill Lynch, were exceptionally qualified and produced very compelling evidence of the valuation of the Clippers and of damages to the Clippers if the sale to Mr. Ballmer does not go through.

81294-00002/2221208.4                    11

Exhibit C
Page 70

1    On the other hand, the Court finds that the testimony presented by Dean Bonham on the

2    same issues to be not credible.  The Court finds his training and experience totally lacking,

3    including the fact that he does not have a college degree or even a high school diploma, he has no

4    formal training in accounting for valuation of businesses, and he was unable to recall if he ever

5    previously testified as a valuation expert in court.  Moreover, his blatant misrepresentation of his

6    expertise was remarkable to the Court.  Mr. Bonham testified on direct that he was the president

7    of the Denver Nuggets in 1990.  This testimony was proven to be an intentional misrepresentation

8    on cross-examination, during which he conceded that he was only president of marketing and

9    sales for the Nuggets.  Further, when he was asked what facts he relied on in forming his opinion,

10   he said, "I can't give you a factual basis."  He admitted he had not done any valuations for the

11   Clippers, but indicated he was testifying just based on his personal experience.  Accordingly, the

12   Court finds that Mr. Bonham's testimony -- that the Clippers would sell for $2 Billion or more at

13   an NBA auction -- was total speculation and not grounded in any training or experience, and,

14   therefore, the Court gives it no weight.

15       The Court finds credible and compelling the testimony of Mr. Zakkour that the process

16   undertaken by Rochelle in obtaining the $2 Billion offer from Mr. Ballmer was, as he described

17   it, the "Perfect Storm," and it produced higher bids than one could expect at a typical or more

18   prolonged auction, in part, because of the transparency inherent in such auctions.  He testified that

19   the blind, one-bid auction worked to produce the highest bids possible.

20       Based on the evidence presented, the Court needs to determine whether that evidence is

21   sufficient to make a finding under Section 1310(b) and decide whether it is likely that if the deal

22   to Mr. Ballmer does not go through, this Trust is likely to suffer a massive loss in value, of the

23   type that would support this type of order.  The Court finds that if the Court does not protect the

24   $2 Billion offer with a Section 1310(b) order, three things are likely to occur:

25       First, the credible evidence is that Mr. Ballmer paid an amazing price that cannot be

26   explained by a market analysis and was so far in excess of the comprehensive Bank of America

27   market valuations (Exs. 42 and 43) that the price was, as Mr. Zakkour described it, a "knock-out,"

28   "slam dunk," "home run," and "Nirvana."  Mr. Zakkour testified that anyone receiving this price

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

-[PROPOSED] STATEMENT OF DECISION

Exhibit C
Page 71

1  would be exceedingly ecstatic.  He testified that the most recent sale of an NBA team, the

2  Milwaukee Bucks last year, was for four to five times revenues, while the sale of the Clippers to

3  Mr. Ballmer would be for twelve times revenues.  That is the highest revenue multiple ever for a

4  professional sports team.  The stunning offer by Mr. Ballmer was premised and conditioned upon

5  certainty regarding ownership and litigation that Section 1310(b) provides.

6          Mr. Zakkour produced credible evidence that the one-shot, blind bid auction by Rochelle

7  created the highest bids possible, which will not be duplicated in any other auction going forward,

8  such as the NBA auction.  The evidence shows that the next best offer for the Clippers was $1.6

9  Billion.  If the Trust loses Mr. Ballmer's offer because the Court does not provide Section

10  1310(b) protection, the Trust will lose $400 Million in value.  A massive and imminent loss of

11  value supports the Court's exercise of its discretion under Section 1310(b).

12          Second, if the Ballmer deal dies, the NBA is scheduled to vote to take the team and

13  auction it off.  Based on Mr. Zakkour's testimony, if three quarters of the owners vote to take the

14  team, the NBA auction will not produce bids as high as Rochelle's auction.  More importantly,

15  the NBA is currently a defendant in Donald's pending federal and state lawsuits so there is

16  tremendous uncertainty about ownership.  Any successful bidder would be faced with a risk that a

17  court might, in the future, set aside the NBA sale.  In addition, any bidder has the uncertainty

18  about whether they would become embroiled in Donald's lawsuits against the NBA and the costs

19  associated with that.  Mr. Zakkour testified that "uncertainty is the enemy of value," And huge

20  ownership and litigation ~~and~~ uncertainties would logically cause the team's value to drop substantially

21  at auction by the NBA.  ~~A massive risk to the value of the Clippers is likely~~.  Given the testimony

22  of Mr. Parsons and Mr. Zakkour, ~~the risk of harm is not speculative~~. *the Court finds that the Clippers are likely to suffer a massive loss in value and that loss is not speculative.*

23          Third, if the NBA owners do not vote to take the team, and Donald remains the owner,

24  Mr. Parsons has credibly spelled out what is likely to happen.  The team would experience a loss

25  of value which he describes as a "death spiral."  Mr. Parsons testified that five or six sponsors,

26  including Kia and Mandalay Bay, have told him that if Donald is in, then they are out.  He also

27  testified that the wildly popular father figure of the team, Coach Doc Rivers, and players would

28  likely defect and refuse to play.  Resulting defections of sponsors, coaches, and players would

81294-00002/2221208.4                                    13

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

Exhibit C
Page 72

1    affect ticket sales _and_ promotions.  The value of the team would be the victim of the spiral.  The

2    Clippers would suffer a massive loss of value if it survived at all.  Given the testimony of Mr.

3    Parsons and Mr. Zakkour, the risk of harm is not speculative.

4         Accordingly, under all of these scenarios, the Clippers would suffer a massive loss of

5    value.  The Court finds, based upon all the evidence and arguments presented, that the Court

6    clearly has the discretion to order and does order the protections of Section 1310(b).

7         Despite the foregoing, the Court does not find Rochelle's estoppel argument compelling.

8    Rochelle did not change her conduct to her detriment in entering into the BTS.  There was no

9    detrimental reliance on that.

10        Additionally, the Court does not base its Section 1310(b) finding on bank loans being

11   called because there is insufficient evidence to support that claim.  Unlike the testimony of Mr.

12   Parsons and Mr. Zakkour that there is a likely substantial and massive harm to the value of the

13   team, there is no action currently being taken by the bank to call the loans at issue.

14

15   DATED:  _8 - 12 - 14_ '

16                                    _____
                                       HONORABLE MICHAEL I. LEVANAS
17                                     JUDGE OF THE SUPERIOR COURT

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] STATEMENT OF DECISION

Exhibit C
Page 73

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

# Exhibit D

1 | Maxwell M. Blecher (SBN 26202)
mblecher@blechercollins.com
2 | BLECHER COLLINS PEPPERMAN & JOYE, P.C.
515 South Figueroa Street, Suite 1750
3 | Los Angeles, California 90071-3334
Telephone: (213) 622-4222
4 | Facsimile: (213) 622-1656

5 | Bobby Samini (SBN 181796)
bsamini@saminilaw.com
6 | SAMINI SCHEINBERG, PC
949 South Coast Drive, Suite 420
7 | Costa Mesa, California 92626
Telephone: (949) 724-0900
8 | Facsimile: (949) 724-0901

9 | Gary M. Ruttenberg (SBN 48590)
gruttenberg@bloom-ruttenberg.com
Stefanie S. Cutler (SBN 254364)
10 | scutler@bloom-ruttenberg.com
BLOOM & RUTTENBERG
11 | 11111 Santa Monica Blvd., Suite 1840
Los Angeles, CA 90025-3344
12 | Telephone: (310) 444-1979
Facsimile: (310) 444-1917

13
Alexander Ginzburg (SBN 166795)
14 | alexander@gbllp-law.com
Yasha Bronshteyn (SBN 210248)
15 | yasha@gbllp-law.com
GINZBURG & BRONSHTEYN, LLP
16 | 11111 Santa Monica Blvd., Suite 1840
Los Angeles, CA 90025-3344
17 | Telephone: (310) 914-3222
Facsimile: (310) 914-4242

18
Attorneys for Respondent
19 | DONALD T. STERLING

FILED
Superior Court of California
County of Los Angeles

JUL 24 2014

Sherri R. Carter, Executive Officer/Clerk
By_____, Deputy
Salvador Jimenez

20 | SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF LOS ANGELES

21 | In the Matter of

22 |

23 | THE STERLING FAMILY TRUST

24 |

25 |

26 |

27 |

28 |

Case No. BP152858

Assigned to Hon. Michael Levanas, Dept. 5

**DONALD T. STERLING'S POST-TRIAL BRIEF**

Trial Dates: July 7, 2014 – July 23, 2014

---

DONALD T. STERLING'S POST-TRIAL BRIEF

## TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT ................................................................. 1

STATEMENT OF FACTS .................................................................... 3

    A.    Timeline of Events ............................................. 4

    B.    Trial Testimony and Evidence ................................. 10

        1.    Dr. Cummings' Testimony on the Standard of Care ........ 10

        2.    Donald's CT Scan ........................................ 12

        3.    Donald's PET Scan ....................................... 12

        4.    Dr. Platzer's Relationship with Shelly, Her Examination of Donald, and
            Privacy Concerns ........................................ 12

        5.    Dr. Spar's Relationship with Mr. O'Donnell, Examination of Donald, and
            Disclosure of Donald's Private Medical Information ............... 16

        6.    Donald's Trial Testimony ................................. 18

        7.    Shelly's Trial Testimony ................................. 19

        8.    No Evidence During Trial Testimony Relating to Probate Code section
            1310(b) of Immediate or Imminent Injury or Loss to Person or Property 21

LEGAL ARGUMENTS AND POINTS AND AUTHORITIES ............................... 23

I.    Shelly's Petition Is Not an Appropriate Action in Winding Up the Affairs of the Trust.. 23

    A.    Donald Holds All of the Stock of LAC Basketball Club, Inc. That Was Previously
        Funded into The Sterling Family Trust .............................. 24

    B.    The Assets of the Sterling Family Trust Must Be Immediately Distributed to
        Donald and Shelly ................................................ 28

    C.    Shelly's Attempt to Pursue a Future Sale of the Clippers Is Not an Authorized
        Passive Act to Wind Up the Trust .................................. 29

II.    Donald Sterling Was Not Properly Deemed No Longer a Co-Trustee ................ 35

    A.    The Doctor's Letters Do Not Comply with the Trust Provisions ........... 36

    B.    Shelly's Efforts to Remove Donald as Co-Trustee of the Sterling Family Trust
        Were Through False Pretenses, Undue Influence, Unclean Hands, and in Breach of
        Her Fiduciary Duties to Donald as Her Husband, Co-Trustee, and Co-Settlor .... 42

        1.    Shelly's Hands are Unclean ............................... 42

        2.    The Doctors' Letters Were Obtained Through False Pretenses and Undue
            Influence, and Unclean Hands ............................. 45

Blecher Collins
Pepperman & Joye

-i-

DONALD T. STERLING'S POST-TRIAL BRIEF

3.    Shelly Breached Her Fiduciary Duties Toward Donald ......................... 47

4.    The Conduct of Shelly's Lawyers, As Her Agents, Is Imputed to Her ..... 49

C.    The Doctors' Letters and Medical Information Therein Were Obtained in Violation of CMIA ........................................................................................................ 50

1.    The Medical Information Illegally Obtained May Not Be Used For the Purposes of Removing Donald as a Co-Trustee ....................................... 54

2.    Case Law Exists to Exclude the Illegally Obtained Medical Evidence ... 55

D.    Estoppel Does Not Assist Shelly's Cause ......................................................... 56

E.    Shelly's "Best Interests" Argument Is Also Futile ........................................... 58

III.   The Court Should Not Make Orders under Probate Code section 1310(b) ................... 59

A.    The Legislative History Makes Clear that Probate Code Section 1310(b) Does Not Apply to This Case ........................................................................................... 61

B.    No Case Law Supports Shelly's Claim that the Revoked Sterling Family Trust Will Suffer Irreparable Injury to Person or Property ........................................ 64

CONCLUSION ........................................................................................................... 69

-ii-

DONALD T. STERLING'S POST-TRIAL BRIEF

Exhibit D
Page 76

# TABLE OF AUTHORITIES

Page(s)

CASES

*Anderson v. Hunt,*
  196 Cal. App. 4th 722 (2011)..............................................................38

*Arluk Med. Center Indus. Group, Inc. v. Dobler,*
  116 Cal. App. 4th 1324 (2004)............................................................25

*Ball v. Mann,*
  88 Cal. App. 2d 695 (1948)................................................................30

*Board of Medical Quality Assurance v. Gherardini,*
  93 Cal. App. 3d 669 (1979)...........................................................50, 55

*Botsford v. Haskins & Sells,*
  81 Cal. App. 3d 780 (1978)................................................................31

*Brown v. Mortensen,*
  51 Cal. 4th 1052 (2011).....................................................................53

*Cal. Fed. Savings & Loan Assn. v. City of Los Angeles,*
  11 Cal. 4th 342 (1995)......................................................................61

*Cal. Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.,*
  14 Cal. 4th 627 (1997)......................................................................61

*Camp v. Jeffer, Mangels, Butler & Marmaro,*
  35 Cal. App. 4th 620 (1995)..............................................................45

*Carolina Casualty Ins. Co. v. L.M. Ross Law Group, LLP,*
  184 Cal. App. 4th 196 (2010)............................................................26

*Conservatorship of Hart,*
  228 Cal. App. 3d 1244 (1991)...................................................60, 65, 66

*Conservatorship of Link,*
  158 Cal. App. 3d 138 (1984)..............................................................51

*Conservatorship of McElroy,*
  104 Cal. App. 4th 536 (2002)..............................................60, 66, 67, 68

*Crosstalk Prods. v. Jacobson,*
  65 Cal. App. 4th 631 (1998)...............................................................43

*Cutter v. Brownbridge,*
  183 Cal. App. 3d 836 (1986)...............................................................50

*Dickson, Carlson & Campillo v. Pole,*
  83 Cal. App. 4th 436 (2000)...............................................................43

*Dollinger DeAnza Assoc. v. Chi. Title Ins. Co.,*
  199 Cal. App. 4th 1132 (2011)............................................................56

*Estate of Mann,*
  184 Cal. App. 3d 593 (1986)...............................................................36

*Estate of Nicholas,*
  177 Cal. App. 3d 1071 (1986)..............................................................33

*Estate of Scrimger,*
  188 Cal. 158 (1922)..........................................................................34

*Federal Kemper Life Assurance,*
  36 Cal. 4th 281 (2005)......................................................................49

*Fibreboard Paper Prods. Corp. v. East Bay Union of Machinists,*
  227 Cal. App. 2d 675 (1964)..............................................................44

*Fisch, Spiegler, Ginsburg & Ladner v. Appel,*
  10 Cal. App. 4th 1810 (1992)..............................................................25

*Fortunato v. Superior Court,*
  114 Cal. App. 4th 475 (2003)..............................................................52

DONALD T. STERLING'S POST-TRIAL BRIEF

Blecher Collins
Pepperman & Joye

1  Gagan v. Gouyd,
       73 Cal. App. 4th 835 (1999) ............................................................... 26
2  Galdjie v. Darwish,
       113 Cal. App. 4th 1331 (2003) ..................................................... 25, 26
3  Gold v. Superior Court,
       3 Cal. 3d 275 (1970) ...................................................... 60, 64, 65, 67
4  Guardianship of Walters,
       93 Cal. App. 2d 208 (1949) ............................................................. 68
5  Harustak v. Wilkins,
       84 Cal. App. 4th 208 (2001) ............................................................ 51
6  Hill v. Nat'l Collegiate Athletic Assn.,
       7 Cal. 4th 1 (1994) .......................................................................... 50
7  Hise v. Superior Court,
       21 Cal. 2d 614 (1943) ..................................................................... 34
8  In re Guardianship of O'Connor,
       28 Cal. App. 2d 527 (1938) ...................................................... 30, 56
9  In re Lathers' Will,
       243 N.Y.S. 366 (N.Y. Sur. Ct. 1930) ............................................. 34
10 In re Marriage of Campbell,
       136 Cal. App. 4th 502 (2006) ..................................................... 61, 62
11 In re Marriage of Cloney,
       91 Cal. App. 4th 429 (2001) ............................................................ 49
12 In re Marriage of Greenway,
       217 Cal. App. 4th 628 (2013) .......................................................... 36
13 In re Preston,
       2014 WL 495635 (Bankr. C.D. Cal. Feb. 14, 2014) ...................... 36
14 Jacobs v. Universal Dev. Corp.,
       53 Cal. App. 4th 692 (1997) ............................................................ 43
15 Jarrow Formulas, Inc. v. Nutrition Now, Inc.,
       304 F.3d 829 (9th Cir. 2002) ........................................................... 44
16 Jay Bharat Developers, Inc. v. Minidis,
       167 Cal. App. 4th 437 (2008) .......................................................... 44
17 Johnson v. Kotyck,
       76 Cal. App. 4th 83 (1999) ............................................................. 27
18 Kane v. Superior Court,
       37 Cal. App. 4th 1577 (1995) ................................................ 66, 67, 68
19 Keck v. Keck,,
       16 Cal. App. 2d 521 (1936) ............................................................. 30
20 Kendall-Jackson Winery, Ltd. v. Superior Court,
       76 Cal. App. 4th 970 (1999) ...................................................... 43, 44
21 Keshecki v. St. Vincent's Medical Center,
       785 N.Y.S.2d 300 (Sup. Ct. 2004) .................................................. 56
22 Kramer v. Policy Holders Life Insurance Assn.,
       5 Cal. App. 2d 380 (1937) ......................................................... 54, 55
23 Laycock v. Hammer,
       141 Cal. App. 4th 25 (2006) ...................................................... 27, 28
24 Lazzarevich v. Lazzarevich,
       39 Cal. 2d 48 (1952) ....................................................................... 49
25 Lintz v. Lintz,
       222 Cal. App. 4th 1346 (2014) ........................................................ 47
26 Magic Kitchen LLC v. Good Things Int'l Ltd.,
       153 Cal. App. 4th 1144 (2007) ........................................................ 43
27 Masry v. Masry,
       166 Cal. App. 4th 738 (2008) .......................................................... 25
28

Blecher Collins
Pepperman & Joye

-iv-

Exhibit D
Page 78

1  | Matter of Miguel M. (Barron)
   |   17 N.Y.3d 37 (N.Y. 2011) ............................................................... 56
2  | Matter of Derek,
   |   821 N.Y.S.2d 387 (Sur. Ct. 2006) ................................................. 56
3  | McDowell v. Watson,
   |   59 Cal. App. 4th 1155 . (1997) ......................................... 62, 63, 64
4  | Mendoza v. Ruesga,
   |   169 Cal. App. 4th 270 (2008) ........................................................ 44
5  | Myrick v. Enron Oil & Gas Co.,
   |   296 S.W.3d 724 (Tex. App. El Paso 2009) ........................... 31, 32, 33
6  | Neary v. City Bank Farmers Trust Co.,
   |   24 N.Y.S.2d 264 ............................................................................ 34
7  | Odorizzi v. Bloomfield School Dist.,
   |   246 Cal. App. 2d 123 (2014) ......................................................... 46
8  | Pating v. Board of Medical Quality Assurance,
   |   130 Cal. App. 3d 608 (1982) ......................................................... 54
9  | Peoples Bank v. D'Lo Royalties, Inc.,
   |   235 So.2d 257 (Miss. 1970) .......................................................... 35
10 | Pettus v. Cole,
   |   49 Cal. App. 4th 402 (1996) .......................................................... 54
11 | Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,
   |   324 U.S. 806 (1945) ...................................................................... 44
12 | Quarterman v. Kefauver,
   |   55 Cal. App. 4th 1366 (1997) ........................................................ 61
13 | Ranch v. Superior Court,
   |   113 Cal. App. 4th 1377 (2003) ...................................................... 52
14 | Republic Molding Corp. v. B. W. Photo Utils.,
   |   319 F.2d 347 (1963) ...................................................................... 44
15 | Robertson v. Health Net of Cal., Inc.,
   |   132 Cal. App. 4th 1419 (2005) ...................................................... 62
16 | San Diego Trolley, Inc. v. Superior Court,
   |   87 Cal. App. 4th 1083 (2001) ........................................................ 52
17 | Security First Nat'l Bank v. Wellslager,
   |   88 Cal. App. 2d 210 (1948) ........................................................... 27
18 | Simmons v. Ghaderi,
   |   44 Cal. 4th 570 (2008) .................................................................. 52
19 | Slatkin v. White,
   |   102 Cal. App. 4th 963 (2002) ........................................................ 62
20 | Stalberg v. Western Title Ins. Co.,
   |   27 Cal. App. 4th 925 (1994) .......................................................... 49
21 | Stanton v. Panish,
   |   28 Cal. 3d 107 (1980) ................................................................... 61
22 | Title Ins. & Trust Co. v. Duffill,
   |   191 Cal. 629 (1923) ...................................................................... 26
23 | Transamerica Title Ins. Co. v. Superior Court,
   |   188 Cal. App. 3d 1047 (1987) ....................................................... 53
24 | Walgren v. Dolan,
   |   226 Cal. App. 3d 572 (1990) ......................................................... 26
25 | Watson v. Sutro,
   |   86 Cal. 500 (1890) ........................................................................ 49
26 | Zanelli v. McGrath,
   |   166 Cal. App. 4th 615 (2008) ........................................................ 26
27 | Zirbes v. Stratton,
   |   187 Cal. App. 3d 1407 (1986) ....................................................... 49
28 |

Blecher Collins
Pepperman & Joye

07/25/2014

Exhibit D
Page 79

STATUTES

42 U.S.C § 1320d ................................................................................. 39

Cal Rev. & Tax Code § 62 ................................................................... 26

Civil Code Section
   56 ................................................................................. 50, 51, 52
   2295 ......................................................................................... 49
   2298 ......................................................................................... 49
   2299 ......................................................................................... 49
   2332 ......................................................................................... 49

Corporation Code § 16404 .............................................................. 47, 48

Evidence Code
   452 ................................................................................... 4, 9, 62

Family Code Section 721 ..................................................................... 47

Probate Code Section
   810 - 813 ............................................................................. passim
   1304 ........................................................................................ 59
   1310(b) ................................................................................ passim
   2630 ........................................................................................ 30
   2631 ........................................................................................ 31
   15410 ............................................................................... I, 25, 32
   15407(a) ......................................................................... 24, 28, 29
   16002 ....................................................................................... 58
   16003 ................................................................................. 48, 58
   16004 ....................................................................................... 58
   16013 ....................................................................................... 58
   17200 ............................................................................... 1, 3, 28
   17202 ....................................................................................... 27
   17206 ....................................................................................... 28
   17209 ....................................................................................... 28
   18200 ....................................................................................... 27
   19001 ....................................................................................... 27

REGULATIONS

45 C.F.R. §§160-164 .......................................................................... 39

Exhibit D
Page 80

1    Respondent Donald T. Sterling ("Donald") respectfully submits his Post-Trial Brief

2  addressing the three issues raised by the Court:

3    1) Is Rochelle Sterling's *Probate Code* section 17200 petition an appropriate action in

4  winding down the affairs of the trust.

5    2) Was Donald Sterling properly deemed no longer a Co-Trustee.

6    3) Whether the Court should make orders under *Probate Code* section 1310(b).

7                                    **SUMMARY OF ARGUMENT**

8    *First*, Shelly's Petition is inappropriate because the Sterling Family Trust, an inter vivos

9  revocable trust, was revoked prior to its filing. *See Prob. Code* § 15410(a). The letter of

10  revocation demanded that "all income and principal of the community trust shall promptly be

11  distributed to the Settlors as their community property . . . ." Ex. 29, ¶ 2.5.a. At no time since its

12  creation did the Sterling Family Trust become irrevocable. The trustees are the same individuals

13  as the settlors. There are no issues of accounting, distribution, or care or preservation of trust

14  assets. There is no issue of payment of liabilities; there is only the matter of returning a stock

15  certificate (LAC Basketball Club, Inc.[1]) back to Donald—a single asset which is managed within

16  the corporate structure and not the stockholder. Ex. 40.

17    *Second*, Donald was not properly removed as a co-trustee under section 7.5.c (the

18  "Removal Provision") of the Sterling Family Trust. The doctrine of unclean hands, which

19  embraces Shelly's breaches of fiduciary duty, precludes enforcement of the purported removal of

20  Donald as a trustee. The procedure used to remove Donald was not a good faith undertaking to

21  remove a trustee incapable of performing his duties. Rather, it was a mechanism used to break a

22  co-trustee deadlock about whether or not to sell the Clippers. Secret Plan B evolved as a means of

23  circumventing Donald's unwillingness to sell. This misuse of the trust was accomplished by false

24  pretenses and by the lawyers subverting the independence of the examining physicians and by

25  securing letters which do not comport with or satisfy the provisions of *Probate Code* § 810 et seq.

26  _____

27  [1] The Clippers are owned by LAC Basketball Club, Inc., a California corporation whose stock was
owned 100% by the Sterling Family Trust and is now held by Donald, for Donald and Shelly as

28  their community property.

Blecher Collins
Pepperman & Joye

1  The two doctors, Dr. Meril Sue Platzer and Dr. James Spar, who performed examinations and

2  purported to certify as to Donald's incapacity, were working with and paid by Shelly's lawyers

3  from the outset with a predetermined outcome with the singular objective concealed from Donald

4  in a whirlwind rush to sell the Clippers.  Shelly, her lawyers, and the doctors admittedly concealed

5  from Donald and his lawyers that they were working for Shelly and her lawyers to remove him

6  from the Trust to accomplish the sale.  Shelly attempts to rationalize such illegal activity by

7  claiming that Donald would have had to cooperate anyway.  Shelly breached her fiduciary duties

8  to her husband, co-settlor, co-trustee, and co-beneficiary by acting in her own self-interest and

9  against her husband's interest.  The letters do not comport to the trust provisions or satisfy *Probate*

10 *Code* Section 810 et seq. requirements.  The doctors' letters were wrongly obtained by false

11 pretenses, breach of fiduciary duty, undue influence, and unclean hands.  The doctors' letters

12 contain disclosures which violate HIPAA, CMIA, and HITECH.  Given the influence and pressure

13 exerted by Shelly, her lawyers, and the NBA, the significant amount of assets owned by the then-

14 existing Sterling Family Trust, the extraordinary speed with which they acted, and the extreme

15 stress placed on Donald, the unclean hands of Shelly, Dr. Platzer, Dr. Spar, and Shelly's lawyers is

16 overwhelming.  The entire surreptitious process cannot be approved by the Court.

17      *Third,* the Court should not make orders under *Probate Code* section 1310(b) because the

18 Clippers are a unique, irreplaceable asset and if sold under protest cannot be replaced by Donald.

19 There is no precedent for the making of any such order.  There is no issue of preventing

20 *extraordinary* or *imminent* injury or loss of person or property; the value of the LAC Basketball

21 Club, Inc. stock is going to remain the same or increase.  Donald, a sophisticated businessman

22 who has owned the Clippers for 33 years and made his fortune from "galloping inflation" with his

23 real estate empire (T.T. 7/9/14, 69:9-13), testified about the "tremendous opportunity" in owning a

24 sports franchise in the Los Angeles market, particularly in light of the valuable content and media

25 deals.  T.T. 7/8/14, 97:14-22, 103:4-22.  Donald expects that the passage of time will increase the

26 value of the team, a "trophy asset" in high demand, in a major metropolitan market, as we've seen

27 with recent sale prices of other sports franchises, including the Dodgers, and franchises in much

28 smaller markets such as the Sacramento Kings and Milwaukee Bucks.  There is no record of an

Blecher Collins
Pepperman & Joye

1  NBA team ever depreciating in value, especially in Los Angeles, and the if the NBA confiscates
2  the team, it must mitigate damages and cannot allow the team to sell for less.

3      Additionally, the former asset in question is stock, which is not being sold.  LAC
4  Basketball Club, Inc., a corporation, owns the franchise and the additional assets (defined in the
5  Binding Term Sheet ("BTS") as the "Target Assets") which are the subject of the proposed sale.
6  Orders by this Court cannot affect internal corporate acts or actions.

7      Further, the sale of the Clippers to Mr. Ballmer will significantly harm Donald.  Because
8  Donald purchased the Clippers for $12 million, there is an enormous capital gains consequence if
9  the assets are sold.  T.T. 7/21/14, 5:26-27.  At the first death of Donald or Shelly, there will be a
10 step up in basis and the Sterlings will save a currently estimated $650 million in capital gains taxes
11 if a sale is consummated during the survivor's lifetime.  Any Section 1310(b) order will
12 prejudicially deprive Donald of his right to appeal since it will be rendered moot by the
13 completion of the sale.

14     In sum, the Court must deny Shelly's Petition because (1) this Court does not have
15 authority to direct Shelly to take active acts in winding up the Sterling Family Trust, (2) Donald
16 was not removed as a trustee of his Sterling Family Trust, and (3) the injury prevention exception
17 under Probate Code 1310(b) does not apply.

18                          **STATEMENT OF FACTS**

19     It is undisputed that Dr. Platzer and Dr. Spar did not make a neutral, independent, or
20 impartial determination of Donald's capacity.  Neither Shelly, nor her lawyers, nor Dr. Platzer, nor
21 Dr. Spar disclosed the true and illegitimate purpose of the medical examinations to Donald or his
22 attorneys.  Therefore, there was a breach of fiduciary duty and a breach of the duty of good faith
23 and fair dealing.  There was no informed consent and no valid and knowing waiver of disclosure
24 of Donald's private medical records.  Rather, both doctors were working with Shelly's attorneys
25 from the outset to remove Donald as a trustee from the Sterling Family Trust for the singular
26 objective of forcing the sale of the Clippers—the basketball franchise Donald has owned for 33
27 years as the "controlling owner"—over his vociferous objections.  The examinations of Dr. Platzer
28 and Dr. Spar cannot be relied upon as fair, independent, or impartial in this proceeding, as the

*Blecher Collins Pepperman & Joye*

-3-
**DONALD T. STERLING'S POST-TRIAL BRIEF**

Exhibit D
Page 83

1  entire process was tainted by undue influence, unclean hands, false pretenses, and misconduct in

2  violation of Donald's rights to privacy over his medical records. It is undisputed that Mr.

3  O'Donnell and Ms. Zwicker, acting as Shelly's agents at the direction of their client, were the

4  masterminds of secret Plan B, and were not acting in Donald's best interests. Indeed, Mr.

5  O'Donnell deliberately concealed and withheld from production a substantial amount of

6  communications between Shelly's lawyers at Greenberg Glusker and Dr. Platzer and Dr. Spar

7  until trial, confirming the bias and prejudicing Donald's case and ability to properly prepare. T.T.

8  7/7/14, 17:25-18:27, 22:20-21, 25:15-26:27; 28:17-18, 29:5-14.

9  **A.   Timeline of Events**

10  Donald and Shelly have been married for nearly 59 years, since 1955. T.T. 7/9/14, 54:3-4,

11  80:14-16. Shelly testified that she has been concerned about her estranged husband's health for

12  three years. T.T. 7/9/14, 83:17-20. They have been living separately for at least a year but she

13  testified that she remains his "only" caregiver. T.T. 7/9/14, 86:5-8.

14  Another person who claimed to be Donald's caregiver was Ms. V. Stiviano. In September

15  2013, Donald and Ms. Stiviano had a private conversation in her living room which, without

16  Donald's knowledge or consent, was illegally recorded and released to the public in violation of

17  his California constitutional right to privacy, and seven months later, was heard around the world.

18  On or about December 9, 2013, Donald bought a home for $1.8 million in Ms. Stiviano's

19  name. *Sterling v. Stiviano*, Verified Complaint ¶ 15, Ex. A, filed Mar. 7, 2014, L.A. Superior

20  Court, BC53869 (Fruin, J.).[2]

21  On December 18, 2013, Donald and Shelly restated the Sterling Family Trust. Ex. 29.

22  Laura Zwicker of Greenberg Glusker was Shelly's attorney at that time. The Restatement changed

23  the Removal Provision from the prior trust instrument, and eliminated the procedure for a removed

24  trustee to be reinstated. *Compare* Ex. 29, ¶ 7.5.c *with* Ex. 4, ¶ XV B.3. Shelly testified that she

25

26

27  [2] Pursuant to Evidence Code § 452(d), the Court may take judicial notice of "[r]ecords of . . . any

28  court of this state."

-4-

**DONALD T. STERLING'S POST-TRIAL BRIEF**

Blecher Collins
Pepperman & Joye

1  was not concerned about Donald's mental health at the time they restated the Trust with Donald as

2  co-trustee. T.T. 7/10/14, 33:24-27.

3       In March 2014, Shelly sued Ms. Stiviano to recover gifts that Donald had purchased for

4  Ms. Stiviano. *Sterling v. Stiviano*, Verified Complaint filed Mar. 7, 2014, L.A. Superior Court,

5  BC53869 (Fruin, J.). On April 25 and 27, 2014, TMZ and Deadspin released recordings of the

6  illegally recorded private conversation between Donald and Ms. Stiviano. Shelly and Donald

7  were together in San Francisco at that time for Donald's 80th birthday and the playoff game

8  between the Clippers and the Golden State Warriors. T.T. 7/10/14, 35:24-25. Shelly did not

9  testify that she had any concerns about Donald's mental health in connection with the release of

10 the recordings. She did not publicly come to his defense that Donald was sick nor did she contact

11 the NBA to express any concerns about Donald's health during Commissioner Silver's

12 investigation. On April 29, 2014, Commissioner Silver fined Donald $2.5 million, banned him for

13 life, and stated that he would urge the NBA Board of Governors to terminate the current

14 ownership of the Clippers.

15      On May 11, 2014, Donald conducted an interview with Anderson Cooper, and it aired on

16 May 12. Ex. 17. Disclaiming any expertise as to Donald's mental state, Anderson Cooper

17 explained that he "spoke with Donald Sterling for more than an hour" and that Donald "did not

18 strike me as someone who is suffering from dementia." *Id.* at 18. "Donald Sterling, without

19 counsel there, without a P.R. team there, clearly had things he wanted to say." *Id.* Donald was

20 "very present" during the interview and when Anderson Cooper "skipped around on questions,"

21 Donald "would come back to questions I asked so he could finish his answers." *Id.* at 19. Mr.

22 Cooper added: "Certainly, if he had clear signs of dementia . . .it's not something I would allow an

23 interview to go forward with." *Id.*

24      Shelly and her lawyer, Mr. O'Donnell of Greenberg Glusker, vowed to fight for Shelly to

25 retain her 50% ownership in the Clippers. On or about May 13, they met with Commissioner

26 Silver in New York and, knowing that Donald—who is the longest-tenured NBA owner and has

27 never sold *any* property—would not sell the Clippers, they began plotting with the NBA to wrest

28 control of the team away from Donald. T.T. 7/914, 84:3-5. **This leads to secret Plan B.** By this

Blecher Collins
Pepperman & Joye

1   point, Shelly and Donald are separately represented by counsel and their interests are not aligned.

2   That same day, Shelly called Donald and urged him to undergo neurological testing.  Shelly

3   testified that her concern arose from Donald's Anderson Cooper interview.

4        From the outset, Donald has wanted to fight the NBA's maximum punishment against him

5   and the most severe in the history of the NBA.  T.T. 7/9/14, 64:20-26, 65:15-26, 67:2-3.  As

6   widely reported in the press, Donald refused to pay the NBA's $2.5 million fine on the grounds

7   that he did not violate the NBA's Constitution and Bylaws, and geared up to sue the NBA for

8   violation of Donald's rights.  On May 15, Donald's lawyer, Maxwell Blecher, wrote to the NBA:

> We reject your demand for payment because in the circumstances
> there has been no violation of Article 35A, warranting the
> punishment imposed under Article 24 or any other of the bases set
> forth in your demand, or any punishment at all.  Even if there were,
> the penalty violates Mr. Sterling's due process rights, both
> procedural and substantive.  *Accordingly, this matter will need to*
> *be adjudicated.*

13   Shelly contacted Dr. Platzer on May 15, and at Shelly's behest, Donald went to Cedars-

14   Sinai Medical Center on May 16, 2014 and underwent a CT scan and PET scan of his brain as a

15   diagnostic measure.  Ex. 7-8.

16        On May 19, 2014 at approximately 2:30 p.m., Dr. Platzer arrived, unannounced, and took

17   an 80-minute exam of Donald in his home.  Ex. 1 at 1, 5; T.T. 7/8/14, 78:17-18.

18        Immediately after Dr. Platzer diagnosed Donald with Alzheimer's, Dr. Platzer went to the

19   Polo Lounge with Donald's wife for a social interaction.  T.T. 7/7/14, 55:21-25.  When Donald

20   wanted to join them, Shelly and Dr. Platzer testified that he was not welcome and Shelly

21   "discouraged" it.  T.T. 7/7/14, 56:15-18.  And at some point that same day, Dr. Platzer spoke with

22   Shelly's attorneys and received a subsequent email from Mr. O'Donnell.  Ex. B17.  From the very

23   first day (May 19, 2014) that Dr. Platzer met with her "patient" Donald as his "treating physician,"

24   she was communicating with Shelly's lawyers, *with Shelly copied on the email*, about preparing,

25   divulging protected health information, and sending a "draft" letter to Mr. O'Donnell.  *Id.*  Shelly

26   was instrumental in setting up and carrying out secret Plan B.

27        Also on May 19, 2014, Commissioner Silver instituted the NBA's formal written charge

28   (the "Charge") against the Clippers, which consisted of Counts I-VI and approximately 1,000

-6-
**DONALD T. STERLING'S POST-TRIAL BRIEF**

Blecher Collins
Pepperman & Joye

1  pages of exhibits. Ex. 26.  Donald had **five** business days to file his Answer in order to avoid

2  losing ownership of his team.

3       *Shelly used these same five days to schedule Donald's medical examinations.*  It is

4  undisputed that neither Shelly, nor her lawyer, nor Dr. Platzer, nor Dr. Spar disclosed to Donald or

5  his attorneys that the purpose of the medical examinations was to determine Donald's capacity to

6  serve as co-trustee of the Sterling Family Trust.  Both doctors testified that added "anxiety" could

7  negatively affect his test performance.  T.T. 7/8/14, 37:4-17; 7/7/14, 53:9-15.  Yet neither doctor

8  accounted for the extreme stress, anxiety, and pressure Donald was under at the time of their

9  examinations due to the unprecedented pending NBA proceedings against him or the extraordinary

10  presence of his estranged wife at both examinations.

11       Dr. Spar testified he was contacted directly by Mr. O'Donnell on May 21, 2014 and was

12  asked to conduct an examination of Donald for the purpose of determining capacity with respect to

13  Donald's removal as co-trustee of the Sterling Family Trust.  T.T. 7/8/14, 31:7-22.  Shelly would

14  have this court believe that she asked *her lawyer* to contact Dr. Spar because she was concerned

15  about Donald's health—and not because of secret Plan B.  T.T. 7/10/14, 51:10-12, 51:26-27.

16  However, that contradicts Dr. Spar's testimony and what Mr. O'Donnell told the press: that they

17  were "scrupulously" following the Removal Provision when he contacted Dr. Spar at Shelly's

18  direction.  Mr. O'Donnell was quoted in a June 17, 2014 *Forbes* article entitled "How Rochelle

19  Sterling Got Donald Sterling's Medical Records to Claim Control of the Clippers":

20       At the time I contacted Dr. Spar at the direction of my client,
         Shelly Sterling, we were fully aware of section 7.5c of the trust
21       agreement signed by Donald Sterling.  Attorneys at Greenberg
         Glusker scrupulously followed the terms of this provision, which
22       authorized the release of Mr. Sterling's medical exams and reports
         for the purpose of securing the removal of an incapacitated trustee.
23       Any claim to the contrary is entirely without merit. .

24  T.T. 7/10/14, 57:18-21.  Dr. Spar indicated he wanted to conduct the exam later next week, but

25  Mr. O'Donnell urged him to do it the next day due to "time pressure."  T.T. 7/8/14, 32:11-25.  Dr.

26  Spar arrived at Donald's house, unannounced, on May 22, 2014 at 1:30 p.m. to perform a 50-

27  minute examination.  T.T. 7/8/14, 50:7, 73:5-6.  After the exam, Dr. Spar called Mr. O'Donnell to

28

Blecher Collins
Pepperman & Joye

1 | let him know that he found Donald incapacitated and that he would write the report and send it
2 | over to him by the next week. T.T. 7/8/14, 39:20-24.

3 |     On May 22, 2014, Shelly told Donald that she had met with Commissioner Silver, and
4 | Shelly promised Donald that she would negotiate with the NBA to sell the team **_only_** on the
5 | condition that she retain at least a 20% ownership. T.T. 7/9/14, 63:8-65:6. Relying on Shelly's
6 | representation, Donald authorized Shelly to negotiate on his behalf with the NBA "as an
7 | accommodation to her." Ex. 14; T.T. 7/8/14, 73:13-22; T.T. 7/9/14, 67:20-28. The May 22, 2014
8 | letter does not provide Shelly with Donald's power of attorney to consummate a sale or authorize
9 | her to negotiate with anyone other than the NBA.

10 |     The next day, on May 23, the NBA set forth the procedures for the June 3 hearing for the
11 | NBA Board of Governors to vote on the NBA's Charge against LAC Basketball Club, Inc. and the
12 | termination proceedings.

13 |     Between May 24-28, Shelly, without Donald's cooperation or involvement, worked with
14 | the NBA to solicit bids. The entire time secret Plan B was in the works. Shelly's expert Anwar
15 | Zakkour testified that he heard Shelly and her lawyers discussing Plan B as early as Monday, May
16 | 26, 2014. T.T. 7/22/14, 85:19-25. Shelly unilaterally accepted Mr. Ballmer's $2 billion offer and
17 | negotiated perks and benefits for herself to Donald's detriment. Ex. 3.

18 |     On May 27, 2014, Donald and Shelly separately filed Answers to the NBA Charge.

19 |     Also on May 27, 2014, Dr. Spar drafted a letter concerning his findings of Donald's
20 | examination and sent it directly to Mr. O'Donnell. Ex. 6.

21 |     On May 29, 2014—the same date of the BTS and Donald's refusal to sell the Clippers—
22 | Dr. Platzer signed a "Physician's Certification of Trustee's Incapacity" prepared by Shelly's
23 | lawyers with Greenberg Glusker's document number at the bottom of the page. Ex. 1. Using
24 | identical phrasing, both doctors conclude that Donald's "score is below normal for his age and
25 | advanced education." Exs. 1, 6.

26 |     On May 29, 2014, Donald refused to accept the terms of the deal with Mr. Ballmer to
27 | which Shelly had unilaterally agreed. Neither Sterling retained any ownership interest under
28 | Shelly's proposed deal. Ex. 3.

Exhibit D
Page 88

Blecher Collins
Pepperman & Joye

Thirty minutes later, Mr. O'Donnell notified Shelly that Donald had been deemed incapacitated and removed as trustee of the Sterling Family Trust (of which Donald had been the trustee since 1998). T.T. 7/10/14, 22:10-14. Donald's intimately personal confidential medical records were immediately leaked to the press, and Donald's private health records became widespread news. Shelly showed no remorse at trial for leaking Donald's private medical information records to the public or press.

Later that evening, Shelly and Mr. Ballmer signed the BTS, Shelly acting in her own self-interest and against the known and stated interest of her husband of 58 years and Clippers owner of 33 years. Ex. 3.

On May 30, 2014, Donald, faced with the imminent prospect of the NBA's confiscation of his team, filed a $1 billion lawsuit against the NBA with respect to the termination proceedings, lifetime ban, and $2.5 million fine for violation of his privacy rights under the California Constitution, antitrust, and other claims. *Sterling v. NBA* Complaint, CV-14-4192, C.D. Cal., filed May 30, 2014 (Olguin, J.).[3]

That same day, Shelly entered into a settlement agreement with the NBA in which she purports to indemnify the NBA on behalf of herself and the Sterling Family Trust—with complete disregard for Donald's welfare, dignity, or desire to fight the NBA to maintain ownership and economic opportunity. Ex. 44. When asked why she would want to take away Donald's right to sue the NBA, Shelly testified that she did not understand the indemnification. T.T. 7/10/14, 72:26 She similarly testified that she did not understand antitrust (T.T. 7/10/14, 71:19), even though she was married to Donald at the time the Clippers previously successfully used the antitrust laws to prevent the NBA from interfering with the Clippers' relocation from San Diego to Los Angeles. *See* T.T. 7/9/14, 52:3-53:15.

Shelly also incredulously testified that she never thought Donald would sue or not agree to the sale (T.T. 7/10/14, 70:10-11, 72:7-9), even though it was widely reported that Donald intended

---

[3]   Pursuant to Evidence Code § 452(d), the Court may take judicial notice of "[r]ecords of (1) any court of this state or (2) any court of record of the United States or of any state of the United States...."

1    to sue and fight the NBA proceedings. As his wife and "only" caregiver, she should have known

2    (and her lawyers certainly did know) that Donald had been preparing the complaint that was filed

3    on the same day that she tried to take away his right to sue.

4        On June 4, 2014, the NBA suggested that "all outstanding issues" between the NBA and

5    Donald would be resolved if Donald consented to the sale. T.T. 7/9/14, 66:1-27. However, by

6    June 8, Commissioner Silver reversed course and, during a press conference, stated that there was

7    no possibility that the ban or fine would be rescinded. T.T 7/9/14, 68:6-11.

8        On June 5, 2014, Mr. O'Donnell wrote the following letter to Mr. Schield, Mr. Walton,

9    and All Employees of Beverly Hills Properties, with a "cc" to Shelly, which further evidences

10   Shelly and her attorneys' disregard and disrespect for Donald.

11               We represent Shelly Sterling, the sole Trustee of The Sterling
                 Family Trust. This letter will put you on notice that Donald
12               Sterling has been removed as a Trustee and Shelly Sterling is the
                 only person authorized to act on behalf of The Sterling Family
13               Trust and all of its assets, including Beverly Hills Properties. Until
                 further notice, you are instructed not to write any checks and/or
14               transfer any funds or other assets at the request of Donald Sterling.
                 Any financial transactions must be expressly authorized by Shelly
15               Sterling. Anyone who disobeys this instruction will be subject to
                 immediate termination.
16
     Ex. F; T.T. 7/9/14, 68:14-70:2.
17
18       On June 9, 2014, Donald revoked the Sterling Family Trust. Ex. 45; T.T. 7/9/14, 70:3-13.

19   Shelly concedes that the revocation was effective and that Donald had sufficient capacity to

20   revoke the Sterling Family Trust. Two days later, on June 11, 2014, Shelly filed the Petition in

     this Court.
21
22   **B.    Trial Testimony and Evidence**

23   **1.    Dr. Cummings' Testimony on the Standard of Care**

     Dr. Cummings[4] testified as to the unusual circumstances surrounding the doctors'
24
     examinations, including the distractions and stress of Shelly's presence during both examinations.
25
26       Dr. Cummings opined that "... there are standards with regard to the mental status

27   examination and how it's optimally conducted. And one would not conduct it in the presence of

28   _____
     [4] Dr. Cummings' CV is Exhibit L.

Blecher Collins
Pepperman & Joye

1   other people who might have a distracting influence." T.T. 7/23/14, 11:19-23.  As to a doctor

2   disclosing to his patient the purpose of a mental evaluation, Dr. Cummings testified that in his

3   view there is an accepted standard of care with respect to the physician's disclosure to the patient

4   in respect to the conduct of the examination and that "... a professional examination includes

5   disclosure as to the purpose of the assessment." T.T 7/23/14, 17:14-18.

6   THE OPTIMAL MENTAL STATUS EXAMINATION IS
    CONDUCTED WHEN THE PATIENT IS NOT DISTRACTED

7   AND IS ABLE TO CONCENTRATE FULLY ON THE TASK
    AT HAND AS POSED TO BY THE EXAMINER. (*Id.*, 8:17-20.)

8   * * *

    THE STANDARD OF CARE FOR A MENTAL STATUS

9   EXAMINATION REQUIRES THAT THE PATIENT BE ABLE
    TO ATTEND FULLY AND COMPLETELY TO THE THINGS

10  THAT ARE ASKED OF THE EXAMINER. (*Id.*, 9:8-11.)
    * * *

11  I THINK THE WORD "DISTRACTION" AND AN INABILITY
    TO ATTEND TO THE TASK THAT WERE REQUESTED

12  DURING THE MENTAL STATUS EXAMINATION IS THE
    MOST KEY THING THAT I WOULD EMPHASIZE IN TERMS

13  OF DOING MY OWN MENTAL STATUS EXAMINATION.
    (*Id.*, 10:25-11:1.)

14  * * *

    Q.  DOES  MR.  STERLING'S  REQUEST  THAT  MRS.

15  STERLING  BE  PRESENT  FOR  THE  EXAMINATION
    MITIGATE OR CHANGE ANY OF YOUR TESTIMONY

16  ABOUT HER BEING PRESENT BEING INAPPROPRIATE?
    A. NO, IT DOES NOT.

17  Q. SO DESPITE WHAT HE WOULD HAVE WANTED OR
    REQUESTED, YOU THINK HER PRESENCE WAS AN

18  UNNECESSARY DISTRACTION, STRESS, SLASH, STRESS?
    A. YES, I DO. (*Id.*, 26:16-23.)

19  * * *

    THE FACT THAT WE ARE IN THIS COURT WORKING ON

20  THIS PROBLEM, WHICH SEEMS TO BE BETWEEN THEM,
    SUGGESTS TO ME THAT THERE WAS A STRESS IN THE

21  RELATIONSHIP. (*Id.*, 13:9-11.)
    * * *

22  I THINK A PROFESSIONAL EXAMINATION INCLUDES
    DISCLOSURE AS TO THE PURPOSE OF THE ASSESSMENT.

23  (*Id.*, 17:17-18.)
    * * *

24  YOU ARE TRYING TO DEVELOP A RAPPORT, A TRUST
    WITH THE PATIENT. THEY NEED TO TRUST YOU AND

25  THEY NEED TO UNDERSTAND WHY IT IS THAT YOU'RE
    ASSESSING THEM. THIS WOULD BE PART OF EVERY

26  MENTAL STATUS EXAMINATION. (*Id.*, 17:21-24.)
    * * *

27  I COULD TELL FROM THE DIFFERENCES BETWEEN THE
    EXAMINATIONS THAT IT WAS LIKELY HE WAS

28  DISTRACTED. (*Id.*, 22:25-26.)

-11-

DONALD T. STERLING'S POST-TRIAL BRIEF

Blecher Collins
Pepperman & Joye

## 2.  Donald's CT Scan

The CT scan findings show "**mild** diffuse cortical deep atrophy with **mildly** enlarged cortical sulci, ventricles and basilar cisterns of a **mild** degree." The CT scan impression states: "**Mild** atrophy." Dr. Spar testified that the "CT scan was unremarkable." T.T. 7/8/14, 31:23-24.

## 3.  Donald's PET Scan

The PET scan findings show "moderate cortical atrophy" and "reductions of a moderate degree in the bilateral parietal lobes" while the "basal ganglia and thalamic nuclei" and "cerebellar hemispheres are both "symmetric and within normal limits." The PET scan impression states: "The findings suggest the process is relatively **mild** at this time."

## 4.  Dr. Platzer's Relationship with Shelly, Her Examination of Donald, and Privacy Concerns

Dr. Platzer testified that she was contacted by Shelly on May 15, 2014, and Shelly said she was very worried about Donald and his memory issues. T.T. 7/7/14, 40:26-27. After speaking on the phone with Shelly, Dr. Platzer arranged for Donald to have a CT scan and PET scan at Cedars-Sinai Medical Center. *Id.*, 41:6-8; T.T. 7/9/14, 15:21. At no time on May 15, 2014 did Dr. Platzer speak with Donald. T.T. 7/8/14, 15:22-24.

After the radiologist at Cedars-Sinai, Dr. Alan Waxman, transmitted the results to Dr. Platzer on May 16, 2014, Dr. Platzer contacted Shelly to set up an appointment with Donald for Monday, May 19, 2014 in his home. *Id.*, 16:11-15; T.T. 7/9/14, 32:23:24. Donald had no knowledge that an appointment was scheduled with Dr. Platzer at his home until she arrived at his house. Dr. Platzer testified that Donald was her patient from May 16 until June 9, 2014. T.T. 7/8/14, 24:20-25:1; T.T. 7/9/14, 14:24-27. Additionally, Dr. Platzer testified that she billed Donald's insurance for his medical services. T.T. 7/8/14, 8:10-18.

On May 19, 2014, unannounced, at approximately 2:30 p.m., Dr. Platzer arrived at Donald's home and took an 80-minute exam of Donald in his home with Shelly present. T.T. 7/7/14, 49:15-16. Prior to the examination, Shelly, not Donald, completed and signed the

Exhibit D
Page 92

1  notification of patient rights. Ex. A6.  During the examination, Dr. Platzer took a medical history

2  but she did not inquire into Donald's businesses or his foundation. T.T. 7/8/14, 22:4-11.

3          Dr. Platzer's notes state: "Mrs. Sterling states that her husband has had memory issues at

4  least 3 years perhaps longer 5 years but was never evaluated for this problem." *Id.* As to

5  Donald's mental status during the exam, Dr. Platzer notes: "Good eye contact," "fluent" speech,

6  Donald "knew the month day of the week and year" and "oriented to the city county and state."

7  *Id.* at 2. She notes the CT scan shows "**mild**" atrophy and the PET scan shows "moderate"

8  atrophy and "**mild** to moderate" reductions, and the results match "mild to moderate

9  Neurodementia of the Alzheimer's type." *Id.* at 3-4. Dr. Platzer testified that "the caregiver

10  information is very important." T.T. 7/7/14, 55:2-3.

11          Dr. Platzer testified that when she met with Donald on May 19, 2014, ***there was no***

12  ***indication that her evaluation was part and parcel to anything related to capacity in a trust or***

13  ***Donald's capacity to be a trustee.*** T.T. 7/8/14, 42:15-19; T.T. 7/9/14, 6:7-15, 36:20-28. Further,

14  Dr. Platzer testified that she only did a neurological evaluation and not an evaluation to determine

15  whether Donald had capacity to serve as a co-trustee of his trust because at that time Dr. Platzer

16  was not aware of the Sterling Family Trust. T.T. 7/8/14, 21:12-20. She further testified that she

17  had no knowledge of secret "Plan B" to forcibly remove Donald as a co-trustee of his trust. T.T.

18  7/9/14, 6:26-7:2. Dr. Platzer testified that Donald's medical file contained both "sensitive" and

19  "protected health information." *Id.*, 13:3-8. Dr. Platzer testified that she had no knowledge of the

20  Sterling Family Trust until May 23, 2014.

21          After Dr. Platzer concluded her evaluation of Donald, Dr. Platzer went to the Polo Lounge

22  with Shelly to further discuss Donald's diagnosis. ***However, according to Dr. Platzer's file, she***

23  ***received a telephone call and email from Mr. O'Donnell that same day.*** Ex. B18. Dr. Platzer

24  testified that the email was sent to her and to Shelly on May 19, 2014. T.T. 7/9/14, 10:15-21. The

25  email from Mr. O'Donnell with a time stamp of 6:28 p.m. to Dr. Platzer, ***with a copy to Shelly***,

26  states: "Dear Dr. Platzer, it was nice speaking with you today" and it continues with Mr.

27  O'Donnell providing his cell phone number to Dr. Platzer and requesting a "draft" of her letter.

28  Ex. B18. But Dr. Platzer has no recollection about her conversation with Mr. O'Donnell on May

-13-
**DONALD T. STERLING'S POST-TRIAL BRIEF**

Blecher Collins
Pepperman & Joye

1    19, 2014.  T.T. 7/9/14, 10:24-11:16.  Dr. Platzer testified that she made no phone calls and

2    received no phone calls during her examination of Donald or afterwards at the Polo Lounge;

3    therefore, the conversation with Mr. O'Donnell had to have occurred *prior* to her examination of

4    Donald.

5            To continue the cover-up, Dr. Platzer testified that she had no knowledge of any

6    communications with Mr. O'Donnell on May 19, 2014.  She finally admitted that she received

7    communications from Mr. O'Donnell on the day of Donald's examination.  She could not

8    remember the conversation she had with him.

9            Q.      Did you call anybody before you got to the Polo
             lounge?
10           A.      No.
             . . . .
11           Q.      Did anybody call you?
             A.      No.
12           Q.      Did you talk to anybody on the telephone?
             A.      I don't recall that I called anyone on the
13           telephone.  I doubt it.

14   T.T. 7/9/14, 8:1-3, 8-12.  Dr. Platzer testified that on May 20, 2014, without any documentation,

15   she disclosed to Mr. O'Donnell that Donald was her patient, such disclosure being individually

16   identifiable protected health information.  *Id.,* 14:7-9.

17           From the very first day that Dr. Platzer met with her "patient" Donald as his "treating

18   physician" on May 19, 2014, Dr. Platzer was communicating with Shelly's lawyers about

19   preparing and sending a "draft" letter to Mr. O'Donnell.  She testified that she was first contacted

20   on May 23, 2014.  T.T. 7/8/14, 12:15-23.  Here, Dr. Platzer's records show that she was working

21   with and for Shelly's attorneys from the very outset of "Plan B."

22           Over the course of the next 10 days, Dr. Platzer spent substantial time "discussing case

23   with attorney Ms. Laura Zwicker and Mr. O'Donnell and writing examination report and writing a

24   letter of competence related to the Sterling Family Trust" and "[d]iscussion with attorney Ms.

25   Laura Zwicker . . . prior to composing letter for the trust."  Ex. B17-18.

26           On May 21, 2014, Mr. O'Donnell advised Dr. Platzer: "Mrs. Sterling is concerned that her

27   husband no longer has capacity to prudently carry out the numerous duties imposed by the trust

28   instrument and by state law on a trustee, especially given the extraordinary value and complexity

-14-
**DONALD T. STERLING'S POST-TRIAL BRIEF**

Blecher Collins Pepperman & Joye

1  of the assets held by the Trust . . . must. . . be removed as a trustee in order to safeguard the assets

2  and interests of the beneficiaries of the Trust . . ." Ex. A55-56.

3       On May 23, 2014, Shelly's attorney, Ms. Zwicker, similarly provided Dr. Platzer with a

4  sample certificate in a form to follow: "If it is not possible to complete your report today, would

5  you feel comfortable providing a certificate in a form similar to the attached." Ex. A30.  Even

6  though she was ordered to produce all of her records, Dr. Platzer testified that she did not produce

7  the form certificate.  It appears that the form provided by Ms. Zwicker is the certificate signed by

8  Dr. Platzer on May 29, 2014 with the Greenberg Glusker document number on the page.

9       Dr. Platzer also expressed serious reservations about sharing Donald's private medical

10  records, which Mr. O'Donnell referred to as dealing with a "headache." Ex. B17.  On May 21,

11  2014, after Dr. Platzer requested documentation from Mr. O'Donnell and Ms. Zwicker that

12  authorized her to release Donald's medical information, Mr. O'Donnell sent an email to Dr.

13  Platzer and Ms. Zwicker asking "How do we deal with this latest headache?" T.T. 7/9/14, 17:2-

14  13; Ex. B21.  Later that day, an email was sent with an attached letter from Mr. O'Donnell to Dr.

15  Platzer. Ex. A55.  The letter misrepresents the provisions of the Sterling Family Trust and

16  oversimplifies the purported "waiver" language. *Id.* Mr. O'Donnell did not send Dr. Platzer the

17  terms of the Removal Provision under section 7.5.c of the Sterling Family Trust. T.T. 7/9/14,

18  19:2-5.

19       Dr. Platzer testified that after spending significant time discussing the trust with Shelly's

20  lawyers and reviewing the trust provision, she ultimately concluded that the trust provision

21  provided a waiver that allowed her to share Donald's medical records with Shelly's lawyers. ***Dr.***

22  ***Platzer never discussed the fact that she prepared a report based on her prior medical***

23  ***examination that she now understood was intended to disqualify her patient, Donald, as a co-***

24  ***trustee of the Sterling Family Trust***. T.T. 7/8/14, 23:28-24:1-4.

25       On May 29, 2014—the same date of the BTS and Donald's refusal to sell the Clippers—

26  Dr. Platzer signed a "physician's certification of trustee's incapacity" prepared by or in

27  conjunction with Shelly's lawyers. Dr. Platzer states that Donald is "suffering from cognitive

28  impairment secondary to primary dementia Alzheimer's disease" and states that the PET scan was

Blecher Collins
Pepperman & Joye

-15-
DONALD T. STERLING'S POST-TRIAL BRIEF

1   "positive for moderate reductions" in the anterior mesial regions of the temporal lobes and

2   bilateral parietal regions right greater than left."

3        Unequivocally, Dr. Platzer testified that she never discussed the release of Donald's private

4   and confidential medical records with Donald even though she knew that releasing such

5   information was in conflict with her patient's interests. T.T. 7/9/14, 20:6-11, 21:17-26; 29:17-22.

6   Dr. Platzer did not discuss with Donald or his attorneys the release of Donald's confidential

7   medical records —but instead discussed that with Shelly's attorneys. Based upon their

8   representation and solely on the purported "waiver" in the Sterling Family Trust (which by its

9   terms is not an effective waiver under the stringent requirements for waivers under HIPAA or

10   CMIA), Dr. Platzer released Donald's private and confidential medical records to third parties.

11   *Id.*, 34:22-25, 44:19-21.

12        **5.**     **Dr. Spar's Relationship with Mr. O'Donnell, Examination of Donald,**

13              **and Disclosure of Donald's Private Medical Information**

14        Dr. Spar made clear that he was working for Shelly and her lawyers from the outset to

15   implement secret Plan B. Dr. Spar actually testified that Donald was not his patient. He was hired

16   with a predetermined objective.

17        On May 21, 2014, Dr. Spar testified he was contacted by Mr. O'Donnell and was asked to

18   conduct an examination of Donald. T.T. 7/8/2014, 31:9. Dr. Spar indicated he wanted to conduct

19   the examination later next week, but Mr. O'Donnell urged him to do it the next day. *Id.*, 32:12-32.

20   Dr. Spar testified that he arrived at Donald's house on May 22, 2014 at 1:30 p.m. and performed a

21   50-minute examination with Shelly present. Dr. Spar did not ask Donald for permission to write a

22   report about him. *Id.*, 50:1-21. Dr. Spar did not ask Donald anything about his business

23   operations. *Id.*, 51:4-6. Dr. Spar did not take a complete medical history. *Id.*, 51:9-10. Dr. Spar

24   conceded that Donald was distracted and preoccupied by a meeting with his attorneys in the other

25   room, that Donald exerted "a possibly less-than-optimal effort," and "on some of the test items he

26   tended to 'give up' easily," even stating "I don't want to do it" and "I have to get back to my

27   meeting" and that he did not finish the exam. Ex. 6. This is consistent with Dr. Cummings'

28   testimony that outside "stress" could produce a suboptimal performance. It is undisputed that

**DONALD T. STERLING'S POST-TRIAL BRIEF**

Blecher Collins
Pepperman & Joye

1  Donald was under extreme stress because of the five-day window to respond to the unprecedented

2  NBA charge to confiscate his team coupled with the fact that he was the center of a media

3  firestorm.

4       After the exam, Dr. Spar dutifully called Mr. O'Donnell to let him know that he found

5  Donald incapacitated and that he would write the report and send it over to him by next week. *Id.*,

6  58:25-28.

7       On May 27, 2014, Dr. Spar drafted a letter concerning his findings of Donald's

8  examination and sent it directly to Mr. O'Donnell. Dr. Spar's letter states that Donald was "well

9  dressed and groomed, alert and in no distress," "his mood was generally euthymic and his affect

10  was **appropriate** in direction and degree. There were **no abnormalities** of the form, flow or

11  content of thought, and his psychomotor behavior was entirely **within normal** limits." Ex. 6

12  (emphasis added). Donald scored 24/29, and had Dr. Spar asked and had Donald properly

13  answered "what floor are we on" that score would have been 25/30—within normal range. *Id.*

14  Donald's "naming was **intact**," his "recall of remote, interpersonal events and information was

15  **mildly to moderately** impaired. His frontal executive function as reflected by clock drawing was

16  **within normal** limits; as reflected by similarities and word list generation was **mildly impaired**."

17  *Id.* Dr. Spar's concludes that Donald is "suffering from **mild** global cognitive impairment, with

18  relatively greater impairment in memory and frontal executive functions." *Id.*

19       Although *Dr. Spar's letter refers to his examination as a "second opinion,"* Dr. Spar

20  testified that he did not know there was a prior opinion, and thought that referred to the PET scan.

21  T.T. 7/8/14, 61:11-18.

22       Dr. Spar admitted that the PET scan and CT scan constitute protected health information.

23  *Id.*, 54:9-12. Dr. Spar did not request from Donald or his attorneys any written authorization for

24  disclosure of his protected health information. *Id.*, 56:17-20. Dr. Spar never even received or

25  reviewed the waiver provision. He simply trusted Shelly and her lawyers. To this date, despite

26  asking Mr. O'Donnell to send him the trust language where Donald waived his federal and state

27  medical and mental health privacy rights, Dr. Spar has never seen the trust language other than a

28  little excerpt in *Forbes* online. *Id.*, 51:13-22. Dr. Spar admitted that UCLA compliance officers

-17-

**DONALD T. STERLING'S POST-TRIAL BRIEF**

Blecher Collins
Pepperman & Joye

1   advised him that he "may not have been in compliance with" HIPAA. *Id.*, 53:15. It is undisputed

2   that Dr. Spar was a hired gun.

3          **6.    Donald's Trial Testimony**

4         Donald was never informed that the purpose of the examinations was to determine his

5   capacity under the Removal Provision of the Trust. T.T. 7/8/14, 89:6-17; T.T. 7/9/14, 56:11-23,

6   57:10-13, 57:26-58:7. Donald trusted his wife when she represented that the examinations were

7   "routine" medical examinations for his 80th birthday. *Id.*; T.T. 7/9/14, 56:6-10. Donald did not

8   provide informed consent, he was not able to consult his attorneys, he was not able to schedule the

9   appointments at a convenient time when he was not under enormous stress and time-sensitive

10   deadlines. He was deprived of the opportunity to cooperate in the choosing of independent and

11   impartial doctors.

12          Q.  Okay. Now, were you told before you were examined by Dr.

13          Spar and Dr. Platzer -- were you told that the purpose of the examination was to see if you were competent to remain as a trustee?

14          A.  Absolutely not. Neither of them told me any reason they were

15          there. I trusted my wife. It was my 80th birthday and she said: At this stage in your life you should be examined. She sent me for a

16          .heart exam, and then she said these two doctors are coming in. It's a routine exam for your 80th birthday so you'll live and be happy

17          and we can live together. I didn't know that these were two people who were adversaries and came in to examine me and were hired

18          guns who were going to testify against me.
           . . .

19          Q.  If you had been told, sir, that the purpose of the examination was to determine whether you were competent to stay as a trustee,

20          would you have submitted to the examination?
          A.  Do you think any first-year law student would let the adversary

21          examine you on the capacity hearing?

22   T.T. 7/8/14, 89:5-26. Donald testified that he purchased the team. T.T. 7/9/14, 52:3-53:14.

23   Donald testified about the five areas of assets in the Sterling Family Trust and his involvement in

24   every area. T.T. 7/8/14, 89:28-90:1, 93:15-17; T.T. 7/9/14, 47:24-26, 48:2, 54:5-18, 72:17-75:22.

25   First, he has a charitable foundation, the Sterling Charitable Foundation, supporting 50 charities,

26   and Donald knows how much is contributed to each charity. T.T. 7/9/14, 72:24-73:10. Second,

27   he has a real estate empire of approximately 200 buildings, 10,000 apartments and some homes

28   and the Clippers practice facility, all of which Donald has acquired and negotiated and managed

Blecher Collins
Pepperman & Joye

1  the mortgages for, never missing a payment or selling anything. T.T. 7/9/14, 50:28, 73:11-74:20.

2  Third, he has owned the Clippers for 33 years, negotiating coaches' and players' contracts. T.T.

3  7/9/14, 74:21-26.  Fourth, Donald has a professional law corporation and a continuously active bar

4  number (#31124) for over 50 years, dating back to 1961. T.T. 7/9/14, 75:1-15.  Fifth, he has a

5  stock portfolio, and Donald selects the stocks and bonds. T.T. 7/9/14, 75:21-22.

6        In fighting to keep the Clippers, Donald explained that he is motivated by economics, not

7  ego: "I'm trying to generate as much success for my trust as I can." T.T. 7/8/14, 97:5-28.  The

8  Clippers are negotiating a new TV deal, and Donald testified that he expected it would be

9  comparable to the Lakers $3 billion TV deal.  Also, given the Clippers' success, several radio

10  stations are offering a "substantial fee."  *Id.*, 97:14-22, 103:4-22.

11        **7.    Shelly's Trial Testimony**

12        Shelly confirmed that she almost always set up Donald's medical appointments and acted

13  as his caregiver. T.T. 7/9/14, 86:3-27.  It is curious that Shelly had *her lawyers* schedule a second

14  opinion with Dr. Spar, who testified that he was solely hired for the purpose of preparing a letter

15  for Donald's removal as co-trustee from the Sterling Family Trust. 7/10/14, 51:23-52:6.

16        Shelly testified that she had no knowledge of "Plan B" and that she did not know about the

17  Removal Provision (¶ 7.5.c) in the Sterling Family Trust until May 29, 2014 after Donald refused

18  to sell the Clippers to Mr. Ballmer. *Id.*, 22:10-16, 53:21-23.

19        Q. WHEN DID YOU FIRST BECOME AWARE OF THE TRUST'S
         REMOVAL PROVISION?
20        A. WHEN YOU HANDED ME THE PAPER.
         Q. ON MAY 29?
21        A. YES, WHEN HE WOULDN'T SIGN.
         * *
22        Q. MRS. STERLING, HAVE YOU HEARD THE TERM "PLAN B"?
         A. NO, I HAVE NOT.
23        Q. YOU NEVER HEARD OF PLAN B?
         A. NO.  WHAT'S PLAN B?
24        * * *
         Q. HE DID NOT SAY THAT?
25        A. NO.  HE GAVE ME A PAPER A LITTLE LATER, MAYBE A
         HALF HOUR LATER,  AND HE SAID, "WOULD YOU SIGN THIS TO
26        REVOKE HIM FROM THE TRUST," AND I SAID YES.

27  *Id.*, 22:10-16, 53:21-54:21.

28

**DONALD T. STERLING'S POST-TRIAL BRIEF**

Blecher Collins
Pepperman & Joye

1    This statement is wholly inconsistent with actions taken by Shelly, Donald's doctors who

2    were hired by Shelly, Mr. O'Donnell and Ms. Zwicker, Shelly's attorneys and agents.  Ex. A30,

3    B17-18.  This statement is also refuted by the testimony of Anwar Zakkour, Shelly's financial

4    adviser and expert witness, who testified that he heard Shelly and her attorneys discussing secret

5    Plan B as early as May 26, 2014.  T.T. 7/22/14, 85:19-25, 86:1, 4-6.

6        Shelly would have this court believe that the first time that she was made aware that she

7    could act as the sole trustee of the Sterling Family Trust was by Mr. O'Donnell, her attorney, on

8    May 29, 2014 *after* Donald refused to sell the Clippers to Mr. Ballmer.  T.T. 7/10/14, 54:11-13.

9    Shelly also stated that at that time she did not know that the examinations of Dr. Platzer and Dr.

10   Spar were going to be used as a basis for removal of her husband as trustee.  *Id.*, 54:14-21; 73:19-

11   21, 74:3-9.  Shelly cannot be trusted.  Her credibility is entirely lacking and her story is

12   contradicted by the facts.  She was copied on the May 19, 2014 email from Mr. O'Donnell to Dr.

13   Platzer (Ex B17) and she and her attorneys were placed in the Greenburg & Glusker conference

14   room on May 26, 2014, discussing Plan B.  T.T. 85:19-25, 86:1, 4-6.

15       Shelly repeatedly stated that, when she and her attorneys arranged for the two doctors to

16   come to Donald's house for his medical examinations, *it was not for purposes of the trust*:

17           **I was concerned for his health, not for anything else.  I had no
             other purpose in mind.**
18
19   T.T. 7/10/14, 52:18-20.  Shelly testified that she had "no idea" why her attorney asked Dr. Spar to

20   prepare a report.  *Id.*, 53:1-3.

21       Shelly never talked about the trust's Removal Provision with either Dr. Spar or Dr. Platzer.

22   *Id.*, 10:5-10; 23:26-27:1-4.  Shelly did not disclose to Donald that the purpose of the medical

23   examinations was to remove him as co-trustee of their trust.  *Id.*, 9:4-7.  In connection with setting

24   up Dr. Spar's examination, Shelly testified that she told Donald "that [they] are getting a second

25   opinion" because she was "worried about [Donald] and [she] wanted to make sure that the

26   diagnosis that [she] had gotten before was correct."  *Id.*  Shelly testified that she was unaware that

27   her attorneys were consulting with Dr. Platzer and Dr. Spar about the report she hired them to give

28   concerning Donald.  *Id.*, 48:2-8.  Nor was Shelly aware that Dr. Platzer was billing her for services

Blecher Collins
Pepperman & Joye

1  after Dr. Platzer conducted the medical examination of Donald. *Id.*, 48:20-27; 49:1. Nor was

2  Shelly aware that her attorney and agent, Mr. O'Donnell, requested Dr. Spar to evaluate Donald

3  for trust purposes, and not out of concern for Donald's wellbeing. *Id.*, 50:7-15.

4      Shelly was copied on the May 19, 2014 email from Mr. O'Donnell to Dr. Platzer but

5  denied having any knowledge of the telephone call between Mr. O'Donnell and Dr. Platzer that

6  day. T.T. 7/10/14, 42:16-43:9. According to Shelly, she did not know that her attorney contacted

7  Dr. Platzer on May 19, 2014 until Dr. Platzer took the stand. *Id.* When asked if she found it

8  unusual that her lawyers were talking to the doctor that she retained because she was concerned

9  about Donald's mental health, Shelly avoided answering the question. *Id.*, 43:14-26.

10      **8.**    **No Evidence During Trial Testimony Relating to *Probate Code* section**

11      **1310(b) of Immediate or Imminent Injury or Loss to Person or**

12      **Property**

13      No evidence was offered that meets the strict requirement that the risk of injury or loss to

14  person or property be extraordinary or imminent.

15      Darren Schield, the Chief Financial Officer of Beverly Hills Properties, a dba of both of the

16  Sterlings, testified that the Sterlings owned real properties worth approximately $2.5 billion

17  subject to $480 million in debt. T.T. 7/21/14, 22:18-20. The debt in terms of mortgages and lines

18  of credit are with three different banks: Union Bank, Bank of America, and City National Bank.

19  *Id.*, 7:23-28. He testified that he had ***not*** received an actual Notice of Default from any of the three

20  lenders. *Id.* 20:16-23. Mr. Schield was unable to testify about whether the mortgages or lines of

21  credit were in jeopardy as a result of the revocation of the Sterling Family Trust. *Id.*, 21:10-15.

22  He responded, "That would be a question for our bankers." *Id.*, 21:15. He testified that if there

23  was an actual notice of default issued by the lenders, the Sterlings would be afforded the

24  opportunity to cure the default by borrowing from other lenders, borrowing from private lenders,

25  or taking the company public. *Id.*, 22:10-13, 24:2-6.

26      Shelly offered Mr. Schield's testimony for the proposition that, if the mortgages and line of

27  credit are called, Beverly Hills Properties will have no choice but to sell some of its real estate

28  holdings. This argument ignores the Sterlings' other holdings outside of this entity, including their

-21-
**DONALD T. STERLING'S POST-TRIAL BRIEF**

Blecher Collins Pepperman & Joye

1   stock and bond portfolio.  Mr. Schield was unable to state with certainty that if real estate holdings

2   were sold to cure the default that they would be sold for less than fair market value.  *Id.*, 18:23-28.

3   At most he was only able to speculate.

4        Mr. Schield did not testify about any immediate or irreparable harm to person or property

5   as a result of the revocation of the Sterling Family Trust.  The only damage he testified to was a

6   potential financial risk of a higher interest rate if new loans were obtained.  *Id.*, 22:25-23:2.

7        Richard Parsons, the interim Chief Executive Officer of the Clippers, testified that the

8   Clippers are a "trophy asset" and that there is no way to get to the $2 billion dollar price tag on a

9   "financial metric basis" (T.T. 7/22/14, 9:26-10:8), making the totality of his and Anwar Zakkour's

10  testimony on the topic of valuation of the Clippers irrelevant.  Mr. Parsons testified that "it's not a

11  financial transaction . . . it's like buying a Faberge egg."  *Id.*, 10:1-4.  "Its value is to the person

12  who wants to own it, who wants to acquire it because you can't get there on the numbers."  *Id.*,

13  10:4-7.  Most poignantly and to the issue of *Probate Code* section 1310(b), Mr. Parsons

14  unequivocally testified that if the sale of the Clippers to Mr. Ballmer was not approved, as he was

15  informed by Commissioner Silver, the NBA would quickly and swiftly move to reinstitute their

16  proceedings to remove Donald as an owner from the NBA.  *Id.*, 10:19-26.  This evidence alone

17  demonstrates that there will be no irreparable or immediate loss to Shelly if this Court does not

18  grant Shelly's Petition or her request for an exception to the stay provision.  If the prophesy of Mr.

19  Parsons' "death spiral" comes true, the "death spiral" is cured when the NBA holds a vote to seize

20  the team and force a sale.  *Id.*, 29:13-25.  Because of the NBA's ability to seize the team, there has

21  been no evidence offered establishing an extraordinary circumstance of an immediate or imminent

22  risk of injury or loss to person or property.

23       Nor has there been any testimony that if the NBA team is seized that the same or higher

24  price could not be obtained from Mr. Ballmer or another buyer.  Dean Bonham, Donald's

25  valuation expert, opined that a full auction could achieve the same or higher price.  T.T. 7/22/14,

26  95:13-96:5.  Irrespective of whether the team is subsequently sold for a lower price, such damage

27  is not the sort of damage that the exception to the stay provision contemplates.  No one is arguing

28  or stating that $2 billion dollars for the sale of the Clippers is a bad deal.  But because the sale of

**DONALD T. STERLING'S POST-TRIAL BRIEF**

Blecher Collins
Pepperman & Joye

1   the team was done in less than one week, required all cash buyers, and only one outbound call was

2   made to international buyers, it is also likely that it was not the best offer that Shelly and Donald

3   could have received. *Id.*, 86:27-87:6. Mr. Bonham testified that the unusual circumstances and

4   unusually short timeline with Shelly's bidding process for the Clippers potentially deprived a

5   complete bidding process among all interested owners. T.T. 7/22/14, 104:26-105:11.

6                 **LEGAL ARGUMENTS AND POINTS AND AUTHORITIES**

7   **I.**     **Shelly's Petition Is Not an Appropriate Action in Winding Up the Affairs of the**

8        **Trust**

9         Shelly is not asking this Court to interpret or construe the terms of the revoked revocable

10   trust instrument. Shelly is not asking this Court to confirm the sale of an asset under existing

11   *Probate Code* procedures. Instead, Shelly seeks relief under *Probate Code* section 17200 solely to

12   "bless" the actions already taken by her, to which no "blessing" is required (or should be permitted

13   as an advisory opinion) under the terms of the Sterling Family Trust. Because (a) the transaction

14   contemplated under the BTS is a sale of <u>assets</u> by LAC Basketball Club, Inc., a corporation, and

15   not a sale of its stock which was held in the Sterling Family Trust, and (b) the trust was self-

16   executing and was revoked before Shelly filed her Petition, this Court should abstain from

17   intervening in the matter and dismiss Shelly's Petition as improvidently filed—without confirming

18   Shelly's acts or transactions or approving the sale as Shelly and Mr. Ballmer seek under the terms

19   of the BTS.

20         If Mr. Ballmer wants to waive the condition precedent in the BTS as to his receipt of an

21   irrevocable consent by Donald or a final non-appealable order of this Court confirming Shelly's

22   authority to unilaterally bind the Sterling Family Trust and sell the Target Asset and attempt to

23   force the prospective sale to satisfy the BTS, that matter belongs in another court on another day

24   with a claim for specific performance against Shelly and Donald, individually, because they now

25   hold their community property assets in such capacity. Ex. 40. Probate court does not exist to

26   approve the sale of assets of an NBA basketball team owned by a corporation.

27         If the Court decides that Shelly successfully removed Donald as a co-trustee of the Sterling

28   Family Trust (which it should not), the revocation of the Sterling Family Trust precludes Shelly

-23-

Blecher Collins Pepperman & Joye

1   from relying on any authority as a former trustee of the Sterling Family Trust to unilaterally act to

2   pursue the future sale of the Clippers.  Shelly, as a former trustee, does not have the continuing

3   authority to sell the Clippers to Mr. Ballmer because (a) all rights and title to the Clippers are held

4   by LAC Basketball Club, Inc., a corporation whose stock is held by Donald, as the community

5   property of Donald and Shelly, and not by Shelly as the former trustee (*see* Ex. 40), and (b) to the

6   extent that life may be breathed into the Sterling Family Trust, after its revocation on June 9,

7   2014, the sale of the Clippers to Ballmer is not within the scope of Shelly's alleged wind-up

8   authority.

9       The Sterling Family Trust was expressly made revocable by its terms.  The trust instrument

10  is, and was, revocable by either settlor during their joint lifetimes. *See Prob. Code* § 15407(a) ("a

11  trust terminates when any of the following occurs: . . . (5) The trust is revoked.").

12      As stipulated by the parties, Donald exercised his unilateral right to revoke the Sterling

13  Family Trust on June 9, 2014, and the revocation was immediately effective to terminate the trust.

14  This was prior to the Petition herein being executed or filed on June 11, 2014.

15  **A.    Donald Holds All of the Stock of LAC Basketball Club, Inc. That Was**

16  **Previously Funded into The Sterling Family Trust**

17      When the Sterling Family Trust terminated by operation of Donald's revocation, the trust

18  became passive, and legal as well as equitable title reverted back to the beneficiaries—in this case

19  including all of the stock of LAC Basketball Club, Inc. to Donald, who was the original sole

20  shareholder.  Ex. 40.  Shelly incorrectly concludes that if she cannot consummate the sale of the

21  Clippers to Mr. Ballmer, then Mr. Ballmer's rights under the BTS are extinguished.  Shelly argues

22  that that the trust cannot escape its binding contractual obligations by revocation after the contract

23  has been formed.  However, as the former trustee of the Sterling Family Trust, Shelly cannot take

24  any additional active role in the sale of the assets of LAC Basketball Club, Inc.  Any further action

25  required of the stockholder of LAC Basketball Club, Inc. in the sale of its stock of LAC Basketball

26  Club, Inc. must be done by Donald in his individual capacity.

27      Donald's revocation of the Sterling Family Trust in no way impedes Donald and Shelly

28  from participating as shareholders in the sale of the assets of LAC Basketball Club, Inc. to Mr.

-24-

**DONALD T. STERLING'S POST-TRIAL BRIEF**

Blecher Collins Pepperman & Joye

1  Ballmer if Donald agreed to do so.  But, as Donald testified and as Shelly and Mr. Ballmer knew

2  at the time they executed the BTS, Donald made clear that he did not and does not agree to sell the

3  assets of LAC Basketball Club, Inc. to Mr. Ballmer under the present terms and circumstances.

4  Ex. 14, T.T. 7/9/14, 67:16-19; 7/8/14, 73:13-22, 67:20-28.  Because the Sterling Family Trust is,

5  and was, revocable, the trust instrument is a legal fiction as to claimants because Donald and

6  Shelly, individually, are still the equitable owners of the assets held therein and liable for the

7  obligations thereof.

8  **The law is plain that any prospective sale of the assets of LAC Basketball Club, Inc.**

9  **as it relates to its stockholder is now properly in the hands of Donald and Shelly, as**

10  **individuals.**

11  *Probate Code* section 15410(a)(1) states: "At the termination of a trust, the trust property

12  shall be disposed of as follows: (a) In the case of a trust that is revoked by the settlor, the trust

13  property shall be disposed of in the following order of priority: (1) As directed by the settlor."

14  Upon Donald's revocation of the Sterling Family Trust, Donald and Shelly, as husband and wife,

15  exclusively hold the right to control the assets.  The stock of LAC Basketball Club, Inc. reverts

16  back to Donald, who was the original shareholder.  This right trumps Shelly's right as former

17  trustee to wind up the trust's affairs.  *See Masry v. Masry*, 166 Cal. App. 4th 738, 743 (2008)

18  ("married parties are permitted to dispose of their share of the community without the consent of

19  the other spouse").

20  Here, Donald has directed, and Shelly refuses, to return all his assets which were funded

21  into their trust.  Shelly's failure to return the trust assets is another breach of her fiduciary duties

22  owed to Donald.  "A settlor with the power to revoke a living trust effectively retains full

23  ownership and control over any property transferred to that trust . . ." *Arluk Med. Center Indus.*

24  *Group, Inc. v. Dobler*, 116 Cal. App. 4th 1324, 1331-32 (2004); *see Fisch, Spiegler, Ginsburg &*

25  *Ladner v. Appel*, 10 Cal. App. 4th 1810, 1813 (1992) (homestead exemption valid even though

26  title to couple's home held in their revocable living trust; living trust is simply an "estate planning

27  device").  Because a revocable inter vivos trust is essentially "a probate avoidance device," courts

28  generally treat the trustor as the true owner of the estate assets. *Galdjie v. Darwish*, 113 Cal. App.

Blecher Collins
Pepperman & Joye

-25-

**DONALD T. STERLING'S POST-TRIAL BRIEF**

4th 1331, 1349 (2003); *see also Walgren v. Dolan*, 226 Cal. App. 3d 572, 578 (1990). Donald and Shelly, in their individual capacities, were viewed as the owners of the assets in their revocable trust. For example, the Internal Revenue Service and the California Franchise Tax Board generally tax property in a revocable trust as if it were owned by Donald and Shelly, in their individual capacities (and not as co-trustees), and the trustors' creditors are entitled to reach trust property. *Galdjie*, 113 Cal. App. 4th at 1350; *Walgren*, 226 Cal. App. 3d at 578; *see also Gagan v. Gouyd*, 73 Cal. App. 4th 835, 842 (1999) *disapproved on other grounds by Mejia v. Reed*, 31 Cal. 4th 657 (2003) (property in a revocable trust is subject to creditor claims to the extent of the debtor's power of revocation).[5] Additionally, for purposes of determining the "unity of ownership" element under easement law, the fact that an owner transferred his interest into an inter vivos revocable trust does not mean there was an actual transfer of property. *Zanelli v. McGrath*, 166 Cal. App. 4th 615, 633 (2008). Moreover, "[p]roperty transferred to, or held in, a revocable inter vivos trust is deemed . . . the property of the settlor . . ." *Id.; see also Carolina Casualty Ins. Co. v. L.M. Ross Law Group, LLP*, 184 Cal. App. 4th 196, 208-09 (2010); *Cal Rev. & Tax Code* § 62 (transfer by settlor to revocable trust is not a change in ownership).

Under general principles of trust law, trust beneficiaries hold "an equitable estate or beneficial interest in" property held in trust and are "'regarded as the real owner[s] of [that] property.'" *Title Ins. & Trust Co. v. Duffill*, 191 Cal. 629, 647 (1923). The trustee is "'merely the depositary of the legal title'" to the property; "'the legal estate'" the trustee holds "'is ... no more than the shadow . . . following the equitable estate. . . .'" *Id.* at 648. Any interest that

---

[5] A number of California statutes reflect the Legislature's recognition of these principles. *See Prob. Code* §§ 15800 (holder of revocation power, not beneficiary, has rights otherwise afforded beneficiary under California's Trust Law (*Probate Code* § 15000 et seq.) and is owed duties of trustee), 15801, subd. (a) (holder of revocation power, not beneficiary, has power to consent or withhold consent where beneficiary's consent may, or must, be given before action may be taken), 15802 (holder of revocation power, not beneficiary, shall be given any notice that is to be given to a beneficiary), **15410, subd. (a) (when settlor revokes trust, property shall be disposed of as settlor directs)**, 16001, subd. (a) (trustee of revocable trust shall follow written directions of holder of revocation power), 16064, subd. (b) (trustee of revocable trust need not report information or account to beneficiary), 18200 (during lifetime of settlor who retains revocation power, trust property is subject to claims of settlor's creditors to extent of revocation power), 19001, subd. (a) (property subject to revocation power at the time of settlor's death is subject to claims of creditors of deceased settlor's estate).

-26-

DONALD T. STERLING'S POST-TRIAL BRIEF

1  beneficiaries of a revocable trust have in trust property is "merely potential" and can "evaporate in

2  a moment at the whim of the [settlor]." *Johnson v. Kotyck*, 76 Cal. App. 4th 83, 88 (1999); *see*

3  *also Security First Nat'l Bank v. Wellslager*, 88 Cal. App. 2d 210, 214 (1948) (settlor with

4  revocation power "retain[s] the power and control of the trust estate and [can] with a stroke of the

5  pen … divest[] the beneficiaries of their interest").

6        Thus, although Donald transferred legal title of the stock of LAC Basketball Club, Inc. to

7  himself and to Shelly as co-trustees, Donald and Shelly, as the trust beneficiaries and holder of the

8  revocation power, continued to hold the entire equitable estate personally and effectively retained

9  full ownership of the assets.  Under these circumstances, it cannot be said that the transfer of bare

10 legal title to Donald and Shelly as co-trustees constituted a "change in ownership" and the parties

11 do not contend otherwise.

12        Through the enactment of *Probate Code* sections 18200 and 19001, the Legislature made

13 clear that a settlor, during his or her lifetime, cannot create a revocable trust to avoid his creditors.

14 *See Laycock v. Hammer*, 141 Cal. App. 4th 25, 31 (2006).  *Probate Code* section 18200 states,

15 "[i]f the settlor retains the power to revoke the trust in whole or in part, the trust property is

16 subject to the claims of creditors of the settlor to the extent of the power of revocation during the

17 lifetime of the settlor."  That claim, however, is a determination that belongs in a civil courtroom,

18 and not within a trust proceeding involving a revoked trust, which is before this Court.  Even if it

19 is later determined that Mr. Ballmer had a valid contract, he still would not be able to sue for

20 specific performance because as of now, a condition precedent has not been met—namely, Shelly

21 does not have Donald's consent, nor can she obtain a court order "blessing" the transaction unless

22 he waives the same.

23        Because the assets of LAC Basketball Club, Inc. are held by Donald as the sole

24 shareholder, the Court must dismiss Shelly's Petition under *Probate Code* section 17202 because

25 this proceeding is not reasonably necessary to protect the interests of Shelly and Donald.  Probate

26 court *has absolute discretion* to "dismiss a petition if it appears that the proceeding is not

27 reasonably necessary for the protection of the interests of the trustee or beneficiary." *Prob. Code*

28 § 17202.  The Legislature even went as far as to state that "[t]he administration of trusts is

**DONALD T. STERLING'S POST-TRIAL BRIEF**

Blecher Collins
Pepperman & Joye

1  intended to proceed expeditiously and *free of judicial intervention*, subject to the jurisdiction of

2  the court." *Prob. Code* § 17209 (emphasis added).  Section 17206 of the *Probate Code* expressly

3  grants this Court the authority to dismiss Shelly's Petition, which requests that this Court take

4  action over a corporate entity which is not before this Court.  Section 17206 states that this Court

5  "in its discretion may make any orders and take any other action necessary or proper to dispose of

6  the matters presented by the petition. . . ." *Prob. Code* § 17206.

7          The Court correctly noted that Shelly is *not* asking this Court to interpret the terms of the

8  trust instrument.  Instead, Shelly seeks relief under *Probate Code* section 17200 to do nothing

9  more than "bless" the actions taken by her, to which no "blessing" is required under the terms of

10  the Sterling Family Trust or by LAC Basketball Club, Inc.  Because the trust is self-executing and

11  Donald is the sole shareholder of LAC Basketball Club, Inc., this Court should abstain from

12  intervening in the matter and dismiss Shelly's Petition as improvidently filed without approving

13  the sale as Shelly and Ballmer seek under the terms of the BTS.  If Mr. Ballmer wants to force the

14  sale to satisfy the BTS, that matter belongs in superior or federal court with a claim for specific

15  performance.  Probate court does not exist to approve the sale of NBA basketball teams.

16  **B.       The Assets of the Sterling Family Trust Must Be Immediately Distributed to**

17  **            Donald and Shelly**

18          The express terms of the Sterling Family Trust require immediate distribution. *See Prob.*

19  *Code* § 15410(a)(1).  The Sterling Family Trust provides that upon revocation, assets "shall

20  promptly be distributed to the settlors as their community property." Ex. 29, ¶ 2.5.a.  The trust

21  does not require or permit any additional time.  Shelly's reliance on the provision that "the Trustee

22  may retain sufficient assets to secure payment of liabilities lawfully incurred by the Trustee" (*see*

23  *id.*) is unavailing because (1) until all conditions precedent are satisfied under the BTS, the

24  Sterling Family Trust has incurred no liability to Mr. Ballmer, (2) the terms of the trust do not

25  authorize a former trustee to create a new liability, and (3) the language is limited to the *payment*

26  *of existing* liabilities.

27          The survivorship provision is not applicable in cases of revocation by a settlor.  Upon

28  revocation, the assets held by the Sterling Family Trust are immediately distributable to Donald

1  and Shelly, as husband and wife, the settlors of the trust.  Survivorship provisions are triggered

2  upon the death of a settlor and only apply to beneficiaries.  Because Donald and Shelly are the

3  settlors of their trust, this provision does not apply.  In any event, the 30-day period has expired,

4  rendering this argument moot.

5  **C.    Shelly's Attempt to Pursue a Future Sale of the Clippers Is Not an Authorized**

6  **Passive Act to Wind Up the Trust**

7      Because the Sterling Family Trust was revoked, this Court can only authorize a former

8  trustee of a revocable inter vivos trust to take *__passive__* actions in winding up the trust.  California

9  law does not authorize a former trustee of a revocable inter vivos trust to take acts that are active.

10  Shelly and Mr. Ballmer have failed to cite any California case law that addresses the issue of the

11  revocation of an inter vivos revocable trust.

12      If Shelly has any authority to act as a former trustee of her and Donald's revocable trust,

13  the winding up period is solely for the benefit of the settlors to afford them the opportunity to

14  attribute liability to the trustee for their improper acts and transactions.

15      *Probate Code* Section 15407(b), which authorizes a trustee "powers reasonably necessary

16  under the circumstances to wind up the affairs of the trust," is constricted by the fact that the

17  Sterling Family Trust was a revocable trust that became passive, and that legal as well as equitable

18  title of assets reverted back to Donald and Shelly in their individual capacities.  *Prob. Code* §

19  15407(b).

20      Nor does the Restatement (Third) of Trusts § 89 support Shelly's position.  The

21  Restatement (Third) of Trusts § 89 provides that "[t]he powers of a trustee do not end on the

22  trust's termination date but may be exercised as appropriate to the performance of the trustee's

23  duties in winding up administration."  The comments make clear that the provision relates only to

24  unsaleable interests:

25      *The period for winding up the trust refers to the period after the termination
        date and before trust administration ends by complete distribution of the trust*
26      *estate. . . If . . . the trust terms or circumstances require the sale of property*
        *that is __not readily saleable__, the period for winding up the trust may be longer*
27      *than it would be in the absence of these or other complimentary*
        *circumstances.*

28

Blecher Collins
Pepperman & Joye

BC
PJ

1   Rest. 3d Trusts, § 89 (emphasis added).

2   In *Ball v. Mann*, 88 Cal. App. 2d 695, 699 (1948), the appellate court upheld the superior

3   court's ruling determining that the wife had no right, title, or interest in property that was

4   conveyed to a grantee in trust for two minor children. The *Ball* court found that the trust

5   terminated upon the youngest child becoming of legal age, and that the trust became passive upon

6   its termination and was to be administered solely for the purposes of winding up the trust.

7   A "court of equity has power to terminate a dry, simple or passive trust and may do so

8   even before the time fixed for its termination by the terms of the trust instrument." *Id.* (citation

9   omitted). Additionally, *Ball* held that "[w]hen the objects of a trust have been fully performed the

10  title of the trustee ceases and the legal as well as the equitable title vests in the beneficial owner

11  unless the intention of the creator clearly appears that the legal title should continue in the trustee."

12  *Id.*

13  *Probate Code* section 2630 is instructive regarding Shelly's duties in winding up the

14  Trust's affairs. Like a trust estate, guardianship and conservatorship estates terminate. A

15  guardianship estate terminates upon a ward attaining majority or by death of the ward. A

16  conservatorship estate ends on the death of the conservatee. Similarly, a revocable trust "dies" if a

17  settlor revokes his trust. The probate court maintains some limited jurisdiction for ministerial acts

18  such as settling an accounting or enforcing any orders incident to the accounting (such as

19  enforcement of a surcharge against the fiduciary) or overseeing the termination of the ward-

20  guardian and conservatee-conservator relationship. *Prob. Code* § 2630. There are no California

21  cases which authorize a guardian or a conservator to take affirmative steps that are outside the

22  scope of winding up the affairs of the guardianship/conservatorship estate. At most, case law

23  solidifies the fact that a guardian/conservator can present an account to the Court to approve the

24  amount of charges and receipt, and acts and transactions of the fiduciary. *See, e.g., Keck v. Keck*,

25  16 Cal. App. 2d 521 (1936) (former conservatee (referred to as former incompetent) was able to

26  compel accounting from former conservator (referred to as guardian)); *In re Guardianship of*

27  *O'Connor*, 28 Cal. App. 2d 527 (1938) (former ward compelled guardian to account after she was

28  restored to competency).

-30-

DONALD T. STERLING'S POST-TRIAL BRIEF

Guidance can also be drawn from *Probate Code* section 2631, which limits the contractual ability of the guardian/conservator. *Probate Code* § 2631(a) states:

> Upon the death of the ward or conservatee, the guardian or conservator may contract for and pay a reasonable sum for the expenses of the last illness and the disposition of the remains of the deceased ward or conservatee, and for unpaid court-approved attorney's fees, and may pay the unpaid expenses of the guardianship or conservatorship accruing before or after the death of the ward or conservatee, in full or in part, to the extent reasonable, from any personal property of the deceased ward or conservatee which is under the control of the guardian or conservator.

At most, the fiduciary is able to pay expenses of last illness, burial, and accrued expenses – nothing more.

The limitation of the scope of a guardian/conservator's duties as set forth in the *Probate Code* is consistent with the terms of the Sterling Family Trust. The sale of the assets of LAC Basketball Club, Inc. is by no means the satisfaction of an outstanding liability.

The Sterling Family Trust property in question, specifically the Target Assets of LAC Basketball Club, Inc., is readily saleable. Indeed, Shelly testified that from May 23 through May 28, 2014—generally before the doctors' letters of May 27th and May 29th were available—Shelly and her lawyers and advisors were in contact with numerous parties in connection with the sale of the Clippers, three of whom submitted formal bids ranging from $1.2 billion to $2 billion. Shelly, as the purported sole trustee of the Sterling Family Trust, unilaterally accepted the $2 billion bid submitted by Mr. Ballmer. But Donald revoked the trust before Shelly filed her Petition alleging she was still the trustee. The key to this case is that the BTS contains a <u>condition precedent</u> which still exists, making the BTS an nonfinalized transaction.

The two main cases relied on by Shelly to support her position that she has wind-up authority to transfer the Target Asset from LAC Basketball Club, Inc. to Mr. Ballmer irrespective of the fact that the trust was revoked and that the shares reverted back to Shelly and Donald are *Botsford v. Haskins & Sells*, 81 Cal. App. 3d 780 (1978) and *Myrick v. Enron Oil & Gas Co.*, 296 S.W.3d 724 (Tex. App. El Paso 2009). Neither of these cases support Shelly's position that she may consummate the sale of the Clippers to Mr. Ballmer. Rather, *Botsford* supports Donald's

-31-

DONALD T. STERLING'S POST-TRIAL BRIEF

Exhibit D
Page 111

1  position. *Botsford* looks at cases[6] nationwide where, after trust revocation or termination,

2  permitted acts were limited to:

3      1)        Those necessary for the proper winding up of the trust;

4      2)        Those necessary for the proper preservation of trust property;

5      3) .     Those necessary to provide care for trust property;

6      4)        Those in which an accounting was needed to be tendered or settled; and

7      5)        Those where the winding up of the trust is according to the directions of the settlor.

8  *Botsford* states that "[i]t would have been wholly unreasonable for the trustee, upon the trusts'

9  termination, to distribute that cause of action to the 500-odd shareholders of plaintiff corporations,

10 as their individual interest might appear. Indeed such as a distribution would patently have

11 frustrated the purpose of the trust." *Id.* Here, prior to Shelly's attempts to remove Donald as co-

12 trustee, the shares of LAC Basketball Club, Inc. were held solely by Donald. It is reasonable that

13 the shares could be returned to a single individual and that this would not frustrate the purposes of

14 the trust. It is Shelly's action in failing to return the trust assets to Donald that is frustrating the

15 purposes of the trust and is in violation of the terms of the Sterling Family Trust and *Probate Code*

16 section 15410. No case cited within *Botsford* permits a trustee to sell assets held in a corporation

17 whose stock is held by the settlors or either of them in their individual capacities.

18     *Myrick* is distinguishable and provides no support for Shelly's position regarding her

19 windup authority. In *Myrick*, the settlor, William Lewis Moody III, created an irrevocable trust

20 and named a bank (Moody Bank) to serve as the trustee. *Two months prior to the settlor's death*,

21 the Bank's Trust Committee approved a proposed gas and oil lease. After the settlor's death and

22 before making a final distribution to the beneficiaries, the Bank made a determination that because

23 of the "ongoing litigation in Galveston County," it was "reasonable" to enter into the lease after

24 the settlor's death. *Myrick*, 296 S.W.3d at 728. The court found that the "pending Trust 25

25 litigation prevented Moody Bank from 'winding up' the affairs of Trust 25 and making a final

26

---

27 [6] Virtually all reported cases relate to testamentary or other irrevocable trusts terminating because of a given event (e.g., beneficiary reaching a given age or death), or at a specified time or other
28 occurrence. Donald is unable to find any cases which deal with an ***inter vivos revocable trust.***

Blecher Collins
Pepperman & Joye

1    distribution . . . ." *Id.* It further stated that the Bank had a "continuing duty to manage the trust

2    estate and seek the best possible result for the beneficiaries." *Id.*

3         This case only hurts Shelly's position. Before this Court is a revocable trust that was

4    revoked by a settlor. In *Myrick*, the trust was ***irrevocable***—it terminated upon fulfilling its

5    purposes. Moody Bank's duty to manage the trust estate for the benefit of the beneficiaries is not

6    synonymous to our case. Here, unlike *Myrick*, the settlors and beneficiaries are one and the same.

7    In *Myrick*, the reference to beneficiaries was to the children and grandchildren of William Lewis

8    Moody III. Lastly, there is no pending litigation that precludes Shelly or Donald from distributing

9    the assets to them in their individual capacities. The law actually requires them to do so. This is

10   not the situation of administering a trust with the goal of a "final distribution" to the named vested

11   beneficiaries. The facts and the law in *Myrick* are distinguishable and should not be considered by

12   this Court.

13        Shelly's attempt to unilaterally sell the assets of LAC Basketball Club, Inc. for $2 billion is

14   not a passive act and does not wind up the affairs of the Sterling Family Trust. If the Court finds

15   Shelly is authorized to wind up the affairs of the Sterling Family Trust, at most Shelly is a trustee

16   of a passive trust, which no longer maintains legal or equitable title over the Target Assets, which

17   have reverted back to Donald by operation of law. Shelly cannot unilaterally proceed to

18   consummate the prospective sale of the assets to LAC Basketball Club, Inc. to Mr. Ballmer

19   because she is not the shareholder of the corporation.

20        Shelly's reliance on *Estate of Nicholas*, 177 Cal. App. 3d 1071 (1986) is wholly misplaced,

21   as the context is fundamentally different from the instant circumstances, which relate to the issue

22   after the creation of a testamentary trust under the decedent's will. In *Estate of Nicholas*, William

23   Nicholas died in 1966, leaving his entire estate to Bank of America, in trust, until his youngest

24   child reached the age of 40 years. The testamentary trust terminated by its own terms in 1982

25   when the youngest child turned 40. The Sterling Family Trust is and was a revocable inter vivos

26   trust. This distinction has significant legal implications. *Estate of Nicholas* is inapposite because

27   it addresses the wind-up of an irrevocable testamentary trust and concerns post-death

28   administration, which is entirely irrelevant to this proceeding.

Blecher Collins
Pepperman & Joye

-33-
DONALD T. STERLING'S POST-TRIAL BRIEF

Blecher Collins
Pepperman & Joye

1    *Estate of Scrimger*, 188 Cal. 158 (1922) concerns a testamentary trust that was created on

2    the death of Nancy Scrimger.  Four charitable institutions were named as the remainder

3    beneficiaries of an undivided one-third (1/3) interest of the trust estate, including the Roman

4    Catholic Orphan Asylum.  However, Roman Catholic Orphan Asylum changed its name to Roman

5    Catholic Orphan Asylum of San Francisco.  Again, Shelly relies on a case where the context is

6    fundamentally different.  In *Estate of Scrimger*, the court was required to construe the

7    testamentary trust to determine who was the correct beneficiary.  The circumstances of *Estate of*

8    *Scrimger* offers no guidance here because that case dealt with distribution of assets to a

9    beneficiary after the death of the testator.

10       In relying on *Hise v. Superior Court*, 21 Cal. 2d 614 (1943), Shelly has confused an inter

11   vivos trust, such as the Sterling Family Trust, and a constructive trust or other types of trust

12   agreements.  *Hise* did not concern a revocable inter vivos trust and was not created by settlors.

13   Instead, this matter dealt with equitable liens, debtor-creditor relationships, and an agreement

14   where a company took title to and possession of all assets, both real and personal, owned by a loan

15   association.  Again, this case addresses legal issues not even contemplated by the *Probate Code*.

16       All other cases cited by Shelly are distinguishable, not based on California law, are

17   secondary sources, and do not need to be relied upon by this Court.  Shelly cites non-California

18   cases in a feeble attempt to locate authority for her position.  None of those cases address a

19   situation where a court is asked to wind-up a revocable trust.

20       Shelly's attempt to rely on inapplicable New York authority offers her no more support.  *In*

21   *re Lathers' Will*, 243 N.Y.S. 366 (N.Y. Sur. Ct. 1930) is a case in which the decedent, Mr.

22   Lathers, left numerous gifts and left the residue of his estate to his executors and the survivor

23   thereof in trust.  This secondary source from 1930 does not relate to the facts at hand.  Again,

24   Shelly is relying on a case concerning a <u>testamentary trust</u> where the trust was created on the death

25   of the testator.  *Lathers* is readily distinguishable from this matter, which involves a revocable

26   trust that was revoked by a co-settlor and co-trustee.

27       *Neary v. City Bank Farmers Trust Co.*, 24 N.Y.S.2d 264 (App. Div. 1940) does not

28   advance Shelly's position.  In *Neary*, the grantor created a living trust naming herself as the

-34-

1   beneficiary and a trust company as the trustee. At a later time, the grantor revoked the trust by

2   sending a letter to the trustee and demanded that the trustee immediately turn over to her all trust

3   assets. *Neary* held that as a result of the termination of a trust, the trustee was able to render an

4   accounting and seek approval of its past acts. *Neary* only concerns passive management in the

5   rendering of an accounting. Nothing in *Neary* permits a *former* trustee, in this case Shelly, to take

6   affirmative acts and sell a trust asset.

7          Shelly's reliance on *Peoples Bank v. D'Lo Royalties, Inc.*, 235 So.2d 257, 266 (Miss.

8   1970) for the proposition that Shelly continues to have the authority to take active steps to sell the

9   Clippers is misplaced. Again, Shelly has confused an inter vivos trust, such as the Sterling Family

10  Trust, with a "business trust" or "Massachusetts Trusts." Neither a business trust or

11  Massachusetts Trust have anything to do with her case. Those trusts were widely used in the

12  southern portions of the United States after the First World War in lieu of incorporation. *Peoples*

13  *Bank* offers Shelly no support.

14         It is clear that this Court does not have jurisdiction over the now revoked Sterling Family

15  Trust. The law is well established that during the joint lifetimes of the settlors, Donald and Shelly,

16  they were able to hold assets in their trust as a legal convenience. The moment Donald revoked

17  the Sterling Family Trust, all such assets reverted back to Donald and Shelly in the manner in

18  which they were originally held. Shelly would have this Court accept the legal formalities of the

19  trust creation and powers conferred to the trustee to take acts but at the same time ignore the

20  trustees' obligation to promptly return such assets to their rightful owner. Shelly cannot have it

21  both ways.

22  **II.    Donald Sterling Was Not Properly Deemed No Longer a Co-Trustee**

23         For many reasons, discussed below, Donald was not legally removed as a co-trustee of his

24  trust: (1) the doctors' letters do not comply with the Removal Provision or the PEI Provision, (2)

25  the medical evaluations and doctors' letters were obtained by Shelly and her agents through false

26  pretenses, undue influence, unclean hands, and in breach of Shelly's fiduciary duties to Donald, as

27  her husband, co-trustee, and co-settlor, (3) the medical records and doctors' letters were obtained

28

Exhibit D
Page 115

and disclosed in violation of HIPAA, HITECH, and CMIA. Moreover, the doctrine of estoppel or best interests does not cure Shelly's wrongdoings and inequitable conduct.

### A.    The Doctor's Letters Do Not Comply with the Trust Provisions

California law on incapacity applies, as defined by the Sterling Family Trust's provision. Ex. 29, ¶ 10.24. *Probate Code* section 810 provides for a "rebuttable presumption" with respect to capacity:

> 810. The Legislature finds and declares the following:
> (a) For purposes of this part, **there shall exist a rebuttable presumption** affecting the burden of proof that **all persons have the capacity to make decisions and to be responsible for their acts or decisions**.
> (b) A person who has a mental or physical disorder **may still be capable of** contracting, conveying, marrying, making medical decisions, **executing** wills or **trusts,** and performing other actions.
> (c) A judicial determination that a person is **totally without understanding,** or is **of unsound mind,** or **suffers from one or more mental deficits so substantial** that, under the circumstances, the person should be deemed to lack the legal capacity to perform a specific act, should be based on evidence of a **deficit in one or more of the person's mental functions** rather than on a diagnosis of a person's mental or physical disorder.

*Prob. Code* § 810 (emphasis added). Shelly bears the burden of overcoming the presumption of Donald's capacity. *Estate of Mann*, 184 Cal. App. 3d 593, 602 (1986); *In re Preston*, 2014 WL 495635, at *9 (Bankr. C.D. Cal. Feb. 14, 2014) (finding trust did not meet § 810 burden to overcome capacity presumption of crack cocaine addict; "[t]o the contrary, it appears that Debtor was actively working and participating in social engagements up until the petition date").

*Probate Code* § 811 requires a mental deficit in (1) alertness and attention, (2) information processing, (3) thought processes, or (4) ability to modulate mood and affect, as well as evidence of a *"correlation" between the deficit and the decision or acts in question. Id.* § 811(a) (emphasis added).

> In other words, under this statutory scheme, incompetency due to an 'unsound sound' cannot be based on the diagnosis of a medical or physical disorder, and it is not enough identify a few mental deficits. There *must be a causal link* between the impaired mental function and the issue or action in question.

*In re Marriage of Greenway*, 217 Cal. App. 4th 628, 640 (2013) (emphasis added).

Exhibit D
Page 116

1    The deficit may be considered *only* if it "*significantly* impairs the person's ability to

2 understand and appreciate the consequences of his or her actions *with regard to the type of act or*

3 *decision in question.*" *Prob. Code* § 811(b) (emphasis added). To lack capacity, the deficit must

4 be "*so substantial* that the person lacks the capacity to do a certain act" and "the *frequency,*

5 *severity, and duration* of periods of impairment" should also be considered. *Id.* § 811(c).

6    811. (a) A determination that a person is of **unsound mind or lacks the capacity to make a decision or do a certain act**,

7 including, but not limited to, the incapacity to contract, to make a conveyance, to marry, to make medical decisions, to execute wills,

8 or to **execute trusts**, shall be supported by evidence of a **deficit** in at least one of the following **mental functions**, subject to

9 subdivision (b), and evidence of a **correlation between the deficit** or deficits and the **decision or acts in question**:

10    (1) **Alertness and attention**, including, but not limited to, the following:

11    (A) Level of arousal or consciousness.

12    (B) Orientation to time, place, person, and situation.
       (C) Ability to attend and concentrate.

13    (2) **Information processing**, including, but not limited to, the following:

14    (A) Short- and long-term memory, including immediate recall.
       (B) Ability to understand or communicate with others, either

15 verbally or otherwise.
       (C) Recognition of familiar objects and familiar persons.

16    (D) Ability to understand and appreciate quantities.
       (E) Ability to reason using abstract concepts.

17    (F) Ability to plan, organize, and carry out actions in one's own rational self-interest.

18    (G) Ability to reason logically.
       (3) **Thought processes**. Deficits in these functions may be

19 demonstrated by the presence of the following:
       (A) Severely disorganized thinking.

20    (B) Hallucinations.
       (C) Delusions.

21    (D) Uncontrollable, repetitive, or intrusive thoughts.
       (4) **Ability to modulate mood and affect**. Deficits in this ability

22 may be demonstrated by the presence of a pervasive and persistent or recurrent state of euphoria, anger, anxiety, fear, panic,

23 depression, hopelessness or despair, helplessness, apathy or indifference, that is inappropriate in degree to the individual's

24 circumstances.
       (b) A deficit in the mental functions listed above may be

25 considered **only if the deficit**, by itself or in combination with one or more other mental function deficits, **significantly impairs the**

26 **person's ability to understand and appreciate the consequences of his or her actions with regard to the type of act or decision**

27 **in question.**
       (c) In determining whether a person suffers from a deficit in

28 mental function so **substantial** that the person lacks the capacity to do a certain act, the court may take into consideration the

-37-

Biecher Collins
Pepperman & Joye

Exhibit D
Page 117

frequency, severity, and duration of periods of impairment.

(d) The mere diagnosis of a mental or physical disorder shall not be sufficient in and of itself to support a determination that a person is of unsound mind or lacks the capacity to do a certain act.

(e) This part applies only to the evidence that is presented to, and the findings that are made by, a court determining the capacity of a person to do a certain act or make a decision, including, but not limited to, making medical decisions. Nothing in this part shall affect the decisionmaking process set forth in Section 1418.8 of the Health and Safety Code, nor increase or decrease the burdens of documentation on, or potential liability of, health care providers who, outside the judicial context, determine the capacity of patients to make a medical decision.

*Prob. Code* § 811 (emphasis added). Section 812 provides that a person lacks capacity only if he cannot appreciate the rights, duties, consequences, risks, and benefits "*involved in the decision.*" *Id.* § 812 (emphasis added). "'It has been held over and over in this state that old age, feebleness, forgetfulness, filthy personal habits, personal eccentricities, failure to recognize old friends or relatives, physical disability, absent-mindedness and mental confusion do not furnish grounds'" for finding incapacity. *Anderson v. Hunt*, 196 Cal. App. 4th 722, 727 (2011) (citation omitted).

It was clear during the course of Donald's testimony that he was alert, maintained attention, he was able to process information, and completely understood and appreciated the consequences of his actions with regard to whether the sale should go through. The evidence has also clearly established that the specific requirements set forth in the Sterling Family Trust were not followed by Shelly or Dr. Platzer or Dr. Spar, and that therefore, Shelly has not removed her husband of nearly 60 years from his co-trusteeship. It has been determined that Donald's capacity is not properly in issue in this proceeding.

Section 7.5.c (the "Removal Provision") and Section 10.24 (the "Procedure Establishing Incapacity Provision" or "PEI Provision") set forth the requirements to remove Donald, as a trustee of the Sterling Family Trust, from his fiduciary position. Shelly failed to comply with the strict terms and conditions of the Removal Provision, which relies on the procedural requirements in the PEI Provision. Therefore, Donald was not removed as a co-trustee.

Shelly and her lawyers relied on the Removal Provision to effectuate her purported unilateral removal of Donald as co-trustee. The Removal Provision, Section 7.5.c, provides:

Blecher Collins Pepperman & Joye

1   Any individual who is deemed incapacitated, as defined in [the PEI
2   Provision], shall cease to serve as a Trustee of all trusts
    administered under this document. Each individual who agrees to
3   serve as a Trustee of any trust administered under this document
    (A) shall cooperate in any examination **reasonably appropriate** to
4   carry out the provisions of this [Removal Provision], (B) waives
    the doctor-patient and/or psychiatrist-patient privilege **with**
5   **respect to the results of such examination**, and (C) shall **allow a**
    **Co-Trustee or Current Beneficiaries of the trust to review the**
6   **individual's individually identifiable health information or**
    **other medical records**, waiving any privacy rights governed by
7   the Health Insurance Portability and Accountability Act of 1996,
    42 U.S.C § 1320d (HIPAA), and the regulations thereunder,
8   including 45 C.F.R. §§160-164, to the extent required to
    implement this [Removal Provision]. . . . (emphasis added).

9   The PEI Provision states that a co-trustee may be removed if he or she lacks capacity.

10  Specifically, Section 10.24 provides:

11  "Incapacity" and derivations thereof mean **incapable of managing**
12  **an individual's affairs under the criteria set forth in California**
    **Probate Code Section §810 et seq.**   An individual shall be
13  deemed incapacitated if any of the following conditions exist: (a)
    the individual's regular attending physician (provided such a
14  physician is not related by blood or marriage to any Trustee or
    beneficiary) examines the individual and certifies in writing that
15  the individual is incapacitated, **(b) two licensed physicians who,**
    **as a regular part of their practice are called upon to determine**
16  **the capacity of others, and neither of whom is related by blood**
    **or marriage to any Trustee or beneficiary, examine the**
17  **individual and certify in writing that the individual is**
    **incapacitated**, or (c) an order of the court having jurisdiction of
18  the trust as to which the individual is serving as a Trustee or as to
    which the individual is a beneficiary, as the case may be, finds that
19  the individual is incapacitated. . . .

20  Shelly chose option (b) above to secretly orchestrate her husband's removal as co-trustee in order

21  to sell the Clippers out from under him against his will.  Unbeknownst to Donald or his attorneys,

22  Shelly's lawyers obtained letters from two licensed physicians who, as a regular part of their

23  practice are called upon to determine the capacity of others, and who examined Donald.  Without

24  Donald's knowledge, the doctors then disclosed Donald's private medical records to Shelly,

25  Shelly's attorneys, Mr. Ballmer, the NBA, other third parties, and the public—with complete

26  disregard to Donald's welfare or privacy and complete disregard of Federal and State law.

27  By filing her Petition and seeking the Court's approval of her acts, Shelly has asked the

28  Court to bless her usurpation of power and removal of Donald as co-trustee—which if granted by

Blecher Collins Pepperman & Joye

-39-
**DONALD T. STERLING'S POST-TRIAL BRIEF**

1    this Court would amount to a judicial finding that Donald is incapacitated without providing

2    Donald the opportunity to present his own doctor's testimony to rebut the two doctors hired by

3    Shelly and her lawyers.  The Court should be wary of setting this type of precedent to allow one

4    spouse to take advantage of the other and deny them their rights to property.

5           Shelly did not comply with the PEI Provision because (1) Donald was not given notice of

6    Shelly's intent to cause mental examinations to be conducted, nor did Donald have any ability to

7    cooperate in the selection of doctors or schedule a convenient time for determining his capacity to

8    serve as trustee, (2) Shelly fraudulently failed to disclose the purpose of the examinations that she

9    and her lawyers orchestrated, (3) Donald was deprived of the opportunity to consult his attorneys;

10   (4) neither of the letters obtained from the physicians comply with the specific requirements set

11   forth in the Sterling Family Trust or Probate Code §§ 810-813, and (5) Dr. Spar's and Dr.

12   Platzer's letters are based, in part, upon privileged information and protected material, release or

13   use of which Donald did not knowingly consent to waive at the time of the examinations, and

14   disclosure of which violated state and federal law.  As a result, Dr. Platzer's and Dr. Spar's letters

15   offered by Shelly are insufficient, on their face, to remove Donald as a co-trustee of the Sterling

16   Family Trust.

17          The doctors' letters fail to comply with the requirements of the Probate Code Sectin 810-

18   813, the PEI and Removal Provisions, and are based upon illegally obtained material.  The

19   doctors' letters make conclusory statements about Donald's alleged deficits in mental function,

20   none which amount to or shows that Donald lacked capacity as defined by *Probate Code* sections

21   810 and 811.  In addition, Dr. Spar's letter is not certified as required under the PEI Provision.

22   Neither letter is sufficient from an evidentiary basis since neither purports to express an opinion or

23   finding as to a medical certainty.  The doctors' letters also fail to make any finding of incapacity

24   under Probate Code sections 810 and 811.  The letters are insufficient on their face.

25          The examinations and letters are defective and incomplete.  Dr. Spar only asked Donald 29

26   of 30 questions from the Folstein Mini-Mental Examination, neglecting to inquire "Where are we?

27   (Floor)."  A correct answer would have given Donald a score of 25 of 30.  Dr. Platzer appeared to

28   make changes to her determination of Donald's score by crossing out certain scores.

Blecher Collins
Pepperman & Joye

1   Significantly, Shelly has used her Petition as a backdoor to rubberstamp her ouster of

2   Donald as a co-trustee.  This is not permissible.  Shelly is asking the Court to indirectly confirm

3   Donald's incapacity without a capacity hearing, which would violate Donald's right to due

4   process.  In the alternative, Shelly is asking the Court to ignore an unsuccessful attempt to remove

5   Donald by her failure to comply with the Sterling Family Trust requirement.

6       The Removal Provision states that Shelly and Donald must "cooperate" with one another

7   regarding the determination the mental capacity of either of them.  The procedures set forth in the

8   Removal Provision are vague as to the terms "reasonable" and "cooperate" in their interpretation,

9   use, or application.  Cooperation (the noun of cooperate) is defined by Black Law Dictionary, 8th

10  Edition, to mean: "an association of individuals who join together for a common benefit."  There

11  is no conceivable way that Donald can cooperate unless he knows that the removal provision is

12  being invoked.  There is no conceivable way that Shelly cooperated with Donald in the selection

13  of the doctors or the obtaining of the medical examinations, let alone the doctors' letters.  Neither

14  Shelly nor her lawyers nor Dr. Platzer, nor Dr. Spar disclosed to Donald or his attorneys that

15  Donald was purportedly participating or cooperating in an evaluation to be used for legal

16  purposes.  That lack of disclosure and lack of notice violate the terms of the trust.  Shelly her

17  lawyers, Dr. Platzer, and Dr. Spar all concealed their true intentions behind Donald's

18  appointments with Dr. Platzer and Dr. Spar, and failed to give Donald any notice that the

19  evaluations or letters were being used for legal purposes.  No trustee has unrestricted authority,

20  nor can they dupe their co-settlor, co-trustee, co-beneficiary, and husband into unauthorized

21  removal, especially where they already believe that person is susceptible to undue influence or

22  fraud of others.  Here, Shelly used her position of trust and confidence to deprive Donald of the

23  right to fight the confiscation of his finances.

24      "The requirements of loyalty and fair dealing and good faith are at the core of every trust

25  instrument, whether specifically stated or not." Rest. (Second) of Trust § 164 cmt. h, at 343-44

26  (1980).  The Court should find that Secret Plan B fails to comply with Probate Code §§ 810-813

27  and the Removal and PEI Provisions of the Sterling Family Trust.  Thus, the doctors' letters did

28  not remove Donald as Co-Trustee.

Blecher Collins Pepperman & Joye

**B.** **Shelly's Efforts to Remove Donald as Co-Trustee of the Sterling Family Trust Were Through False Pretenses, Undue Influence, Unclean Hands, and in Breach of Her Fiduciary Duties to Donald as Her Husband, Co-Trustee, and Co-Settlor**

The evidence shows that both Dr. Platzer and Dr. Spar's letters obtained by Shelly were induced by false pretenses, undue influence, unclean hands, and a breach of Shelly's fiduciary duties owed to Donald.

**1.** **Shelly's Hands are Unclean**

Shelly and the NBA have always known that Donald did not want to sell the Clippers. Shelly, her lawyers, and the NBA undertook to oust Donald and put Shelly in a position to unilaterally sell the Clippers. This became Secret Plan B. It is undisputed that neither Shelly nor her lawyers, nor the doctors disclosed to Donald or his lawyers that the doctors' examinations were being used for purposes of removing him as co-trustee of the Sterling Family Trust. This secrecy and speedy timeline ensured Donald had no opportunity to protect himself or stop the execution of the BTS or the Settlement Agreement with the NBA, to his detriment. As Donald testified:

> Q. Okay. Now, were you told before you were examined by Dr . Spar and Dr. Platzer -- were you told that the purpose of the examination was to see if you were competent to remain as a trustee?
> A. Absolutely not. Neither of them told me any reason they were there. I trusted my wife. It was my 80th birthday and she said: At this stage in your life you should be examined. She sent me for a heart exam, and then she said these two doctors are coming in. It's a routine exam for your 80th birthday so you'll live and be happy and we can live together. I didn't know that these were two people who were adversaries and came in to examine me and were hired guns who were going to testify against me.
> . . .
> Q. If you had been told, sir, that the purpose of the examination was to determine whether you were competent to stay as a trustee, would you have submitted to the examination?
> A. Do you think any first-year law student would let the adversary examine you on the capacity hearing?

T.T. 7/8/14, 89:5-26.

Blecher Collins Pepperman & Joye

BC PJ

-42-

DONALD T. STERLING'S POST-TRIAL BRIEF

1    Had he known, Donald would have consulted his own lawyers and engaged doctors who

2  only had Donald's health, welfare, best interests, and privacy in mind—not the egregious conflict

3  of interest that was forced upon and concealed from him.  And he would have been well rested,

4  focused, and chosen the time and place most convenient for him.  That is the advantage secrecy

5  played to Shelly's enormous benefit and to Donald's unfortunate detriment.

6    From the outset, both doctors were expert witnesses working with and for Mr. O'Donnell.

7  Shelly and her lawyers hired, advised, and oversaw both doctors as to their mission, and both

8  doctors reported directly to and communicated frequently with Shelly's lawyers—and never with

9  Donald or his lawyers.  Shelly's lawyers spent significant time assisting Dr. Platzer with her

10  report.  Dr. Spar admitted he was a hired gun, testifying Donald was not his patient and addressing

11  his letter directly to Mr. O'Donnell with the opening words "At your request."  Dr. Platzer and

12  Shelly either had a serious memory lapse or outright lied about when she first learned about secret

13  Plan B.  Dr. Platzer's and Dr. Spar's reports lack the impartiality and objectiveness envisioned and

14.  required by the Sterling Family Trust.  The doctors' active participation in Plan B is exacerbated

15  by their cavalier treatment of Donald's privacy rights.

16    Shelly's Petition must be denied due to her unclean hands.  Courts have held that, "'[h]e

17  who comes into equity must come with clean hands.'"  *Jacobs v. Universal Dev. Corp.*, 53 Cal.

18  App. 4th 692, 699 (1997); *Crosstalk Prods. v. Jacobson*, 65 Cal. App. 4th 631, 647 (1998).  As

19  such, the doctrine of unclean hands "'closes the doors of a court of equity to one tainted with

20  inequitableness or bad faith relative to the matter in which he seeks relief, however improper may

21  have been the behavior of the defendant.'"  *Jacobs*, 53 Cal. App. 4th at 699 (citation omitted).

22  California courts apply unclean hands to legal and equitable claims and to both tort and contract

23  remedies.  *Id.*

24    Unclean hands is a well-established equitable doctrine that prevents a party with unclean

25  hands in the matter at issue from obtaining relief in Court.  *See, e.g., Magic Kitchen LLC v. Good*

26  *Things Int'l Ltd.*, 153 Cal. App. 4th 1144, 1166 (2007); *Kendall-Jackson Winery, Ltd. v. Superior*

27  *Court*, 76 Cal. App. 4th 970, 985 (1999); *Dickson, Carlson & Campillo v. Pole*, 83 Cal. App. 4th

28  436, 446 (2000).  It prevents "a wrongdoer from enjoying the fruits of his [or her] transgression."

-43-
DONALD T. STERLING'S POST-TRIAL BRIEF

1  *Kendall–Jackson*, 76 Cal. App. 4th at 978. "Of course if a party comes into a court of equity with

2  unclean hands relating to the transaction before the court, he will be denied relief." *Fibreboard*

3  *Paper Prods. Corp. v. East Bay Union of Machinists*, 227 Cal. App. 2d 675, 729 (1964). "The

4  unclean hands doctrine 'closes the doors of a court of equity to one tainted with inequitableness or

5  bad faith relative to the matter in which he seeks relief.'" *Jarrow Formulas, Inc. v. Nutrition Now,*

6  *Inc.*, 304 F.3d 829, 841 (9th Cir. 2002), quoting *Precision Instrument Mfg. Co. v. Automotive*

7  *Maintenance Machinery Co.*, 324 U.S. 806, 814 (1945). "What is material is not that the

8  plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts, or that the

9  manner of dirtying renders inequitable the assertion of such rights against the defendant."

10  *Republic Molding Corp. v. B. W. Photo Utils.*, 319 F.2d 347, 349 (1963).

11      The doctrine of unclean hands requires unconscionable, bad faith,

12  or inequitable conduct by the plaintiff in connection with the matter in controversy. Unclean hands applies when it would be

13  inequitable to provide the plaintiff any relief, and provides a complete defense to both legal and equitable causes of action.

14  'Whether the defense applies in particular circumstances depends on the analogous case law, the nature of the misconduct, and the

15  relationship of the misconduct to the claimed injuries.'

16  *Mendoza v. Ruesga*, 169 Cal. App. 4th 270, 278-79 (2008) (citations omitted).

17  Unclean hands is an "equitable rationale for refusing relief where principles of fairness dictate that

18  the plaintiff should not recover, regardless of the merits of his claim. It is available to protect the

19  court from having its powers used to bring about an inequitable result in the litigation before it."

20  *Id.* at 279 (citation omitted).

21      "Courts have 'gleaned a three-pronged test to determine the effect to be given to the

22  plaintiff's unclean hands conduct. Whether the particular misconduct is a bar to the alleged claim

23  for relief depends on (1) analogous case law, (2) the nature of the misconduct, and (3) the

24  relationship of the misconduct to the claimed injuries.'" *Jay Bharat Developers, Inc. v. Minidis*,

25  167 Cal. App. 4th 437, 445-46 (2008) (citation omitted).

26      As here, where conduct relates to issues or matters before the Court (and requested relief),

27  the doctrine of unclean hands can prevent the totality of the relief requested. By analogy, as

28  discussed, the disclosure of private medical records is illegal, and in the civil context, such

*Blecher Collins Pepperman & Joye*

1   evidence has been suppressed in sister state jurisdictions. The disclosure of Donald's intimately

2   personal medical records by "hired gun" expert witnesses for the adverse party in order to

3   accomplish a singular objective—the sale of the Clippers in the face of Donald's vociferous

4   refusal to sell—was unlawful, severely detrimental to Donald, and goes to the very core of

5   Shelly's entire Petition. Shelly and her lawyers' secretive conduct in obtaining Dr. Platzer's and

6   Dr. Spar's letters in an attempt to achieve the sale of the Clippers that Donald refused cannot be

7   ignored. Accordingly, Donald requests that the Court find that the unclean hands doctrine

8   eliminates Shelly's entire action.

9          2.      **The Doctors' Letters Were Obtained Through False Pretenses, Undue**

10                 **Influence, and Unclean Hands**

11         Donald was induced to submit to medical examinations under false pretenses. Shelly, his

12  wife, induced him to meet with doctors she hired based on fraudulent representations. More

13  specifically, Shelly told her husband, to whom she owed fiduciary duties, that the examinations

14  were for "routine examinations" for Donald's 80th birthday. The doctors also failed to disclose the

15  purpose, nature, and consequences of the mental examinations or value Donald's privacy with

16  respect to his medical records in violation of federal and state law.

17         As soon as Shelly's lawyers decided to pursue their secret "Plan B" (seeking to push

18  Donald aside), they scrambled to find two doctors who could give Shelly what she wanted, namely

19  letters to declare Donald "incapacitated" so that he was removed as co-trustee and from

20  management of the Sterling Family Trust and its assets, including the Clippers. However, Shelly's

21  attorneys decided to cut a few corners in the process. The short cuts by the doctors chosen by

22  Shelly's attorneys are apparent from reading the doctors' letters.

23         Behavior which "brings the clean hands doctrine into operation must relate directly to the

24  transaction concerning which the complaint is made, i.e., it must pertain to the very subject matter

25  involved and affect the equitable relations between the litigants." *Camp v. Jeffer, Mangels, Butler*

26  *& Marmaro*, 35 Cal. App. 4th 620, 639 (1995). Pursuant to Civil Code section 1709, "[o]ne who

27  willfully deceives another with intent to induce him to alter his position to his injury or risk, is

28  liable for any damage which he thereby suffers." Civil Code section 1575 defines undue influence

Blecher Collins
Pepperman & Joye

07/25/2014

1  as: "(1) In the use, by one in whom a confidence is reposed by another, or who holds a real or

2  apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair

3  advantage over him; (2) In taking an unfair advantage of another's weakness of mind; or (3) In

4  taking a grossly oppressive and unfair advantage of another's necessities or distress." Undue

5  influence occurs when one is "induced to do or forbear to do an act which he would not do, or

6  would do, if left to act freely." *Odorizzi v. Bloomfield School Dist.*, 246 Cal. App. 2d 123, 132

7  (2014).

8       Admittedly, neither Shelly, nor Dr. Platzer, nor Dr. Spar disclosed to Donald that the

9  alleged tests and examinations of Donald were in any way related to the Sterling Family Trust, or

10  done for any legal purpose.  Shelly, her lawyers, and the doctors never disclosed or discussed that

11  Donald's supposed incapacity was at issue.  To the contrary, Donald agreed to "routine"

12  examinations, and Shelly told Donald that the "exam" was a continuation of and done as a result

13  of the tests Donald underwent earlier at Cedars-Sinai Medical Center.

14       On May 19, 2014, when Dr. Platzer examined Donald at his Beverly Hills home, Dr.

15  Platzer never inquired if Donald understood the nature of their meeting, if Donald was aware why

16  she was there.  She never informed Donald of her change of status from Donald's treating

17  physician to Shelly's expert witness.  Shelly and her lawyers knew, and they had a duty to disclose

18  this information to Shelly's husband and co-trustee.  Shelly intentionally failed to disclose the

19  information to Donald to gain a legal advantage over her husband, in breach of the covenant of

20  good faith and fair dealing and in violation of her fiduciary duties owed to Donald.

21       Like Dr. Platzer, Dr. Spar similarly failed to inform Donald about the purpose of their

22  meeting.  And again, Shelly was present and intentionally concealed from Donald her true

23  intentions.  In fact, Dr. Spar's letter specifically states that Donald was yanked out of his business

24  meeting and on several occasions tried to leave to return to his meeting, when Shelly stopped

25  Donald and prevented him from leaving.  Ex. 6.

26       These admissions from Shelly and the two doctors support Donald's position that the two

27  doctors' letters were improperly and/or illegally obtained.  Shelly and her lawyers, acting in

28

Blecher Collins
Pepperman & Joye

Exhibit D
Page 126

1   Shelly's own self-interest with complete disregard to Donald's interests, orchestrated the medical
2   examinations based on false pretenses with malice aforethought.

3       **3.      Shelly Breached Her Fiduciary Duties Toward Donald**

4       The record is clear that Shelly sacrificed her fiduciary obligations to her husband for her
5   own personal gain and benefit to Donald's detriment. The *Family Code* prohibits this behavior
6   between spouses. *Family Code* section 721 imposes "the highest good faith and fair dealing on
7   each spouse":

> . . . (b) Except as provided in Sections 143, 144, 146, 16040, and 16047 of the Probate Code, in transactions between themselves, a **husband and wife are subject to the general rules governing fiduciary relationships** which control the actions of persons occupying confidential relations with each other. This **confidential relationship imposes a duty of the highest faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other**. This confidential relationship is a fiduciary relationship subject to the same rights and duties of nonmarital business partners, as provided in Sections 16403, 16404, and 16503 of the Corporations Code, including, but not limited to, the following:
>
> (2) Rendering upon request, **true and full information of all things affecting any transaction which concerns the community property**. Nothing in this section is intended to impose a duty for either spouse to keep detailed books and records of community property transactions.

18  Fam. Code § 721 (emphasis added). "'[I]f one spouse secures an advantage from the transaction,
19  a *statutory presumption* arises under section 721 that the *advantaged spouse exercised undue*
20  *influence and the transaction will be set aside*.'" *Lintz v. Lintz*, 222 Cal. App. 4th 1346, 1353
21  (2014) (citation omitted) (emphasis added). The spouse advantaged by the transaction bears the
22  burden of establishing that the "disadvantaged spouse acted freely and voluntarily, with full
23  knowledge of all the facts, and with a complete understanding of the effect of the transaction." *Id.*
24  (internal quotations omitted). Because direct evidence is "'rarely obtainable,'" the Court "'must
25  determine the issue of undue influence by inferences drawn from all the facts and circumstances.'"
26  *Id.* at 1355.

27      In addition, Corporation Code § 16404 states in pertinent part:



(a) The fiduciary duties a partner owes to the partnership and the other partners are the **duty of loyalty and the duty of care** set forth in subdivisions (b) and (c).

(d) A partner shall discharge the duties to the partnership and the other partners under this chapter or under the partnership agreement and exercise any rights consistently with the obligation of **good faith and fair dealing**.

Corp. Code § 16404 (emphasis added).

A revocable trust created by two settlors as husband and wife is a contract between the spouses. Implied in every contract is a covenant of good faith and fair dealing. Restatement (Second) of Contracts, § 205. As co-trustees, Donald and Shelly each owed fiduciary duties to each other as trustees and beneficiaries of the Sterling Family Trust.

Shelly negotiated terms within the BTS for her own benefit, including the rights to tickets, parking, VIP passes, rings, and titles. *See* Ex. 3 at 9-10 [BTS, Lifetime Rights]. Shelly's assignment of these rights to the Sterling Family Trust as "community property" (*see* Ex. 33) is illusory by virtue "of the restrictions in effect with respect to Donald['s]...further participation in any activities involving or relating to the ... NBA ... or the Clippers ..." *Id.* Finally, Shelly, under the terms of the BTS, negotiated the right to allow up to 10% of the stock in the Corporation owning the Clippers to be retained and contributed to a charitable foundation. *See* Ex. 3 at 1-2. If exercised, this would deprive Donald of up to $100,000,000 from his share of the community property interest. The "benefits" and "perks" Shelly testified that she retained for her own self-interest are a breach of her fiduciary duty under Probate Code § 16003.

As explained above, the doctors' letters that Shelly obtained to remove Donald as a co-trustee were obtained on false pretenses by means which constitute unclean hands. Shelly, her lawyers acting on her behalf, and the doctors working for and with her lawyers concealed from Donald that he was being asked to participate in an evaluation to be used for legal purposes, more specifically, to remove him from all decision-making in running the Sterling Family Trust. The lack of disclosure and lack of notice violate the terms of the Sterling Family Trust.

When Shelly decided to push Donald aside by any means necessary, her actions were in violation of her duties to Donald as her spouse and as her co-trustee.

-48-

**4.      The Conduct of Shelly's Lawyers, As Her Agents, Is Imputed to Her**

Shelly cannot insulate herself from the acts of her lawyers and their intentional and nefarious acts in creating and implementing secret Plan B. Even if secret Plan B was created and carried out solely by Shelly's lawyers, as Shelly falsely testified, such acts can be imputed to Shelly because of her agency relationship with her counsel. "An agent is one who represents another, called the principal, in dealings with third persons." *Civ. Code* § 2295. In California, "agency is either actual or ostensible." *Id.* § 2298. "An agency is actual when the agent is really employed by the principal." *Id.* § 2299. A party is held to know what their attorney "knows and should communicate to [them]." *Lazzarevich v. Lazzarevich*, 39 Cal. 2d 48, 50 (1952); *accord Civ. Code* § 2332 (principal deemed to know whatever agent knows "and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the [principal]").

The knowledge of the agent in the course of the agency is the knowledge of the principal. *In re Marriage of Cloney*, 91 Cal. App. 4th 429, 439 (2001). This is true even if "the knowledge acquired by the agent was not actually communicated to the principal." *Riordan v. Federal Kemper Life Assurance*, 36 Cal. 4th 281, 288 (2005). A client has constructive notice where, as here, "'the knowledge of the attorney has been gained in the course of the particular transaction in which he has been employed by that principal.'" *Zirbes v. Stratton*, 187 Cal. App. 3d 1407, 1413 (1986) (citation omitted). It is well-settled that "'one who acts through another will be presumed to know all that the agent learns during the transaction, whether it is actually communicated to him or not.'" *Watson v. Sutro*, 86 Cal. 500, 517 (1890); *accord Maron v. Swig*, 115 Cal. App. 2d 87, 90 (1952). The rule applies to attorneys as well as other agents. *See, e.g., Stalberg v. Western Title Ins. Co.*, 27 Cal. App. 4th 925, 930 (1994). "Notice to counsel or attorney is constructive notice to client." *Watson*, 86 Cal. at 516-17. Thus, "'one who acts through another will be presumed to know all that the agent learns during the transaction, whether it is actually communicated to him or not.'" *Id.* at 517. As such, the unclean hands of Shelly's attorney <u>must</u> be imputed to Shelly.

**C.   The Doctors' Letters and Medical Information Therein Were Obtained in Violation of CMIA**

California law has long recognized that a person's medical profile is an area of privacy infinitely more intimate and more personal in quality and nature than many areas already judicially recognized and protected. *Cutter v. Brownbridge*, 183 Cal. App. 3d 836 (1986).  Moreover, individuals, as patients, have a substantial interest in the privacy of their medical information. *Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal. 4th 1 (1994).  There is a reasonable expectation to privacy under the California Constitution.  "A person's medical profile is an area of privacy infinitely more intimate, more personal in quality and nature than many areas already judicially recognized and protected." *Board of Medical Quality Assurance v. Gherardini*, 93 Cal. App. 3d 669, 679 (1979).

With this in mind, the California Legislature enacted the Confidentiality of Medical Information Act ("CMIA") in an attempt to further protect and safeguard the release of an individual's private medical information.  CMIA specifically states that "a provider of health care . . . shall not disclose medical information regarding a patient of the provider of health care . . . without first obtaining an authorization. . ." *Civ. Code* § 56.10(a).

The purported waiver of medical privacy rights in the Sterling Family Trust is invalid because it fails to comply with the statutory requirements for a valid waiver.  CMIA specifically states that "a provider of health care . . . shall not disclose medical information regarding a patient of the provider of health care . . . without first obtaining an authorization, except as provided in subdivision (b) or (c)." *Civ. Code* § 56.10(a).  None of the exceptions provided for under either subdivision (b) or (c) are applicable in this case.  In order for a patient to waive or authorize the release of their confidential individual identifiable private medical information, the authorization is valid if it:

> (a) Is handwritten by the person who signs it or is in a typeface **no smaller than 14-point type.**
>
> (b) Is clearly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization.

DONALD T. STERLING'S POST-TRIAL BRIEF

Blecher Collins
Pepperman & Joye

1

2      (d) States the specific uses and limitations on the types of medical information to be disclosed.

3

4      (e) States the name or functions of the provider of health care, health care service plan, pharmaceutical company, or contractor that may disclose the medical information.

5

6      (f) States the name or functions of the persons or entities authorized to receive the medical information.

7      (g) States the specific uses and limitations on the use of the medical information by the persons or entities authorized to receive the medical information.

8

9      (h) States a specific date after which the provider of health care, health care service plan, pharmaceutical company, or contractor is no longer authorized to disclose the medical information.

10

11     (i) Advises the person signing the authorization of the right to receive a copy of the authorization.

12

13     *Civ. Code* § 56.11.  On the face of the Sterling Family Trust, there was no compliance with the

14     provisions of the CMIA to effectuate a valid waiver.  Moreover, CMIA expressly provides that

15     "[a]ny waiver by a patient of the provisions of this part, except as authorized by Section 56.11 or

16     56.21 or subdivision (b) of Section 56.26 [both of which are inapplicable], **shall be deemed**

17     **contrary to public policy and shall be unenforceable.**" *Civ. Code* § 56.37 (emphasis added.)

18          Statutory requirements of type size and formatting to make waivers and notices effective

19     **are not mere formalities,** but rather serve to ensure that minimum requirements for imparting

20     notice or understanding of the consequences of an action.  A waiver or notice is invalid if the

21     statutory requirements are not satisfied.  *See, e.g., Harustak v. Wilkins,* 84 Cal. App. 4th 208

22     (2001) (involved invalidity of a Probate Code section 16061.7 notice), *See also Conservatorship*

23     *of Link,* 158 Cal. App. 3d 138, 141-42 (1984).  HIPAA's and CMIA's requirements for a valid

24     waiver involve policies and issues of personal health autonomy that are of more importance than

25     the policy underlying the time limitations on contesting a trust.  The waiver provision in the

26     Sterling Family Trust is not conspicuous and therefore not reasonably equivalent to the statutory

27     requirements for type face and style.  Any purported waiver must be narrowly construed and does

28

Blecher Collins
Pepperman & Joye

-51-

DONALD T. STERLING'S POST-TRIAL BRIEF

1  not broadly encompass Donald seeking treatment regardless of the secret and nefarious motive and

2  objective of Shelly and her attorneys.

3        On the face of the Sterling Family Trust, there is no waiver of Donald's rights under

4  CMIA.  Even if the Court attempted to construe the purported waiver of HIPAA to apply to

5  CMIA, the statutory requirements under the CMIA are net met by the Removal Provision located

6  at Section 7.5.c of the Sterling Family Trust.  There is no case law that allows this Court to ignore

7  the statutory requirements under CMIA for an effective waiver.  *Civ. Code* § 56.37.  The law

8  states that there shall be not waiver if there is not complete compliance and that the any other

9  attempt to waive this right which does not comply **"shall be deemed contrary to public policy**

10  **and shall be unenforceable."**  *Civ. Code* §56.11 (emphasis added).

11        In addition, here, it is undisputed that Donald believed that the doctors were present for

12  treatment of Donald's perceived memory problems based on Shelly's concerns for her husband.  It

13  is also undisputed that Donald was not advised that the purpose of the doctors' visits was to

14  evaluate and determine Donald's capacity and removal as trustee as co-trustee of the Sterling

15  Family Trust he established with his wife.  Any purported waiver of HIPAA must be determined

16  in light of Donald's belief and understanding that he was being treated by Dr. Platzer and Dr.

17  Spar.  The fact that Shelly's attorneys dispatched the doctors for the purpose of determining

18  Donald's capacity to serve as co-trustee of the trust he established cannot alter Donald's

19  understanding that the doctors were there to treat him.

20        Even if the purported HIPAA waiver were valid (which it is not for failing to satisfy the

21  statutory requirements), it must be narrowly construed.  Indeed, courts may not extend the waiver

22  of privileges, including the physician-patient privilege, beyond the express limits of section 912.

23  *Simmons v. Ghaderi*, 44 Cal. 4th 570, 586 (2008).  In light of the important public policies

24  underlying privileges, the scope of the waiver of a privilege is generally construed narrowly.  *See*

25  *Fortunato v. Superior Court* 114 Cal. App. 4th 475, 482 (2003) (privilege against forced

26  disclosure of tax return); *2,022 Ranch v. Superior Court*, 113 Cal. App. 4th 1377, 1395 (2003)

27  (attorney-client privilege); *San Diego Trolley, Inc. v. Superior Court*, 87 Cal. App. 4th 1083, 1092

28

Blecher Collins
Pepperman & Joye

1  (2001) (psychotherapist-patient privilege); *Transamerica Title Ins. Co. v. Superior Court*, 188 Cal.

2  App. 3d 1047, 1052 (1987) (attorney-client privilege).

3       Thus, by its express terms, the Removal Provision does not waive the privacy rights

4  afforded to Donald under CMIA.  Moreover, Section 264(c)(2) of HIPAA explicitly provides that

5  a regulation promulgated under HIPAA shall not supersede a contrary provision of state law if the

6  provision of state law imposes requirements, standards, or implementation specifications that are

7  more stringent than the requirements, standards, or implementation specifications imposed under

8  the regulation.  In other words, HIPAA does not preempt CMIA, and the California Supreme

9  Court's holding in *Brown v. Mortensen*, 51 Cal. 4th 1052 (2011) stands for this proposition.

10  Accordingly, Donald's medical information is protected under CMIA, and the release of his

11  medical information to Shelly, her lawyers, the NBA, other third parties, and the public without

12  his consent is absolutely unlawful.

13       At no time did Donald authorize, in writing or otherwise, Dr. Platzer or Dr. Spar to release

14  his private medical information to Shelly, her attorneys, or any other third party.  Yet, quite

15  incredulously and in direct contravention and violation of CMIA, Donald's doctors released his

16  private medical information without his written consent or authorization.  CMIA is clear that any

17  person or entity that wishes to obtain private medical information on an individual pursuant to

18  subdivision (a) of Section 56.10 must obtain a valid authorization for the release of this

19  information.  At the time of the examinations, Donald provided no valid, knowing authorization to

20  Shelly, Shelly's lawyers, or Donald's physicians with regard to the release of his medical records.[7]

21  CMIA affords Donald additional privacy protections, and Donald's privacy rights as to his

22  medical information were not waived under the Removal Provision of the Sterling Family Trust

23  document.  Accordingly, Shelly must not be permitted to rely on Donald's medical records which

24  were obtained inequitably by unclean hands.

25

26

27  [7] Even if the waiver provision in section 7.5.c were read to include CMIA, the waiver does not

28  comply with CMIA's stringent requirements, e.g. larger type, set apart, and separately signed and dated.

Blecher Collins Pepperman & Joye

1

**1.**   **The Medical Information Illegally Obtained May Not Be Used For the**

2

**Purposes of Removing Donald as a Co-Trustee**

3    If a patient is treated by a physician for one purpose, that confidential individual

4  identifiable private medical information cannot be used for another purpose.  In *Pating v. Board of*

5  *Medical Quality Assurance*, 130 Cal. App. 3d 608 (1982), the court held that "exclusionary rule

6  [applied] to [prevent the] admission of evidence obtained in violation of the patient's

7  constitutional right of privacy." *Id.* at 617.  "Such a misuse of information that was properly

8  obtained for another purpose can also form the basis of a claim for violation of the state

9  constitutional right to privacy." *Pettus v. Cole*, 49 Cal. App. 4th 402, 458 (1996) (citation

10  omitted).  "It is equally reasonable, pursuant to the provisions of section 56.20 [CMIA], for an

11  employee to expect that extraneous information about his personal life and thoughts,

12  communicated in confidence to a psychiatrist in an employment-related examination, will not be

13  used by his employer as the basis for adverse personnel action." *Id.* at 459.

14    In *Skeels v. Pilegaard*, 2013 U.S. Dist. LEXIS 34302 (court date 2013), the court

15  recognized a "that a disclosure of medical information in violation of the CMIA supports a privacy

16  claim under the California Constitution.  *See Pettus*, 49 Cal. App. 4th at 440-47 (noting that the

17  reasonableness of a plaintiff's expectation of privacy in his medical information was confirmed by

18  the protection of such information by the CMIA, and that this supported a constitutional privacy

19  claim)."

20    *Kramer v. Policy Holders Life Insurance Assn.*, 5 Cal. App. 2d 380 (1937) involved non-

21  waiver of the doctor-patient privilege. *Kramer* is instructive in connection with Shelly's retention

22  of Dr. Platzer and Dr. Spar and the concept that a doctor may not serve two masters:

23        If, upon request or upon his own motion he (the doctor) assumes to
       advise or administer treatment to the patient, and the latter in any
24        manner acquiesces therein, the physician thereby casts aside his
       relation as an employee of the company, and transfers his
25        allegiance to the patient.  In such instances a case is presented
       where one cannot serve two masters at one and the same time. The
26        allegiance of the physician must be wholly upon one side or the
       other. It matters not, in this connection, who calls him in the first
27        instance, or who pays him. He may present himself at the side of
       the patient of his own motion and he may not expect or in fact
28        receive pay.

Blecher Collins
Pepperman & Joye

*Id.* at 387.

While on the stand on three separate occasions, Dr. Platzer unequivocally testified that she did not conduct the examination on May 19, 2014 for the purposes of the Sterling Family Trust. As in *Pettus*, Donald had a reasonable expectation of privacy that his communications regarding his medical health would not be used for the purposes of his removal. Donald was never informed of Shelly's secret "Plan B" or that the results would be used for another purpose.

More specifically, Dr. Platzer (and maybe Dr. Spar) had a duty to claim the privilege on behalf of her non-consenting patient. In this case, Donald did not consent to the release of his private medical records for another purpose – to use to disqualify him as a co-trustee of his trust. In *Board of Medical Quality Assurance v. Gherardini*, 93 Cal. App. 3d 669, 675 (1979), the court confronted:

> [A] threshold question of the right of [the provider] to assert the statutory privilege or constitutional rights to privacy on behalf of the patient who, insofar as the record reflects, has not been notified of the Medical Board's desire to look at the data or consented to such an examination by the investigators. [The provider], a third party recipient of privileged matter, has standing to claim the privilege on behalf of the absent nonconsenting patient (citation omitted) and under the "vicarious exclusionary rule" to object to the admission of evidence obtained in violation of another's constitutional rights (citation omitted).

Donald did not consent to the release of his medical information, nor did he waive his privacy rights. Shelly's contention that Donald waived all his privacy rights pursuant to the Removal Provision of the Sterling Family Trust is misplaced.

Dr. Spar and Dr. Platzer's medical examinations of Donald cannot be used to implement the Removal Provision under the Trust because they were not obtained for that purpose. And, even if the Court finds that Dr. Spar's evaluation was for such purposes it most certainly cannot make the same finding with regard to Dr. Platzer's examination without both the the Removal Provision is not triggered.

## 2.   Case Law Exists to Exclude the Illegally Obtained Medical Evidence

New York's supreme courts have addressed the issue of evidentiary exclusion of medical information obtained without the requisite HIPAA authorization and held that the suppression was

Blecher Collins Pepperman & Joye

1  appropriate. *Keshecki v. St. Vincent's Medical Center*, 785 N.Y.S.2d 300 (Sup. Ct. 2004) was a

2  medical malpractice case in which the defense counsel discussed the plaintiff's medical condition

3  with her treating physician without first obtaining a HIPAA authorization form. In addressing the

4  HIPAA violation, the court reasoned: "HIPAA protects that privacy of the plaintiff, and this court

5  must protect that right. The only adequate remedy is to preclude any evidence obtained contrary

6  to those safeguards." *Id.* at 545. Moreover, the *Keshecki* court detailed what must be included in

7  a HIPAA authorization in order for an attorney to have private discussions with a party's

8  physician.

9       Furthermore, in *Matter of Derek*, 821 N.Y.S.2d 387, 390 (Sur. Ct. 2006), the court

10  precluded treating physicians' affirmations from a guardianship proceeding where they failed to

11  observe the physician-patient privilege as well as HIPAA's privacy rule. In *Matter of Miguel M.*

12  *(Barron)*, 17 N.Y.3d 37, 45 (N.Y. 2011) held that "medical records obtained in violation of

13  HIPAA or the Privacy Rule, and the information contained in those records, are not admissible in"

14  and suppressed the medical records.

15       Donald respectfully renews his request that this Court exclude the doctors' letters because

16  Donald's medical records were improperly disclosed in violation of HIPAA and CMIA.

17       **D.   Estoppel Does Not Assist Shelly's Cause**

18       "One who seeks equity must do equity" is a well-established maxim of equity. Shelly

19  cannot prove the elements of estoppel. Equitable estoppel "requires: (1) the party to be estopped

20  knew the facts; (2) the other party was ignorant of the facts; (3) the party intended his [or her]

21  conduct would be acted upon, or acted in a manner that the party asserting the estoppel had a right

22  to believe it so intended; and (4) the other party relied upon the conduct to his [or her] injury.

23  Where one of the elements is missing, there can be no estoppel." *Dollinger DeAnza Assoc. v. Chi.*

24  *Title Ins. Co.*, 199 Cal. App. 4th 1132 (2011). Another maxim of jurisprudence states: "He who

25  comes into equity must come with clean hands."

26       Donald is the longest-tenured owner in the NBA and the owner of a real estate empire. He

27  is well-known for never selling any of his properties. Shelly, his wife of nearly six decades, has

28  always known that Donald never wanted to sell the Clippers (with the accompanying capital gains

Blecher Collins Pepperman & Joye

1   tax of $650 million), a unique asset in high demand and appreciating value, and never intended to

2   sell the Clippers in his lifetime.

3           Indeed, Shelly and her lawyers vowed to fight to keep the Clippers up until their meeting

4   with the NBA on May 13. Shelly knew that Donald did not agree to unilaterally authorize Shelly

5   to sell the Clippers. And Donald most certainly did not agree to the terms to which Shelly

6   attempted to bind the Sterling Family Trust to her self-interested benefit and his detriment. As of

7   May 22, 2014, Shelly and her lawyers knew Donald had been examined by two doctors and

8   deemed incapacitated. Why did they still seek the May 22, 2014 authorization without disclosing

9   that fact? And why did they continue to seek Donald's consent to the sale up until May 29 when

10  they sold it from under him?

11          Donald's statements, and those made by his lawyers, to Shelly did not authorize Shelly to

12  unilaterally negotiate for and sell the team without his consent, involvement, and approval. Shelly

13  knew that Donald intended only for Shelly to negotiate and bring back a deal for his approval –

14  not to actually sell the team from under him. Shelly knew that Donald's intent was only for her to

15  solicit offers, i.e., conduct an auction and then they would make the final decision together.

16          In fact, the record is clear that Shelly and the NBA did not rely on Donald's consent. By

17  the time that Shelly actually entered into the BTS with Mr. Ballmer, she and her lawyers had

18  already shifted to secret Plan B and did not come to final terms with Mr. Ballmer in reliance on

19  Donald's statements. This is made clear by the fact that the BTS contains the condition precedent

20  and a recital of the circumstances. On May 29, 2014, after Donald told Shelly he refused to sell,

21  secret Plan B was immediately implemented, and 30 minutes later, Shelly signed off on Donald's

22  removal as co-trustee. This was the very first time Donald's lawyers learned that Shelly had

23  misusing Donald's protected health information.

24          As Shelly also knows, Donald only agreed to allow Shelly to solicit bids because Shelly

25  promised and assured him that Shelly would be able to own at least 20% of the team with the new

26  owner; otherwise, she promised she would not sell. Shelly told Donald that she and her attorney

27  had already agreed to that with Commissioner Silver and the NBA. Donald felt guilty that he had

28  brought all this on his wife and she should not be punished and lose her 50% ownership via the

Blecher Collins
Pepperman & Joye

BC
PJ

1    NBA's termination proceedings. When Donald realized that Mr. Ballmer was going to be 100%

2    owner of the Clippers and Shelly was not going to retain any ownership stake (other than the up to

3    10% interest that would be retained in the form of her charitable foundation out of her portion of

4    the sale proceeds), Donald did not agree to those terms of the sale that were not consistent with

5    Shelly's promise to him.

6            As such, equitable estoppel does not support Shelly's position and should not be relied

7    upon by this Court.

8        **E.    Shelly's "Best Interests" Argument Is Also Futile**

9            If the Court is asked to determine the issue of what is in the best interests of the Sterling

10   Family Trust, it must have already found that Shelly attempted to wrongfully and illegally remove

11   Donald as a co-trustee. It is clear that Shelly's sole motivation was to be able to control the sale of

12   the Clippers. Now she is seeking to continue with the sale even though she has unclean hands.

13   Her wrongful conduct should not be rewarded by the Court. Her request to carry out her unilateral

14   prospective sale of the Clippers over her husband's objection should be denied.

15           Shelly's "best interests" argument is not founded in law or equity. Shelly asks this Court

16   to find that, even though she fraudulently removed her husband as a co-trustee of the Sterling

17   Family Trust, this Court should still authorize Shelly to unilaterally proceed with the sale of the

18   Clippers to Mr. Ballmer. This is only Shelly's best interests. Such contention is wholly without

19   merit. Shelly's argument ignores the basic underpinnings of Shelly's fiduciary duties, as a co-

20   trustee to the settlors and beneficiaries of the Sterling Family Trust, namely to Donald. *See* Prob.

21   Code §§ 16002 (duty of loyalty), 16003 (duty of impartiality), 16004 (duty to avoid a conflict of

22   interest), and 16013 (duty of co-trustees to one another). It also ignores that if Donald and Shelly

23   hold on to the Clippers and the team passes by succession, there would be a stepped-up basis as to

24   the value of the team, which significantly reduces any capital gains taxes (estimated at plus or

25   minus $650 million) that would be due if the team was sold. Lastly, Shelly's assertion that the

26   sale of the Clippers to Mr. Ballmer is in the best interests of both Shelly and Donald is wholly

27   speculative. Sports franchises are unique trophy assets, akin to a Faberge egg, in high demand

28   such that the loss of the asset cannot be replaced and the harm to Donald is irreparable. No one

-58-

**DONALD T. STERLING'S POST-TRIAL BRIEF**

Blecher Collins Pepperman & Joye

1  can reliably predict the value of a sports franchise in the future. It is equally plausible that the

2  team would be worth more than $2 billion in the future. Would the very successful Mr. Ballmer

3  pay $2 billion for an asset he expected to depreciate?

4       Shelly's argument considers only her own interests, is speculative, and should be rejected.

**III.    The Court Should Not Make Orders under Probate Code section 1310(b)**

6       This Court cannot grant Shelly's request for an order under *Probate* Code section 1310(b)

7  because Shelly has not and cannot make an affirmative showing of an extraordinary circumstance

8  involving a potential irreparable injury or loss of the sort contemplated under the code or by the

9  Legislature. Therefore the exception under this section preventing a stay on appeal cannot apply.

10  Generally, an appeal from a probate proceeding is governed by *Probate Code* sections 1300-1312.

11  More specifically, *Probate Code* section 1304 specifies which orders from a trust proceeding are

12  appealable. Any final order issued by this Court on Shelly's Petition under *Probate Code* section

13  17200 is certainly appealable. *Prob. Code* § 1304(a). Probate Code section 1310 provides:

14       1310. (a) **Except as provided in subdivisions (b), (c), (d), and
         (e), an appeal pursuant to** Chapter 1 (commencing with Section
15       1300) **stays the operation and effect of the judgment or order.**
              (b) Notwithstanding that an appeal is taken from the judgment or
16       order, **for the purpose of preventing injury or loss to a person
         or property,** the trial court **may** direct the exercise of the powers
17       of the fiduciary, or may appoint a temporary guardian or
         conservator of the person or estate, or both, or a special
18       administrator or temporary trustee, to exercise the powers, from
         time to time, as if no appeal were pending. All acts of the
19       fiduciary pursuant to the directions of the court made under this
         subdivision are valid, irrespective of the result of the appeal. An
20       appeal of the directions made by the court under this subdivision
         shall not stay these directions.

*Prob. Code* § 1310(b) (emphasis added).

22

23       The general rule is that appeals in probate proceedings automatically stay the operation and

24  effect of the appealed order. *Prob. Code* § 1310(a). Only when it is necessary to take immediate

25  action to prevent imminent "injury or loss to a person or property," or appoint a temporary trustee

26  a probate court <u>may</u> direct a trustee to exercise such powers as if no appeal were pending. *Id.* §

27  1310(b). Such an order is the exceedingly rare exception to the general rule. Shelly bears the

28

Blecher Collins
Pepperman & Joye

1  burden of establishing the imminent injury or loss to person or property. *Gold v. Superior Court*,

2  3 Cal. 3d 275, 285 (1970).

3      In *Gold*, the California Supreme Court construed an analogous provision that applies in

4  guardianship and conservatorship proceedings. *Id.* at 279. The *Gold* court reasoned the statutory

5  exception should be narrowly construed and carefully restricted to cases where there is an

6  affirmative showing of extraordinary circumstances.

7        By specifically conditioning the application of the statute upon the
prevention of injury or loss to person or property the Legislature

8  has determined that the exception should be operative only in a
limited class of cases. This language, with its emphasis upon

9  preventive action, imports a sense of urgency. While such
situations are not inconceivable, the necessity for immediate action

10  to avert such potential injury or loss is not a common circumstance
in the usual conservatorship proceeding. Thus, on its face, the

11  language of the statute indicates (1) that the only instances
properly falling within the ambit of the exception are those which

12  present a necessity for preventive action against particular risk
contemplated by the statute; and (2) that such instances are

13  probably rare. In sum, the language of this statute strongly
suggests that the exception applies only to the exceptional case

14  involving a risk of imminent injury or loss.

15  *Id.* at 281; *see also Conservatorship of Hart*, 228 Cal. App. 3d 1244, 1261 (1991) (requiring clear

16  justification with showing of risk of imminent injury or loss).

17      Similar provisions have been extant for many years. *Gold*, 3 Cal. 3d at 281-85 (discussing

18  provisions of predecessor statute governing exception in conservatorship proceedings under

19  former *Probate Code* § 2102); *Hart*, 228 Cal. App. 3d 1244, 1252-53 (1991) (discussing

20  provisions of predecessor statute governing exceptions in conservatorship proceedings under

21  former *Probate Code* § 2751); *Conservatorship of McElroy*, 104 Cal. App. 4th 536, 556-558

22  (2002) (discussing provisions of predecessor statute governing exception in conservatorship

23  proceedings under former *Probate Code* § 7241). In part because one effect of such an order is to

24  "abrogate, at least as a practical matter, an appellant's statutory right to review of the earlier order,

25  exercise of the power granted by [*Probate Code* § 1310(b)] must be clearly justified by a showing

26  of *risk of imminent* injury or loss." *Hart*, 228 Cal. App. 3d at 1262 (emphasis added); *see also*

27  *Gold*, 3 Cal. 3d at 281-82.

28

-60-

Blecher Collins
Pepperman & Joye

1    Here, a direction under Probate Code Section 1310(b) is specifically not appropriate

2    because there is no injury or loss to Sterling Family Trust property. The Sterling Family Trust has

3    been revoked. As discussed above, its assets are now the community property of Donald and

4    Shelly. Finally, the only property at issue are the shares of LAC Basketball Club, Inc., a

5    corporation, which are **_not_** being sold. The BTS pertains to assets of the corporation only, which

6    are not subject to the jurisdiction or order of this Court.

7    ### A.    The Legislative History Makes Clear that Probate Code Section 1310(b)

8    ### Does Not Apply to This Case

9    The current enactment of *Probate Code* section 1310(b) is as amended by the Legislature

10   in July 2010 by Assembly Bill 2271 (Silva) ("AB 2271"). The legislative history establishes the

11   type of risk or injury contemplated. It is not found in this case.

> The touchstone of statutory interpretation is the probable intent of
> the Legislature. When interpreting a statute, we must ascertain
> legislative intent so as to effectuate the purpose of a particular law.
> Of course our first step in determining that intent is to scrutinize
> the actual words of the statute, giving them a plain and
> commonsense meaning.

16   *Quarterman v. Kefauver*, 55 Cal. App. 4th 1366, 1371 (1997), *citing Cal. Teachers Assn. v.*

17   *Governing Bd. of Rialto Unified School Dist.*, 14 Cal. 4th 627, 632-33 (1997). "When the words

18   are clear and unambiguous, there is no need for statutory construction or resort to other indicia of

19   legislative intent, such as legislative history." *Quarterman*, 55 Cal. App. 4th at 1371, citing *Cal.*

20   *Fed. Savings & Loan Assn. v. City of Los Angeles*, 11 Cal. 4th 342, 349 (1995). "But language

21   that appears unambiguous on its face may be shown to have a latent ambiguity; if so, a court may

22   turn to customary rules of statutory construction or legislative history for guidance." *Quarterman*,

23   55 Cal. App. 4th at 1371, citing *Stanton v. Panish*, 28 Cal. 3d 107, 115 (1980).

24   If the meaning of the statutory language is not clear, the Court may enlist extrinsic aids,

25   including the legislative history of the statute, to divine the legislative intent. But if neither the

26   words of the statute nor its history expose a clear meaning, the Court must "apply reason and

27   practicality, and interpret the statute in accord with common sense and justice, and to avoid an

28   absurd result." *In re Marriage of Campbell*, 136 Cal. App. 4th 502, 506 (2006). Thus, the Court

*Blecher Collins Pepperman & Joye*

-61-

**DONALD T. STERLING'S POST-TRIAL BRIEF**

1   cannot sacrifice the legislative purpose to a literal construction of a statute. *Slatkin v. White*, 102

2   Cal. App. 4th 963, 970 (2002). The interpretation and application of a statutory scheme presents a

3   pure question of law. *Robertson v. Health Net of Cal., Inc.*, 132 Cal. App. 4th 1419 (2005); *In re*

4   *Marriage of Campbell*, 136 Cal. App. 4th at 506.

5        A court may take judicial notice of legislative analyses of bills prior to passage as an aid to

6   the interpretation of a statute. *Evid. Code* §§ 452(c), 455, 459; *McDowell v. Watson,* 59 Cal. App.

7   4th 1155, 1161-62, n.3. (1997).

8        Here, the Court is asked to interpret what is the "injury or loss to a person or property"

9   contemplated by the Legislature because these words are not clear or unambiguous. *Prob. Code* §

10   1310(b). This Court must determine what constitutes such an injury or loss that triggers the

11   exception to the stay of an appeal. A review of the legislative history and case law interpreting

12   predecessor statutes make it clear that this exception can only be applied in a limited class of cases

13   where there is a showing that a stay of the appeal has a ***direct effect on life or death decisions***.

14   Neither the Legislature nor any reported cases have interpreted the "injury or loss to a person or

15   property" to mean whether a party would receive some dollar amount more or less if a transaction

16   is approved or disapproved by the Court. Such a finding would have a chilling effect on litigants'

17   rights to appellate jurisdiction.

18        Because "injury or loss to a person or property" in *Probate Code* section 1310(b) could be

19   subject to multiple interpretations, it is critical that the Court review the legislative history. In AB

20   2271, for the first time, the Legislature contemplates the addition of the terms "trust" and

21   "trustee." None of the previous incarnations of this subsection of the statute (former *Probate Code*

22   §§ 1631, 1632, 2102, 2751, 2752, 7241, former *Code of Civil Procedure* §§ 966, 1765, and former

23   *Guardianship Act of 1850* § 14) reference a trust or a trustee. AB 2271 was introduced to the

24   Assembly Committee on Judiciary on February 18, 2010. 2009 Bill Tracking CA A.B. 2271. The

25   key issue before the Assembly Committee on Judiciary was the following question: "In order to

26   protect a trust's assets and beneficiaries, should a court be permitted to appoint a temporary trustee

27   to protect a trust while an order is on appeal?" 2009 Legis. Bill Hist. CA A.B. 2271 (March 10,

28   2010).

**DONALD T. STERLING'S POST-TRIAL BRIEF**

The synopsis of AB 2271, as stated before the Assembly Committee on Judiciary, is as follows:

> This non-controversial bill, sponsored by the Conference of California Bar Associations, seeks to protect a trust and its beneficiaries from harm, pending appeal of a court order concerning the trust. As a general rule, an appeal of an order in probate court stays the order. This bill allows a court to appoint a temporary trustee during appeal of an order regarding the trust, such as an order removing the original trustee for dishonesty. There is no known opposition to this bill.

*Id.* AB 2271 was summarized as follows: "Expands a court's ability to protect a trust against loss when an order is on appeal. Specifically, this bill allows a court to appoint a temporary trustee when an appeal is pending in order to prevent injury or loss to a person or property." *Id.* As part of the Legislative Comments, the following hypothetical was posed to illustrate the purpose of the amendment:

> The need for this provision is best demonstrated by the following example:
>
> Suppose a trustee is stealing funds from a trust and one of the trust's beneficiaries, learning of the theft, brings an action to remove the trustee. The court rules in the beneficiary's favor and orders the removal of the trustee, but the trustee appeals. Under existing law, the removed trustee would continue to serve as trustee pending the appeal, potentially raiding the trust before the appeal is considered. The bill allows the court to appoint a temporary trustee to protect the trust estate pending the appeal.

*Id.;* 2009 Legis. Bill Hist. CA A.B. 2271 (June 28, 2010) (as also discussed on the Assembly Floor and stating that AB 2271 "[e]xpands a court's ability to protect a trust against loss when an order is on appeal. Specifically, this bill allows a court to appoint a temporary trustee when an appeal is pending in order to prevent injury or loss to a person or property.").

The legislative history on July 17, 2010 from the California Senate Floor further sheds light on the legislative intent:

> AB 1172 (Kaloogian), Chapter 724, Statutes of 1997, consolidated the various appeal provisions under the Probate Code and provided the circumstances under which an appeal stays an order during the pendency of the appeal. Under the provisions of AB 1172, the court could appoint a temporary guardian or conservator of the person or estate, or a special administrator to exercise fiduciary powers for the purpose of preventing injury or loss to a person or property. AB 1669 (Committee on Judiciary), Chapter 688,

Blecher Collins Pepperman & Joye

1   Statutes of 2000, added bond requirements to these appeal
2   provisions. This bill authorizes a court to appoint a temporary
    trustee to exercise fiduciary powers to prevent loss to the trust
    property during an appeal.
3
4   2009 Legis. Bill Hist. CA A.B. 2271 (June 17, 2010). According to Assembly Member Silva's
5   office the argument in support of AB 2271 was that:
6   Current law does not permit a court to appoint a temporary trustee
    to manage an estate in probate after the court has ordered the
    trustee removed and the trustee has appealed the court's decision.
7   In most cases, the court's decision to remove the trustee is because
    of a need to protect the trust estate and beneficiaries from the
8   trustee's incompetence, dishonesty, or both. Yet existing law
    permits the incompetent or dishonest trustee to remain in authority
9   until the appeal has run its course, threatening to compound the
    damage already done to the trust estate.
10
11  *Id.* Here, the legislative history makes clear that the sort of limited situation contemplated by the
    Legislature relating to a trust and a removed trustee is one where the "fox is guarding the hen
12
13  house" or that there is a Court determination of incompetence, dishonesty, or both. Here, neither
14  issue is before this Court. Shelly's requested relief is that she be conferred authority to take a
15  specific action. If any beneficiaries' interest needs to be protected from the fox, it is most
16  certainly *Donald*, who needs protection from Shelly and her attorneys who have shown that they
17  will go to any measures to deprive Donald of his right to defend himself against the NBA's threats
18  of seizing the Clippers. This is clear from Shelly's and her attorneys' implementation of secret
    Plan B.
19
20  **B.   No Case Law Supports Shelly's Claim that the Revoked Sterling Family Trust**
21  **Will Suffer Irreparable Injury to Person or Property**

22      The Legislature's intent to limit the application of the exception to the automatic appellate
23  stay is further illustrated by the fact that there are no published decisions which relate to a trust
24  proceeding and *Probate Code* section 1310(b) or its predecessors. The exception to the automatic
25  appellate stay must be narrowly construed. *Gold*, 3 Cal. 3d at 282. "By specifically conditioning
26  the application of the statute upon the prevention of injury or loss to person or property the
27  Legislature has determined that the exception should be operative only in limited class of cases."
28  *Id.* at 281.

-64-

Blecher Collins Pepperman & Joye

Exhibit D
Page 144

1   Furthermore, the exception requires an affirmative showing in the trial court of

2   extraordinary circumstances involving potential injury or loss of the sort contemplated by the

3   statute before the exception applies. *Gold*, 3 Cal. 3d at 282 (discussing former *Probate Code* §

4   2102). Its application "must be clearly justified by a showing of risk of imminent injury or loss."

5   *Hart*, 228 Cal. App. 3d at 1261.

6   Here, Shelly does not make the requisite factual showing of potential irreparable and

7   extraordinary loss to person or property as contemplated by the Legislature. Most definitely if the

8   Court did not grant Shelly's request under *Probate Code* section 1310(b), the Sterling Family

9   Trust would **not** suffer an **irreparable** loss. Shelly claims that if the sale of the Clippers is not

10  blessed by this Court, the Sterling Family Trust may *potentially* lose $400 million because another

11  buyer would *potentially* offer less, and that outstanding loans (on real properties not owned by

12  LAC Basketball Club, Inc.) would need to be paid off or renegotiated. Shelly also argues that if

13  Donald remains an owner of the Clippers, the team will go into a "death spiral."

14  Not only are these arguments wholly speculative, they do not relate to the type of

15  irreparable loss that the Legislature contemplated as discussed in limited case law interpreting

16  Probate Code § 1310(b) and predecessor statutes. Shelly's desire to obtain the most money for the

17  sale of the Clippers does not justify an end run around the statutory requirements, which are

18  intended to protect appellate jurisdiction. In short, the injury prevention exception does not apply

19  here.

20  *First*, any loss suffered by Shelly would only be monetary. In the context of a monetary

21  loss, this Court must determine what would be the actual and irreparable loss that would occur if

22  this Court allowed Donald to appeal a disfavorable judgment. Again, Shelly receiving less money

23  for the Clippers is not the type of loss contemplated by the Legislature. If the Court made such a

24  finding, it would set an untenable precedent. The request in Shelly's Petition to sell the assets of

25  LAC Basketball Club, Inc. to Mr. Ballmer is nothing more than a "vanilla" petition under *Probate*

26  *Code* § 17200 and akin to a sale of real property. A ruling in Shelly's favor would invite trustees

27  or beneficiaries to seek relief under this section if a piece of real property sold for some amount

28

-65-
**DONALD T. STERLING'S POST-TRIAL BRIEF**

Blecher Collins
Pepperman & Joye

1  less than that trustee or beneficiary thought it should or could sell for.  This certainly was not

2  intended by the Legislature.

3          In *Conservatorship of McElroy*, 104 Cal. App. 4th at 556-557, the appellate court found

4  that, in light of the conservatee's age and failing health, it was appropriate to not allow a stay on

5  appeal where the "potential harm to the estate was the potential tax liability if the conservatee

6  were to die" before the appeal concluded.  The conservator filed a petition for substituted

7  judgment to amend the terms of the conservatee's trust, create a new revocable trust, and transfer

8  assets between the trusts.  *Id.* at 543.  The conservator argued that the substituted judgment should

9  be granted because, in part, it created tax advantages that could only be taken during the

10  conservatee's lifetime because on a conservatee's death the conservator would be prevented from

11  executing a new estate plan  *Id.*  Over the conservatee's long-term girlfriend's objection, the trial

12  court granted the petition for substituted judgment.  *Id.*  In determining if the exception under

13  *Probate Code* section 1310(b) should apply, the *McElroy* court contemplated the risk of harm to

14  the girlfriend in allowing the conservator to take such steps.

15          [T]he risk of harm to [the girlfriend] in allowing the conservator to
          take the requested actions was insignificant in relation to the risk
16          of harm to the estate if the action were not taken.  The potential
          harm to the estate was the potential tax liability if the conservatee
17          were to die before the actions were taken. .

18  *Id.* at 556-57; *see In Conservatorship of Hart*, 228 Cal. App. 3d 1244, 1250 (1991) (discussing

19  provisions of predecessor statute governing exception in conservatorship proceedings under

20  former *Probate Code* section 2751(b), where the appellate court was presented with the question

21  of whether it should authorize a petition for substituted judgment to make inter vivos gifts to the

22  conservatee's family members to take advantage of tax laws).  Here, the risk of harm to Donald is

23  substantial.  He will lose a trophy asset that cannot be replaced and be forced to pay capital gain

24  taxes that will otherwise be avoided if Shelly does first.

25          In reaching its holding in *McElroy* regarding the application of *Probate Code* section

26  1310(b), the court relied almost entirely on the depublished opinion, *Kane v. Superior Court*, 37

27  Cal. App. 4th 1577 (1995) (*depublished*), breathing life back into this case.  *McElroy*, 104 Cal.

28  App. 4th at 556-57.  In *Kane*, the court denied the writ of a decedent's children seeking to vacate

Blecher Collins
Pepperman & Joye

-66-

DONALD T. STERLING'S POST-TRIAL BRIEF

1   an order under the predecessor statute, former *Probate Code* section 7241(b).   *Kane*, 37 Cal. App.

2   4th at 1587, *depub*.   The trial court specifically directed the fiduciary to turn over three vials of the

3   decedent's sperm to decedent's girlfriend to prevent girlfriend from suffering "imminent injury or

4   loss" because she was in her 40s and her ability to conceive continued to decrease and could have

5   been eliminated before the appeal concluded.   *Kane*, 37 Cal. App. 4th at 1587, *depub*.   *McElroy*

6   relied on *Kane's* interpretation of former *Probate Code* section 7241(b):

7       Although the order may be appealed, 'the language the Legislature used in enacting this subdivision clearly empowers a trial court to

8       direct such order to be immediately carried out unaffected by any subsequent appeal of the order, and without regard to the possible

9       outcome on appeal.'   *(Ibid.)*   The court emphasized 'the Legislature's express recognition [that] some situations present

10       such an extraordinary risk of injury or loss that they require immediate intervention by the probate court to make orders which

11       can be implemented immediately despite the filing of an appeal, and regardless of the result on appeal.'   *(Id.* at 1586)."

12   *McElroy*, 104 Cal. App. 4th at 556.   *Kane* further held that:

13

14       only a narrow interpretation of the exception could be consistent with the apparent legislative intent such orders would not be

15       subject to appellate review . . . *Where, as in the instant case, the trial court's order directs the very act which constitutes the subject*

16       *matter of the appeal, the exception operates to effectively deprive the appellant of his appeal.*

17   *Kane*, 37 Cal. App. 4th at 1585, *depub* (emphasis in original).   *Kane* concluded that case was a

18   very narrow situation where the exception to the automatic appellate stay could apply.   *Id.*

19       In *Gold*, the California Supreme Court (discussing provisions of predecessor statute

20   governing exception in conservatorship proceedings under former *Probate Code* section 2102)

21   held that an order to the conservator's former attorney for attorney's fees did not rise to the level

22   of "extraordinary circumstances involving potential injury or loss of the sort contemplated by the

23   statute before the exception applies."   3 Cal. 3d at 282.   Because the application of the exception

24   to the appellate stay must be "carefully restricted," the California Supreme Court held that any

25   monetary damages owed to the former attorney or losses therefrom were not of the sort

26   contemplated by the Legislature.   *Id.* at 281.   *Gold* further stated that to rule otherwise would

27       undermine the general purpose of the conservatorship provisions of the Probate Code, namely, to encourage persons in need of

28       assistance to avail themselves of the protection of the law . . . but it

Blecher Collins
Pepperman & Joye

would also defeat the specific purpose of [former *Probate Code*] section 2102.

*Id.* at 286.

In *Guardianship of Walters*, 93 Cal. App. 2d 208 (1949), the court held that it was inappropriate for the trial court to apply the exception to the stay provision under former *Probate Code* section 1631 because the evidence was insufficient to support a finding of loss or injury to the estate pending appeal. *Id.* at 211. In *Walters*, the trial court appointed a temporary guardian of Allie Walters Sacks over her objection.[8] *Id.* at 210. The trial court ordered that the temporary guardian could take immediate possession of all of Mrs. Sacks' real and personal property pending the appeal. On appeal, the court held that "[n]o evidence was produced that [Mrs. Sacks'] personal estate [was] in danger of being wasted or dissipated." *Id.* at 212. It further stated that "[i]t was clear to [them] that there was no showing of reasonable necessity for an order directing the guardian to take possession of the property" and that "[i]n short, the uncontradicted showing was that Mrs. Sacks' real properties are, and for almost two years last past, have been under first-class management." *Id.* at 213. The *Walters* court based its ruling on the fact that Mrs. Sacks had hired a management team to assist her, and preserve and protect her assets. *Id.* at 213-14. Because Mrs. Sacks had a management team in place to assist her manage her assets, the court held that there was insufficient evidence to support a finding of probable loss or injury to the estate pending the appeal. *Id.* at 214.

All of the cases applying the exception have one common theme: If the appeal was stayed, the party seeking to apply the stay exception would suffer a readily known and ascertainable harm if they had to wait out the appellate processes. In *Kane*, the girlfriend's ability to conceive may have been eliminated. *Kane*, 37 Cal. App. 4th at 1585, *depub.* In *McElroy*, the conservatee was old, frail, and ill, and it was unclear if he would survive the appeal so to allow his conservator to execute a new estate plan. *McElroy*, 104 Cal. App. 4th at 556-57. This case is akin to *Walters*, 93

---

[8] This case was decided before the enactment of the modern day conservatorship provisions in the *Probate Code*.

-68-

1  Cal. App. 2d at 214, where the court found that, where there was proper management parameters

2  in place during the pendency of an appeal, the estate would not suffer any harm.

3          Here, as in *Walters*, there is a system in place to manage the day-to-day operations of LAC

4  Basketball Club, Inc.  Richard Parsons, the supremely well-qualified interim CEO, testified that

5  he has been able to stabilize the organization.  Season ticket sales, which comprise of 85% the

6  team's largest revenue stream , are on par and revenue is actually up from last year (as a result of

7  an increase in ticket prices).  T.T. 7/22/14, 22:18-21.  The installation of Mr. Parsons is roughly

8  equivalent to this Court appointing a temporary trustee of the asset in question to ensure its

9  preservation during an appeal.

10         All parties agree that Donald, as a result of the revocation of the Sterling Family Trust,

11  owns the stock in LAC Basketball Club, Inc. as the community property of Donald and Shelly,

12  which in turn still owns the Clippers.  Because Donald was the sole shareholder of LAC

13  Basketball Club, Inc. when the stock was funded into the Sterling Family Trust, the stock is

14  returned to Donald in his name alone.  The refusal of this Court to apply this extraordinary remedy

15  would not deprive the Sterlings of their asset.  To the contrary, it would allow Donald to continue

16  to fight the NBA in federal court in its attempt to seize the Clippers from the Sterlings (if in fact

17  the NBA takes such action, which is still speculative).  As stated above, Shelly's concern about

18  obtaining the most money for the sale of the Clippers does not justify an end run around the

19  statutory requirements, which are intended to protect appellate jurisdiction.  Because there is no

20  irreparable harm that will come to Shelly or Donald if the sale is subject to an appeal, the injury

21  prevention exception does not apply.

22                              **CONCLUSION**

23         For these reasons and as further briefed, argued, and presented by Donald throughout these

24  proceedings, this Court must deny Shelly's Petition.  In conclusion, Donald requests that this

25  Court deny Shelly's Petition and:

26         1.      Find that as a result of the June 9, 2014 revocation by Donald of the

27  Sterling Family Trust and the fact that the only sale is of ***assets*** of LAC Basketball, Inc., a

28  corporation, this Court does not maintain jurisdiction to make any findings concerning the

-69-

**DONALD T. STERLING'S POST-TRIAL BRIEF**

1 | interpretation of the Sterling Family Trust or confirm, authorize, or instruct the taking of any

2 | active acts taken by Shelly as a former co-trustee; and/or find that Shelly, as a former trustee of the

3 | Sterling Family Trust, does not have the continuing authority to sell the Clippers to Mr. Ballmer

4 | because (a) all rights and title to the assets being sold are held by LAC Basketball Club, Inc., the

5 | shares of which are held by Donald as the sole shareholder, as community property of Donald and

6 | Shelly, and not by Shelly as the former trustee, and (b) to the extent that life is breathed into the

7 | Sterling Family Trust, after its revocation on June 9, 2014, the sale of the Clippers to Mr. Ballmer

8 | is not within the scope of Shelly's alleged wind-up authority.

9 |          2.      Find that Shelly failed to comply with the terms of the Sterling Family Trust

10 | and did not remove Donald as a co-trustee of the Sterling Family Trust; or in the alternative, find

11 | that Shelly's attempted removal of Donald as co-trustee of the Sterling Family Trust was the result

12 | of false pretenses, undue influence, unclean hands, a violation of the covenant of good faith and

13 | fair dealing, or a breach of her fiduciary duties to Donald as a co-trustee, as a co-settlor, and as her

14 | husband.

15 |          3.      Find that the Court should not make an order under Probate Code section

16 | 1310(b) because the Clippers are a unique, irreplaceable asset and the sale is not necessary to

17 | prevent injury or loss of property of the Sterling Family Trust.

18 |

19 | Dated:  July 24, 2014                    BLECHER COLLINS PEPPERMAN & JOYE, P.C.

20 |

21 |                                         By: _____

22 |                                              Maxwell M. Blecher
                                                 Attorneys for Respondent
23 |                                              DONALD T. STERLING

24 |

25 |

26 |

27 | 60003.4

28 |

-70-
**DONALD T. STERLING'S POST-TRIAL BRIEF**

Blecher Collins Pepperman & Joye

<u>**PROOF OF SERVICE**</u>

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 515 South Figueroa Street, Suite 1750, Los Angeles, CA 90071-3334.

On July 24, 2014, I served true copies of the following document(s) described as **DONALD T. STERLING'S POST-TRIAL BRIEF**

on the interested parties in this action as follows:

Bertram Fields
Pierce O'Donnell
Marc M. Stern
Caroline Heindel
GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, CA 90067-4590
E-mail: BFields@GreenbergGlusker.com
PODonnell@GreenbergGlusker.com
MStern@GreenbergGlusker.com
CHeindel@GreenbergGlusker.com

Adam F. Streisand
Amy K. Bell
LOEB & LOEB, LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
E-mail: astreisand@loeb.com

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent to the persons at the e-mail addresses listed above.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 24, 2014, at Los Angeles, California.

Lorelei L. Gerdine

DONALD T. STERLING'S POST-TRIAL BRIEF

Exhibit D
Page 151

# Exhibit E

COURT OF APPEAL - SECOND DIST.

**FILED**

Aug 13, 2014

JOSEPH A. LANE, Clerk

KLEWIS                    Deputy Clerk

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re THE STERLING FAMILY TRUST | B258151 |
| | (Super. Ct. No.  BP152858 |
| ROCHELLE H. STERLING, as Trustee, et. al , | (Michael Levanas, Judge) |
| Respondents, | |
| v. | |
| DONLAD T. STERLING, | **ORDER** |
| Appellant. | |

    We have read and considered the petition for writ of supersedeas and request for an immediate stay filed on August 13, 2014.  We have also read and considered the opposition and reply, both filed in Case No. B258140.

    Petitioner's request for judicial notice of the exhibits and legislative history of Probate Code section 1310, both filed in Case No. B258063, is granted.

    The evidence before this court indicates the sale of the Los Angeles Clippers to Steven Ballmer has closed.  Petitioner has failed to show otherwise.  Thus, there is nothing for this court to stay.  (See *Messenkop v. Duffield* (1930) 211 Cal. 222, 225; *Estate of Dabney* (1951) 37 Cal.2d 401, 411.)

///

///

///

///

1

Even if the sale had not closed, petitioner has failed to show that the balancing of the relative harms favors granting a temporary stay or supersedeas.  (See *Nuckolls v. Bank of California, Nat'l Asso.* (1936) 7 Cal.2d 574, 578; *Sun-Maid Raisin Growers v. Paul* (1964) 229 Cal.App.2d 368, 376.)

Accordingly, the petition and temporary stay request are denied.

BIGELOW, P. J.                    RUBIN, J.                    FLIER, J.

2

# Exhibit F



Appellate Courts Case Information

CALIFORNIA COURTS
THE JUDICIAL BRANCH OF CALIFORNIA

2nd Appellate District                                    Change court ⌄

*Court data last updated: 04/02/2015 08:21 AM*

**Docket (Register of Actions)**

**Sterling v. Sterling**
**Division 8**
**Case Number B258151**

| Date | Description | Notes |
|------|-------------|-------|
| 08/13/2014 | Petition for writ of supersedeas filed. | |
| 08/13/2014 | Exhibits filed in support of: | 1 vol |
| 08/13/2014 | Request for judicial notice filed. | |
| 08/13/2014 | Opposition filed. | RPI Rochelle Sterling's opposition to writ of mandate/supersedeas/request for immediate stay. |
| 08/13/2014 | Filed declaration of: | Supplemental declaration of Bob Baradaran in opposition to writ of mandate/supersedeas. |
| 08/13/2014 | Filed declaration of: | Scott Roades in opposition to writ of mandate/supersedeas. |
| 08/13/2014 | Motion filed. | RPI Rochelle Sterling's motion to consolidate writ petition and appeal and to have opposition to request for immediate stay accompanying petition for writ of mandate/supersedeas and related documents deemed filed in both. |
| 08/13/2014 | Order filed. | Writ of Supersedeas and temporary stay request are denied. |
| 08/13/2014 | Notice of appeal lodged/received. | 8-12-14 Donald Sterling |
| 08/13/2014 | Filed letter from: | RPI Rochelle Sterling dated August 13, 2014. |
| 08/14/2014 | Filing fee. | Responsive Fee (Rochelle Sterling) |
| 08/14/2014 | Order filed. | Respondent's motion to have the opposition and related documents filed in case number B258140 be deemed filed in this case is granted. The request for consolidation is denied as moot because the petition is case number B258140 has already been denied. |
| 08/15/2014 | Filing fee. | #2517 |

| | | |
|---|---|---|
| 09/11/2014 | Letter to counsel - 10 days to file case information statement. | |
| 09/16/2014 | Civil case information statement filed. | |
| 01/20/2015 | Reporter's transcript filed. | R-4 |
| 01/30/2015 | Substitution of attorneys filed for: | Maxwell Blecher substituting out as counsel for appellant. Bobby Samini is now counsel for appellant. |
| 02/25/2015 | Granted - extension of time. | Appellant's appendix and opening brief filed. Due on 05/01/2015 By 60 Day(s) |

**Click here** to request automatic e-mail notifications about this case.

Careers | Contact Us | Accessibility | Public Access to Records | Terms of Use | Privacy    © 2014
Judicial Council of California / Administrative Office of the Courts

Exhibit F
Page 156

Appellate Courts Case Information

CALIFORNIA COURTS
THE JUDICIAL BRANCH OF CALIFORNIA

2nd Appellate District                                    Change court ▾

*Court data last updated: 04/02/2015 08:21 AM*

**Future Scheduled Actions**

**Sterling v. Sterling**
**Division 8**
**Case Number B258151**

| Description | Due Date | Notes |
|---|---|---|
| Appellant's appendix and opening brief filed. | 05/01/2015 | |

**Click here** to request automatic e-mail notifications about this case.

Careers | Contact Us | Accessibility | Public Access to Records | Terms of Use | Privacy    © 2014
Judicial Council of California / Administrative Office of the Courts

Case 2:14-cv-04192-FMO-SH    Document 51-2    Filed 04/06/15    Page 167 of 208    Page ID
#:976

# Exhibit G

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                    WESTERN DIVISION

4     THE HON. JUDGE FERNANDO M. OLGUIN, JUDGE PRESIDING

5

6  DONALD STERLING, et al.,          )
                                     )
7                   Plaintiffs,      )
                                     )
8           vs.                      ) NO. 14-CV-4192-FMO
                                     )
9  NATIONAL BASKETBALL ASSOCIATION,  )
   et al.,                           )
10                                   )
                    Defendants.      )
11  _____)

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                Los Angeles, California

17               Thursday, January 8, 2015

18

19

20

21

22       LISA M. GONZALEZ, CSR No. 5920, CCRR
              U.S. District Courthouse
23       312 North Spring Street - Room 438
              Los Angeles, California 90012
24                   213.894.2979
                 www.lisamariecsr.com
25

```
 1   APPEARANCES:

 2

 3   FOR THE PLAINTIFFS:  SAMINI SCHEINBERG PC
                         BY:  BOBBY SAMINI, ESQ.
 4                       and MATTHEW MOESLY, ESQ.
                         949 South Coast Drive
 5                       Suite 420
                         Costa Mesa, California  92626
 6                       (949) 724-0900

 7

 8   FOR THE DEFENDANTS:  SKADDEN, ARPS, SLATE, MEAGHER & FLOM
                         BY:   JEFFREY A. MISHKIN, ESQ.
 9                       300 South Grand Avenue
                         Los Angeles, California  90071
10                       (213) 687-5328

11                       and JASON D. RUSSELL, ESQ.
                         and ANGELA COLT, ATTORNEY AT LAW
12                       Four Times Square
                         New York, NY  10036
13                       (212) 735-3458

14

15

16

17

18

19

20

21

22

23

24

25
```

1        *Los Angeles, California, Thursday, January 8, 2015;*

2                        *10:16 A.M.*

3                         *-o0o-*

4        THE CLERK:  Calling Item Number 1, CV-14-4192,

5   Donald Sterling, et al. vs. National Basketball Association,

6   et al.

7        Counsel, please approach and make their

8   appearances.

9        MR. SAMINI:  Good morning, Your Honor.  Bobby

10  Samini on behalf of Donald Sterling.

11       MR. MOESLY:  Good morning, Your Honor.  Matthew

12  Moesly on behalf of Donald Sterling.

13       MR. MISHKIN:  Good morning, Your Honor.  Jeffrey

14  Mishkin, Skadden, Arps, Slate, on behalf of National

15  Basketball Association, Adam Silver.  My colleagues are

16  Jason Russell and Angela Colt.

17       THE COURT:  Okay.  So we're here for the

18  scheduling conference.

19       MR. MISHKIN:  Yes, Your Honor.

20       THE COURT:  I just had a couple of issues I wanted

21  to address.  It seems to me like the parties will need to

22  have a discussion with respect to the operative complaint.

23  It seems like there may be some issues or claims in the

24  complaint that are now moot in light of what happened in the

25  state court.

4

1           Do the parties have a position regarding the

2     amendment to the complaint?

3           MR. SAMINI:  Your Honor, we are currently looking

4     at an amendment to the complaint.  I would say we are

5     probably still a week or two out of having all of those

6     issues resolved.  There are some issues that are currently

7     on appeal in the state court matter and we're trying to

8     reconcile the timing of that appeal and how that appeal

9     might affect some of the issues here, but I think probably

10    in the next week or two, we'll have that worked out.

11          THE COURT:  Okay.

12          MR. SAMINI:  Until then substantively it's

13    difficult for me to say what exactly would change.

14          THE COURT:  Okay.  Let me then --

15          What's defendant's view on that?

16          MR. MISHKIN:  Your Honor, I don't know all the

17    issues that Mr. Samini is thinking about --

18          THE COURT:  I am going to have you guys -- we're

19    going to go through some of the issues right now.  I'm not

20    sure what appeal issues plaintiffs' counsel is referring to,

21    but I'm going to have you meet and confer in person on the

22    record, and I want a transcript -- I want to see a

23    transcript of it.  On the complaint because I have some

24    serious concerns about some of the claims that are still in

25    there --

5

1          The first issue I want to raise is the

2   indemnification issues, and there have been numerous

3   references to the indemnity issues in this case, and so let

4   me ask a couple of questions.

5          Is Mr. Sterling subject to the May 30th, 2014,

6   settlement agreement as an individual, I'm asking?

7          MR. MISHKIN:  There may be a question about that,

8   Your Honor, but I think it is very clear that the NBA is

9   indemnified by Mrs. Sterling and the trust under that

10  agreement.  Mr. Sterling's precise status in relation to the

11  trust --

12         THE COURT:  Well, but you dismissed -- you

13  dismissed the trust from the case; right?

14         MR. MISHKIN:  Yes.

15         THE COURT:  So does that mean that any claim you

16  have with respect to the May 30th, 2014, settlement

17  agreement is moot?

18         MR. MISHKIN:  Your Honor, I don't think that's

19  going to be before you.  At the moment, there is no issue

20  between the NBA and Mrs. Sterling and the trust.  There are

21  separate indemnification provisions --

22         THE COURT:  I understand, and we'll get to those

23  in a second.

24         MR. MISHKIN:  I think that first one's not before

25  you.

*Lisa M. Gonzalez, Official Reporter*

6

```
 1            THE COURT:  Okay.  So then I want to make sure

 2    that when you amend your counterclaim because you're going

 3    to have to amend your answer in your counterclaim, I don't

 4    want any reference to it in there.

 5            MR. MISHKIN:  That's correct.

 6            THE COURT:  So let's talk about the other

 7    indemnity agreements.  We've got the 2005 agreement and

 8    undertaking and we've got the plaintiffs' indemnification

 9    obligations under the NBA constitution and the 1989 amended

10    and revised joint venture agreement.

11            Are you still pursuing any counterclaims on the

12    basis of those indemnity agreements?

13            MR. MISHKIN:  Yes, Your Honor.  As we understand

14    the law in this circuit, we need to, if there's going to be

15    an indemnification request, we need to have made it in a

16    counterclaim.  I think there's some dispute about that, but

17    we -- we thought to be very careful that we should have it

18    in the complaint; so yes, we are pursuing those.

19            THE COURT:  Okay.  I mean -- well, it seems to me,

20    from what I'm hearing in your case, is that, and even

21    plaintiffs' counsel seems to acknowledge this because he

22    does indicate in the 26(f) report that the -- with respect

23    to at least one of the indemnification agreements, but it

24    seems to me that indemnity is a threshold issue that should

25    be resolved early.  And -- I mean do counsel have a view
```

1  about that?  I mean because if I find that Mr. Sterling has

2  to indemnify the defendants, why is he going to pursue the

3  lawsuit?

4          MR. SAMINI:  Your Honor, we do believe that the

5  indemnity is a threshold issue, we do believe that it should

6  be addressed early on, and so I'm not sure what the Court

7  has in mind as far as how it would like us to address that

8  issue or to --

9          THE COURT:  Well, I think what I want to do is,

10 after the new complaint is filed and the new responsive

11 counterclaim, I think within 30 days of that, the two

12 pleadings filed, the -- I want the defendants to move for

13 summary judgment.  I don't think there's any need to do

14 discovery, the agreements are what they are, and move for

15 summary judgment on the indemnification issues only.  And

16 let's get that resolved first, and then we'll move on to the

17 other issues.

18         And I do have requirements, which when I set out

19 my scheduling order, you'll see I have a separate order that

20 describes how I want summary judgment motions done, so

21 you'll have that.  And I'll give you some deadlines, and

22 I'll ask for your input on deadlines, or you can give me a

23 proposed stipulation with deadlines for the amended

24 complaint and for the responsive counterclaim.  But does

25 that -- I think that's the best way to proceed unless

8

1   counsel feel otherwise.  I mean, that doesn't mean you can't

2   file any other motions to dismiss on any other claims, but I

3   think that the indemnity issue is important.  Is that --

4            MR. MISHKIN:  That's fine, Your Honor.

5            THE COURT:  Is that okay with plaintiffs' counsel

6   too?

7            MR. SAMINI:  Yes, that would be fine.  Just for

8   clarification, it would only be as to the three indemnity

9   obligations or references that were made by the Court and

10  not the indemnity that is between Mrs. Sterling and the NBA?

11           THE COURT:  That's my understanding, that's why I

12  raised -- I wanted to make sure that that was -- that

13  whether or not that was in the case or not and whether or

14  not Mr. Sterling was somehow covered by that May 2014

15  agreement and -- so at least as to those three indemnity

16  agreements, you can file for summary judgment on those.

17  Okay.

18           And -- now, let me -- let me -- and this is just

19  both for purposes of your -- your meet and confer on the

20  amended complaint.  Let me just give you some of my thoughts

21  here.  The -- I'm a little unclear on the constitutional

22  claim that the plaintiff is asserting.

23           Are you asserting it -- are you asserting it

24  pursuant to the Penal Code -- that's what your complaint

25  seems to suggest -- the California Penal Code provision and

1  not Article One, Section One, of the California

2  constitution?

3         MR. SAMINI:  Your Honor, when we amend, it's my

4  understanding that it will be asserted per the Penal Code

5  and the constitution.

6         THE COURT:  So it will be two separate claims

7  then.

8         MR. SAMINI:  It will be two separate claims,

9  Your Honor.

10         THE COURT:  Now, let me ask you this:  And this is

11  just questions to think about as you're going to the meet

12  and confer.  Now, the -- well, when you do the -- in your

13  consideration and I want -- I think you guys should be

14  exchanging legal discussion on whether or not the claim is

15  valid, that's part of what I want you to do.  But in your

16  discussion of the constitutional portion of the claim, I

17  want to make sure that you are cognizant of the *Hill vs.*

18  *NCAA* case, that's 7 Cal.4th 1, and I would want to know how

19  this -- your -- your privacy claim fits.

20         And I think that the best case that describes the

21  way this privacy right works in California is a case called

22  *Department of Fair Employment and Housing vs. Superior*

23  *Court*, which is at 99 Cal.App.4th 896.  And you have to

24  decide whether you're talking about informational privacy,

25  economy privacy, and I'm just -- it's not clear to me

10

1  where -- how that claim fits here, but I want you to look at

2  that claim and I want you to look at those cases and all the

3  cases that rely on the *Hill* case to see whether or not the

4  constitutional claim is a -- is a valid claim here under the

5  California constitution.

6          Does anybody have any questions or response to

7  that?

8          The other issue that -- with respect to the

9  California Penal Code issue, I did look at that

10  Ninth Circuit case that you referred me to, but let me ask

11  you this:  What -- the Ninth Circuit applies that statute

12  only in the context of a diversity case and we're not here

13  on diversity, we're here on federal question.  So -- and

14  that particular statute -- you're going to have to address

15  whether the statute disallows taped conversations in

16  judicial proceedings, administrative proceedings and

17  legislative proceedings or other proceedings.  So one thing

18  you're going to have to really think about is whether or not

19  this proceeding before the NBA constitutes another

20  proceeding because it's clearly not judicial, it's clearly

21  not administrative and it's clearly not legislative.  So

22  you're going to have to -- I want you guys to discuss these

23  issues as part of your meet and confer and whether or not

24  you have a valid claim and is the NBA the proper defendant

25  under that claim since they -- they are not the ones who did

1    the tape-recording in this particular case.  But, again,

2    these are issues you're going to discuss.  I'm hoping it

3    will help you clean up the case a little bit, but it is what

4    it is.

5            Now, the -- it seems to me that the Sherman Act

6    claim, though, getting back, now getting back to the issue,

7    you need to talk about whether or not the Sherman Act and

8    the conversion claims have been mooted by the sale.  So you

9    need to discuss that.  Do you have a position on that now?

10           MR. SAMINI:  Your Honor, I don't have a position

11   on that now.  My previous co-counsel, Mr. Blecher, was

12   primarily focused on that issue.  We are looking at that

13   now.  I think there is going to be some tie-in.  There is an

14   appeal now pending in the probate action.  I think the

15   outcome of that appeal might have some impact on that issue.

16   That's something we're researching now.

17           I do understand the sensitivity from the opposing

18   counsel, and the court's concern whether or not there is a

19   Sherman Act claim which still exists.  That is something we

20   will need some time to really address substantively with the

21   court.

22           THE COURT:  Now, you do understand, though, right,

23   that the interesting position that you're in is that, to the

24   extent the Sherman Act claim remains, to that -- at that

25   point arguably your penal code claim is not applicable.

```
 1          MR. SAMINI:  Your Honor, we understand that
 2   there's --
 3          THE COURT:  I mean at least that would be the way
 4   I read that case because it's only applicable on diversity
 5   cases and you're not here on diversity.  I think you can get
 6   in here on diversity, but that's a different question.  But
 7   I really want you guys to talk about all these issues.  I
 8   mean 'cause I don't want you -- I really don't want you
 9   wasting my time with all this briefing later on on these
10   issues, and these are issues -- many of these issues,
11   especially the privacy issues, you know, I'm very familiar
12   with and so -- and I've even given you the cases that I
13   think are -- so I expect you to really follow those cases
14   and look at the case law because this is at most
15   informational privacy we're talking about under the
16   California constitution and that gets the least amount of
17   protection, and I'm just not sure how you're going to get
18   past that but -- okay.  So we're talking about -- we've
19   spoken about the conversion and the Sherman Act.
20          The breach of fiduciary duty claim, you know, we
21   don't have to deal with that right away, but I think at some
22   point we will need to address whether defendants owed
23   Mr. Sterling a fiduciary duty, and so we'll deal with that
24   later.  I know there's that case, the case involving the
25   Oakland Raiders and the National Football League case.  So,
```

1    again, Mr. Samini --

2              MR. SAMINI:  Samini, yeah.

3              THE COURT:  -- please take a look at that case

4    before you decide whether or not to include that claim.

5              And then the only other issue I wanted to raise

6    was the breach of contract claim.  Again, we'll deal with

7    that later on, but I do think that's kind of an interesting

8    issue because the constitution for the NBA made statements

9    about the actions taken by the commissioner are final,

10   binding, and conclusive.  So it's kind of -- it's an

11   interesting theory that you're pursuing on that breach of

12   contract theory, but I'm sure we'll be dealing with that

13   case, that issue, down the line.

14             So those are my thoughts on the claims in the

15   complaint and -- and even the counterclaims.  And so why

16   don't you guys, as I think about it, submit to me a proposed

17   schedule that will work for your meet and confer, for your

18   filing of the amended complaint, filing of the counter --

19   the answer to the counterclaim, and I'll take a look at it

20   and probably sign off on it, you know, as long as it's --

21   don't make it too, you know, don't stretch it out too far.

22   And then also a deadline for the summary judgment order.  I

23   mean the summary judgment brief on the indemnity issues.

24             Does that sound okay?  I'll let you guys submit

25   the schedule to me.

14

1          MR. SAMINI:  Thank you very much.

2          MR. MISHKIN:  Thank you very much.  And thank you

3    for the law school exam.

4          THE COURT:  Well, it's a -- I don't know -- I

5    haven't had to turn to this case in months and so -- I'll be

6    issuing a scheduling order which will more or less go with

7    the dates that I think of the shorter schedule.  I think it

8    was defendant who proposed.  I forget now.  It will be

9    closer to those dates, maybe a little bit more, but -- but

10   you'll have enough time to do what you need to do.

11         Let me just ask one last question.  What exactly

12   is on appeal.  I haven't really been following this case.

13   Particularly once I found out it had been assigned to me, I

14   really stopped reading articles or watching anything.  What

15   exactly is on appeal there?

16         MR. SAMINI:  Your Honor, the opening appellate

17   briefs have not been filed yet, but there has been an

18   appeal, a notice of appeal filed with respect to the

19   decision that was entered in the probate court.  There was a

20   writ that was filed that came back very quickly so we're --

21   we're now in the process of taking essentially the entirety

22   of what occurred in the probate court will be the subject of

23   that appeal.  Now whether every issue is going to be of

24   particular importance, I don't know yet, but I think there

25   are going to be some key issues there which may have some

15

1   impact here.

2          THE COURT:  Okay.  Well, you guys, are you

3   handling the appeal?

4          MR. SAMINI:  Your Honor, we are handling the

5   appeal.  We do have appellate counsel who is also involved

6   in that matter with us.

7          THE COURT:  Okay.  Well, you know, just keep me

8   posted, and if there's anything we need to do in this case

9   to address what's going on in that case.  So --

10         MR. MISHKIN:  We'll do the best we can to resolve

11  as much as we can.

12         THE COURT:  Okay.  Thank you.

13         MR. SAMINI:  Thank you, Your Honor.

14              *(Thereupon, proceedings adjourned)*

15

16                      *-oOo-*

17

18

19

20

21

22

23

24

25

*Lisa M. Gonzalez, Official Reporter*

1

2

3                                    *CERTIFICATE*

4

5          *I hereby certify that pursuant to Section 753,*

6  *Title 28, United States Code, the foregoing is a true and*

7  *correct transcript of the stenographically reported*

8  *proceedings held in the above-entitled matter and that the*

9  *transcript format is in conformance with the regulations of*

10 *the Judicial Conference of the United States.*

11

12 *Date:  January 21, 2015*

13

14                              *Lisa M. Gonzalez*
                          */s/_____*
15                          *Lisa M. Gonzalez, U.S. Court Reporter*
                          *CSR No. 5920*
16

17

18

19

20

21

22

23

24

25

'
'cause [1]  12/8

-

-o0o [1]  3/3
-oOo [1]  15/16

/

/s [1]  16/14

0

0900 [1]  2/6

1

10036 [1]  2/12
10:16 [1]  3/2
14-CV-4192-FMO [1]  1/8
1989 [1]  6/9

2

2005 [1]  6/7
2014 [3]  5/5 5/16 8/14
2015 [3]  1/17 3/1 16/12
21 [1]  16/12
212 [1]  2/13
213 [1]  2/10
213.894.2979 [1]  1/24
26 [1]  6/22
28 [1]  16/6

3

30 [1]  7/11
300 [1]  2/9
30th [2]  5/5 5/16
312 [1]  1/23
3458 [1]  2/13

4

4192 [1]  3/4
420 [1]  2/5
438 [1]  1/23

5

5328 [1]  2/10
5920 [2]  1/22 16/15

6

687-5328 [1]  2/10

7

724-0900 [1]  2/6
735-3458 [1]  2/13
753 [1]  16/5

8

896 [1]  9/23

9

90012 [1]  1/23
90071 [1]  2/9
92626 [1]  2/5
949 [2]  2/4 2/6
99 [1]  9/23

A

A.M [1]  3/2
about [16]  4/17 4/24 5/7 6/6 6/16 7/1 9/11
 9/24 10/18 11/7 12/7 12/15 12/18 12/19 13/9
 13/16
above [1]  16/8
above-entitled [1]  16/8
acknowledge [1]  6/21
Act [5]  11/5 11/7 11/19 11/24 12/19

action [1]  11/14
Adam [1]  3/15
address [6]  3/21 7/7 10/14 11/20 12/22 15/9
addressed [1]  7/6
adjourned [1]  15/14
administrative [2]  10/16 10/21
affect [1]  4/9
after [1]  7/10
again [3]  11/1 13/1 13/6
agreement [6]  5/6 5/10 5/17 6/7 6/10 8/15
agreements [5]  6/7 6/12 6/23 7/14 8/16
al [4]  1/6 1/9 3/5 3/6
all [5]  4/5 4/16 10/2 12/7 12/9
also [2]  13/22 15/5
am [1]  4/18
amend [3]  6/2 6/3 9/3
amended [4]  6/9 7/23 8/20 13/18
amendment [2]  4/2 4/4
amount [1]  12/16
ANGELA [2]  2/11 3/16
Angeles [4]  1/16 1/23 2/9 3/1
another [1]  10/19
answer [2]  6/3 13/19
any [7]  5/15 6/4 6/11 7/13 8/2 8/2 10/6
anybody [1]  10/6
anything [2]  14/14 15/8
appeal [13]  4/7 4/8 4/8 4/20 11/14 11/15
 14/12 14/15 14/18 14/18 14/23 15/3 15/5
appearances [2]  2/1 3/8
appellate [2]  14/16 15/5
applicable [2]  11/25 12/4
applies [1]  10/11
approach [1]  3/7
are [25]
arguably [1]  11/25
ARPS [2]  2/8 3/14
Article [1]  9/1
articles [1]  14/14
as [13]  5/6 6/13 7/7 7/7 8/8 8/15 9/11 10/23
 13/16 13/20 13/20 15/11 15/11
ask [5]  5/4 7/22 9/10 10/10 14/11
asking [1]  5/6
asserted [1]  9/4
asserting [3]  8/22 8/23 8/23
assigned [1]  14/13
ASSOCIATION [3]  1/9 3/5 3/15
ATTORNEY [1]  2/11
Avenue [1]  2/9
away [1]  12/21

B

back [3]  11/6 11/6 14/20
basis [1]  6/12
BASKETBALL [3]  1/9 3/5 3/15
be [21]
because [8]  4/23 6/2 6/21 7/1 10/20 12/4
 12/14 13/8
been [6]  5/2 11/8 14/12 14/13 14/17 14/17
before [4]  5/19 5/24 10/19 13/4
behalf [3]  3/10 3/12 3/14
believe [2]  7/4 7/5
best [3]  7/25 9/20 15/10
between [2]  5/20 8/10
binding [1]  13/10
bit [2]  11/3 14/9
Blecher [1]  11/11
BOBBY [2]  2/3 3/9
both [1]  8/19
breach [3]  12/20 13/6 13/11
brief [1]  13/23
briefing [1]  12/9
briefs [1]  14/17

C

Cal.4th [1]  9/18
Cal.App.4th [1]  9/23
CALIFORNIA [12]  1/2 1/16 1/23 2/5 2/9 3/1
 8/25 9/1 9/21 10/5 10/9 12/16
called [1]  9/21
Calling [1]  3/4
came [1]  14/20
can [5]  7/22 8/16 12/5 15/10 15/11
can't [1]  8/1
careful [1]  6/17
case [23]
cases [5]  10/2 10/3 12/5 12/12 12/13
CCRR [1]  1/22
CENTRAL [1]  1/2
CERTIFICATE [1]  16/3
certify [1]  16/5
change [1]  4/13
circuit [3]  6/14 10/10 10/11
claim [18]
claims [7]  3/23 4/24 8/2 9/6 9/8 11/8 13/14
clarification [1]  8/8
clean [1]  11/3
clear [2]  5/8 9/25
clearly [3]  10/20 10/20 10/21
closer [1]  14/9
co [1]  11/11
co-counsel [1]  11/11
Coast [1]  2/4
code [6]  8/24 8/25 9/4 10/9 11/25 16/6
cognizant [1]  9/17
colleagues [1]  3/15
COLT [2]  2/11 3/16
commissioner [1]  13/9
complaint [12]  3/22 3/24 4/2 4/4 4/23 6/18
 7/10 7/24 8/20 8/24 13/15 13/18
concern [1]  11/18
concerns [1]  4/24
conclusive [1]  13/10
confer [5]  4/21 8/19 9/12 10/23 13/17
conference [2]  3/18 16/10
conformance [1]  16/9
consideration [1]  9/13
constitutes [1]  10/19
constitution [6]  6/9 9/2 9/5 10/5 12/16 13/8
constitutional [3]  8/21 9/16 10/4
context [1]  10/12
contract [2]  13/6 13/12
conversations [1]  10/15
conversion [2]  11/8 12/19
correct [2]  6/5 16/7
Costa [1]  2/5
counsel [9]  3/7 4/20 6/21 6/25 8/1 8/5 11/11
 11/18 15/5
counter [1]  13/18
counterclaim [6]  6/2 6/3 6/16 7/11 7/24
 13/19
counterclaims [2]  6/11 13/15
couple [2]  3/20 5/4
court [11]  1/1 3/25 4/7 4/11 7/6 8/9 9/23
 11/21 14/19 14/22 16/15
court's [1]  11/18
Courthouse [1]  1/22
covered [1]  8/14
CSR [2]  1/22 16/15
currently [2]  4/3 4/6
CV [2]  1/8 3/4
CV-14-4192 [1]  3/4

D

Date [1]  16/12
dates [2]  14/7 14/9

**D**

days [1] 7/11
deadline [1] 13/22
deadlines [3] 7/21 7/22 7/23
deal [3] 12/21 12/23 13/6
dealing [1] 13/12
decide [2] 9/24 13/4
decision [1] 14/19
defendant [2] 10/24 14/8
defendant's [1] 4/15
defendants [5] 1/10 2/8 7/2 7/12 12/22
Department [1] 9/22
describes [2] 7/20 9/20
did [2] 10/9 10/25
different [1] 12/6
difficult [1] 4/13
disallows [1] 10/15
discovery [1] 7/14
discuss [3] 10/22 11/2 11/9
discussion [3] 3/22 9/14 9/16
dismiss [1] 8/2
dismissed [2] 5/12 5/13
dispute [1] 6/16
DISTRICT [3] 1/1 1/2 1/22
diversity [5] 10/12 10/13 12/4 12/5 12/6
DIVISION [1] 1/3
do [18]
does [5] 5/15 6/22 7/24 10/6 13/24
doesn't [1] 8/1
don't [13] 4/16 5/18 6/3 7/13 11/10 12/8 12/8
 12/21 13/16 13/21 13/21 14/4 14/24
DONALD [4] 1/6 3/5 3/10 3/12
done [1] 7/20
down [1] 13/13
Drive [1] 2/4
duty [2] 12/20 12/23

**E**

early [2] 6/25 7/6
economy [1] 9/25
Employment [1] 9/22
enough [1] 14/10
entered [1] 14/19
entirety [1] 14/21
entitled [1] 16/8
especially [1] 12/11
ESQ [4] 2/3 2/4 2/8 2/11
essentially [1] 14/21
et [4] 1/6 1/9 3/5 3/6
even [3] 6/20 12/12 13/15
every [1] 14/23
exactly [3] 4/13 14/11 14/15
exam [1] 14/3
exchanging [1] 9/14
exists [1] 11/19
expect [1] 12/13
extent [1] 11/24

**F**

Fair [1] 9/22
familiar [1] 12/11
far [2] 7/7 13/21
federal [1] 10/13
feel [1] 8/1
FERNANDO [1] 1/4
fiduciary [2] 12/20 12/23
file [2] 8/2 8/16
filed [5] 7/10 7/12 14/17 14/18 14/20
filing [2] 13/18 13/18
final [1] 13/9
find [1] 7/1
fine [2] 8/4 8/7
first [3] 5/1 5/24 7/16

fits [2] 9/19 10/1
DOCUMENT [1] 1/8
FMO [1] 1/8
focused [1] 11/12
follow [1] 12/13
following [1] 14/12
Football [1] 12/25
foregoing [1] 16/6
forget [1] 14/8
format [1] 16/9
found [1] 14/13
Four [1] 2/12

**G**

get [4] 5/22 7/16 12/5 12/17
gets [1] 12/16
getting [2] 11/6 11/6
give [3] 7/21 7/22 8/20
given [1] 12/12
go [2] 4/19 14/6
going [17]
GONZALEZ [3] 1/22 16/14 16/15
Good [3] 3/9 3/11 3/13
got [2] 6/7 6/8
Grand [1] 2/9
guys [5] 4/18 9/13 10/22 12/7 13/16 13/24
 15/2

**H**

had [3] 3/20 14/5 14/13
handling [2] 15/3 15/4
happened [1] 3/24
has [3] 7/1 7/7 14/17
have [30]
haven't [2] 14/5 14/12
having [1] 4/5
he [2] 6/21 7/2
hearing [1] 6/20
held [1] 16/8
help [1] 11/3
here [10] 3/17 4/9 8/21 10/1 10/4 10/12 10/13
 12/5 12/6 15/1
hereby [1] 16/5
Hill [2] 9/17 10/3
HON [1] 1/4
Honor [18]
hoping [1] 11/2
Housing [1] 9/22
how [6] 4/8 7/7 7/20 9/18 10/1 12/17

**I**

I'll [5] 7/21 7/22 13/19 13/24 14/5
I'm [11] 4/19 4/21 5/6 6/20 7/6 8/21 9/25
 11/2 12/11 12/17 13/12
I've [1] 12/12
impact [1] 11/15 15/1
importance [1] 14/24
important [1] 8/3
include [1] 13/4
indemnification [6] 5/2 5/21 6/8 6/15 6/23
 7/15
indemnified [1] 5/9
indemnify [1] 7/2
indemnity [10] 5/3 6/7 6/12 6/24 7/5 8/3 8/8
 8/10 8/15 13/23
indicate [1] 6/22
individual [1] 5/6
informational [1] 9/24 12/15
input [1] 7/22
interesting [3] 11/23 13/7 13/11
involved [1] 15/5
involving [1] 12/24
is [43]
issue [15] 5/1 5/19 6/24 7/5 7/8 8/3 10/8 10/9

11/6 11/12 11/15 13/5 13/8 13/13 14/23
issuing [1] 14/6
it [29]
it's [11] 4/12 9/3 9/25 10/20 10/20 10/21 12/4
 13/10 13/10 13/20 14/4
Item [1] 3/4

**J**

January [3] 1/17 3/1 16/12
JASON [2] 2/11 3/16
JEFFREY [2] 2/8 3/13
joint [1] 6/10
JUDGE [2] 1/4 1/4
judgment [6] 7/13 7/15 7/20 8/16 13/22
 13/23
judicial [3] 10/16 10/20 16/10
just [9] 3/20 8/7 8/18 8/20 9/11 9/25 12/17
 14/11 15/7

**K**

keep [1] 15/7
key [1] 14/25
kind [2] 13/7 13/10
know [10] 4/16 9/18 12/11 12/20 12/24 13/20
 13/21 14/1 14/4 14/24 15/7

**L**

last [1] 14/11
later [2] 12/9 12/24 13/7
law [4] 2/11 6/14 12/14 14/3
lawsuit [1] 7/3
League [1] 12/25
least [4] 6/23 8/15 12/3 12/16
legal [1] 9/14
legislative [2] 10/17 10/21
less [1] 14/6
let [9] 4/14 5/3 8/18 8/18 8/20 9/10 10/10
 13/24 14/11
let's [2] 6/6 7/16
light [1] 3/24
like [3] 3/21 3/23 7/7
line [1] 13/13
LISA [3] 1/22 16/14 16/15
little [3] 8/21 11/3 14/9
long [1] 13/20
look [6] 10/1 10/2 10/9 12/14 13/3 13/19
looking [2] 4/3 11/12
Los [4] 1/16 1/23 2/9 3/1

**M**

made [3] 6/15 8/9 13/8
make [5] 3/7 6/1 8/12 9/17 13/21
many [1] 12/10
matter [3] 4/7 15/6 16/8
MATTHEW [2] 2/4 3/11
may [6] 3/23 5/5 5/7 5/16 8/14 14/25
maybe [1] 14/9
me [20]
MEAGHER [1] 2/8
mean [9] 5/15 6/19 6/25 7/1 8/1 8/1 12/3 12/8
 13/23
meet [5] 4/21 8/19 9/11 10/23 13/17
Mesa [1] 2/5
might [2] 4/9 11/15
mind [1] 7/7
MISHKIN [2] 2/8 3/14
MOESLY [3] 2/4 3/11 3/12
moment [1] 5/19
months [1] 14/5
moot [2] 3/24 5/17
mooted [1] 11/8
more [2] 14/6 14/9
morning [3] 3/9 3/11 3/13

## M

most [1] 12/14
motions [2] 7/20 8/2
move [3] 7/12 7/14 7/16
MR [3] 3/11 4/12 9/8
Mr. [8] 4/17 5/5 5/10 7/1 8/14 11/11 12/23 13/1
Mr. Blecher [1] 11/11
Mr. Samini [2] 4/17 13/1
Mr. Sterling [4] 5/5 7/1 8/14 12/23
Mr. Sterling's [1] 5/10
Mrs. [3] 5/9 5/20 8/10
Mrs. Sterling [3] 5/9 5/20 8/10
much [3] 14/1 14/2 15/11
my [8] 3/15 7/19 8/11 8/20 9/3 11/11 12/9 13/14

## N

NATIONAL [4] 1/9 3/5 3/14 12/25
NBA [7] 5/8 5/20 6/9 8/10 10/19 10/24 13/8
NCAA [1] 9/18
need [10] 3/21 6/14 6/15 7/13 11/7 11/9 11/20 12/22 14/10 15/8
new [3] 2/12 7/10 7/10
next [1] 4/10
Ninth [2] 10/10 10/11
Ninth Circuit [2] 10/10 10/11
no [4] 1/8 1/22 5/19 16/15
North [1] 1/23
not [25]
notice [1] 14/18
now [16] 3/24 4/19 8/18 9/10 9/12 11/5 11/6 11/9 11/11 11/13 11/14 11/16 11/22 14/8 14/21 14/23
Number [1] 3/4
numerous [1] 5/2
NY [1] 2/12

## O

o0o [1] 3/3
Oakland [1] 12/25
obligations [2] 6/9 8/9
occurred [1] 14/22
off [1] 13/20
okay [12] 3/17 4/11 4/14 6/1 6/19 8/5 8/17 12/18 13/24 15/2 15/7 15/12
OLGUIN [1] 1/4
once [1] 14/13
one [5] 6/23 9/1 9/1 10/17 14/11
one's [1] 5/24
ones [1] 10/25
only [5] 7/15 8/8 10/12 12/4 13/5
oOo [1] 15/16
opening [1] 14/16
operative [1] 3/22
opposing [1] 11/17
order [4] 7/19 7/19 13/22 14/6
other [7] 6/6 7/17 8/2 8/2 10/8 10/17 13/5
otherwise [1] 8/1
out [5] 4/5 4/10 7/18 13/21 14/13
outcome [1] 11/15
owed [1] 12/22

## P

part [2] 9/15 10/23
particular [3] 10/14 11/1 14/24
Particularly [1] 14/13
parties [2] 3/21 4/1
past [1] 12/18
PC [1] 2/3
penal [5] 8/24 8/25 9/4 10/9 11/25
pending [1] 11/14
per [1] 9/4

person [1] 4/21
plaintiff [1] 8/22
Plaintiffs [2] 1/11 2/3
plaintiffs' [4] 4/20 6/8 6/21 8/5
pleadings [1] 7/12
please [2] 3/7 13/3
point [2] 11/25 12/22
portion [1] 9/16
position [4] 4/1 11/9 11/10 11/23
posted [1] 15/8
precise [1] 5/10
PRESIDING [1] 1/4
previous [1] 11/11
primarily [1] 11/12
privacy [6] 9/19 9/21 9/24 9/25 12/11 12/15
probably [2] 4/5 4/9 13/20
probate [3] 11/14 14/19 14/22
proceed [1] 7/25
proceeding [2] 10/19 10/20
proceedings [7] 1/15 10/16 10/16 10/17 10/17 15/14 16/8
process [1] 14/21
proper [1] 10/24
proposed [3] 7/23 13/16 14/8
protection [1] 12/17
provision [1] 8/25
provisions [1] 5/21
purposes [1] 8/19
pursuant [2] 8/24 16/5
pursue [1] 7/2
pursuing [3] 6/11 6/18 13/11

## Q

question [4] 5/7 10/13 12/6 14/11
questions [3] 5/4 9/11 10/6
quickly [1] 14/20

## R

Raiders [1] 12/25
raise [2] 5/1 13/5
raised [1] 8/12
read [1] 12/4
reading [1] 14/14
really [7] 10/18 11/20 12/7 12/8 12/13 14/12 14/14
reconcile [1] 4/8
record [1] 4/22
recording [1] 11/1
reference [1] 6/4
references [2] 5/3 8/9
referred [1] 10/10
referring [1] 4/20
regarding [1] 4/1
regulations [1] 16/9
relation [1] 5/10
rely [1] 10/3
remains [1] 11/24
report [1] 6/22
reported [1] 16/7
Reporter [1] 16/15
REPORTER'S [1] 1/15
request [1] 6/15
requirements [1] 7/18
researching [1] 11/16
resolve [1] 15/10
resolved [3] 4/6 6/25 7/16
respect [5] 3/22 5/16 6/22 10/8 14/18
response [1] 10/6
responsive [2] 7/10 7/24
revised [1] 6/10
right [5] 4/19 5/13 9/21 11/22 12/21
Room [1] 1/23
RUSSELL [2] 2/11 3/16

## S

sale [1] 11/8
SAMINI [8] 2/3 2/3 3/10 4/12 4/17 9/8 13/1 13/2
say [2] 4/4 4/13
schedule [3] 13/17 13/25 14/7
scheduling [3] 3/18 7/19 14/6
SCHEINBERG [1] 2/3
school [1] 14/3
second [1] 5/23
Section [2] 9/1 16/5
see [3] 4/22 7/19 10/3
seems [7] 3/21 3/23 6/19 6/21 6/24 8/25 11/5
sensitivity [1] 11/17
separate [4] 5/21 7/19 9/6 9/8
serious [1] 4/24
set [1] 7/18
settlement [2] 5/6 5/16
Sherman [5] 11/5 11/7 11/19 11/24 12/19
shorter [1] 14/7
should [4] 6/17 6/24 7/5 9/13
sign [1] 13/20
Silver [1] 3/15
since [1] 10/25
SKADDEN [2] 2/8 3/14
SLATE [2] 2/8 3/14
so [2]
some [15] 3/23 4/6 4/9 4/19 4/23 4/24 6/16 7/21 8/20 11/13 11/15 11/20 12/21 14/25 14/25
somehow [1] 8/14
something [2] 11/16 11/19
sound [1] 13/24
South [2] 2/4 2/9
spoken [1] 12/19
Spring [1] 1/23
Square [1] 2/12
state [2] 3/25 4/7
statements [1] 13/8
STATES [3] 1/1 16/6 16/10
status [1] 5/10
statute [3] 10/11 10/14 10/15
stenographically [1] 16/7
STERLING [11] 1/6 3/5 3/10 3/12 5/5 5/9 5/20 7/1 8/10 8/14 12/23
Sterling's [1] 5/10
still [4] 4/5 4/24 6/11 11/19
stipulation [1] 7/23
stopped [1] 14/14
Street [1] 1/23
stretch [1] 13/21
subject [2] 5/5 14/22
submit [2] 13/16 13/24
substantively [2] 4/12 11/20
suggest [1] 8/25
Suite [1] 2/5
summary [6] 7/13 7/15 7/20 8/16 13/22 13/23
Superior [1] 9/22
sure [7] 4/20 6/1 7/6 8/12 9/17 12/17 13/12

## T

take [2] 13/3 13/19
taken [1] 13/9
taking [1] 14/21
talk [3] 6/6 11/7 12/7
talking [3] 9/24 12/15 12/18
tape [1] 11/1
tape-recording [1] 11/1
taped [1] 10/15
thank [5] 14/1 14/2 14/2 15/12 15/13
that [99]

**T**

that's [12]  5/18 6/5 7/25 8/4 8/11 8/11 8/24
  9/15 9/18 11/16 12/6 13/7
their [1]  3/7
then [7]  4/12 4/14 6/1 7/16 9/7 13/5 13/22
theory [2]  13/11 13/12
there [16]  3/23 4/6 4/25 5/2 5/7 5/19 5/20 6/4
  11/13 11/13 11/18 14/15 14/17 14/19 14/24
  14/25
there's [6]  6/14 6/16 7/13 12/2 12/24 15/8
Thereupon [1]  15/14
these [6]  10/22 11/2 12/7 12/9 12/10 12/10
they [3]  7/14 10/25 10/25
thing [1]  10/17
think [24]
thinking [1]  4/17
this [16]  5/3 6/14 6/21 8/18 9/10 9/10 9/19
  9/21 10/11 10/19 11/1 12/9 12/14 14/5 14/12
  15/8
those [10]  4/5 5/22 6/12 6/18 8/15 8/16 10/2
  12/13 13/14 14/9
though [2]  11/6 11/22
thought [1]  6/17
thoughts [2]  8/20 13/14
three [2]  8/8 8/15
threshold [2]  6/24 7/5
through [1]  4/19
Thursday [2]  1/17 3/1
tie [1]  11/13
tie-in [1]  11/13
time [3]  11/20 12/9 14/10
Times [1]  2/12
timing [1]  4/8
Title [1]  16/6
too [3]  8/6 13/21 13/21
transcript [5]  1/15 4/22 4/23 16/7 16/9
true [1]  16/6
trust [4]  5/9 5/11 5/13 5/20
trying [1]  4/7
turn [1]  14/5
two [5]  4/5 4/10 7/11 9/6 9/8

**U**

U.S [2]  1/22 16/15
unclear [1]  8/21
under [5]  5/9 6/9 10/4 10/25 12/15
understand [5]  5/22 6/13 11/17 11/22 12/1
understanding [2]  8/11 9/4
undertaking [1]  6/8
UNITED [3]  1/1 16/6 16/10
unless [1]  7/25
Until [1]  4/12
up [1]  11/3
us [2]  7/7 15/6

**V**

valid [3]  9/15 10/4 10/24
venture [1]  6/10
very [6]  5/8 6/17 12/11 14/1 14/2 14/20
view [2]  4/15 6/25

**W**

want [18]
wanted [3]  3/20 8/12 13/5
was [9]  8/12 8/13 8/14 11/11 13/6 14/8 14/19
  14/19 14/20
wasting [1]  12/9
watching [1]  14/14
way [3]  7/25 9/21 12/3
we [22]
we'll [7]  4/10 5/22 7/16 12/23 13/6 13/12
  15/10
we're [10]  3/17 4/7 4/18 10/12 10/13 11/16
  12/15 12/18 14/20 14/21
week [2]  4/5 4/10
well [7]  5/12 6/19 7/9 9/12 14/4 15/2 15/7
were [1]  8/9
WESTERN [1]  1/3
what [15]  3/24 4/13 4/20 6/20 7/6 7/9 7/14
  8/24 9/15 10/11 11/3 14/10 14/11 14/14
  14/22
what's [2]  4/15 15/9
when [4]  6/2 7/18 9/3 9/12
where [1]  10/1
whether [13]  8/13 8/13 9/14 9/24 10/3 10/15
  10/18 10/23 11/7 11/18 12/22 13/4 14/23
which [5]  7/18 9/23 11/19 14/6 14/25
who [3]  10/25 14/8 15/5
why [3]  7/2 8/11 13/15
will [11]  3/21 9/4 9/6 9/8 11/3 11/20 12/22
  13/17 14/6 14/8 14/22
within [1]  7/11
work [1]  13/17
worked [1]  4/10
works [1]  9/21
would [7]  4/4 4/13 7/7 8/7 8/8 9/18 12/3
writ [1]  14/20
www.lisamariecsr.com [1]  1/24

**Y**

yeah [1]  13/2
yes [5]  3/19 5/14 6/13 6/18 8/7
yet [2]  14/17 14/24
York [1]  2/12
you [55]
you'll [3]  7/19 7/21 14/10
you're [11]  6/2 9/11 9/24 10/14 10/18 10/22
  11/2 11/23 12/5 12/17 13/11
your [34]
Your Honor [11]  4/3 4/16 5/8 5/18 7/4 9/3
  9/9 11/10 12/1 14/16 15/4

# Exhibit H



# National Basketball Association

Richard W. Buchanan
Executive Vice President &
General Counsel

**PRIVILEGED & CONFIDENTIAL**

April 29, 2014

### By Overnight Mail and Email

Donald Sterling
Sterling World Plaza
9441 Wilshire Boulevard
Penthouse Suite
Beverly Hills, CA 90212
dschield@bhprop.com, dpaulsen@bhprop.com

Dear Donald:

We have completed our investigation regarding the audio recordings released on April 26 and 27 by the media outlets TMZ and Deadspin.

Based on this investigation, Commissioner Silver has concluded that you are the man whose voice is heard in the recordings and that the views you express and the demands you make in the recordings are of a discriminatory and offensive nature, already have had a material adverse impact on the NBA and its teams, and will cause additional material adverse consequences for the NBA and its teams if not remedied immediately. The Commissioner has also concluded that you failed to cooperate with the investigation by, among other things, refusing to appear for a scheduled interview and by failing to tell the truth.

Under the authority provided by the NBA Constitution and By-Laws, including but not limited to Article 24 thereof, and by the rules, regulations, memoranda, resolutions, directives, and agreements of the NBA, including but not limited to the Agreement and Undertaking by you, the Clippers, and others in favor of the NBA dated July 26, 2005, and the Joint Venture Agreement dated January 1, 1989, please be advised that the Commissioner, in his judgment, has made the following determination in the best interests of the NBA:

1.   You are fined in the amount of $2,500,000. Please remit this sum to the NBA (attention Jason Cahilly, CFO) by no later than May 12, 2014.

2.   You are permanently banned from any further involvement with the Los Angeles Clippers or the NBA.

Olympic Tower • 645 Fifth Avenue • New York NY 10022 • Main: (212) 407-8000 • Direct: (212) 407-8013 • Fax: (212) 888-7931 • Email: rbuchanan@nba.com

Donald Sterling
April 29, 2014
Page 2

        a.    During your ban, you may not: (i) be present at the offices, arena, or any other facility of the Clippers or any other NBA team; (ii) attend or participate in any NBA or team-related event or other activity, including without limitation Clippers practices and games and NBA Board of Governors meetings; (iii) have any involvement in business or player matters relating to the Clippers; or (iv) otherwise be involved directly or indirectly with any business, affairs, event, or matter of the Clippers, the NBA, or any other team.

        b.    During your ban, the Clippers will be managed by a person approved by the Commissioner. Such person may not be replaced without the approval of the Commissioner.

    3.    Failure to abide by the above terms will result in the imposition of additional penalties.

    4.    The penalties set forth in paragraphs 1 and 2 above are based on the recordings released on April 26 and 27. You are subject to additional penalties if new information comes to light.

        Please also be advised that the Commissioner is referring this matter to the Board of Governors for further consideration pursuant to Articles 13 and 14 of the NBA Constitution.

        Please contact me if you have any questions.

        Sincerely,

        Richard W. Buchanan

        Richard W. Buchanan

cc:    Adam Silver
      Andy Roeser
      Robert Platt

 # National Basketball Association

Richard W. Buchanan
Executive Vice President &
General Counsel

May 14, 2014

## By Overnight Mail and Email

Donald Sterling
Sterling World Plaza
9441 Wilshire Boulevard
Penthouse Suite
Beverly Hills, CA 90212
dschield@bhprop.com, dpaulsen@bhprop.com

Dear Donald:

By letter dated April 29, 2014, you were notified by Commissioner
Silver that you had been fined $2.5 million for acts described therein. The letter
required your payment of the fine by no later than May 12, 2014, to the attention of
the NBA's Chief Financial Officer, Jason Cahilly.

As of this date, the NBA has not received your payment of the $2.5
million fine, and you are therefore in default. Please remit this sum immediately.

Sincerely,

Richard W. Buchanan

Olympic Tower • 645 Fifth Avenue • New York NY 10022 • Main: (212) 407-8000 • Direct: (212) 407-8013 • Fax: (212) 888-7931 • Email: rbuchanan@nba.com

Exhibit H
Page 181



**Blecher Collins Pepperman & Joye**

A Professional Corporation
ATTORNEYS AT LAW

515 SOUTH FIGUEROA STREET, SUITE 1750
LOS ANGELES, CALIFORNIA 90071-3334
T. 213.622.4222 • F. 213.689.1944
WWW.BLECHERCOLLINS.COM

MBLECHER@BLECHERCOLLINS.COM

## PRIVILEGED & CONFIDENTIAL

May 15, 2014

### VIA E-MAIL and U.S. MAIL

Richard W. Buchanan, Esq.
Executive Vice President & General Counsel
National Basketball Association
Olympic Tower
645 Fifth Avenue
New York, NY 10022
E-Mail: rbuchanan@nba.com

      Re:   Donald Sterling

Dear Mr. Buchanan:

      This will respond to your letters of April 29 and May 14. We, among others, represent Donald T. Sterling. We reject your demand for payment because in the circumstances there has been no violation of Article 35A, warranting the punishment imposed under Article 24 or any of the bases set forth in your demand, or any punishment at all. Even if there were, the penalty violates Mr. Sterling's due process rights, both procedural and substantive. Accordingly, this matter will need to be adjudicated.

      Very truly yours,

MAXWELL M. BLECHER

MMB:lg

59523.1

# Exhibit I



## AGREEMENT AND UNDERTAKING

Agreement and Undertaking dated July 26, 2005 from LAC Basketball Club, Inc. (the "Team"), The Sterling Family Trust U/A/D August 13, 1998 (the "Trust"), Donald T. Sterling ("DTS") and Rochelle H. Sterling ("RHS" and collectively with the Team, the Trust and DTS, the "Owners"), each having a business address at c/o STAPLES Center, 1111 South Figueroa Street, Suite 1100, Los Angeles, California 90015, in favor of the NATIONAL BASKETBALL ASSOCIATION ("NBA"), each of the present and future member teams of the NBA (the "NBA Teams"), NBA PROPERTIES, INC., NBA MEDIA VENTURES, LLC, NBA DEVELOPMENT, LLC, NBA STORE, LLC, PLANET INSURANCE, LTD., WNBA, LLC, WNBA ENTERPRISES, LLC, NBDL HOLDINGS, LLC, and any other entity formed generally by the NBA Teams after this date (together with the NBA, but excluding the NBA Teams, the "NBA Entities"), c/o National Basketball Association, Olympic Tower, 645 Fifth Avenue, New York, New York 10022, Attn: General Counsel.

## RECITALS

A.     DTS proposes to transfer to the Trust 100% of the outstanding shares of the Team, which owns the NBA membership known as Los Angeles Clippers (the "Membership") and all assets used in the operation of the Membership (the "Transaction").

B.     The Transaction requires the approval of the Board of Governors of the NBA.

C.     The Board of Governors has granted such approval upon the condition that each of the Owners executes, delivers and performs this Agreement and Undertaking.

6282/53750-282 NYLIB2/1110964v4

Exhibit I
Page 183

NOW, THEREFORE, in consideration of the approval by the Board of Governors of the Transaction, each of the Owners agrees and undertakes as follows:

1.      Notwithstanding anything to the contrary in any Transaction Document (as defined in Section 4(a)), the Team shall continue to pay, perform and discharge all debts, liabilities and obligations arising in the ordinary course of the operation of the Membership, howsoever arising, whether known or unknown, fixed or contingent, mature or unmatured, whether or not existing on the date hereof or arising in the future, including, without limitation, the following:

(a)      all debts, liabilities and obligations of the Team and its predecessors under all agreements with players, coaches and other employees including, by way of example but not of limitation, all deferred compensation obligations;

(b)      all debts, liabilities and obligations of the Team and its predecessors under all pension, insurance and other benefit programs covering players, coaches or other employees; and

(c)      all debts, liabilities and obligations of the Team and its predecessors to any of the NBA Teams and to any of the NBA Entities, and its (and its predecessors') share of all debts, liabilities and obligations of the NBA Entities.

2.      The Owners jointly and severally shall be bound by and conduct themselves in accordance with, and shall cause their respective affiliates to be bound by and conduct themselves in accordance with, (a) the Constitution and By-Laws of the NBA, (b) the governing documents of each of the NBA Entities, (c) all present and future rules, regulations, memoranda, resolutions and directives of each of the NBA Entities and the NBA Commissioner, (d) any agreements and arrangements to which the Team is (or after the date of this Agreement

2

Exhibit I
Page 184

may become) subject or by which it or its assets are (or may become) bound with or in favor of

any of the NBA Entities, including, without limitation, this Agreement, and (e) any agreements

and arrangements to which the NBA Teams generally or any of the NBA Entities are (or after the

date of this Agreement may become) subject or by which they or their assets are (or may

become) bound, in each case as they may be amended or adopted from time to time and

including the custom and practice thereunder (clauses (a)-(e) collectively, "NBA Rules"),

including, but not limited to, (v) NBA Rules relating to membership relocation, indebtedness and

ownership transfers, (w) NBA Rules relating to territorial rights and limitations, (x) NBA Rules

relating to the telecast or broadcast, by over-the-air television, non-broadcast television, radio or

any other means, whether on a local, regional, national or international basis, of NBA games, (y)

NBA Rules relating to advertising and promotional arrangements with establishments that have

or offer legalized gambling, and (z) NBA Rules relating to the direct or indirect ownership of

interests in teams by entities that have direct or indirect ownership interests in establishments

that have or offer legalized gambling on NBA games.  The Owners jointly and severally agree

not to take or support, and to cause their respective affiliates not to take or support, any position

or action that may violate or be inconsistent with any NBA Rule or any right of any NBA Entity

or NBA Team, or which may have a material adverse impact on any of the NBA Entities or NBA

Teams.

      3.     The Owners acknowledge and agree that if at any time the Team's NBA

membership or any other NBA-related asset or any interest in the Team shall be sold, assigned or

otherwise transferred to any third party (whether directly or indirectly, by operation of law or

otherwise and including any change of control), the Team, each transferring Owner, each

transferee, and certain direct and indirect owners of each transferor and transferee shall be

Exhibit I
Page 185

required to execute a document containing release and indemnification provisions in favor of the NBA Entities, the NBA Teams and various other persons and entities substantially in the forms set forth in sections 6 and 7 of this Agreement (or such successor forms as may then be required by the NBA).

        4.        The Owners jointly and severally represent, warrant and agree as follows:

        (a)        The Transaction has been consummated today in accordance with the terms of the documents listed on schedule 4(a) (the "Transaction Documents").

        (b)        Except as provided in the Transaction Documents, there are no agreements, arrangements or understandings, whether written or oral, among any of the Owners relating to the Transaction or to the ownership, control, management, right to transfer direct or indirect interests in, or financing of the Team or any of the other Owners (including, without limitation, partnership or shareholders agreements).  The NBA has received true and complete copies of each of the Transaction Documents.

        (c)        All consents, approvals and filings necessary for the consummation of the Transaction have been obtained or made.

        (d)        After giving effect to the Transaction, none of the assets of the Team (including the Membership) or direct or indirect ownership interests in the Team are pledged to secure the indebtedness or obligations of any person or entity.

        (e)        After giving effect to the Transaction, the Team does not have any indebtedness.

        (f)        All information furnished by or on behalf of the Owners to the NBA Entities in connection with the request for approval of the Transaction is true and correct in

Exhibit I
Page 186

all material respects and has not contained any material misstatement or omitted any material statement which would make such information not misleading

(g)      After giving effect to the Transaction, there are no options, warrants, rights or convertible securities of any kind entitling any person or entity to acquire, directly or indirectly, any shares, partnership interests, membership interests, debt instruments or other economic rights in the Team or any of the other Owners, nor does the Team or any of the other Owners have any obligation to issue any such options, warrants, rights or convertible securities.  No Owner is holding its direct or indirect interest in the Team or rights under the Transaction Documents for the benefit of any other person or entity.  No Owner presently has any intention of, or agreement or arrangement with respect to, selling, relocating or otherwise transferring any of its direct or indirect interests in the Team or any of the assets of the Team.

(h)      Schedule 1 contains a true and complete list, after giving effect to the Transaction, of all of the individuals and entities that directly or indirectly own interests in the Team (including the beneficiaries and trustees of any trusts), and their respective percentage ownership interests in the Team and each intermediate entity.  The Trust directly owns 100% of the ownership interests in the Team.  The only trustee of the Trust is DTS.  DTS and RHS are the only beneficiaries of the Trust. The Team directly owns the Membership and all other assets used in or related to the ownership and operation of the Membership.

(i)      Each Owner that is an entity is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, and has the power and authority to own, operate and lease its properties and to carry on its business. Each Owner has the power and authority to execute and deliver this Agreement and to perform its obligations hereunder.  This Agreement constitutes a valid and binding obligation of the Owners,

5

Exhibit I
Page 187

enforceable against it in accordance with its terms.

(j)      There is no action, suit or proceeding pending or, to the knowledge of any Owner, threatened against any Owner which is reasonably likely to result in a material adverse change in the business, properties, assets or prospects or in the condition, financial or otherwise (a "Material Adverse Change"), of such Owner, or which is reasonably likely to prevent, impede or adversely affect the consummation of the Transaction or the operation of the Membership.  There is no order, writ, injunction or decree that has been issued by, or, to the knowledge of any Owner, requested by, any court or governmental agency which has resulted or is reasonably likely to result in any Material Adverse Change with respect to any Owner or which is reasonably likely to prevent, impede or adversely affect the consummation of the Transaction or the operation of the Membership.

(k)      Each Owner is in compliance in all material respects with all laws, regulations and orders, federal, provincial or otherwise, except where the failure to be in compliance (individually or collectively) would not be reasonably likely to result in a Material Adverse Change with respect to such Owner or have a material adverse effect on the ability of such Owner to conduct its business as currently conducted or the operation of the Membership.

(l)      Each Owner has performed in all material respects all obligations required to be performed by such Owner to date with respect to the Transaction.  No Owner is in default under any material contract, agreement, lease, or other instrument relating to the Transaction to which such Owner is a party or by which such Owner is bound.  Each of the Transaction Documents constitutes a valid and binding obligation enforceable against each Owner that is a party thereto in accordance with its terms.

6

Exhibit I
Page 188

(m)     The execution and delivery of this Agreement and the Transaction Documents, and the compliance by the Owners with its terms, will not conflict with, or result in the breach or termination of, any of the terms, conditions or provisions of, or constitute a default under, or result in the creation of any lien, charge or encumbrance upon any Owner's properties or assets pursuant to any indenture, mortgage, lease, agreement or other instrument to which such Owner is a party or by which such Owner is bound.  The Transaction will have no adverse effect on the business, assets, operations or condition, financial or otherwise, of the Team or the Membership.

(n)     None of the Owners has any Claims against any of the Affiliated NBA Parties (as those terms are defined in Section 6(a)).

(o)     The person representing the Team on the NBA Board of Governors shall continue to be DTS and the person serving as the Team's Alternate Governor shall continue to be Andy Roeser.

5.     (a)     The Owners acknowledge and agree that any direct or indirect sale, assignment, pledge, change of control, change in voting or economic interests or other transfer of the Membership or any other NBA-related asset, or of any direct, indirect, contingent or convertible interest (regardless of the size of the interest) in or rights with respect to the Team or any of the other Owners, including, but not limited to, any addition, replacement or substitution of a trustee or beneficiary of the Trust having a direct or indirect interest in the Team, whether or not contemplated by the Transaction Documents, shall require the prior approval of the NBA Entities in accordance with NBA Rules.

(b)     None of the Transaction Documents shall be amended, modified, terminated or waived in any respect, and none of the Owners or their affiliates shall enter into

7

Exhibit I
Page 189

any new agreements, arrangements or understandings, which change any management arrangements or change in a material way the business transaction presented to and approved by the NBA, without the prior written consent of the NBA.  None of the Owners shall assign, pledge or otherwise encumber any of their rights, or delegate any of their duties, under any of the Transaction Documents, without the prior written consent of the NBA, and any assignment, pledge, encumbrance or delegation in violation of this provision shall be void.

6.    (a)    Each of the Owners, on its own behalf and on behalf of its affiliates, hereby releases and forever discharges the NBA Entities, the NBA Teams (other than the Team), and each of their respective predecessors, successors, assigns and affiliates,  and the past, present and future direct and indirect directors, officers, employees, agents, owners, partners, members, managers, shareholders, governors, affiliates and subsidiaries of each of the foregoing (collectively, including the NBA Entities and NBA Teams, the "Affiliated NBA Parties") from all actions, causes of action, suits, debts,  losses, costs, controversies, damages, liabilities, judgments, claims, and demands whatsoever, in law, admiralty or equity (collectively, "Claims"), known or unknown and arising out of or relating to facts or circumstances existing on or prior to the date of this Agreement, that any of the Owners (or its affiliates) ever had, now has or hereafter can, shall or may have against any of them.  Each of the Owners jointly and severally represents and warrants to the NBA Entities that none of the Claims purportedly released under the prior sentence has been assigned or transferred to any other party.

(b)    The release and discharge set forth in section 6(a) shall not apply to terminate, modify or amend any contracts, agreements, commitments or understandings between or among the Team and any of the NBA Entities or NBA Teams which were entered into by the Team in the ordinary course of its business of operating the Membership, or release

8

Exhibit I
Page 190

or discharge any liability or obligation of any party arising in the ordinary course of business under any of those contracts, agreements, commitments or understandings.

7.    (a)    The Owners jointly and severally shall indemnify, defend and hold harmless each of the Affiliated NBA Parties from and against all actions, causes of action, suits, debts, obligations, losses, damages, amounts paid in settlement, liabilities, costs and expenses (including, without limitation, interest, penalties and reasonable attorneys' fees and expenses) (collectively, "Losses") resulting to, imposed upon, asserted against or incurred by any Affiliated NBA Party (including, but not limited to, in any action between any of the Owners and any Affiliated NBA Party) in connection with or arising out of (i) the Transaction or any transactions or other acts or occurrences relating to the Transaction, (ii) any breach or misrepresentation by any of the Owners under this Agreement, or (iii) any act or omission (or alleged act or omission), whether on, prior to or after the date of this Agreement, by or on behalf of any of the Owners or their respective past, present or future affiliates.

(b)    Upon the request of the NBA, the Owners shall advance to the NBA or another indemnified party an amount equal to any Losses as those Losses are incurred.

8.    In the event of any breach by any of the Owners of its agreements contained herein, in addition to all other legal and equitable rights and remedies available to the NBA Entities and the NBA Teams, such breach shall constitute a failure to fulfill a contractual obligation within the meaning of Article 13(d) of the NBA Constitution, and shall entitle the NBA Entities and NBA Teams to exercise all rights and remedies against the Team as if the Team had itself committed such breach.

9.    Each Owner acknowledges that from time to time it and one or more of the NBA Entities will jointly retain one or more law firms or experts to represent and advise

9

Exhibit I
Page 191

them ("League Advisors").  Each Owner agrees and consents to the representation of the NBA Entities and the other NBA Teams by League Advisors in connection with any and all controversies and disputes, including any litigation or other adversarial proceeding adverse to such Owner.  In any such adverse representation, the current or prior representation of such Owner by that League Advisor, and the information that was conveyed to that League Advisor in the course of such representation, shall not be asserted as, and shall not constitute, a basis to disqualify that League Advisor from the adverse representation.

       10.    Any notice or other communication under this Agreement shall be in writing and shall be considered given when delivered personally, sent by reputable overnight courier or mailed by registered mail, return receipt requested, to the parties at the addresses set forth above (or at such other address as a party may specify by notice similarly given).

       11.    The covenants and agreements by the Owners contained in this Agreement shall be construed as several covenants by each of the Owners in favor of the NBA Entities and not as covenants between any of the Owners.  Accordingly, any of such covenants and agreements, and any of the representations made by the Owners in this Agreement, may be waived, amended, consented to or otherwise approved by the NBA Entities, on the one hand, and the particular Owner to which such covenant, agreement or representation applies, on the other hand, without the consent or approval of any other party.  By way of illustration and not limitation, changes in any Owner's direct or indirect ownership of the Team may be consented to by such Owner and the NBA Entities without the consent of any other party.  The covenants and agreements by the Owners contained in this Agreement shall apply to them in their capacities as owners of an interest in the Membership and otherwise.

10

Exhibit I
Page 192

12.     This Agreement shall be governed by and construed in accordance with the law of the State of New York applicable to agreements made and to be performed entirely in New York.

13.     This Agreement may be executed in counterparts, which together shall constitute the same instrument.


[THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK]

11

Exhibit I
Page 193

IN WITNESS WHEREOF, the Owners have executed and delivered this

Agreement and Undertaking, intending to be bound hereby, as of the date first written above.


LAC BASKETBALL CLUB, INC.

By: _____

Andy Roeser
Chief Executive Officer


THE STERLING FAMILY TRUST U/A/D
AUGUST 13, 1998

By: _____

Donald T. Sterling
Trustee

_____

Donald T. Sterling

_____

Rochelle H. Sterling

12

Exhibit I
Page 194

SCHEDULE 1
<u>DIRECT AND INDIRECT OWNERS OF THE TEAM</u>

The Sterling Family Trust U/A/D August 13, 1998                    100%

    Trustee:  Donald T. Sterling

    Beneficiaries:  Donald T. Sterling
                Rochelle H. Sterling

13

Exhibit I
Page 195

SCHEDULE 4(a)
TRANSACTION DOCUMENTS

1)      Stock Assignment Separate from Certificate dated as of January 25, 2005 from Donald T. Sterling to The Sterling Family Trust U/A/D August 13, 1998.

2)      The Sterling Family Trust Agreement, dated August 13, 1998.

3)      Articles of Incorporation of LAC Basketball Club, Inc., as amended.

4)      Bylaws of LAC Basketball Club, Inc., as adopted on April 1, 2005.

14

Exhibit I
Page 196