# EXHIBIT F

Bobby Samini, Esq. (SBN 181796)
**SAMINI SCHEINBERG, PC**
949 South Coast Drive, Suite 420
Costa Mesa, California 92626
Telephone: (949) 724-0900
Facsimile: (949) 724-0901

Attorney for Respondent,
DONALD T. STERLING

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In the Matter of the STERLING FAMILY TRUST | CASE NO.:<br><br>**NOTICE OF REMOVAL BY RESPONDENT DONALD T. STERLING [Title 28 U.S.C. sections 1441(c) and 1446(a)]** |

[REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]

- 1 –

NOTICE OF REMOVAL BY RESPONDENT DONALD T. STERLING
[TITLE 28 U.S.C. SECTIONS 1441(C) AND 1446(A)]

**EXHIBIT F, PAGE 287**

SAMINI SCHEINBERG, PC
949 South Coast Drive, Suite 420
Costa Mesa, California 92626
Tel. (949)724-0900

**NOTICE OF REMOVAL**

Respondent DONALD T. STERLING ("respondent" or "DONALD STERLING"), by filing this notice of removal, removes this action from the Probate Division of the Los Angeles County Superior Court to the United States District Court for the Central District of California. In support of the removal, DONALD STERLING states as follows:

**REMOVAL OF THIS ACTION**

1. The petition in this action was filed on June 13, 2014, by petitioner ROCHELLE H. STERLING ("petitioner" or "ROCHELLE STERLING"). The petition was filed in the Los Angeles County Superior Court (case number BP 152858). The petition was assigned for all purposes to the Honorable Michael Levanas in Department 5 of the Los Angeles County Superior Court. (See attached Exhibit 1; petition of ROCHELLE STERLING.) Respondent DONALD STERLING filed his Statement of Opposition to the petition on June 23, 2014. (See attached Exhibit 2, respondent's Statement of Opposition.) This notice of removal is filed less than thirty days after the petition was filed, pursuant to 28 U.S.C. §1446(b).

2. The petition was filed by ROCHELLE STERLING in her effort to obtain court approval for a proposed sale of the Los Angeles Clippers to Steve Ballmer. Petitioner also sought the court's determination that respondent DONALD STERLING lacked the requisite mental capacity to act as co-trustee of the Sterling Family Trust.

3. The petition seeks court confirmation that ROCHELLE STERLING was authorized as sole trustee of the Sterling Family Trust to enter an agreement with Steve Ballmer for the proposed sale of the Los Angeles Clippers on May 29, 2014. The petition contends that DONALD STERLING lacked the capacity to act as co-trustee of the Sterling Family Trust on May 29, 2014. Respondent challenged any assertion of his alleged incapacity to act as co-trustee on the basis of fraud and undue influence. ROCHELLE STERLING scheduled examinations of DONALD STERLING in May 2014 by two doctors that petitioner handpicked. Petitioner fraudulently misrepresented the purpose of the two examinations in May 2014, and used undue influence on DONALD STERLING to arrange for his appearances at the two examinations. Petitioner pursued determinations by the two doctors that DONALD STERLING allegedly lacked the mental capacity to act as co-trustee of the Sterling Family Trust. Petitioner engaged

– 2 –

SAMINI SCHEINBERG, PC
949 South Coast Drive, Suite 420
Costa Mesa, California 92626
Tel. (949)724-0900

1   in her subterfuge to attempt the removal of DONALD STERLING as co-trustee of the Sterling

2   Family Trust in order to attempt a proposed sale of the Los Angeles Clippers to Steve Ballmer.

3   Petitioner stipulated to the capacity of DONALD STERLING to act as co-trustee on June 30,

4   2014.

5   4. This Court has original jurisdiction under the provisions of 28 U.S.C. §§ 1331 (Federal

6   Question).   In advance of the two examinations of DONALD STERLING in May 2014,

7   petitioner unlawfully authorized the transmission of private and personal medical records of

8   respondent to her handpicked doctors.  The unlawful authorization by ROCHELL STERLING

9   of the transfer and use of respondent's private and personal medical records violated 13 U.S.C.

10  section 13400(1) and 42 U.S.C. section 164.402.   This action is removed pursuant to the

11  provisions of 28 U.S.C. § 1441 and 28 U.S.C. § 1446.

12
13  5. This Court has original jurisdiction under the provision of 28 U.S.C. § 1331 (Federal

14  Question). This action is removed pursuant to the provisions of 28 U.S.C. § 1441 and 28 U.S.C.

15  § 1446.

16                                    **FEDERAL QUESTION**

17  6. 28 U.S.C. § 1331 provides that the federal district courts "shall have original jurisdiction of

18  all civil actions arising under the Constitution, laws, or treaties of the United States."

19
20  7. Accordingly, this case may be removed to this Court under 28 U.S.C. § 1441 (a).

21
22                                     **OTHER MATTERS**

23  8. By filing this notice of removal, Respondent does not waive any defense that may be

24  available including, without limitation, lack of personal jurisdiction, improper venue,
    insufficient service of process and failure to state a claim upon which relief may be granted.

25  ///

26  ///

27  ///

28  ///

**EXHIBIT F, PAGE 289**

9. Pursuant 28 U.S.C. § 1446(d), a Notice of filing of Notice of Removal, attached to the Declaration of Babak Samini filed concurrently herewith, together with this Notice of Removal, will be served upon Petitioner's counsel and will be filed with the Clerk of the Superior Court for the County of Los Angeles.

10. Pursuant to 28 U.S.C. § 1446(a), a copy of all process, pleadings and orders served upon Respondent are attached hereto as **Exhibit "A"**.

11. This Court is a proper venue for this actin pursuant to 28 U.S.C. § 1441(a). The United States District Court for the Central District of California, Western Division, embraces the County of Los Angeles, in which the state court action is now pending. *See* 28 U.S.C. § 84(c).

12. This Notice of Removal is timely filed. The statute provides that "[e]ach defendant shall have 30 days after receipt ... of the initial pleading ... to file a notice of removal." 28 U.S.C. § 1446(b)(2)(B). Respondent was served with the Petition on June 11, 2014. This Notice of Removal is filed within 30 days of June 11, 2014.

12. If any question arises as to the propriety of the removal of this action, Respondent respectfully requests the opportunity to submit briefing and oral argument and to conduct discovery in support of his position that subject matter jurisdiction exists.

**SAMINI SCHEINBERG, PC**

Date: July 3, 2014

By: _____
Bobby Samini, Esq.
Attorney for Respondent,
DONALD T. STERLING

- 4 -

NOTICE OF REMOVAL BY RESPONDENT DONALD T. STERLING
[TITLE 28 U.S.C. SECTIONS 1441(C) AND 1446(A)]

**EXHIBIT F, PAGE 290**

SAMINI SCHEINBERG, PC
949 South Coast Drive, Suite 420
Costa Mesa, California 92626
Tel. (949)724-0900

Exhibit "A"

1   PIERCE O'DONNELL (SBN 81298)
    PODonnell@GreenbergGlusker.com
2   MARC M. STERN (SBN 126409)
    MStern@GreenbergGlusker.com
3   GREENBERG GLUSKER FIELDS CLAMAN &
    MACHTINGER LLP
4   1900 Avenue of the Stars, 21st Floor
    Los Angeles, California 90067-4590
5   Telephone: 310.553.3610
    Fax: 310.553.0687
6
    Attorneys for Trustee
7   ROCHELLE H. STERLING

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 COUNTY OF LOS ANGELES

10                               BP152858

11

12   In the Matter of               Case No.  BP152858

13   THE STERLING FAMILY      **EX PARTE PETITION (1) FOR**
    TRUST,                     **CONFIRMATION OF TRUSTEE'S ACTS**
14                          **AND INSTRUCTING TRUSTEE AND**
                            **(2) FOR ORDER DIRECTING TRUSTEE**
15                          **UNDER PROBATE CODE §1310(b) TO**
                          **PREVENT INJURY OR LOSS TO TRUST**
16
                        [Probate Code §§1310(b); 17200(b)(5) & (6)]
17
                        [Declaration of Rochelle Sterling and Richard
18                        Buchanan and [Proposed] Order Filed
                        Concurrently]
19
                        Date:
20                        Time:
                        Dept.:

21       Petitioner Rochelle H. Sterling ("Petitioner"), sole Trustee of the Sterling Family Trust

22   (the "Trust"), hereby presents her Ex Parte Petition (1) For Confirmation of Trustee's Acts and

23   Instructing Trustee and (2) For Order Directing Trustee Under Probate Code §1310(b) to Prevent

24   Injury or Loss to Trust (the "Petition") as follows:

25       1.   **Overview**: This Petition is brought pursuant to Probate Code §§17200(b)(5) & (6)

26   concerning the internal affairs of the Trust and requests that the Court confirm Petitioner's act, as

27   sole Trustee of the Trust, of selling certain assets of the Trust, namely, the Los Angeles Clippers

28

81294-00002/2190870.5

PETITION FOR CONFIRMATION OF TRUSTEE'S ACTS AND INSTRUCTING TRUSTEE

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

**EXHIBIT F, PAGE 292**

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    NBA Franchise (the "Clippers"),[1] at a record price of $2 Billion. This confirmation is required to

2    satisfy the "Conditions to Closing" under the Binding Term Sheet, dated May 29, 2014 (the

3    "BTS"), which memorializes the terms of sale of the Clippers to a new limited liability company

4    wholly-owned by former Microsoft Corp. CEO Steve Ballmer ("Buyer"). A true and correct

5    copy of the BTS is attached hereto as Exhibit 1.[2] A fully executed copy of the BTS was provided

6    to Donald T. Sterling ("Donald") through his counsel on or about June 4, 2014. Because there

7    will be a significant loss to the Trust and its beneficiaries if the Clippers are not promptly sold

8    upon the terms and conditions of the BTS,[3] Petitioner also requests an Order under Probate Code

9    §1310(b) directing her, as Trustee of the Trust, to consummate the sale of the Clippers as

10   provided in the BTS notwithstanding any appeal that may be taken of the substantive Order

11   confirming Petitioner's act and instructing her with respect to the sale.

12        The BTS contemplates a closing on July 15, 2014. Notwithstanding the BTS, the NBA

13   has set its own deadline of September 15, 2014, for the closing of the sale and has advised

14   Petitioner that if the sale is not consummated by that date, the NBA will undertake proceedings to

15   seize and sell the team. See Declaration of Richard W. Buchanan ("Buchanan Decl."), at ¶¶ 13,

16   14 and 20.) Thus, the sale of this $2 Billion asset hinges on granting the requested relief. It is

17   imperative that the Court act as soon as possible. Time is of the essence.

18        2.    **Trust**: The Trust was established on August 12, 1998, by Donald and Petitioner,

19   husband and wife, as Settlors and Trustees. Donald and Petitioner are the sole vested current

20   beneficiaries of the Trust. The Trust was subsequently restated by Donald and Petitioner on

21   December 18, 2013. (Declaration of Rochelle Sterling ("Pet. Decl."), at ¶¶ 1, 2.) True and

---

[1] The Clippers are owned by LAC Basketball Club, Inc. ("LAC"), a California corporation whose stock is owned 100% by the Trust. (Pet. Decl., at ¶4.)

[2] The As a result of Donald's lifetime ban from the NBA, as discussed more thoroughly below, the Lifetime Rights under the BTS (pages 9 and 10) exist only during Petitioner's lifetime. Because the Lifetime Rights are nevertheless community property and properly belong to the Trust, Petitioner assigned the Lifetime Rights to the Trust. A true and correct copy of the Assignment is attached hereto as Exhibit 2.

[3] The BTS provides for up to 10% of the Clippers to be retained by LAC and contributed to a charitable foundation, to be sold at a later date. However, Petitioner will not exercise the option to have any interest in the Clippers contributed to the foundation without either written consent by Donald, or a person who has authority to act on his behalf, or a Court Order. (Pet. Decl. at ¶10.)

EXHIBIT F, PAGE 293

1 correct copies of various relevant pages and provisions of the Trust, as restated on December 18,

2 2013,[4] are attached hereto as the following Exhibits:

| Page or Provision | Exhibit Number |
|---|---|
| Page 1 | 3 |
| Paragraphs 2.5. through 2.7. | 4 |
| Article 7 | 5 |
| Article 8 | 6 |
| Paragraph 10.24 | 7 |
| Signature/Notary pages | 8 |

3. **Venue and Jurisdiction**: Both Settlors reside in Los Angeles County, California,

12 and the principal place of administration of the Trust is Los Angeles County, California. The

13 Court, therefore, has jurisdiction to hear this Petition and to grant the relief requested herein

14 pursuant to Probate Code §§17200(b)(5) & (6), and proper venue lies in this Court.

4. **Based on Donald's Incapacity, Petitioner Acted Within Her Authority As Sole**

16 **Trustee of the Trust**: Pursuant to the applicable provisions of the Trust instrument discussed

17 below, Donald ceased serving as a Co-Trustee of the Trust as of May 29, 2014, upon Petitioner's

18 receipt of written certifications of his incapacity by two licensed physicians whose practice

19 regularly includes determinations of capacity. As a result, Petitioner currently serves as sole

20 Trustee of the Trust.

a. <u>Provisions of Trust</u>: The Trust contains the following provisions relevant

22 to Petitioner's status as the sole Trustee of the Trust:

i. Paragraph 7.2.a. provides that "[i]f either Settlor ceases to serve, the

24 other shall serve as Trustee." (Ex. 5, ¶7.2.a.)

ii. Paragraph 7.3. provides that "[a]n individual serving as a Co-

26 Trustee of any trust may designate one or more persons to serve serially (but not together) as his

---

[4] All references to the Trust in this Petition are to the Trust as restated on December 18, 2013.

81294-00002/2190870.5

3

PETITION FOR CONFIRMATION OF TRUSTEE'S ACTS AND INSTRUCTING TRUSTEE

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1   or her successors and/or as successors to any such designees." Under Paragraph 7.3.a., a

2   designation "shall be in writing, signed by the individual Trustee making the designation and

3   delivered to any other then serving Co-Trustees of the trust." (Ex. 5, ¶7.3.)

4           iii.     Paragraph 7.5.c. states: "Any individual who is deemed

5   incapacitated, as defined in Paragraph 10.24., shall cease to serve as a Trustee of all trusts

6   administered under this document. Each individual who agrees to serve as a Trustee of any trust

7   administered under this document (A) shall cooperate in any examination reasonably appropriate

8   to carry out the provisions of this Paragraph 7.5.c., (B) waives the doctor-patient and/or

9   psychiatrist-patient privilege with respect to the results of such examination, and (C) shall allow a

10  Co-Trustee or the Current Beneficiaries of the trust to review the individual's individually

11  identifiable health information or other medical records, waiving any privacy rights governed by

12  the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. §1320d (HIPAA), and

13  the regulations thereunder, including 45 C.F.R. §§160-164, to the extent required to implement

14  this Paragraph 7.5.c. An individual's obligation to comply with the provisions of this

15  Paragraph 7.5.c. is specifically enforceable." (Ex. 5, ¶7.5.c.)

16          iv.     Paragraph 10.24. defines "incapacity," and derivations thereof, and

17  provides that "[a]n individual shall be deemed to be incapacitated if . . . two licensed physicians

18  who, as a regular part of their practice are called upon to determine the capacity of others, and

19  neither of whom is related by blood or marriage to any Trustee or beneficiary, examine the

20  individual and certify in writing that the individual is incapacitated." (Ex. 7.)

21          b.    <u>Determination of Donald's Incapacity</u>:

22          i.     Paragraph 7.5.c. of the Trust, quoted above, includes language

23  waiving an individual Trustee's privilege and privacy rights for purposes of determining whether

24  the individual is incapacitated and ceases to serve as a Trustee. When the Trust was executed on

25  December 18, 2013, Donald and Petitioner both signed the "Acceptance by Trustee," which

26  expressly acknowledged that waiver. (Ex. 8.[5])

27

28  [5] The Acceptance By Trustee states, "The undersigned hereby accept the office of Trustee and agree to serve in accordance with the terms and conditions of service as set forth in this document, specifically including those terms

81294-00002/2190870.5                     4

1          ii.      Donald, who is 80 years old, was examined by Dr. Meril S. Platzer

2   on May 19, 2014, and by Dr. James Edward Spar on May 22, 2014.  Prior to these examinations,

3   at Dr. Platzer's request, Donald voluntarily underwent a CT scan and a PET scan of his brain at

4   Cedars Sinai Medical Center.

5          iii.     Both Dr. Platzer and Dr. Spar are licensed physicians who, as a

6   regular part of their practice, are called upon to determine the capacity of others, and both

7   Dr. Platzer and Dr. Spar are board-certified by the American Board of Psychiatry and Neurology.

8   Neither Dr. Platzer nor Dr. Spar is related by blood or marriage to Donald or Petitioner, the sole

9   vested current beneficiaries of the Trust under Probate Code §15800.

10          1.      Dr. Platzer is a neurologist who regularly sees patients

11   suffering from Alzheimer's Disease and other forms of dementia.  A true and correct copy of

12   Dr. Platzer's Curriculum Vitae is attached hereto as Exhibit 9.

13          2.      Dr. Spar specializes in geriatric psychiatry and has

14   frequently been appointed by courts to determine capacity.  Petitioner requests that this Court take

15   judicial notice of *Conservatorship of Ramirez* (2001) 90 Cal.App.4[th] 390, Los Angeles Superior

16   Court case number NP008126, in which Dr. Spar was appointed by this Court to examine the

17   proposed conservatee and file a report with the Court.  A true and correct copy of Dr. Spar's

18   Curriculum Vitae is attached hereto as Exhibit 10.

19          iv.     Following their examinations of Donald, both Dr. Platzer and

20   Dr. Spar certified in writing that Donald was incapable of carrying out the duties as a Trustee of

21   the Trust.  True and correct copies of their written certifications of Donald's incapacity are

22   attached hereto as Exhibits 11 and 12, respectively.

23          1.      Dr. Spar's letter/certification dated May 27, 2014,

24   concludes: "Because of his cognitive impairment, Mr. Sterling is at risk of making potentially

25   serious errors of judgment, impulse control, and recall in the management of his finances and his

26   trust.  Accordingly, in my opinion he is substantially unable to manage his finances and resist

27

28   and conditions of service imposed pursuant to Paragraph 7.5.c."
81294-00002/2190870.5                          5

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    fraud and undue influence, and is no longer competent to act as trustee of his trust."

2              2.    Dr. Platzer's certification dated May 29, 2014, concludes:

3    "It is my opinion that Mr. Donald T. Sterling is unable to reasonably carry out the duties as

4    Trustee of The Sterling Family Trust as a result of, among other factors, an impairment of his

5    level of attention, information processing, short term memory impairment and ability to modulate

6    mood, emotional lability, and is at risk of making potentially serious errors of judgment."

7              v.    Dr. Stephen L. Read is also board-certified by the American Board

8    of Psychiatry and Neurology and specializes in geriatric psychiatry and has frequently been

9    appointed by courts to determine capacity. Petitioner requests that this Court take judicial notice

10    of *In Re Estate of Witzel* (2013; unpublished), Los Angeles Superior Court case number

11    BP101210, in which Dr. Read testified about a Co-Trustee's competence to serve. A true and

12    correct copy of Dr. Read's Curriculum Vitae is attached hereto as Exhibit 13. Dr. Read has

13    confirmed the methodology and conclusions of Drs. Platzer and Spar. A true and correct copy of

14    Dr. Read's written conclusions is attached hereto as Exhibit 14.

15              c.    <u>No Designation of Alternate Successor Trustee</u>:

16              i.    While both Donald and Petitioner served as Co-Trustees of the

17    Trust, each of them had the power, under Paragraph 7.3. of the Trust, to designate a successor to

18    serve in his or her place as a Co-Trustee of the Trust should he or she cease to serve. Absent such

19    a designation, the Trust names Petitioner to serve as sole Trustee if Donald ceases to serve. (Ex.

20    5, ¶7.3.)

21              ii.    Any such designation was, under Paragraph 7.3.a. of the Trust,

22    required to have been "in writing, signed by the individual Trustee making the designation and

23    delivered to any other then serving Co-Trustees of the trust." (<u>Id</u>.) At no time from December

24    18, 2013, when the Trust was restated, through May 29, 2014, when Donald ceased serving as a

25    Co-Trustee of the Trust, did Petitioner, as a Co-Trustee of the Trust, ever receive a document by

26    which Donald designated a successor to himself. (Pet. Decl. at ¶3.)

27

28

GREENBERG GLUSKER FIELDS CLAMAN<br>& MACHTINGER LLP<br>1900 Avenue of the Stars, 21st Floor<br>Los Angeles, California 90067-4590

81294-00002/2190870.5            6

**EXHIBIT F, PAGE 297**

1       d.      Effect of Determination of Donald's Incapacity:

2               i.      Pursuant to Paragraph 7.5.c. of the Trust, Donald ceased serving as

3   a Trustee of the Trust on May 29, 2014, when the second of the two licensed physicians' written

4   certifications of his incapacity was issued and received by Petitioner. (Ex. 5, ¶7.5.c.)

5               ii.     Paragraph 7.2.a. of the Trust names Petitioner as the sole Trustee of

6   the Trust if Donald ceases to serve without having made any contrary designation of successor

7   Trustees under Paragraph 7.3. of the Trust that alters the succession of Trustees. (Ex 5, ¶7.2.a.)

8               iii.    Petitioner has served as the sole Trustee of the Trust since Donald

9   ceased serving as a Co-Trustee on May 29, 2014. Petitioner, through her counsel, promptly

10  delivered notice of Donald's removal as a Trustee of the Trust to Donald, through his counsel, on

11  May 29, 2014. A true and correct copy of the notice is attached hereto as Exhibit 15.

12      5.      Urgent Need for Order Confirming Act and Need for Probate Code §1310(b)

13  Order: There is an urgent need for Orders from this Court both confirming Petitioner's acts in

14  connection with the sale of the Clippers upon the terms and conditions set forth in the BTS (the

15  "Sale Order") and directing Petitioner, as Trustee of the Trust, to consummate the sale under the

16  BTS pursuant to Probate Code §1310(b), even if there is an appeal of the Sale Order. This

17  urgency arises because, for reasons set forth below, there is a strong likelihood that the National

18  Basketball Association (the "NBA") will seize and sell the Clippers, a significant and valuable

19  asset of the Trust, if the sale under the BTS cannot be closed on or before September 15, 2014. A

20  Condition to Closing the sale is that:

21          "either (i) Donald [] irrevocably consents, in writing, to the sale of the Purchased Assets in a
            document in form and substance reasonably satisfactory to Buyer, and which consent includes
22          the cessation/termination of any and all lawsuits that are then-pending against Buyer or with
            respect to the transactions contemplated hereby, or (ii) a court of competent jurisdiction over
23          the Trust issues a final and non-appealable order confirming [Petitioner's] authority to
            unilaterally bind the Trust and sell the Purchased Assets hereunder." (Ex. 1, at p. 8)
24

25  Thus, without Donald's consent to the sale of the Clippers under the BTS, it is necessary to obtain

26  an Order confirming Petitioner's authority to unilaterally bind the Trust and sell the Clippers as

27  set forth in the BTS. Although the July 15, 2014, Closing Date for the sale under the BTS can be

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

**EXHIBIT F, PAGE 298**

1  extended (Ex. 1, at pp. 6-7), the NBA has imposed a non-extendable closing date of September

2  15, 2014, for the sale. (Buchanan Decl., at ¶¶ 13,14 and 20.)

3          a.    Background: On March 7, 2014, Petitioner filed suit in Los Angeles

4  Superior Court, Case No. BC538659, to recover certain transfers that Donald had made from their

5  community property which Petitioner believes were for less than full and adequate consideration

6  and were without her consent. In apparent retaliation by the defendant in the suit, audio

7  recordings of Donald expressing racially offensive remarks (the "Recording") became public.

8  (Buchanan Decl., at ¶4.) Reaction to the Recording by the public and throughout the NBA

9  community was swift and severe, generating significant attention. (Buchanan Decl., at ¶5.) The

10  NBA condemned Donald's remarks as contrary to its principles of diversity, inclusion and respect

11  and deeply hurtful to the multicultural and multiethnic NBA community, including NBA owners,

12  players, fans, coaches, team personnel and business partners. (Buchanan Decl., at ¶ 4.)

13          On April 29, 2014, NBA Commissioner Adam Silver fined Donald $2.5 Million

14  and banned him for life from any further association with the Clippers or the NBA. The

15  Commissioner further stated that he would urge the NBA Board of Governors to terminate the

16  current ownership of the Clippers and sell the team to a new owner. (Buchanan Decl., at ¶6.) By

17  May 9, 2014, the NBA had taken control of the day-to-day operations of the Clippers by

18  installing former Citigroup Chairman and former Chairman and CEO of Time Warner Dick

19  Parsons as the interim Chief Executive Officer. Mr. Parsons reports to the Commissioner.

20  (Buchanan Decl., at ¶7.) The next day Donald participated in a televised interview with CNN's

21  Anderson Cooper in which he admitted making the racially offensive statements in the Recording

22  and acknowledged the harm he had caused. However, he also made additional offensive and dis-

23  criminatory statements about African-Americans during the interview. (Buchanan Decl., at ¶8.)

24          On May 19, 2014, the Commissioner initiated a written charge ("Charge") in

25  accordance with the procedures set forth in the NBA Constitution asserting that LAC's

26  membership in the NBA should be terminated. (Buchanan Decl., at ¶9.) A hearing before the

27  NBA Board of Governors (excluding Donald) was scheduled for June 3, 2014, to hear evidence

28  and vote on the Charge. Under the NBA Constitution, if the Charge was sustained by a vote of

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

81294-00002/2190870.5        8

1   three-fourths of the NBA Board of Governors, LAC's membership in the NBA would

2   automatically be terminated. (Buchanan Decl., at ¶10.) Upon termination, the NBA would seize

3   the team, remove the Sterling family as owners, and sell the Clippers through a public auction

4   conducted by the NBA. (Buchanan Decl., at ¶20.)

5          b.      Petitioner's Actions on Behalf of the Trust:  Around the middle of May,

6   2014, Petitioner came to understand from the NBA that it would be impossible for Donald and

7   her to retain any interest in the Clippers. (Pet. Decl., at ¶5.) Thus, Petitioner took immediate

8   action to ensure preservation of the value of the Clippers for the Trust's beneficiaries.  To that

9   end, she obtained Donald's consent to give her authority to sell the team so that she (rather than

10  the NBA) could control the inevitable sale. (Pet. Decl., at ¶6.) Accordingly, on May 22, 2014,

11  Donald sent the NBA a signed letter agreeing to the sale of his interest in the Clippers and

12  authorizing Petitioner to negotiate with the NBA regarding all issues in connection with a sale of

13  the Clippers. (Pet. Decl., at ¶6; Buchanan Decl., at ¶11.)  A true and correct copy of Donald's

14  May 22, 2014, authorization letter is attached hereto as Exhibit 16.

15         Next, Petitioner retained counsel and experienced investment bankers to assist her

16  in the marketing and sale of the Clippers.  Between May 23 and May 29, Petitioner and her

17  advisors were in contact with at least twelve parties in connection with the sale of the Clippers,

18  four of whom submitted formal bids.  The formal bids submitted to Petitioner ranged in value

19  from $1.2 Billion to $2 Billion – the latter of which was submitted by Buyer and accepted by

20  Petitioner, as Trustee of the Trust.  Petitioner ultimately signed the BTS, accepting Buyer's $2

21  Billion offer, the highest offer Petitioner received for the team. (Pet. Decl., at ¶7.)

22         Petitioner firmly believed, and still believes, that if the NBA had terminated

23  LAC's membership – as the NBA was virtually certain to do at the June 3 hearing – and seized

24  and sold the Clippers at public auction, there would have been no way to ensure that the sales

25  price of this significant and valuable asset of the Trust was maximized for the benefit of the

26  Trust's beneficiaries.  Thus, time was of the essence in locating an appropriate purchaser for the

27  Clippers and entering into a binding contract to sell the Clippers in advance of the June 3 hearing.

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

81294-00002/2190870.5                    9

**EXHIBIT F, PAGE 300**

1          c.     Petitioner Obtained the Highest Possible Value for the Clippers: Petitioner

2 is informed and believes that the $2 Billion purchase price for the Clippers under the BTS –

3 which includes not only the NBA franchise, but also assets which are of a nature customarily

4 associated with an NBA franchise, including all cash, intellectual property and goodwill related to

5 the assets owned by LAC, but excluding assets (and liabilities or obligations) which either are not

6 related to the franchise or are not customarily associated with an NBA franchise (collectively, the

7 "Purchased Assets") – represents the full and fair market value of the Clippers and clearly

8 demonstrates the adequacy of her efforts to market and sell the Clippers, notwithstanding the

9 exceptionally short period of time. (Pet. Decl., at ¶8.) In fact, the fast track sale – prompted by

10 the looming June 3 hearing to terminate LAC's NBA membership – likely heightened the interest

11 for the Clippers and contributed to the record sale price. Less than one month ago, on May 15,

12 2014, the NBA approved the sale of another team, the Milwaukee Bucks, for $550 Million – less

13 than one-third of the price obtained for the Clippers under the BTS. According to *Forbes*

14 *Magazine*, the Bucks were worth $405 Million at the time of sale. The same *Forbes* article

15 valued the Clippers at $575 Million. A true and correct copy of a summary of the *Forbes* analysis

16 is attached hereto as Exhibit 17.

17          d.     Based on the BTS, the NBA Provisionally Withdrew the Charge Against

18 LAC and Donald: After the NBA received a copy of the signed BTS, the NBA immediately

19 withdrew the Charge and cancelled the June 3 hearing based on the assurances of Petitioner, as

20 Trustee of the Trust, and Buyer that they would "proceed promptly to a closing of the

21 transaction." (Buchanan Decl., at ¶14.) A true and correct copy of the NBA's May 30, 2014,

22 letter is attached hereto as Exhibit 18. It is anticipated that a vote by the NBA owners to approve

23 Buyer's proposed ownership of the Clippers – which is required to consummate the sale of the

24 team by September 15, 2014 – will be conducted at the next regularly-scheduled NBA Board of

25 Governors meeting on July 15, 2014. (Buchanan Decl., at ¶14.)

26          e.     There Remains an Imminent Risk of NBA Seizure and Sale of the Clippers

27 if the Sale Under the BTS is not Consummated: Although Petitioner staved off an immediate

28 seizure and forced sale of the Clippers by the NBA, the threat remains. Although the NBA

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1  withdrew the Charge, it did so without prejudice and expressly reserved all of its rights,

2  "including the right to renew the Charge or file a new or amended charge at a later date."

3  (Buchanan Decl., at ¶¶14, 20 and Ex. 18.) Moreover, the NBA entered a settlement agreement

4  with Petitioner, LAC, and the Trust (the "Settlement Agreement") under which Petitioner only

5  has until September 15, 2014, to complete the sale to Buyer. If the sale is not consummated by

6  that date, the NBA has the right to reinstate the Charge and reschedule the termination hearing.

7  (Buchanan Decl. at ¶¶14, 20.)

8       It is the NBA's position that every day that Mr. Sterling remains an owner of the

9  Clippers causes additional damage not only to the Trust, but to the team and the NBA. The NBA

10  believes that the sale of the team to new ownership is the only way to put an end to this harm and

11  permit the Clippers and the NBA to disassociate themselves from Donald's "abhorrent views"

12  and actions, and that immediate consummation of the BTS would best accomplish this result.

13  Petitioner's actions in entering into the BTS must be confirmed in order for the sale to close and

14  be approved by the NBA Board of Governors at its next meeting. (Buchanan Decl., at ¶15.)

15       Given the NBA's position that Donald's continued ownership of the Clippers is

16  causing substantial harm to the Clippers and the NBA's relationship with its fans, existing and

17  potential business partners and licensees, current and former NBA players and other Clippers

18  employees (Buchanan Decl., at ¶¶16-19), it is virtually certain that if the sale to Buyer does not

19  close, the NBA will reinstitute the Charge, conduct a hearing, terminate ownership and seize and

20  sell the team at public auction. In fact, the NBA has confirmed that if Donald delays the sale to

21  Buyer, it will most likely do just that. (Buchanan Decl., at ¶20.) That result is not in the best

22  interests of the Trust or its beneficiaries.

23       f.   A Sale Under the Terms of the BTS is in the Best Interest of the Trust:

24  Petitioner's actions culminated in the execution of the BTS which allowed Petitioner to control

25  the sale of the Clippers; had Petitioner not executed the BTS, it is highly likely that the NBA

26  would have seized the Clippers and taken control of the sale which likely would have resulted in a

27  substantially lower sale price. By virtue of Petitioner's efforts, an unprecedented sale price of

28  $2 Billion was obtained, and the NBA dismissed the Charge against LAC and Donald. The sale

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

**EXHIBIT F, PAGE 302**

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1   of the Clippers for $2 Billion is for the benefit of, and is in the best interests of, the Trust and its

2   beneficiaries, Donald and Petitioner. The $2 Billion sale price that Petitioner negotiated

3   represents the highest price ever paid for a sports franchise in North America[6] and is more than

4   three times greater than the $550 Million for which the Milwaukee Bucks NBA franchise recently

5   sold, a sale that was just confirmed on May 15, 2014. Even after the income tax on the sale

6   proceeds is paid, the sale of the Clippers on the terms set forth in the BTS should result in *net*

7   sales proceeds being received by the Trust for the benefit of its beneficiaries that are in excess of

8   twice the *gross* proceeds from the sale of the Milwaukee Bucks.

9         Moreover, if the NBA had seized the Clippers, or seizes the Clippers in the future,

10  and controls the sale process, there will likely be additional costs to the Trust. The NBA contends

11  that under the NBA Constitution, and as a result of the Settlement Agreement, LAC and the Trust

12  would be responsible for all of the NBA's costs in connection with a termination and subsequent

13  sale of the Clippers, which could include the costs of hiring a bank, other experts, and counsel.

14  LAC and the Trust could also potentially be responsible for millions of dollars of damages.

15  (Buchanan Decl., at ¶20.)

16        g.    Petitioner Requires a Court Order Affirming Her Actions on Behalf of the

17  Trust: The BTS requires as a Condition of Closing either Donald's consent or a final and non-

18  appealable Order confirming Petitioner's authority to unilaterally bind the Trust. Because Donald

19  has, to date, refused to consent to the sale of the Clippers, a final and non-appealable order

20  confirming Petitioner's authority to unilaterally bind the Trust and sell the Clippers is required to

21  close the sale. Petitioner therefore requests that this Court confirm that Petitioner had authority to

22  (i) unilaterally bind the Trust under the BTS, as the owner of LAC which owns the Clippers, and

23  (ii) sell the Purchased Assets.

24        h.    Order under Probate Code §1310(b) is Necessary and Appropriate Given

25  the Tight Time Constraint the NBA Has Placed on the Sale: As discussed above, time is of the

26  essence with respect to closing the sale of the Clippers. If the sale is not closed by September 15,

27

28  [6] Although the sale price for the Los Angeles Dodgers was slightly higher, that sale included substantial real estate holdings in addition to the baseball franchise.

81294-00002/2190870.5                      12

EXHIBIT F, PAGE 303

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1   2014, it is highly likely that the NBA will reinstate the Charge against LAC (and Donald) and set

2   a hearing at which the LAC's membership will be terminated. That action will be followed by a

3   seizure and sale of the team at public auction, eviscerating all of Petitioner's efforts to maximize

4   the sale proceeds in the best interests of the Trust's beneficiaries. (Buchanan Decl., at ¶20.)

5          It will likely take two to three months to negotiate and draft the numerous

6   documents necessary for the closing of the sale under the BTS. Petitioner needs to have her

7   authority to consummate the sale under the BTS as soon as possible so that her counsel and

8   counsel for Buyer can begin this complex process.

9          Although, at times, Donald has consented to a sale, he has repeatedly changed his

10  mind. On May 22, Donald represented to NBA Commissioner Adam Silver that he agreed to a

11  sale of his interest in the Clippers and specifically authorized Petitioner to negotiate a sale. A

12  week later, he refused to consent to the sale despite the staggering sale price. Then on June 5,

13  Donald announced through his attorney Max Blecher that he consented to the sale. A true and

14  correct copy of a June 5, 2014, AP newswire report is attached hereto as Exhibit 19. By June 9,

15  Donald had again made a complete about-face. A true and correct copy of a June 10, 2014, AP

16  newswire report is attached hereto as Exhibit 20.

17         Under the BTS, if Donald does not consent to the sale, Petitioner must obtain a final non-

18  appealable court order confirming her authority to unilaterally bind the Trust under the BTS. Left

19  to its normal course, the process will take much longer than either Buyer or the NBA is willing to

20  wait. The BTS contemplates a closing by July 15, 2014, and the NBA Board of Governors plans

21  to meet that day to vote on whether to approve the sale to Buyer. Although the BTS contains

22  provisions permitting an extension of that date, the Settlement Agreement provides that the sale

23  must close by September 15, 2014. (Buchanan Decl., at ¶20.)

24         It would be impossible for this mater to be heard by the trial court on regular notice, and

25  possibly the appellate courts, in time to meet the NBA's deadline. If heard on regular notice,

26  Petitioner would not have a ruling by this Court until after the July 15, 2014, vote. A subsequent

27  appeal to the Court of Appeal and/or petition for review filed with the California Supreme Court

28

1    could not possibly be completed prior to the NBA's September 15, 2014, deadline.[7]  The entire

2    appellate process could consume one to two years.

3            Thus, Petitioner requests that this Court direct Petitioner under Probate Code §1310(b) to

4    consummate the sale of the Clippers as provided in the BTS notwithstanding any appeal that may

5    be taken of the substantive Order confirming Petitioner's actions in order to prevent loss and

6    injury to Donald and Petitioner as a result of not consummating the private sale of the Clippers to

7    Buyer.

8            6.      **Donald's Purported Revocation of the Trust on June 9, 2014, Does Not Effect**

9    **the BTS**:  On June 9, 2014, Petitioner received from Donald a two-page letter by which Donald

10   purported to revoke the Trust (the "June Revocation"), a true and correct copy of which is

11   attached as Exhibit 21.  Petitioner does not believe that Donald had capacity on June 9, 2014, to

12   execute the June Revocation.

13           If, however, Donald did have capacity to execute the June Revocation, then the

14   June Revocation revoked the Trust, but, under both the terms of the Trust and California law, the

15   BTS remains a binding Trust contract and Petitioner, as Trustee of the Trust, does not need to

16   immediately distribute the Trust assets to Donald and herself, individually, as the Trust's

17   beneficiaries, but can instead retain the requisite assets to consummate the contractually required

18   sale of the Clippers under the BTS.  Moreover, immediate distribution would be imprudent given

19   the issues surrounding Donald's capacity and the inevitable deadlock between Donald (who

20   opposes the Clippers' sale) and Petitioner (who supports the Clippers' sale), making it impossible

21   to perform under the BTS, a binding contract entered into prior to the purported revocation.

22           Paragraph 2.5.a. of the Trust provides that either Settlor may revoke the Community

23   Trust, and, upon revocation, the assets of "the Community Trust shall promptly be distributed to

24   the Settlors as their community property."  Paragraph 2.6.a. of the Trust contains a similar

25   provision relating to any Separate Trust.  In both cases, however, the Trust expressly provides

26   that "the Trustee may retain sufficient assets to secure payment of liabilities lawfully incurred by

27

28   [7] Donald could conceivably even file a petition for writ of certiorari with the United States Supreme Court, further
     delaying the finality of any prior decision.
     81294-00002/2190870.5                                    14

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

EXHIBIT F, PAGE 305

1   the Trustee in the administration of the [applicable] Trust." Furthermore, Paragraph 6.6. of the

2   Trust provides that although "[a]ll interests under [the Trust] shall vest upon the occurrence of the

3   event specified herein, . . . [, the] Trustee may delay distribution or division of any trust for a

4   reasonable period of administration."

5        Consistent with the Trust, Probate Code §15407(a)(5) provides that "[a] trust terminates

6   when any of the following occurs: . . . (5) The trust is revoked"; however, under Probate Code

7   §15407(b), "[o]n termination of the trust, the trustee continues to have the powers reasonably

8   necessary under the circumstances to wind up the affairs of the trust." The commentary to

9   §15407 states, "[a]s to the trustee's powers upon termination see Restatement, Third, of Trusts

10   Section 89."[8] Restatement, Third, of Trusts Section 89 provides that "[t]he powers of a trustee do

11   not end on the trust's termination date but may be exercised as appropriate to the performance of

12   the trustee's duties in winding up administration." The comments to Section 89 provide

13   additional guidance. Comment b states that "[a]lthough the termination date for a trust has

14   arrived, the trustee does not thereby necessarily cease to be trustee but normally continues to

15   serve until the trust is finally wound up. The period for winding up the trust refers to the period

16   after the termination date and before trust administration ends by complete distribution of the

17   trust estate. . . . If . . . the trust terms or circumstances require the sale of property that is not

18   readily saleable . . ., the period for winding up the trust may properly be longer than it would be

19   in the absence of these or other complicating circumstances." Comment d states that "[a]lthough

20   the trust termination date has arrived, the trustee can properly exercise such powers as are

21   reasonable and appropriate for the preservation of trust property until the process of winding up is

22   completed . . . [including] keep[ing] trust property productive. . . . Accordingly, suitable new

23   investments or commitments (e.g. renewal of leases on trust-owned apartments) may be

24   appropriate to avoid wasting the potential of trust assets to produce income."

25        Thus, if this Court confirms that Petitioner validly executed the BTS on behalf of the

26   Trust, the Trust and California law provide that Petitioner, as Trustee, has the power to retain

27

28   [8] *See also, Botsford v. Haskins & Sells* (1978) 81 Cal.App.3rd 780, 784.

81294-00002/2190870.5      15

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

**EXHIBIT F, PAGE 306**

1   LAC and the other Purchased Assets held by the Trust for the relatively short period necessary to

2   consummate the sale of the Clippers under the BTS, even after the June Revocation.  Confirming

3   that, notwithstanding the June Revocation, the Trustee retains the authority to consummate the

4   sale under the BTS will protect the Trust from damages claims by Buyer for failure to close the

5   sale and allows the highly beneficial sale to be consummated.

6       7.   **For the Benefit of the Trust, the Sale Should be Confirmed**:  Even assuming

7   *arguendo* that Donald continues to serve as a Co-Trustee of the Trust and does not agree to the

8   sale, the Court should nevertheless confirm the sale because it is in the best interests of the

9   Trust's beneficiaries as set forth in greater detail in Paragraph 5 above.  This is not a situation

10   where the Trustee's two choices are to hold an asset or to sell an asset.  The NBA has made its

11   position clear: the two options are to (i) consummate the pending private sale that Petitioner seeks

12   to have confirmed by the Court or (ii) have LAC's NBA membership terminated and the Clippers

13   sold through a public auction controlled by the NBA.  Because Petitioner believes the pending

14   private sale is extremely favorable to Donald and Petitioner, as beneficiaries of the Trust, and also

15   allows the Trustee control over the sale process, Petitioner believes that this Court should approve

16   the sale even if the Court were to determine that Donald remains a Co-Trustee of the Trust or that

17   the Trust is revoked.  Petitioner is cognizant that a third option is to challenge the NBA's right

18   under the NBA Constitution to seize and sell the Clippers,[9] but this third option will not only be

19   costly and protracted, with little likelihood of success, causing the opportunity to sell the Clippers

20   for $2 Billion to be lost, but also expose the Trust to substantial damages from Buyer and the

21   NBA.

22       8.   **Notice**:  The names and addresses of each person entitled to notice of this Petition,

23   all of whom are adults, are as follows:

| NAME | AGE/RELATIONSHIP |
|------|------------------|
| Donald T. Sterling<br>c/o Maxwell M. Blecher, Esq.<br>Blecher Collins Pepperman & Joye<br>515 South Figueroa Street<br>Suite 1750 | Adult Beneficiary |

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

[9] Donald has filed a federal action against the NBA and its Commissioner Adam Silver alleging violation of constitutional rights (free speech); breach of contract; antitrust; conversion; and breach of fiduciary duty.

81294-00002/2190870.5          16

**EXHIBIT F, PAGE 307**

1  As set forth in the accompanying Declaration of Marc M. Stern, notice of this Ex Parte Petition

2  was given to Donald, through his attorneys, telephonically and by email on June 10, 2014, at

3  approximately 9:40 a.m.

4  WHEREFORE, Petitioner prays for an Order of this Court:

5      1.    Confirming that Petitioner had authority to unilaterally bind the Trust, as the

6  owner of LAC which owns the Clippers, by executing the BTS and agreeing to sell the Purchased

7  Assets pursuant thereto;

8      2.    Authorizing and instructing Petitioner to sell the Clippers to a limited liability

9  company wholly-owned by Steve Ballmer upon the terms and conditions set forth in the BTS, and

10  to take all actions necessary or appropriate to complete the sale, including but not limited to the

11  execution of any and all documents necessary to complete the sale and the transfer of the Clippers

12  contemplated thereby;

13      3.    Directing Petitioner under Probate Code §1310(b), as Trustee of the Trust,

14  to consummate the sale of the Clippers as provided in the BTS notwithstanding any appeal that

15  may be taken of the Order confirming Petitioner's act and instructing her with respect to the sale;

16  and

17      4.    For such further relief as the Court deems appropriate.

18  DATED: June _10_, 2014                    RESPECTFULLY SUBMITTED

19

20

21                                           ROCHELLE H. STERLING, Trustee

22

23                                           GREENBERG GLUSKER FIELDS CLAMAN

24                                           & MACHTINGER LLP

25                                           By:

26                                           PIERCE O'DONNELL (SBN 81298)
                                             Attorneys for Trustee Rochelle H. Sterling

27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

81294-00002/2190870.4                        17

PETITION FOR CONFIRMATION OF TRUSTEE'S ACTS AND INSTRUCTING TRUSTEE

**EXHIBIT F, PAGE 308**

## VERIFICATION

I have read the foregoing Ex Parte Petition (1) For Confirmation of Trustee's Acts and Instructing Trustee and (2) For Order Directing Trustee Under Probate Code §1310(b) to Prevent Injury or Loss to Trust and know its contents.

☒  I am a party to this action. The matters stated in it are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐  I am an officer of _____, a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason. I have read the foregoing document(s). I am informed and believe and on that ground allege that the matters stated in it are true.

☐  I am one of the attorneys of record for _____, a party to this action. Such party is absent from the county in which I have my office, and I make this verification for and on behalf of that party for that reason. I have read the foregoing document(s). I am informed and believe and on that ground allege that the matters stated in it are true.

Executed at Los Angeles, California on June _10_, 2014.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_Rochelle Sterling_
ROCHELLE H. STERLING

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

81294-00002/2190870.4

18

PETITION FOR CONFIRMATION OF TRUSTEE'S ACTS AND INSTRUCTING TRUSTEE

**EXHIBIT F, PAGE 309**



(              (

## BINDING TERM SHEET

### Dated as of Thursday, May 29, 2014 (the "Effective Date")

Sellers and Buyer are entering into this binding term sheet (the "Binding Term Sheet") setting forth the terms and conditions of the acquisition by Buyer of all of the assets owned by LAC Basketball Club, Inc. ("LAC") relating to the Los Angeles Clippers NBA franchise (the "Franchise") and which are of a nature customarily associated with an NBA franchise (such assets, including all cash, intellectual property and goodwill related to such assets owned by LAC, and excluding, for the avoidance of doubt, any assets (and any liabilities or obligations) which are either not related to the Franchise or are not customarily associated with an NBA franchise), are herein referred to as the "Target Assets").

| | |
|---|---|
| Sellers: | LAC, The Sterling Family Trust (the "Trust") and Rochelle "Shelly" Sterling, as trustee of the Trust and in her individual capacity (with the Trust being the owner of all of the issued and outstanding shares of LAC) (all of such parties, collectively, "Sellers"). |
| Buyer: | Steven A. Ballmer, for himself personally and on behalf of a limited liability company to be created by him ("Newco") which will acquire the Purchased Assets hereunder (and of which Mr. Ballmer shall be the sole owner through the Closing; Mr. Ballmer and Newco, collectively, "Buyer"). |
| Purchase Price: | The purchase price for 100% of the Target Assets (the "Purchase Price") shall be US$2 Billion. |
| | The Purchase Price is not subject to further adjustment based on any further diligence review by Buyer or other factors. |
| | The Purchase Price shall be payable at the Closing in cash by wire transfer of immediately available funds to the account(s) designated by Sellers. |
| Structure of Transaction: | At Sellers' option, LAC will either (i) sell 100% of the Target Assets to Buyer for 100% of the Purchase Price, or (ii) sell 90% of the Target Assets to Buyer for 90% of the Purchase Price, in which case the following additional transactions will occur: Newco will acquire an undivided 90% interest in the Target Assets in consideration for payment to Sellers of 90% of the Purchase Price; LAC will retain a 10% interest in the Target Assets; concurrently with such purchase and sale, LAC will contribute its remaining 10% interest in the Target Assets to Newco in exchange for a 10% membership interest in Newco; and immediately thereafter, LAC will contribute its membership interest in |

Exhibit 1 - Page 19

EXHIBIT F, PAGE 311

| | |
|---|---|
| | Newco (the "Foundation Interest") to a charitable foundation as described below. Shelly Sterling may, in her sole discretion, reduce the amount of the membership interest comprising the Foundation Interest, in which case the percentages described in this section shall be adjusted accordingly. The Target Assets purchased by Buyer at the Closing shall be referred to herein as the "Purchased Assets". If Sellers do not make an election (with a specified percentage) prior to June 15, 2014, then Sellers shall be obligated to sell 100% of the Target Assets to Buyer at the Closing for 100% of the Purchase Price. |
| Charitable Foundation: | The charitable foundation referred to above will be either a new foundation dedicated to benefiting children, minorities, abused women, and other causes, which will be called The Shelly Sterling Foundation (the "Foundation"), or a donor-advised fund at a recognized public charity reasonably acceptable to the NBA (the "Fund"). Shelly Sterling will serve as Chair of the Foundation or advisor of the Fund (as applicable) during her lifetime. If a Foundation is utilized, Buyer and Shelly Sterling will each have the right to appoint six members to the Foundation's Board of Directors. The parties shall use reasonable best efforts to structure the overall transaction and the contribution of the Foundation Interest to the Foundation or the Fund in a manner such that Sellers are not taxed on the value of the Foundation Interest at or following the Closing. |
| | Notwithstanding the Foundation Interest, Buyer will have total control over Newco, the Franchise and its operations and management, with the exception that Buyer may not require the Foundation or the Fund to make additional capital contributions or dilute the Foundation Interest without the prior written consent of the Foundation or the Fund (as applicable). |
| | For a period of 90 days following the death of Shelly Sterling, Buyer will have a call option to purchase the Foundation Interest from the Foundation or the Fund for a purchase price equal to the Purchase Price multiplied by the percentage interest of the Foundation Interest, increased by a factor of 2% on each annual anniversary of the Closing (compounding on each such anniversary) until the option is exercised. The closing of the purchase and sale of the Foundation Interest shall occur on a date mutually agreed to by the parties which shall be no later than 90 days following the exercise of the option. The purchase price for the |

2

Exhibit 1 - Page 20

EXHIBIT F, PAGE 312

| | |
|---|---|
| | Foundation Interest shall be paid at such closing in cash in immediately available funds. |
| **Transaction Form:** | Asset purchase. Without limiting their obligation to consummate an asset purchase under this Binding Term Sheet, the parties may consider another mutually acceptable structure (e.g., purchase of equity, merger or consolidation) that results in Buyer having complete control and, subject to the Foundation Interest, ownership of the assets that comprise the Franchise as a going concern. The parties will use good faith efforts to use a structure that provides Sellers and Buyer with maximum tax benefits. |
| | Buyer shall assume all contracts and obligations arising in the ordinary course of business (through the Closing) attendant to the Purchased Assets, except for any indebtedness for borrowed money and any payments associated therewith (which shall be the sole responsibility of Sellers) and except for obligations or liabilities which are not related to the Franchise or otherwise are not customarily associated with an NBA franchise (including any such obligations or liabilities which are not customarily associated with any practice facility or with any associated foundation or charitable organization), each of which shall be the sole responsibility of Sellers. Buyer shall offer to hire all employees and assume all benefit plans of LAC that are customary for an NBA franchise (but excluding any unfunded obligations arising with respect to periods prior to the Closing Date). For the avoidance of doubt, Buyer shall be responsible for and shall assume all obligations to pay any deferred compensation or the like payable to any player, coach, staff member, management personnel or any other agent or employee of LAC, all of which have either been disclosed to Buyer in writing or are of a type and amount which is customary for an NBA franchise. |
| | Buyer shall be responsible for any sales or use tax resulting from the transfer of any of the Purchased Assets and any documentary transfer tax imposed on the recordation of any instrument required to consummate the transactions provided for herein. |
| | The Purchased Assets shall be transferred to Buyer at the Closing, free and clear of all liens, claims, encumbrances and security interests. Subject to the foregoing, and to the representations and warranties provided for herein, Buyer will otherwise purchase the Purchased Assets on an "as-is, |

Exhibit 1 - Page 21

EXHIBIT F, PAGE 313

| | |
|---|---|
| | where-is" basis.<br><br>If Sellers fail to deliver to Buyer at the Closing all of the assets owned by Sellers or their affiliates which are necessary or primarily used in the operation of the Franchise as currently operated by Sellers (other than the practice facility, which will be retained by the Trust), then Sellers, at Buyer's election, will have an obligation to deliver such assets to Buyer following the Closing for no additional consideration. |
| NBA Approval; Settlement Agreement | Buyer and its representatives and owners acknowledge that they have read the NBA Ownership Transfer Manual and represent that they have no knowledge of any basis on which they would not be approved as the new owners of the membership. The parties shall use reasonable best efforts to close the transaction by the Closing Date, including by executing all customary documents and taking all actions required to obtain NBA approval, and shall not take any action that would impair or delay the prompt consummation of the transaction.<br><br>Anything herein to the contrary notwithstanding, if the Settlement Agreement (as defined below) is not executed prior to 5:00 p.m. Pacific Daylight Time on June 2, 2014, this Binding Term Sheet shall terminate and be of no further force or effect without any liabilities to the parties hereunder. |
| Earnest Money Deposit; Proof of Funds | Buyer shall make an earnest money deposit (the "Deposit") equal to $300,000,000 by 5:00 p.m. Pacific Daylight Time on June 2, 2014; which shall be held in escrow by a mutually acceptable financial institution pursuant to a customary escrow agreement. If the Closing occurs, the Deposit will be released and paid to Sellers at the Closing as partial payment of the Purchase Price. The Deposit shall be returned to Buyer if the transaction does not close by the Closing Date for any reason other than Buyer's breach of this Binding Term Sheet, including Buyer's failure to close if the Conditions to Closing are or could be materially satisfied (other than as the result of a breach or failure by Sellers to comply with their obligations hereunder), in which case the Deposit will be paid to Sellers as liquidated damages (and not a penalty). The parties expressly acknowledge and agree that the purpose of this liquidated damages provision is to induce full performance of the Binding Term Sheet in accordance with its terms. The parties further stipulate and agree that (i) the actual damages |

4

Exhibit 1 - Page 22

EXHIBIT F, PAGE 314

|  | that would result from a termination of the Binding Term Sheet is incapable or very difficult of accurate estimation, (ii) the liquidated damage amount set forth herein is a reasonable forecast of just compensation for the harm, and (iii) the liquidated damages sum set forth herein is not grossly disproportionate to any damages that might reasonably be incurred by the Sellers if the transactions contemplated herein are not consummated.

Buyer shall, by 12:00 p.m. Pacific Daylight Time on June 2, 2014, deliver to Sellers proof of funds of the full Purchase Price in form and substance satisfactory to Sellers. |
| Due Diligence: | Buyer hereby confirms it has completed its due diligence investigation. |
| Access to Information: | Between the Effective Date and the Closing Date, Sellers will grant Buyer and its representatives reasonable access to the Franchise's officers, employees, properties, facilities, books, records, contracts and other assets, subject in all cases to compliance with all applicable NBA Rules and any required NBA approvals. |
| Representations and Warranties: | Sellers represent and warrant to Buyer that, subject to the matters described under the "Trusteeship" section below, (i) the execution, delivery and performance of this Binding Term Sheet have been duly and validly authorized by all necessary action on the part of each Seller, (ii) this Binding Term Sheet constitutes a valid and binding obligation of each Seller, enforceable against each Seller in accordance with its terms, and (iii) the Purchased Assets include all assets owned by Sellers or their affiliates which are necessary or primarily used in the operation of the Franchise (other than the practice facility). In addition, Sellers represent and warrant to Buyer that (i) since April 30, 2014, LAC has not made any distribution or other advance to any other Seller or its affiliates, other than in the ordinary course of business and (ii) Rochelle "Shelly" Sterling has not received notice that Donald T. Sterling has designated a successor to himself as a trustee of the Trust.

Buyer represents and warrants to Sellers that (i) the execution, delivery and performance of this Binding Term Sheet have been duly and validly authorized by all necessary action on the part of Buyer, each owner of Buyer or any other person and (ii) this Binding Term Sheet constitutes a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms. |

5

Exhibit 1 - Page 23

EXHIBIT F, PAGE 315

(     (

| | |
|---|---|
| | The Long-Form Agreements will contain other customary representations and warranties to be provided by the Sellers on a joint and several basis as to fundamental matters (i.e., authorization, power and authority, capitalization, consents and approvals, litigation, title to and adequacy of assets, tax matters, employee matters, material contracts, financial statements, third party debt, related party transactions and absence of undisclosed liabilities (the "Fundamental Representations")), as well as other representations and warranties to be provided by both parties which are customary for a transaction of this nature and subject to mutual agreement.   The representations and warranties relating to authorization, title to assets, tax matters, third party debt and related party transactions shall survive the Closing indefinitely; no other representations and warranties of Sellers will survive the Closing.

Notwithstanding anything herein to the contrary, unless and until the Buyer Condition to Closing is satisfied, Sellers' representations and warranties contained in this Binding Term Sheet or in any Long Form Agreement, whether to be given as of the Effective Date, the Closing Date or otherwise, shall not include Sellers' authority to sell the Purchased Assets as it relates to any of the matters described in the "Trusteeship" section below; provided, that Sellers represent and warrant to Buyer that Sellers in good faith believe that they have the authority to enter into the transactions contemplated hereby and to sell the Purchased Assets to Buyer.

Notwithstanding anything herein or the Long-Form Agreements, absent fraud on the part of Sellers, under no circumstances whatsoever shall Sellers be liable to Buyer under any contract, strict liability, negligence or other legal or equitable theory, for any incidental, indirect, special, consequential or punitive damages or lost profits in connection with the subject matter hereof. |
| Closing Date: | Subject to satisfaction of the Conditions to Closing, the closing for the transactions contemplated hereby (the "Closing") shall occur on July 15, 2014, or such earlier date as the parties shall mutually agree (the "Closing Date"), provided that if Sellers and Buyer are working together in good faith to effect the Closing and the Conditions to Closing have not been satisfied prior to such date, then the Closing Date shall automatically be extended by 30 days; and provided further, that if as of the Closing Date, the |

6

Exhibit 1 - Page 24

|  | Buyer Condition to Closing (as defined in the Conditions section below) is not satisfied, Buyer, at Buyer's sole discretion and subject only to any required NBA approval, may extend the Closing Date for an additional period not to exceed the shorter of (x) an additional 360 days (i.e., for an extension of 390 days in total), and (y) the date 10 days following the date on which the Buyer Condition to Closing is satisfied. Time is of the essence. If the Closing does not occur by the Closing Date (as it may be extended per this paragraph or otherwise by agreement of the parties), the Deposit shall be treated as set forth in the Earnest Money Deposit; Proof of Funds section above, and this Binding Term Sheet shall terminate (other than Seller's indemnification obligations set forth herein, which shall survive and such termination shall not relieve any party for its breach of this Binding Term Sheet prior to the date of such termination).<br><br>Subject to the terms and conditions of the Binding Term Sheet, at the Closing, the parties will execute customary transfer instruments and closing documents to consummate the transaction. |
| Conditions: | The obligations of Buyer and Sellers to close the transaction under this Binding Term Sheet are conditioned solely upon satisfaction of the following conditions and the Buyer Condition to Closing set forth in the next paragraph (the following conditions, including the Buyer Condition to Closing, shall be collectively referred to herein as the "Conditions to Closing"):<br><br>(i)   expiration or early termination of any applicable waiting periods under the Hart-Scott-Rodino Act,<br>(ii)  absence of injunction, restraining order or other governmental order or action, and absence of material litigation challenging the authority of Buyer or Sellers to consummate the transactions contemplated hereunder or otherwise seeking to prevent the consummation of such transactions,<br>(iii) receipt of NBA approval,<br>(iv)  accuracy of the Fundamental Representations in all material respects and the accuracy of other representations and warranties contemplated by the "Representations and Warranties" section above, except when failure to be accurate has not had and would not reasonably be expected to have a material adverse effect on the Franchise, |

Exhibit 1 - Page 25

**EXHIBIT F, PAGE 317**

|  | (v) performance of covenants set forth in this Binding Term Sheet in all material respects, <br><br> (vi) entry into a new practice facility lease (as described below), and <br><br> (vii) Sellers shall have entered into a mutual release and settlement agreement with the NBA under which all charges against each of the Sellers are dismissed, the parties exchange mutual releases, and Shelly Sterling shall have the right to donate the $2.5 million amount associated with the fine imposed by the NBA on Donald T. Sterling to a charity of her choosing in lieu of paying such fine (the "Settlement Agreement"). <br><br> In addition, the obligations of Buyer to close the transaction under this Binding Term Sheet are conditioned upon satisfaction of the following condition as of the Closing Date: either (i) Donald T. Sterling irrevocably consents, in writing, to the sale of the Purchased Assets in a document in form and substance reasonably satisfactory to Buyer, and which consent includes the cessation/termination of any and all lawsuits that are then-pending against Buyer or with respect to the transactions contemplated hereby, or (ii) a court of competent jurisdiction over the Trust issues a final and non-appealable order confirming Shelly Sterling's authority to unilaterally bind the Trust and sell the Purchased Assets hereunder (or pursuant to the Long Form Agreement) (the "Buyer Condition to Closing"). <br><br> The parties will file their Hart-Scott-Rodino notifications promptly after the execution of this Binding Term Sheet, and shall jointly determine whether to elect early termination of the waiting period thereunder. <br><br> There will be no condition for Buyer's ability to obtain financing to fund the transaction. |
|---|---|
| Exclusivity: | From the Effective Date through the Closing Date, neither Sellers nor Buyer, nor any of their respective affiliates, representatives, advisors, or agents, shall, directly or indirectly, shop, market or proceed with any transaction involving a transfer, sale, partnership, hypothecation, merger, or other transaction involving the ownership or control of the Purchased Assets or of any entity that owns or controls the Purchased Assets, or which would otherwise be inconsistent with, or delay the consummation of the transactions contemplated by this Binding Term Sheet. |

8

Exhibit 1 - Page 26

EXHIBIT F, PAGE 318

| | |
|---|---|
| **Practice Facility Lease:** | Sellers and Buyer agree that the existing practice facility lease between the Trust and LAC shall be terminated as of the Closing Date, and the Trust and Buyer shall enter into a new triple net (NNN) lease of the current practice facility for a period of 10 years at a market rental rate with customary escalators to be agreed upon by the Trust and Buyer and otherwise on customary terms and conditions. |
| **Operations Between Effective Date and Closing Date:** | Sellers and Buyer agree that operations of the Franchise between the Effective Date of this Binding Term Sheet and the Closing Date will be in the ordinary course as currently managed by Dick Parsons as Interim CEO. Subject to NBA approval, Buyer will be afforded the maximum set of interim operating rights prior to the Closing, as such rights are set forth in the NBA Ownership Transfer Manual. |
| **Break-Up Fee:** | Buyer will lose the Deposit if Buyer fails to close or otherwise materially breaches this Binding Term Sheet, if all Conditions to Closing are or could be materially satisfied (other than as the result of a breach or failure by Sellers); provided, that, for clarity, Buyer shall not lose the Deposit due to its failure to waive any Conditions to Closing or its failure to extend the Closing Date. |
| **Lifetime Rights:** | Shelly Sterling will, for the remainder of her life, receive from Buyer, at Buyer's sole expense, the following:<br><br>(i)   10 tickets in Section 101 or 111 for all Clippers preseason, regular season and postseason games at Staples Center and all Clippers preseason, regular season and postseason away games versus the Los Angeles Lakers at Staples Center, with the exact location of such tickets to be identified by Shelly Sterling and reasonably approved by Buyer;<br><br>(ii)  2 courtside tickets for all Clippers preseason, regular season and postseason home games at Staples Center and all Clippers preseason, regular season and postseason away games versus the Los Angeles Lakers at Staples Center;<br><br>(iii) 6 parking spaces in the Lot C Garage for each game at Staples Center described above (the "Staples Games");<br><br>(iv) 12 VIP passes (including access to the Lexus Club, Arena Club, Chairman's Lounge and media room or equivalent) for each Staples Game; and<br><br>(v)  three championship rings following any Clipper NBA championship.<br><br>All references to Staples Center in this section shall include |

Exhibit 1 - Page 27

| | |
|---|---|
| | any successor or alternative arenas used by the Clippers and/or the Lakers for home games during the lifetime of Shelly Sterling.<br><br>Buyer shall also give Shelly Sterling the title of "Owner Emeritus" and "Clipper's Number 1 Fan", which titles she shall retain for the duration of her lifetime. |
| Employment Agreements: | Buyer shall, effective as of the Closing, offer two year employment contracts to each of Carl Lehr, Gary Sacks and Eric Miller on substantially similar terms as their current employment terms with LAC. |
| Long-Form Agreements: | The parties will negotiate in good faith to enter into terms of a long-form agreement and other related documentation in furtherance of the underlying transaction, on terms consistent in all respects with this Binding Term Sheet ("Long-Form Agreements"). The parties will use their reasonable efforts to negotiate and execute such Long-Form Agreements promptly following the Effective Date of this Binding Term Sheet. However, unless and until such time as this Binding Term Sheet is replaced by any such further documentation, this Binding Term Sheet remains binding on, and memorializes the legal, contractual and enforceable rights and obligations of, the parties.<br><br>In the event that all of the Conditions to Closing are satisfied by the parties, and the parties do not agree on the terms of Long-Form Agreements by the Closing Date, Buyer shall purchase, and Sellers shall sell to Buyer, the Purchased Assets in accordance with the terms of this Binding Term Sheet and, at the Closing, Sellers shall deliver to Buyer a statement of representations as to (i) the ownership of and title to the Purchased Assets being transferred, (ii) the power and authority of the transferor parties, (iii) the enforceability thereon of this Binding Term Sheet and (iv) the other representations identified opposite the heading "Representations and Warranties" above, which shall be on customary terms and include materiality qualifiers to be agreed between Sellers and Buyer (and the disclosure schedules to such representations and warranties shall only reflect matters that are of a type and amount which are customarily associated with an NBA franchise). |
| Further Assurances: | Each party hereto shall use its reasonable best efforts to take, or cause to be taken, all appropriate action and all things necessary to consummate and make effective the transactions contemplated by this Binding Term Sheet. |
| Expenses: | Except as set forth herein, each party shall bear all of its |

10

Exhibit 1 - Page 28

(          (

| | |
|---|---|
| | own expenses, it being understood that Buyer shall bear all applicable governmental and NBA filing fees with respect to the transactions contemplated hereby. LAC shall not be responsible for any expenses of Sellers relating to the transactions contemplated hereby. |
| Disputes: | Notwithstanding the terms of any Non-Disclosure Agreement previously executed by Buyer, and subject to NBA rules and to Buyer's specific performance rights as set forth below, any dispute, claim or controversy arising under this Binding Term Sheet or the Long-Form Agreements (including with respect to disposition of the Deposit or whether to include certain terms in the Long-Form Agreements) or the breach, termination, enforcement, interpretation or validity thereof, shall be resolved exclusively by arbitration in Los Angeles, California before a single arbitrator. The arbitration shall be administered by JAMS pursuant to JAMS' Streamlined Arbitration Rules and Procedures, and the decisions of the arbitrator shall be final, conclusive, unappealable and binding on the parties. Under all circumstances prior to the Closing the parties will instruct the arbitrator to resolve such disputes within 3 business days following submission thereto. |
| Governing Law; Specific Performance: | This Binding Term Sheet shall be governed by the laws of the State of California, notwithstanding the terms of any Non-Disclosure Agreement previously executed by Buyer. Each party recognizes that the Purchased Assets are unique and damages cannot provide an adequate remedy in the event of a breach of this Binding Term Sheet by Sellers. Therefore, if the Conditions to Closing are satisfied or could be materially satisfied by Sellers and Sellers fail or refuse to consummate the sale and purchase of the Purchased Assets contemplated hereby, Buyer shall be entitled to seek specific performance of the sale and purchase of the Purchased Assets and the other obligations of the Sellers hereunder. |
| Indemnification: | If Buyer is named as a party in any claim or legal action brought (whether before or after Closing) by or on behalf of Donald T. Sterling or his affiliates and arising from, with respect to or in connection with the attempted purchase of the Purchased Assets (including, without limitation, with respect to the matters described in the Trusteeship section below, but excluding any claim arising from or relating to any breach by Buyer under this Binding Term Sheet or the Long-Form Agreements), then Sellers shall indemnify and defend Buyer against any costs, expenses (including reasonable attorneys' fees) and liabilities (collectively, "Losses") resulting from any such claim; provided, that if |

11

Exhibit 1 - Page 29

EXHIBIT F, PAGE 321

| | |
|---|---|
| | any such claim is brought prior to Closing and asserts that Sellers do not have the legal right to sell and transfer the Purchased Assets to Buyer as provided herein (a "DTS Claim") and Buyer elects in its sole discretion to waive the Buyer Condition to Closing and the Closing therefore occurs prior to the resolution of the DTS Claim, then Sellers shall not be obligated to indemnify Buyer for any Losses incurred following the Closing with respect to the DTS Claim. |
| Trusteeship: | Buyer has been advised that Donald T. Sterling has been removed as a Trustee of the Trust pursuant to paragraph 7.5.c of the Trust. |

*[Signature Page Follows]*

12

Exhibit 1 - Page 30

**EXHIBIT F, PAGE 322**

(                    (

The undersigned parties have executed this Binding Term Sheet as of the date first written above:

SELLERS

LAC Basketball Club, Inc.,
a California corporation

By: _____
Name:
Its:  _____Chairman of the Board_____

_____
Rochelle H. Sterling, individually and in her
capacity as Trustee of The Sterling Family Trust

BUYER

_____
Steven A. Ballmer, individually and on behalf
of Newco

13

Exhibit 1 - Page 31

EXHIBIT F, PAGE 323

# EXHIBIT 2

EXHIBIT F, PAGE 324

## ASSIGNMENT OF ASSETS TO
## REVOCABLE TRUST

ROCHELLE H. STERLING hereby assigns those "Lifetime Rights" set forth on pages 9 and 10 of that certain Binding Term Sheet dated as of May 29, 2014 (the "Term Sheet"), which pages are attached hereto as Exhibit A and incorporated herein by this reference, to the Trustee of THE STERLING FAMILY TRUST (the "Trust"). Because of the restrictions in effect with respect to DONALD T. STERLING's further participation in any activities involving or related to the National Basketball Association (the "NBA") or the Clippers franchise of the NBA (the "Clippers"), the Lifetime Rights are stated as rights received by ROCHELLE H. STERLING during her lifetime. Notwithstanding the foregoing, the Lifetime Rights are and shall remain the community property of the Settlors of the Trust and shall hereinafter be held by the Trustee of the Trust.

This Assignment of Assets to Revocable Trust is binding upon the Settlors of the Trust, their heirs, assigns, successors in interest and personal representatives and may be specifically enforced by the Trustee of the Trust.

Effective as of May 29, 2014.

_____
ROCHELLE H. STERLING, individually

Received and accepted by:

_____
ROCHELLE H. STERLING, as sole Trustee
of THE STERLING FAMILY TRUST

Exhibit 2 - Page 32

**EXHIBIT F, PAGE 325**

| Practice Facility Lease: | Sellers and Buyer agree that the existing practice facility lease between the Trust and LAC shall be terminated as of the Closing Date, and the Trust and Buyer shall enter into a new triple net (NNN) lease of the current practice facility for a period of 10 years at a market rental rate with customary escalators to be agreed upon by the Trust and Buyer and otherwise on customary terms and conditions. |
|---|---|
| Operations Between Effective Date and Closing Date: | Sellers and Buyer agree that operations of the Franchise between the Effective Date of this Binding Term Sheet and the Closing Date will be in the ordinary course as currently managed by Dick Parsons as Interim CEO. Subject to NBA approval, Buyer will be afforded the maximum set of interim operating rights prior to the Closing, as such rights are set forth in the NBA Ownership Transfer Manual. |
| Break-Up Fee: | Buyer will lose the Deposit if Buyer fails to close or otherwise materially breaches this Binding Term Sheet, if all Conditions to Closing are or could be materially satisfied (other than as the result of a breach or failure by Sellers); provided, that, for clarity, Buyer shall not lose the Deposit due to its failure to waive any Conditions to Closing or its failure to extend the Closing Date. |
| Lifetime Rights: | Shelly Sterling will, for the remainder of her life, receive from Buyer, at Buyer's sole expense, the following:<br><br>(i) 10 tickets in Section 101 or 111 for all Clippers preseason, regular season and postseason games at Staples Center and all Clippers preseason, regular season and postseason away games versus the Los Angeles Lakers at Staples Center, with the exact location of such tickets to be identified by Shelly Sterling and reasonably approved by Buyer;<br><br>(ii) 2 courtside tickets for all Clippers preseason, regular season and postseason home games at Staples Center and all Clippers preseason, regular season and postseason away games versus the Los Angeles Lakers at Staples Center;<br><br>(iii) 6 parking spaces in the Lot C Garage for each game at Staples Center described above (the "Staples Games");<br><br>(iv) 12 VIP passes (including access to the Lexus Club, Arena Club, Chairman's Lounge and media room or equivalent) for each Staples Game; and<br><br>(v) three championship rings following any Clipper NBA championship.<br><br>All references to Staples Center in this section shall include |

9

Exhibit 2 - Page 33

EXHIBIT F, PAGE 326

| | any successor or alternative arenas used by the Clippers and/or the Lakers for home games during the lifetime of Shelly Sterling. |
| | Buyer shall also give Shelly Sterling the title of "Owner Emeritus" and "Clipper's Number 1 Fan", which titles she shall retain for the duration of her lifetime. |
| Employment Agreements: | Buyer shall, effective as of the Closing, offer two year employment contracts to each of Carl Lehr, Gary Sacks and Eric Miller on substantially similar terms as their current employment terms with LAC. |
| Long-Form Agreements: | The parties will negotiate in good faith to enter into terms of a long-form agreement and other related documentation in furtherance of the underlying transaction, on terms consistent in all respects with this Binding Term Sheet ("Long-Form Agreements"). The parties will use their reasonable efforts to negotiate and execute such Long-Form Agreements promptly following the Effective Date of this Binding Term Sheet. However, unless and until such time as this Binding Term Sheet is replaced by any such further documentation, this Binding Term Sheet remains binding on, and memorializes the legal, contractual and enforceable rights and obligations of, the parties. |
| | In the event that all of the Conditions to Closing are satisfied by the parties, and the parties do not agree on the terms of Long-Form Agreements by the Closing Date, Buyer shall purchase, and Sellers shall sell to Buyer, the Purchased Assets in accordance with the terms of this Binding Term Sheet and, at the Closing, Sellers shall deliver to Buyer a statement of representations as to (i) the ownership of and title to the Purchased Assets being transferred, (ii) the power and authority of the transferor parties, (iii) the enforceability thereon of this Binding Term Sheet and (iv) the other representations identified opposite the heading "Representations and Warranties" above, which shall be on customary terms and include materiality qualifiers to be agreed between Sellers and Buyer (and the disclosure schedules to such representations and warranties shall only reflect matters that are of a type and amount which are customarily associated with an NBA franchise). |
| Further Assurances: | Each party hereto shall use its reasonable best efforts to take, or cause to be taken, all appropriate action and all things necessary to consummate and make effective the transactions contemplated by this Binding Term Sheet. |
| Expenses: | Except as set forth herein, each party shall bear all of its |

Exhibit 2 - Page 34

# EXHIBIT 3

**THE STERLING FAMILY TRUST**
**(2013 RESTATEMENT)**

**ARTICLE 1**
**INTRODUCTION**

1.1     Restatement Of Trust

On August 13, 1998,  DONALD T. STERLING and ROCHELLE H. STERLING, who are referred to herein individually as the "Husband" or the "Wife," respectively, or as a "Settlor," and collectively as the "Settlors" or as the "Trustee," depending upon the context, executed that certain Declaration of Trust referred to as THE STERLING FAMILY TRUST.  Pursuant to the Settlors' retained powers, the Settlors hereby restate THE STERLING FAMILY TRUST in its entirety.  This restatement shall neither create a new trust nor require the transfer or re-registration of assets now held by the Trustee of THE STERLING FAMILY TRUST.

1.2     Family Of Settlors

The Settlors are married to each other and have two (2) adult living children of their marriage, namely, JOANNA STERLING MILLER and CHRIS STERLING.  The Settlors have one (1) deceased child, namely SCOTT STERLING.  The Settlors have no other children, living or deceased.  References herein to the Settlors' children shall include only the foregoing named children.

1.3     Disinheritance Clause

The Settlors have intentionally omitted to provide for any individual not mentioned in this document who, if either Settlor had died intestate, would be entitled to share in his or her estate as an heir at law or otherwise.

1.4     Names Of Trusts

The trust restated by this document shall continue to be referred to as THE STERLING FAMILY TRUST.  From time to time, various trusts may be established under this document, and, as a matter of convenience, each such trust may be designated by any name set forth in this document or by any other name that the Trustee considers appropriate.

1.5     Character Of Property

The Community Trust shall remain the community property of the Settlors, and a Settlor's Separate Trust shall remain the separate property of the transferring Settlor.  To

- 1 -

Exhibit 3 - Page 35

**EXHIBIT F, PAGE 329**

# EXHIBIT 4

## 2.5  Settlors' Powers To Revoke, Withdraw, Appoint And Amend Community Trust

### 2.5.a  Revocation

Either Settlor may revoke the Community Trust, and, following the revocation, all of the income and principal of the Community Trust shall promptly be distributed to the Settlors as their community property, unless the Settlors, acting together, contemporaneously direct that all or any portion of the assets of the Community Trust be distributed to any one or more other persons. If the Community Trust is revoked, the Trustee may retain sufficient assets to secure payment of liabilities lawfully incurred by the Trustee in the administration of the Community Trust, including Trustee's fees that have been earned, unless the Trustee is indemnified to the Trustee's satisfaction against loss or expense.

### 2.5.b  Withdrawal

Either Settlor may withdraw all or any portion of the income and/or principal of the Community Trust, and, following the withdrawal, the withdrawn portion of the Community Trust shall promptly be distributed to the Settlors as their community property, unless the Settlors, acting together, contemporaneously direct that all or any portion of the withdrawn assets be distributed to any one or more other persons. If all or a major portion of the Community Trust is withdrawn, the Trustee may retain sufficient assets to secure payment of liabilities lawfully incurred by the Trustee in the administration of the Community Trust, including Trustee's fees that have been earned, unless the Trustee is indemnified to the Trustee's satisfaction against loss or expense.

### 2.5.c  Joint Appointment

Both Settlors, acting together, may appoint all or any portion of the Community Trust in favor of any one or more persons, including themselves and their estates.

### 2.5.d  Joint Amendment

Both Settlors, acting together, may amend the Community Trust, in whole or in part.

### 2.5.e  Unilateral General Testamentary Power Of Appointment

Either Settlor may unilaterally appoint all or any portion of his or her fifty percent (50%) share of the Community Trust in favor of any one or more persons, including such Settlor's estate; provided, however, that such appointment shall only be effective at the Settlor's death if he or she is the Deceased Settlor.

-4-

Exhibit 4 - Page 36

**EXHIBIT F, PAGE 331**

2.6     **Settlor's Powers To Revoke, Withdraw, Appoint And Amend His Or Her Separate Trust**

2.6.a     Revocation

A Settlor may revoke his or her Separate Trust, and, following the revocation, all of the income and principal of the Settlor's Separate Trust shall promptly be distributed to such Settlor as his or her separate property, unless the Settlor contemporaneously directs that all or any portion of the assets of his or her Separate Trust be distributed to any one or more other persons. If the Settlor's Separate Trust is revoked, the Trustee may retain sufficient assets to secure payment of liabilities lawfully incurred by the Trustee in the administration of the Separate Trust, including Trustee's fees that have been earned, unless the Trustee is indemnified to the Trustee's satisfaction against loss or expense.

2.6.b     Withdrawal

A Settlor may withdraw all or any portion of the income and/or principal of his or her Separate Trust, and, following the withdrawal, the withdrawn portion of the Settlor's Separate Trust shall promptly be distributed to such Settlor as his or her separate property, unless the Settlor contemporaneously directs that all or any portion of the withdrawn assets be distributed to any one or more other persons. If all or a major portion of a Settlor's Separate Trust is withdrawn, the Trustee may retain sufficient assets to secure payment of liabilities lawfully incurred by the Trustee in the administration of the Separate Trust, including Trustee's fees that have been earned, unless the Trustee is indemnified to the Trustee's satisfaction against loss or expense.

2.6.c     Appointment

A Settlor may appoint all or any portion of his or her Separate Trust in favor of any one or more persons, including himself or herself or his or her estate.

2.6.d     Amendment

A Settlor may amend his or her Separate Trust, in whole or in part.

2.7     **Exercise Of Settlors' Powers**

The Settlors' powers under this Article 2 shall be exercised as follows:

2.7.a     No Writing Required

A direction with respect to, or a withdrawal from, a trust under this Article 2 by a Settlor who is then serving as sole Trustee of that trust need not be in writing.

- 5 -

Exhibit 4 - Page 37

**EXHIBIT F, PAGE 332**

### 2.7.b Writing Required

A direction with respect to, or a withdrawal from, a trust under this Article 2 by a Settlor who is not then serving as sole Trustee of that trust shall be made by a writing signed by that Settlor. A revocation or an amendment shall be made by a writing signed by the Settlor or Settlors, as the case may be. Any writing required by this Paragraph 2.7.b, shall clearly identify the trust as to which the power being exercised relates and shall be delivered to all then serving Trustees of the trust.

### ARTICLE 3
### ADMINISTRATION OF TRUSTS
### UPON DEATH OF DECEASED SETTLOR

### 3.1 Administrative Trust

Upon the death of the Deceased Settlor, all trust property, including all trusts established pursuant to Paragraph 1.5., and any additions thereto by reason of the Deceased Settlor's death, shall be referred to as the "Administrative Trust." The Trustee shall (i) pay all taxes and expenses relating to the Administrative Trust, (ii) distribute the portion of the Deceased Settlor's interest in the Administrative Trust that the Deceased Settlor has effectively appointed pursuant to Paragraphs 2.5. and 2.6, and (iii) distribute the residue of the Administrative Trust as provided in Paragraph 3.2. The Trustee of the Administrative Trust may distribute to any Current Beneficiary of any trust under Paragraph 3.2. such amounts of income and/or principal as are consistent with the terms of such trust, and any such distributions shall be in lieu of and thus charged against the income and/or principal remaining to be distributed to such trust.

### 3.2 Division Of Residue Of Administrative Trust Into Separate Trusts

The Trustee shall distribute the residue of the Administrative Trust to new trusts, referred to as the "Survivor's Trust," the "Credit Trust" and the "Marital Trust," as provided in this Paragraph 3.2.

### 3.2.a Gift To The Survivor's Trust

The Trustee shall distribute to the Survivor's Trust (i) all Tangible Personal Property, (ii) the remainder of the Surviving Settlor's Separate Trust held as part of the residue of the Administrative Trust and (iii) that amount of the remainder of the Community Trust as shall equal the Surviving Settlor's interest therein. The Survivor's Trust shall be administered as provided in Paragraph 4.1.

- 6 -

Exhibit 4 - Page 38

EXHIBIT F, PAGE 333

# EXHIBIT 5

EXHIBIT F, PAGE 334

forth in this document; (ii) the provisions of the applicable Code section or Regulatory Authority shall override and supersede any provisions of the trust preventing the trust from qualifying for treatment under the Code section; (iii) the Independent Trustee of the trust shall amend the trust to expressly include any required provisions and to restrict or eliminate any inconsistent provisions, either by a writing which is delivered to the Trustee and to all Current Beneficiaries of the trust or by petitioning the court having jurisdiction over the trust to have the provisions of the trust reformed; (iv) the trust shall be administered in accordance with the Code section and applicable Regulatory Authority; and (v) the Trustee shall not take any action or have any power which would impair the ability of the trust to qualify for treatment under the Code section. The Independent Trustee of the trust is further authorized to enter into any and all agreements with the Internal Revenue Service or any other governmental body or official or to execute, from time to time, any agreements, declarations of policy or disclaimers that may be required in order for the trust to qualify under the particular Code section.

6.18    No Revocation Or Amendment Except As Specifically Provided

Except as expressly provided to the contrary in this document, including the provisions of Article 2 relating to the Community Trust and each Settlor's Separate Trust and Paragraph 4.1. relating to the Survivor's Trust, no trust administered under this document may be revoked or amended.

## ARTICLE 7
## PROVISIONS REGARDING TRUSTEES

7.1    *General Provisions Concerning Fiduciaries*

Except to the extent expressly provided otherwise, references to the "Trustee" of any trust are to the person then serving as sole Trustee of such trust or to the persons then serving as Co-Trustees of such trust. The provisions of this Article 7 shall apply to all fiduciaries serving under this document, including Trustees and Special Trustees.

7.2    Appointment Of Trustees

7.2.a    In General

The Settlors, DONALD T. STERLING and ROCHELLE H. STERLING, shall serve as Trustee. If either Settlor ceases to serve, the other shall serve as Trustee. If both Settlors cease to serve, JOANNA STERLING MILLER, DARREN SCHIELD, DOUGLAS L. WALTON and RICHARD ANDREW ROESER shall serve as Trustee. If any one of JOANNA STERLING MILLER, DARREN SCHIELD, DOUGLAS L. WALTON or RICHARD ANDREW ROESER fails to qualify or ceases to serve, the others

- 38 -

81294-00002/1915393.5

Exhibit 5 - Page 39

shall serve as Trustees.  If two or more of JOANNA STERLING MILLER, DARREN SCHIELD, DOUGLAS L. WALTON and RICHARD ANDREW ROESER fail to qualify or cease to serve, BANK OF AMERICA, N.A. through its MERRILL LYNCH TRUST COMPANY division ("MERRILL LYNCH") shall serve with the one or ones remaining.  If all of JOANNA STERLING MILLER, DARREN SCHIELD, DOUGLAS L. WALTON and RICHARD ANDREW ROESER fail to qualify or cease to serve, MERRILL LYNCH shall serve alone as Trustee.  The persons named in Paragraph 7.2.a. or their successors designated under Paragraph 7.3, are referred to in this Article 7 collectively as the "Primary Trustee." Except as otherwise provided in this Article 7, the Primary Trustee shall serve as Trustee of all trusts administered under this document.

       7.2.b       Trustees Of Trusts For Issue

       (i)       Trust for JOANNA STERLING MILLER.  JOANNA STERLING MILLER shall serve as sole Trustee of the trust administered for her benefit under Paragraph 5.5.  If JOANNA STERLING MILLER fails to qualify as Trustee or ceases to serve and has not designated a successor Trustee as provided in Paragraph 7.3., the Primary Trustee shall serve as Trustee of JOANNA STERLING MILLER's trust.

       (ii)       Trust for CHRIS STERLING.  CHRIS STERLING, DARREN SCHIELD, DOUGLAS L. WALTON and RICHARD ANDREW ROESER shall serve as Trustee of the trust administered for CHRIS STERLING's benefit under Paragraph 5.5.  If CHRIS STERLING fails to qualify or ceases to serve, the others shall serve as Trustee.  If any one or more of DARREN SCHIELD, DOUGLAS L. WALTON or RICHARD ANDREW ROESER fails to qualify or ceases to serve, MERRILL LYNCH shall serve as a Trustee with such of CHRIS STERLING, DARREN SCHIELD, DOUGLAS L. WALTON and RICHARD ANDREW ROESER who is then serving.  If all of CHRIS STERLING, DARREN SCHIELD, DOUGLAS L. WALTON and RICHARD ANDREW ROESER fail to qualify or cease to serve, MERRILL LYNCH shall serve alone as Trustee.

       (iii)       Trust for Descendant.  Trusts For Descendants.  The Primary Trustee shall serve as Trustee of the Descendant's trust administered under Paragraph 5.6.  Upon attaining age twenty-five (25), the Descendant shall serve as a Co-Trustee of the Descendant's trust with the Primary Trustee.  From and after attaining age thirty-five (35), the Descendant shall serve as the sole Trustee of the Descendant's trust.  If the Descendant fails to qualify as a Co-Trustee or as sole Trustee or ceases to serve and has not designated a

81294-00002/1915193.5

Exhibit 5 - Page 40

EXHIBIT F, PAGE 336

successor Trustee as provided in Paragraph 7.3., the Primary Trustee shall serve as Trustee of the Descendant's trust.

      7.2.c      Vacancy In Office Of Trustee

      If at any time there is a vacancy in the office of Trustee of any trust administered under this document, including if a Trustee resigns, is removed or declines to serve as provided in Paragraph 7.5., and there is no Replacement Trustee who is able and willing to serve as a Trustee of the trust, the Majority Beneficiaries of the trust shall designate a successor Trustee for the trust in the manner provided in Paragraph 7.3.a., as if the Majority Beneficiaries were the only then serving Trustees of the trust; provided, however, that if the vacancy occurs as a result of a removal pursuant to Paragraph 7.5.d., other than pursuant to clause (A) of subparagraph (ii) thereof, or pursuant to Paragraph 7.5.f., the Majority Beneficiaries shall designate a bank or trust company authorized to conduct trust business in the jurisdiction the laws of which govern such trust under Paragraph 12.3. and having trust assets under management in excess of One Billion Dollars ($1,000,000,000) as successor Trustee for the trust, in the manner provided in Paragraph 7.3., as if the Majority Beneficiaries were the only then serving Trustees of the trust.

      7.2.d      If No Trustee Is An Independent Trustee

      If at any time (i) the Trustee of a trust is requested to exercise a power vested in the Independent Trustee pursuant to Paragraph 6.4. or otherwise determines that it is appropriate for an Independent Trustee to consider exercising a power vested in the Independent Trustee with respect to the trust and (ii) no Trustee then serving with respect to the trust is an Independent Person, the Replacement Trustee of the trust who is an Independent Person shall serve for the sole purpose of exercising or not exercising the powers vested in the Independent Trustee. If no Replacement Trustee of the trust is an Independent Person, the then serving Trustee of the trust shall designate an Independent Person to serve, in the manner provided in Paragraph 7.3., for the sole purpose of exercising or not exercising such powers.

      7.2.e      If No Trustee Is A Neutral Person

      If at any time (i) the Trustee of a trust is requested to exercise a power vested in the Neutral Person serving as Trustee pursuant to Paragraph 6.5. or otherwise determines that it is appropriate for a Neutral Person to consider exercising a power vested in the Neutral Person serving as Trustee with respect to the trust and (ii) no Trustee then serving with respect to the trust is a Neutral Person, the Replacement Trustee of the trust who is a Neutral Person shall serve as a Trustee for the sole purpose of exercising or not exercising the powers vested in the Neutral Person serving as Trustee. If no Replacement Trustee of the trust is a

- 40 -

81294-00002/1935393.5

Exhibit 5 - Page 41

**EXHIBIT F, PAGE 337**

Neutral Person, the then serving Trustee of the trust shall designate a Neutral Person to serve, in the manner provided in Paragraph 7.3., for the sole purpose of exercising or not exercising such powers.

### 7.3       Designation Of Co-Trustees And Successor Trustees

An individual serving as the sole Trustee of any trust may designate one or more persons to serve as his or her successors, to serve with him or her as a Co-Trustee and/or to serve as successors to any such designees. An individual serving as a Co-Trustee of any trust may designate one or more persons to serve serially (but not together) as his or her successors and/or as successors to any such designees. In addition, if all then serving Co-Trustees of any trust are individuals, they may designate one or more persons to serve with them as a Co-Trustee, as the successor for any one or more of them, and/or as successors to such designated Co-Trustees. A designation may name persons either in lieu of or in addition to those persons named in Paragraph 7.2. A designation may be revoked or amended by a subsequent designation. If a conflict occurs between the terms of two or more designations, whether such designations were by the same or different Trustees, the terms of the most recent designation shall prevail.

#### 7.3.a       Exercise Of Designation

A designation under this Paragraph 7.3. shall be in writing, signed by the individual Trustee making the designation and delivered to any other then serving Co-Trustees of the trust.

#### 7.3.b       Other Terms Of Designation.

A designation may (i) waive bond, (ii) specify the compensation for so serving, (iii) be for a fixed or an unlimited duration, (iv) be for all or a portion of the designating Trustee's powers or (v) otherwise set forth terms and conditions of service by the designee.

#### 7.3.c       Effect Of Removal Of Designating Trustee

If a Trustee is removed for cause pursuant to Paragraph 7.5.d., other than pursuant to clause (A) of subparagraph (ii) thereof, all designations by the removed Trustee under this Paragraph 7.3. shall be void, and any Co-Trustee appointed by the removed Trustee shall cease to serve, unless such Co-Trustee would have been a Replacement Trustee by reason of being named in this document or designated by a predecessor to the removed Trustee.

- 41 -

Exhibit 5 - Page 42

### 7.4       Qualification Of Successor Trustees

#### 7.4.a       Consent To Serve

No person shall qualify to serve as a Trustee of any trust unless the person has consented to serve in writing, which consent shall specifically accept any terms and conditions of service, including those imposed pursuant to Paragraph 7.5.c, or by a designation under Paragraph 7.3. All fees and costs incurred by the person in determining whether or not to consent to serve shall be paid from the trust as an expense of administration.

#### 7.4.b       Conflicts Of Interest

No person shall be disqualified from serving as a Trustee of any trust by reason of (i) owning an interest in real or personal property in which the trust holds an interest, (ii) owning an interest in a corporation, partnership, limited liability company or other business venture in which the trust holds or has at any time held an equitable, beneficial or management interest or (iii) being an officer, director or employee of any corporation, partnership, limited liability company or other business venture in which the trust holds or has at any time held an equitable, beneficial or management interest.

### 7.5       Declination, Resignation And Removal Of Trustees

#### 7.5.a       Declination

A Replacement Trustee of any trust may decline to serve upon written notice to the then serving Trustee or, if there is none, to all then Current Beneficiaries of the trust.

#### 7.5.b       Resignation

A Trustee of any trust may resign upon written notice to all other Co-Trustees or, if there are none, to the resigning Trustee's successor or, if none, to all then Current Beneficiaries of the trust.

#### 7.5.c       Removal Of Individual Due To Incapacity

Any individual who is deemed incapacitated, as defined in Paragraph 10.24., shall cease to serve as a Trustee of all trusts administered under this document. Each individual who agrees to serve as a Trustee of any trust administered under this document (A) shall cooperate in any examination reasonably appropriate to carry out the provisions of this Paragraph 7.5.c., (B) waives the doctor-patient and/or psychiatrist-patient privilege with respect to the results of such examination, and (C) shall allow a Co-Trustee or the Current Beneficiaries of the trust to review the individual's individually identifiable health information or other

81294-00002/1915393.5

- 42 -

Exhibit 5 - Page 43

EXHIBIT F, PAGE 339

medical records, waiving any privacy rights governed by the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. §1320d (HIPAA), and the regulations thereunder, including 45 C.F.R. §§160-164, to the extent required to implement this Paragraph 7.5.c. An individual's obligation to comply with the provisions of this Paragraph 7.5.c. is specifically enforceable.

### 7.5.d    Removal Of Trustees For Cause

(i)    Majority Beneficiaries May Remove Trustee For Cause. The Majority Beneficiaries of any trust may remove any Trustee thereof for reasonable cause by delivering written notice of the removal which specifies the reasonable cause for the removal to all persons then serving as Trustee, to the Replacement Trustee and to all other Current Beneficiaries of the trust.

(ii)    Causes For Removal. As used in this Paragraph 7.5.d., the term "reasonable cause" includes (A) the incapacity of the Trustee as provided in Paragraph 7.5.c., (B) the willful or negligent mismanagement of the trust assets by the Trustee, (C) the abuse or abandonment of, or inattention to, the trust by the Trustee, (D) a federal or state charge against the Trustee involving the commission of a felony or serious misdemeanor, (E) an act of stealing, dishonesty, fraud, embezzlement, moral turpitude or moral degeneration by the Trustee, (F) Substance Abuse by the Trustee, (G) the Trustee's poor physical, mental or emotional health which causes the Trustee to be unable to devote sufficient time to administer the trust, (H) the Trustee's failure to comply with a written agreement regarding compensation or any other legally enforceable written agreement affecting the trust's operation, (I) a demand for unreasonable compensation, (J) the failure of a corporate Trustee to appoint a senior officer with at least five (5) years of experience in administering trusts to handle the account, (K) unreasonably high turnover of account officers assigned to the trust (unless requested by the Majority Beneficiaries), (L) unreasonably poor investment performance, (M) the removal of all Current Beneficiaries from the State in which the corporate Trustee is licensed to conduct business as a corporate Trustee, (N) the relocation of the Trustee away from the location where the trust operates so as to interfere with the administration of the trust, (O) unreasonable lack of communication between the Trustee and the Current Beneficiaries, (P) unreasonably inaccurate or unclear transaction statements or statements of account, (Q) unreasonable conflicts between the Trustee and the Current Beneficiaries caused by the Trustee, (R) merger, acquisition or a deteriorating financial condition of a corporate Trustee; or (S) any other reason for which a court of competent jurisdiction would remove a Trustee.

- 43 -

81294-00002/1915393.5

Exhibit 5 - Page 44

**EXHIBIT F, PAGE 340**

7.5.e    Liability Of Former Trustee

If a Trustee resigns or is removed as provided in this Paragraph 7.5., or ceases to serve, including by virtue of the termination of any trust, the Trustee shall not be relieved of liability until the Trustee's accounting has been settled pursuant to Paragraph 8.3, and the Trustee's successor, if any, has commenced serving.

7.5.f    Removal Of Trustee Without Cause

(i)   Removal Of Trustee Without Cause.   The (A) Majority Beneficiaries of any trust acting together with (B) the majority of the persons then serving as Trustee of such trust may remove any Trustee of such trust without cause by delivering written notice of the removal to all persons then serving as Trustee, to the Replacement Trustee and to all Current Beneficiaries of the trust.

(ii)   Removal Of Corporate Trustee Without Cause.   The Majority Beneficiaries of any trust may remove the corporate Trustee of such trust without cause by delivering written notice of the removal to all persons then serving as Trustee, to the Replacement Trustee and to all Current Beneficiaries of the trust.

7.6    Provisions Relating To Multiple Trustees

7.6.a    In General

When two Co-Trustees are serving, they shall act unanimously. When more than two Co-Trustees are serving, they shall act by majority vote; no dissenting Co-Trustee shall be liable to any person for any action taken or not taken pursuant to the decision of the majority.

7.6.b    When Settlors Are Serving As Co-Trustees

The provisions of this Paragraph 7.6.b. shall apply only while both Settlors are serving as the only Trustees of any trust.

(i)   Financial And Administrative Matters Other Than Real Property. Except as provided in subparagraph (ii) below, either Trustee alone, and without the approval of the other, may, with respect to transactions involving assets not in excess of One Hundred Thousand Dollars, adjusted as provided in Paragraph 6.12., (A) sign checks or other withdrawal instruments drawn on the trust's bank, stock, bond, brokerage or other accounts, including orders and instructions, (B) execute any other instruments of conveyance of property of the trust, excluding real property, (C) form, alone or with others, and invest property of the

- 44 -

Exhibit 5 - Page 45

EXHIBIT F, PAGE 341

trust in, any new business entity, including a corporation, partnership or limited liability company and (D) take any action authorized by the following provisions of this Paragraph 7.6.b. In addition, a Trustee may act with respect to any other matter that has been delegated to such Trustee by the other pursuant to Paragraph 7.6.c.

(ii)   Real Property Matters.  Both Trustees shall act together with respect to the execution of any instrument by which an interest in real property in the Community Trust is leased for a longer period than one year or is sold, conveyed or encumbered unless one Trustee has delegated powers affecting the real property to the other Trustee pursuant to Paragraph 7.6.c.

(iii)   Partnership Matters.  If the trust is a general or limited partner of any partnership, either Trustee alone may, with respect to transactions involving assets not in excess of One Hundred Thousand Dollars, adjusted as provided in Paragraph 6.12., execute any documents on behalf of the trust with respect to the partnership, including governance, loan, encumbrance and/or conveyance documents.

(iv)   Limited Liability Company Matters.  If the trust is a manager or member of any limited liability company, either Trustee alone may, with respect to transactions involving assets not in excess of One Hundred Thousand Dollars, adjusted as provided in Paragraph 6.12., execute any documents on behalf of the trust with respect to the limited liability company, including governance, loan, encumbrance and/or conveyance documents.

(v)   Corporate Matters.  If the trust is a shareholder of any corporation, either Trustee alone may, with respect to transactions involving assets not in excess of One Hundred Thousand Dollars, adjusted as provided in Paragraph 6.12., execute any documents on behalf of the trust with respect to the corporation, including governance, loan, encumbrance and/or conveyance documents.

(vi)   Ongoing Business Matters.  A Trustee who, acting alone, operates or manages a business that is a part of the Community Trust may, acting alone, sell, exchange, encumber or dispose of that business after complying with the requirements of California Family Code §1100(d).

(vii)   Reliance By Third Parties.  Subject to subparagraph (ii) above, any third party may accept orders and other instructions from either Trustee, and either

-45-

Exhibit 5 - Page 46

Trustee may alone execute any documents on behalf of the trust which the third party may
require.

### 7.6.c    Delegation By Trustees Permitted

(i)    Exercise Of Delegation Power.    Any Co-Trustee may at
any time delegate to any one or more other Co-Trustees all or any of the delegating Trustee's
powers.  The delegation shall (A) be in writing, (B) be delivered to all other Co-Trustees and (C)
specify the powers delegated.  Any delegation may be revoked or modified in the same manner.
Notwithstanding the foregoing, powers vested exclusively in the Independent Trustee may only
be delegated by an Independent Trustee to another Independent Trustee and powers vested
exclusively in the Neutral Person serving as Trustee may only be delegated by a Neutral Person
serving as Trustee to another Neutral Person serving as Trustee.

(ii)    Reliance On Delegation By Third Parties.    Any third
party, including any insurer, transfer agent, securities broker, bank, trust company, credit union,
title insurer or other financial institution, may rely upon any delegation pursuant to this
Paragraph 7.6.c. and shall incur no liability for any action taken in reliance on the delegation in
the absence of actual knowledge of its revocation or modification.

(iii)    Duty To Monitor By Delegating Trustee. Any delegation
pursuant to this Paragraph 7.6.c. shall not relieve the delegating Co-Trustee of the duty to
monitor the actions of the Co-Trustees to whom powers have been delegated.

### 7.7    Bond Waived

No bond shall be required of any person serving as a Trustee of any trust
unless requested, in writing, by the Majority Beneficiaries of the trust.

### 7.8    Compensation For Services

#### 7.8.a    For Individuals

Any individual serving as a Trustee of any trust shall be entitled to
(i) receive reasonable compensation for services rendered to the trust as a Trustee, even if
receiving compensation as a partner, officer, director, manager, member or employee of any
corporation, partnership, limited liability company or other business venture, an interest in which
is held by the trust and (ii) be reimbursed for any reasonable expenses of the trust that the
individual has paid.  Notwithstanding the foregoing, a Settlor shall not receive compensation as
Trustee with respect to any trust revocable by such Settlor.  Any individual may waive the right

- 46 -

Exhibit 5 - Page 47

to compensation for services to be rendered to any trust. A waiver may be limited in duration or to specific services. The Trustee is authorized to retain himself or herself or any firm with which he or she is associated to render legal or other professional services. Fees may be paid for such services without respect to such relationship and without respect to any agreement which the Trustee may have with his or her firm concerning the division of fees and commissions after complying with the requirements of California Probate Code §15687, if applicable.

7.8.b     For Corporate Trustees

Any corporate Trustee shall receive compensation for its services in the amount and at the time specified in its Schedule of Fees and Charges established from time to time (and in effect when the services were rendered) by the corporate Trustee for the administration of trusts of a character similar to the trust as to which the corporate trustee is serving, including minimum fees, and additional compensation for special investments, closely-held business interests and certain other services. The Settlors intend this Paragraph be a provision for specific rates or amounts of commissions within the meaning of any applicable statute requiring such a provision. The Settlors recognize that such compensation may exceed the compensation for services in effect from time to time under applicable law. If a corporate Trustee engages an affiliate to assist with the administration of any trust pursuant to Paragraph 8.1.a., the compensation paid by the trust to the affiliate shall not affect the corporate Trustee's compensation.

7.9     Liability Of Trustee

7.9.a     In General.

Unless expressly provided otherwise in this document, the Trustee shall be liable for any action taken or omission made that fails to comply with the Trustee's standard of care determined under California law. Notwithstanding the foregoing, with respect to (i) the determination of whether to implement an express recommendation set forth in this document or (ii) a distribution made or withheld without actual notice of the event upon which the right to the distribution depends, the Trustee shall only be liable for an action taken or omission made in bad faith or with gross negligence.

7.9.b     With Respect To Investments

Pursuant to the California Uniform Prudent Investor Act, the Trustee's investment performance shall be evaluated in light of the Trustee's overall investment performance and not in light of any isolated investment. Notwithstanding the foregoing, the

- 47 -

Exhibit 5 - Page 48

EXHIBIT F, PAGE 344

Trustee shall have no liability for retaining any property transferred to any trust by either or both
Settlors, as provided in Paragraph 8.1.c., without diversification.

 7.9.c  **With Respect To Acts Of Predecessor**

 A successor Trustee shall not be liable for an action taken or
omission made by a predecessor Trustee unless the successor (i) has actual knowledge of facts
which might reasonably be expected to put the successor on notice of such action or omission
and (ii) fails to investigate and/or take appropriate remedial action. All fees and costs incurred in
connection with a determination of a predecessor Trustee's liability shall be paid by and charged
against the trust as to which the predecessor Trustee served, subject to any right of
reimbursement or contribution from the predecessor Trustee.

 7.9.d  **With Respect To Acts Of Designees, Delegates Or Professionals**

 A Trustee who has (i) designated Co-Trustees, (ii) delegated
powers to a Co-Trustee or (iii) employed professionals or agents to assist with the administration
of any trust pursuant to Paragraph 8.1.a. shall not be liable for the actions or omissions of such
designees, delegates, professionals or agents, nor shall the Trustee be obligated to continually
supervise or monitor any of them, unless the Trustee either (i) has designated, delegated or
employed such designees, delegates, professionals or agents in bad faith or with gross negligence
or (ii) has actual knowledge of facts which might reasonably be expected to put the Trustee on
notice of improper actions or omissions by such designees, delegates, professionals or agents and
thereafter fails to investigate and/or take appropriate remedial action.

 7.9.e  With Respect To Independent Person Or Neutral Person
Serving As Trustee

 Neither an Independent Trustee serving solely for the purpose of
exercising one or more of the powers vested in the Independent Trustee nor a Neutral Person
serving as Trustee solely for the purpose of exercising one or more of the powers vested in the
Neutral Person shall have any responsibility for the administration of any other assets of the
trust.

 7.9.f  **Burden Of Proof**

 In all cases, a person claiming that the Trustee has failed to comply
with the Trustee's standard of care under this Paragraph 7.9. shall have the burden of proving
such claim.

- 48 -

41294-00002/1915393.5

Exhibit 5 - Page 49

**EXHIBIT F, PAGE 345**



**EXHIBIT F, PAGE 346**

### ARTICLE 8
### MANAGEMENT OF TRUST ASSETS

8.1     Powers Of Trustee

Subject to any limitations elsewhere in this document, the Trustee is granted all powers appropriate to carry out the terms of each trust administered under this document, including the following:

8.1.a     To Employ Professional And Other Assistants

(i)     To employ, compensate and grant discretionary authority to agents, managers, attorneys, accountants, brokers, investment counselors and others, even if they are associated or affiliated with a Trustee. Any third party, including any insurer, transfer agent, securities broker, bank, trust company, credit union, title insurer or other financial institution, may rely upon any grant of authority pursuant to this Paragraph 8.1.a. and shall incur no liability for any action taken in reliance on such grant of authority in the absence of actual knowledge of its revocation or modification.

(ii)     To pay out of income or principal or both the reasonable charges and fees of such agents, managers, attorneys, accountants, brokers, investment counselors and others, as it shall in its sole discretion determine, including the power to select brokers and dealers affiliated with any Trustee for the sale or purchase of any securities or other investment property in the trust. This authorization shall include an affiliated broker acting in a principal or agency capacity for equity and fixed income securities, routing orders for over-the-counter (OTC) stocks to a market maker affiliated with any Trustee, routing listed stocks to specialists affiliated with any Trustee, or routing after-hours orders to a proprietary trading operation in which any Trustee or an affiliate owns an equity interest. In such case the Trustee or an affiliate may receive both monetary and non-monetary "payment for order flow," including an inter-company transfer of funds in connection with orders routed to an affiliated market maker; monetary compensation (including fee sharing) from, and participation in the profits of, certain affiliated and independent exchange specialists who execute orders; other compensation as part of reciprocal order routing arrangements with various exchange specialists and dealer firms; and rebates and credits against fees paid by various exchanges to member firms. To the extent permitted by applicable law, the Trustee's compensation shall not be reduced by any additional compensation received by the Trustee, its parent, or any affiliate thereof, or any agent, principal, advisor, counsel, broker, dealer, market maker or specialist (including exchange

81294-00002/1915393.5

Exhibit 6 - Page 50

**EXHIBIT F, PAGE 347**

specialist) affiliated with the Trustee, its parent or any affiliate thereof, for providing any of the services authorized in this Paragraph.

#### 8.1.b      To Pay Expenses

To pay all expenses and taxes incurred in the administration of the trust, including such insurance as the Trustee deems advisable to protect the trust from damage or loss and to protect the Trustee from liability.

#### 8.1.c      To Receive And Retain Property

To receive and retain any property, without regard to whether the receipt or retention of the property violates sound diversification principles or the property is underproductive.

#### 8.1.d      To Hold Property

To hold title to any property of the trust in the name of the Trustee or in the name of a nominee (without revealing nominee status if the nominee has the power to revoke the trust).

#### 8.1.e      To Operate A Business

To form, hold and operate legal entities, including corporations, partnerships (limited and general) and limited liability companies; to operate a business, directly or through one or more legal entities; to terminate any business or withdraw from or dissolve any legal entity; to exercise all voting and management rights attendant to holding an interest in a business or legal entity, including the right to vote securities, give proxies and pay assessments; to participate in voting trusts, pooling arrangements, foreclosures, reorganizations, consolidations, mergers, liquidations and dissolutions; to deposit securities with and transfer title to any protective or other committee; and to exercise or sell stock subscription or conversion rights.

#### 8.1.f      To Manage And Control Property

To manage, control, lease for terms within or beyond the duration of any trust, grant options with respect to, partition, divide, improve, insure and repair any kind of property, real or personal; to create restrictions, easements and servitudes.

#### 8.1.g      To Purchase And Sell

(i)      To purchase, exchange or sell for cash or upon terms at public or private sale any kind of property, real or personal, including trust funds administered

- 50 -

Exhibit 6 - Page 51

**EXHIBIT F, PAGE 348**

by the Trustee, stocks, bonds, futures contracts and other securities, puts, calls, straddles and other options of every kind, annuities, general and limited partnership interests, interests in limited liability companies and interests in other businesses and legal entities, whether or not an interest in any such property is already included in the trust. Any such purchase, exchange or sale may be made with any person, including any beneficiary, any fiduciary under this document or any estate or trust, including an estate or trust having as a beneficiary or fiduciary any beneficiary or fiduciary under this document; provided, however, that any property sold to any such beneficiary, fiduciary, estate or trust is sold for adequate consideration. The Trustee may maintain brokerage accounts, including margin and commodity accounts, and, in connection therewith, may borrow, pledge securities, make short sales and sell on margin or otherwise. If any security is purchased for a premium or at a discount, such premium or discount shall be amortized.

(ii)   In addition to the provisions of subparagraph (i) above, to invest in or retain any securities or other property, real or personal (within or without the United States), including: any security as defined by the Securities Act of 1933 or other applicable law, any contract of sale of a commodity for future delivery within the meaning of the Commodity Exchange Act, shares or interests in any private investment fund, private equity or venture capital fund, hedge fund, common trust fund, joint venture, general or limited partnership, limited liability company, statutory or common law business trust, statutory trust, real estate investment trust or an open-end (including any mutual fund) or closed-end management type investment company or unit investment trust, whether registered under the Investment Company Act of 1940 or unregistered, any money market instrument, bank deposit account (including savings, time, certificate of deposit and transaction accounts), precious metal, foreign exchange, structured product, insurance contract, options, options on futures and variable forward contracts, swaps, caps, collars and other derivative instruments of a financial nature, notwithstanding the fact that the trustee, investment manager or custodian, its respective parent or any affiliate, is an issuer of such investment or provides services (whether as manager, underwriter, distributor, custodian, advisor, agent, servicer, Trustee or otherwise) with respect to any such investment and further, notwithstanding that the Trustee, investment manager, custodian or its respective parent or any affiliate may receive compensation with respect to any such investment (in addition to Trustee's commissions), so long as the total compensation received is reasonable. To the extent permitted by applicable law, this provision is intended to override any contrary provision of law prohibiting such additional fees or otherwise requiring either a reduction in Trustee's commissions or an election between such additional fees and such commissions. Any

-51-

81294-00002/1915393.5

Exhibit 6 - Page 52

EXHIBIT F, PAGE 349

diversification requirement that would otherwise apply, including one imposed by a Prudent Investor Act or similar applicable law, is negated.

### 8.1.h    To Borrow And Encumber

To borrow and to encumber trust property by mortgage, deed of trust, pledge, guarantee, indemnity or otherwise for the debts of the trust, the debts of any entity an interest in which is owned by the trust or the joint debts of the trust, any entity an interest in which is owned by the trust and any co-owner of the property in which the trust or an entity an interest in which is owned by the trust has an interest; and, in connection therewith, to execute any mortgages, deeds of trust, pledges, guarantees, indemnities or other loan or security documents attendant thereto. Any mortgage, deed of trust, pledge, guarantee, indemnity or other encumbrance may be for a period within or beyond the duration of the trust.

### 8.1.i    To Secure The Debt Of A Beneficiary

With respect to any revocable trust, including the Community Trust and each Settlor's Separate Trust under Article 2 and the Survivor's Trust under Paragraph 4.1., the Trustee shall, at the direction of the individual entitled to revoke the trust, encumber all or any of the assets thereof by mortgage, deed of trust, pledge, guarantee, indemnity or otherwise to secure any indebtedness of the individual. With respect to any irrevocable trust, the Trustee shall encumber all or any of the assets thereof by mortgage, deed of trust, pledge, guarantee, indemnity or otherwise to secure any indebtedness of any Current Beneficiary of the trust, even though such mortgage, deed of trust, pledge, guarantee, indemnity or other security is not for the benefit of the trust but is for the exclusive benefit of the Current Beneficiary, if directed to do so by the Independent Trustee.

### 8.1.j    To Lend

To lend money or property of any trust to any beneficiary of the trust upon such terms as the Independent Trustee considers appropriate, and to lend money or property of any trust to any person other than a beneficiary of the trust upon such terms as the Trustee considers appropriate.

### 8.1.k    To Deposit And Withdraw Funds

To deposit funds in and withdraw funds from accounts of any kind, with any insurer, securities broker, bank, trust company, credit union or other financial institution, including a Trustee.

-52-

81294:00002/1915393.5

Exhibit 6 - Page 53

EXHIBIT F, PAGE 350

### 8.1.l    To Distribute Assets

To allocate or distribute trust assets, in cash or in kind or partly in each, including undivided interests, pro rata or non-pro rata, and for this purpose to sell trust assets. In making any allocation or distribution, the Trustee shall consider the income tax bases of such assets. Unless otherwise required by the Code and Regulatory Authority, the Trustee shall value an asset distributed in kind at its value on the date of distribution. Whenever the distribution of property constitutes the residual transfer of property after the satisfaction of a pecuniary amount, the pecuniary amount shall bear interest at the statutory rate of interest set forth in California Probate Code §12001, beginning from the date specified in California Probate Code §12003 and continuing until the date of distribution.

### 8.1.m    To Commence, Defend And Compromise Actions

To litigate, arbitrate, mediate and compromise claims and actions; and to commence, maintain or defend any claims or actions brought on behalf of or against the trust or any potential claims or actions on behalf of or against the trust.

### 8.1.n    To Release Powers

To release or restrict, by means of a written document, any power granted the Trustee. Unless otherwise specified by all of the Trustees then serving, any power released or restricted shall continue to exist and shall pass to and be held by all other Trustees.

### 8.1.o    To Deal With Insurance

To acquire insurance of any kind, including property, casualty or liability insurance, errors and omissions insurance and insurance on the life, health or income of any beneficiary, Trustee or other individual in whom the trust or any beneficiary of the trust has an insurable interest, by purchase, bequest, gift, exchange or in any other manner; to retain an insurance policy as a part of the trust; and to exercise all options, benefits, rights and privileges of an owner thereof, including the right to borrow against, to pledge and to cancel or otherwise terminate or dispose of the policy, to surrender the policy for its cash value, to name and change beneficiaries, to select and change settlement options and to receive any benefits thereunder. The Trustee may maintain, defend, compromise, arbitrate or settle any suit or claim with respect to such insurance. The Trustee shall not be liable for any acts or omissions of an insured in connection with any policy of insurance on the insured's life, health or income. Insurers shall have no obligation to inquire into the terms of this document or to see to the application of the proceeds of any policy, and may rely without liability on a receipt, release or other instrument executed by the Trustee.

- 53 -

Exhibit 6 - Page 54

EXHIBIT F, PAGE 351

**8.2     Segregation Of Separate Trusts**

The Trustee shall keep an account for each separate trust and may physically segregate the assets of the separate trusts administered under this document.

**8.3     Accounting**

Although the Trustee shall be under no obligation to render an annual accounting to any beneficiary of any trust administered under this document, (i) with respect to any revocable trust, any individual having the power to revoke the trust (but no other person or entity) shall be entitled to receive information concerning, or compel an accounting for, that trust and (ii) with respect to any irrevocable trust, any beneficiary thereof may obtain information concerning, or compel an accounting for, that trust as provided by California Probate Code §16060 et seq. The Trustee's account may, at the Trustee's option, either be settled pursuant to the provisions of the California Probate Code or by providing the account to all Current Beneficiaries of the trust. No guardian ad litem shall be required for any minor or unascertained Current Beneficiary of the trust. Unless written objections are received by the Trustee within the time period specified in California Probate Code §16461, the account and all transactions set forth therein shall be deemed settled and approved.

**8.4     Other Property May Be Added**

Additional property may be added to any trust with the approval of its Trustee.

**8.5     Trust As Owner Of S Stock**

Other than a charitable remainder trust under Code §664(d), the Settlors intend that each trust administered under this document be permitted to own stock in an S Corporation pursuant to Code §1361(c)(2)(A), including as a Qualified Subchapter S Trust or as an Electing Small Business Trust. If the trust does not by its terms qualify to own stock in an S Corporation pursuant to Code §1361(c)(2)(A); the Trustee shall have the power to determine whether the trust should be a Qualified Subchapter S Trust or an Electing Small Business Trust and to take appropriate action under Paragraph 6.17.

**8.6     Environmental Hazards And Compliance With Environmental Laws**

**8.6.a     Authorization To Inspect Property Prior To Accepting Property Or Consenting To Serve As Trustee**

(i)     Prior to accepting assets as part of any trust, the Trustee thereof may take or cause to be taken the actions set forth in subparagraphs (A) and (B) below at the expense of the trust. Similarly, prior to consenting to serve as a Trustee of any trust, any

- 54 -

81294-00002/1915393.5

Exhibit 6 - Page 55

**EXHIBIT F, PAGE 352**

Replacement Trustee may take or cause to be taken the actions set forth in subparagraphs (A) and (B) below at the expense of the trust.

(A)     To enter and inspect any existing or proposed asset of the trust (or of any corporation, partnership, limited liability company or other business venture in which the trust holds an interest) for the purpose of determining the existence, location, nature and magnitude of any past or present release or threatened release of any Hazardous Substance; and

(B)     To review records of the currently serving Trustee or of a Settlor (or of any corporation, partnership, limited liability company or other business venture in which the trust or a Settlor holds an interest) for the purpose of determining compliance with any federal, state or local Environmental Laws including those records relating to permits, licenses, notices, reporting requirements and governmental monitoring of any Hazardous Substance.

(ii)     The right of the Trustee or Replacement Trustee to enter and inspect assets and records of a corporation, partnership, limited liability company or other business venture under subparagraph (i) above shall be treated as equivalent to the right under state law of a shareholder, partner or member to inspect assets and records under similar circumstances.

(iii)     Acts performed under this Paragraph 8.6.a. shall constitute neither acceptance of the asset in question by the Trustee nor consent to serve as a Trustee by a Replacement Trustee.

(iv)     If, upon any review of the trust's existing or proposed assets under this Paragraph 8.6.a., the Trustee discovers or has reason to believe that an asset of the trust is or may be contaminated with a Hazardous Substance or is otherwise not in compliance with any Environmental Law, the Trustee may refuse to accept the transfer of any asset proposed to be transferred to the Trustee. Similarly, the Replacement Trustee may decline to serve as Trustee solely with respect to such asset while consenting to serve with respect to all other assets of the trust. If there is no person willing to serve as a Trustee with respect to any asset in, or proposed to be transferred to, the trust, the court having jurisdiction over the trust shall appoint a receiver or Special Trustee to hold and manage the rejected asset, pending its final disposition.

- 55 -

Exhibit 6 - Page 56

EXHIBIT F, PAGE 353

### 8.6.b    Trustee's Powers Relating To Environmental Laws

The Settlors intend that the Trustee have the widest possible discretion in identifying and responding to problems associated with the potential or actual environmental liability of the trust or the Trustee, in order to protect the interests of the trust, the Trustee and the beneficiaries of the trust. The Trustee may, on behalf of the trust, take any action considered appropriate to prevent, abate, avoid or otherwise remedy any actual or threatened violation of any Environmental Law or any condition that may give rise to liability under any Environmental Law relating to any asset which is or has been held as part of the trust, including performing investigations and audits and taking any actions required by any Environmental Law. If the trust holds one or more assets, either directly or through any corporation, partnership, limited liability company or other business venture, the nature, condition or operation of which is likely to give rise to liability under, or is an actual or threatened violation of, any Environmental Law, the Independent Trustee may take one or more of the following actions:

(i)    Modify the trust by granting the Trustee such additional powers as are required to protect the trust and its beneficiaries from liability or damage relating to the actual or threatened violation of any Environmental Law;

(ii)    Divide the trust as provided in Paragraph 6.8.;

(iii)    Designate a Special Trustee as provided in Paragraph 7.3. to administer any such assets or business interests which fail to comply with or may give rise to liability under any Environmental Law;

(iv)    Abandon such assets or business interests; or

(v)    With court approval, terminate the trust or partially or totally distribute its assets to its beneficiaries.

### 8.6.c    Indemnification Of Trustee For Environmental Expenses

The Trustee shall be entitled to be indemnified from the trust for any Environmental Expenses, including Environmental Expenses relating to: (i) any real property or business enterprise which is or has at any time been held or operated by the trust; and (ii) any real property or business enterprise which is or has at any time been held or operated by a corporation, partnership, limited liability company or other business venture in which the trust holds or has at any time held an equitable, beneficial or management interest. Notwithstanding anything in this Paragraph 8.6.c. to the contrary, the foregoing right of indemnification shall not

81294-00002/1915393.5

- 56 -

Exhibit 6 - Page 57

apply to any Environmental Expenses which are a result of the Trustee's actions or omissions in bad faith, with gross negligence or with willful misconduct.

    8.6.d    **Indemnification Of Trustee For Environmental Expenses In Excess Of Trust Value**

    If the assets of the trust are insufficient, or there is insufficient liquidity in the trust to satisfy the obligation of indemnification for Environmental Expenses under Paragraph 8.6.c., the Trustee shall notify the beneficiaries of the trust, in writing. Each of the trust beneficiaries shall, within thirty (30) days following the delivery of the notice, indemnify the Trustee for such Environmental Expenses. Any indemnification under this Paragraph 8.6.d. shall be in a form acceptable to the Trustee.

    8.6.e    **Exoneration Of Trustee For Actions Or Omissions Relating To Any Environmental Law**

    The Trustee shall not be liable to any beneficiary or to any third party for any action or omission relating to any Environmental Law or for the payment of any Environmental Expenses unless resulting from bad faith, gross negligence or willful misconduct.

    8.7    **Administration Of Creative Property**

    The Trustee may take the following actions with respect to any Creative Property included in any trust:

    8.7.a    **Exploit Creative Property**

    To exploit any Creative Property, including any Creative Property which is unfinished or unpublished at the time of the death of the Settlor who created or holds the rights to the Creative Property; and to arrange for the writing, publication, promotion, copyrighting and licensing of Creative Property, or of a biography of a Settlor.

    8.7.b    **Proceeds From Creative Property**

    To provide for the processing, management, investigation and collection from any source of any sums due to the trust from Creative Property, or rights therein, specifically including (i) residuals due to the trust, (ii) the share or percentage of net profits from musical compositions, plays, films, television programs, online programs, games or other Creative Property, and (iii) royalties, residuals, licensing fees and other proceeds under contract for the publication, performance or other exploitation of Creative Property; and to employ and reasonably compensate one or more auditors to track and audit the sums due to the trust from Creative Property, or rights therein.

81294-00002/1915393.5

Exhibit 6 - Page 58

##### 8.7.c    Copyright

With respect to copyrights on Creative Property held as a part of the trust; to protect the trust's ownership interest in such copyrights, to maintain exclusivity and unified control over such copyrights and to avoid the fractionalization of any such copyrights that could impair the value of, or income generated by, such copyrights; to register, secure, extend and renew any such copyrights; to take any and all legal action to prevent or redress the infringement of any such copyrights; and to grant licenses and other contractual rights for the publication, performance or other exploitation of Creative Property,

### ARTICLE 9

### PAYMENT OF ESTATE AND GENERATION-SKIPPING TRANSFER TAXES

#### 9.1    Deceased Settlor's Estate Taxes

Unless specifically provided to the contrary in another provision of this document, all Estate Taxes occasioned by the death of the Deceased Settlor (the "Decedent's Taxes") shall be paid by, charged against and recovered from the persons (including trusts) receiving taxable benefits from property includible in the Deceased Settlor's Gross Estate in accordance with the principles of California Probate Code §20110 and related sections, after giving effect to Code §2207A. Notwithstanding the foregoing:

##### 9.1.a    Attributable To Specific Gifts

The specific gift of the Deceased Settlor's Tangible Personal Property under Paragraph 3.2.a, shall not bear any of the Decedent's Taxes. All Decedent's Taxes attributable to such gift shall be charged against and paid from the property passing to the Credit Trust under Paragraph 3.2.b.

##### 9.1.b    Attributable To Partial QTIP Election

If the Deceased Settlor's Executor does not make a QTIP Election for the entire Marital Trust, each person (including a trust) receiving taxable benefits from the Deceased Settlor's Gross Estate shall be responsible for paying only that portion of the Decedent's Taxes which such person would have been responsible for paying if the Deceased Settlor's Executor had made a QTIP Election for the entire Marital Trust, and any remaining Decedent's Taxes shall be paid from the Non-QTIP Marital Trust.

##### 9.1.c    Attributable To Divided Trust

If any trust to which a portion of the Decedent's Taxes are apportioned has been divided into an Exempt Trust and a Non-Exempt Trust, all Decedent's Taxes attributable to such trust shall be paid out of and charged against the Non-Exempt Trust

- 58 -

81294-00002/1915393.5

Exhibit 6 - Page 59

# EXHIBIT 1

**EXHIBIT F, PAGE 357**

remediation, removal, transportation, use or existence of a waste, substance or material hazardous, toxic, radioactive or dangerous to the public health, safety or the environment.

10.24    Incapacity

"Incapacity", and derivations thereof mean incapable of managing an individual's affairs under the criteria set forth in California Probate Code §810 et seq. An individual shall be deemed to be incapacitated if any of the following conditions exist: (a) the individual's regular attending physician (provided such physician is not related by blood or marriage to any Trustee or beneficiary) examines the individual and certifies in writing that the individual is incapacitated, (b) two licensed physicians who, as a regular part of their practice are called upon to determine the capacity of others, and neither of whom is related by blood or marriage to any Trustee or beneficiary, examine the individual and certify in writing that the individual is incapacitated or (c) an order of the court having jurisdiction over the trust as to which the individual is serving as a Trustee or as to which the individual is a beneficiary, as the case may be, finds that the individual is incapacitated. The expenses of any examination or court proceeding to determine if an individual is incapacitated shall be paid (i) if the individual is a Settlor, from all trusts established under this document revocable by him or her, and (ii) if the individual is a Current Beneficiary other than a Settlor, from all trusts established under this document with respect to which he or she is a Current Beneficiary and (iii) if the individual is a Trustee but not a Current Beneficiary under this document, from all trusts administered under this document as to which the individual is serving as a Trustee, in each case in proportion to the relative values of the trusts from which payment is to be made.

10.25    Including

"Including" means "including, but not limited to."

10.26    Independent Person

"Independent Person" means a person who is neither (i) a beneficiary of the trust, (ii) a person who has transferred or joined in the transfer of property to the trust, nor (iii) a Related or Subordinate Party to any person described in the preceding clauses (i) or (ii).

10.27    Independent Trustee.

"Independent Trustee" means all Independent Persons serving as Trustee.

10.28    Issue

"Issue" of any individual means the individual's lineal descendants of all generations (i.e., the individual's children, grandchildren, great-grandchildren and so on).

- 65 -

Exhibit 7 - Page 70

EXHIBIT F, PAGE 358

EXHIBIT 8

12.8     Counterparts

This document may be executed in one or more counterparts, each of which shall be deemed an original part and all of which, when taken together, shall constitute a single instrument.

Executed on _12-18-13_

_[signature]_     _[signature]_
DONALD T. STERLING, SETTLOR     ROCHELLE H. STERLING, SETTLOR

### ACCEPTANCE BY TRUSTEE

The undersigned hereby accept the office of Trustee and agree to serve in accordance with the terms and conditions of service as set forth in this document, specifically including those terms and conditions of service imposed pursuant to Paragraph 7.5.c.

Executed on _1-5-18-13_

_[signature]_     _[signature]_
DONALD T. STERLING, TRUSTEE     ROCHELLE H. STERLING, TRUSTEE

-72-

81294-00002/1915393.5

Exhibit 8 - Page 71

EXHIBIT F, PAGE 360

STATE OF CALIFORNIA            )
                              )
COUNTY OF Los Angeles         )

On December 18, 2013 , before me, A. Shing , Notary Public,
(here insert name and title of officer)
personally appeared DONALD T. STERLING, who proved to me on the basis of satisfactory
evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies),
and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

I certify UNDER PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____        (Seal)

A. SHING
Commission # 1945346
Notary Public - California
Los Angeles County
My Comm. Expires Jul 31, 2015

STATE OF CALIFORNIA            )
                              )
COUNTY OF Los Angeles         )

On December 18, 2013 , before me, A. Shing , Notary Public,
(here insert name and title of officer)
personally appeared ROCHELLE H. STERLING, who proved to me on the basis of
satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or
the entity upon behalf of which the person(s) acted, executed the instrument.

I certify UNDER PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____        (Seal)

A. SHING
Commission # 1945346
Notary Public - California
Los Angeles County
My Comm. Expires Jul 31, 2015

81294-00002/1915393.5

- 73 -

Exhibit 8 - Page 72

EXHIBIT F, PAGE 361

# EXHIBIT 9

EXHIBIT F, PAGE 362

Curriculum Vitae
Dr. Meril Sue Platzer

Date of Birth August 24, 1951
Place of Birth New York City, New York
Marital Status Divorced
Three children 2 boys and 1 girl 18,22 and 27years old

Education
1966-1969 Grant High School Van Nuys, California Lifetime Member of the California Scholarship Federation
1969-1971 Undergraduate College University of Miami Coral Gables, Florida
1971-1973 University of California Los Angeles, California Bachelor of Arts Cum Laude

Graduate Training
1973-1974 University of California Los Angeles Master of Arts Geography (Biogeography) Specialty in Animal, Political and Plant Geography
1975-1978 Universidad Autónoma de Guadalajara Guadalajara México School of Medicine
1978-1981 Wayne State University Detroit Michigan School of Medicine
Doctor of Medicine June 1981

Post Graduate Training
1981-1982 Straight Medical Internship University of Southern California Los Angeles County Hospital Los Angeles California
1982-1985 Neurology Resident University of Southern California Los Angeles California Chairman of the Department Dr. Leslie Weiner M.D,

Practice July 1985 to the present Solo Practice in the Field of Neurology
6325 Topanga Canyon Blvd Suite 417 Woodland Hills, California

Diplomate of the American Academy of Neurology 1998 to the present recertified 2008
Professional License California Go47770 1981 to the present

Hospital Privileges
Active West Hills Hospital West Hills, California
Courtesy Consultant
Providence Hospital Tarzana California
Northridge Hospital Northridge California
Motion Picture Hospital Woodland Hills, California

Memberships
American Academy of Neurology Active Member Board Certified
International Scientific Advisory Association ISTAAT 2009 to present

EXHIBIT F, PAGE 363

Curriculum Vitae Dr. Meril S. Platzer

Specialty in Practice

Alzheimer's Dementia, Headaches, and Seizure Control and use of Vagal Nerve
Stimulators.

Trials
Cognex Trial Study of 10,000 patients open label for patients who suffered from
Dementia 1992
Topamax trials for seizures TRIAD and CoTrait studies add on therapy for seizure
control 1998-1999
Vagal Nerve Stimulators for Uncontrollable Seizures 1999 Baltimore, Maryland and San
Francisco California
National Advisory Speakers Forum and Advisory panel for Reminyl a new Dementia
medication Orlando, Florida November 30, 2000-December 3, 2000.

Programs

Migraine Prevention and Management Consultants Conference
Hyatt Grand Champions Indian Wells, California October 9-10, 2003
Keppra Speaker Training Meeting New Orleans, Louisiana November 12-13, 2004
Access Unlimited Guest of Radio Show with patient regarding Vagal Nerve Stimulator
and complete treatment of her Seizures April 2004 KPFB radio station
Inside Edition TV show April 2001 regarding Jerry Mathers (actor) and his most recent
illness (treating doctor)
17th Annual Public Policy Forum Grand Hyatt Washington D.C. April 30, 2005-May 3,
2005. Advocate for the State of California sponsored by the American Academy of
Neurology Policy Forum for Alzheimer's Dementia
Also Advocate and attendee 2006 and 2007
Neurology on the Hill participant 3rd Annual May 23, 2005-May 24, 2005 advocate for
the State of California sponsored by the American Academy of Neurology.
Participant as an Advocate for the Neurology on the Hill program 2006, 2007, 2008 and
2010.
Fast Mag trial May 2005 Early Stroke treatment
Palatucci Alumnus State Advocate (California) American Academy of Neurology 2008
Focus point Alzheimer's early detection prevention and end of life issues. Fort
Lauderdale, Florida
Advisor Palatucci Advocacy for the American Academy of Neurology January 7-12,
2010 Fort Lauderdale, Florida.
Guest Speaker at Silverado Assisted Living Facility National Memory Day November 18,
2008. Early Detection and Treatment of Alzheimer's Dementia.

Presenter of Art Poster at the International Conference Alzheimers Dementia Paris
France July 2011 Art Therapy Sense of Self Worth and the Alzheimer's Patient

Curriculum Vitae Dr. Meril Platzer

Keppra Speaker Training Program New Orleans, Louisiana November 13, 2004 (UCB)
Namenda Speaker Training Meeting Las Vegas Nevada December 5-7th, 2003 (Forest Labs)
Namenda Changing the Treatment Paradigm in Alzheimer's disease Speaker February 26, 2004 Westlake Village, California
Memantine "Another Frontier in the Treatment of Dementia" Speaker Silverado Senior Living Calabasas California February 18, 2004.
Carbatrol SPEQT Study Phase IV Investigator's Meeting January 31, 2003-February 2, 2003 Dallas Texas.
Host of Exercise Your Memory Programs Blue Shield of California Woodland Hills, California 12/13/2002 12/11/02 and February 2003 and two additional programs February and March 2002 Radio Show with phone in questions by audience.

Neurology Consultant's Conference San Francisco, California Topamax OrthoMcNeil November 8-9, 2001 Clinical and Scientific Liaisons treatment of Seizures
Migraine Consultants Meeting Merck Maxalt April 14-16, 2000 San Francisco California
Epilepsy Consultants Meeting April 1, 2000 Topamax Fort Lauderdale Florida
Namenda Advisory Board Glendale California April 3, 2004
Exelon National Speakers Bureau Meeting Novartis October 4-5, 2002 Boca Raton, Florida.
American Academy of Neurology Regional Consultant Forum Attention Deficit Disorder Stratera Costa Mesa California December 7, 2002.
Eisai Pfizer Inc 2002 Alzheimer's Disease Advisory Council West Regional Meeting Santa Barbara California August 16-18, 2002.
Woman's Issues in Epilepsy Speaker Woodland Hills California Lamictal GlaxoSmithKline Kline
Speaker on Dementia Nurse and Physician's Assistants and Practioners CME credits Quarterly Meeting January 2004 sponsored by Novartis
Host and Speaker Memory Clinic Westlake Village, California City Hall August 2002 Sponsored by Pfizer and attended by City Councilperson Susan McSweeney
Speaker on Early Detection treatment and future of Alzheimer's disease treatment and quality of life issues Westlake Hyatt Hotel May 2009.
Dubai City Hospital Volunteered in the Evaluation of patient with Multiple Sclerosis March 2009
Attendee at the International Conference Alzheimer's Dementia Vienna Austria 2009 And ICAD attendee Madrid Spain 2005 and Stockholm Sweden 2001.

EXHIBIT _10_

UCLA Physician James Spar, MD

Page 1 of 1

UCLA Campus (http://www.ucla.edu)  |  UCLA Home (http://www.ucla/health.org)  |  School of Medicine (http://dgsom.healthsciences.ucla.edu/pages/)

Translate: Select Language ▼

Subn

**UCLA Health**  |  It begins with U

# James Spar, MD

**James Spar, MD**

PHOTO
NOT
AVAILABLE

**Specialty**
Geriatric Psychiatry, Psychiatry

**Gender**
Male

**Language Spoken**
English

**Hospital Affiliation**
Ronald Reagan UCLA Medical Center
Stewart and Lynda Resnick Neuropsychiatric Hospital at UCLA

**State License Number**
G34995

**Contact**
(310) 825-0038

**MEDICAL BOARD CERTIFICATION**
Geriatric Psychiatry, American Board of Psychiatry and Neurology, 1991, 2011
Psychiatry, American Board of Psychiatry and Neurology, 1978

**EDUCATION**

**Fellowship**
Geriatric Psychiatry, UCLA Neuropsychiatric Hospital, 1977 - 1978

**Residency**
Psychiatry, UCLA Neuropsychiatric Hospital, 1974 - 1977

**Internship**
Internal Medicine, Children's Hospital of San Francisco, 1972 - 1973

**Medical Degree**
MD, UCLA School of Medicine, 1972

**AFFILIATION**

**Department Affiliation**
Director, Geriatric Psychiatric Inpatient Unit
Physician, Psychiatry and Biobehavioral Sciences, Geriatric Psychiatry

Referring a Patient to UCLA
Our staff will assist you in selecting the appropriate UCLA clinical department for your patient.

Find out how to refer a patient (http://www.uclahealth.org/body.cfm?action=detail&ref=8127&oTopID=0&id=479&action=update) to update your profile.

Dr. James Spar, click here (http://www.uclahealth.org/body.cfm?action=detail&ref=8127&oTopID=0&id=479&action=update) to update your profile.

Exhibit 10 - Page 76
6/10/2014

**EXHIBIT F, PAGE 367**

James Spar M.D. | David Geffen School of Medicine at UCLA      Page 1 of 2



**David Geffen** School of Medicine | Shaping the Future      Search

Education, research | patient care | diversity affairs | community | news/media

Office of the Dean | Department | UCLA CTSI | Strategic Planning Initiative | Faculty Search | Biomed Library | Room Reservation | Construction

## James Spar, M.D.



Director, Geriatric Assessment Program
Geriatric Day Treatment
Geriatric Psychiatric Inpatient Unit

Professor, Psychiatry and Biobehavioral Sciences

**Awards and Honors:**

Children's Hospital of San Francisco
UCLA Neuropsychiatric Hospital
UCLA Neuropsychiatric Hospital

Login to edit your profile page

**Contact Information:**

**Work Phone Number:**
(310) 825-0038
(310) 825-0038

**Mailing Address:**
Office
37-378 Semel
Los Angeles,
UNITED STATES

**Work Email Address:**
jspar@mednet.ucla.edu

**Website:**

**Home Page:**
Web-Profile

**Publications:**

Chen S Y, Altshuler L L, Spar J E  Bipolar disorder in late life: a review Journal of geriatric psychiatry and neurology, 1998; 11(1): 29-35.

Spar J E, Garb A S  Assessing competency to make a will The American journal of psychiatry, 1992; 149(2): 169-74.

Smell G W, Matsuyama S S, Komanduri R, Spar J E, Fairbanks L  HLA antigens in decreased, demented, and nondemented elderly Journal of geriatric psychiatry and neurology, 1991; 2(2): 70-5.

Wilkins J N, Spar J E, Carlson H E  Desipramine increases circulating growth hormone in elderly depressed patients: a pilot study Psychoneuroendocrinology, 1989; 14(3): 195-202.

Spar J E  Plasma trazodone concentrations in elderly depressed inpatients: cardiac effects and short-term efficacy Journal of clinical psychopharmacology, 1987; 7(6): 406-9.

La Rue A, Spar J, Hill C D  Cognitive impairment in late-life depression: clinical correlates and treatment implications Journal of affective disorders, 1987; 11(3): 179-84.

Leuchter A F, Spar J E, Walter D O, Weiner H  Electroencephalographic spectra and coherence in the diagnosis of Alzheimer's-type and multi-infarct dementia. A pilot study Archives of general psychiatry, 1987; 44(11): 993-8.

La Rue A, D'Elia L F, Clark E O, Spar J E, Jarvik L F  Clinical tests of memory in dementia, depression, and healthy aging Psychology and aging, 1986; 1(1): 69-77.

Leuchter A F, Spar J E  The late-onset psychoses. Clinical and diagnostic features The Journal of nervous and mental disease, 1985; 173(8): 488-94.

Spar J E, La Rue A  Major depression in the elderly: DSM-III criteria and the dexamethasone suppression test as predictors of treatment response The American journal of psychiatry, 1983; 140(7): 844-7.

Irwin M, Spar J E  Reversible cardiac conduction abnormality associated with trazodone administration The American journal of psychiatry, 1983; 140(7): 945-6.

Beck J C, Benson D F, Scheibel A B, Spar J E, Rubenstein L Z  Dementia in the elderly: the silent epidemic Annals of internal medicine, 1982; 97(2): 231-41.

Spar J E  Dementia in the aged The Psychiatric clinics of North America, 1982; 5(1): 67-86.

Spar J E, Gerner R  Does the dexamethasone suppression test distinguish dementia from depression? The American journal of psychiatry, 1982; 139(2): 238-40.

Spar J E, Ford C V, Liston E H  Hospital treatment of elderly neuropsychiatric patients. II. Statistical profile of the first 122 patients in a new teaching ward Journal of the American Geriatrics Society, 1980; 28(12): 539-43.

Ford C V, Spar J E, Davis B, Liston E H  Hospital treatment of elderly neuropsychiatric patients. I. Initial clinical and administrative experience with a new teaching ward Journal of the American Geriatrics Society, 1980; 28(10): 446-50.

Spar J E, Ford C V, Liston E H  Bipolar affective disorder in aged patients The Journal of clinical psychiatry, 1979; 40 (12): 504-7.

van Putten T, Spar J E  The board-and-care home: does it deserve a bad press? Hospital & community psychiatry, 1979; 30(7): 461-4.

Exhibit 10 - Page 77
6/10/2014

**EXHIBIT F, PAGE 368**

James Spar M.D. } David Geffen School of Medicine at UCLA



EXHIBIT

**PHYSICIAN'S CERTIFICATION OF TRUSTEE'S INCAPACITY**

1.     I, Dr. Meril Sue Platzer, am a physician (Diplomate of the American Board of Neurology and Psychiatry) licensed by the State of California. My address is 6325 Topanga Canyon Blvd Suite 101 Woodland Hills California 91367.

2.     I am not related by blood or marriage to any Trustee or to any Beneficiary of The Sterling Family Trust.

3.     I last examined Donald T. Sterling on May 19, 2014 and, based upon my recent examination, I am rendering the following certification.

4.     Based upon my evaluation performed on May 19, 2014, it is my opinion that Mr. Donald T. Sterling is suffering from cognitive impairment secondary to primary dementia Alzheimer's disease. The duration of the memory issues is at least 3 years. The MiniMental Status Exam using the Folstein technique he scored 23 out of possible 30 points. He was unable to spell the world World backwards, perform serial 7's past 93, unaware of the season, recalled 2 objects after three minutes and initially had difficulty drawing a clock. The score is below normal for his age and advanced education. The PET scan of the brain performed May 16, 2014 at Mark Taper Foundation Imaging Center was positive for moderate reductions in the anterior mesial regions of the temporal lobes and bilateral parietal regions right greater than left. The constellation of findings is consistent with a Neurodementia of the Alzheimer's type.

5.     It is my opinion that Mr. Donald T. Sterling is unable to reasonably carry out the duties as Trustee of The Sterling Family Trust as a result of, among other factors, an impairment of his level of attention, information processing, short term memory impairment and ability to modulate mood, emotional lability, and is at risk of making potentially serious errors of judgment.

6.     If additional information is needed, I can be reached at the address above.

Dated: May 29, 2014

_____
(Signature)

_____Dr. Meril Sue Platzer

(Print name)

812?4-00002/2175787.1

Exhibit 11 - Page 79

**EXHIBIT F, PAGE 371**

EXHIBIT 12

UNIVERSITY OF CALIFORNIA, LOS ANGELES



UCLA

BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO          SANTA BARBARA • SANTA CRUZ

May 27, 2014

JAMES E. SPAR, M.D.
PROFESSOR, DEPARTMENT OF PSYCHIATRY
& BIOBEHAVIORAL SCIENCES
DIVISION OF GERIATRIC PSYCHIATRY
DAVID GEFFEN SCHOOL OF MEDICINE AT UCLA
760 WESTWOOD PLAZA
LOS ANGELES, CALIFORNIA 90024-1759

Pierce O'Donnell
Greenberg Glusker Fields Claman & Machtinger LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, CA 90067

Dear Mr. O'Donnell:

At your request I evaluated Mr. Donald Sterling, an 80-year old businessman, in his
home at 808 North Beverly Drive, on May 22, 2014. When I arrived at his house, Mr.
Sterling was meeting with several attorneys in another part of the house, and did not
leave the meeting until his wife, Shelly Sterling, arrived and indicated that I was
there. At that point he came into the room to meet me, followed by Shelly. He asked
her to sit on a chair to my right, while he sat in a chair to my left, and I was sitting in
between them on the couch. I asked him if he knew why I was there, and he said, "I
think so". I explained that you had contacted me and indicated that he had recently
undergone a positron emission tomographic (PET) scan of his brain at Cedars-Sinai
Medical Center that was read as "consistent with a neuro dementia of the Alzheimer's
type". I informed him that I had told you that a scan of this type alone is not
adequate to establish the diagnosis of Alzheimer's disease and could not determine an
individual's actual mental capacity, and that an in-person evaluation would be
necessary to rule out or confirm the presence of cognitive impairment consistent with
Alzheimer's disease. I explained to Mr. Sterling that I would be conducting such an
evaluation; Shelly Sterling added that I was there for "a second opinion", and Mr.
Sterling agreed to cooperate with the evaluation.

During the evaluation Mrs. Sterling remained in the room, added some historical
information when I asked, and on two occasions, when Mr. Sterling became impatient
with the evaluation and wanted to return to "a room full of six attorneys", encouraged
Mr. Sterling to complete the evaluation. She did not otherwise interfere with the
evaluation in any way.

I elicited his history of memory and other cognitive impairment, then administered a
general mental status examination, a Folstein Mini-Mental State Examination (MMSE),
and several additional tests of remote memory, naming, language comprehension,
general fund of knowledge, and frontal executive functions, including abstract
thinking, word list generation, clock drawing, and the Trails B test.

Exhibit 12 - Page 80

EXHIBIT F, PAGE 373

UNIVERSITY OF CALIFORNIA, LOS ANGELES



UCLA

BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO          SANTA BARBARA • SANTA CRUZ

Mr. Sterling admitted that he has noticed problems with his memory over the past two years. He said, "I can't remember names and streets". He also acknowledged word finding difficulties, and when I asked if he ever got lost, he said no, but stated, "Sometimes I get confused when I get off an elevator". Mrs. Sterling indicated that she has noticed the same problems, but put the onset at about three years ago.

On general mental status examination Mr. Sterling was well dressed and groomed, alert and in no distress, and generally quite cooperative with the examination. However, on one occasion he asked if we were done and started to leave, but I indicated that there was about 5 more minutes of testing, and he consented to stay and continue the testing. Towards the end, when I administered the Trails B test, he was unable to perform the task and became angry, stating, "I can't do it, I don't want to do it, and I have to get back to my meeting". Mrs. Sterling and I were able to convince him to try again, and he looked at the test page, stated, "I can't do it", threw the pen down and left the room. Other than this outburst at the end, his mood was generally euthymic and his affect was appropriate in direction and degree. There were no abnormalities of the form, flow or content of thought, and his psychomotor behavior was entirely within normal limits. He scored 24/29 (I did not administer the "What floor are we on" item) on the MMSE, losing one point each on orientation to date and day, two on attention and concentration (I administered serial sevens – he would not attempt to spell "world" backwards), and two on recall. This score is below normal for his age and advanced education. His performance on the other tests was mixed: his naming was intact, but his recall of remote, impersonal events and information was mildly to moderately impaired. His frontal executive function as reflected by clock drawing was within normal limits; as reflected by similarities and word list generation was mildly impaired; and as reflected by the Trails B test was more significantly impaired. It should be noted that on some of the test items he tended to "give up" easily, and required quite a bit of prompting to complete the task. However, I believe the test results are valid despite a possibly less-than-optimal effort on his part.

Based upon this evaluation I believe that Mr. Sterling is suffering from mild global cognitive impairment, with relatively greater impairment in memory and frontal executive functions. The overall picture is consistent with early Alzheimer's disease, but could reflect other forms of brain disease. Because of his cognitive impairment, Mr. Sterling is at risk of making potentially serious errors of judgment, impulse control, and recall in the management of his finances and his trust. Accordingly, in my opinion he is substantially unable to manage his finances and resist fraud and undue influence, and is no longer competent to act as trustee of his trust.

Sincerely,

J. Edward Spar, M.D.
Professor of Psychiatry
Division of Geriatric Psychiatry

Exhibit 12 - Page 81

EXHIBIT F, PAGE 374

EXHIBIT _13_

home | forensic | geriatric | academic | printable CV | contact

# Stephen L. Read, MD

Psychiatry
Geriatric & Forensic Psychiatry



PATIENT OFFICE
(All Appointments)
2566 Overland Avenue
Suite 500B
Los Angeles, California 90064

BUSINESS OFFICE
(All Correspondence)
1621 West 25th Street
PMB #255
San Pedro, California
90732

Phone (310) 521-9747
FAX (310) 521-8112
E-mail: ReadSMD@aol.com;
www.geriatricpsychiatrist.com

# CURRICULUM VITAE

## PROFESSIONAL EXPERIENCE:

### Present Position:

☐ Private Practice, Psychiatry, Geriatric and Forensic Psychiatry; from March 1985.

Dr. Read has maintained a private practice for more than thirty years, in parallel with his academic, research, and institutional commitments. From his practice, he has a direct experience in the full spectrum of care settings of elders—home and community, assisted living, skilled nursing, and inpatient psychiatric care. Currently Dr. Read limits his practice to outpatient settings, with an especial emphasis on forensic geriatric matters. He has been retained in more than 1100 cases and has qualified to testify in federal and multiple state courts on a full range of issues related to his professional expertise in geriatric psychiatry.

☐ Health Sciences Clinical Professor (currently Level 3), Department of

Psychiatry and Biobehavioral Sciences, David Geffen School of Medicine at
UCLA, July, 2006-present.

Dr. Read actively participates in the productive Fellowship in Geriatric
Psychiatry based at UCLA and West Los Angeles Veterans Affairs Medical
Center and is proud to have been recognized by the fellows themselves for
these efforts. Dr. Read's forensic focus has involved the initiation and the
development of a curriculum in Forensic Geriatric Psychiatry for the
Fellowship.

**Previous Positions Held:**

☐ Staff Psychiatrist, Greater Los Angeles Veterans Affairs Health Care System:
From August, 1995 to April, 2014 (half-time):

As attending psychiatrist in the outpatient clinics at WLAVAMC, Dr.
Read contributed to the core clinical teaching program of the UCLA/VA
fellowship in Geriatric Psychiatry. In addition, Dr. Read consulted at
VA in clinical matters involving older patients, particularly regarding
issues of competence and capacity and he chaired a Task Force that
developed VA policy for the management of unbefriended patients who
lack decision-making capacity.

☐ Staff Psychiatrist, Greater Los Angeles Veterans Affairs Health Care System
(5/8 time):
o  Community-Based Outpatient Clinic (Gardena and Los Angeles
Clinics) and Los Angeles Air Force Base. May, 1997 to August,
2004.
o  Associate Director, UPBEAT Program, VAMC, West Los Angeles
June 1994 to May 1997.
o  Director, Inpatient Neurobehavior Unit and Staff Geropsychiatrist,
Nursing Home Care Unit, July, 1984--October, 1987
☐ Associate Clinical Professor, Department of Psychiatry and Biobehavioral
Sciences, David Geffen School of Medicine at UCLA, October, 1995-
-2006:
o  Attending Psychiatrist, Mild Cognitive Impairment Clinic, July, 2000
—June 2001
o  Attending Psychiatrist, Mood Disorders Clinic, 1998-2004
☐ Assistant Clinical Professor, Department of Psychiatry and Biobehavioral
Sciences, UCLA School of Medicine, January, 1988—June, 2006.
☐ Geropsychiatric Consultant, John Douglas French Center for Alzheimer's
Disease, June, 1994—January, 1995
☐ Medical Director, John Douglas French Center for Alzheimer's Disease
(3951 Katella Ave., Los Alamitos, CA  90720), October, 1987--June,
1994
☐ Psychiatric Consultant, Mission Lodge (Skilled Nursing Center for
Alzheimer's Disease), San Gabriel, CA, July, 1995—January, 1999

☐  Assistant Professor in Residence, Department of Psychiatry

Biobehavioral Sciences, University of California, Los Angeles, November, 1984--January, 1988

□ Consulting Psychiatrist, Geriatric Day Hospital, Century City Hospital, Los Angeles, CA, January, 1986--November, 1987

## EDUCATION and TRAINING

September, 1966-December, 1968: Rice University, Houston, Texas

January, 1969-December, 1971: Bachelor of Science, College of Agriculture, University of California, Berkeley;   Major: Conservation of Natural Resources

1972—Research Assistant, International Pacific Halibut Commission, Seattle, Washington and

Vancouver, British Columbia

March, 1973-June, 1974: University of Washington, Seattle

Postgraduate studies in biochemistry and genetics

September, 1974-June, 1978: Medical Doctor

Faculty of Medicine, University of British Columbia, Vancouver, British Columbia

July, 1978-June, 1979: PGY I, Internal Medicine

Presbyterian Medical Center, Denver, Colorado

July 1979--June, 1981: PGY2-3, Dept of Psychiatry,     Harbor-UCLA Medical Center, Torrance, CA

July, 1981-June, 1982: Chief Resident, (PGY4); Dept of Psychiatry, Harbor-UCLA Medical Center,       Torrance, CA

July, 1982--June, 1984: Fellow, PGY5-6; Psychogeriatrics & Neurobehavior, -
Department of Psychiatry & Biobehavioral Sciences
UCLA School of Medicine/VAMC West Los Angeles

**LICENSURE:**  Physician & Surgeon, California, September, 1979, #40920

**BOARD CERTIFICATION:**  by American Board of Psychiatry and Neurology:

Competence in Psychiatry, April, 1987
Added Qualifications in Geriatric Psychiatry, May, 1991, re-certified 2001 and 2011

Added Qualifications in Forensic Psychiatry, June, 1999, re-certified 2009

## PROFESSIONAL ACTIVITIES:

**Community Service:**

o  Scientific Advisory Board, John Douglas French Foundation for Alzheimer's Research, 1987-present

o  External Advisory Board, Alzheimer's Disease Center, University of Southern California/University of California, Irvine, 1994-1999

o  Scientific Advisory Board, Alzheimer's Association, Orange County, January, 1991-July, 1995

o  LPS Task Force, Southern California Psychiatric Society, 1996-1997 and June,

Exhibit 13 - Page 84

EXHIBIT F, PAGE 378

2008 to present.

- o   Elder Financial Abuse. Presentation to the California State Senate Sub-Committee on Aging. Robert Kennedy Medical Center, Hawthorne, CA. November 3, 1999
- o   Legal Aspects of Elder Abuse and Exploitation. Presentation to a Workgroup of the California State Senate Subcommittee on Aging & LTC (Chair: John Vasconcellos),
   Sacramento, CA, November 19, 2003
- o   Medical Scientific Advisory Board, Alzheimer's Association, California Southland Chapter, January 1, 2008—December, 2013.
- o   Multiple presentations to Bar Association groups on issues of elder capacity, elder financial abuse, testamentary capacity, financial elder abuse.

## Professional Organizations and Scholarly Societies:

- o   American Academy for Psychiatry and the Law
     ▪ Member, Committee on Geriatric Psychiatry and the Law
- o   American Association of Geriatric Psychiatry
- o   American Geriatrics Society
- o   American Medical Association, and California and Los Angeles County
- o   American and California Psychiatric Associations, and Southern California Psychiatric Society.
- o   American Association for the Advancement of Science
- o   Physicians for Social Responsibility

## Editorial Services:

American Journal of Psychiatry
American Journal of Geriatric Psychiatry
International Journal of Geriatric Psychiatry
Journal of the American Geriatrics Society (Editorial Board, 1993-1995)

## Consulting Activities:

- o   Consultant to the California State Bar concerning revision of probate code, June, 1995--November, 1995
- o   Community Advisory Board, LivHome, a home care agency of Southern California, January 2001—present
- o   Attorney General of Pennsylvania in re: American with Disabilities Act (ADA), in Pennsylvania Protection and Advocacy vs. Commonwealth of Pennsylvania, 2003-2006.
- o   Attorney General of California in re: Laguna Honda (San Francisco City/County Long-Term Care Facility), 2008-9.
- o   Motion Picture Television Fund—Wasserman Campus, 2012

## HONORS AND SPECIAL AWARDS:

- o Appeared on CBS "Good Morning America" re: the needs for specialized long-term care for patients with Alzheimer's Disease, 1988.
- o Named in Best Doctors in America: Pacific Region, 1996-1997 by Woodward/White Inc., Aiken, South Carolina and cited in "Los Angeles Magazine," 1996
- o Quoted in magazine re: evaluation and imaging in elders with cognitive impairment, Time, September, 2001
- o Named as "Super Doctor" in Forensic Psychiatry, 2011.
- o Distinguished Fellow, American Psychiatric Association, 2011

## RESEARCH GRANTS AND FELLOWSHIPS RECEIVED:

January, 1986: Veterans Administration Research Advisory Group
    Low Choline Flux: A Trait for Dementia of the Alzheimer Type?--Principal Investigator
July, 1985: French Foundation for Alzheimer Research
    Intraventricular Bethanechol for Dementia of the Alzheimer Type--Principal Investigator
1988-1993: Principal Investigator for therapeutic drug trials for memory disturbance in Alzheimer's Disease

## LECTURES AND PRESENTATIONS:

Forensic Practice in Geriatric Psychiatry, Grand Rounds, Department of Psychiatry, University of New Mexico, February 11, 2014

"Retiring?" Is that *Really* the Goal?
    NexGen, Azusa-Pacific University, December 3, 2013

Dad, Can I Have the Car Keys?—The Onset of Incapacity; Ethical Pitfalls for Counsel and the
    Options. 39th Annual Trust and Estate Conference, USC Gould School of Law November 22, 2013

Impaired Medical Decision-Making in Older Patients: A Symposium
    American Academic of Psychiatry and the Law
    San Diego, CA, October 27, 2013

Physicians and Decision-Making Capacity
    Tuum Est: Leading Edge Medicine
    University of British Columbia, Vancouver, BC, October 3, 2013

Curriculum in Geriatric Forensic Psychiatry: The UCLA Experience
    American Association for Geriatric Psychiatry, Training Directors Conference
    March 14, 2013

Who Can Speak for the Unbefriended, Incapacitated Medical Patient?
    Southern California Bioethics Council, January 17, 2013

Exhibit 13 - Page 86

EXHIBIT F, PAGE 380

The Case of the Dementing Millionaire.
     American Academy of Psychiatry and the Law, Montreal, Canada, October, 26,
2012

Capacity and Mental-Illness Issues
     Hoarding Forum 2012, County of Los Angeles-Deparement of Mental Health Older
Adult System of Care, Los Angeles, June 26, 2012

Four Year Sustained Response to Actos in Early Alzheimer's Dementia: A Case Report
     American Academic for Geriatric Psychiatry (Poster Presentation)
     Washington, DC, March 17, 2012

AMA Discharge for the Incompetent, Unbefriended Patient? For Symposium
     American Academy of Psychiatry & the Law, Boston, MA, October 28, 2011

Forensic Training in Geriatric Psychiatry Fellowship
     American Association for Geriatric Psychiatry, San Antonio, TX, March 18, 2011

Life Issues in Later Years
     Grand Rounds, Department of Psychiatry, Harbor-UCLA Medical Center, Sept.
14, 2010

When Things Fall Apart: Bitter Conflict in End-of-Life Care
     American Association for Geriatric Psychiatry, Savannah, GA, March 8, 2010

Probate Conservatorship for the Seriously Mentally Ill
     Roundtable on Involuntary Treatment, LPS Task Force, Orange, CA, June 3, 2009

Dementia and Capacity
     Symposium on Incapacity (Keynote Speaker)
     Boise, Idaho, March 20, 2009

Dementia and Capacity
     Elder Law Committee of American College of Trust
and Estate Counsel (ACTEC)
     Palm Springs, CA, March 6, 2009
Aspects of Dementia and Elder Financial Abuse; Continuing Education of the Bar
     Los Angeles, CA  July 24, 2008
     San Diego, CA  August 1, 2008
     Irvine, CA  August 7, 2008

Wills and Legacy: Don Quixote and Modern Times
     Creativity & Madness. Barcelona, Spain, April 10, 2008

Hoarding Behavior in the Elderly: Diagnostic and Capacity Issues.
     Grand Rounds, Department of Psychiatry, GLAVAHCS. Los Angeles, January 18,
2007

Exhibit 13 - Page 87

EXHIBIT F, PAGE 381

Capacity In the Elderly: Financial and Contracting. For Real Estate Fraud in the Elderly.
Sepulveda VA GRECC Conference. San Pedro, CA, October 26, 2006

Hoarding Behavior in the Elderly (poster). UCLA Conference on Aging, June 20, 2006

Capacity and Influence: Gero-Psychiatry Update. South Bay Bar Association, Probate Section.
Torrance, CA; November 16, 2005

Capacity and Influence: Gero-Psychiatric Update. Santa Monica Bar Association,
Probate Section. Santa Monica, CA  November 10, 2005

Assessment of Capacity. For Geriatric Medicine Symposium, SCAN Health Care Plan;
Palm Springs, CA; September 10, 2005.

Behaviors Associated with Excess Cholinergic Activity in Humans with Dementia (poster)
Conference on Neural Control of Behavior, UCLA, February 5-7, 2004

Vulnerability to Undue Influence in NPH (Normal Pressure Hydrocephalus) (poster)
American Academy of Psychiatry and the Law, San Antonio, TX,  October 18, 2003

Capacity and Undue Influence: Review of DPCDA-related concepts and future directions
Southern California Association of Psychiatry and the Law
Rosemead, CA, June 14, 2003

Undue Influence and Executive Functions, Clinical Aspects
Southern California Council of Elder Law Attorneys, Encino, CA, June 11, 2003

Geriatric Psychiatry: A Critical Element to Sustain Elders in the "Least Restrictive Setting"
Professional Fiduciary Association of California, Irvine, CA  May 2, 2003

Testamentary Capacity; An Epidemic Issue
Southern California Council of Elder Law Attorneys, Encino, CA, February 12, 2003

Undue Influence, Frontal Lobes, and Executive Function
American Academy of Psychiatry and the Law, Newport Beach, CA, October 25, 2002,

Psychiatry and Long-Term Care. UCLA Seventh Annual Review of Psychiatry. October 12, 2002

Assessment of Capacity, Continuing Education of the Bar (CEB)
Beverly Hills, CA, March 5&6, 2002 and Los Angeles, March 15, 2002

Psychiatry and Long-Term Care. UCLA Sixth Annual Review of Psychiatry, October 19, 2001

2001

Memory and Aging: Alzheimer?s, Other Dementia and Regional Brain Dysfunction.
  International College of Applied Kinesiology-USA,      Palm Springs, CA, June 24,
  2000

Research in Different Settings (A Symposium): Summer Research Institute in Geriatric
Psychiatry,
  American Association for Geriatric Psychiatry/NIMH, Los Angeles, July 27, 1997

Informed Non-Consent vs. Incapacity--Ethical Decision Making for the Elderly
  Annual Review of Geriatric Medicine, Marina del Rey, CA, January, 1997

The Impact of Depression on Outcomes of Medically Ill Elderly
  California Psychological Assn, Pasadena, CA, November 9, 1996

The Road to Diagnosis [of Alzheimer's Disease]: Initial Signposts
  Huntington Hospital, Pasadena, CA, November 2, 1996

Falls in Long Term Care: Significance, Assessment, & Prevention
  Golden State Care Center, Chatsworth, CA, October 14 & November 12, 1996

Alcohol and Substance Abuse (in the Elderly),
  Board Review Course for Added Qualifications Exam, Santa Monica, CA, October
  4, 1996

Key Ethical Issues: Views from a Researcher
  Challenges in Geriatrics, Manhattan Beach, CA, May 31, 1996

Treating Anxiety, Depression, and Alcohol Abuse in the Primary Care of Older Adults
  Challenges in Geriatrics, Manhattan Beach, CA, May 31, 1996

Mental Status Assessment, Faculty Development in Clinical Geriatric Assessment
  UCLA Multicampus Program in Geriatric Medicine and Gerontology, April 24,
  1996

UPBEAT!: Psychogeriatric Care to Improve Healthcare Outcomes in Ailing Elderly
Veterans
  American Society on Aging, Anaheim, CA, March 18, 1996

Psychiatric Case Studies, Geriatric Medicine Review, UCLA School of Medicine, January
  20, 1996

Longitudinal Management of Behavior Disorders
  Alzheimer's Association Conference, Los Angeles, CA , November 3, 1996

Advanced Psychopharmacology
  Geriatric Medicine Review, UCLA School of Medicine, January 20, 1995

**EXHIBIT F, PAGE 383**

Issues in Long Term Care [for patients with Alzheimer's Disease]
Alzheimer Association of Los Angeles/UCLA Alzheimer's Disease Center
Los Angeles, November 6, 1994

Facilitation of Advance Directives for Dementia Patients in LTC
American Society on Aging, San Francisco, March, 1994

The Experience of Dementia, Friends of Caregivers Symposium, Long Beach, February 4, 1994

Longitudinal Behavior Management in Dementia
Alzheimer Association of Los Angeles/UCLA Alzheimer's Disease Center
Los Angeles, November, 1993

SPECT in Dementia, Western Society for Nuclear Medicine, Vancouver, BC, Oct, 1993

Hierarchic Dementia Scale for Cognitive Deficits in LTC
American Psychiatric Association, San Francisco, May, 1993

SPECT in Dementia: Clinical and pathological correlation.
American Academy of Neurology, San Diego, May 1992

Depression in Alzheimer's Disease
American Psychiatric Association, Washington, D.C., May 1992

Colloquium on Gero-Psychiatry Fellowship Program
VA Western Region (in San Francisco), February 1992

Correlates of Caregiver Burden
International Alzheimer's Disease Association, Amsterdam, Sept, 1991

Atypical (Dementia) Syndromes, American Psychiatric Association, New Orleans, May 1992

Experimental Treatments for Dementia: A Review
American Association for Geriatric Psychiatry, San Diego, CA, February, 1990

Behavioral Disorders in Alzheimer's Disease: Depression is Uncommon
French Foundation for Alzheimer Research, Los Angeles, Oct, 1989

SPECT in the Differential Diagnosis of Dementia
American Psychiatric Association, San Francisco, May, 1989

Intraventricular Bethanechol in Alzheimer's Disease,
Southern Illinois University, Springfield, March 1988

Psychiatric Symptoms in Alzheimer's Disease
John Douglas French Foundation Symposium, September, 1987

Exhibit 13 - Page 90

**EXHIBIT F, PAGE 384**

Intraventricular bethanechol for Alzheimer Disease: A dose-response study.
Neurology/Neurosurgery Grand Rounds, Dartmouth College, October, 1986

Intraventricular bethanechol for Alzheimer Disease: A dose-response study.
John Douglas French Foundation, Los Angeles, CA, June, 1986

Preliminary report of IVBC for Alzheimer Disease
American Psychiatric Association, Washington, D.C., May, 1986

Toward a treatment for Alzheimer Disease
Federation of Western Neurological Societies, San Francisco, February, 1986

Choline uptake: A familial trait?, John Douglas French Foundation, Los Angeles February,
1985

Delusions in the older patient,    Hospital and Community Psychiatry, Denver, October,
1984

Dementia and neurosyphilis, American Geriatrics Society, Denver, May, 1984

Treatment decisions in cognitively impaired patients
Gerontological Society of America, San Francisco, Nov, 1983

Family members as decision-makers in subjects with dementia: A basis for informed
consent?
American Academy of Psychiatry and the Law, Portland, Oct, 1983

Informed consent in research subjects with dementia: A symposium
American Psychological Association, Anaheim, CA, August, 1983

Postgraduate training in geriatric psychiatry: A cross-cultural perspective
American Psychiatric Association, Los Angeles, 1983

## PUBLICATIONS:

1. Miller MH, Read SL, Bajwa B. Treating postpartum psychosis: An interaction born of
hope. Roche Report: Frontiers of Psychiatry, December, 1980.

2. Read SL. Catatonia in thrombotic thrombocytopenic purpura (TTP). Journal of Clinical
Psychiatry 1983;44:343-344

3. Jarvik LF, Read SL, Mintz J, Neshkes R. Pretreatment orthostatic hypotension in
geriatric depression: Predictor of response to imipramine and doxepin. Journal of Clinical
Psychopharmacology 1983;3:368-372

4. Stuller A, Bell K, Read S, Ananth J. Case Presentation: Antabuse Psychosis. Psychiatric
Journal of the University of Ottawa 1983;8:179-180

Exhibit 13 - Page 91

**EXHIBIT F, PAGE 385**

5. Read SL. Development: Terminable or interminable? Contemporary Psychiatry 1983;2:102-104

6. Read SL. A handy neurology consultant. Contemporary Psychiatry 1983;2:126-127

7. Read SL, Jarvik LF. Cerebrovascular disease in the differential diagnosis of dementia. Psychiatric Annals 1984;14:100-108

8. Miller BL, Read SL, Mahler ME, Benson DF. Altered mental status in the elderly. Primary Care 1984;11:653-666

9. Cummings JL, Tan H, Read SL, Benson DF. Amnesia in anoxic encephalopathy: Clinical-pathological correlation. Neurology 1984; 34:678-681

10. Cummings JL, Benson DF, Hill MA, Read SL. Aphasia in dementia of the Alzheimer type. Neurology 1985;35394-397

11. Read SL, Small GW, Jarvik LF. Dementia Syndrome. In Yudofsky S (Ed). Psychiatric Update, American Psychiatric Association, Washington, D.C., 1985

12. Miller BL, Jenden DS, Cummings JL, Read SL, Rice K, Benson DF. Abnormal erythrocyte choline and influx in Alzheimer's Disease. Life Science 1986;38:485-490

13. Read S. Review of: "Alzheimer's Dementia:" Dilemmas in clinical research. Alzheimer Disease and Associated Disorders 1987; 1:61-63

14. Read SL. Update on cholinergic enhancement therapy for Alzheimer's Disease. Bull Clin Neurosci 1987;52:34-7

15. Read S, Cummings JL. Alzheimer's Disease: Past, present, and future. Hospital Medicine (supplement) April, 1987, 63-84

16. Cummings JL, Read S. Multi-Infarct Dementia. Hospital Medicine November, 1988, 25-42.

17. Trautner RJ, Cummings JL, Read SL, Benson DF. Idiopathic basal ganglia calcification and organic mood disorder. Am J Psychiatry 1988;145:350-353

18. Kempler D, Van Lancker D, Read S. Proverb and idiom comprehension in Alzheimer Disease. Alzheimer Disease and Associated Disorders 1988;2:38-49

19. Mody CK, McIntyre HB, Miller BL, Read SL. Topographic Brain Mapping and EEG Frequency Analysis in Alzheimer's Disease: A preliminary report. Bulletin of Clinical Neurosciences 1988;53:94-97

20. Read S: A bonny rose. In Talbott JA, Manevitz AZA (Eds): Psychiatric House Calls. Washington DC, American Psychiatric Association Press, Inc., 1988, pp.34-35

Exhibit 13 - Page 92

11/14

EXHIBIT F, PAGE 386

21. Signer SF, Read SL. The patient with stroke. In: American Psychiatric Association: Treatments of Psychiatric Disorders: A Task Force Report of the American Psychiatric Association. Washington, DC, American Psychiatric Association, 1989

22. Miller BL, Jenden DJ, Tang C, Read SL. Factors influencing erythrocyte choline. Life Sciences 1989;44:477-482

23. Buchwald JS, Erwin RJ, Read S Van Lancker D, Cummings JL: Midlatency auditory evoked responses: differential abnormality of P1 in Alzheimer's Disease. Electroencephalography and Clinical Neurophysiology 1989;74:378-84

24. Harbaugh RE, Reeder TM, Senter HJ, Knopman DS, Baskin DS, Pirozzolo F, Chui HC, Shetter AG, Bakay RAE, Leblanc R, Watson RT, DeKosky ST, Schmitt FA, Read SL, Johnston JT. Intracerebro-ventricular bethanechol chloride infusion in Alzheimer's Disease: Results of a collaborative double-blind study. J Neurosurg 1989; 71:481-486

25. Miller BL, Jenden DJ, Tang CS, Read SL, Lin KM: Correlations of red and white blood cell choline: implications for interpreting lithium effects on choline transport and metabolism. Lithium

26. Read SL. Depresson is uncommon in Alzheimer Disease: Another aspect of the cholinergic deficit syndrome? Bull Clin Neurosci 1989; 54:8-13

27. Smith CA, Read SL, Satz P, Shapira J. A positive dose-response curve to a cholinergic agonist on the Randt Memory Test demonstrated in three patients with Alzheimer's Disease. Journal of Clinical and Experimental Neuropsychology 11:89, 1989.

28. Read SL, Frazee J, Smith CS, Shapira J, Cummings JL, Tomiyasu U. Intra-cerebroventricular bethanechol in Alzheimer's Disease: Variable Dose-related Responses. Arch Neurol 1990;47:1025-1030.

29. Read S. Community Resources. In: Cummings JL, Miller BL (Eds): Alzheimer's Disease: Treatment and Long-Term Management. New York, Marcel Dekker, Inc., 1990, pp. 235-244

30. Read SL. The Dementias. In Sadavoy J, Jarvik LF; Shamoian C (Eds): Comprehensive Review of Geriatric Psychiatry. Washington, D.C., American Psychiatric Press, Inc., 1991, pp. 287-310

31. Miller BL, Read SL, Tang C, Jenden D. Differences in red blood cell choline and lipid-bound choline between patients with Alzheimer's Disease and control subjects. Neurobiol Aging 1991;12:61-64

32. Leuchter AF, Read SL, Shapira J, Walter DO, Smith C. Stable bimodal response to cholinomimetic drugs in Alzheimer's Disease: Brain mapping correlates. Neuropsycho-pharmacology 1991;4:165-73

33. Read SL. Assessing dementia requires an interdisciplinary approach. Psychiatric Times,

Exhibit 13 - Page 93

EXHIBIT F, PAGE 387

April, 1991, pp 33-34.

34. Read SL. Long-term care for dementia: if appropriate, why "special"? (Editorial). J Am Geriatr Soc 1992;40:101-2.

35. Gorman DG, Read S, Cummings JL. Cholinergic therapy of behavioral disturbances in Alzheimer's Disease. Neuropsychiatry, Neuropsychology, and Behavioral Neurology 1993;6:229-234.

36. Vinters HV, Secor DL, Read SL, Frazee JG, Tomiyasu U, Stanley TM, Ferreiro JA, Akers M-A. Microvasculature in brain biopsy specimens from patients with Alzheimer's Disease: An immunohistochemical and ultrastructural study. Ultrastructural Pathology 1994;18:333-348.

37. Hankin M, Read S. Mental incapacity to marry. Estate Planning, Trust and Probate News. State Bar of California 1994; 14:46-52.

38. Read SL, Miller B, Mena I, Kim R, Itabashi H. SPECT in Dementia: Clinical and pathological correlation. J Am Geriatr Soc 1995;43:1243-1247.

39. Yener GG, Leuchter AF, Jenden D, Read SL, Cummings JL, Miller BL. Quantitative EEG in fronto-temporal dementias. Clinical Electroencephalography 1996;27:61-68.

40. Read Stephen. Vascular Dementias. In: Sadavoy J, Lazarus LW, Jarvik LF, Grossberg GT (Eds). Comprehensive Review of Geriatric Psychiatry—II. Washington, DC, American Psychiatric Press, 1996, pp. 459-477.

41. Stein W, Read SL. Chronic pain in the setting of Parkinson's disease and depression. J Pain and Symptom Management 1997;14:255-258.

42. Di Patre PL, Read SL, Cummings JL, Tomiyasu U, Vartavarian L, Secor DL, Vinters HV. Progression of clinical deterioration and pathologic changes in patients with Alzheimer Disease evaluated at biopsy and autopsy. Arch Neurol 1999;56:1254-1261.

43. Shoghi-Jadid K, Small GW, Agdeppa ED, Kepe V, Ercoli LM, Siddarth P, Read S, Satyamurthy N, Petric A, Huang S-C, Barrio J. Localization of Neurofibrillary Tangles (NFTs) and Beta-Amyloid Plaques (APs) in the Brains of Living Patients with Alzheimer's Disease. Am J Geriatric Psychiatry 2002;10:24-35.

44. Read Stephen. Vascular Dementias. In: Grossberg GT, Sadavoy J, Jarvik LF, Meyers BS (Eds). Comprehensive Review of Geriatric Psychiatry—III. New York, New York, W. W. Norton and Company, 2004, pp. 511-524.

45. Read, Stephen L. Ethical Issues [in Geriatric Psychiatry]. Sadock BJ and Sadock VA (Eds); Comprehensive Textbook of Psychiatry. New York, Lippincott Williams & Wilkins, 2005, Vol. II, pp. 3806-3813.

46. Asghar-Ali A, Kavirajan H, Read S. The Effect of Risperidone on Nursing Burden Associated with Caring for Patients with Dementia. (Letter to the Editor) Journal

Exhibit 3 - Page 94

EXHIBIT F, PAGE 388

American Geriatrics Society 2005; 53:1261-1262.

47. Weinstock R, Read SL, Leung G, Silva AS. Violence in the Elderly. In Simon R, Tardiff K (Eds). Textbook of Violence Assessment and Management. Simon RI, Tardiff K (Eds). Washington DC, American Psychiatric Association Press, 2008, pp. 381-406.

48. Read, Stephen L. Elder Abuse. Psychiatric Times, November, 2008 (vol. XXV, No. 10), 62-64.

49. Read, Stephen. Naltrexone Effects in Patients with Dementia. (Letter to the Editor). American Journal of Psychiatry 2010;167:1278-9.

50. Read S, Weinstock R. Forensic Geriatric Psychiatry. In Simon RI, Gold LH. The American Psychiatric Publishing Textbook of Forensic Psychiatry, Second Edition. Washington DC, American Psychiatric Association Press, 2010, pp. 505-528.

51. Read S, Wu P, Biscow M. Sustained 4-Year Cognitive and Functional Response in Early Alzheimer's Disease with Pioglitazone. J Am Geriatr Soc 2014;62:584-586.

52. Read S, Kaufman A. Geriatric Forensic Psychiatry Training in Forensic and Geriatric Psychiatry Fellowships. In Holzer JC, Kohn R, Ellison JM, Recupero PR (Eds). Textbook in Geriatric Forensic Psychiatry, Oxford University Press (in preparation)

53. Read, Stephen L., Kim, Tae-Soon. Psychiatric Times, (in preparation)

## PAPERS IN PREPARATION (RESEARCH COMPLETED)

1. UCLA Fellowship in Geriatric Psychiatry—results of the first 30 Years
2. Sustained Incapacity and Vulnerability to Undue Influence in Normal Pressure Hydrocephalus
3. Hoarding in the Elderly: Capacity and Psychiatric Diagnosis
4. Elderly Homicides: Importance of Forensic Geriatric Psychiatry Assessment

EXHIBIT 14

<div align="center">

**Stephen L. Read, MD**
Psychiatry
Geriatric & Forensic Psychiatry



</div>

<div style="float:left">

**PATIENT OFFICE**
2566 Overland Avenue
Suite 500B
Los Angeles, California 90064

</div>

<div style="float:right">

**BUSINESS OFFICE**
(All Correspondence)
1621 West 25th Street, PMB 255
San Pedro, California 90732

</div>

<div align="center">

Phone (310) 521-9747; FAX (310) 521-8112
E-mail: ReadSMD@aol.com; www.geriatricpsychiatrist.com

</div>

<div align="center">

June 10, 2014

</div>

Laura Zwicker, Esq.
Greenberg Glusker Fields Claman & Machtinger LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, CA 90067

<div align="center">

In re: Mr. Donald STERLING

</div>

Dear Ms. Zwicker:

At your request I have reviewed evaluations of Mr. Donald Sterling in light of possible conflict about Mr. Sterling's capacity to continue to act as Trustee of The Sterling Family Trust. My review is informed by the following:

1. Paragraph 10.24 of The Sterling Family Trust defines Incapacity (in relevant part):

"'Incapacity' and derivations thereof mean incapable of managing an individual's affairs under the criteria set forth in California Probate Code §810 et seq. An individual shall be deemed to be incapacitated if . . . (b) two licensed physicians who, as a regular part of their practice are called upon to determine the capacity of others, and neither of whom is related by blood or marriage to any Trustee or Beneficiary, examine the individual and certify in writing that the individual is incapacitated."

2. My review is undertaken with the authorization of your client, Rochelle H. Sterling, Trustee, as per paragraph 7.5.e of The Sterling Family Trust.

3. My training and experience (summarized below) and, particularly, my familiarity with California Probate Code §810-§813.

4. Experience with diagnostic criteria for cognitive disorders, specifically including the Diagnostic and Statistical Manual published by the American Psychiatric Association, versions IV-TR and 5.

<div align="center">

1

</div>

Exhibit 14 - Page 96

<u>Sources of Information, consistent with material of a type that reasonably may be relied upon by an
expert in forming an opinion upon the subject to which my report relates, with review of findings:</u>

1. Report of X-ray CT scan of brain 5/16/14 of Donald T. Sterling, Cedars-Sinai Medical Center.

   "Mild atrophy" of brain tissue is identified, with the important absence of any suggestion of stroke,
   hydrocephalus, tumor, or other specific brain abnormality.

2. Report of PET (Positron Emission Tomography) scan of brain 5/16/14 of Donald T. Sterling, Cedars-
   Sinai Medical Center.

   "The constellation of findings are most consistent with a neuro dementia of the Alzheimer's type."

3. Report of Meril S. Platzer, MD 5/19/14 in re: Mr. Donald T. Sterling.

   Dr. Platzer is a neurologist with more than 20 years experience. Her consultation letter cites memory
   loss and emotional lability, with a duration of symptoms of 2-3 years. She characterizes Mr. Sterling as
   a "fair to poor historian." She reports that Mrs. Sterling stated that the memory problems may have
   been evident as long as five years, and that his personality has changed.

   Medical history reported includes appendectomy, radiation treatment for prostate cancer two years
   previously with secondary urinary dysfunction (treated), hypertension, elevated cholesterol, gout, and a
   peripheral neuropathy, vitamin B12 deficiency (treated), hearing loss.

   On neurological examination, Dr. Platzer confirmed sensory loss below the knees, but did not record
   any other abnormality. General physical examination findings were normal.

   On mental status, Dr. Platzer described Mr. Sterling as "tangential at times with poor insight" and he
   was "easily distracted." He had impairments in orientation, and difficulties with the sequencing tasks of
   reverse spelling and serial subtraction, short term memory, and he was unable accurately to number a
   clock. He achieved a score of 23/30 on the Folstein Mini-mental state examination (MMSE).

   Dr. Platzer's diagnostic impression was "primary dementia of the Alzheimer's type."

4. Letter of James E. Spar, MD to Mr. Pierce O'Donnell 5/27/14 in re: Mr. Donald T. Sterling.

   Dr. Spar is Professor of Psychiatry in the Division of Geriatric Psychiatry at UCLA, with extensive
   experience in Geriatric Psychiatry and, especially, in evaluating elderly persons for capacity issues. In
   his letter of May 27, he elicits a history essentially congruent with that reported by Dr. Platzer, noting
   that Mrs. Sterling was present throughout the evaluation at Mr. Sterling's request.

2

Exhibit 14 - Page 97

EXHIBIT F, PAGE 392

Dr. Spar's report focuses on the features of interaction and on the mental status examination, including some of the same items as Dr. Platzer, but also addressing a somewhat broader range of mental functions. In summary, he describes Mr. Sterling as cooperative, but that he "gave up" easily on some tasks and the became impatient twice, particularly when asked to complete a task that he could not manage (Trails B). With Dr. Spar, Mr. Sterling achieved a score of 24/29 on the MMSE (Dr. Spar did not elicit response to one item), however he notes that Mr. Sterling would not even attempt the reverse spelling task that he had tried with Dr. Platzer. With Dr. Spar, Mr. Sterling did complete the clock drawing task, but he had impairments in word list generation and on the abstraction task of identifying similarities.

Dr. Spar's diagnostic impression is that Mr. Sterling "is suffernign from mild global cognitive impairment . . . consistent with early Alzheimer's disease, but could reflect other forms of brain disease."

Based on his findings, Dr. Spar opined that "Mr. Sterling is at risk of making potentially serious errors of judgment, impulse control, and recall in the management of his finances and his trust. Accordingly, in my opinion he is substantially unable to manage his finances and resist fraud and undue influence, and is no longer competent to act as trustee of his trust."

5.  Physician's Certification of Trustee's Incapacity by Dr. Meril Sue Platzer 5/29/14 in re:  Mr. Donald T. Sterling.

Dr. Platzer's certification is based on her examination of May 19, 2014, which findings she reviews. Based on those findings, Dr. Platzer opines:

"It is my opinion that Mr. Donald T. Sterling is unable to reasonably carry out the duties as Trustee of The Sterling Family Trust as a result of, among other factors, an impairment of his level of attention, information processing, short term memory impairment and ability to modulate mood, emotional lability, and is at risk of making potentially serious errors of judgment."

Impression and Discussion:  Mr. Donald T. Sterling is a married business man, 80 years of age.  It has not passed notice that he is currently embroiled in a very public challenge to his credibility, with consequences for his financial well-being and his reputation.  In particular, The Sterling Family Trust is known to control substantial and complex assets, with business interests of a high level of complexity and with social consequences.

Both Dr. Meril Platzer, a specialist in neurology, and Dr. James Spar, a specialist in geriatric psychiatry, independently describe thorough evaluations of Sterling within the last month. Both report very similar findings:  Mr. Donald Sterling has significant deficits in multiple areas of mental function, including

3

Exhibit 14 - Page 98

short-term memory, the ability to handle and manipulate information (as demonstrated in the sequencing tasks of reverse spelling and serial subtractions), reasoning (poor ability to identify similarities, as described by Dr. Spar). In addition, Mr. Sterling was not consistently able to place numbers in a circle to make a clock face and he got so frustrated with Dr. Spar's presentation of the task known as Trails B, that he left the room. In my opinion, this easy frustration represents a serious element affecting Mr. Sterling's capacity and is consistent with the "emotional lability" attested to by Dr. Platzer. In summary, both of the highly qualified evaluators have identified significant deficits in multiple mental functions, as per CPC §811, that are relevant in the consideration of the capacity of Mr. Donald T. Sterling.

In my professional opinion, it is extremely unlikely that Mr. Sterling's deficits in mental function are due to some treatable cause, i.e. that they are reversible. Although the precise diagnosis of the cause of mental impairments is not necessary, or even necessarily relevant, in the consideration of capacity determinations, I agree that the history and the findings are highly suspect as representing the slow emergence of a progressive dementia, and specifically Alzheimer's Disease. In addition to the features cited above, the earliest finding of language impairment due to Alzheimer's Disease, for example, is a diminished word list generation, as reported by Dr. Spar. In addition, the findings described are fully consistent with the general loss of brain tissue and, more specifically, with the pattern of impaired brain function demonstrated by the PET scan of May 16, 2014.

The overall severity of Mr. Sterling's deficits in mental function may be "mild," as stated by Dr. Spar, but in my opinion, this is best interpreted in the context of the range of severities observed in dementing illnesses. It is now widely recognized that decision-making, especially for complex financial matters, is impaired even in stages of progressive dementia that are termed "mild," including stages of illness prior to the presence of dementia being recognized. Mr. Sterling's deficits in mental function certainly include features directly relevant to his capacity meaningfully to serve as Trustee of the The Sterling Family Trust, specifically deficits even performing simple arithmetic, with short-term memory, and with executive functions (referring to the sequencing impairments in particular). In addition, Mr. Sterling's emotional lability further complicates any expectation that he would be able to cope with and adapt to his level of information processing deficits.

In conclusion, therefore, in my professional opinion, the statements and attestations of Drs. Meril S. Platzer, MD and James E. Spar, MD document solid grounds for the determination that Mr. Donald T. Sterling lacks the capacity to function as Trustee of the Sterling Family Trust.

My Qualifications: I am a physician licensed to practice medicine in the state of California since 1979. I am board-certified in Psychiatry with subspecialty certification in Geriatric Psychiatry and in Forensic Psychiatry. I completed fellowships in Geriatric Psychiatry and Neurobehavior at UCLA and the West Los

4

Exhibit 14 - Page 99

Angeles Veterans Affairs Medical Center. I am Clinical Professor in the Department of Psychiatry and Biobehavioral Sciences, David Geffen School of Medicine at UCLA where I continue to collaborate in selected research projects in dementia and to teach and supervise the training of residents and fellows. I have over thirty years experience in the evaluation, diagnosis, care, and treatment of patients with disorders of memory and behavior, including dementia and, especially, Alzheimer's Disease. I am a Distinguished Fellow of the American Psychiatric Association. I have been retained as an expert in more than 1100 matters involving multiple aspects of competence and capacity. My full curriculum vitae is available at my web-site, www.geriatricpsychiatrist.com.

All of the facts set forth in this declaration are of my own knowledge except as to those matters that are stated to be of opinion, and as to those matters, I believe same to be true. If called upon as a witness, I would and could testify competently thereto.

Please contact me if I can be of any further assistance in this matter.

Sincerely,

Stephen Read, M.D.
Clinical Professor, UCLA

5

Exhibit 14 - Page 100

**EXHIBIT F, PAGE 395**

EXHIBIT 15

Pierce O'Donnell

D: 310.201.7558
F: 310.201.1792
PODonnell@GreenbergGlusker.com
File Number: 81294-00002



May 29, 2014

Via Email
Maxwell M. Blecher, Esq.
Blecher Collins Pepperman & Joye
515 South Figueroa Street
Suite 1750
Los Angeles, California 90071

Re:     The Sterling Family Trust

Dear Mr. Blecher:

The Sterling Family Trust was established on August 13, 1998, by Donald T. Sterling and Rochelle H. Sterling, as Settlors and as Trustees. The Sterling Family Trust was restated by the parties on December 18, 2013 (as restated, the "Trust"). Enclosed for your convenience is a copy of the Trust as restated.

Paragraph 7.5.c. of the Trust states: "Any individual who is deemed incapacitated, as defined in Paragraph 10.24., shall cease to serve as a Trustee of all trusts administered under this document." Paragraph 10.24. of the Trust defines "incapacity," and derivations thereof, and provides that "[a]n individual shall be deemed to be incapacitated if . . . two licensed physicians who, as a regular part of their practice are called upon to determine the capacity of others, and neither of whom is related by blood or marriage to any Trustee or beneficiary, examine the individual and certify in writing that the individual is incapacitated."

Donald T. Sterling was examined by Dr. Meril S. Platzer on May 19, 2014, and by Dr. James Edward Spar on May 22, 2014. Prior to those examinations, at Dr Platzer's request, Mr. Sterling underwent a CT scan and a PET scan of his brain at Cedars-Sinai Medical Center. I have enclosed for your information the results of the CT scan and PET scan.

Both Dr. Platzer and Dr. Spar are licensed physicians who, as a regular part of their practice, are called upon to determine the capacity of others. Dr. Platzer is a neurologist who regularly sees patients suffering from Alzheimer's Disease and other forms of dementia, and Dr. Spar has frequently been appointed by the courts to determine capacity. *See, e.g., Conservatorship of Ramirez* (2001) 90 Cal.App.4th 390. Neither Dr. Platzer nor Dr. Spar are related by blood or marriage to Mr. or Mrs. Sterling, currently considered the sole beneficiaries of the Trust.

Both Dr. Platzer and Dr. Spar have certified in writing that Mr. Sterling is incapable of carrying out the duties as Trustee of the Trust. Enclosed for your information are copies of their written certifications of Mr. Sterling's incapacity. Pursuant to Paragraph 7.5.c. and Paragraph

Greenberg Glusker Fields Claman & Machtinger LLP
1900 Avenue of the Stars, 21st Floor, Los Angeles, California 90067
T: 310.553.3610  |  F: 310.553.0687

81294-00002/2184182.2

GreenbergGlusker.com

Exhibit 15 - Page 101

**EXHIBIT F, PAGE 397**

Maxwell M. Blecher, Esq.
May 29, 2014
Page 2

10.24. of the Trust, a determination of incapacity results in the removal of an individual serving as Trustee.

Paragraph 7.2.a. of the Trust provides that "[i]f either Settlor ceases to serve, the other shall serve as Trustee." Thus, as a result of Mr. Sterling ceasing to serve as a Trustee of the Trust, Mrs. Sterling is now the sole Trustee of the Trust. Therefore, Mr. Sterling should immediately cease taking any action as a Trustee of the Trust or holding himself out to third parties as a Trustee of the Trust.

Please do not hesitate to contact me if you or your client have any questions about the Trust, Mr. Sterling's removal as a Co-Trustee of the Trust due to incapacity or Mrs. Sterling immediately commencing to serve as the sole Trustee of the Trust.

Sincerely,

Pierce O'Donnell

PO/mms

GreenbergGlusker.com

Exhibit 15 - Page 102

**EXHIBIT F, PAGE 398**



EXHIBIT 16

EXHIBIT F, PAGE 399

**DOUGLAS L. WALTON**
Attorney at Law
9441 Wilshire Boulevard, Penthouse
Beverly Hills, California 90212

Telephone (310) 278-8000
Fax (310) 278-8010

May 22, 2014

Mr. Adam Silver, Commissioner
Mr. Richard W. Buchanan, Esq., Vice-President and General Counsel
National Basketball Association
Olympic Tower
645 Fifth Avenue
New York, NY 10022

RE:     In re Termination of the National Basketball Association Membership of
LAC Basketball Club, Inc.

Gentlemen:

As you know, I have been a long-time attorney for Donald T. Sterling. Mr. Sterling
agrees to the sale of his interest in the Los Angeles Clippers.

This letter confirms that Donald T. Sterling authorizes Rochelle Sterling to negotiate with
the National Basketball Association regarding all issues in connection with a sale of the
Los Angeles Clippers team, owned by LAC Basketball Club, Inc.

Very truly yours,

Douglas L. Walton
DLW/gg

Read and Approved:

Donald T. Sterling

Cc:    Pierce O'Donnell, Esq.
Maxwell Blecher, Esq.

Exhibit 16 - Page 103

**EXHIBIT F, PAGE 400**



EXHIBIT F, PAGE 401

Milwaukee Bucks on the Forbes NBA Team Valuations List          http://www.forbes.com/teams/milwaukee-bucks/

**Forbes**

| New Posts | Most Popular | Lists | Video |
|---|---|---|---|
| +3 posts this hour | Highest-Paying Diplo | Most Powerful Wo | LeVar Burton's Kick |

2 FREE issues of Forbes          Log In | Sign up | Connect      〉 | Help

| NBA Team Value | 91 | Forbes 400 Richest Americans | World's Most Powerful People | The Celebrity 100 | The World's Billionaires | +more |
|---|---|---|---|---|---|---|

#29 Charlotte I          Browse list

14
Tweet

# Milwaukee Bucks

**Team Value** [1] **$405 M**

Team Value calculated January 2014

Follow (10)

## At a Glance

Owner: Herbert Kohl

Championships: 1

Price Paid: $18 M

Year Purchased: 1985

Revenue [2] : $109 M

Operating Income [3] : $11.5 M

Debt/Value [4] : 19%

Player Expenses [5] : $68 M

Gate Receipts [6] : $21 M

Wins-to-player cost ratio [7] : 91

Revenue per Fan [8] : $28

Metro Area Population: 1.6 M

## Forbes Lists

**#30 NBA Team Valuations**

## Numbers

Valuation Breakdown

Sport [9]
$238 M

Market [10]
$89 M

Stadium [11]
$48 M

Brand [12]
$35 M

SmileTrain

0.00                                  0.00

**DAVI'S STORY**

**MORE STORIES**

**DONATE NOW**

## Photos

Exhibit 17 - Page 104
6/10/2014 2:39 PM

**EXHIBIT F, PAGE 402**

Milwaukee Bucks on the Forbes NBA Team Valuations List                    http://www.forbes.com/teams/milwaukee-bucks/

**Forbes**          New Posts          Most Popular          Lists          Video
                    +3 posts this hour   Highest-Paying Dipl: Most Powerful Wo: LeVar Bur  

The 26-year-old BMO Harris Bradley Center is one of the NBA's          1-Yr Change
oldest arenas and owner Herb Kohl wants it replaced. The venue         30%
recently got $3 million in upgrades to luxury suites and theater
boxes, but it is not enough to keep up with the newer venues           Annualized Change [13]
around the NBA. The team's current lease at the Bradley Center         13%
runs until 2017 and shares only a limited portion of suite,
merchandise and concession revenues with the Bucks. An average
of only 13,000 households watched Bucks games last season on           Historical
Fox Sports Wisconsin, which was the second smallest audience
for games behind the Charlotte Bobcats.                                Player Expenses [5]
                                                                       $68 M

More on Forbes

### As NBA Finals Continue, Tax                                        Operating Income [3]
### Incentives Lure 76ers Into                                         $12 M
### New Jersey

(Update: The final number on these tax credits, which was              Revenue [2]
previously not available, is said to be $82 million.) What was the     $109 M
difference in Thursday's NBA finals game between the Miami
Heat and the San Antonio Spurs? Most would say conditioning.
The Heat's much touted star, LeBron James, was unable to [...]         Wins-to-player cost
[...] more>>                                                           ratio [7]
                                                                       91
**K** Kelly Phillips Erb, Contributor

                                                                       Value [1]
                                                                       $405 M
### The Sterlings, The Clippers
### And Lessons About Having                                           SportsMoney Team Valuations
### Business Partners

Donald Sterling's fall from power and the PR disaster                   NBA   MLB   NFL   NHL   Soccer NASCAR
surrounding his plunge will be the stuff of legend. First, he was he
voted the most hated man in America in a new poll by E-Score,          Most Read on Forbes
beating out such villains as Bernie Madoff, O.J. Simpson, and
even Justin Bieber. Then, his estranged wife, Shelly, had             NEWS   People   Places   Companies
him declared [...] [...] more>>

**M** Michael Schwerdtfeger, Contributor                              FDA May Destroy American
                                                                      Artisan Cheese Industry
                                                                      +93,877 views
### How Donald Sterling And V.
### Stiviano Turned The $90                                           iPhone 6 Rumor Mill: New
### Billion Sports Industry On Its                                    Pictures Reveal Slimmer More
### Head                                                              Rounded Design
                                                                      +84,278 views
It is the most disruptive audio recording of a private conversation
unwillingly made public since Watergate. The private chat             The Best And Worst States To
between Donald Sterling and then girlfriend V. Stiviano that took     Make A Living In 2014
place in a private residence and was subsequently made public         +78,050 views
has turned the $90 billion sports industry--the aggregate value of
the 122 MLB, [...] [...] more>>                                       Contrave: Is This The Weight
                                                                      Loss Drug We've Been Waiting
**M** Mike Ozanian, Forbes Staff                                      For?
                                                                      +76,792 views

Venue                                                                 How To Speak McKinsey: 15 Key
BMO Harris                                                            Phrases To Pass Yourself Off As
Bradley Center                                                        A Top Management Consultant
                                                                      +61,564 views
Owner
Bradley Center
Sports and
Entertainment

Year Opened
1988

Capacity
18,600

Cost To Build
$90 M

Concessionaire
Levy Restaurants

Average Ticket Price
$46

+ show

Exhibit 17 - Page 105
6/10/2014 2:39 PM

**EXHIBIT F, PAGE 403**

Milwaukee Bucks on the Forbes NBA Team Valuations List                    http://www.forbes.com/teams/milwaukee-bucks/

**Forbes**      New Posts        Most Popular    Lists      Video
                +3 posts this hour  Highest-Paying Dipk  Most Powerful Wor  LeVar Burton's Kids

List of Franchises
Franchise Solutions



WARREN BUFFETT'S
TOP 5 STOCKS

Buffett's firm, Berkshire
Hathaway, holds
dozens of stocks. But
these five make up 75%
of his portfolio...worth
$65 billion.

Click here to get Buffett's
top 5 stocks, plus his 38
latest buys, FREE

## $1.8 Billion For The L.A. Clippers? That's 3.27 Times More Than Any Other NBA Team, And 120 Times The Team's Operating Income

Two quick thoughts on the rumor that ex-Microsoft CEO Steve Ballmer is willing to pay up to $1.8 Billion to buy the Clippers. First, the NBA is a shared monopoly, which allows team owners to charge unusually high prices for the sale of their franchises as long as no other team owner [...] [...] more>>

Marc Edelman, Contributor

**Key Connections**
From Forbes Lists

People

Teams

Places



**Company Golf Balls Printed Fast**

Get Your Logo on the
Box and Ball Fast 3-7
day Production

Golfbox.com

## Every NBA Owner Will Vote In Favor Of Forcing Sterling To Sell the Clippers

NBA Commissioner Adam Silver announced today that besides the lifetime ban the league gave Los Angeles Clippers owner Donald Sterling for his racist remarks, Silver is going to urge the Board of Governors--which is comprised of all 30 team owners--to force Sterling to sell the team. Three-fourths of the owners need [...] [...] more>>

Mike Ozanian, Forbes Staff

**Media Buzz**
Milwaukee Bucks on:

**Media Partners**
TV
**Fox Sports
Wisconsin**

Radio
620 WTMJ

## Fool Proof: Donald Sterling Proves Sports Owner Is The Cushiest Job Of All Time

There is no other business in which mismanagement and downright illegal or immoral behavior is more consistently rewarded. [...] more>>

Brian Solomon, Forbes Staff

## How Michael Jordan Outsmarted Robert Johnson And Herb Kohl

The agreed to sale of the Milwaukee Bucks last week by Herb Kohl to Marc Lasry and Wesley Edens for $550 million shows how Michael Jordan outsmarted a billionaire and a U.S. senator. In June 2003, Jordan was considering whether to either invest in the Bucks or the NBA's expansion team in Charlotte. Kohl [...] [...] more>>

Mike Ozanian, Forbes Staff

Exhibit 17 - Page 106
6/10/2014 2:39 PM

**EXHIBIT F, PAGE 404**

Milwaukee Bucks on the Forbes NBA Team Valuations List          http://www.forbes.com/teams/milwaukee-bucks/

Forbes

| New Posts | Most Popular | Lists | Video |
|---|---|---|---|
| +3 posts this hour | Highest-Paying Diploma | Most Powerful Women | LeVar Burton's Kicks |

## Milwaukee Bucks

In a rather inexplicable deal, Marc Lasry and Wesley Edens, two men who got rich in part by buying damaged assets at bargain basement prices, have agreed to pay $550 million--at least $50 million more than anyone else was considering paying--for the Milwaukee Bucks. Half the deal is spot on with [...] [...] more>>

Ⓕ Mike Ozanian, Forbes Staff

Load more

Revenue and operating income are for 2012-13 season and net of revenue sharing and arena debt service.

1. Value of team based on current arena deal (unless new arena is pending) without deduction for arena debt (other than arena debt).
2. Net of arena revenues used for debt payments.
3. Earnings before interest, taxes, depreciation and amortization.
4. Includes arena debts.
5. Includes benefits and bonuses.
6. Includes club seats.
7. Compares the number of wins per player payroll relative to the rest of the NBA. Playoff wins count twice as much as regular season wins. A score of 120 means that the team achieved 20% more victories per dollar of payroll compared with the league average during the 2012-13 season.
8. Local revenues divided by metro population with populations in two-team markets divided in half.
9. Portion of franchise's value attributable to revenue shared among all teams.
10. Portion of franchise's value attributable to its city and market size.
11. Portion of franchise's value attributable to its arena.
12. Portion of franchise's value attributable to its brand.
13. Current team value compared with latest transaction price.

# Inside Forbes



Inside New CEO Mary Barra's Urgent Mission To Fix GM



Thailand's Richest: Some Win Amid Political Strife



These MLB Pros Earned Over $1M Not Playing



see photos



Exhibit 17 - Page 107
6/10/2014 2:39 PM

EXHIBIT F, PAGE 405

Milwaukee Bucks on the Forbes NBA Team Valuations List

http://www.forbes.com/teams/milwaukee-bucks/

**Forbes**

| New Posts | Most Popular | Lists | Video |
|---|---|---|---|
| +3 posts this hour | Highest-Paying Diph | Most Powerful Wor | LeVar Burton's Kick |

---

| BUSINESS | INVESTING | TECHNOLOGY | ENTREPRENEURS | OP/ED | LEADERSHIP | LIFESTYLE | LISTS |

## Conferences

Forbes Reinventing America Summit

Forbes Women's Summit

Forbes 400 Philanthropy Summit

Forbes Under 30 Summit

Forbes CIO Summit

Forbes CMO Summit

Forbes Healthcare Summit

Forbes Global CEO Conference

Forbes and NAPFA Advisor iConference

## Education

Forbes School of Business at Ashford University

College Planning Tool

## Newsletters

Forbes Investor

Special Situation Survey

Forbes Dividend Investor

Investing Portal

## Products

Forbes Identity Protection

Forbes Newsfeeds

Reprints & Permissions

## Company Info

Advertise

Forbes Press Room

Forbes Careers

Contact Us

Sitemap

Help

2 Free Issues | Subscriber Services | Gift Subscription

| Forbes China | Forbes Poland | RealClear Politics |
| Forbes India | Forbes Romania | RealClear Markets |
| Forbes Israel | Forbes Russia | RealClear World |
| Forbes Mexico | Forbes Spain | RealClear Sports |
| Forbes Middle East | | |

2014 Forbes.com LLC™   All Rights Reserved

Terms and Conditions | Privacy Statement | Market Data by Morningstar | AdChoices

Exhibit 17 - Page 108

6/10/2014 2:39 PM

**EXHIBIT F, PAGE 406**

Los Angeles Clippers on the Forbes NBA Team Valuations List

http://www.forbes.com/teams/los-angeles-clippers/

| NBA Team Value | 1.2k | Forbes 400 Richest Americans | World's Most Powerful People | The Celebrity 100 | The World's Billionaires | +more |

#12 Portland T

Browse list

Phoenix Suns #14

709

Tweet



4

0

# Los Angeles Clippers

Team Value [1] **$575 M**

Team Value calculated January 2014

Follow (8)

2

84

0

## At a Glance

Owner: Donald Sterling

Championships: 0

Price Paid: $12 M

Year Purchased: 1981

Revenue [2] : $128 M

Operating Income [3] : $15.0 M

Debt/Value [4] : 0%

Player Expenses [5] : $80 M

Gate Receipts [6] : $41 M

Wins-to-player cost ratio [7] : 122

Revenue per Fan [8] : $10

Metro Area Population: 16.4 M

## Forbes Lists

#13 NBA Team Valuations

## Numbers





Valuation Breakdown



Sport [9]
$216 M

Market [10]
$198 M

Stadium [11]
$100 M

Brand [12]
$64 M

Value Change

1-Yr Change
34%

Annualized Change [13]
12%

Photos





MAKE EVERY PURCHASE COUNT

CHASE O          Reward Yourself

SportsMoney Team Valuations

## Profile

The popularity of the Clippers has surged in recent years led by All-Star point guard Chris Paul and highlight reel staple Blake Griffin. TV ratings for Clippers games on Prime Ticket surged 55% last year and commanded the fifth biggest audience in the NBA. The Clippers racked up the two best regular season performances in franchise history over the last two years. The

Exhibit 17 - Page 109
6/10/2014 2:39 PM

**EXHIBIT F, PAGE 407**

Los Angeles Clippers on the Forbes NBA Team Valuations List                http://www.forbes.com/teams/los-angeles-clippers/

**Forbes**   New Posts        Most Popular      Lists        Video
             +3 posts this hour   Highest-Paying Diplo Most Powerful Wor LeVar Burton's Kick

Staples last year that ties the team to the arena at least through
the 2023-24 season.

More on Forbes

### In Sports Governance, Silver Takes The Gold

During Game 1 of the NBA Finals, we saw governance at work
once again. With thousands in the stands and millions watching
at home, an air conditioning failure pushed the temperature to 90
degrees inside the arena and presented NBA management with a
decision: "go" or "no go." They decided [...] [...] more>>

Raphael Bostic, Contributor

### Ahead Of IPO, Alibaba Inexplicably Splurges On A Soccer Team

Do sports teams and online shopping have synergies? [...]
more>>

Brian Solomon, Forbes Staff

### Five Reasons Manchester United Is Getting No Juice From Ballmer's $2 Billion Bid For Clippers

Shares of Madison Square Garden have been red hot since former
Microsoft CEO Steve Ballmer offered $2 billion for the NBA's Los
Angeles Clippers. That is what one would expect since the
Clippers price tag is an unprecedented 15 times revenue for a
sports team and MSG owns two teams: [...] [...] more>>

Mike Ozanian, Forbes Staff

Related Searches

Best Franchise Opportunities

List of Franchises

2014 Top Franchises

### Sale Of Los Angeles Clippers For $2 Billion Illustrates The Multiple Madness Of Ballmer

The sale of the Los Angeles Clippers by Donald and Rochelle
Sterling to former Microsoft CEO Steve Ballmer was approved by
the NBA Friday. The $2 billion price for the basketball team ties

---

Operating Income [3]
$15 M

Revenue [2]
$128 M

Wins-to-player cost ratio [7]
122

Value [1]
$575 M

Venue
Staples Center

Owner
AEG

Year Opened
1999

Capacity
18,997

Cost To Build
$400 M

Concessionaire
Levy Restaurants

Average Ticket Price
$63

Major Sponsors

   

KIA 

Key Connections
From Forbes Lists

People

Teams

---

Most Read on Forbes

NEWS   People   Places   Companies

**FDA May Destroy American Artisan Cheese Industry**
+93,877 views

**iPhone 6 Rumor Mill: New Pictures Reveal Slimmer More Rounded Design**
+84,278 views

**The Best And Worst States To Make A Living In 2014**
+78,050 views

**Contrave: Is This The Weight Loss Drug We've Been Waiting For?**
+76,792 views

**How To Speak McKinsey: 15 Key Phrases To Pass Yourself Off As A Top Management Consultant**
+61,564 views

+ show


SHOPPING HAS NEVER BEEN SO REWARDING.
CHASE



MAKE EVERY PURCHASE COUNT.
CHASE

---

Exhibit 17 - Page 110
6/10/2014 2:39 PM

**EXHIBIT F, PAGE 408**

Los Angeles Clippers on the Forbes NBA Team Valuations List          http://www.forbes.com/teams/los-angeles-clippers/

**Forbes**          New Posts          Most Popular     Lists          Video
+3 posts this hour     Highest-Paying Diph  Most Powerful Wor  LeVar Burton's Kicks

Mike Ozanian,Forbes Staff

## Madison Square Garden Stock Jumps As Los Angeles Clippers Fetch $2 Billion

The Dolan family, the controlling owners of publicly traded Madison Square Garden, are big winners in the sale of the Los Angeles Clippers for an NBA record price of $2 billion. Yes, the New York Rangers are in the Stanley Cup Finals for the first time in 20 years, and the [...] [...] more>>

Mike Ozanian,Forbes Staff

## Three Reasons Why Former Microsoft CEO Steve Ballmer May Be Wasting $2 Billion On The Los Angeles Clippers -- And Three Why He May Not

Steve Ballmer, the recently-retired former chief executive of Microsoft, is spending $2bn on buying the Los Angeles Clippers NBA franchise -- a record for a professional basketball team. The purchase follows an unsuccessful tilt at the Sacramento Kings basketball outfit last year and cements a life-long passion for Ballmer, who [...] [...] more>>

Andrew Cave,Contributor

## How Donald Sterling And V. Stiviano Turned The $90 Billion Sports Industry On Its Head

It is the most disruptive audio recording of a private conversation unwillingly made public since Watergate. The private chat between Donald Sterling and then girlfriend V. Stiviano that took place in a private residence and was subsequently made public has turned the $90 billion sports industry--the aggregate value of the 122 MLB, [...] [...] more>>

Mike Ozanian,Forbes Staff

## Steve Ballmer, The Clippers And The Basketball Bubble

There may be only one chance in a lifetime to buy a basketball team in a city like Los Angeles, but there are now a number of people willing today to pay more than $1 billion for it. [...] more>>

Nathan Vardi,Forbes Staff

Places


Media Buzz
Los Angeles Clippers on:

Media Partners
TV
Prime Ticket

Radio
KFWB Talk 980

Exhibit 17 - Page 111
6/10/2014 2:39 PM

**EXHIBIT F, PAGE 409**

Los Angeles Clippers on the Forbes NBA Team Valuations List

http://www.forbes.com/teams/los-angeles-clippers/

**Forbes**    New Posts    Most Popular    Lists    Video
+3 posts this hour    Highest-Paying Diplo Most Powerful Wor LeVar Burton's Kicks



Revenue and operating income are for 2012-13 season and net of revenue sharing and arena debt service.

1. Value of team based on current arena deal (unless new arena is pending) without deduction for debt (other than arena debt).
2. Net of arena revenues used for debt payments.
3. Earnings before interest, taxes, depreciation and amortization.
4. Includes arena debts.
5. Includes benefits and bonuses.
6. Includes club seats.
7. Compares the number of wins per player payroll relative to the rest of the NBA. Playoff wins count twice as much as regular season wins. A score of 120 means that the team achieved 20% more victories per dollar of payroll compared with the league average during the 2012-13 season.
8. Local revenues divided by metro population with populations in two-team markets divided in half.
9. Portion of franchise's value attributable to revenue shared among all teams.
10. Portion of franchise's value attributable to its city and market size.
11. Portion of franchise's value attributable to its arena.
12. Portion of franchise's value attributable to its brand.
13. Current team value compared with latest transaction price.

# Inside Forbes



Inside New CEO Mary Barra's Urgent Mission To Fix GM

Mary Barra made history by becoming the first female CEO of General Motors. Now can she fix the company?



Thailand's Richest: Some Win Amid Political Strife



These MLB Pros Earned Over $1M Not Playing



see photos

Inside The Best Franchises In America



Real-Time Billionaires

---

BUSINESS   INVESTING   TECHNOLOGY   ENTREPRENEURS   OP/ED   LEADERSHIP   LIFESTYLE   LISTS

**Conferences**

Forbes Reinventing America Summit

Forbes Women's Summit

**Education**

Forbes School of Business at Ashford University

**Products**

Forbes Identity Protection

Forbes Newsfeeds

Reprints & Permissions

Exhibit 17 - Page 112
6/10/2014 2:39 PM

**EXHIBIT F, PAGE 410**

Los Angeles Clippers on the Forbes NBA Team Valuations List
http://www.forbes.com/teams/los-angeles-clippers/

Forbes

New Posts
+3 posts this hour
Newsletters

Most Popular
Highest-Paying Dipl

Lists
Most Powerful Wor
Forbes Press Room
Forbes Careers
Contact Us
Sitemap
Help

Vid

LeVa:

Forbes CMO Summit
Forbes Healthcare Summit
Forbes Global CEO Conference
Forbes and NAPFA Advisor
iConference

Forbes Investor
Special Situation Survey
Forbes Dividend Investor
Investing Portal



2 Free Issues | Subscriber Services |
Gift Subscription

Forbes China
Forbes India
Forbes Israel
Forbes Mexico
Forbes Middle
East

Forbes Poland
Forbes
Romania
Forbes Russia
Forbes Spain

RealClear
Politics
RealClear
Markets
RealClear World
RealClear
Sports

2014 Forbes.com LLC™  All Rights Reserved     Terms and Conditions  |  Privacy Statement  |  Market Data by Morningstar  |  AdChoices

Exhibit 17 - Page 113
6/10/2014 2:39 PM

**EXHIBIT F, PAGE 411**



EXHIBIT F, PAGE 412



# National Basketball Association

Richard W. Buchanan
Executive Vice President &
General Counsel

May 30, 2014

**By Overnight Mail and Email**

Pierce O'Donnell, Esq.
Greenberg Glusker
1900 Avenue of the Stars, 21st Floor
Los Angeles, CA 90067
podonnell@greenbergglusker.com

Dear Pierce:

You have advised the NBA that your client, Shelly Sterling, as sole trustee of the Sterling Family Trust, has executed a binding term sheet to sell LAC Basketball Club, Inc. to Steve Ballmer, and that it is the intention of those parties to proceed promptly to a closing of the transaction. As a result, the Commissioner is hereby withdrawing the Charge dated May 19, 2014, in the Matter of the Termination of the NBA Membership of LAC Basketball Club, Inc. (the "Charge"). The withdrawal of the Charge is made without prejudice and the NBA reserves all of its rights, including the right to renew the Charge or file a new or amended charge at a later date.

Consistent with the foregoing, the Board of Governors hearing that was scheduled for June 3, 2014 is hereby canceled.

Sincerely,

Richard W. Buchanan

cc:    Maxwell Blecher, Esq.

Olympic Tower • 645 Fifth Avenue • New York NY 10022 • Main: (212) 407-8000 • Direct: (212) 407-8013 • Fax: (212) 888-7931 • Email: rbuchanan@nba.com

Exhibit 18 - Page 114

**EXHIBIT F, PAGE 413**

EXHIBIT 19

EXHIBIT F, PAGE 414

Donald Sterling Agrees to Sell Clippers; Will Dismiss Lawsuit Again...    http://abcnews.go.com/Sports/wireStory/attorney-donald-sterling-ag...

Yahoo!-ABC News Network          Privacy Policy    Interest-Based Ads    Terms of Use    Contact Us
                                                                         © 2014 ABC News Internet Ventures. All rights reserved.

NOW  LAS VEGAS SHOOTING  •  AAPL  •  2014 TONY AWARDS  •  TRACY MORGAN  •  GAME OF THRONES
HOME | VIDEO | U.S. | WORLD | POLITICS | ENTERTAINMENT | TECH | HEALTH | LIFESTYLE | SHOWS    MORE

WATCH LIVE: HOUSE HEARING ON THE VETERANS AFFAIRS SCANDAL

BasicTalk  **$9.99/MO.** EVERY MONTH PLUS TAXES & GOV'T FEES  BELIEVE IT.

# Donald Sterling Agrees to Sell Clippers, Dismiss Lawsuit Against NBA

LOS ANGELES June 5, 2014 (AP)

[91]        187   2        24 Comments



Donald Sterling watches the Clippers play the Los Angeles Lakers during an NBA preseason basketball game in Los Angeles, Dec. 19, 2011.

Danny Moloshok/AP Photo

 **AP**  Los Angeles Clippers owner Donald Sterling agreed Wednesday to sign off on selling the team to former Microsoft CEO Steve Ballmer for what would be a record $2 billion, according to his attorney.

Sterling "has made an agreement with the NBA to resolve all their differences" and as co-owner has given his consent to a deal that was negotiated by his wife, Shelly Sterling, to sell the team, said attorney Maxwell Blecher.

Representatives for Shelly Sterling declined to comment. The NBA declined to comment on Wednesday afternoon.

Donald Sterling filed a $1 billion suit against the NBA in federal court last week alleging the league violated his constitutional rights by relying on information from an "illegal" recording that publicized racist remarks he made to a girlfriend. It also says the league committed a breach of contract by fining Sterling $2.5 million and that it violated antitrust laws by trying to force a sale.

Blecher said the suit will be dismissed. If the NBA owners approve the sale, it will be a record-high sum for a team that cost Donald Sterling about $12 million in 1981, Blecher's co-counsel, Bobby Samini, said the vote by league owners is expected to take place in mid-July.

Ballmer beat out bids by Guggenheim Partners and a group including former NBA All-Star Grant Hill. Ballmer made more than an hour-long personal visit to Shelly Sterling's Malibu home last week and laid out his plan.

This is not Ballmer's first foray into potential NBA ownership. Ballmer and investor Chris Hansen headed a group that agreed to a deal to buy the Kings from the Maloof family in January 2013 with the intention of moving the team to Seattle, where the SuperSonics played until 2008.

But Sacramento Mayor Kevin Johnson lobbied the NBA for time to put together a bid to keep the team in California, and though the Ballmer-Hansen group later increased its offer, owners voted to

## HOT RIGHT NOW

1  She's Her Own Twin

2  Should You Collect Social Security at 62?

3  Las Vegas Cop Killers Were Husband-Wife Team

4  California Chrome Co-Owner 'Ashamed' of Angry Rant

5  Clintons Were 'Dead Broke' After Leaving White House



## YOU MIGHT ALSO LIKE...



Exhibit 19 - Page 115
6/9/2014 7:19 PM

**EXHIBIT F, PAGE 415**

Donald Sterling Agrees to Sell Clippers; Will Dismiss Lawsuit Again...     http://abcnews.go.com/Sports/wireStory/attorney-donald-sterling-ag...

deny the bid for relocation and the Kings were sold to Vivek Ranadive.

---

Follow Tami Abdollah at http://www.twitter.com/latams

31            187 8:1 2              24 Comments

### FROM AROUND THE WEB

  

Dwyane Wade's Wives, Girlfriends All Wrapped Up in 15 Pictures *(Rant Sports)*

Miley Cyrus' Daring Crop Top Leaves Little To The Imagination *(StyleBistro - Look Books)*

10 highest-paid NBA players *(Bankrate.com)*

PHOTOS: Fitness Enthusiast Jen Selter is a HOTTIE *(Rant Sports)*

Broke and Famous, 15 Stars That Lost It All, *(She Budgets)*

Hot Pictures of Olympic Skier Morgan Beck-Miller, Bode Miller's Wife *(Rant Sports)*

Surfer Attacked By Two Great White Sharks 🐬 *(Life)*

### MORE FROM ABC NEWS



Lisa Kudrow Demands New Trial After Juror's 'Mistake'

Rihanna Shines at CFDA Awards, Olsens Take Home Accessory Honor'

Secondary Drowning Nearly Takes Life of California Toddler

'Dancing Hamster' in Kia Ad Accused of Claiming $51K in Disability Benefits

Marine Reunites With Best Friend From Afghan Tour, Pal Wags Tail

NBA Finals animations by Swarbrick

A single move, a Texas-sized ripple

Recommended by

### PHOTO GALLERIES



View: Meet the Man Behind Big Bird and Oscar the Grouch
Lifestyle
● ● ● ● ● ●

### SEE IT, SHARE IT


Las Vegas Metropolitan Police Department/AP Photo

Las Vegas Cop Killers Were Husband-Wife Team

Tracy Morgan's Recovery 'Will Be Arduous'

Charles Eshelman/Getty Images


Courtesy of Chris Koclanis

Guy Turns NYC Apartment Into Arcade, Loses Fiancée


Suzanne Kreiter/The Boston Globe via Getty Images

How the Inspiration for 'The Fault in Our Stars' Would Have Liked It


David Wicock/PA Wire/Press Association Images

Sidewalk Spikes Outside Luxury Building Irk City's Mayor


ABCNews.com

Google Animates Young Student's Drawing: 'Pretty Little Liars' to Re-Write Rules of TV

John Lempersk/WireImage

Halle Berry To Pay $16,000 Each Month in Child Support

---

### OFFERS YOU MIGHT LIKE

nvll ADVERTISEMENT

**Ready for Retirement?**

Have a $500K portfolio? Ken Fisher, a 30-year Forbes columnist, has a retirement guide for you!

More >>

**74 Year Old's Skin Secret**

The ultimate skin tightening remedy that is helping every day women achieve younger looking skin!

More >>

**New Rule in California:**

New Rule In California: Do Not Pay Your Next Car Insurance Bill Until You Read This...

More >>

### JOIN THE DISCUSSION

**EXHIBIT F, PAGE 416**

Donald Sterling Agrees to Sell Clippers; Will Dismiss Lawsuit Again...    http://abcnews.go.com/Sports/wireStory/attorney-donald-sterling-ag...

**24 Comments    ABC News**

Sort by Best                                                                          Share 🖒  Favorite ★

> Join the discussion...

**shall** • 5 days ago
yawn. I hope his picture will go away now, and V's.
4    ▪ Reply ▪ Share ›

**Defenestrator** • 5 days ago
What a drama king. If you ever believe the hype about a "meritocracy" in this country - where only the best and brightest among us become incredibly wealthy - just take a listen to this idiot.
1    ▪ Reply ▪ Share ›

**The TOPI As in 221** • 5 days ago
I still say Stiviano made him stroke.
1    ▪ Reply ▪ Share ›

**RohnertPark1** • 5 days ago
Let the battle for buying the team begin!
1    ▪ Reply ▪ Share ›

>> **Casey** ⭧ RohnertPark1 • 5 days ago
>> Didn't Steve Ballmer from Seattle already buy the team?
>> 1    ▪ Reply ▪ Share ›

>>> **5Senipar** ⭧ Casey • 5 days ago
>>> No. He made an offer that was accepted by the Sterlings. It still must be approved by the owners before he can take ownership/possession. He is not officially the owner yet.
>>> 1    ▪ Reply ▪ Share ›

>>>> **Casey** ⭧ 5Senipar • 5 days ago
>>>> Oh got it! I didn't know the owners had to approve as well.
>>>> Thanks,
>>>> 2    ▪ Reply ▪ Share ›

>>>> **The TOPI As in 221** ⭧ Casey • 5 days ago
>>>> Yes.
>>>> ▪ Reply ▪ Share ›

>>>>> **Casey** ⭧ The TOPI As in 221 • 5 days ago
>>>>> So then there would be no battle for buying the team, right? Too bad they cant move the team to Seattle! We have a winning football team, soccer team and woman's basketball, it would be great to get a winning basketball team!
>>>>> ▪ Reply ▪ Share ›

>>>>> **Wisenheimer** ⭧ Casey • 5 days ago
>>>>> Seattle is a small city. It does not make financial sense to give up a nearly 20 million viewer market for an under five million viewer market.
>>>>> 1    ▪ Reply ▪ Share ›

>>>>>> **Casey** ⭧ Wisenheimer • 4 days ago
>>>>>> Oh I know we will never get the team, even Steve said that. But I can still hold out hope!
>>>>>> ▪ Reply ▪ Share ›

sponsored offers

**New Rule in California:**
New Rule in California: Do Not Pay Your Next Car Insurance Bill Until You Read This...
TheFinanceGuardian

**Luxury Cruises for Less**
How can you book cruises that are cheaper than dinner at a restaurant?
Vacations to Go

**Who's Been Arrested?**
Los Angeles arrest records. Who do you know?
InstantCheckMate

**MOST COMMENTED**



1  Las Vegas Shooting Suspects 'Talked About Murdering Cops'

2  Mother Defends Breastfeeding Her Baby During Graduation

3  Hillary Clinton Talks of Benghazi's Personal Toll

4  Hillary Clinton Defends High-Dollar Speaking Fees

5  London Metal Spikes Outside Luxury Building Sparks Human Rights Firestorm - ABC News

Exhibit 19 – Page 117
6/9/2014 7:19 PM

**EXHIBIT F, PAGE 417**

Donald Sterling Agrees to Sell Clippers; Will Dismiss Lawsuit Again...    http://abcnews.go.com/Sports/wireStory/attorney-donald-sterling-ag...

Exhibit 19 - Page 118
6/9/2014 7:19 PM

**EXHIBIT F, PAGE 418**



EXHIBIT F, PAGE 419

APNewsBreak: Shelly Sterling Heads to Court - ABC News          http://abcnews.go.com/Sports/wireStory/attorney-donald-sterling-dea...

Yahoo!-ABC News Network          Privacy Policy   Interest-Based Ads   Terms of Use   Contact Us
© 2014 ABC News Internet Ventures. All rights reserved.

 Los Angeles arrest records. Who do you know?

 14 Benefits Most Seniors Didn't Know They Had

 Side Effects: Weight Gain, Rashes, Diarrhea & More...

Advertorials by Sponsorlifestyles™

# Donald Sterling Says No Deal; Suit Is On

LOS ANGELES June 10, 2014 (AP)
By TAMI ABDOLLAH Associated Press



430  [8+] [2]          59 Comments

Donald Sterling attends the NBA playoff game between the Clippers
and the Golden State Warriors, April 21, 2014 at the Staples Center in
Los Angeles, Calif.
Robyn Beck/AFP/Getty Images

NEXT VIDEO
Former Microsoft CEO bids
$2 Billion For Clippers

 **AP**   Shelly Sterling will go to probate court Wednesday to seek an emergency
order for a hearing so a judge can confirm her authority to sell the Los
Angeles Clippers, according to an individual familiar with the matter.

The individual was not authorized to speak publicly and spoke on condition of anonymity.

Shelly Sterling brokered what would be a record-breaking $2 billion deal with former Microsoft
CEO Steve Ballmer to sell the team after her husband and co-owner Donald Sterling made racist
comments to a girlfriend that were recorded and published. The NBA moved swiftly to oust him
as an owner.

But Donald Sterling has vowed not to sell and is suing the NBA for $1 billion.

Shelly Sterling contends she is the sole trustee of The Sterling Family Trust, which owns the team.
Donald Sterling was stripped as co-trustee after two neurologists last month determined he was
suffering from dementia and "mentally incapacitated" under the trust's conditions, according to a
person who is familiar with the trust and the medical evaluations but could not speak publicly.

The aim of Sterling's court bid is to have a judge confirm provisions of the family trust to ensure
the Ballmer sale moves forward without a hitch. Donald Sterling has the right to present his side
at any hearing and appeal any decision.

His attorney Maxwell Blecher said a representative for Donald Sterling will likely be at any hearing
but declined to comment further Tuesday. Sterling's attorneys have called the idea that he is
mentally incapacitated "absurd."

On Monday, Donald Sterling pulled his support from the Ballmer deal and issued a one-page
statement titled "The Team is not for Sale."

He instructed his attorneys to prosecute the lawsuit against the NBA that alleges the league
violated his constitutional rights by relying on information from an "illegal" recording that
published racist remarks he made to a girlfriend. It also said the league committed a breach of
contract by fining Sterling $2.5 million and that it violated antitrust laws by trying to force a sale.

HOME > SPORTS

## HOT RIGHT NOW

1   'Game of Thrones' Kit Harington: 'I May Be Out of a Job'

2   Rampaging Las Vegas Couple 'Too Radical' For Bundy Ranch

3   Boston Twins Born 24 Days Apart

4   Baby Rhino Glued to Keeper After Seeing Poachers Kill Mother

5   Hillary Clinton Talks Monica Lewinsky

 Cumbersome CPAP machines or risky surgery are not the only answers to solving sleep apnea.

 If you don't speak Spanish, watch this video now

 Los Angeles arrest records. Who do you know?
Ads By Adblade™

## YOU MIGHT ALSO LIKE...






'I have decided that I must fight to protect my rights," Donald Sterling said. "While my position may not be popular, I believe that my rights to privacy and the preservation of my rights to due process should not be trampled."

NBA general counsel Rick Buchanan has called Donald Sterling's lawsuit "entirely baseless."

"Since it was his wife Shelly Sterling, and not the NBA, that has entered into an agreement to sell the Clippers, Mr. Sterling is complaining about a set of facts that doesn't even exist."

Donald Sterling had agreed to ink the deal and drop the suit last week assuming "all their differences had been resolved," his attorneys said. But individuals close to the negotiations who weren't authorized to speak publicly said he decided to not sign the papers after learning the NBA won't revoke its lifetime ban and $2.5 million fine.

"There was never a discussion involving the NBA in which we would modify Mr. Sterling's penalty in any way whatsoever. Any suggestion otherwise is complete fabrication," NBA spokesman Mike Bass said.

Donald Sterling's comments to V. Stiviano included telling her to not bring black people to Clippers games, specifically mentioning Hall of Famer Magic Johnson. They resulted in outrage from the public and players and even prompted President Barack Obama to comment on what he called Sterling's "incredibly offensive racist statements."

Donald Sterling said in his statement that he was "extremely sorry for the hurtful statements" he made privately but said them out of anger and jealousy and didn't intend for them to be public.

Tami Abdollah can be reached at http://www.twitter.com/latams

431 ☷☰☷  59 Comments

## FROM AROUND THE WEB







'I Feel Nothing But Love When I Look Into Their Eyes' (Unbound)

Early Multiple Sclerosis Symptoms You Should Never Ignore (WebMD)

Lisa Kudrow Demands New Trial After Juror's 'Mistake'

'Dancing Hamster' in Kia Ad Accused of Claiming $5K in Disability Benefits

Celebrities Who have Killed Someone will SHOCK You (Rant Lifestyle)

Is Fibromyalgia The Real Diagnosis? (Envita)

26 Actors Who Are Actually Terrible (Rant Lifestyle)

Pictures Show Why Andre Drummond Should Have Stayed With Jennette McCurdy (Rant Sports)

Kim Kardashian Sheds the Fake Eyelashes and Flawless Foundation (StyleBistro)

## MORE FROM ABC NEWS



Florida Judge Caught Lying About Relationship With Prosecutor 64

Las Vegas Cop Killers Were Husband-Wife Team

D-Day Color Footage Gives Rare Insight into Invasion of Normandy 64

Hillary Clinton Defends High-Dollar Speaking Fees

Police Make Shocking Arrest in N.C. Woman's Murder 64

Recommended by

## OFFERS YOU MIGHT LIKE

**New Rule in California:**

New Rule in California: Do Not Pay Your Next Car-Insurance Bill Until You Read This...

More >>

**Vintage Engagement Rings**

Shop Brilliant Earth's beyond conflict free diamond rings, antique rings, and fine jewelry!

More >>

ADVERTISEMENT

**Ready for Retirement?**

Have a $500K portfolio? Ken Fisher, a 30-year Forbes columnist, has a retirement guide for you!

More >>

### PHOTO GALLERIES



View: Meet the Man Behind Big Bird and Oscar the Grouch
Lifestyle

### SEE IT, SHARE IT

10-Year-Old Genius Graduates High School
KSTV

Baby Rhino Glued to Keeper After Seeing Poachers Kill Mother
Flick-n-Pay/YouTube

Shaquille O'Neal Sells Home for $10?
Zillow

Celebrity Women Who Pay Big Post-Split
John Lamparski/WireImage /Getty Images

WATCH: This Could Be the Greatest Plumbing Invention Since the Plunger
Courtesy Saung-Il Kim

Space Smells and 4 Other Things We Learned From Astronaut Mike Hopkins
Dmitry Lovetsky/AFP /Getty Images

'Game of Thrones' Kit Harington: 'I May Be Out of a Job'
ABC

APNewsBreak: Shelly Sterling Heads to Court - ABC News     http://abcnews.go.com/Sports/wireStory/attorney-donald-sterling-dea...

## JOIN THE DISCUSSION

59 Comments    ABC News         Login

Sort by Best                                      Share   Favorite ★

> Join the discussion…

**Beeyrself · 17 hours ago**
Bravo, I may disagree with your recorded comments, but I hope you win. The NBA's actions were arrogant and misguided.
18   · Reply · Share ›

> **Rafterman00 ↝ Beeyrself · 10 hours ago**
> Why? Their league, their rules.
> 3   · Reply · Share ›
>
>> **Bob ↝ Rafterman00 · 3 hours ago**
>> Good for him...he is completely right. The NBA has no issues with JayZ being a part owner of the Nets and JayZ uses the "N" Word in all his songs.
>>
>> Remember, Donald Sterling and Jerry Buss etc made the rules...they MADE THE NBA, they technically own the NBA... all the other owners came way after them. There would be no NBA today without them as the league was close to bankruptcy back in the late 70's and early 80's. They essentially had to buy the team and essential accept losing money on the teams for years (more Donald Sterling than Jerry Buss) before turning the potentially bankrupt business into a profit...bringing in all the other owners benefited from them saving the league.
>>
>> If not, you should try investing in a Women's Roller Hockey League and see how lucrative that business is...EXACTLY.
>>
>> Donald Sterling wants the NBA to lift the lifetime ban.
>>
>> Because in essence he wants to sell the Clippers to Steve Ballmer and his "investors". Donald Sterling would in turn be one of the investors...a VERY silent investors under the name of Cayman Island Sport Offshore LLC. etc etc
>>
>> But in order for that to work, his lifetime banned had to be lifted.
>> · Reply · Share ›
>>
>>> **cornrow ↝ Rafterman00 · 6 hours ago**
>>> let's see the rules stand up in court! LOL!
>>> 2   · Reply · Share ›

**Thomas Davis · 17 hours ago**
His comments were ridiculous and hurtful, but he is right and a judge will see it that way. He was having an intimate conversation with his lady friend in the privacy of his own home. While the couple were not married to meet the exception clause, the tapes reveal that they were indeed more than just friends.

I dont believe for a minute a judge would agree with the NBA that Sterlings statements breached any agreement with the NBA as they were never intended for public use nor was he aware that they were being recorded. The NBA fine is outrageous . His lifetime ban is also profane . His actions were not intended to hurt the NBA and he had no expectation they would be made public , especially comments made in the heat of the moment like those.

I think Sterling should apologize and seek voluntary restitution to the African American community, but the NBAs actions are illegal. They will be thrown out.
15   · Reply · Share ›

> **Dick the Butcher ↝ Thomas Davis · 7 hours ago**
> "I dont believe for a minute a judge would agree with the NBA that Sterlings

sponsored offers

**Get Credit Assistance**
Daily file monitoring, access to your Equifax® 3-bureau credit scores and more.
Equifax

**Mom's Sneaky Diet Trick**
Controversy over new skinny pill -- is it too strong for store shelves?...
Garcinia Cambogia Plus

**Unique Engagement Rings**
Shop Brilliant Earth's beyond conflict free diamond rings, antique rings, and fine jewelry!
Brilliant Earth



**MOST COMMENTED**

1   Gunfire Reported at Portland-Area High School

2   House Speaker's Dire Prediction About Benghazi Deal: 'We're Going To Pay For This'

3   Couple in Las Vegas Rampage Were Booted From Bundy Ranch

4   Republicans Rip Hillary Clinton's Leadership at State Department

5   Iraq On the Brink After Years of Political Turmoil



Cumbersome CPAP machines or risky surgery are not the only answers to solving sleep apnea.

If you don't speak Spanish, watch this video now

Los Angeles arrest records. Who do you know?
Ads By Adblade℠

Exhibit 20 - Page 121
6/10/2014 3:07 PM

**EXHIBIT F, PAGE 422**

APNewsBreak: Shelly Sterling Heads to Court - ABC News          http://abcnews.go.com/Sports/wireStory/attorney-donald-sterling-dea...

Exhibit 20 - Page 122
6/10/2014 3:07 PM
4 of 4

**EXHIBIT F, PAGE 423**

EXHIBIT 21

☎0001/0002

# DONALD T. STERLING
808 N. Beverly Drive
Beverly Hills, California 90210

June 9, 2014

**Via Facsimile (310) 278-8010
and U.S. Mail -- Certified -- Return Receipt Requested**

Rochelle H. Sterling
23740 Malibu Road
Malibu, California 90265

Re:   **Notice of Revocation of The Sterling Family Trust (2013
Restatement), Dated December 18, 2013**

NOTICE IS HEREBY GIVEN that I, Donald T. Sterling, hereby elect, effective immediately, to revoke The Sterling Family Trust (2013 Restatement), dated December 18, 2014 (the "Sterling Trust"). The revocation includes each and every trust purportedly created pursuant to the Sterling Trust. The election to revoke is hereby made pursuant Section 2.5.a and 2.6.a of the Sterling Trust and any other application provision thereunder.

Section 2.5a of the Sterling Trust provides in pertinent part that, upon revocation: "all income and principal of the Community Trust shall promptly be distributed to the Settlors as their community property...".

Section 2.6a of the Sterling Trust provides in pertinent part that, upon revocation: "all income and principal of the Settlor's Separate Trust shall promptly be distributed to such Settlor as his or her separate property...".

Demand is hereby made that you comply with the terms of the Sterling Trust with respect to your action post revocation.

Exhibit 21 - Page 123

**EXHIBIT F, PAGE 425**

Page 2

Furthermore, I hereby object to each and every assertion made in that: (i) certain correspondence from Pierce O'Donnell dated March 29, 2014; and (ii) certain correspondence from Pierce O'Donnell dated June 5, 2014. I assert, without limitation, that any attempt to remove me as a Trustee of the Sterling Trust is invalid and illegal. Further, any assertion that I am 'incapacitated' as that term is defined in the Sterling Trust is false and without merit.

By:
Name:   Donald T. Sterling
Title:    Settlor

cc:   Pierce O'Donnell, Esq.          (via electronic mail)
      Greenberg Glusker Fields Claman & Machtinger LLP
      1900 Avenue of the Stars, 21st Floor
      Los Angeles, California 90067

      Bob Baradaran, Esq.           (via electronic mail)
      Managing Partner
      Greenberg Glusker Fields Claman & Machtinger LLP
      1900 Avenue of the Stars, 21st Floor
      Los Angeles, California 90067

      Douglas Walton, Esq.          (via electron mail)

      Mr. Darren Shield             (via electron mail)

Exhibit 21 - Page 124

**EXHIBIT F, PAGE 426**

1   PIERCE O'DONNELL (SBN 81298)
    PODonnell@GreenbergGlusker.com
2   MARC M. STERN (SBN 126409)
    MStern@GreenbergGlusker.com
3   GREENBERG GLUSKER FIELDS CLAMAN &
    MACHTINGER LLP
4   1900 Avenue of the Stars, 21st Floor
    Los Angeles, California 90067-4590
5   Telephone: 310.553.3610
    Fax: 310.553.0687
6
7   Attorneys for Trustee
    ROCHELLE H. STERLING
8
9                   SUPERIOR COURT OF THE STATE OF CALIFORNIA
10                          COUNTY OF LOS ANGELES
11
    In the Matter of                    Case No.  **BP152858**
12
                                        ORDER GRANTING EX PARTE
13      THE STERLING FAMILY             PETITION (1) FOR CONFIRMATION OF
        TRUST.                          TRUSTEE'S ACTS AND INSTRUCTING
14                                      TRUSTEE AND (2) FOR ORDER
                                        DIRECTING TRUSTEE UNDER
15                                      PROBATE CODE §1310(b) TO PREVENT
                                        INJURY OR LOSS TO TRUST
16
                                        [Probate Code §§1310(b); 17200(b)(5) & (6),
17                                      CRC 3.1200 et seq.]
18                                      *[Filed concurrently with Ex Parte Petition (1)
                                        for Confirmation of Trustee's Acts etc., and
19                                      other supporting papers]*
20                                      Date:      June 11, 2014
                                        Time:      8:30 am
21                                      Dept.:     Room 260 (ex parte)
22
23          The verified Ex Parte Petition (1) For Confirmation Of Trustee's Acts And Instructing
24   Trustee And (2) For Order Directing Trustee Under Probate Code §1310(B) To Prevent Injury Or
25   Loss To Trust (the "Petition") of Rochelle H. Sterling ("Petitioner"), sole Trustee of The Sterling
26   Family Trust dated August 12, 1998, and restated in its entirety on December 18, 2013 (as
27   restated, the "Trust") was heard ex parte on June 11, 2014, at 8:30 am, in Room 260 of the Los
28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

81294-00002/2191943.2

ORDER ON EX PARTE PET FOR CONFIRMATION OF TRUSTEE'S ACTS AND INSTRUCTING TRUSTEE

**EXHIBIT F, PAGE 427**

1 Angeles County Superior Court located at 111 N. Hill Street, Los Angeles, California 90012, The

2 Honorable _____, Judge presiding. Pierce O'Donnell and Marc M.

3 Stern of Greenberg Glusker Fields Claman & Machtinger LLP appeared for the Trustee of the

4 Trust, Maxwell M. Blecher of Blecher Collins Pepperman & Joye and _____

5 _____, appeared for Donald T. Sterling and Adam Streisand of

6 Loeb & Loeb LLP appeared for Steve Ballmer.

7   After reviewing the papers, records and files herein, the Court finds that (a) notice of the

8 ex parte hearing was given as required by law, (b) this Court has jurisdiction to grant the relief

9 requested in the Petition, (c) proper venue lies and (d) it is in the best interests of the Trust and

10 those interested in the Trust that the Petition be heard ex parte without further notice.

11   **IT IS THEREFORE ORDERED THAT:**

12   1. Confirming that Petitioner had authority to unilaterally bind the Trust, as the

13 owner of LAC which owns the Clippers, by executing the BTS and agreeing to sell the Purchased

14 Assets pursuant thereto;

15   2. Authorizing and instructing Petitioner to sell the Clippers to a limited liability

16 company wholly-owned by Steve Ballmer upon the terms and conditions set forth in the BTS, and

17 to take all actions necessary or appropriate to complete the sale, including but not limited to the

18 execution of any and all documents necessary to complete the sale and the transfer of the Clippers

19 contemplated thereby; and

20   3. Directing Petitioner under Probate Code §1310(b), as Trustee of the Trust, to

21 consummate the sale of the Clippers as provided in the BTS notwithstanding any appeal that may

22 be taken of the Order confirming Petitioner's act and instructing her with respect to the sale.

23

24

25 DATED: _____

26

27            JUDGE OF THE
           LOS ANGELES SUPERIOR COURT

28

ORDER ON EX PARTE PET FOR CONFIRMATION OF TRUSTEE'S ACTS AND INSTRUCTING TRUSTEE

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

EXHIBIT F, PAGE 428

1  LOEB & LOEB LLP
   ADAM F. STREISAND (SBN 155662)
2  AMY K. BELL (SBN 251387)
   10100 Santa Monica Blvd., Suite 2200
3  Los Angeles, CA 90067
   Telephone: 310.282.2000
4  Facsimile: 310.282.2200

5  Attorneys for Joining Party
   Steven A. Ballmer

6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                      FOR THE COUNTY OF LOS ANGELES

10

11 In the Matter of                    )  Case No.: BP152858
                                        )
12 THE STERLING FAMILY TRUST.           )  Assigned to Hon. Michael I. Levanas
                                        )
13                                      )  JOINDER IN EX PARTE PETITION
                                        )  (1) FOR CONFIRMATION OF
14                                      )  TRUSTEE'S ACTS AND
                                        )  INSTRUCTING TRUSTEE AND (2)
15                                      )  FOR ORDER DIRECTING
                                        )  TRUSTEE UNDER PROBATE CODE
16                                      )  §1310(B) TO PREVENT INJURY OR
                                        )  LOSS TO TRUST
17                                      )
                                        )  Date:    July 7, 2014
18                                      )  Time:    8:30 a.m.
                                        )  Dept:    5
19

20

21

22

23

24

25

26

27

28

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2370461.1
223368-10001

JOINDER BY STEVEN A. BALLMER IN EX PARTE PETITION

EXHIBIT F, PAGE 429

       **TO EACH PARTY AND ATTORNEY OF RECORD IN THE CAUSE NOW PENDING BEFORE THIS HONORABLE COURT:**

       **PLEASE TAKE NOTICE** that, as an interested party in accordance with his rights in the premises under Probate Code section 18100, Steven A. Ballmer hereby joins in the Ex Parte Petition by Rochelle Sterling (1) For Confirmation of Trustee's Acts and Instructing Trustee and (2) For Order Directing Trustee Under Probate Code §1310(b) to Prevent Injury or Loss to Trust, and in the relief prayed for therein.

Dated:  June 12, 2014

                                  STEVEN A. BALLMER

LOEB & LOEB LLP
Adam F. Streisand

By: _____
     Adam F. Streisand
     Attorneys for Joining Party
     Steven A. Ballmer

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2370461.1
223368-10001

1

JOINDER BY STEVEN A. BALLMER IN EX PARTE PETITION

**EXHIBIT F, PAGE 430**

## PROOF OF SERVICE

The undersigned declares as follows: I am employed in the County of Los Angeles, State of California and over the age of 18. My business address is 10100 Santa Monica Boulevard, Suite 2200, Los Angeles, California 90067. I am not a party to this cause.

On June 13, 2014, I served a true copy of the foregoing document described as **JOINDER IN EX PARTE PETITION (1) FOR CONFIRMATION OF TRUSTEE'S ACTS AND INSTRUCTING TRUSTEE AND (2) FOR ORDER DIRECTING TRUSTEE UNDER PROBATE CODE § 1310(B) TO PREVENT INJURY OR LOSS TO TRUST** on each interested party(ies), as set forth below or on the attached service list.

[ ] **(VIA FACSIMILE)** by transmitting the above-named document to the fax number set forth below, or on the attached service list.

[ ] **(VIA EMAIL)** I caused the transmission of the above-named document(s) to the email address set forth below, or on the attached service list.

[X] **(VIA U.S. MAIL)** by placing the above-named document in a sealed envelope addressed as set forth below or on the attached service list and then by placing such sealed envelope for collection and mailing with the United States Postal Service in accordance with Loeb & Loeb LLP's ordinary business practices.

[ ] **(VIA OVERNIGHT DELIVERY)** by placing the above-named document in a sealed envelope addressed as set forth below or on the attached service list and then by placing said envelope for collection and overnight delivery via Overnite Express in accordance with Loeb & Loeb LLP's ordinary business practices.

I am readily familiar with Loeb & Loeb LLP's practice for collecting and processing correspondence for mailing with the United States Postal Service and Overnight Delivery Service. That practice includes the deposit of all correspondence with the United States Postal Service and/or Overnight Delivery Service the same day it is collected and processed, in the ordinary course of business.

[ ] **(VIA PERSONAL DELIVERY)** by placing the above-named document in a sealed envelope addressed as set forth below or on the attached service list and then by delivering the document to **Nationwide Legal, Inc.** (207 South Broadway, 6th Floor Los Angeles, CA 90012 (213) 625-9100) messenger service to be delivered by personal delivery.

| | |
|---|---|
| Pierce O'Donnell<br>Marc M. Stern<br>Greenbreg Glusker Fields Claman<br>& Machtinger LLP<br>1900 Avenue of the Stars<br>21st Floor<br>Los Angeles, California 90067-4590 | Bobby Samini, Esq.<br>Samini Scheinberg PC<br>949 South Coast Drive<br>Suite 420<br>Costa Mesa, California 92626 |

Executed on June 13, 2014, at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dolores A. Gameros
(Type or print name)

(Signature)

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

**EXHIBIT F, PAGE 431**

1  Maxwell M. Blecher (SBN 26202)
   mblecher@blechercollins.com
2  **BLECHER COLLINS PEPPERMAN & JOYE, P.C.**
   515 South Figueroa Street, Suite 1750
3  Los Angeles, California 90071-3334
   Telephone: (213) 622-4222
4  Facsimile: (213) 622-1656

5  Bobby Samini, Esq. (SBN 181796)
   bsamini@saminilaw.com
6  **SAMINI SCHEINBERG, PC**
   949 South Coast Drive, Suite 420
7  Costa Mesa, California 92626
   Telephone: (949) 724-0900
8  Facsimile: (949) 724-0901

9  Attorneys for Respondent
   DONALD T. STERLING

10

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

JUN 23 2014

Sherri R. Carter, Executive Officer/Clerk
By Nancy Rhodes, Deputy

11          SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                     COUNTY OF LOS ANGELES

13

14  In the Matter of                    Case No. BP152858

15                                      **RESPONDENT DONALD T. STERLING'S**
                                        **STATEMENT OF OPPOSITION**
16  THE STERLING FAMILY TRUST.
                                        Assigned for All Purposes to:
17                                      Hon. Michael Levanas, Dept. 5

18
                                        Trial Date: July 7, 2014
19                                      Time: 8:30 am
                                        Dept.: 5
20

21

22

23

24

25

26

27

28

_RESPONDENT DONALD T. STERLING'S STATEMENT OF OPPOSITION_

**EXHIBIT F, PAGE 432**

1  Respondent DONALD T. STERLING opposes the petition of ROCHELLE H. STERLING

2  as follows:

3      A.  To the extent that Petitioner seeks an adjudication that Respondent lacks mental

4  competency sufficient to serve as a trustee for the STERLING FAMILY TRUST or in any other

5  capacity having to do with the Los Angeles Clippers, Respondent contends that the claims of

6  Petitioner are false and inaccurate and that Respondent will establish by competent medical and

7  lay testimony that he is fully capable of performing the functions of trustee of the STERLING

8  FAMILY TRUST and acting in the best interests of the TRUST.

9      B.  To the extent Petitioner seeks judicial affirmation of Respondent's alleged removal

10  as a trustee of the STERLING FAMILY TRUST by reason of having two physicians certify that

11  Respondent lacked mental competency to performs the duties of a trustee, Respondent alleges that:

12      1.  Petitioner is determined to sell the Los Angeles Clippers (owned by the

13  STERLING FAMILY TRUST) over Respondent's objection and has fabricated and

14  implemented this disingenuous basis to override Respondent valid objections to such sale.

15  In doing so, Petitioner has not acted in an equitable manner and equity should deny her

16  prayer for relief;

17      2.  Respondent was induced to submit to medical examination under false

18  pretenses in that Petitioner induced Respondent to meet with doctors she hired based on

19  fraudulent representations;

20      3.  The medical conclusions themselves were induced by undue influence and

21  were wrong at the time rendered and continue to be wrong;

22      4.  The trust agreement originally had a provision which allowed a trustee

23  "booted out" by reason of a finding of incompetency to get reinstated by producing

24  contrary medical evidence. This provision was inadvertently omitted from the restated

25  Trust Agreement. There being no evidence that its elimination was bargained for, equity

26  should restore that provision and allow Respondent to be reinstated;

27      5.  The "ouster" of Respondent is against public policy and principles of equity

28  and should not be tolerated.

Blecher Collins
Pepperman & Joye

-1-

RESPONDENT DONALD T. STERLING'S STATEMENT OF OPPOSITION

**EXHIBIT F, PAGE 433**

1    C.    Finally, Petitioner's claim of irreparable injury if the present negotiations abort is

2  pure speculation.  Indeed it is equally or more likely that with the passage of time the Clippers will

3  be worth more than the amount now being considered.

4

5  Dated:  June 22, 2014                    BLECHER COLLINS PEPPERMAN & JOYE, P.C.

6

7                                           By: _____

8                                               Maxwell M. Blecher
                                                Attorneys for Respondent
9                                               DONALD T. STERLING

10  59847.1

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

RESPONDENT DONALD T. STERLING'S STATEMENT OF OPPOSITION

**EXHIBIT F, PAGE 434**

## PROOF OF SERVICE

1

2 STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3      At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 515 South

4 Figueroa Street, Suite 1750, Los Angeles, CA 90071-3334.

5      On June 22, 2014, I served true copies of the following document(s) described as RESPONDENT DONALD T. STERLING'S STATEMENT OF OPPOSITION on the

6 interested parties in this action as follows:

7      Pierce O'Donnell
     PODonnell@GreenbergGlusker.com

8      Caroline Heindel
     cheindel@greenbergglusker.com

9      GREENBERG GLUSKER FIELDS
     CLAMAN & MACHTINGER LLP

10      1900 Avenue of the Stars, 21st Floor
     Los Angeles, CA 90067-4590

11

12      **BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent to the persons at the e-mail addresses listed above.

13

14      I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

15      Executed on June 22, 2014, at Los Angeles, California.

16

17                 _____
                Lorelei L. Gerdine

18

19

20

21

22

23

24

25

26

27

28

RESPONDENT DONALD T. STERLING'S STATEMENT OF OPPOSITION

**EXHIBIT F, PAGE 435**

RETURN TO CUSTOMER

1 MAXWELL M. BLECHER, ESQ., SBN 26202
BLECHER COLLINS PEPPERMAN & JOYE, PC
2 515 S. Figueroa Street, Ste. 1750
Los Angeles, CA 90071
3 Telephone: (213) 622-4222
Facsimile: (213) 622-1656
4 Email: mblecher@blechercollins.com

5 BOBBY SAMINI, ESQ., SBN 181796
SAMINI SCHEINBERG, PC
6 949 South Coast Drive, Ste. 420
Costa Mesa, CA 92626
7 Telephone: (949) 724-0900
Facsimile: (949) 724-0901
8 Email: bsamini@saminilaw.com

9 GARY M. RUTTENBERG, ESQ., SBN 48590
STEFANIE S. CUTLER, ESQ., SBN 254364
10 BLOOM & RUTTENBERG
11111 Santa Monica Blvd., Ste. 1840
11 Los Angeles, CA 90025-3344
Telephone: (310)444-1979
12 Facsimile: (310)444-1917
Email: ruttenberg@aol.com

13

ALEXANDER R. GINZBURG, ESQ., SBN 166795
14 YASHA BRONSHTEYN, ESQ., SBN 210248
GINZBURG & BRONSHTEYN, LLP
15 11111 Santa Monica Blvd., Ste. 1840
Los Angeles, CA 90025-3344
16 Telephone: (310) 914-3222
Facsimile: (310) 914-4242
17 Email: yasha@gbllp-law.com

18 Attorneys for Donald Sterling

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

JUL 03 2014

Sherri R. Carter, Executive Officer/Clerk
By Thea Blackwell, Deputy

19

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

20

### FOR THE COUNTY OF LOS ANGELES

21

| | |
|---|---|
| In the Matter of | CASE NO.: BP152858 |
| 22 | SUPPLEMENTAL OBJECTIONS OF |
| THE STERLING FAMILY TRUST | RESPONDENT DONALD T. STERLING TO |
| 23 | EX PARTE PETITION (1) FOR |
| | CONFIRMATION OF TRUSTEE'S ACTS |
| 24 | AND INSTRUCTING TRUTEE AND (2) |
| | FOR ORDER DIRECTING TRUSTEE |
| 25 | UNDER PROBATE CODE §1310(b) TO |
| | PREVENT INJURY OR LOSS TO TRUST |
| 26 | |
| | Trial Date:   July 7, 2014 |
| 27 | Time:            1:30 pm |
| | Dept:            5 |
| 28 | Judge:          Michael I. Levanas |

By Fax

1

SUPPLEMENTAL OBJECTIONS OF RESPONDENT DONALD T. STERLING

DONALD T. STERLING ("Donald") hereby files his SUPPLEMENTAL OBJECTIONS OF RESPONDENT DONALD T. STERLING TO EX PARTE PETITION (1) FOR CONFIRMATION OF TRUSTEE'S ACTS AND INSTRUCTING TRUTEE AND (2) FOR ORDER DIRECTING TRUSTEE UNDER PROBATE CODE §1310(b) TO PREVENT INJURY OR LOSS TO TRUST that was filed on June 23, 2014 and incorporated the same herein and respectfully states as follows:

1.    In advance of the two examinations of DONALD STERLING in May 2014, Petitioner, or someone acting on her direction or behalf, unlawfully authorized the transmission of private and personal medical records of Respondent to her handpicked doctors. The unlawful authorization of the transfer, disclosure and use of Respondent's private and personal medical records violated both California and Federal laws relating to patient privacy and the privacy of Respondent's individually identifiable health information.

WHEREFORE, this Court should:

1.    Deny Petitioner ROCHELLE H. STERLING's EX PARTE PETITION (1) FOR CONFIRMATION OF TRUSTEE'S ACTS AND INSTRUCTING TRUTEE AND (2) FOR ORDER DIRECTING TRUSTEE UNDER PROBATE CODE §1310(b) TO PREVENT INJURY OR LOSS TO TRUST in its entirety; and

2.    For such further relief as the Court deems appropriate.


Respectfully submitted,

DATED: July 3, 2014          GINZBURG & BRONSHTEYN, LLP


By: _____
      ALEXANDER GINZBURG, ESQ.

DATED: July 3, 2014          BLOOM & RUTTENBERG


By: _____
      GARY M. RUTTENBERG, ESQ.


2

SUPPLEMENTAL OBJECTIONS OF RESPONDENT DONALD T. STERLING

**EXHIBIT F, PAGE 437**

07/03/2014 00:21 FAX                  ☑0001/0001

1                    (VERIFICATION-446, 2015.5 C.C.P.)

2   STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

3        I am the RESPONDENT, in the above-entitled action or pleading; I have read the foregoing

4   SUPPLEMENTAL OBJECTIONS OF RESPONDENT DONALD T. STERLING TO EX PARTE

5   PETITION (1) FOR CONFIRMATION OF TRUSTEE'S ACTS AND INSTRUCTING TRUTEE

6   AND (2) FOR ORDER DIRECTING TRUSTEE UNDER PROBATE CODE §1310(b) TO

7   PREVENT INJURY OR LOSS TO TRUST and know the contents thereof; and I certify that the

8   same is true of my own knowledge, except as to those matters which are therein stated upon my

9   information or belief, and as to those matters I believe it to be true.

10        EXECUTED this __3RD__ day of __JULY_____, 2014, at Los Angeles, California.

11        I declare under penalty of perjury, under the laws of the State of California, that the

12   foregoing is true and correct.

13

14

15                    DONALD T. STERLING

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT F, PAGE 438**

Proof of Service

I, the undersigned, declare and say as follows:

I am 18 years of age or older, employed at the business noted above my signature which is in the county where any mailing herein states occurred, and not a party to the within actions.

On July 3, 2014, I caused to be served the documents(s) listed below my signature under the heading "Document(s) Served" by placing a copy of the document(s) (or the original, if so noted below) in individual envelope for each of the parties listed below my signature under the heading "Parties Served" (except for fax-only service), addressed to them at their last known addresses in this action exactly as shown (excepting parenthetical referenced to their capacity), there being U.S. Mail deliver service to those addresses used for service by mail, and by sealing said envelopes, and on the same day, as marked with "X" by –.

[ X ] placing each envelope for collection and processing for mailing following my firms ordinary business practice with which I am readily familiar and under which on the same day correspondence is so placed for mailing it is deposited in the ordinary course of business with the U.S. Postal Service at my business address, 1ˢᵗ-class postage fully prepaid.

[ ] depositing each envelope into the U.S. Mail with 1ˢᵗ-class postage fully prepaid at a mail box or collection facility in the city and state of my business address. "Parties Served" lists all parties and counsel served in the within matter, and their respective capacities. [required for federal cases, including bankruptcy, among others].

[ ] faxing each page of each document and this proof of service to the parties served at their last known fax numbers as listed below from a fax machine located at my business address which reported no errors and which produced a transmission confirmation report, a true copy [ X ] email each page of each document and this proof of service to the parties served at their last known email address and which produced a transmission confirmation report, a true copy.

[ ] depositing each envelope at a drop box or other facility in the city and state of my business address within the time and pursuant to procedures readily familiar to me necessary for delivery [ ] by Federal Express on the morning of the next business day or [ ] by courier on the same day, (use only if overnight or courier services authorized or as a supplement.).

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed on July 3, 2014, at my business address, 11111 Santa Monica Blvd., Suite 1840, Los Angeles, California 90025-3352, in the County of Los Angeles.

BRENDA PAREDES

Document(s) Served (exact title)

SUPPLEMENTAL OBJECTIONS OF RESPONDENT DONALD T. STERLING TO EX PARTE PETITION (1) FOR CONFIRMATION OF TRUSTEE'S ACTS AND INSTRUCTING TRUTEE AND (2) FOR ORDER DIRECTING TRUSTEE UNDER PROBATE CODE §1310(b) TO PREVENT INJURY OR LOSS TO TRUST

Person(s) Served

| | |
|---|---|
| Pierce O'Donnell, Esq. | Adam F. Streisand, Esq. |
| Marc M. Stern, Esq. | Amy K. Bell, Esq. |
| Greenberg Glusker Fields Claman & Machtinger LLP | Loeb & Loeb, LLP, |
| Attorneys for Rochelle Sterling | Attorney for Steven A. Ballmer |
| 1900 Avenue of the Stars, 21st Fl. | 10100 Santa Monica Blvd., Suite 2200 |
| Los Angeles, CA 90067-4590 | Los Angeles, CA 90067 |
| E-Mail: Podonnell@greenbergglusker.com | E-Mail:astreisand@loeb.com |

**EXHIBIT F, PAGE 439**

SAMINI SCHEINBERG, PC
949 South Coast Drive, Suite 420
Costa Mesa, California 92626
Tel. (949) 724-0900

**PROOF OF SERVICE**

STATE OF CALIFORNIA )
) SS:
COUNTY OF LOS ANGELES )

   I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action; my business address is 949 South Coast Drive, Suite 420, Costa Mesa, California 92626. On July 3, 2014, I served the within **RESPONDENT DONALD T. STERLING'S NOTICE OF REMOVAL** on the interested parties in said action by placing ___ the original __X__ a true copy thereof, addressed as follows:

| | |
|---|---|
| Betram Fields<br>Pierce O'Donnell<br>Marc M. Stern<br>Caroline Heindel<br>**GREENBERG GLUSKER FIELDS**<br>**CLAMAN & MACHTINGER LLP**<br>1900 Avenue of the Stars, 21st Floor<br>Los Angeles, CA 90067-4590 | Adam F. Streisand<br>Amy K. Bell<br>**LOEB & LOEB, LLP**<br>10100 Santa Monica Blvd., Suite 2200<br>Los Angeles, CA 90067 |

__X__  BY UNITED STATES MAIL,   I am "readily familiar" with the practice of collection and processing correspondence for mailing. Under that practice, it would be deposited in a box or other facility regularly maintained by the United States Postal Service with First-Class postage thereon fully prepaid that same day at Costa Mesa, California, in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

___BY FACSIMILE TRANSMISSION, I caused the above-referenced document(s) to be transmitted to the above-listed addressee(s).

___  BY PERSONAL SERVICE, I caused to be delivered such envelope by hand to the offices of the addressee.

___ State  I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

__X__  Federal   I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Dated: July 3, 2014

Diana Alderete

-5-