# EXHIBIT J

Appellate Case No. B258151

## COURT OF APPEAL FOR THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT, DIVISION EIGHT

DONALD T. STERLING

Appellant,

vs.

ROCHELLE H. STERLING

Respondent.

Appeal from the Los Angeles County Superior Court

Civil Case No. BP152858

Hon. Michael Levanas, Judge Presiding

### APPELLANT'S OPENING BRIEF

Bobby Samini, Esq. (SBN 181796)*
Matthew M. Hoesly, Esq. (SBN 289593)
840 Newport Center Drive, Suite 700
Newport Beach, California 92660
Telephone: (949) 724-0900
Facsimile: (949) 724-0901

i

**EXHIBIT J, PAGE 467**

Appellate Case No. B258151

---

## COURT OF APPEAL FOR THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT, DIVISION EIGHT

---

DONALD T. STERLING

Appellant,

vs.

ROCHELLE H. STERLING

Respondent.

---

Appeal from the Los Angeles County Superior Court

Civil Case No. BP152858

Hon. Michael Levanas, Judge Presiding

---

### APPELLANT'S OPENING BRIEF

---

Bobby Samini, Esq. (SBN 181796)*
Matthew M. Hoesly, Esq. (SBN 289593)
840 Newport Center Drive, Suite 700
Newport Beach, California 92660
Telephone: (949) 724-0900
Facsimile: (949) 724-0901

i

**EXHIBIT J, PAGE 468**

## Certificate of Interested Entities or Persons

### (Cal. Rules of Court, Rule 8.208)

The following entities or persons have either (1) an ownership interest of 10 percent or more in the party or parties filing this certificate (Cal. Rules of Court, rule 8.208(e)(1)), or (2) a financial or other interest in the outcome of the proceeding that the justices should consider in determining whether to disqualify themselves (Cal. Rules of Court, rule 8.208(e)(2)):

None.

Dated: June 1, 2015

Bobby Samini, Esq.
Matthew M. Hoesly, Esq.
Attorneys for Appellant
Donald T. Sterling

EXHIBIT J, PAGE 469

# TABLE OF CONTENTS

Table of Contents
I.   STATEMENT OF APPELLATE JURISDICTION ................................. 1
II.  INTRODUCTION ........................................................................ 1
III. STANDARD OF REVIEW ............................................................ 3
IV. STATEMENT OF FACTS AND PROCEDURAL HISTORY ................... 4
   A.  Parties ................................................................................. 4
   B.  The Sterling Family Trust ..................................................... 4
   C.  Rochelle's Attempt to Remove Donald as Co-Trustee ............... 5
   D.  Underlying Probate Trial on Rochelle's Ex Parte Petition ........ 8
   E.  Trial Testimony and Evidence ............................................... 9
      1.  Dr. Cummings' Trial Testimony .......................................... 9
      2.  Donald's Trial Testimony .................................................10
      3.  Rochelle's Trial Testimony ...............................................10
      4.  No Evidence Was Presented During Trial Relating to  Probate Code section 1310(b) of Immediate or Imminent  Injury or Loss to Person or Property to Justify the Trial  Court's Ruling ...................................................11
V.  ARGUMENT ..............................................................................12
   A.  The Trial Court Abused its Discretion and Committed Prejudicial Error In Invoking Probate Code Section 1310(b) .....................................12
      1.  This court can and should reverse the August 7 statement of decision as there was no evidence offered that meets the strict requirement that the risk of injury or loss to person or property be extraordinary or imminent. ...................................................12
      2.  The legislative history of Probate Code section 1310(b) ..........................13
      3.  The trial court's order is a further abuse of discretion in that it violates the California Supreme Court's holding that the provision must be narrowly construed ...................................................17
   B.  The Court Abused its Authority in Compelling a Sale of Trust  Assets Pursuant to Probate Code Section 15407, Which Permits a Trustee  to Engage in Acts "Reasonably Necessary" to "Wind Up" A Trust .................21

**EXHIBIT J, PAGE 470**

1.  Upon termination of the Trust, beneficial title to Trust assets was restored to each Settlor.................................................................................21

2.  The trial court abused its discretion in allowing the sale of the Clippers over Donald's objections as it is not properly within the scope of winding up the Trust .................................................................................22

3.  The Trial Court Abused Its Discretion in Ruling That The Doctor Certifications of Donald's Incapacity Satisfied Rochelle's Burden Under the Terms of the Trust.................................................................................24

VI.  CONCLUSION.................................................................................28

CERTIFICATE OF COMPLIANCE .................................................................................30

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

EXHIBIT J, PAGE 471

## TABLE OF AUTHORITIES

**Cases**

*Andersen v. Hunt* (2011) 196 Cal.App.4th 722, 730 ............................................27

*Arluk Med. Center Indus. Group, Inc. v. Dobler* (2004) 116 Cal.App. 4th 1324, 1331-32 ............................................21

*Botsford v. Haskins & Sells* (1978) 81 Cal.App.3d 780 ............................................24

*Brandt v. Superior Court* (1985) 37 Cal.3d 813, 816 ............................................ 3

*Bullock v. City & County of San Francisco* (1990) 221 Cal.App.3d 1072, 1094-1095 ............................................ 3

*Conservatorship of Hart* (1991) 228 Cal.App.3d 1244, 1261 ............................................18

*Conservatorship of McElroy* ("McElroy") (2002) 104 Cal.App.4th 536 ............................................19

*Estate of Fritschi* (1963) 60 Cal.2d 367, 372 ............................................25

*Lintz v. Lintz* (2014) 222 Cal.App.4th 1346, 1352, fn. 2 ............................................27

*Estate of Nicholas* (1986) 177 Cal.App.3d 1071 ............................................24

*Estate of Sarabia* (1990) 221 Cal.App.3d 599, 604 ............................................25

*Estate of Wilson* (2012) 211 Cal.App.4th 1284, 1290 ............................................ 3

*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 801 ............................................ 3

*Gold v. Superior Court* (1970) 3 Cal.3d 275, 285 ............................................13

*Gold*, supra, 3 Cal.3d at p. 279 ............................................17

*Guardianship of Walters* (1949) 93 Cal.Ap.2d 208, 214 ............................................18

*Hale v. Superior Court* (2014) 225 Cal.App.4th 268, 272 ............................................13

*Harustak v. Wilkins* (2000) 84 Cal.App.4th 208, 212 ............................................ 3

*In re Marriage of Campbell* (2006) 136 Cal.App.4th 502, 506 ............................................14

*In re Marriage of Greenway* (2013) 217 Cal.App.4th 628, 640 ............................................26

*In re Marriage of Greenway*, supra, 217 Cal.Ap.4th at p. 640 ............................................27

*In re Stratton* (1933) 133 Cal.App. 738, 739 ............................................18

*Kane v. Superior Court* (1995) 37 Cal.App.4th 1577 ............................................19

*Lozada v. City & County of San Francisco* (2006) 145 Cal.App.4th 1139, 1149 .... 3

*Masry v. Masry* (2008) 166 Cal.App.4th 738, 743 ............................................22

*McDowell v. Watson* (1997) 59 Cal.App.4th 1155, 1161-62 ............................................14

*Myrick v. Enron Oil & Gas Co.* (Tex. App. El Paso 2009) 296 S.W.3d 724 ..........24

*Oceanside Union School District v. Superior Court* (1962) 58 Cal.2d 180, 185-186, fn. 4 ............................................ 3

*Quarterman v. Kefauver* (1997) 55 Cal.App.4th 1366, 1371 ............................................14

**EXHIBIT J, PAGE 472**

*Rail-Transport Employees Assn. v. Union Pacific Motor Freight* (1996) 46
Cal.App.4th 469, 473 .................................................................13
*Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th
220, 235 ..................................................................................14
*Slatkin v. White* (2002) 102 Cal.App.4th 963, 970 ...............................14
*Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1319........................21
*Valley Bank v. Superior Court* (1975) 15 Cal.3d 652, 655 ......................... 3

## Statutes

28 USC § 158(a)(1)............................................................ 1
28 USC § 158(a)(1)............................................................ 1
Cal. Code of Civil Proc.§ 475 ............................................. 2
Cal. Const., Art. VI, § 13 .................................................. 1
Cal. Prob. Code § 810(a)..................................................24
Cal. Prob. Code § 811(a)...............................................26,28
Cal. Prob. Code § 811(d)..................................................28
Cal. Prob. Code § 1310(a)................................................13
Cal. Prob. Code § 1310(b) ...........................................1,2,9,12
Cal. Prob. Code § 1851(a)................................................16
Cal. Prob. Code § 15407(b)...............................................22
Cal. Prob. Code § 15410..................................................21
Cal. Prob. Code § 15410(a)(1)............................................24
Cal. Prob. Code § 16000 ..................................................23
Cal. Prob. Code § 16001 ..................................................23
Cal. Prob. Code § 16202 ..................................................23
Evid. Code  § § 452(c), 455, 459.........................................14

## Treatises

3 Cal. Transactions Forms – Est. Planning  § 13:16 .............................22
CEB California Trust Administration  § 16:49, p. 1184 .......................22
Rest. 3d Trusts, § 89, comment b ..........................................23
Restatement Second, Trusts  § 344 Comment c..................................22
Restatement Second, Trusts  § 345 Comment f................................22
Restatement Second, Trusts § 345............................................21

**EXHIBIT J, PAGE 473**

The undersigned appellant ("Appellant") Donald T. Sterling ("Donald") 1 submits this opening brief in support of his appeal from the Superior Court's ruling on Rochelle Sterling's Petition under Probate Code section 17200.

## I.     STATEMENT OF APPELLATE JURISDICTION

Appellant takes this appeal from a judgment of the Superior Court of Los Angeles County on Rochelle Sterling's ex parte Petition for confirmation of trustee's acts and instructing trustee and for order directing trustee under Probate Code § 1310(b) commenced on July 7, 2014. The final judgment was entered on August 11, 2014. This court has jurisdiction over this matter because on August 12, 2014, Appellant Donald T. Sterling timely filed his request to have this appeal heard by the United States District Court, pursuant to 28 USC § 158(a)(1).

Appellant takes this appeal from a judgment of the Superior Court of Los Angeles County on Rochelle Sterling's ex parte Petition for confirmation of trustee's acts and instructing trustee and for order directing trustee under Probate Code § 1310(b) commenced on July 7, 2014. The final judgment was entered on August 11, 2014. This court has jurisdiction over this matter because on August 12, 2014, Appellant Donald T. Sterling timely filed his request to have this appeal heard by the United States District Court, pursuant to 28 USC § 158(a)(1).

## II. INTRODUCTION

The trial court committed an abuse of discretion and reversible error by invoking Probate Code §1310(b) and allowing the sale of the Clippers to go forward, thereby causing prejudicial error resulting in a miscarriage of justice to Donald. (Cal. Const., Art. VI, § 13.) California

---

[1] Appellant refers to the Sterlings by their first names, not out of disrespect, but for clarity and ease.

1

EXHIBIT J, PAGE 474

Code of Civil Procedure section 475 provides that courts must disregard any error, improper ruling, instruction, or defect in the pleadings or proceedings "which does not affect the parties' substantial rights"; no appealed judgment or order shall be "reversed or affected by reason of any error, ruling, instruction, or defect" unless the record demonstrates that the error was "prejudicial" and caused appellant "substantial injury," and that a "different result would have been probable" absent the error; there "shall be no presumption that error is prejudicial." Here, Donald suffered substantial injury by being forced to sell his beloved Los Angeles Clippers NBA team, notwithstanding that he was forced to sell the team at a much lower price than he could have received under different circumstances.  Losing the team caused Donald irreparable harm as there is no way for the team to be properly and adequately economically valued. The trial court's decision to invoke Probate Code §1310(b) should, therefore, be reversed.

The trial court also abused its discretion and committed reversible error by ruling that: (1) Rochelle Sterling ("Rochelle") acted properly under the Sterling Family Trust in removing her husband Donald as co-trustee, and directing her to sell one of the Trust's assets, the Los Angeles Clippers NBA Franchise, to Steve Ballmer, with whom Rochelle had entered into a "Binding Term Sheet" ("BTS") on behalf of the Trust, and (2) that Donald's revocation of the Trust (a revocation the parties stipulated Donald had the capacity to make) did not preclude Rochelle from disposing of these Trust assets, because doing so fell within her powers to "wind up" the Trust under Probate Code sections 15407 and 17200.

This case raises cutting-edge issues in probate law, on which judges and litigants would benefit from appellate guidance.  These

2

issues are of "widespread interest" (*Brandt v. Superior Court* (1985) 37 Cal.3d 813, 816) and of "first impression" and "general interest to the bench and bar." *Valley Bank v. Superior Court* (1975) 15 Cal.3d 652, 655. This is also a case where "general guidelines can be laid down for future cases" making it proper for appeal. *Oceanside Union School District v. Superior Court* (1962) 58 Cal.2d 180, 185-186, fn. 4.

## III. **STANDARD OF REVIEW**

A trial court's interpretation of a statute is reviewed de novo. (*Harustak v. Wilkins* (2000) 84 Cal.App.4th 208, 212.) Similarly, the application of a statutory standard to undisputed facts is reviewed de novo. (Id.) The de novo standard of review also applies to mixed questions of law and fact when legal issues predominate. (Id.) The application of the law to a set of facts is also subject to independent review when the issues, as they do here, "can have practical significance far beyond the confines of the case then before the court." (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 801 [applying de novo review to the question of whether a transaction was usurious].) Likewise, the application of a statute (or constitutional provision) to undisputed facts is a question of law, reviewed de novo on appeal. (*Lozada v. City & County of San Francisco* (2006) 145 Cal.App.4th 1139, 1149; see *Bullock v. City & County of San Francisco* (1990) 221 Cal.App.3d 1072, 1094-1095 – whether Ellis Act applied to conversion of residential hotel into tourist hotel.)

The court also applies a de novo standard of review when the meaning of a contract, such as the Restatement of the Trust in this case, may be determined without the aid of extrinsic evidence. (*Estate of Wilson* (2012) 211 Cal.App.4th 1284, 1290.)

3

**EXHIBIT J, PAGE 476**

## IV. <u>STATEMENT OF FACTS AND PROCEDURAL HISTORY</u>

In this Opening Brief, Appellant Donald T. Sterling ("Donald") will be making references to the Reporter's Transcript, filed concurrently herewith. ("RT")

### A.   <u>Parties</u>

Donald is a businessman and was, until purportedly removed as co-trustee and his revocation of the trust on June 9, 2014, a co-Trustee of the Sterling Family Trust (the "Trust"). (RT 289: 3-7; Ex. 29) Rochelle Sterling is the wife of Donald Sterling and was, until the trust was revoked on June 9, the only other co-Trustee of the Sterling Family Trust. (RT 296:19-21) Donald and Rochelle were married for nearly 58 years. (RT 273: 3-4; 299: 14-16) They had been living separately for at least a year prior to the trial but she testified that she remained his "only" caregiver. (RT 299:17-18; 305: 5-8)

On December 18, 2013, Donald and Rochelle restated the Sterling Family Trust. (Ex. 29) The Restatement changed the Removal Provision from the prior Trust instrument and eliminated the procedure for a removed trustee to be reinstated. (Ex. 29 and Ex. 4.) Rochelle was not concerned about Donald's mental health at the time they restated the Trust. (RT 357: 20-27)

Steve Ballmer is the current owner of the former Trust assets – namely the Los Angeles Clippers NBA Franchise.

### B.   <u>The Sterling Family Trust</u>

The Sterling Family Trust was established on August 12, 1998 by Donald and Rochelle Sterling, as Settlors and Trustees. (Ex. 29) At the time Rochelle's Petition was filed, Donald and Rochelle were the sole vested beneficiaries of the Trust. (Id. 297:9-21) The Trust was restated by Donald and Rochelle on December 18, 2013. (RT 298:10-

4

<b>EXHIBIT J, PAGE 477</b>

14; Ex. 29) Rochelle admitted that there was no concern about Donald's mental health at the time of this restatement.  (RT 357:20-27)  In addition, Anderson Cooper did an interview with Donald in May 2014 and had no concerns about Donald's mental condition. Since its creation, the Trust was always a revocable trust.  On June 9, 2014, Donald revoked the Trust. (RT 289:3-7)  Both parties only stipulated that Donald had sufficient capacity to revoke the Trust.

C.    **Rochelle's Attempt to Remove Donald as Co-Trustee**

Rochelle and her lawyer met with the Commissioner of the NBA, Adam Silver, on or about May 13, 2014, and began to plot with the NBA to wrest control of the team away from Donald knowing he never sells any property. (RT 335:25-336:13) This lead to secret Plan B.

The Trust provided that an individual would no longer serve as Trustee if he is deemed incapacitated as defined in the Trust document. (Ex. 29.)   Paragraph 10.24 of the Trust document states that "[i]ncapacity and derivations thereof mean incapable of managing an individual's affairs under the criteria set forth in California Probate Code §819 et seq." (Id.) A Trustee could be deemed incapacitated if "two licensed physicians, who, as a regular part of their practice are called upon to determine the capacity of others...examine the individual and certify in writing that the individual is incapacitated." (Id.)  In addition, if one of the two co-Trustees was deemed incapacitated, the other would serve as the sole Trustee. (Id.)

At Rochelle's request, Donald underwent CT and PET scans of his brain on May 16, 2014. (RT 275:3-23; 306:19-308:22) Three days later, also at Rochelle's request, Dr. Meril Sue Platzer ("Dr. Platzer") arrived at Donald's home unannounced to perform an 80-minute exam

**EXHIBIT J, PAGE 478**

of Donald.   (RT 309:5-310:4) Dr. Platzer diagnosed Donald with Alzheimer's immediately after the examination.  (RT 310:15-18)  At the time of the examination, neither Donald nor Dr. Platzer was aware that this neurological examination would be used to remove Donald from the Trust.  (RT 276:10-277:13) Nonetheless, after coordinating closely with Rochelle's attorneys and receiving a sample certificate from them, Dr. Platzer signed a "physician's certification of trustee's incapacity." (RT 110:3-20)

At the insistence of Rochelle's attorney that there was "time pressure," Dr. Spar arrived at Donald's home unannounced to perform a 50-minute exam of Donald on May 22, 2014.  (RT  333:8-18)  Dr. Spar knew that he had been hired for the objective of removing Donald as co-Trustee of the Trust.   (RT 144:9-17; 160:21-23)   Dr. Spar conceded that Donald was distracted and preoccupied by a meeting with his attorneys in the other room.  (RT 163:8-15) Donald stated that he needed to get back to his meeting and did not finish the exam.  (RT 151:3-12)  Despite the truncated session, Dr. Spar called Rochelle's attorneys immediately after the session to let them know that he would find Donald incapacitated. (RT 152: 3-25; 171: 23-28) The next week, he sent over his findings. (RT 154: 8-155:23)

During the same period of time, Donald was preoccupied by the risk of losing ownership of the Clippers as a result of actions by the NBA. Both examining doctors acknowledged that "anxiety" could negatively affect his test performance. (RT 103:11-16; 104: 1-10; 105: 4-15; 150:5-16) Donald had authorized Rochelle to negotiate with the NBA "as an accommodation to [Rochelle]" based on her representation that she would retain at least a 20% ownership.  (RT 186:13-23.) Rochelle then began to solicit bids, all the while secret Plan B was in

6

**EXHIBIT J, PAGE 479**

the works. (RT 336:5-11; ) Eventually, Rochelle unilaterally accepted Steve Ballmer's $2 billion offer and negotiated perks and benefits for herself to Donald's detriment. (RT 343:14-28; Ex. 3) Shortly after Donald refused to accept the terms Rochelle had negotiated with Ballmer, Rochelle's attorney notified her that Donald had been deemed incapacitated and removed as trustee of the Trust. (RT 345:1-347:4) Donald's intimately personal confidential medical records were immediately leaked to the press, and Donald's private health records became widespread news.

Later that evening, Rochelle and Ballmer signed the BTS, which memorialized the terms of the Clippers sale. (RT 346:25-347:4) Under the BTS, Ballmer agreed to purchase the Clippers for $2 Billion. (343:14-20) On June 9, 2014, Donald, under the Trust terms, unilaterally revoked the Trust. (RT 289:3-7) Rochelle concedes that the revocation was effective and that Donald had sufficient capacity to revoke the Sterling Family Trust. Two days later, on June 11, 2014, Rochelle filed the Petition in trial court for (1) confirmation of the trustee's acts and instructing trustee; and (2) for order directing trustee under Probate Code § 1310(b) to prevent injury or loss to trust. The Petition requested that the trial court confirm Rochelle's sale of the Los Angeles Clippers as the Trust's sole Trustee. The confirmation was required to satisfy the conditions of the BTS memorializing the terms of the sale of the Clippers to a new limited liability company wholly-owned by Steve Ballmer.

On May 29, 2014, the date on which Rochelle purportedly entered into the BTS on behalf of the Trust, the Trust held stock in the LAC Basketball Club, Inc., which held the right to the Clippers. (RT 346:25-347:4) Before transfer to the Trust, the stock of the LAC

7

**EXHIBIT J, PAGE 480**

Basketball Club, Inc. was held by Donald Sterling.  Rochelle also requested an order under Probate Code § 1310(b), asking the trial court to (1) find that there would be a significant loss to the Trust and its beneficiaries if the Clippers were not promptly sold; and (2) direct Rochelle to consummate the sale of the Clippers.

Under the BTS, as a condition of sale to Mr. Ballmer, Rochelle was required to obtain a final non-appealable court order confirming her authority to unilaterally bind the Trust. (Ex. 3.) Rochelle contended that if the sale to Ballmer under the BTS did not close on or before September 15, 2014, the NBA could begin the process to seize and sell the Clippers for a lower price. (RT 359: 6-10)

Because the appellate process rendered it impractical to hear the matter before the September 15, 2014, deadline imposed by the NBA, Rochelle contended that the court could bypass the appellate process by invoking Probate Code § 1310(b) to allow the sale notwithstanding any appeal.  Even though the Trust had been revoked, Rochelle contended that she had authority under Probate Code § 15407(b) because she, as trustee, retained certain powers "reasonably necessary under the circumstances to wind up the affairs of the trust." Donald opposed the petition, arguing, inter alia, that he was fraudulently induced into the medical examinations, which wrongly concluded that he lacked capacity to manage the Trust.

**D.    Underlying Probate Trial on Rochelle's Ex Parte Petition**

In July 2014, the Los Angeles Superior Court conducted an evidentiary hearing on the ex parte petition.  The trial focused on three issues:   (1) Whether Rochelle followed the terms of the Trust in removing Donald as co-trustee, including whether the submissions of the two medical doctors conformed to the Trust's requirements; (2)

8

**EXHIBIT J, PAGE 481**

whether the revocation of the Trust by Donald precluded the court from directing the sale to Mr. Ballmer; and (3) whether the order directing the sale should be subject to the automatic stay exception under Probate Code section 1310(b).

The trial court's order granting Rochelle's ex parte petition for confirmation of trustee's acts and instructing trustee and for order directing trustee under Probate Code § 1310(b) to prevent injury or loss to trust, stated as follows: (1) confirmed that Rochelle had the authority to bind the Sterling Family Trust to an agreement to sell the Clippers; (2) authorized Rochelle to sell the Clippers based on the terms and conditions of her agreement with Steven Ballmer; and (3) invoked § 1310(b) to allow Rochelle to sell the Clippers without regard to any appeal.

The trial court explicitly invoked § 1310(b) to bypass the automatic stay triggered by an appeal. Counsel asked the trial court to stay this ruling to allow a writ petition to be filed. The trial court refused to stay its ruling, observing that a writ petition could be filed between the time its tentative decision was announced and the order became final. Following its refusal to stay proceedings, the court proceeded to issue a final statement of decision six days early, before the deadline for filing objections to the proposed statement of decision had run.

**E.** **Trial Testimony and Evidence**

1. Dr. Cummings' Trial Testimony

Dr. Cummings testified as to the unusual circumstances surrounding the doctor's examinations, including the distractions and stress during Donald's examination and opined that there is an accepted standard of care with respect to the physician's disclosure to the patient. (RT 600: 21-28; 601: 14-22; 603: 2-6; 15-19; 24-28) Donald should

9

**EXHIBIT J, PAGE 482**

have been told the purpose of the assessment. (RT 609: 20-28; 610: 1-5)

### 2. Donald's Trial Testimony

Donald was never informed that the purpose of his examinations was to determine his capacity under the Removal Provision of the Trust. (RT 186: 13-23; 187: 22-25; 188: 1-10; 191: 15-22; 194: 17-195: 1; 202: 5-17;j 203: 16-20; 204:20-205:5; 275:3-23.) Donald trusted his wife when she represented that the examinations were "routine" medical exams for his 80th birthday. (Id.) Donald did not provide informed consent, he was not able to consult his attorneys, and he was not able to schedule the appointments at a convenient time when he was not under enormous stress and time-sensitive deadlines. (Id.) He was also deprived of the opportunity to cooperate in the choosing of independent and impartial doctors. (Id.) Donald also testified as to his purchase of the Clippers (RT 271:6-272:12), his involvement in each area of the Sterling Trust (RT 206:15-207:3), his real estate empire and his law corporation and stock portfolio (RT 266:24-267:17; 269:27-270:1; 291:17-294:25) and the Clippers negotiations for a new TV deal. (RT 210:14-26; 216: 4-23)

### 3. Rochelle's Trial Testimony

Rochelle admitted that she is Donald's caregiver and that she had no knowledge of "Plan B." (RT 305:5-8; 377: 20-28; 378: 1-13) Rochelle claimed she did not know about the Removal Provision (7.5.c) in the Trust until May 29, 2014, after Donald refused to sell the Clippers to Mr. Ballmer. (RT 378: 14-28; 379: 1-4; 381: 16-28; 382: 1-20) However, this is wholly inconsistent with actions taken by Rochelle in conjunction with the doctors she hired and her attorneys. (RT 362: 5-18; 364: 6-23; 365: 13-28; 366: 1-28) This statement was also refuted

**EXHIBIT J, PAGE 483**

by Anwar Zakkour who testified he heard Rochelle and her attorneys discussing secret Plan B as early as May 26, 2014. (RT 568: 5-28; 569 1-7)

Rochelle's credibility is also in question based upon her claim that she did not know that the examinations of Dr. Platzer and Dr. Spar were going to be used as a basis for removal of her husband as trustee. (RT 364: 14-28; 365: 13-28; 366: 1-28; 367: 1-24) In fact, she was copied on the May 19, 2014, email from Mr. O'Donnell to Dr. Platzer (Ex. B17) and she and her attorneys were placed in the Greenburg & Glusker conference room on May 26, 2014, discussing Plan B.

4.    No Evidence Was Presented During Trial Relating to Probate Code section 1310(b) of Immediate or Imminent Injury or Loss to Person or Property to Justify the Trial Court's Ruling

Darren Schield, the Chief Financial Officer of Beverly Hills Properties, a dba of both of the Sterlings, testified that the Sterlings owned real properties worth approximately $2.5 billion subject to $480 million in debt. (RT 459: 15-28; 460: 23-24) He testified that he never received a Notice of Default from any lenders and was unable to state with certainty that if real estate holdings were sold to cure the default that they would be sold for less than fair market value. (RT 473: 13-28; 474: 1-19)

Richard Parsons, the interim Chief Executive Officer of the Clippers, testified that the Clippers are a "trophy asset" and that there is no way to get to the $2 billion price tag on a "financial metric basis" making his testimony on the topic of valuation irrelevant. (RT 493: 1-11) Mr. Parsons unequivocally testified that if the sale of the Clippers to Mr. Ballmer was not approved, the NBA would swiftly move to reinstitute their proceedings to remove Donald as an owner. (RT 493:

**EXHIBIT J, PAGE 484**

12-28; 494: 1-25)  This evidence alone demonstrates that there would have been no irreparable harm to Rochelle if the court did not grant her petition.  There was no evidence offered establishing an extraordinary circumstance of an immediate or imminent risk of injury or loss to person or property.

Nor was there any testimony that if the NBA team was seized that the same or higher price could not have been obtained from either Mr. Ballmer or another buyer.  Dean Bonham, Donald's valuation expert, opined that a full auction could achieve the same or higher price.  (RT 578: 23-28; 579: 1-28; 580: 1-22)  Irrespective of whether the team is subsequently sold for a lower price, such damage is not the sort of damage that the exception to the stay provision contemplates.  While $2 billion is a good deal of money, because the sale was consummated in less than one week, required all cash buyers, and only one outbound call was made to international buyers, it is also likely that it was not the best offer that Rochelle and Donald could have received.  Mr. Bonham testified that the unusual circumstances and unusually short timeline with Rochelle's bidding process for the Clippers potentially deprived a complete bidding process among all interested owners.  (RT 580: 10-22)

## V. <u>ARGUMENT</u>

### A. <u>The Trial Court Abused its Discretion and Committed Prejudicial Error In Invoking Probate Code Section 1310(b)</u>

1.  **This court can and should reverse the August 7 statement of decision as there was no evidence offered that meets the strict requirement that the risk of injury or loss to person or property be extraordinary or imminent.**

The trial court erroneously granted Rochelle's request for an order under Probate Code Section 1310(b), finding that she had made

12

an affirmative showing that the Trust would suffer from "injury or loss."
By invoking its powers under Section 1310(b), the court overrode the
general rule that an appeal in a probate proceeding automatically stays
the operation and effect of the appealed order. (Probate Code §
1310(a).)  But the trial court overestimated its discretion to invoke
Section 1310(b), which applies only where immediate action is.
necessary "for the purpose of preventing injury or loss to a person."
Such an order must be the exceedingly rare exception to the general
rule, with the party attempting to invoke its remedy bearing the burden
of establishing the imminent injury or loss to person or property. (*Gold
v. Superior Court* (1970) 3 Cal.3d 275, 285.)

## 2. The legislative history of Probate Code section 1310(b)

The current incarnation of section 1310(b), as amended by the
Legislature in July 2010 by Assembly Bill 2271, allows the trial court
to direct the action of a fiduciary to prevent "loss or injury to a person
or property" even if the court's order has been appealed. The legislative
history of this provision establishes that this power was to be used
sparingly, and was not to be invoked where, as here, a party seeks to
sell property over the wishes of its co-owner, and the risk of loss to the
proponent of the section 1310(b) exception is only monetary, while the
other party stands to lose a unique, irreplaceable asset in the absence of
a stay.

In interpreting a statute, the Court must follow the legislature's
intent, as exhibited by the plain meaning of the actual words of the law.
(*Hale v. Superior Court* (2014) 225 Cal.App.4th 268, 272.)  If the
statute is ambiguous on its face, the Court must turn to the legislative
history to determine the legislature's intent. (*Rail-Transport Employees
Assn. v. Union Pacific Motor Freight* (1996) 46 Cal.App.4th 469, 473.)

13

**EXHIBIT J, PAGE 486**

But even language that appears unambiguous on its face may be shown to have a latent ambiguity. (*Quarterman v. Kefauver* (1997) 55 Cal.App.4th 1366, 1371.) In that case, a court may turn to customary rules of statutory construction or legislative history for guidance. (Id.)

When interpreting an ambiguous statute, "consideration must be given to the consequences that will flow from a particular interpretation. [Citation.] In this regard, it is presumed the Legislature intended reasonable results consistent with its expressed purpose, not absurd consequences." (*Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 235.) But if neither the words of the statute nor its history expose a clear meaning, the Court must "apply reason and practicality, and interpret the statute in accord with common sense and justice, and to avoid an absurd result." (*In re Marriage of Campbell* (2006) 136 Cal.App.4th 502, 506.) Thus, the Court cannot sacrifice the legislative purpose to a literal construction of a statute. (*Slatkin v. White* (2002) 102 Cal.App.4th 963, 970.)

Here, the trial court abused its discretion in invoking section 1310(b)—specifically, the code section cannot be invoked to force a party who has not been deemed incapacitated by any court to sell his unique property. A review of the legislative history and case law interpreting predecessor statutes makes it clear that this power is to be invoked in only the most extraordinary circumstances where necessary to prevent imminent loss or injury.[2] The trial court, therefore, caused prejudicial error to Donald in its abuse of discretion here.

---

[2] A court may take judicial notice of legislative analyses of bills prior to passage as an aid to interpreting the statute. (Evid. Code § § 452(c), 455, 459; *McDowell v. Watson* (1997) 59 Cal.App.4th 1155, 1161-62, n. 3.) Donald has submitted under separate cover a request for judicial notice attaching portions of the legislative history of section 1310(b).

14

**EXHIBIT J, PAGE 487**

The trial court's abuse of discretion is made obvious after a review of the legislative history of section 1310. The legislature first granted the trial court similar powers in 1921, as an amendment to the then California Code of Civil Procedure ("CCP") section 1765, relating to a guardian's duty to care for the person and his estate. This provision provided that:

> An appeal from the order of an appointment [of guardianship] shall stay the power of the guardian, except that, for the purpose of preventing injury or loss to the person or property, the court making the appointment may direct the exercise of the powers of the guardian, from time to time, as though no appeal were pending, and all acts of the guardian pursuant to such directions shall be valid, irrespective of the result of the appeal.

(Request for Judicial Notice ("RJN") Ex. 2 [Senate Bill 190, January 17, 1921].)

The reenactment of this provision as part of the Probate Code in 1931 clarified that the provision related to "[a]n appeal from an order appointing a guardian for an insane or incompetent person," recognizing that such protection could be necessary to safeguard the party deemed insane or incompetent. (RJN Ex. 7 [Chapter 281, Statutes of 1931].) (Emphasis added.) Without such power, the incompetent party would have no guardian during the appellate process, exposing him to various risks of injury to his person and property. In the next several decades, the legislature expanded the application of this power to include conservatorships, which serve a similar purpose to guardianships in the protection of a person adjudicated to be unable to care for himself or herself or manage his or her own finances. (RJN Ex. 8 [Chapter 1902, Statutes of 1957 (enacting section 2102 re

15

**EXHIBIT J, PAGE 488**

conservatorships)]; RJN Ex. 11 [Chapter 726, Statutes of 1979 (enacting section 2751, which consolidated the provisions re guardianship and conservatorship)]; see also Probate Code § 1851(a) [requirements for petition for conservatorship].)

While there were several additional iterations of this provision, the changes related only to the type of representative the trial court could appoint. (RJN Ex. 13 [Chapter 1199, Statutes of 1988 (enacting section 7241, which replaced "guardian or conservator" with "personal representative" and "temporary guardian or conservator" with "special administrator")]; RJN Ex. 14 [Assembly Bill 1172, Chapter 724, Statutes of 1997 (enacting 1310, which replaced "personal representative" with "fiduciary" and allowing the court to appoint a "temporary guardian or conservator")].) In 2010, the legislature made a final change in allowing the court to appoint a temporary trustee. (RJN Ex. 16 [Assembly Bill 2271, Chapter 94, Statutes of 2010].)

Thus, while the legislature amended and renumbered the provision many times since it was introduced in 1921, the provision remained largely unchanged with one exception – the type of person who could invoke the trial court's powers. While the application of the provision is no longer limited to guardians, the legislature has never indicated any change in its intentions – to protect the well-being of those deemed vulnerable by the law. The trial court's use of this provision to override the wishes of Donald to retain ownership of the Clippers undermined this intent and by invoking section 1310(b), the court abused its discretion.

16

EXHIBIT J, PAGE 489

**3. The trial court's order is a further abuse of discretion in that it violates the California Supreme Court's holding that the provision must be narrowly construed**

The California Supreme Court has confirmed that the exception from the automatic stay should be narrowly construed. In *Gold*, the California Supreme Court construed a predecessor statute, which was limited to guardianship and conservatorship proceedings. (*Gold*, supra, 3 Cal.3d at p. 279.) In confronting an issue of first impression (id. at 280), the Court reasoned that the legislature drafted this exception to be narrowly construed and carefully restricted to cases where there is an affirmative showing of extraordinary circumstances. (Id. at p. 281.) Pointing to the statute's emphasis on preventative action, the Court found that the language imports a sense of urgency. (Id.) The Court also found that "on its face, the language of the statute indicates (1) that the only instances properly falling within the ambit of the exception are those which present a necessity for preventative action against the particular risk contemplated by the statute; and (2) that such instances are probably rare." (Id.) (Emphasis added.) "In sum, the language of this statute strongly suggests that the exception applies only to the exceptional case involving a risk of imminent injury or loss." (Id.)

Additionally, the Court pointed to the effect of the statute, in which the conservator's acts made pursuant to the provision would be made valid, irrespective of the result of the appeal. (Id. at p. 282.) In drafting such a statute, "the Legislature has created an extraordinary procedure" that affects a party's right of appellate review. (Id.) Recognizing this harsh effect, the Court concluded that the provision must be "carefully restricted" and requires "an affirmative showing in the trial court of extraordinary circumstances involving potential injury or loss of the sort contemplated by the statute." (Id.)

17

**EXHIBIT J, PAGE 490**

In addition to analyzing the plain language of the statute, the Court also turned to its legislative history for further support of its conclusion. (Id.) Prior to 1957, the only procedure in the code for taking care of a person or property was through guardianship, which was available for minors or adults who were insane or incompetent. (Id.) To remove the stigma of an adjudication of insanity or incompetency and to expedite the administration of estates, the legislature added a section to the Probate Code that allowed for conservatorships. (Id. at pp. 282-283.) The court traced the statute back to predecessor Probate Code section 1631, which stayed the guardian's powers "except in cases clearly presenting extraordinary circumstances." (Id. at p. 283.) The legislature adopted this language in response to concerns that an automatic stay in guardianship cases would lead to hardship "if the appellant be really incompetent [since] his property might be dissipated by designing persons during the pendency of the appeal." (Id. citing to *In re Stratton* (1933) 133 Cal.App. 738, 739.)

Thus, the purpose of the statute was to insure that one who has been declared incompetent retains the right to manage his own property pending an appeal from the order appointing a guardian unless he is proven incompetent to do so during that period. (Id. at p. 284 citing to *Guardianship of Walters* (1949) 93 Cal.Ap.2d 208, 214.) Even then, the control of his estate would not be taken from him except to the extent that it is necessary to avoid loss or injury. (Id.)

The reasoning of *Gold* survives the amendments to the statute, and was adopted by the court in *Conservatorship of Hart* (1991) 228 Cal.App.3d 1244, 1261. In interpreting section 2751(b), the court found that because the effect of such an order "is to abrogate, at least as a

18

practical matter, an appellant's statutory right to review of the earlier order, exercise of the power granted by subdivision (b) must be clearly justified by a showing of risk of imminent injury or loss." (Id.)

Never has Section 1310(b) or any of its predecessors been used to force a party to sell a unique property he wishes to retain. Nor has it been used to stave off a perceived monetary loss (no matter how large), which would conversely result in another party being deprived of a unique, irretrievable asset. Indeed, the legislative history and case law support the conclusion that, if anyone had the proper kind of loss cognizable under section 1310(b) here, it is Donald.

In post-trial briefing, Rochelle and Ballmer cited to *Conservatorship of McElroy* ("McElroy") (2002) 104 Cal.App.4th 536 for the proposition that the trial court could invoke §1310(b) "for the purpose of preventing injury or loss to a person or property."[3] (5 Ex. Tab 40, p.1181.) Rather than supporting the trial court's order here, this case better illustrates the limited instances when section 1310(b) can be invoked.

In McElroy, a son was appointed as his father's conservator following a petition, independent investigation by the court, and a hearing, as required by the Probate Code. (104 Cal.App.4th at pp. 540-541.) The conservatorship was necessary because the father could no longer provide for his personal needs and had "major impairment in orientation to time, place, and situation; major impairment in ability to

---

[3] Rochelle and Ballmer also cited to *Kane v. Superior Court* (1995) 37 Cal.App.4th 1577, which is inapposite. There the appellate court did not reach the issue of whether the trial court property invoked section 7241(b), a predecessor statute, but rather decided that an order under the statute did not require an undertaking. (*Id.* at p. 1587.) Further, the trial court ordered the executor of an estate to release the deceased's aging companion, which the deceased had previously authorized. (*Id.* at p. 1580.) Notably, the court did not override the wishes of the deceased in ordering this release, but rather effectuated them.

**EXHIBIT J, PAGE 492**

recall, to reason logically, to understand, and to appreciate quantities." (Id. at p. 541.) There, the son sought to set up two living trusts on behalf of his father in order to avoid several million dollars of estate taxes upon his father's death, which the court authorized. (Id. at pp. 543, 556.) His father's long-time companion opposed this action and sought to appeal the order. (Id. at pp. 541-43.) Because the father was in poor health and could die at any time, the trial court invoked section 1310(b) to allow the son to create the trusts despite the appeal. (Id. at p. 557.) The court of appeal affirmed the trial court's order. (Id.)

In contrast to McElroy, at no time has Donald been deemed incapacitated by any court. Indeed, Rochelle took the issue of an independent capacity determination by the court off the table from the very beginning. Rochelle further conceded that Donald had capacity in December 2013, when he restated the Trust, and stipulated that he had capacity in June 2014, when he revoked the Trust. This is inconsistent with the notion that Donald is so incapable of managing his own property that someone else must make his business decisions for him.

The invocation of section 1310(b) in this case served as a convenient vehicle to make what the court thought was the right business choice – to sell the Clippers for $2 billion – but this is not the purpose of § 1310(b). Section 1310(b) was designed to protect vulnerable parties who could not manage their personal and business affairs from being swindled while an appeal was pending. It was not the intent of Legislature to allow the trial court to make business decisions on behalf of parties, and to circumvent review of this decision by ordering a sale to proceed irrespective of any appeal.

**EXHIBIT J, PAGE 493**

**B.     The Court Abused its Authority in Compelling a Sale of
Trust Assets Pursuant to Probate Code Section 15407, Which
Permits a Trustee to Engage in Acts "Reasonably Necessary" to
"Wind Up" A Trust**

   **1.     Upon termination of the Trust, beneficial title to Trust
assets was restored to each Settlor**

   The Trust was expressly made revocable by its terms and was
revocable by either settlor during their joint lifetimes.  Donald exercised
his unilateral right to revoke the Trust on June 9, 2014, which
immediately terminated the Trust.  Beneficial title to trust assets held in
a revocable trust remains with the settlors of the trust.  (*Arluk Med.
Center Indus. Group, Inc. v. Dobler* (2004) 116 Cal.App. 4th 1324,
1331-32 ["[a] settlor with the power to revoke a living trust effectively
retains full ownership and control over any property transferred to that
trust.."]' *Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298,
1319 ["Under general principles of trust law, trust beneficiaries hold
'the equitable estate or beneficial interest in' property held in trust and
are 'regarded as the real owner[s] of [that] property.'"].)  Therefore,
Rochelle, as sole remaining Trustee, had a duty to return the Trust assets
to Donald now that the Trust has been terminated.  (See Restatement
Second, Trusts § 345 ["Upon the termination of the trust it is the duty
of the trustee to the person beneficially entitled to the trust property to
transfer the property to him or, if the trustee has possession but not title,
to deliver possession to him"].)

   The Trust specifically provides that upon revocation, assets
"shall promptly be distributed to the settlors as their community
property." (Trial Ex. 29, ¶ 2.5a.)  Probate Code Section 15410 further
provides that "[a]t the termination of a trust that is revoked by the
settlor, the trust property shall be disposed of," in order of priority, "as

21

**EXHIBIT J, PAGE 494**

directed by the settlor" or "as provided in the trust instrument." Upon Donald's revocation of the Sterling Family Trust, Donald and Rochelle, as husband and wife, both hold the right to control any community property assets. Ordinarily, then, Rochelle could not unilaterally proceed to consummate the prospective sale of the Clippers in violation of Donald's ownership interest. (See *Masry v. Masry* (2008) 166 Cal.App.4th 738, 743 ["married parties are permitted to dispose of [only] their share of the community without consent of the other spouse"].

   **2.     The trial court abused its discretion in allowing the sale of the Clippers over Donald's objections as it is not properly within the scope of winding up the Trust**

   The trial court allowed Rochelle to nonetheless force the sale of the Clippers by determining that it fell within the rubric of the trustee's nebulous powers to "wind up" the Trust under Probate Code section 15407(b). The court abused its discretion in doing so as there is little authority that explains the scope of these "wind up" powers, but the authority that does exist supports the view that it should be limited and should not extend to situations like this, involving a sale to increase assets.

   The Restatement Second of Trusts provides that the trustee "should buy or sell assets only to facilitate termination, not to increase value." (CEB California Trust Administration § 16:49, p. 1184; see also Restatement Second, Trusts § 344 Comment c; Restatement Second, Trusts § 345 Comment f; 3 Cal. Transactions Forms – Est. Planning § 13:16.) Comment b to Restatement (Third) of Trusts § 89 further makes clear that the provision relates only to unsalable interests:

**EXHIBIT J, PAGE 495**

> The period for winding up the trust refers to the period after the termination date and before trust administration ends by complete distribution of the trust estate…If…the trust terms or circumstances require the sale of property that is not readily saleable,…the period for winding up the trust may be longer than it would be in the absence of these or other complicating circumstances.

Rest. 3d Trusts, § 89, comment b.

Moreover, and in whichever manner the wind up power is exercised, it must be subject to the trustee's fiduciary duties. The annotations to section 15407 observe that a trustee enjoys "limited powers" to wind up the affairs of the trust, and, in referring to a trustee's other powers under Section 16200 et seq. suggests that this authority, like other powers of the trustee, must be exercised only to the extent it does not violate the trustee's fiduciary duties. (See Probate Code section 15407, annotations ["Subdivision (b) makes clear that even though the trust has terminated, the trustee retains limited powers needed to wind up the affairs of the trust. For other provisions relating to trustee's powers, see Section 16200 et seq."]; Cal. Prob. Code § 16202 ["The grant of a power to a trustee, whether by the trust instrument, by statute, or by the court, does not in itself require or permit the exercise of the power. The exercise of power by a trustee is subject to the trustee's fiduciary duties"]; Cal. Prob. Code § 16202, annotation ["…This section recognizes that a power granted to the trustee from any source does not necessarily permit the exercise of the power, nor does it prevent the exercise of a power in a manner that conflicts with a general duty whether the trust instrument so directs (see Section 16000) or where the trustee is directed so to act by a person holding the power to revoke the trust (See Section 16001)."].)

23

**EXHIBIT J, PAGE 496**

There is no California case that specifically addresses the scope of wind up authority following the revocation of an inter vivos revocable trust such as the one here. In her attempt to obtain the court's blessing to wield unlimited power to dispose of Trust assets as she wishes, and in complete disregard to Donald, Rochelle relied on, and the trial Court incorrectly approved, inapposite cases dealing with post-death administration or administration of testamentary or irrevocable trusts, e.g., *Botsford v. Haskins & Sells* (1978) 81 Cal.App.3d 780 (distribution of a trust asset consisting of a cause of action to 500 shareholders), *Myrick v. Enron Oil & Gas Co.* (Tex. App. El Paso 2009) 296 S.W.3d 724 (dealing with an irrevocable trust after the death of the settlor), and *Estate of Nicholas* (1986) 177 Cal.App.3d 1071 (termination of a testamentary trust).

These three cases involve the very different circumstance of irrevocable trusts and their termination at death. But the winding up of an irrevocable trust upon the death of a settlor who can no longer speak for himself or enjoy his trust assets is quite different from the winding up of a trust upon the revocation of the trust by a living settlor who has the right to beneficial ownership and management of the assets. Here, Donald, as a living, breathing, revoking settlor, is perfectly capable of speaking for himself and directing the trustee to return to his Trusts assets as required under Probate Code section 15410(a)(1).

## 3. The Trial Court Abused Its Discretion in Ruling That The Doctor Certifications of Donald's Incapacity Satisfied Rochelle's Burden Under the Terms of the Trust

Probate Code section 810, subd. (a) establishes a rebuttable presumption of capacity. A person presumed to be sane and competent and the party challenging capacity has the burden to overcome the

**EXHIBIT J, PAGE 497**

presumption. (See Prob. Code, § 810, subd. (a); see also *Estate of Fritschi* (1963) 60 Cal.2d 367, 372; *Estate of Sarabia* (1990) 221 Cal.App.3d 599, 604.) Rochelle, as the Petitioner, therefore had the burden of establishing that the Trust's removal provision for determining incapacity was satisfied.

Paragraph 7.5c. of the Trust provides in relevant part: "Any individual who is deemed incapacitated, as defined in Paragraph 10.24., shall cease to serve as a Trustee of all trusts administered under this document." (Ex. 29.) Paragraph 10.24(b) of the Trust specifies:

> "Incapacity and derivations thereof mean incapable of managing an individual's affairs under the criteria set forth in California Probate Code §810 et seq. An individual shall be deemed to be incapacitated if any of the following conditions exist:…(b) two licensed physicians who, as a regular part of their practice are called upon to determine the capacity of others, and neither of whom is related by blood or marriage to any Trustee or beneficiary, examine the individual and certify in writing that the individual is incapacitated…" (Ex. 29.)

Thus, to remove Donald as Trustee, the court had to find that the Trust instrument required: (1) two licensed physicians (2) who are regularly called upon to determine capacity (3) to examine Donald and certify in writing that he is "incapable of managing [his] affairs under the criteria set forth in California Probate Code §810 et seq." (Id. at pp. 1704, 1727 [Trust, paragraphs 7.5.c and 10.24(b)].) Requirements (1) and (2) were not at issue. (Ex. 29.) However, the parties expressly agreed that the trial court would determine requirement (3) as to whether the certifications of incapacity by Drs. Platzer and Spar satisfied the Trust's requirements, including Probate Code sections 810 et seq. (Ex. 29.)

25

**EXHIBIT J, PAGE 498**

Evidence of a deficit in mental function alone does not support a determination of incapacity under Probate Code section 811, subd. (a). To the contrary, Section 811, subd. (a), requires not only evidence of at least one deficit in the statutorily identified mental functions, but also requires "evidence of a correlation between the deficit or deficits and the decision or acts in question." (Prob. Code, § 811, subd. (a); see also, *In re Marriage of Greenway* (2013) 217 Cal.App.4th 628, 640 ["[t]here must be a causal link between the impaired mental function and the issue or action in question;" "in considering the causal link...the frequency, severity, and duration of period of impairment" are assessed].) Section 811(b) confirms that "[a] deficit in the mental functions listed [in Section 811(a)] may be considered only if the deficit, by itself or in combination with one or more other mental function deficits, significantly impairs the person's ability to understand and appreciate the consequences of his or her actions with regard to the type of act or decision in question." (Prob. Code, §811, subd. (b).)

Probate Code sections 811 and 812 require incapacity to be measured by a "certain act" or decision at issue, such as capacity to enter into a specific contract, execute a trust, or make a will. (See Prob. Code § § 811(a) ["do a certain act"]; 811(b) ["type of act or decision in question"]; 811(c) ["capacity to do a certain act"]; 811(d) ["capacity to do a certain act"].) 812 ["the rights, duties, consequences, risks and benefits involved in the decision"]. As one court has explained: "Probate Code section 811, subdivision (b) provides that a deficit in mental function is relevant only to the extent 'it significantly impairs the person's ability to appreciate the consequences of his or her actions with regard to the type or act or decision in question.' [Citation.] And under Probate Code section 812, a person's capacity is evaluated with

26

**EXHIBIT J, PAGE 499**

regard to 'the rights, duties, consequences, risks and benefits 'involved in the decision.'" (*Lintz v. Lintz* (2014) 222 Cal.App.4th 1346, 1352, fn. 2, quoting *Andersen v. Hunt* (2011) 196 Cal.App.4th 722, 730 [emphasis in original]; see also *In re Marriage of Greenway*, supra, 217 Cal.Ap.4th at p. 640 ["There must be a causal link between the impaired mental function and the issue or action in question."].)

Here, the doctor's certifications discuss mental deficits, but do not provide any correlation to any "certain act" or decision by Donald as required by the Trust and Probate Code sections 810 et seq. Quite simply, the general conclusion that Donald was incapacitated to serve as Trustee was made in a vacuum, without any correlation to how the mental deficits substantially impair Donald's ability to do any certain act or make any specific decision as Trustee. The certifications recite only that the deficit(s) rendered Donald incapacitated to serve as Trustee in a general sense. Moreover, the doctors testified at trial that they did not talk to Donald about his involvement with the Trust's businesses, and there is no evidence that either doctor knew about or considered any particular acts or decisions by Donald as Trustee. (RT 135: 4-9) The doctors did not, for example, inquire or consider whether Donald's actions as Co-Trustee were limited to arriving at his office every day and directing others to carry out the functions of Trustee. Dr. Spar admitted that he never even read the Trust including the removal provisions of Paragraphs 7.5.c and 10.24(b) that require compliance with Sections 810 et seq. (RT 164: 11-22; 165: 1-15.) While Dr. Spar opined that Donald was "unable to competently carry out the duties as Trustee" (RT 175: 3-8), Rochelle did not present any evidence that Dr. Spar knew about or considered any duties, acts or decisions by Donald as Trustee that were significantly impaired by the mental deficits. By

**EXHIBIT J, PAGE 500**

failing to correlate the mental deficits to any certain act or decision, the certifications beg the question: what exactly was Donald incapacitated from doing as Trustee?

The doctor's certifications of a mental defect, in the form of a diagnosis of Alzheimer's, fail to comply with the requirements of the Probate Code section 810-811, are based on illegally obtained material and are, therefore, simply not enough. Probate Code section 811, subd. (a), is clear that evidence of a mental deficit alone – without evidence that it significantly impairs a person's ability to understand and appreciate the consequences of his actions with regard to a certain act – is insufficient to support a determination of incapacity. "The mere diagnosis of a mental or physical disorder shall not be sufficient in and of itself to support a determination that a person is of unsound mind or lacks the capacity to do a certain act." (Prob. Code § 811(d).)

In sum, there was insufficient evidence (if any at all) as required under the Trust, of any correlation between the mental deficits and significant impairment of any certain act or decision by Donald as Trustee. The doctor's certifications fail to satisfy the requirements of Probate Code sections 810 et seq. that are expressly incorporated into the Trust to protect the Trustees from removal. Accordingly, the Court improperly found that Rochelle removed Donald as Trustee, and the decision must be reversed.

## VI. CONCLUSION

The trial court abused its discretion by ruling that (1) Rochelle had authority to bind the Trust and enter into the transactions contemplated by the BTS; (2) Rochelle sell the Clippers to Ballmer upon the terms and conditions set forth in the BTS; and (3) Probate Code section 1310(b) be invoked to consummate the sale of the

28

**EXHIBIT J, PAGE 501**

Clippers as set forth in the BTS, without limitation. The court caused
prejudicial error in its rulings and, therefore, the order must be reversed
and remanded.


Dated: June 1, 2015

Bobby Samini, Esq.
Matthew M. Hoesly, Esq.
Attorneys for Appellant
Donald T. Sterling

29

**EXHIBIT J, PAGE 502**

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type and length limits set forth in the California Rules of Court and the Fourth Appellate District, Third Division's local rules. The typeface is Times New Roman, 14-point font. The principal brief has 9,669 words as determined by the Word computer-generated word count tool.

Dated: June 1, 2015

Bobby Samini, Esq.
Matthew M. Hoesly, Esq.
Attorneys for Plaintiff

**EXHIBIT J, PAGE 503**

## PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF ORANGE

I am over 18 years of age. I am not a party to the within action. My business address is 840 Newport Center Drive, Suite 700, Newport Beach, CA, 92660.

On June 1, 2015, I served the foregoing document, described as APPELLANT'S OPENING BRIEF, on the parties in this action by sealing a copy of the document in an envelope addressed as follows:

**See Attached Service List**

I deposited the envelope, with first class postage fully prepaid thereon, into the United States Mail at Newport Beach, California.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on June 1, 2015, at Newport Beach, California.

Michael Moore

31

## SERVICE LIST

| | |
|---|---|
| Rochelle H. Sterling | Robert A. Olson<br>Greines, Martin, Stein & Richland LLP<br>5900 Wilshire Boulevard, 12th Floor<br>Los Angeles, CA 90036<br><br>Caroline S. Heindel<br>Greenberg Glusker et al LLP<br>1900 Ave Of The Stars #2100<br>Los Angeles, CA 90067-4590 |
| Steven A Ballmer | Adam F. Streisand<br>Loeb & Loeb<br>10100 Santa Monica Blvd., Suite 2200<br>Los Angeles, CA 90067-4164 |
| S.C.L.A. | Frederick Bennett<br>Superior Court of Los Angeles County<br>111 North Hill Street, Room 546<br>Los Angeles, CA 90012 |
| Hon. Michael Levanas | Los Angeles Superior Court<br>111 North Hill Street, Dept. 5<br>90012 |

**EXHIBIT J, PAGE 505**