# EXHIBIT A

FILED
LOS ANGELES SUPERIOR COURT

NOV 06 2015

SHERRI R. CARTER, EXECUTIVE OFFICER/ CLERK
BY ROSEMARIE D. AQUINO, DEPUTY

Case Number: BC590575
DONALD T STERLING VS TMZ PRODUCTIONS INC ET AL

Filing Date: 08/07/2015
Case Type: Other Intentional Tort-not PI/WD/PD (General Jurisdiction)
Status: Pending

11/06/2015

TMZ PRODUCTIONS, INC MOTION TO STRIKE Complaint Pursuant to the Anti-SLAPP
Statute, CCP § 425.16.

## FINAL RULING

TMZ's Request for Judicial Notice ("RJN") is GRANTED.

The Motion to Dismiss is GRANTED pursuant to CCP §425.16.

See discussion below.

## DISCUSSION

Plaintiff claims that Defendant Stiviano illegally recorded their private conversation and subsequently turned over said recording to Defendant TMZ. Plaintiff alleges that Defendant TMZ thereafter publicly and illegally disseminated the recording. The complaint (filed on 08/7/2015) contains two causes of action for (1) Violation of California Penal Code §630 et seq. and (2) Violation of California Business & Professions Code §17200 et seq. Defendants are TMZ Productions Inc. (hereinafter, "TMZ"), V. Stiviano (born Maria Vanessa Perez) aka Monica Gallegos, Vanessa Perez and Maria Valdez (hereinafter, "Stiviano").

This motion to dismiss pertains only to TMZ and is brought pursuant to the ANTI-SLAPP statute, CCP Section 425.16. TMZ contends that dissemination of the secretly obtained recording is protected speech which were a matter of of public interest and concern. Because of this, the matter is subject to dismissal under the statute because Plaintiff cannot show a probability of prevailing against TMZ because his claims are barred as a matter of law by the 1st Amendment, the SOL and, in any event, fail on their own terms.

### Request for Judicial Notice

"Courts may take judicial notice of publications introduced to 'indicate what was in the public realm at the time, not whether the contents of those articles were in fact true.' Premier Growth Fund v. Alliance Capital Mgmt. (3d Cir.2006) 435 F.3d 396, 401 n. 15; accord Heliotrope Gen. Inc. v. Ford Motor Co. (9th Cir. 1999) 189 F.3d 971, 981 n. 118 (taking judicial notice 'that the market was aware of the information contained in news articles submitted by the defendants.'). Von Saher v. Norton Simon Museum of Art at

#5

Pasadena (9th Cir. 2010) 592 F.3d 954, 960. See also McKelvey v. Boeing N. Am., Inc. (1999) 74 C.A.4th 151 (superseded by statute on other grounds) (taking judicial notice of 117 newspaper articles, TV transcripts and "fact sheets," which "were offered to show the extent of the widespread publicity" of the event at issue).

CCP § 425.16 states, in pertinent part, as follows:

"(b)(1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

(2) In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.

(3) If the court determines that the plaintiff has established a probability that he or she will prevail on the claim, neither that determination nor the fact of that determination shall be admissible in evidence at any later stage of the case, or in any subsequent action, and no burden of proof or degree of proof otherwise applicable shall be affected by that determination in any later stage of the case or in any subsequent proceeding...

(e) As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest. (f) The special motion may be filed within 60 days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper. The motion shall be scheduled by the clerk of the court for a hearing not more than 30 days after the service of the motion unless the docket conditions of the court require a later hearing..."

"A special motion to strike under section 425.16—the so-called anti-SLAPP statute—allows a defendant to seek early dismissal of a lawsuit that qualifies as a SLAPP. 'SLAPP is an acronym for "strategic lawsuit against public participation."' (Jarrow Formulas, Inc. v. LaMarche (2003) 31 C.4th 728, 732, fn. 1). A SLAPP is '[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue.' (§ 425.16, subd. (b)(1).)." Nygard, Inc. v. Uusi-Kerttula (2008) 159 C.A.4th 1027, 1035.

"A SLAPP is subject to a special motion to strike 'unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the

**#5**

claim.' (§ 425.16, subd. (b)(1).)." Nygard, *supra*, 159 C.A.4th at 1035. The "evaluation of an anti-SLAPP motion requires a two-step process in the trial court," which is addressed below. Id.

### Defendant's Burden

The moving party bears the initial burden of showing that the action falls within the class of suits subject to the special motion to strike.  Matson v. Dvorak (1995) 40 C.A.4th 539, 548; Dixon v. Superior Court (1994) 30 C.A.4th 733, 742; Wilcox v. Superior Court (1994) 17 C.A.4th 809, 819.

A defendant may meet this burden by showing that the act which forms the basis for the plaintiff's suit was (1) any written or oral statement made before a legislative, executive or judicial proceeding; (2) a statement or writing made in connection with an issue under consideration in such a proceeding or "any other official proceeding authorized by law;" (3) any written or oral statement made in a place open to the public or a public forum in connection with an issue of public interest; or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with an issue of public interest.  § 425.16(e); Equilon Enterprises v. Consumer Cause (2002) 29 C.4th 53, 66; Dixon, *supra*, 30 C.A.4th at 742.

TMG correctly asserts that its conduct arises from statements made in a public forum and from its exercise of the right of free speech and was made in connection with an issue of public interest. First, "[c]ases construing the term 'public forum' as used in section 425.16 have noted that the term 'is traditionally defined as a place that is open to the public where information is freely exchanged.' (Damon v. Ocean Hills Journalism Club (2000) 85 C.A.4th 468, 475). 'Under its plain meaning, a public forum is not limited to a physical setting, but also includes other forms of public communication.' (Id., at p. 476)." ComputerXpress, Inc. v. Jackson (2001) 93 C.A.4th 993, 1006.

It is evident that the story TMZ published with Plaintiff's comments, moreover, concerned an issue of public interest. Notably, "[s]ection 425.16...governs even private communications, so long as they concern a public issue. (Averill v. Superior Court (1996) 42 C.A.4th 1170)." Wilbanks v. Wolk (2004) 121 C.A.4th 883, 897. The "public interest" requirement, "like all of section 425.16, is to be 'construed broadly' so as to encourage participation by all segments of our society in vigorous public debate related to issues of public interest. (§ 425.16, subd. (a)..." Seelig v. Infinity Broadcasting Corp. (2002) 97 C.A.4th 798, 808. "The definition of 'public interest' within the meaning of the anti-SLAPP statute has been broadly construed to include not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity." Damon v. Ocean Hills Journalism Club (2000) 85 C.A.4th 468, 479. In fact, "'an issue of public interest' within the meaning of section 425.16, subdivision (e)(3) is *any issue in which the public is interested.* In other words, the issue need not be 'significant' to be protected by the anti-SLAPP statute-it is enough that it is one in which the public takes an interest." Nygard, Inc. v. Uusi-Kerttula (2008) 159 C.A.4th 1027, 1042.

#5

Here, the public has long been interested in Plaintiff, largely by his own doing. Plaintiff cannot and does not dispute that he has been a significant public figure in Southern CA (and nationally) since the 1980's, when he purchased the San Diego Clippers and began promoting himself with billboard and newspaper ads. (See RJN, Exhibit "3"). Plaintiff moved the Clippers to Los Angeles and became a "courtside presence, rubbing elbows with lower-rung celebrities." Id. ESPN The Magazine reported in 2009 that "Sterling himself has become a celebrity in a town that worships notoriety like no other." Id.

Over the years, Mr. Sterling has regularly been in the news for lawsuits accusing him of racism; in stories describing him as the "worst possible owner" (RJN, Exhibit "4") and a "racist, cheapskate" (Id., Exhibit "5"); and he has been publicly accused of harassing employees (Id., Exhibits "4" & "8"), heckling his own Clippers players (Id., Exhibit "6") and bringing people to the Clippers' locker room to ogle players' "black bodies" (Id., Exhibit "7"). According to a 2008 *LaWeekly story*, "U.S. District Judge Dale Fischer, in late 2005, ordered Sterling to pay nearly $5 million in legal fees" "[a]s the result of a housing-discrimination lawsuit alleging that Sterling...tried to drive black and Latino tenants out of his Koreatown apartments..." (Id., Exhibit "8"). Plaintiff reportedly "said he did not like 'Hispanic's or 'blacks' as tenants, telling his surprised onlookers that 'Hispanics smoke, drink, and just hang around the building.' On at least one other occasion, he had told management staff that he believed that 'black tenants smell and attract vermin.'" (Id.). In 2006, the Department of Justice sued Sterling for housing discrimination against African Americans, and he settled the case for $2.73 million. (Id., Exhibit "9").

Plaintiff's high profile extended to the philanthropic world as well. Two 2008 *LaWeekly* stories reported that Plaintiff ran ads heralding a "state-of-the art $50 million dollar [sic] Donald T. Sterling Homeless Center, Medical Center and Courthouse," which was never built. (Id., Exhibits "8" & "11"). The ads featured photos of unknown children, powerful people who did not know their images were being used, and huge images of Plaintiff's face. (Id.).

Plaintiff has alleged that D Stiviano recorded a conversation with him on/about 9/12/13, and then directly or indirectly provided a copy to D TMZ. (Complaint, ¶ 1). On 4/25/14, D TMZ published an article titled "L.A. Clippers Owner to GF: Don't Bring Black People to My Games...Including Magic Johnson," available at http://www.tmz.com/2014/04/26/donald-sterling-clippers-owner-black-people-racist-audio-magic-johnson. "At the top of the article is a link to a nine minute and twenty-six second audio recording played over a running transcript." (Declaration of Matthew Kline [hereinafter, "Kline"], Exhibit "1"). The aforesaid publication is hereinafter referred to as the "April 2014 Story." The reaction to the April 2014 Story was immediate, extensive and did not abate for months, as reflected in the judicially noticeable documents (See RJN, Exhibits "19"-"26"). On 4/29/14, NBA Commissioner Adam Silver banned P for life from "any association with the [NBA] or the Clippers" and fined him $2.5 million. (Id., Exhibit "27"). In late May 2014, the NBA announced the sale of the Clippers for $2 billion. (Id., Exhibit "28").

#5

The outrage caused by April 2014 Story did not relent. Eight months after the recording was released, the New York Post called D TMZ's story one of the "biggest sports bombshell stories in 2014." (Id., Exhibit "29"). MSNBC ranked the April 2014 Story as number 2 out of "The five biggest political sports stories of 2014" (Id., Exhibit "30"), as did the AP. (Id., Exhibit "31"). The *Daily News* listed the April 2014 Story as the 3rd top sports story of the year (Id., Exhibit "32"), *E!Online* ranked it among its five top scandals of 2014 (Id., Exhibit "33") and *BusinessInsider* referenced it in its "The Biggest Career Crashes of 2014" article (Id., Exhibit "34"). The NPR highlighted the scandal in a year-end feature on racism (Id., Exhibit "35") and the AP listed among its top 10 quotes for 2014, P's quote: It bothers me a lot that you want to broadcast that you're associating with black people." (Id., Exhibit "36"). The April 2014 Story captured national interest and "weaved into a much larger, ongoing discussion in America about racism, equality and progress" (Motion, 6:24).

### *Plaintiff has not met his burden*

Once a defendant has made his/her/its prima facie showing that plaintiff's complaint "arises from" their constitutionally protected free speech activity, "the burden shifts to plaintiff to establish a 'probability' that plaintiff will prevail on whatever claims are asserted against defendant. [See CCP § 425.16(b)]." Weil & Brown, et al., CAL. PRAC. GUIDE: CIV. PRO. BEFORE TRIAL (The Rutter Group 2011) ¶ 7:1005, p. 7(II)-44. "'(P)laintiff must demonstrate that *the complaint is both legally sufficient* and supported by a sufficient prima facie showing of facts to sustain a favorable judgment.' [Premier Med. Mgmt. Systems, Inc. v. California Ins. Guar. Ass'n (2006) 136 C.A.4th 464, 476 (emphasis in original; internal quotes omitted)—whether complaint could be *amended* to state valid claim is immaterial; see also Soukup v. Law Offices of Herbert Hafif (2006) 39 C.4th 260, 291]." Id. (emphasis theirs).

"The burden is on plaintiff to produce evidence that would be admissible at trial— i.e., to proffer a prima facie showing of facts supporting a judgment in plaintiff's favor. [Chavez v. Mendoza (2001) 94 C.A.4th 1083, 1087]." Id., p. 7(II)-45. "The 'probability of prevailing' is tested by the same standard governing a motion for summary judgment, nonsuit, or directed verdict. I.e., in opposing a SLAPP motion, it is plaintiff's burden to make a *prima facie* showing of *facts* that would support a judgment in plaintiff's favor..." Id. at ¶ 7:1008, p. 7(II)-45 (emphasis theirs). "Plaintiff must present evidence to overcome any privilege or defense to the claim that has been raised, in order to demonstrate a 'probability of success on the merits'..." Id. at ¶ 7:1015, p. 7(II)-46 (citation omitted).

The court concludes that Plaintiff has not met his burden. Plaintiff alleges that "[o]n or about September 12, 2013, Sterling met with his former friend, Stiviano, at her place of residency as part of a typical social gathering between them. During this particular social gathering, and unbeknownst to Stealing and without his consent, *Stiviano surreptitiously recorded* a conversation between the two individuals during Sterling's meeting with Stiviano." (Complaint, ¶ 12; emphasis added). He further alleges, "on information and belief," that "sometime between September 12, 2013, and April 25, 2014, Stiviano and/or her agents provided the illicitly recorded conversation between Stiviano and Sterling to TMZ and/or its agents. (Id., ¶ 13). He then alleges that "[o]n April 25, 2014, and with

#5

knowledge and/or contemptuous disregard for Plaintiff's privacy rights, TMZ publicized the contents of the illicit recording between Stiviano and Sterling and broadcasted said contents worldwide through various electronic mediums." (Id., ¶ 14).

Even if the aforesaid allegations were true, TMZ's publication of the April 2014 Story is protected by the 1st Amendment, regardless of whether or not Stiviano recorded him illegally or whether or not TMZ knew that Stiviano made the recording illegally and chose to publish the April 2014 Story anyway. *Stiviano, not TMZ, made the recording.*

Bartnicki v. Vopper (2001) 532 U.S. 514 is instructive. In that case, Petitioner Kane, the president of the local union representing the teachers at Wyoming Valley High School, and Petitioner Bartnicki, who was acting as the union's "chief negotiator" during contentious and highly publicized collective-bargaining negotiations with the school board, sued Respondent Vopper, a radio commentator, and other media representatives after Vopper played a tape of petitioners' intercepted phone conversation regarding said negotiations on his public affairs talk show. Petitioners subsequently learned through discovery that Vopper had obtained the tape from respondent Jack Yocum (hereinafter, "Yocum"), the head of a local taxpayers' organization that had opposed the union's demands throughout the negotiations. Yocum, who was added as a D, testified that he had found the tape in his mailbox shortly after the interception and recognized petitioners' voices. Yocum played the tape for some members of the school board, and later delivered the tape itself to Vopper. In their amended complaint, petitioners alleged that their phone conversation had been surreptitiously intercepted by an unknown person using an electronic device, that Yocum had obtained a tape of that conversation, and that he intentionally disclosed it to Vopper, as well as other individuals and media representatives. Vopper and other members of the media repeatedly published the contents of that conversation. Petitioners alleged that each of the Ds "knew or had reason to know" that the recording of the private telephone conversation had been obtained by means of an illegal interception. Relying on both federal and Pennsylvania statutory provisions, petitioners sought actual damages, statutory damages, punitive damages, and attorney's fees and costs.

The District Court, in denying cross-motions for summary judgment, rejected respondents' defense that they were protected by the First Amendment even if the disclosures violated the statutes, finding that the statutes were content-neutral laws of general applicability containing no indicia of prior restraint or the chilling of free speech. On interlocutory appeal, the 3rd Circuit Court of Appeals, reversed and remanded, finding that application of statutes to Ds' unduly infringed their free speech rights, and directing judgment for Ds. Certiorari was granted and the U.S. Supreme Court affirmed; in doing so, it determined as follows:

> "Because of the procedural posture of these cases, it is appropriate to make certain important assumptions about those facts. We accept petitioners' submission that the interception was intentional, and therefore unlawful, and that, at a minimum, respondents 'had reason to know' that it was unlawful. Accordingly, the disclosure of the contents of the intercepted conversation by Yocum to school board members and to representatives of

#5

the media, as well as the subsequent disclosures by the media defendants to the public, violated the federal and state statutes. Under the provisions of the federal statute, as well as its Pennsylvania analogue, petitioners are thus entitled to recover damages from each of the respondents. The only question is whether the application of these statutes in such circumstances violates the First Amendment.   In answering that question, we accept respondents' submission on three factual matters that serve to distinguish most of the cases that have arisen under § 2511. First, respondents played no part in the illegal interception. Rather, they found out about the interception only after it occurred...Second, their access to the information on the tapes was obtained lawfully, even though the information itself was intercepted unlawfully by someone else...Third, the subject matter of the conversation was a matter of public concern. If the statements about the labor negotiations had been made in a public arena—during a bargaining session, for example—they would have been newsworthy. This would also be true if a third party had inadvertently overheard Bartnicki making the same statements to Kane when the two thought they were alone.

"We agree with petitioners that § 2511(1)(c), as well as its Pennsylvania analog, is in fact a content-neutral law of general applicability...In this suit, the basic purpose of the statute at issue is to 'protec [t] the privacy of wire[, electronic,] and oral communications.' S.Rep. No. 1097, 90th Cong., 2d Sess., 66 (1968), U.S.Code Cong. & Admin.News 1968, pp. 2112, 2153. The statute does not distinguish based on the content of the intercepted conversations, nor is it justified by reference to the content of those conversations. Rather, the communications at issue are singled out by virtue of the fact that they were illegally intercepted—by virtue of the source, rather than the subject matter.

On the other hand, the naked prohibition against disclosures is fairly characterized as a regulation of pure speech. Unlike the prohibition against the 'use' of the contents of *527 an illegal interception in §2511(1)(d), subsection (c) is not a regulation of conduct. It is true that the delivery of a tape recording might be regarded as conduct, but given that the purpose of such a delivery is to provide the recipient with the text of recorded statements, it is like the delivery of a handbill or a pamphlet, and as such, it is the kind of 'speech' that the First Amendment protects.  As the majority below put it, '[i]f the acts of "disclosing" and "publishing" information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct.' 200 F.3d, at 120.

As a general matter, 'state action to punish the publication of truthful information seldom can satisfy constitutional standards.' Smith v. Daily Mail Publishing Co., 443 U.S. 97, 102 (1979). More specifically, this Court has repeatedly held that 'if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not

#5

constitutionally punish publication of the information, absent a need ... of the highest order.' *Id.,* at 103; see also Florida Star v. B.J.F., 491 U.S. 524 (1989); Landmark Communications, Inc. v. Virginia, 435 U.S. 829 (1978).

Accordingly, in New York Times Co. v. United States, 403 U.S. 713 (1971) *(per curiam),* the Court upheld the right of the press to publish information of great public concern obtained from documents stolen by a third party. In so doing, that decision resolved a conflict between the basic rule against prior restraints on publication and the interest in preserving the secrecy of information that, if disclosed, might seriously impair the security of the Nation. In resolving that conflict, the attention...was focused on the character of the stolen documents' contents and the consequences of public disclosure. Although the undisputed fact that the newspaper intended to publish information obtained from stolen documents was noted in Justice Harlan's dissent, *id.,* at 754, neither the majority nor the dissenters placed any weight on that fact.

However, New York Times v. United States raised, but did not resolve, the question 'whether, in cases where information has been acquired *unlawfully* by a newspaper or by a source, government may ever punish not only the unlawful acquisition, but the ensuing publication as well.' Florida Star, 491 U.S., at 535, n. 8. The question here, however, is a narrower version of that still-open question. Simply put, the issue here is this: 'Where the punished publisher of information has obtained the information in question in a manner lawful in itself but from a source who has obtained it unlawfully, may the government punish the ensuing publication of that information based on the defect in a chain?' Boehner, 191 F.3d, at 484–485 (Sentelle, J., dissenting)...

Accordingly, we consider whether, given the facts of these cases, the interests served by § 2511(1)(c) can justify its restrictions on speech.

The Government identifies two interests served by the statute—first, the interest in removing an incentive for parties to intercept private conversations, and second, the interest in minimizing the harm to persons whose conversations have been illegally intercepted. We assume that those interests adequately justify the prohibition in §2511(1)(d) against the interceptor's own use of information that he or she acquired by violating § 2511(1)(a), but it by no means follows that punishing disclosures of lawfully obtained information of public interest by one not involved in the initial illegality is an acceptable means of serving those ends...

The Government's second argument, however, is considerably stronger. Privacy of communication is an important interest, Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 559 (1985)...Moreover,

#5

the fear of public disclosure of private conversations might well have a chilling effect on private speech...

[I]t seems to us that there are important interests to be considered on *both* sides of the constitutional calculus. In considering that balance, we acknowledge that some intrusions on privacy are more offensive than others, and that the disclosure of the contents of a private conversation can be an even greater intrusion on privacy than the interception itself. As a result, there is a valid independent justification for prohibiting such disclosures by persons who lawfully obtained access to the contents of an illegally intercepted message, even if that prohibition does not play a significant role in preventing such interceptions from occurring in the first place.

We need not decide whether that interest is strong enough to justify the application of § 2511(c) to disclosures of trade secrets or domestic gossip or other information of purely private concern. Cf. Time, Inc. v. Hill, 385 U.S. 374, 387–388 (1967) (reserving the question whether truthful publication of private matters unrelated to public affairs can be constitutionally proscribed). In other words, the outcome of these cases does not turn on whether § 2511(1)(c) may be enforced with respect to most violations of the statute without offending the First Amendment. The enforcement of that provision in these cases, however, implicates the core purposes of the First Amendment because it imposes sanctions on the publication of truthful information of public concern.

In these cases, privacy concerns give way when balanced against the interest in publishing matters of public importance. As Warren and Brandeis stated in their classic law review article: 'The right of privacy does not prohibit any publication of matter which is of public or general interest.' The Right to Privacy, 4 Harv. L.Rev. 193, 214 (1890). One of the costs associated with participation in public affairs is an attendant loss of privacy.

'Exposure of the self to others in varying degrees is a concomitant of life in a civilized community. The risk of this exposure is an essential incident of life in a society which places a primary value on freedom of speech and of press. "Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period."' Time, Inc. v. Hill, 385 U.S., at 388 (quoting Thornhill v. Alabama, 310 U.S. 88, 102 (1940)).

Our opinion in New York Times Co. v. Sullivan, 376 U.S. 254 (1964), reviewed many of the decisions that settled the 'general proposition that freedom of expression upon public questions is secured by the First Amendment.' *Id.*, at 269, 84 S.Ct. 710; see Roth v. United States, 354 U.S. 476,

#5

484 (1957); Bridges v. California, 314 U.S. 252, 270 (1941); Stromberg v. California, 283 U.S. 359, 369 (1931). Those cases all relied on our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open,' New York Times, 376 U.S., at 270; see Terminiello v. Chicago, 337 U.S. 1, 4 (1949); De Jonge v. Oregon, 299 U.S. 353, 365 (1937); Whitney v. California, 274 U.S. 357, 375–376 (1927) (Brandeis, J., concurring); see also Roth, 354 U.S., at 484; Stromberg, 283 U.S., at 369; Bridges, 314 U.S., at 270. It was the overriding importance of that commitment that supported our holding that neither factual error nor defamatory content, nor a combination of the two, sufficed to remove the First Amendment shield from criticism of official conduct. *Id.,* at 273; see also NAACP v. Button, 371 U.S. 415, 445 (1963); Wood v. Georgia, 370 U.S. 375 (1962); Craig v. Harney, 331 U.S. 367 (1947); Pennekamp v. Florida, 328 U.S. 331, 342, 343, n. 5 (1946); Bridges, 314 U.S., at 270.

We think it clear that parallel reasoning requires the conclusion that a stranger's illegal conduct does not suffice to remove the First Amendment shield from speech about a matter of public concern. The months of negotiations over the proper level of compensation for teachers at the Wyoming Valley West High School were unquestionably a matter of public concern, and respondents were clearly engaged in debate about that concern. That debate may be more mundane than the Communist rhetoric that inspired Justice Brandeis' classic opinion in Whitney v. California, 274 U.S., at 372, but it is no less worthy of constitutional protection." Id. at 526-35.

Here, all of the rationales set forth in Bartnicki apply, particularly given P's infamy, his ownership of the L.A. Clippers, and his remarks that D Stiviano should not bring her black friend to games, nor to associate with NBA Hall-of-Famer Magic Johnson because he is black.

*Penal Code section 632 does not apply to dissemination of communications gathered illegally by another person*

Additionally, Plaintiff's 1st COA fails on its own terms. Penal Code §632 provides, in part, that "(a) Every person who, intentionally and without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device, eavesdrops upon or records the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500), or imprisonment in the county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment..." Again, however, Plaintiff admits that TMZ did not "eavesdrop" or "record" his conversation; rather, Stiviano made the recording. "Penal Code section 632 *does not prohibit* the *disclosure* of information gathered in violation of its terms." Lieberman v. KCOP Television, Inc. (2003) 110 C.A.4th 156, 167.

#5

### The Complaint is time-barred

A claim for damages under Penal Code §637.2[1] accrues when the P discovers the privacy violation. *See* Montalti v. Catanzariti, (1987) 191 C.A.3d 96, 99. Plaintiff undoubtedly "discovered" the alleged violation no later than 4/25/14, when TMZ published the April 2014 Story. Plaintiff, in fact, claims that he was damaged that day. (Complaint, ¶36). His claim that he suffered no "ascertainable" damage before 8/14 is belied by the fact that he was banned for life from the NBA and fined $2.5 million on 4/29/14 (RJN, Exhibit "27") and that he sued the NBA for up to "$9 Billion" I damages in 5/14. (Complaint, Exhibit "1" at p. 4).

### TMZ was not engaged in any unlawful, unfair, or fraudulent business act

Plaintiff's 2nd cause of action fails, because Plaintiff has not produced any evidence showing that TMZ engaged in any "unlawful, unfair or fraudulent business act or practice."

### DEMURRER

Based upon the recommendation made on the anti-SLAPP motion, the demurrer should be TAKEN OFF-CALENDAR.

IT IS SO ORDERED.

NOV 0 6 2015

FREDERICK C. SHALLER
SUPERIOR COURT JUDGE

---

[1] This provision states as follows: "(a) Any person who has been injured by a violation of this chapter may bring an action against the person who committed the violation for the greater of the following amounts:
(1) Five thousand dollars ($5,000).
(2) Three times the amount of actual damages, if any, sustained by the plaintiff.
(b) Any person may, in accordance with Chapter 3 (commencing with Section 525) of Title 7 of Part 2 of the Code of Civil Procedure, bring an action to enjoin and restrain any violation of this chapter, and may in the same action seek damages as provided by subdivision (a).
(c) It is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

#5

46

DANIEL M. PETROCELLI (S.B. #97802)
  dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
  mkline@omm.com
JENNIFER S. MIDDLETON (S.B. #275177)
  jmiddleton@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA  90067-6035
Telephone:    (310) 553-6700
Facsimile:    (310) 246-6779

*Attorneys for Defendant TMZ Productions Inc.*

**FILED**
LOS ANGELES SUPERIOR COURT

NOV 06 2015

SHERRI R. CARTER, EXECUTIVE OFFICER/CLERK
BY ROSEMARIE D. AQUINO, DEPUTY

RECEIVED
AUG 31 2015
ROOM 102

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT

DONALD T. STERLING, an individual,

    Plaintiffs,

      v.

TMZ PRODUCTIONS INC., a California Corporation; V. STIVIANO (born MARIA VANESSA PEREZ) aka MONICA GALLEGOS, VANESSA PEREZ, and MARIA VALDEZ; and DOES 1 through 50,

    Defendants.

Case No. BC590575

[PROPOSED] ORDER GRANTING TMZ PRODUCTIONS INC.'S SPECIAL MOTION TO STRIKE COMPLAINT PURSUANT TO THE ANTI-SLAPP STATUTE, CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 425.16

NOTICE OF MOTION AND SPECIAL MOTION TO STRIKE, REQUEST FOR JUDICIAL NOTICE, AND DECLARATION OF MATTHEW T. KLINE FILED CONCURRENTLY HEREWITH

Hon. Frederick C. Shaller
Department 46

Hearing Date:    November 6, 2015
Hearing Time:    8:30 a.m.
Complaint Filed:   August 7, 2015
Trial Date:     TBD

[PROPOSED] ORDER GRANTING TMZ'S SPECIAL MOTION TO STRIKE PURSUANT TO C.C.P. § 425.16

Exhibit A

[~~PROPOSED~~] ORDER

This Court heard argument on defendant TMZ Productions Inc. ("TMZ")'s special motion to strike plaintiff Donald Sterling's complaint pursuant to the anti-SLAPP statute, California Code of Civil Procedure § 425.16.  After considering all papers and evidence filed in support of and in opposition to TMZ's Motion, and all papers and records on file in this action, and after hearing arguments of counsel, the Court finds that the anti-SLAPP statute applies to TMZ's April 2014 Story that is the subject matter of this action, and the Court further finds that Mr. Sterling has not established a probability of prevailing against TMZ on his First Cause of Action for Violation of California Penal Code §§ 630, *et seq.*, or his Section Cause of Action for Violation of California Business and Professions Code §§ 17200, *et seq.*

**IT IS HEREBY ORDERED**, therefore, that TMZ's special motion to strike is granted, and plaintiff Donald Sterling's complaint is stricken in its entirety against TMZ.  The Clerk shall enter judgment for TMZ.

**IT IS FURTHER ORDERED** that TMZ shall make any motion for attorneys' fees and costs pursuant to California Code of Civil Procedure § 425.16(c) within 60 days of the notice of entry of this order.

**IT IS SO ORDERED.**

Dated: _____, 2015

NOV 06 2015

By: _____

Honorable Frederick C. Shaller

- 1 -

[~~PROPOSED~~] ORDER GRANTING TMZ'S SPECIAL MOTION TO STRIKE PURSUANT TO C.C.P. § 425.16

Exhibit A
15