Filed 11/16/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| ROCHELLE H. STERLING, as Trustee, etc., | B258151 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BP152858) |
| v. | |
| DONALD T. STERLING, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Michael Levanas, Judge. Affirmed.

Bobby Samini, Laura M. Baskurt and Matthew M. Hoesly for Defendant and Appellant.

Greenberg Glusker Fields Claman & Machtinger, Pierce O'Donnell, Bertram Fields, Stephen S. Smith; Greines, Martin, Stein & Richland and Robert A. Olson for Plaintiff and Respondent.

* * * * * *

In this appeal, Donald T. Sterling (Donald) seeks to regain ownership of the Los Angeles Clippers (Clippers), a professional basketball team Steven Ballmer purchased on August 12, 2014. The evidence credited by the probate court overwhelmingly showed that Donald was properly removed as trustee of the Sterling Family Trust, which owned the Clippers.[1] The credited evidence overwhelmingly supported the probate court's conclusion that exigent circumstances warranted the sale of the Clippers to prevent extraordinary loss to the trust. The probate court's sanctioning the sale was correct even though Donald, who initially agreed to the sale, purportedly revoked the trust in an effort to block the sale. On appeal, Donald fails to demonstrate any legal error and fails to consider the facts in accordance with the proper standards on appeal. We affirm the probate court's order.

## FACTS AND PROCEDURE

The National Basketball Association's (NBA) April 2014 charge against Donald triggered Donald's lifetime ban from the Clippers and prompted the sale of the team. Although Donald initially authorized the sale and actively encouraged his wife Rochelle H. Sterling (Rochelle)[2] to sell the team, he subsequently vigorously opposed it. His refusal to sign the sale agreement caused Rochelle to remove him as trustee and to file an ex parte petition in the probate court, seeking confirmation of Donald's removal as trustee and instructions relevant to the sale of the Clippers. The probate court's order following the ex parte petition is the subject of this appeal.

### 1. *Sterling Family Trust*

The Sterling Family Trust is relevant because the trust owned the Clippers and because the trust identified the circumstances justifying removal of a trustee. Donald and Rochelle, established the Sterling Family Trust in 1998, identifying Donald and Rochelle

---

[1] More precisely, the trust owned a corporation, which in turn owned the Clippers, but the distinction is irrelevant for purposes of this appeal.

[2] Because Donald and Rochelle share a surname, we refer to them by their first names.

2

as both settlors and trustees. As later amended and restated, the trust provided for removal of a trustee due to incapacity. Specifically, the trust provided: "Any individual who is deemed incapacitated, as defined in Paragraph 10.24., shall cease to serve as a Trustee of all trusts administered under this document." Paragraph 10.24 in turn provided: "'Incapacity' and derivations thereof mean incapable of managing an individual's affairs under the criteria set forth in California Probate Code §810 et seq. An individual shall be deemed to be incapacitated if . . . two licensed physicians who, as a regular part of their practice are called upon to determine the capacity of others, and neither of whom is related by blood or marriage to any Trustee or beneficiary, examine the individual and certify in writing that the individual is incapacitated . . . ."

In addition to owning the Clippers, the trust owned real property worth approximately $2.5 billion and subject to approximately $480 million in debt. The assets included 150 apartment buildings, 15 residential properties, land, and a hotel. The apartment buildings housed approximately 20,000 tenants.

Under the terms of the trust, the trustee was empowered to (among other things) employ professionals, pay expenses, and purchase and sell property. The trustee also was empowered to operate a business, borrow and encumber trust property, lend money and secure the debt of a beneficiary, deposit and withdraw funds, distribute assets, and litigate claims.

### 2. *The NBA Penalized Donald*

A charge before the NBA's board of governors indicated that on April 26, 2014, a tape recording of Donald's "deeply offensive, demeaning, and discriminatory views toward African Americans, Latinos, and 'minorities' in general" was made public. The NBA imposed a $2.5 million fine on Donald on April 29, 2014. It also imposed a lifetime ban against Donald from participating in the league. Subsequently, the NBA sought to terminate the Sterlings' ownership of the Clippers.

On May 9, 2014, NBA commissioner Adam Silver appointed Richard Parsons as interim chief executive officer of the Clippers. Parsons testified that if the Sterlings did

3

not sell the Clippers, the NBA intended to remove Donald as an owner of the team. The NBA further planned to auction the team.

When Parsons was appointed chief executive officer, the team was in turmoil. Numerous sponsors warned they would terminate their sponsorship if Donald continued to own the team. Season ticket-holders threatened to stop purchasing tickets if Donald continued to own the team. In addition to losing revenue, the team was likely to lose its head coach and several players. Parsons worried that a "death spiral" would ensue. As he explained: "If none of your sponsors want to sponsor you . . . ; the coach doesn't want to coach for you; if your players don't want to play for you, what do you got?" "[I]f the players [abandon the team], the fans are going to abandon us. If the fans do, the television is going to abandon us and it's going to spiral down and down and down to a point where you can't catch it; you can't stop it . . . ."

### 3. *Donald and Rochelle Decide to Sell the Clippers*

Following the NBA's actions against Donald and its plan to auction the team, both Donald and Rochelle wanted to sell the team. On May 22, 2014, Donald's attorney wrote commissioner Silver that "Mr. Sterling agrees to the sale of his interest in the Los Angeles Clippers." "This letter confirms that Donald T. Sterling authorizes Rochelle Sterling to negotiate with the National Basketball Association regarding all issues in connection with a sale of the Los Angeles Clippers team, owned by LAC Basketball Club, Inc." In addition to his attorney, Donald signed the letter, indicating his approval.

Donald instructed Rochelle to sell the team before an NBA hearing set for June 3, 2014. Rochelle obtained offers for the team and reported daily to Donald. On May 28, 2014, Donald agreed to Ballmer's offer. Donald told Rochelle he was proud of her for obtaining such a good offer, exclaiming "Wow, you really did a good job."

Rochelle entered a "Binding Term Sheet" with Ballmer on May 29, 2014. On May 30, 2014, the NBA withdrew its May 19, 2014 charge and canceled the board of governors meeting set for June 3, 2014, based on the understanding that Rochelle planned to sell the Clippers to Ballmer.

4

### *4. Ballmer's Offer to Purchase the Clippers*

Ballmer offered to pay $2 billion to purchase the Clippers. His offer was $400 million more than the next highest offer. Parsons described Ballmer's offer as a "knock-out price." Parsons testified that it would be difficult to match this price if the sale to Ballmer did not occur.

Anwar Zakkour, an investment banker, assisted Rochelle in obtaining bids for the Clippers. He valued the Clippers at $1 billion to $1.3 billion. He concluded that a deal in the $1.5 to $1.8 billion range would be "nirvana." Zakkour recommended Rochelle accept Ballmer's bid, describing it as a "home-run deal." Zakkour was aware the Forbes magazine had valued the Clippers at $575 million. Like Parsons, Zakkour concluded there was a significant risk that no other bidder would match Ballmer's offer. Zakkour testified that the purchase price was the highest for a sports team that did not include real estate.[3]

### *5. Donald Is Found to Lack Capacity to Serve as Trustee of the Sterling Family Trust*

Although Donald initially wanted to sell the Clippers and congratulated Rochelle on obtaining a high bid for the team, Donald refused to sign the Binding Term Sheet setting the terms for the sale to Ballmer. When Rochelle asked Donald to sign, Donald promised to sue.

Rochelle subsequently removed Donald as trustee in accordance with the provisions of the trust, which as noted, required certification by two physicians who regularly determine capacity.

Dr. Meril Sue Platzer, a board-certified neurologist who specialized in the detection of Alzheimer's disease, evaluated Donald. It was a regular part of her practice to determine her patients' mental capacity. After evaluating Donald, Dr. Platzer concluded: "Based upon my evaluation performed on May 19, 2014, it is my opinion

---

[3] The probate court found Donald's purported expert on valuation not credible. The court "found his training and experience totally lacking including no high school diploma, no college degree, no formal training in accounting for valuation of businesses." Additionally, he misrepresented his expertise when he testified.

5

that Mr. Donald T. Sterling is suffering from cognitive impairment secondary to primary dementia Alzheimer's disease." She continued: "It is my opinion that Mr. Donald T. Sterling is unable to reasonably carry out the duties as Trustee of The Sterling Family Trust as a result of, among other factors, an impairment of his level of attention, information processing, short term memory impairment and ability to modulate mood, emotional lability, and is at risk of making potentially serious errors of judgment."

Dr. Platzer testified Donald was unable to spell the word "world" backwards. When asked to subtract 7 from 100, he could not perform the calculation past 93 (100-7=93); he could not subtract 7 from 93 (93-7=86). Dr. Platzer testified that Donald's PET scan indicated he suffered from Alzheimer's disease. She concluded he suffered from Alzheimer's disease for at least three years and more likely five years. She further testified that she considered Probate Code section 811 in reaching her conclusion that Donald was unable to serve as trustee.[4]

Dr. James Spar, a geriatric psychiatrist regularly called upon to determine capacity, also evaluated Donald. Dr. Spar concluded that Donald's performance on a battery of tests was consistent with early Alzheimer's disease or other brain disease. According to Dr. Spar: "Because of his cognitive impairment, Mr. Sterling is at risk of making potentially serious errors of judgment, impulse control, and recall in the management of his finances and his trust. Accordingly, in my opinion he is substantially unable to manage his finances and resist fraud and undue influence, and is no longer competent to act as trustee of his trust."

Dr. Spar testified that based upon his examination he believed Donald was no longer able to serve as trustee of the Sterling Family Trust. He testified that he considered sections 810 and 811 in reaching this conclusion. (Dr. Spar further testified that he assisted in writing those sections of the Probate Code.)

---

[4] Undesignated statutory citations are to the Probate Code.

### *6. Ex Parte Petition*

On June 11, 2014, Rochelle brought an ex parte petition seeking a court order to confirm the sale of the Clippers and to direct the trustee under section 1310, subdivision (b) (section 1310(b)). Rochelle argued that she was the sole trustee because two physicians found that Donald lacked capacity to act as trustee.

The probate court held an eight-day hearing beginning July 7 and ending July 28, 2014. After the hearing, the probate court issued an exhaustive statement of decision making numerous credibility determinations and detailing the court's rationale for rejecting Donald's arguments. The probate court concluded that Ballmer "paid an amazing price that cannot be explained by a market analysis and was so far in excess of the comprehensive . . . valuations . . . that were done by Mr. Zakkour; that he used terms like knock-out, slam dunk, home run, and nirvana."

The probate court found that the trust was likely to lose money on the sale of the Clippers if the sale to Ballmer did not proceed. The next best offer was $400 million less than Ballmer's offer. Second, if the sale was not made to Ballmer, the NBA was likely to auction the team. Such an action would not likely produce a high bid because the NBA was embroiled in litigation with Donald. Additionally, if Donald remained owner, the Clippers were likely to lose massive value because the sponsors, coach, and players did not want to be associated with Donald.

The court rejected Donald's theory that Rochelle had a secret plan to remove him as trustee. The court found Donald willingly participated in examinations by Drs. Platzer and Spar and there was no credible evidence that he was distracted or under stress during the evaluations. The court found Donald was not credible and his "answers were often evasive and in one instance inconsistent with his previous sworn testimony . . . ." The court found Parsons's and Zakkour's valuation of the Clippers credible. The court also found credible that the team would experience a loss of value if Donald continued to own them and the coach and players would likely defect and refuse to play.

The probate court's overarching conclusions were that (1) Donald was properly removed as a trustee of the Sterling Family Trust and (2) "Rochelle had authority to bind

7

unilaterally the Sterling Family Trust . . . by executing the Binding Term Sheet, dated May 29, 2014" and agreeing to sell the Clippers to Ballmer. Invoking its authority under section 1310(b), the court instructed Rochelle to complete the sale.

Section 1310(b) governs a stay on appeal and provides: "Notwithstanding that an appeal is taken from the judgment or order, for the purpose of preventing injury or loss to a person or property, the trial court may direct the exercise of the powers of the fiduciary, or may appoint a temporary guardian or conservator of the person or estate, or both, or a special administrator or temporary trustee, to exercise the powers, from time to time, as if no appeal were pending. All acts of the fiduciary pursuant to the directions of the court made under this subdivision are valid, irrespective of the result of the appeal. An appeal of the directions made by the court under this subdivision shall not stay these directions."

In addition to concluding the sale was proper under section 1310(b), the probate court further concluded Rochelle had authority under section 15407 to wind up the trust even though Donald had revoked the trust. Over Donald's objection, the court found the wind up authority included the sale of the Clippers.

Section 15407 governs a trustee's wind up authority when a trust is terminated or revoked and provides: "(a) A trust terminates when any of the following occurs: [¶] (1) The term of the trust expires. [¶] (2) The trust purpose is fulfilled. [¶] (3) The trust purpose becomes unlawful. [¶] (4) The trust purpose becomes impossible to fulfill. [¶] (5) The trust is revoked. [¶] (b) On termination of the trust, the trustee continues to have the powers reasonably necessary under the circumstances to wind up the affairs of the trust."

### 7. *Subsequent Proceedings*

After the court issued its order approving the Clippers' sale, Donald filed two writ petitions in this court. Donald argued that the probate court's order must be stayed "because without such a stay, Donald's appeal will be rendered hollow—the Clippers, a unique asset, will have been sold, and § 1310(b) protects Rochelle from any liability for actions taken under order of the trial court." Donald further argued that "[e]ven if he

8

prevails on the merits of his appeal, Donald can do little to recover the Clippers." This court denied Donald's writ petitions and his request for a stay; and this appeal followed.[5]

## DISUCSSION

On appeal, Donald contends he was improperly removed as trustee of the Sterling Family Trust. He also argues that the trial court abused its discretion in ordering Rochelle to sell the Clippers notwithstanding his revocation of the trust and in invoking section 1310(b), which sanctioned the sale despite a subsequent appeal. Donald seeks the following relief: reversal of the trial court's order with direction "that the sale of the Los Angeles Clippers from [Rochelle] to Ballmer be undone." Rochelle argues that Donald's appeal suffers from numerous deficiencies, which are dispositive. We begin with Rochelle's argument and then discuss Donald's arguments seriatim.

### 1. *Procedural Deficiencies*

As Rochelle argues, Donald's appeal suffers from numerous deficiencies. First, California Rules of Court, rule 8.204 requires that each brief support reference to a matter in the record with citation "to the volume and page number of the record where the matter appears." (Rule 8.204(a)(1)(C); see *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.) Donald repeatedly cites to matters without identifying the volume and page number in the appellate record where the item appears. He makes factual assertions with no citation to

---

[5] Donald has filed a declaration in this court indicating that since the probate court issued its order approving the Clippers' sale, he has withdrawn his revocation of the trust. Then, following his withdrawal of his revocation he claims he later reinstated his revocation. We deny both Donald's and Rochelle's motions to augment the record to take additional evidence regarding Donald's purported reinstatement and then subsequent revocation of the trust. For purposes of this appeal, we need not consider the legal effect of Donald's apparent indecision regarding whether to revoke the trust, nor are we called upon to determine whether his later reinstatement vitiated the earlier revocation. In the discussion section, we consider on the merits Donald's contention that the court erred in invoking section 15407 to allow the sale of the Clippers as part of the trustee's wind-up authority.

We grant Donald's request to take judicial notice of the legislative history of section 1310. We grant Donald's request to augment the record to include trial exhibit No. 4—a copy of the 1998 Sterling Family Trust.

9

the record and cites to lengthy exhibits from the trial court without identifying their location in the record on appeal (most of which he failed to include in the appellate record). His reply brief contains hardly any citation to the record to support his factual assertions.

Second, Donald summarizes the evidence in the light favorable to his position and ignores the probate court's credibility determinations. He has devoted most of his briefs to rearguing the facts and relies on evidence expressly rejected by the probate court. As a result Donald has forfeited his arguments on appeal based on the sufficiency of the evidence including his argument that the evidence does not support the probate court's determination he was properly removed as a trustee. (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738.)

Third, by way of this appeal, Donald seeks the following relief: "that this Court reverse the probate court's orders and direct that the sale of the Los Angeles Clippers from [Rochelle] to Ballmer be undone." Donald fails to show that he is entitled to this relief. He cites no authority for the proposition that this court can "undo" a sale after that sale was sanctioned under section 1310(b). (His argument directly contradicts the argument made in his writ petition that the sale could not be undone once completed.) Acts taken pursuant to section 1310(b) are valid regardless of the outcome on appeal. (*Kane v. Superior Court* (1995) 37 Cal.App.4th 1577, 1586 [interpreting former § 7241, subd. (b)].) Therefore, even if Donald is successful, the sale of the Clippers cannot be "undone" and Donald seeks no other relief and demonstrates no other prejudice. Although this issue is dispositive, we discuss Donald's arguments as if he were able to demonstrate prejudice.

## 2. *Donald's Removal as Trustee*

Donald argues the record lacks substantial evidence to support the determination that he was properly removed as trustee under the terms of the trust and sections 810 and 811.[6] Section 810 sets forth a rebuttable presumption of competency, and section 811

---

6   Section 810 provides:

10

"The Legislature finds and declares the following:

"(a) For purposes of this part, there shall exist a rebuttable presumption affecting the burden of proof that all persons have the capacity to make decisions and to be responsible for their acts or decisions.

"(b) A person who has a mental or physical disorder may still be capable of contracting, conveying, marrying, making medical decisions, executing wills or trusts, and performing other actions.

"(c) A judicial determination that a person is totally without understanding, or is of unsound mind, or suffers from one or more mental deficits so substantial that, under the circumstances, the person should be deemed to lack the legal capacity to perform a specific act, should be based on evidence of a deficit in one or more of the person's mental functions rather than on a diagnosis of a person's mental or physical disorder."

Section 811 provides:

"(a) A determination that a person is of unsound mind or lacks the capacity to make a decision or do a certain act, including, but not limited to, the incapacity to contract, to make a conveyance, to marry, to make medical decisions, to execute wills, or to execute trusts, shall be supported by evidence of a deficit in at least one of the following mental functions, subject to subdivision (b), and evidence of a correlation between the deficit or deficits and the decision or acts in question:

"(1) Alertness and attention, including, but not limited to, the following:

"(A) Level of arousal or consciousness.

"(B) Orientation to time, place, person, and situation.

"(C) Ability to attend and concentrate.

"(2) Information processing, including, but not limited to, the following:

"(A) Short- and long-term memory, including immediate recall.

"(B) Ability to understand or communicate with others, either verbally or otherwise.

"(C) Recognition of familiar objects and familiar persons.

"(D) Ability to understand and appreciate quantities.

"(E) Ability to reason using abstract concepts.

"(F) Ability to plan, organize, and carry out actions in one's own rational self-interest.

"(G) Ability to reason logically.

identifies grounds for finding incompetency including ability to remember, ability to modulate mood, and ability to process information.

Donald's argument that he was improperly removed as trustee is forfeited. Donald characterizes the facts directly contrary to the probate court findings. For example, the probate court concluded: "There's no credible evidence presented by Dr. [Jeffrey] Cummings [(Donald's expert)] that there is some professional duty or ethical requirement that . . . either doctor needed to advise Donald or that, in general, a doctor must advise a patient about possible legal consequences of an examination. And, in fact, credible evidence is that such warning would make someone tense and could cause negative effects on the results."

Nevertheless, Donald summarizes the evidence as follows: "Dr. Cummings testified as to the unusual circumstances surrounding the doctor's examinations,

---

"(3) Thought processes. Deficits in these functions may be demonstrated by the presence of the following:

"(A) Severely disorganized thinking.

"(B) Hallucinations.

"(C) Delusions.

"(D) Uncontrollable, repetitive, or intrusive thoughts.

"(4) Ability to modulate mood and affect. Deficits in this ability may be demonstrated by the presence of a pervasive and persistent or recurrent state of euphoria, anger, anxiety, fear, panic, depression, hopelessness or despair, helplessness, apathy or indifference, that is inappropriate in degree to the individual's circumstances.

"(b) A deficit in the mental functions listed above may be considered only if the deficit, by itself or in combination with one or more other mental function deficits, significantly impairs the person's ability to understand and appreciate the consequences of his or her actions with regard to the type of act or decision in question.

"(c) In determining whether a person suffers from a deficit in mental function so substantial that the person lacks the capacity to do a certain act, the court may take into consideration the frequency, severity, and duration of periods of impairment.

"(d) The mere diagnosis of a mental or physical disorder shall not be sufficient in and of itself to support a determination that a person is of unsound mind or lacks the capacity to do a certain act."

12

including the distractions and stress during Donald's examination and opined that there is an accepted standard of care with respect to the physician's disclosure to the patient. . . . Donald should have been told the purpose of the assessment."

Additionally, the court found: "Donald willingly participated in the evaluations by both Dr. Spar and Dr. Platzer. He testified that he agreed to be examined by them. There is no credible or compelling evidence that Donald was distracted or under stress during the evaluations by Dr. Platzer or Dr. Spar as suggested by Dr. Cummings. Dr. Cummings, called by Donald, had no facts that supported his opinion outside of the fact that he was advised the Sterlings were separated."

Nevertheless, Donald summarizes the evidence as follows: "Dr. Spar conceded that Donald was distracted and preoccupied . . . ." "During the same period of time, Donald was preoccupied by the risk of losing ownership of the Clippers as a result of actions by the NBA. Both examining doctors acknowledged that 'anxiety' could negatively affect his test performance."

Whereas the court indicated it "does not find any credible or compelling evidence of a 'secret' Plan B," Donald asserts that "Rochelle and her lawyer met with the Commissioner of the NBA, Adam Silver, on or about May 13, 2014, and began to plot with the NBA to wrest control of the team away from Donald knowing he never sells any property. . . . This lead to secret Plan B."

Assuming Donald preserved his argument, he failed to demonstrate error. The testimony of Drs. Platzer and Spar, who regularly determine capacity, amply supported the conclusion that Donald was incapable of managing his affairs under the criteria in section 811, the relevant criteria under the terms of the Sterling Family Trust. Dr. Platzer concluded that Donald had "an impairment of his level of attention, information processing, short term memory impairment and ability to modulate mood, emotional lability, and is at risk of making potentially serious errors of judgment." These were factors under section 811 supporting her determination that Donald lacked capacity. Dr. Spar concluded that "[b]ecause of his cognitive impairment, Mr. Sterling is at risk of making potentially serious errors of judgment, impulse control, and recall in the

13

management of his finances and his trust. Accordingly, in my opinion he is substantially unable to manage his finances and resist fraud and undue influence, and is no longer competent to act as trustee of his trust." Dr. Spar expressly testified he considered section 811 and used those factors to conclude that Donald was no longer able to serve as trustee. His conclusion is consistent with the factors enumerated in section 811.

Further there was evidence that Donald's impairments correlated to his ability to act as trustee. The trustee had all powers to employ persons, pay expenses, hold, manage, and control and sell property, operate business, and borrow and lend money. The trust included ownership of the corporation that owned the stock of the Clippers. The trust additionally owned about 150 apartment buildings, 15 residential properties, land, and a hotel. There were approximately 10,000 units to manage. Three banks held loans totaling about $480 million. Errors of judgment, impulse control and inability to recall are correlated to Donald's ability to manage the substantial trust assets. The inability to resist fraud and undue influence also are correlated to his ability to manage these assets. Stated otherwise, there was a clear link between the imparities Drs. Platzer and Spar found and the ability to perform the duties of the trustee. (See *In re Marriage of Greenway* (2013) 217 Cal.App.4th 628, 640 [under § 811 ["[t]here must be a causal link between the impaired mental function and the issue or action in question"].)

### 3. *The Probate Court Properly Relied on Section 1310(b)*

Donald argues the trial court erred in relying on section 1310(b) because "there was no evidence offered that meets the strict requirement that the risk of injury or loss to person or property be extraordinary or imminent." (Boldface omitted.) Donald relies on the Legislative history of section 1310(b) and *Gold v. Superior Court* (1970) 3 Cal.3d 275, 281 (*Gold*).

Considering a predecessor to section 1310(b) our Supreme Court held that "[b]y specifically conditioning the application of the statute upon the prevention of injury or loss to person or property the Legislature has determined that the exception should be operative only in a limited class of cases. This language, with its emphasis upon preventative action, imports a sense of urgency. While such situations are not

14

inconceivable, the necessity for immediate action to avert such potential injury or loss is not a common circumstance in the usual conservatorship proceeding. Thus, on its face, the language of the statute indicates (1) that the only instances properly falling within the ambit of the exception are those which present a necessity for preventive action against the particular risk contemplated by the statute; and (2) that such instances are probably rare. In sum, the language of this statute strongly suggests that the exception applies only to the exceptional case involving a risk of imminent injury or loss." (*Gold, supra*, 3 Cal.3d at p. 281.)

*Gold* supports Donald's contention that section 1310(b) should be narrowly construed to apply only to the exceptional case in which imminent injury or loss to a person or property is clear. Monetary loss may satisfy this standard. (*Conservatorship of McElroy* (2002) 104 Cal.App.4th 536, 557.) The Legislature recognized that "some situations present such an extraordinary risk of injury or loss that they require immediate intervention by the probate court to make orders which can be implemented immediately despite the filing of an appeal, and regardless of the result on appeal." (*Kane v. Superior Court, supra*, 37 Cal.App.4th at p. 1586.) Nevertheless, the application of section 1310(b) "must be clearly justified by a showing of risk of imminent injury or loss." (*Conservatorship of Hart* (1991) 228 Cal.App.3d 1244, 1261.)

The strict standard described in *Gold* was satisfied in this case. The circumstances here were extraordinary. The trust owned a $2 billion-asset facing an imminent "death spiral" absent its sale. Section 1310(b) may be used to prevent a substantial monetary loss (*Conservatorship of McElroy, supra*, 104 Cal.App.4th at p. 557), and here the evidence showed the potential loss to be at least $400 million. Donald's argument that the standard in section 1310(b) was not established fails to consider the facts as credited by the probate court.

Donald further argues that the legislative history of section 1310(b) shows that the statute does not apply where the "risk of loss . . . is only monetary" and the risk of invoking section 1310(b) is the loss of a unique asset. He assumes that in enacting section 1310(b) the Legislature intended only to "protect the well-being of those deemed

15

vulnerable by the law." Neither the plain language of the statute nor its legislative history supports Donald's argument. The Legislature did not qualify the language as Donald suggests. There is no limitation on its application to a unique asset. The relevant criteria is instead injury or loss to the person or property, regardless of the unique character of the asset. Had the Legislature intended to preclude application of section 1310(b) in cases involving a unique asset, it could easily have said so.

Similarly, the statute does not expressly limit its application to only those "deemed vulnerable by the law." Had the Legislature intended the statute apply to a select category of individuals the language of the statute would reflect such limitation. In any event, Donald ignores the evidence suggesting that, at the time the probate court invoked section 1310(b) he could be described as vulnerable under the law as he was determined to be at risk of making serious lapses in judgment and was found unable to manage his finances or to resist fraud and undue influence. Donald's argument that he was able to manage his own property and make business decisions conflicts with the probate court's finding that he was properly removed as trustee, which as previously discussed was supported by strong evidence.

### 4. *Donald's June 9, 2014 Revocation of the Trust Did Not Preclude the Clippers' Sale*

In a letter dated June 9, 2014, Donald informed Rochelle that he elected effective immediately to revoke the Sterling Family Trust. Donald argues the probate court abused its discretion in allowing Rochelle to sell the Clippers pursuant to a trustee's "wind up" powers under section 15407, subdivision (b) because that statute "should not extend to situations . . . involving a sale to increase assets."

A trust terminates when it is revoked. (§ 15407, subd. (a)(5).) "On termination of the trust, the trustee continues to have the powers reasonably necessary under the circumstances to wind up the affairs of the trust." (§ 15407, subd. (b); see *Botsford v. Haskins & Sells* (1978) 81 Cal.App.3d 780, 789 [after termination of trust, trustee can exercise powers necessary for winding up trust].) "The winding up process involves distribution and conveyance of the trust property to those entitled to it." (*Estate of Nicholas* (1986) 177 Cal.App.3d 1071, 1082.) Here, the Sterling Family Trust expressly

16

permitted the trustee to purchase and sell property. It authorized the trustee "[t]o purchase, exchange or sell for cash or upon terms at public or private sale any kind of property, real or personal . . . ."

Section 15407, subdivision (b) provides that the trustee shall retain powers necessary to wind up the trust. To the same effect is the Restatement Third of Trusts, section 89, which provides: "The powers of a trustee do not end on the trust's termination date but may be exercised as appropriate to the performance of the trustee's duties in winding up administration, including making distribution, in a manner consistent with the purposes of the trust and the interests of the beneficiaries." It further states, "Although the trust termination date has arrived, the trustee can properly exercise such powers as are reasonable and appropriate for the preservation of the trust property until the process of winding up is completed." (Rest.3d Trusts, § 89, com. d, p. 273.)

Donald's argument that the trustee does not have the power during the winding up period to increase the assets of the trust is not supported by section 15407 or any case interpreting it. Donald purports to rely on comment b to section 89 of the Restatement Third of Trusts, but that comment supports Rochelle's position, not his. Comment b to section 89 indicates that the trustee continues to act as trustee even after the termination date for a trust until the trust is "finally wound up." (Rest.3d Trusts, § 89, com. b., p. 271.) It further provides that the duration of the winding up period may depend on the complexity of the trust and the trustee retains the same duties as those held in administering the trust. (*Ibid.*) Donald's rule that a trustee cannot increase assets during the winding up process would lead to the absurd result that the trustee cannot seek the best possible result for beneficiaries, as he or she is required to do. (See *Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 888 [trustee has a duty of loyalty to administer trust in interest of beneficiaries]; *Estate of Vokal* (1953) 121 Cal.App.2d 252, 257 [a trustee must act in the best interests of the beneficiary]; § 16002 [trustee is bound by fiduciary duty].)

Moreover, here the credited evidence overwhelmingly shows that Rochelle acted in the beneficiaries' interest including Donald's interest when she sold the Clippers for $2 billion, an amount higher than Rochelle and her advisors thought possible. The amount

17

caused Donald to congratulate Rochelle. Additionally, the probate court found that the sale to Ballmer was necessary to preserve the unusually high sale price and afforded the trust a $400 million benefit over the next best price and substantially more than the team likely would have received at an NBA auction. Assuming Donald effectively revoked the trust on June 9, 2014, Donald fails to demonstrate such revocation precluded the probate court from authorizing the trustee to sell the Clippers in accordance with the terms of an agreement established prior to Donald's revocation.

## DISPOSITION

The trial court's order is affirmed. Respondent Rochelle Sterling is entitled to costs on appeal.

FLIER, J.

WE CONCUR:

BIGELOW, P. J.

RUBIN, J.